UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; PAMELA BONDI, in her official capacity as Attorney General; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; | § § § § § § § | CIVIL ACTION NO. _____ |
| | § | |
| Respondents, | § | |
| | § | |
| JOSH JOHNSON, in his official capacity as Acting Director of Immigration and Customs Enforcement's Enforcement and Removal Operations Dallas Field Office; THOMAS BERGAMI, in his official capacity as Warden of the Prairieland Detention Facility, | § § § § § § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |
| | § | |

**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS,
REQUEST FOR ORDER TO SHOW CAUSE &
COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF**

## I. INTRODUCTION

1.      Petitioner, Leqaa Kordia, has been confined in the Prairieland Detention Facility since March 14, 2025, over 1,500 miles from her home in New Jersey, because she attended a protest to mourn the dozens of family members in Palestine whom she has lost to war since October 7, 2023, and sent money to her family in Palestine.

1

2.       President Donald J. Trump, and members of his cabinet, have begun an assault on any noncitizen associated with advocacy for Palestinian rights. To President Trump and his cabinet, simply expressing sympathy for Palestinian people is itself support for terrorism. The United States Constitution, however, expressly prohibits such blatant viewpoint discrimination. And where the government seeks to confine someone, the Constitution demands exacting measures. The government must have a lawful reason for confining anyone and provide adequate procedures to safeguard against unlawful deprivations of liberty.

3.       None of these bedrock constitutional principles have been followed since the government began its confinement of Ms. Kordia in March 2025.  Ms. Kordia has lived in the United States since 2016, when she lawfully entered the country on a tourist visa. She maintained lawful status until 2022, when a trusted teacher at her school erroneously told her she could withdraw from the student visa program.

4.       Ms. Kordia is Palestinian and has lost an entire generation of her family to the catastrophic situation in the Gaza Strip ("Gaza").  This loss has inflicted an unimaginable toll on Ms. Kordia and her family. That is why, on a day trip to New York City while she was living in New Jersey, Ms. Kordia attended a Palestinian rights demonstration near Columbia University. Ms. Kordia has attended multiple Palestinian rights demonstrations before and since, without incident.

5.       From Ms. Kordia's perspective, the protest was peaceful, nonviolent, and gave her space to mourn her over one hundred family members and thousands of others who have died in Gaza since October 7, 2023. Despite this, police officers arrested dozens of people who attended the protest, including Ms. Kordia, for a local ordinance violation. Prosecutors swiftly dismissed the charges against Ms. Kordia in the interest of justice.

2

6.      Debates about the appropriate policy response to the military campaign in Gaza are indisputably matters of core public concern within the heartland of the First Amendment.

7.      Nonetheless, nearly a year later, in early March 2025, the federal government announced that it would begin taking enforcement action against noncitizens who exercised their First Amendment rights by publicly supporting Palestinian rights. Acting according to this viewpoint-discriminatory mandate, U.S. Department of Homeland Security ("DHS") agents investigated and surveilled nearly every aspect of Ms. Kordia's life. They sought to review her WhatsApp account, interrogated family members and neighbors, and took photos outside of her house. The investigation revealed nothing except that Ms. Kordia sent a single payment to a Palestinian family member in 2022, which itself is protected First Amendment association.

8.      Recognizing that DHS was investigating her, Ms. Kordia voluntarily met with immigration officers on March 13, 2025. During the interview, agents served her with a Notice to Appear in immigration court in Batavia, New York. In virtually any other similar case, she would have been released and fought her immigration case from her home.

9.      But because she attended a Palestinian rights demonstration and because she had sent money to a family member in Palestine, she was not released. Instead, after this interview, agents loaded her into an unmarked van and flew Ms. Kordia overnight to Prairieland Detention Facility in Alvarado, Texas, while she was fasting and observing the holy month of Ramadan. On the next day, March 14, 2025, DHS and its Secretary, Kristi Noem, released a statement alleging, without citing to any evidence, that Ms. Kordia "supported Hamas."

10.     At a bond hearing, DHS claimed Ms. Kordia was a danger because of her involvement in an April 2024 protest and a single monetary payment she made to a family member in Palestine. Thus, DHS is expressly confining Ms. Kordia because of her speech (the protest) and

her association (the monetary payment), which the First and Fifth Amendments forbid. Recognizing that Ms. Kordia is neither a danger to the community nor a flight, risk, on April 3, 2025, an immigration judge granted her release on payment of a $20,000 bond.

11.    DHS's animosity towards speech and expressive conduct in support of Palestinian rights motivated DHS to appeal that determination, using its automatic stay powers to administratively stay the bond order potentially for 130 days, at a minimum. Thus, Ms. Kordia has remained confined in a detention center over 1,500 miles from home, even though an immigration judge found that confinement unnecessary and without DHS having to justify her continued confinement pending appeal.

12.    What is more, since the start of Ms. Kordia's immigration confinement at the Prairieland Detention Facility on March 14, 2025, Warden Thomas Bergami and Acting Director of the Immigration and Customs Enforcement ("ICE") Dallas Field Office Josh Johnson ("Director Johnson") have routinely violated Ms. Kordia's religious liberty. Since being confined, Ms. Kordia, a practicing Muslim, has not had *a single* halal meal, even though the detention center accommodates the religious dietary needs of other people in custody, including Jewish people who observe a kosher diet. As a result, Ms. Kordia has experienced significant weight loss. In addition, Respondents are constructively denying Ms. Kordia the ability to pray because facility staff either do not have or refuse to provide any of the materials that Ms. Kordia sincerely believes her faith requires for her to pray at appropriate times during the day.

13.    To remedy her unlawful confinement, Ms. Kordia seeks two primary forms of relief: First, under 28 U.S.C. § 2241, Ms. Kordia asks this Court to issue a writ of habeas corpus directing Respondents to release Ms. Kordia because her continued confinement violates the First Amendment, procedural due process, and substantive due process.

14.    At a minimum, Ms. Kordia requests this Court to order Respondents to show cause demonstrating why she should not be released within three days. 28 U.S.C. § 2243.

15.    Second, under the Religious Freedom Restoration Act (42 U.S.C. § 2000bb-1(c)), Ms. Kordia brings claims against Respondents Bergami and Johnson for substantially burdening her sincerely held religious beliefs without adequate justification. She therefore seeks declaratory and injunctive relief against Bergami and Johnson to remedy these violations of religious liberty.

## II. JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, and Article I, § 9, cl. 2 (the Suspension Clause). The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651 and the Declaratory Judgment Act, 28 U.S.C. § 2201.

17.    Venue is proper in this district pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 1391 because Ms. Kordia is detained in the Prairieland Detention Facility in Alvarado, Texas, within the Northern District of Texas, Dallas Division.

## III.    PARTIES

18.    Petitioner Leqaa Kordia was born in Palestine and was lawfully admitted to the United States in 2016. Until her arrest and confinement by ICE, she had been living with her family in New Jersey. She is a practicing Muslim and is confined at the Prairieland Detention Facility in Alvarado, Texas because she protested in support of Palestinian rights and provided financial support to a Palestinian relative. Respondents have continued to confine Ms. Kordia in retaliation for her protected speech and association in violation of the First Amendment. Respondents have also presented inadequate evidence that she poses a danger or a flight risk, yet continue to take steps to prolong her confinement, in violation of her rights under the Fifth Amendment.

19.    Respondent Kristi Noem is named in her official capacity as the Secretary of the

5

Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(a); is legally responsible for pursuing any effort to confine and remove the Petitioner; and as such is a custodian of Ms. Kordia. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

20.      Respondent Pamela Bondi is named in her official capacity as Attorney General of the United States. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(g); and as such is a custodian of Ms. Kordia. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

21.      Respondent Todd Lyons is named in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States and is legally responsible for pursuing any effort to remove Ms. Kordia and confine her pending removal. As such, he is a custodian of Ms. Kordia. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-590.

22.      Respondent Josh Johnson is named in his official capacity as Acting Director of the ICE Enforcement & Removal Operations ("ERO") Dallas Field Office in Dallas, Texas. In this capacity, he is responsible for the administration of immigration laws and the execution of immigration confinement and the institution of removal proceedings within North Texas, which is the jurisdiction where Ms. Kordia is confined. As such, he is a custodian of Ms. Kordia. Johnson acts under color of law as an official of the United States, 42 U.S.C. § 2000bb-2(1), and is

6

responsible for ensuring compliance with federal religious liberty protections. Respondent-Defendant Johnson's address is 8101 North Stemmons Freeway, Dallas, Texas 75247.

23.     Respondent Thomas Bergami is named in his official capacity as the Warden of Prairieland Detention Facility. In this capacity, he oversees the daily administration of the detention center where Ms. Kordia is in custody. As such, he is a custodian of Ms. Kordia. In his official capacity, Warden Bergami acts under color of law as an official of the United States responsible for the administration of detention centers within the jurisdiction of the Dallas Field Office, 42 U.S.C. § 2000bb-2(1), and is responsible for ensuring compliance with federal religious liberty protections. Respondent Bergami's address is 1209 Sunflower Lane, Alvarado, Texas 76009.

## IV.    STATEMENT OF FACTS

### A. Ms. Kordia Is Legally Admitted to the United States and Has Lived Peacefully Among Her Community.

24.     Ms. Kordia is a thirty-two-year-old woman who was born in Jerusalem, Palestine in 1992. Ms. Kordia grew up in the West Bank of Palestine. As a young girl, her parents divorced, and Ms. Kordia stayed in the West Bank with her father.

25.     On or around January 2016, Ms. Kordia decided to apply for a B-2 Visitor Visa to travel to the United States. Once Ms. Kordia's visa was granted, she lawfully entered the United States at John F. Kennedy Airport on or about March 19, 2016, on B-2 status.

26.     Once in the United States, Ms. Kordia was reunited in New Jersey with her mother. From 2016 until she voluntarily met with immigration agents on March 13, 2025, Ms. Kordia lived among family, friends, and teachers in Paterson, New Jersey.

27.     In early 2017, Ms. Kordia adjusted her status to that of an F-1 international student to study English. Ms. Kordia studied English for seven years at two Student and Exchange Visitor

Program-certified institutions—initially at Uceda Paterson and later at Bergen County Career Advancement Training, Inc.

28.     Around the same time, Ms. Kordia's mother filed a family-based visa petition on behalf of Ms. Kordia. The filing of that visa petition is the first step in a two-step process to adjusting to Lawful Permanent Resident ("LPR") status.   United States Citizenship and Immigration Services ("USCIS") received this petition on or about June 5, 2017, and approved it on or about May 6, 2021. Once a visa is available for Ms. Kordia, she can continue the process of adjusting her status to become a Lawful Permanent Resident.

29.     Acting on incorrect advice from a teacher and mentor that she trusted, Ms. Kordia believed that the government approving her mother's petition afforded her lawful immigration status while she awaited adjustment to permanent residence. Relying on that advice, on January 24, 2022, she signed an official termination notice withdrawing from her F-1 program, which was approved by her school on January 26, 2022.

30.     Prior to ICE's initiation of removal proceedings against her, Ms. Kordia believed that she had lawful status based on the incorrect information she received from her teacher and thought she was close to becoming a Lawful Permanent Resident.

31.     In addition to her family-based petition, Ms. Kordia also has strong claims for asylum, withholding of removal, and protection under the Convention Against Torture and Deferred Enforced Departure plan, which protects qualified Palestinian nationals from removal.

**B. Ms. Kordia Attends a Protest on a Matter of Dire Public Concern.**

32.     Since October 7, 2023, Ms. Kordia has lost over 100 family members to the military campaign of the Israeli government in Gaza—almost an entire generation of her family. To mourn the family she had lost, Ms. Kordia attended several peaceful demonstrations in support of Palestinian human rights.

8

33.     In the Spring of 2024, Columbia University students held a series of demonstrations opposing military violence and supporting Palestinian rights, alongside students at dozens of college campuses across the country. At this time, Ms. Kordia was living with her mother in New Jersey. On April 30, 2024, while on a day trip to New York City, Ms. Kordia attended such a protest on the public street outside the closed gates of Columbia University, as she had done on other occasions.

34.     Ms. Kordia was moved to join this demonstration and others because of the sense of loss she felt, and still feels, from losing an entire generation of her family in Gaza. This helped her begin to mourn for the family she had lost. The demonstration, at least where Ms. Kordia stood, was peaceful and nonviolent. Ms. Kordia joined in the group's chanting "ceasefire now!" and "end the siege on Gaza!" among other slogans.

35.     New York Police Department ("NYPD") officers appeared at the protest and ordered the demonstrators to disperse. Before she could leave, though, officers arrested Ms. Kordia and placed her in a transport van with dozens of others. Officers transported Ms. Kordia along with a large group of others to a holding facility before releasing her the following day. Ms. Kordia was initially given a court date but was later informed that the charges had been dismissed without her ever having to appear in court.

36.     Ms. Kordia continues to believe strongly in peace and advocating for Palestinian rights, including her own. Ms. Kordia has attended other Palestinian rights demonstrations without incident.

37.     Ms. Kordia continued living with her mother, surrounded by loved ones, in New Jersey until ICE confined her in March 2025.

**C. The Government Begins the Targeted Suppression of Palestinian Rights Advocacy.**

38.     When running for president in 2023 and 2024, then-candidate Trump repeatedly told his supporters that he would use immigration enforcement measures against noncitizen students engaged in First Amendment activity supportive of Palestinians or critical of the actions of the Israeli government.

39.     For example, at a rally in Las Vegas on October 28, 2023, then-candidate Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[1]

40.     After the student movement to bring attention to atrocities in Gaza ramped up in spring 2024, then-candidate Trump promised campaign donors, should he be elected, "any student that protests [the military campaign in Gaza], I throw them out of the country."[2] He specifically targeted students from foreign countries, saying "[T]here are a lot of foreign students. As soon as they hear that [they will be targeted], they're going to behave."[3]

41.     Candidate Trump made clear that he intended to stifle advocacy for Palestinian rights, stating: "If you get me reelected, we're going to set that movement [for Palestinian rights] back 25 or 30 years."[4]

42.     At least one cabinet level official currently in the Trump Administration expressed similar views during this time. On October 15, 2023, then-Senator Marco Rubio, referring to

---

[1] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro- Palestinian protesters*, Reuters (Jan. 29, 2025), https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.

[2] John Dawsey et. al, *Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/

[3] *Id.*

[4] *Id.*

ongoing student protests in support of Palestinians, stated the U.S. government should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[5]

43.     Once he assumed office, President Trump made good on his promise to target student advocates. On January 29, 2025, President Trump issued Executive Order 14188, Fed. Reg. 8847 (Jan. 29, 2025), directing agency heads to "identify[] all civil and criminal authorities . . . that might be used to combat anti-Semitism." The Executive Order also specifically authorized the Department of Homeland Security and Secretary of State to investigate and remove noncitizens believed to be engaged in "antisemitic" activity. *Id.*

44.     The Executive Order, under the banner of prohibiting antisemitism, relied on a 2019 Executive Order's definition of antisemitism that included lawful, protected speech such as "claiming that the existence of a State of Israel is a racist endeavor" and "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis," among other examples, E.O. 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019) (incorporating International Holocaust Remembrance Alliance's definition of antisemitism, available at: https://holocaustremembrance.com/resources/working-definition-antisemitism). Thus, the Executive Order, and the individual enforcement actions taken pursuant to it, specifically targeted protected First Amendment activity that this administration disagrees with, for both citizens and noncitizens alike.

45.     Confirming the viewpoint-discriminatory nature of the Executive Order, President Trump decried "leftist, anti-American colleges and universities," and said, "to all the resident aliens who joined in the pro-jihadist protests," "we will find you, and we will deport you."[6] For

---

[5] Marco Rubio, *X* (Oct. 15, 2023, 4:24 p.m.), https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

[6] *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, White House (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-

students on visas, President Trump promised to "quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."[7]

46.     Executive Order 14188 followed an even broader executive order that targets any protected speech of noncitizens if the administration views it to reflect "hateful ideology" or "hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." Fed. Reg. 14161 (Jan. 20, 2025). The terms of this order are so broad that they target a diverse array of protected speech, including constitutionally protected advocacy for Palestinian rights. The Executive Order targets, for example, "hostile attitudes" towards American "institutions" in the form of reasonable, lawful disagreement with government policy. Or, as the case here, "hateful ideology" may include a Palestinian woman mourning family she has lost as a result of war by saying, "Ceasefire Now."

47.     These proclamations reach far beyond the government's power to regulate speech. Peaceful demonstrations in support of Palestinian rights are indisputably protected speech and association on a matter of grave public concern. Through his comments as a candidate, and then through his executive orders as President, President Trump sought to silence what he viewed as "pro-jihadist protests," notwithstanding the impossible task of differentiating between natural concern for the human toll of war and allegedly pro-terrorist speech. That the President believes expressing concern for Palestinians constitutes "pro-jihadist protest" does not give him authority to enforce that view on the rest of the country by punishing the expression of different viewpoints.

48.     Relying on these executive orders, groups and organizations opposed to Palestinian rights protests began publicizing names of individuals they wanted the U.S. government to deport.

---

forceful-and-unprecedented-steps-to-combat-anti-semitism/

[7] *Id.*

The groups compiled lists of students who were publicly identifiable as having organized Palestine-related protests, engaged in Palestine-related advocacy, or otherwise appeared to voice opinions supportive of Palestinians, and upon information and belief, submitted these tips to ICE's tip line.[8]

49.    For example, Betar USA,[9] an extremist group that has openly embraced Islamophobia and indicated a desire to work with the far-right extremist group the Proud Boys, has published lists of individuals, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump Administration."[10] Betar USA's Executive Director has met with prominent lawmakers and claims credit for providing information that led to the immigration arrest of an international student.[11]

50.    Canary Mission, an organization dedicated to targeting students, student organizations, and faculty who advocate for Palestinian rights, has similarly proclaimed it has identified "suspected foreign nationals" that it would like to see deported.[12]

51.    Other organizations, such as the Middle East Forum, have indicated they are proactively sharing information with the U.S. government about noncitizens, without publicly

---

[8] Natasha Lennard & Akela Lacy, *The Columbia Network Pushing Behind the Scenes to Deport and Arrest Student Protestors*, The Intercept (Feb. 15, 2025), https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/.

[9] Betar is a self-described "Zionist" movement. *See* https://betarus.org/. The Anti-Defamation League has labeled Betar USA an extremist group.

[10] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.

[11] Anna Betts, *Pro-Israel group says it has 'deportation list' and has sent 'thousands' of names to Trump officials*, The Guardian (Mar. 14, 2025), https://www.theguardian.com/us-news/2025/mar/14/israel-betar-deportation-list-trump.

[12] *Id.*

identifying the specific individuals.[13]

52.    Predictably, this resulted in widespread fear of retaliation for speech supporting Palestinian rights among noncitizen students. Reporting has shown that the executive orders "already appear to be chilling political activism."[14]

53.    On or before Wednesday March 5, 2025, Respondents and others adopted a policy by which they would retaliate against and punish noncitizens, including Ms. Kordia, for their actual or perceived advocacy for Palestinian rights.

54.    Under the policy, the U.S. Department of State and DHS would seek to identify any noncitizen associated with protests supportive of Palestinian human rights. One way to target individuals would be to identify any noncitizen who had been arrested during protests associated with Palestinian rights advocacy on or around campuses, regardless of whether they had participated in the protest, their actual activity during any protest, the nature of any of the conduct charged, or the ultimate outcome or disposition of any of these arrests.[15]

55.    Under the policy, Respondents and others would also identify noncitizen students or faculty generally associated with protests for Palestinian lives and freedom occurring on or around campuses or who espoused views supportive of Palestinian human rights.

56.    On March 6, 2025, the Department of State confirmed the commencement of this

---

[13] Zolan Kanno-Youngs, Tyler Pager & Hamed Aleaziz, *As Trump Broadens Crackdown, Focus Expands to Legal Immigrants and Tourists*, N.Y. Times (Mar. 21, 2025) https://www.nytimes.com/2025/03/21/us/politics/trump-immigration-visa-crackdown.html.

[14] Tovia Smith, *Foreign students say the threat of Trump's executive orders is getting real*, NPR (Mar. 3, 2025), https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreign-students-protests-hamas-hezbollah-israel.

[15] *See, e.g.,* Esther Wang, *A New Yorker and His Dog Were Swept Up in the Violent Arrests at the City College Protest*, Hell Gate, May 9, 2024, https://hellgatenyc.com/omar-neptune-dog-swept-up-city-college-arrests/ (describing how individual who resides near City College campus was arrested while walking dog near City College on same night NYPD entered City College campus in response to encampment, and reporting that a friend from neighborhood dog walking group was also arrested that evening).

policy to the press.

57.    Specifically, on March 6, 2025, the Department of State informed Fox News that it had revoked the student visa of a noncitizen who was "cited for criminal behavior in connection with Hamas-supporting disruptions. This individual was a university student. ICE will proceed with removing this person from the country."[16]

58.    Additionally, on March 6, 2025, the Department of State announced a program called "Catch and Revoke," an artificial-intelligence-driven effort to "cancel the visas of foreign nationals who appear to support Hamas or other designated terror groups."[17]

59.    Government officials confirmed that they would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged terrorist sympathies."[18] The announcement did not clarify how the government would determine someone held "terrorist sympathies."

60.    Government officials also said they would be reviewing civil lawsuits brought against organizations and individuals engaged in or perceived to be engaged in advocacy for Palestinian human rights that purport to "highlight foreign nationals allegedly engaged in antisemitic activity without consequence."[19]

61.    Since March 6, 2025, the Trump Administration has engaged in retaliatory immigration enforcement against individuals who engaged in protected First Amendment

---

[16] Louis Casiano, Bill Melugin, *State Department revokes first visa of foreign student linked to "Hamas-supporting disruptions,"* Fox News (Mar. 6, 2025), *available at* https://www.foxnews.com/politics/state-department-revokes-first-visa-foreign-student-linked-hamas-supporting-disruptions.

[17] *Id.*

[18] *Id.*

[19] *Id.*

activity—more specifically, those engaged or perceived to have engaged in Palestinian rights advocacy or any criticism of Israel or of U.S. support for Israel's military campaign in Gaza.

### *Mahmoud Khalil*

62.    On March 8, 2025, Homeland Security Investigations ("HSI") agents arrested Mahmoud Khalil in the vestibule of his apartment building near Columbia University, at approximately 8:30 p.m.[20] Mr. Khalil is a U.S. lawful permanent resident and master's student at Columbia's School of International and Public Affairs.[21] Mahmoud Khalil has been an outspoken advocate for Palestinian human rights.[22] After his arrest, and similar to the press release made about Ms. Kordia, multiple government officials made statements confirming that Mr. Khalil had been targeted for arrest and detention for his speech and protest activity. For example, on March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University."

63.    The President emphasized that Mr. Khalil's arrest was "the first of many to come," declaring that his Administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[23]

64.    The same day, DHS issued a statement through its social media account on X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive

---

[20] *Id.*

[21] McKinnon de Kuyper, *Mahmoud Khalil's Lawyers Release Video of His Arrest*, N.Y. Times (Mar. 15, 2025), *available at* https://www.nytimes.com/video/us/politics/100000010054472/mahmoud-khalils-arrest.html.

[22] *Id.*

[23]    Donald    J.    Trump,    Truth    Social    (Mar.    10,    2025,    1:05    p.m.),    *available    at* https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to [sic] Hamas, a designated terrorist organization," and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[24]

65.    In a press conference regarding Mr. Khalil on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities," and "if you end up having a green card . . . we're gonna kick you out."[25]

66.    Within hours of Mr. Khalil's arrest, and, again, just like with Ms. Kordia, ICE was arranging to move him to an immigration detention facility in Jena, Louisiana, more than a thousand miles away from his home, his eight-months-pregnant U.S. citizen wife, his community, his lawyers, and the federal district court where he had promptly filed a habeas corpus petition challenging the constitutionality of his confinement.

67.    Federal government officials also made clear that Mr. Khalil was not the only noncitizen they had acted against.

### *Ranjani Srinivasan*

68.    On March 5, 2025, the Department of State informed a graduate student at Columbia University, Ranjani Srinivasan, that her F-1 student visa had been cancelled. The U.S.

---

[24] Dep't of Homeland Sec., *X* (Mar. 9, 2025, 9:29 p.m.), https://x.com/DHSgov/status/1898908955675357314; *see* Surina Venkat, *Department of Homeland Security confirms arrest of Palestinian activist Mahmoud Khalil, SIPA '24*, Colum. Spectator (Mar. 10, 2025), *available at* https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/.

[25] *Secretary of State Marco Rubio Remarks to Press*, U.S. Dep't of State (Mar. 12, 2025), http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/.

Consulate in Chennai did not explain why her visa had been cancelled.[26] On March 9, 2025, Columbia informed Ms. Srinivasan that DHS had terminated her student status.[27]

69.    On March 14, 2025, Secretary of Homeland Security Kristi Noem issued a post on X, accompanied by a video of Ranjani Srinivasan: "I'm glad to see one of the Columbia University terrorist sympathizers use the CBP Home app to self deport."[28]

70.    That same day, the Department of Homeland Security issued a press release, describing Ms. Srinivasan and Ms. Kordia as Hamas supporters and referencing their protected activity.

71.    The DHS press release described Ms. Srinivasan as having "advocat[ed] for violence and terrorism" and as being "involved in activities supporting Hamas, a terrorist organization," without providing any description or information to support such a claim.[29]

72.    Later reporting confirmed that DHS's primary motivation for identifying and targeting Ms. Srinivasan was the agency's perception of her involvement in student protests at Columbia University, and critically that this perception was due to her arrest in April 2024, the same day that protesters who had taken over Hamilton Hall at Columbia were arrested, notwithstanding that she was not involved in the protest.[30] Ms. Srinivasan has since stated

---

[26] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html.

[27] *Id.*

[28] Kristi Noem, *X* (Mar. 14, 2025, 11:01 a.m.), *available at* https://x.com/Sec_Noem/status/1900562928849326488.

[29] *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dep't of Homeland Sec. (Mar. 14, 2025), *available at* https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and.

[30] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), available at https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html ("The department did not state how the two summonses made her a terrorist sympathizer.").

repeatedly that she was trying to return home after a departmental picnic that day, when she was caught between protesters and the police barricades.[31]

### *Dr. Badar Khan Suri*

73.     On March 17, 2025, ICE arrested a third individual, Dr. Badar Khan Suri, a post-doctoral fellow at Georgetown University. Agents arrested him outside his home in Arlington, Virginia, where he lives with his U.S. citizen wife and their three children.[32] Later, DHS Spokesperson Tricia McLaughlin claimed, without substantiation, that Dr. Suri, an Indian national, "was spreading Hamas propaganda and promoting antisemitism on social media."[33]

74.     Similar to ICE's treatment of Ms. Kordia, within twenty-four hours of his arrest, ICE transferred Dr. Suri halfway across the country. Dr. Suri is now confined at the same facility where Ms. Kordia is confined, the Prairieland Detention Facility, in Alvarado, Texas.[34]

75.     No government official has explained whether or how Dr. Suri's civil immigration confinement prevents danger to the community or a risk of flight from immigration enforcement, nor why he should be confined hundreds of miles away from his wife and their young children.

### *Momodou Taal*

76.     The government's retaliatory campaign has caused noncitizen students who may otherwise be exposed to the viewpoint-discriminatory and retaliatory immigration targeting of the administration to seek protection from the courts. These defensive efforts have themselves only given rise to further government retaliation.

---

[31] *Id.*

[32] Kyle Cheney & Josh Gerstein, *Trump is seeking to deport another academic who is legally in the country, lawsuit says*, Politico (Mar. 19, 2025), *available at* https://www.politico.com/news/2025/03/19/trump-deportation-georgetown-graduate-student-00239754.

[33] *Id.*

[34] Am. Pet., *Suri v. Trump*, No. 25-cv-480 (E.D.Va. Apr. 8, 2025), ECF No. 34, ¶ 66-67.

77.    Momodou Taal, a doctoral student in Africana Studies at Cornell University came to the United States as an F-1 student visa holder. Beyond his academic work and other service at Cornell, Mr. Taal was active in student protests of U.S. foreign policy, particularly its military and financial support for Israel.[35]

78.    As Mr. Taal became more prominent in his advocacy, groups and organizations opposed to Palestinian rights began calling on ICE to target, arrest, and deport Mr. Taal for his participation in protest. On March 13, 2025, for example, Betar USA posted on X a "Deport Alert" that specifically named Mr. Taal as a target.[36]

79.    In response to these impending threats, on March 15, Mr. Taal and two others filed a Complaint and Motion for Temporary Restraining Order in the Northern District of New York seeking an injunction against implementation of Executive Order 14188 and Executive Order 14188, and the application of the aforementioned Policy with respect to himself.[37] The court issued an order setting an in-person hearing on March 25, 2025 to address the merits of the Complaint and Motion.[38]

80.    On the morning of March 19, as part of Respondents' ongoing effort to enforce an unlawful policy of targeting non-citizens for arrest and detention, and in response to Mr. Taal's efforts to seek the court's protection, two undercover law enforcement officers appeared in the

---

[35] *See* Pet. ¶ 32, ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00355 (N.D.N.Y. Mar. 13, 2025).

[36] Betar USA (@Betar_USA), *X* (March 13, 2025, 10:38 a.m.), *available at* https://x.com/Betar_USA/status/1900194755050434943 ("Deport alert: Momodou Taal Affiliation: Cornell University Role: Graduate student Countries of Origin: Gambia and the United Kingdom"); *see also* Pet. ¶¶ 36-38, ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00355 (N.D.N.Y. Mar. 13, 2025) (describing concerted campaign targeting Mr. Taal for deportation under the Policy).

[37] *See* Pet., ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00355 (N.D.N.Y. Mar. 13, 2025).

[38] *See* ECF No. 19, *Taal et al. v. Trump et al*, No. 3:25-00355 (N.D.N.Y. Mar. 19, 2025).

parking lot of Mr. Taal's residence.[39] The same day, Mr. Taal filed an emergency motion, again seeking the court's protection via injunction.[40]

81.    In response to Mr. Taal's effort at self-protection against retaliation, the government doubled down. In the early hours of March 21, attorneys from the U.S. Department of Justice emailed counsel for Mr. Taal, informing counsel that ICE intended to arrest and detain Mr. Taal, and inviting Mr. Taal to surrender to HSI.[41]

82.    Later, government officials conceded in filings to the Northern District of New York that DHS agents had identified Mr. Taal by conducting a review of publicly available information in line with the directives of Executive Order 14188 on antisemitism. An HSI official confirmed to the Court that it had referenced this Executive Order when communicating with the State Department concerning Mr. Taal.[42]

83.    Mr. Taal has since decided to leave the United States, stating: "Given what we have seen across the United States, I have lost faith that a favourable ruling from the courts would guarantee my personal safety and ability to express my beliefs," and "I have lost faith I could walk the streets without being abducted. Weighing up these options, I took the decision to leave on my own terms."[43]

---

[39] Malcolm Ferguson, *The Sinister Way Trump's DOJ Tried to Deport Cornell Student Protester*, New Republic (Mar. 21, 2025), *available at* https://newrepublic.com/post/193038/justice-department-deport-cornell-palestine-student-protester-momodou-taal.

[40] *Id.*

[41] *See* ECF No. 25, *Taal et al. v. Trump et al*, No. 3:25-00355 (N.D.N.Y. Mar. 19, 2025).

[42] *See* Dec. of Roy Stanley, Defendants' Opp'n to Motion for Preliminary Injunction and Temporary Restraining Order, *Taal et al. v. Trump et al.*, No. 3:25-00355 (N.D.N.Y. Mar. 19, 2025), ECF No. 30-2.

[43] Momodou Taal, X, Mar. 31, 2025 (6:55pm), https://x.com/MomodouTaal/status/1906842790778057173.

### *Rümeysa Öztürk*

84.     Rümeysa Öztürk is a PhD student at Tufts University. Ms. Öztürk is from Turkey.[44]

85.     On March 26, 2024, almost exactly one year before her arrest, Ms. Öztürk co-authored an op-ed in *The Tufts Daily*. The piece criticized Tufts University's response to several student Senate resolutions concerning human rights violations in Gaza. The authors urged meaningful engagement by the University administration with the Senate resolutions.  In early 2025, the website Canary Mission targeted Ms. Öztürk, claiming she had engaged in "anti-Israel activism" for co-authoring the op-ed.

86.     On March 25, 2025 at approximately 5:15 p.m., hooded, plainclothes officer approached her near her Somerville apartment. Five other agents surrounded her, took her phone, and whisked her away in a car. Similar to with Ms. Kordia, on the evening of her arrest, ICE transported Ms. Öztürk to Lebanon, NH, and then later to St. Albans, VT. In the early morning of March 26, 2025, agents placed Ms. Öztürk on a flight out of Burlington, VT, and then, eventually, to a detention center in Louisiana, over 1000 miles from home.

87.     In her removal proceedings, DHS submitted a memo from a Department of State employee which laid out the reasoning for targeting her, specifically due to her associations, "*including* co-authoring an op-ed that found common cause with an organization that was later temporarily banned from campus."

88.     On March 28, 2025, Secretary of State Marco Rubio delivered remarks to the press regarding Ms. Öztürk's detention.[45] Secretary Rubio stated in response to a question about Ms.

---

[44] Unless otherwise noted, all facts related to Ms. Öztürk's arrest and detention come from *Öztürk v. Trump*, 2025 WL 1145250 (D. Vt. Apr. 18, 2025).

[45] U.S. Department of State, *Secretary of State Marco Rubio Remarks to the Press* (Mar. 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3.

Öztürk, "The activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States." Secretary Rubio further indicated that Ms. Öztürk's confinement was the government "basically asking them to leave the country." He explicitly noted that "that's why they've been detained."

89.    On April 18, 2025, the District of Vermont held that Ms. Öztürk raised substantial questions as to whether her confinement violated the Constitution.[46]

### *Yunseo Chung*

90.    Yunseo Chung is a 21-year-old lawful permanent resident and junior at Columbia University.[47]

91.    On March 5, 2025, Ms. Chung was arrested outside a building on the Columbia University campus.[48] Students and other protesters had staged a sit-in inside an academic building (Milstein) at Barnard College on March 5, 2025, to demand that Barnard reverse the expulsions of the three students.[49] Ms. Chung did not organize the protest, speak to the media about it, or otherwise play a leading role. Rather, she was one participant among many protesting the university's handling of student discipline over Palestine-related speech.

92.    On March 9, 2025, the day after agents arrested Mr. Mahmoud Khalil, an ICE agent informed an attorney for Ms. Chung that "due to the situation with the protesting"[50] the Department

---

[46] *Öztürk v. Trump*, 2025 WL 1145250 (D. Vt. Apr. 18, 2025).

[47] Unless otherwise noted, all references to Ms. Chung's circumstances are pulled from the complaint in Chung v. Trump, No. 25-cv-2412 (S.D.N.Y. Mar. 24, 2025), ECF No. 1.

[48] These charges were dismissed on April 14, 2025. *See Chung v. Trump*, No. 25-cv-2412 (Apr. 29, 2025), ECF No. 41-1.

[49] Sarah Huddleston, *Pro-Palestinian protesters stage sit in in Milstein lobby*, Colum. Spectator (Mar. 5, 2025), available at https://www.columbiaspectator.com/news/2025/03/05/pro-palestinian-protesters-stage-sit-in-in-milstein-lobby/.

[50] Ex. M, Dec. of Sonya Levitova, Mot. for Temporary Restraining Order, *Chung v. Trump*, No. 25-cv-2412 (S.D.N.Y. Mar. 24, 2025), ECF No. 9-13, ¶ 8.

of State could revoke her LPR status.

93.    On March 25, 2025, a court issued a temporary restraining order, prohibiting ICE from detaining Ms. Chung.[51]

94.    After Ms. Chung filed suit, the government submitted documentation in her case confirming that they were looking to confine and deport her because of her "beliefs, statements, or associations."[52]

### *Mohsen Mahdawi*

95.    On April 14, 2025, ICE agents arrested Mohsen Mahdawi after he completed an interview pursuant to his application for U.S. citizenship.[53]

96.    Mr. Mahdawi is a Palestinian LPR and a student at Columbia University.

97.    Mr. Mahdawi has participated in protests and demonstrations supporting Palestinian human rights. Prior to his arrest by ICE, private actors had targeted Mr. Mahdawi, arguing that he should be next on the government's list of people to deport.[54]

98.    ICE agents immediately attempted to transfer Mr. Mahdawi outside of Vermont but were prevented from doing so.[55]

---

[51] Order, Chung v. Trump, No. 25-cv-2412 (S.D.N.Y. Mar. 25, 2025), ECF No. 19.

[52] Ex. A, Decl. of Marina Vides, Motion to Dismiss, *Chung v. Trump*, No. 25-cv-2412 (S.D.N.Y. April 11, 2025), ECF No. 34.

[53] *See* Order, *Mahdawi v. Trump*, No. 25-cv-389 (D. Vt. Apr. 24, 2025), ECF No. 34, at 1.

[54] Pet., *Mahdawi v. Trump*, No. 25-cv-389 (D. Vt. Apr. 14, 2025), ECF No 1, ¶ 41, 49.

[55] *See* Order, *Mahdawi v. Trump*, No. 25-cv-389 (D. Vt. Apr. 24, 2025), ECF No. 34, at 1.

99.    The government confined and seeks to deport Mr. Mahdawi because of his speech and protest activities in support of Palestinian human rights. A federal district judge ordered Mr. Mahdawi released pursuant to *Mapp v. Reno* on April 30, 2025.[56] 241 F.3d 221, 230 (2d Cir. 2001).

\*\*\*

100.    Ultimately, immigration officials have exercised extraordinary and unprecedented power by arresting, detaining, transferring, and initiating removal proceedings against lawful immigrants who the administration perceives as political dissidents. This includes detaining individuals who, had they not been somehow associated with advocacy for Palestinian rights, would never be detained, such as those without criminal histories who have lived in the United States for years with lawful status. The recent crackdown represents a stark and unprecedented departure from prior practice.

### D. Ms. Kordia Is Confined as Part of the Crackdown and Transferred to Prairieland Detention Facility.

101.    Amid the hostile crackdown on noncitizens engaged in or associated with Palestinian rights advocacy, HSI agents at the Newark office of the Department of Homeland Security began investigating Ms. Kordia for alleged "national security violations." At no point in their investigation did HSI agents find, identify, or define these supposed national security violations nor find evidence of such violations. From March 5 through 13, 2025, HSI agents spoke with multiple people associated with Ms. Kordia, including her mother, uncle, a clothing store owner, and tenants of an apartment she briefly rented. They also subpoenaed records from MoneyGram, established a trace on her WhatsApp messaging account, and requested records from

---

[56] *Mahdawi v. Trump, et al.*, 2025 WL 1243135, at \*8 (D.Vt., 2025).

NYPD related to the April 2024 demonstration for Palestinian rights.

102.   There is still no evidence that agents found any indication of "national security violations." Instead, this in-depth investigation only revealed a single wire transfer from February 2022 in which Ms. Kordia sent $1,000 to a family member still living in Palestine.

103.   Tellingly, the agents also took a photo of Ms. Kordia's mother's front porch, where "Palestine" is written.

104.   As part of the investigation, on March 6, 2025, HSI agents visited Ms. Kordia's mother's home and interrogated her. Her mother, nervous about talking to the police and struggling to speak English, her second language, called Ms. Kordia in the agents' presence. The agents told Ms. Kordia over the phone that there was an issue with her immigration status and that they needed to speak with her. Initially, Ms. Kordia agreed to meet the agents alone. After consulting others, though, she decided to hire an attorney first to have representation prior to any conversation with immigration officers.

105.   Once Ms. Kordia retained an attorney, her attorney arranged a meeting with HSI agents. Ms. Kordia voluntarily presented herself, with counsel, to agents at the Newark Field Office on March 13, 2025. While being processed by ICE, agents conducted a standard Risk Classification Assessment ("RCA"), which is intended to help ICE make custody determinations and assess conditions for release, including bond. Ms. Kordia's RCA rated her as low risk across all risk factors, including risk to public safety, flight risk, and criminal history. Indeed, Ms. Kordia has never been convicted of a crime and her RCA lists no criminal history. Despite the RCA's determination of low risk and her long ties to her community, ICE confined her without bond.

106.   Initially, ICE agents issued Ms. Kordia a Notice to Appear ("NTA"), notifying her of the initiation of removal proceedings against her. When she submitted to ICE's custody, her

original NTA scheduled her to appear at the Batavia Immigration Court in Buffalo, New York.

107.    Immediately after officers processed Ms. Kordia at the Newark Field Office, three officers placed her in an unmarked vehicle and transported her to an airport. The officers immediately brought her to a gate to wait for a plane. Ms. Kordia was observing the month of Ramadan in March. Therefore, the day she turned herself in, March 13, 2025, Ms. Kordia had not had anything to eat or drink since before sunrise on that date. Officers provided her with food 30 minutes after she was to break her fast, and then they placed her on a flight to Texas. Ms. Kordia estimates that her flight landed in Texas at approximately 12:00–1:00 AM. Once she arrived at the facility shortly after landing, Ms. Kordia was placed alone in a holding cell for approximately 3–4 hours. Although Ms. Kordia could not tell exactly what time it was, she could sense that it was close to sunrise, and she would need to continue her fast. She was given a dorm assignment at approximately 5:00 AM.

108.    The day after Ms. Kordia voluntarily met with DHS, Respondent Noem publicly announced Ms. Kordia's "arrest." Respondent Noem accused Ms. Kordia, without evidence, of "support[ing] Hamas" and added Ms. Kordia "was arrested for her involvement in pro-Hamas protests at Columbia University in New York City,"[57] omitting that all charges were immediately dropped.

**E. Ms. Kordia's Transfer to Texas Violated DHS's Own Policies.**

109.    DHS has issued a number of directives and policies that relate to First Amendment-protected activity and to custody transfers. Upon information and belief, these directives and

---

[57] *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dept. of Homeland Sec. (Mar. 14, 2025), https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and

policies were still operative when ICE arrested her in New Jersey and transferred her to Texas for immigration confinement.

110.    On May 17, 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."

111.    On September 30, 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights . . . should never be a factor in deciding to take enforcement action."

112.    ICE Policy 11022.1, "Detainee Transfers," prohibits the transfer of individuals from one Field Office's area of responsibility to another if, inter alia, they have immediate family, an attorney of record, pending or ongoing removal proceedings within the area, or if they have been granted bond or scheduled for a bond hearing, unless a Field Office Director or their designee deems the transfer necessary for one of the seven specific reasons identified in the policy.

113.    The policy states that "[t]he Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File."

114.    The policy also states that ICE is required to notify the attorney of record that the individual "is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty-four (24) hours after the transfer occurs."

115.    At the time of her transfer to Texas, Ms. Kordia's mother, stepfather, step-siblings, and other family all lived in New Jersey, and her attorney of record was in New York. ICE was

clearly aware that she had significant family in the area because they had spent several days speaking to multiple family members in New Jersey.

116.    Upon information and belief, there was no justification provided for the transfer to Texas, and the transfer was not necessary.

**F. Ms. Kordia's Immigration Confinement Subjects Her to Miserable Conditions, Including Deprivations of Religious Liberty.**

117.    ICE processed Ms. Kordia into the Prairieland Detention Facility in Alvarado, Texas on or around March 14, 2025. When Ms. Kordia arrived, the facility was so overcrowded that no beds were available. Instead, officers placed her and approximately fifty-five other people in a room intended for twenty. She had to sleep on the concrete floor with a thin mattress and blanket. She was surrounded by dozens of other women on the floor, with no privacy, for approximately her entire first month of confinement.

118.    As a result of sleeping on the ground, Ms. Kordia developed a severe rash all over her body. The rash was so severe that, for a week, the rash bled anytime she touched it. It only stopped bleeding when she bought a long sleeve shirt from the commissary. She asked a nurse to look at the rash.  After observing the rash, the nurse said she would provide Ms. Kordia with medicine but only provided Vaseline. As expected, the Vaseline did not provide any comfort or pain relief.

119.    Since her immigration confinement began, Ms. Kordia has been suffering from frequent migraine headaches, spells of dizziness, and psychological distress. She has submitted at least three requests for medical care but has only ever been offered ibuprofen.

120.    On or about April 14, 2025, after fifteen or twenty people left her dorm, a bed became available in her holding area. The bed, though, is located a few inches below an industrial-sized air-conditioning unit that blows frigid air almost constantly. In the course of trying to sleep

on the bed located a few inches below this unit, Ms. Kordia could not sleep restfully, experienced weakness when awake, and experienced a sore throat and a headache every day. She made three requests to change beds, but she never received a response.

121.    Ms. Kordia's sleeping arrangements were so debilitating that, even though she technically has a bed, she requested to move back to the floor because the rash she experienced when sleeping on the floor is preferable to her fighting through constant sore throats, migraines, and weakness. Ms. Kordia is currently sleeping on the cold concrete among cockroaches and other bugs.

122.    The overcrowding of the facility has made life in the facility nearly impossible. Since arriving at the detention center on March 14, 2025, Ms. Kordia has seen roaches in her sleeping quarters where many people sleep on the floor. Many of the plumbing fixtures, such as showers and sinks, do not work. For example, in the bathroom she shares with dozens of other people, only one of four sinks works. Similarly, the showers have little temperature control, meaning they are either freezing cold or scalding hot. Because of the bugs, broken sinks, and uncontrolled showers, Ms. Kordia struggles to stay clean.

123.    Even requesting something as simple as a cough drop is impossible. On April 15, Ms. Kordia requested a cough drop from a nurse who told her they are out of cough drops because the detention center is so overwhelmed by the amount of people. To date, she has never received a cough drop despite her repeated requests.

124.    In addition to the poor physical conditions, Respondents have woefully failed to accommodate the exercise of Ms. Kordia's religious beliefs.

125.    Ms. Kordia is a practicing Muslim who wears a hijab, prays five times a day, and keeps a halal diet. Despite these sincere religious commitments, Respondent Bergami, the Warden

of Prairieland Detention Facility, and Respondent Josh Johnson, Acting Directing of the ICE Dallas Field Office, have failed to accommodate Ms. Kordia's need to keep a halal diet and pray at appropriate times.

126.    Most alarmingly, Ms. Kordia has not received a single halal meal since her confinement began on March 14, 2025. Halal is an Arabic word that means lawful or permitted. For Muslims observing a halal diet, permissible foods are defined by Islamic teachings, which restrict observers of halal diets from eating certain foods and ingredients that are "haram," meaning prohibited. Halal also prescribes a certain way of raising and slaughtering meat prior to cooking it. Ms. Kordia, consistent with her faith, avoids prohibited ingredients and non-halal meats.

127.    Despite Ms. Kordia repeatedly requesting halal meals since being detained in Texas on March 14, 2025, Warden Bergami, Director Johnson, and their staff have only provided, at best, kosher options. Kosher and halal diets have important differences. Most obviously, they are governed by different religious traditions with different sets of guidelines. For example, kosher preparations of permitted meats must be prepared by a Jewish person who is trained in the specific laws of shechita. Halal has a similar set of guidelines for Muslims, requiring the person slaughtering the animal to be Muslim and recite a specific prayer.

128.    Similarly, the two religious dietary restrictions permit and prohibit different foods. Muslims keeping a halal diet can eat certain foods and ingredients that Jews keeping kosher cannot, and vice versa.

129.    More recently, the officers bringing Ms. Kordia her Styrofoam box of food have begun writing "halal" on the top of the container. When Ms. Kordia opens the packaging, though, the food is pre-packaged with a label on the pre-packaged food that says, "kosher." Apparently, Warden Bergami and Director Johnson would rather their staff force Ms. Kordia to eat religiously

prohibited food than accommodate Ms. Kordia's sincerely held beliefs. Ms. Kordia pointed out the kosher labels on her food to multiple officers. At least one guard told her, "We don't know what halal means." Another officer told her, "This food is not meant to fill you up. You should be lucky that you are even getting food. People cross the border illegally and then complain about the food." As of April 17, 2025, guards have begun writing "kosher/halal" on the outside of the box, even though, the food contained inside is only kosher.

130.    Warden Bergami and Director Johnson's food service puts Ms. Kordia in the exact position religious freedom laws prohibit: either violate her religious commitments or go without eating. And the failure to serve Ms. Kordia halal meals obviously does not serve any government interest because Warden Bergami and Director Johnson accommodate requests for kosher meals. Ms. Kordia, then, is forced to choose between her faith and food, while other detainees can eat consistent with their religious commitments.

131.    Ms. Kordia's experience during Ramadan, which this year occurred from February 28 to March 29, was especially reflective of Warden Bergami and Director Johnson's failure to accommodate Muslim religious traditions. Ramadan is the ninth month of the Islamic calendar and is a time of fasting, celebration, and community among Muslims. To observe the holiday, Ms. Kordia fasted from dawn until sunset, as she has during Ramadan for her whole life. Respondents and their employees routinely failed to bring Ms. Kordia meals at times when she could eat them. For example, dinner is from 5–5:30 p.m. each day. On all days since her confinement at the facility began, dinner was served well before sunset during Ramadan.

132.    Due to receiving her food at inappropriate times during Ramadan, Ms. Kordia requested twice that she receive her food at the same time as other people in custody and simply keep it to eat at the appropriate time during Ramadan. Both times she was told she could not keep

her food and hold on to it. For all of Ramadan, then, Ms. Kordia had to either forgo one of the most sacred rituals in her religion or go hungry.

133.    When Ms. Kordia would remind officers that she fasted during the day and needed food, they would respond indignantly. For example, Officer Reno, on two occasions told Ms. Kordia she "hates Ramadan" because Ms. Kordia asked for her food at a different time to accommodate her religious expression.

134.    As a direct result of these substantial burdens placed on her exercise of religion, since March 14, 2025, Ms. Kordia has lost significant weight. While Ms. Kordia eats enough food to survive, the lack of religious accommodations means she eats the bare minimum. According to facility records, she weighed 170 pounds upon intake, and on April 17, just one month later, she weighed 121 pounds. According to their records, she has lost approximately 30% of her original body weight. Over the last week, Ms. Kordia fainted in the shower from lack of nutrition. After this incident, she had to lay on the floor for some time before she felt well enough to stand again.

135.    Warden Bergami and Director Johnson's staff have also failed to accommodate Ms. Kordia's religious exercise by making it unnecessarily difficult for her to pray at the right times. Many Muslims, including Ms. Kordia, pray five times a day at specific times that change daily based on the position of the sun and the rotation of the Earth. She requested a prayer book detailing the appropriate times to pray, something she requested and received while being processed in New Jersey, but none has been provided at Prairieland. Eventually, about a month after initially requesting a prayer book, she received a book with the prayer times for a city in Mexico, which has different times because the sun is in a different position than in Alvarado.

136.    On the week of April 28, 2025, the facility finally posted prayer times in the dorm area after Ms. Kordia's repeated requests.

137.    Further deterring her religious exercise, Warden Bergami, Director Johnson, and their staff have not provided Ms. Kordia with a prayer mat, ignoring her requests for one. Muslims pray with their knees and forehead on the ground. Typically, this requires prayer mats to provide comfort, particularly where, as in the detention center, the floor is hard concrete. Ms. Kordia's faith also requires a clear and pure space for prayer, and a religious mat helps Muslims create a symbolically pure space for performing the prayer ritual.

138.    When Ms. Kordia asked for a prayer mat, the Chaplain told her that the detention center's prayer mats are only for men and only for Friday prayer. Ms. Kordia has repeatedly requested a prayer mat, but has never received one, including for Friday prayer.

139.    Shockingly, when a different Muslim woman came to the facility on or around April 27, 2025, she requested a prayer mat and received one the next day. Ms. Kordia has still not received a prayer mat. At this point, upon information and belief, it appears Warden Bergami and Director Johnson's staff are intentionally depriving of her religious liberty for the same reason DHS targeted her in the first place—her protected First Amendment activity.

140.    Warden Bergami and Director Johnson's staff have also deterred Ms. Kordia from praying by having inadequate clothing to permit her to pray. Specifically, Ms. Kordia's observance of Muslim prayer rituals requires her to wear a baggy and accommodating garment that will cover her back while she prays. This clothing is neither provided to her at no cost nor made available for purchase at the commissary. At the start of her confinement at Prairieland Detention Facility, Ms. Kordia requested to wear the shirt she was wearing upon entering the facility, but she was told she could not. Instead, she was told she had to wear the assigned uniform, which included two short sleeve shirts and a heavy sweatshirt. She asked for an additional sweatshirt, but was told she could not have one.

141.    Even the clothing available at the commissary is inadequate. When Ms. Kordia kneels down to pray and rests her forehead on the ground, as her religious beliefs dictate she must, the shirt she purchased from the commissary rises above her waistline, exposing her back, in violation of her sincerely held religious beliefs. She has expressed these concerns to the Chaplain, but there is no other clothing option available beyond what she purchased from the commissary.

142.    Similarly, Ms. Kordia's observance of her Islamic faith dictates specific rules for conduct in prayer. She must wash her hands, mouth, nose, face, arms, forehead, ears, and feet prior to prayer. Due to the broken fixtures, and weeks spent sleeping on the floor, she feels she is not clean enough to pray. Ms. Kordia believes other individuals have filed grievances about the unclear living spaces, but it has not been remedied.

143.    Ms. Kordia's confinement at Prairieland prohibits her from maintaining practices that she believes are essential to approaching prayer in a state of worthiness. For Ms. Kordia, praying in the conditions Warden Bergami and Director Johnson subject her to is unworthy of God.

144.    This has caused Ms. Kordia to elect to stop praying, rather than to pray in a religiously unfit manner. For the first approximately four weeks of her confinement, she continued to try to pray. But on April 10 she stopped praying altogether because she felt physically unfit to pray.

145.    Warden Bergami and Director Johnson's refusal to accommodate Ms. Kordia's religious exercise has infected virtually every part of her daily life. Ms. Kordia's observance of Islam also includes several widely practiced customs of modesty. For instance, Ms. Kordia must wake up before the rest of the dorm to shower before other people rise so that she does not need to undress in front of others.

146.    In accordance with her faith, Ms. Kordia must also wear a hijab around men. Since her confinement at Prairieland, men regularly enter her dorm unannounced. On April 16, for example, a man came into the dorm to do repairs when Ms. Kordia did not have her hijab on. Another time, a lieutenant walked into the dorm unannounced while Ms. Kordia had her hijab off. Ms. Kordia had to sprint across the room, passing the lieutenant and infringing her religious beliefs in the process, to retrieve her hijab. Ms. Kordia complained about these burdens on her religious beliefs to the Chaplain and a lieutenant, but men continue entering her room while she is not wearing her hijab.

147.    The daily indignities, hardships, and violations of her religious liberty have taken a toll on Ms. Kordia. She suffers from near-daily migraines and dizziness from the lack of appropriate food and, according to facility records, has lost 30% of her body weight. She struggles to stay clean from weeks of sleeping on the floor and the broken bathroom fixtures; the prevalence of cockroaches exacerbates her experience of uncleanliness and its impacts on her religious exercise. Since being arrested and detained, she has become severely depressed and alienated due to her inability to express her sincerely held religious beliefs, lack of nutritious halal food, and being so far from her family who are unable to visit.

148.    Ms. Kordia fears she will continue to lose significant weight, continue fainting and becoming overwhelmingly dizzy, and eventually seriously injure herself if she is held much longer.

**G. An Immigration Judge Finds that Ms. Kordia is Neither a Flight Risk Nor a Danger to the Community.**

149.    Ms. Kordia continued to suffer from these inhumane conditions of confinement and restrictions on her religious liberty as she exercised her right to seek a bond determination on March 26, 2025. In order to grant release on bond, an immigration judge must determine that an individual is neither a danger to the community nor a flight risk. *Matter of Guerra*, 24 I&N Dec.

37, 40 (BIA 2006).

150.    In support of her request for bond, Ms. Kordia submitted numerous letters of support from friends and family members showing the extensive community she has built in New Jersey. This includes multiple United States citizen family members, including her mother, who can financially support her if released. She also submitted documentation of her approved family-based visa petition and asylum application.

151.    On April 3, 2025, the Immigration Court held a bond hearing.

152.    At the hearing, DHS argued that Ms. Kordia was both a danger to the community and a flight risk. In claiming that Ms. Kordia was a danger to the community, DHS relied on two premises: (1) Ms. Kordia was briefly arrested in connection with a protest near Columbia University in 2024, and (2) she had sent money to a family member living in Palestine. After being pressed by the immigration judge on dangerousness, DHS's counsel told the immigration judge she would "defer to the court and [its] decision on the danger[ousness inquiry]."

153.    At the conclusion of the bond hearing, the immigration judge issued an oral decision granting Ms. Kordia a bond. Thereafter, on April 16, 2025, the immigration judge issued a written decision memorializing the grant of bond. The immigration judge recognized that Ms. Kordia bore "the burden to establish she merits release on bond."

154.    Specifically, the immigration judge found, in connection with the April 30, 2024 arrest, no evidence that Ms. Kordia had threatened police or engaged in any dangerous activity. Similarly, the immigration judge rejected DHS's baseless suggestion that Ms. Kordia may have provided support to a terrorist group, noting that the government admitted they do not know any information about the recipient of the single transaction attributed to Ms. Kordia. Neither of these allegations could form the basis of a finding of danger to the community, and in conjunction with

her extensive community ties and several bases for potential immigration relief, the immigration judge granted Ms. Kordia a bond of $20,000.

155.    Ms. Kordia's family promptly posted the bond the next day, April 4, 2025. ICE did not release Ms. Kordia upon receiving payment. Rather, ICE, by policy and practice, keeps individuals confined for at least 24 hours after a bond hearing, even where the person posts the requisite bond amount, so that DHS attorneys may seek an automatic stay from the Board of Immigration Appeals ("BIA") of any decision granting bond by filing form EOIR-43. DHS filed the EOIR-43 less than 24 hours after the bond hearing.

**H. ICE Prevents Ms. Kordia's Release By Seeking an Automatic Stay.**

156.    In the ordinary course of removal proceedings, ICE virtually never confines an individual legally admitted to the country with no criminal history, particularly where that individual has a viable defense to removal or an approved family-based petition for a green card. Likewise, typical instances of immigration enforcement do not involve an immediate decision by ICE to confine someone thousands of miles away from their family and community. And in the mine-run of cases involving a grant of bond by an immigration judge, it is atypical for ICE to seek an automatic stay of the decision.

157.    In this case, not only did ICE take Ms. Kordia into custody despite the analysis generated within its own RCA but it also immediately transferred her to a facility over 1,500 miles away from her family, community, and then-attorney of record and exercised its automatic stay authority to fight the grant of bond by the immigration judge, exposing Ms. Kordia to ongoing, unlawful custody possibly for a 130-day period or longer, under conditions reflecting religious abuses that have caused her to lose approximately 30% of her body weight so far.

158.    Under the relevant regulations, any time DHS believes a noncitizen "should not be released," DHS's filing of an appeal automatically prevents the immigration judge's bond order

from going into effect. 8 C.F.R. § 1003.19(i)(2). This means the person will necessarily remain in custody until either the BIA decides the bond appeal or ninety days pass. *Id.* § 1003(c)(4). Since DHS has ten days to file the notice of appeal before the ninety-day clock, this stay provision creates a 100-day due-process-free zone where there is no ability to be heard at a meaningful time nor present argument to a neutral arbiter. *Id.* And at the end of the automatic stay period, the immigration judge's order to release a noncitizen on bond remains stayed for up to thirty days while the BIA considers any discretionary stay. *Id.* § 1003(c)(5). Thus, the regulations permit a 130-day period of confinement without any procedures to contest or challenge that confinement

159.    On April 15, 2025, DHS filed a Notice of Appeal, thereby preventing Ms. Kordia's release for an additional 90 days and potentially 120 days.

160.    Once DHS filed the Notice of Appeal, Ms. Kordia did not have an opportunity to contest ICE's unfounded contentions that she is a flight risk and danger. And neither an immigration judge nor the BIA conducts any substantive review of DHS's basis for seeking the self-executing stay before it goes into effect, despite the fact that it overrides an immigration judge's decision after reviewing the evidence and hearing testimony and arguments from counsel.

161.    In its brief to the BIA, DHS, again, points to Ms. Kordia's attendance at the April 2024 protest and a modest money transfer to a relative in Palestine as indicia of supposed danger. As the immigration judge found, neither contention substantiates danger to the community. And more importantly, DHS arguments explicitly seek to justify continued confinement on the basis of protected speech (the protest) and association (payment to family).

162.    Without DHS's viewpoint-discriminatory animus towards protected expression in support of Palestinian rights, Ms. Kordia would be back with her community in Paterson, New Jersey, living peacefully as she had for the nearly nine years prior to her confinement.

## V.    CLAIMS FOR RELIEF

### Count I. First Amendment
### (Habeas Corpus, 28 U.S.C. § 2241)

163.    Ms. Kordia incorporates by reference the preceding paragraphs.

164.    The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and press is accorded aliens residing in this country." (citing *Bridges v. State of Cal.*, 314 U.S. 252 (1941)).

165.    Respondents' retaliatory actions violate the First Amendment where (1) Ms. Kordia engaged in protected activity; (2) Respondents' actions would "chill a person of ordinary firmness from continuing to engage in that activity;" and (3) Respondents' "adverse actions were substantially motivated against [Ms. Kordia's] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002); *see, e.g.*, *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (applying the same three-part framework to First Amendment retaliation claim challenging "revocation of [noncitizen's] bond"). Once Petitioner makes that showing, Respondents must by show "by a preponderance of the evidence that [they] would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

166.    **First,** Ms. Kordia attended the April 30, 2024 protest to mourn the dozens of family members and thousands of others killed in Gaza since October 7, 2023. She was undeniably engaged in speech on a matter of vital public concern—Israeli military actions in Gaza. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the

hierarchy of First Amendment values, and is entitled to special protection."). Even in the bond proceedings here, the only evidence of "dangerousness" DHS presented relies on Ms. Kordia's speech and association, which itself violates the First Amendment. *See Mote v. Walthall*, 902 F.3d 500, 506–07 (5th Cir. 2018); *see, e.g.*, *United States v. Ramon*, 86 F. Supp. 2d 665, 676 (W.D. Tex. 2000).

167.    **Second,** Respondents' actions of confining her would deter anyone from engaging in similar expression again. *Keenan*, 290 F.3d at 258.

168.    **Third,** Respondents would not be confining her right now had it not been for her protected activity. *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287. As a candidate, and then as President, President Trump promised to do exactly what Respondents are doing to Ms. Kordia here—arrest, detain, and deport individuals associated with advocacy in support of Palestinian rights. And upon her being confined, Respondent Noem accused Ms. Kordia, without evidence, of supporting Hamas and describing Ms. Kordia's involvement in a protest for Palestinian rights in a press release.

169.    Nothing about Ms. Kordia's continued confinement reflects standard agency process. In the average visa overstay case, the noncitizen charged as removable is virtually never detained, particularly where the person has no criminal history and ICE themselves rated her as low risk. And DHS has weaponized nearly every weapon in its disposal—including the automatic stay and overnight transfer to a facility halfway across the country in violation of policy—to continue punishing Ms. Kordia for her protected activity.

170.    Because Respondents have custody over Ms. Kordia in violation of her First Amendment rights, the Court should issue a writ of habeas corpus directing Respondents to release Ms. Kordia to safeguard her constitutional liberties. 28 U.S.C. § 2241.

## Count II.  Fifth Amendment Procedural Due Process
### (Habeas Corpus, 28 U.S.C. § 2241)

171.    Ms. Kordia incorporates by reference the preceding paragraphs.

172.    When the Government interferes with a liberty interest, "the procedures attendant upon that deprivation [must be] constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). The constitutional sufficiency of procedures is determined by weighing three factors: (1) the private interest that will be affected by the official action, (2) the risk of erroneous deprivation of that interest through the available procedures, and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

173.    Ms. Kordia has a weighty liberty interest as her freedom "from government . . . detention . . . lies at the heart of the liberty that [the Fifth Amendment] protects." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

174.    The risk of erroneous deprivation of Ms. Kordia's liberty is extremely high, given that the Government used the automatic stay provision to unilaterally override the Immigration judge's determination without any procedural protections at all. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 333 (quotation omitted), yet the Government's decision to seek an automatic stay is not subject to review by an impartial adjudicator, and Ms. Kordia cannot even contest it.

175.    Finally, the Government's interest in preserving its unilateral authority to prevent the release of noncitizens who have already shown they are neither a flight risk nor a danger is minimal. Providing additional procedural protections here introduces no additional administrative burdens because the regulations *already* provide the Government with the opportunity to seek a discretionary or emergency stay of a bond decision. Unlike the automatic stay provision here, a

discretionary stay requires DHS to justify the confinement of the individual to the BIA and gives the noncitizen the opportunity to respond. Permitting the BIA to determine whether a stay of release is in fact warranted reduces the risk of erroneous deprivation without any meaningful costs to the government.

176.    Because Respondents have custody over Ms. Kordia in violation of her Fifth Amendment rights, the Court should issue a writ of habeas corpus directing Respondents to release Ms. Kordia to safeguard her constitutional liberties. 28 U.S.C. § 2241.

**Count III. Fifth Amendment – Substantive Due Process**
**(Habeas Corpus, 28 U.S.C. § 2241)**

177.    Ms. Kordia incorporates by reference the preceding paragraphs.

178.    The Due Process Clause of the Fifth Amendment provides that no state shall deprive any person of liberty without due process of law. U.S. Const. amend. XIV.

179.    The "Due Process Clause applies to all persons within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 690. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id.*

180.    Confinement for noncriminal purposes is only allowed "in narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (internal quotations and citations omitted).

181.    With respect to immigration confinement, the Supreme Court has recognized two special justifications: preventing flight and preventing danger to the community. *See id.*

182.    Respondents' confinement of Ms. Kordia is wholly unjustified with respect to either justification.

183.     Soon after arresting Ms. Kordia, ICE determined that Ms. Kordia is a low risk of flight and a low risk to public safety according to *its own* Risk Classification Assessment. Nevertheless, ICE took her into custody.

184.     At her bond hearing, Ms. Kordia bore the burden of establishing "to the satisfaction of the Immigration judge" that she is neither a flight risk nor danger to the community. *In re Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006). Ms. Kordia did just that. Only after Respondents were forced to manufacture some justification for her continued confinement, in face of their own original determination that Ms. Kordia represented a low risk of flight or danger, did the government raise baseless arguments focused solely on her advocacy and support of Palestinian people and her association with Palestinian family members. Nevertheless, Ms. Kordia met her burden, and the Immigration judge granted her bond.

185.     Ms. Kordia posted the bond set by the Immigration judge.

186.     Respondents' continued confinement of Ms. Kordia, therefore, no longer bears a "reasonable relation" to any legitimate nonpunitive government purpose. *Zadvydas*, 533 U.S. at 690. Indeed, as discussed above, *supra* § IV.C, the apparent basis for her continued confinement is Respondents' desire to punish her for her speech in support of Palestinian rights–a constitutionally impermissible purpose.

187.     Because Respondents have custody over Ms. Kordia in violation of her Fifth Amendment rights, the Court should issue a writ of habeas corpus directing Respondents to release Ms. Kordia to safeguard her constitutional liberties. 28 U.S.C. § 2241.

### Count IV.  Release Pending Determination
### (Habeas Corpus, 28 U.S.C. § 2241)

188.     Ms. Kordia incorporates by reference the preceding paragraphs.

189.     As part of this Court's authority under the All Writs Act, the habeas corpus statute,

and its inherent equitable authority to preserve the Court's authority, the Court may order the release of Ms. Kordia on bond during the pendency of these proceedings. *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974); *Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001). Such release is proper where Ms. Kordia (a) has raised substantial constitutional claims with a high probability of success; and (b) where exceptional circumstances exist, including serious deterioration of Petitioner's health. *Calley*, 496 F.2d at 702 & n.1.

190.    Here, Ms. Kordia has presented substantial claims on the merits of her First and Fifth Amendment claims because her confinement is direct retaliation for core protected activity and the government has no constitutionally adequate evidence supporting her confinement. In addition, her confinement deprives her of religious liberty, subjects her to inhumane conditions, and is rapidly causing the deterioration of her physical and mental health.

191.    In addition, Ms. Kordia has already posted a $20,000 bond with the immigration court after the judge deemed her not a flight risk nor a danger to the United States. Thus, the government has no interest in her continued confinement that could outweigh the daily harm and constitutional violations her continued confinement inflicts.

192.    Under its inherent authority under the habeas statute and the All Writs Act, the Court should direct Respondents to release Ms. Kordia during the pendency of these proceedings.

### Count V.  Religious Freedom & Restoration Act
### (42 U.S.C. § 2000bb-1(c))
### *Against Defendants Bergami & Johnson*

193.    Ms. Kordia incorporates by reference the preceding paragraphs.

194.    The Religious Freedom and Restoration Act ("RFRA") prohibits Respondents-Defendants from "substantially burden[ing] a person's exercise of religion" unless they can "demonstrate[] that the application of the burden to the person:" (a) is "in furtherance of a

compelling government interest;" and (b) "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a-b).

195.     Respondents-Defendants Bergami and Johnson face a high bar in justifying actions that substantially burden the exercise of religion and cannot rest on "broadly formulated interests[.]" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014). Rather, they must identify a compelling interest in infringing the religious exercise of "the particular claimant whose sincere exercise of religion is being substantially burdened" considering the "marginal interest" in enforcing the challenged infringements against the specific claimant in question. *Holt v. Hobbs*, 574 U.S. 352, 362–63 (2015); *Burwell*, 573 U.S. at 726. Moreover, "[t]he least-restrictive-means standard is exceptionally demanding[.]" *Burwell*, 573 U.S. at 728.

196.     Here, Bergami and Johnson have forced Ms. Kordia to endure conditions that substantially burden her exercise of Islam, which cannot be justified by any compelling interest, and are unnecessarily restrictive even if they could articulate any supposed justification. These burdens include Respondent-Defendants' failure to provide halal meals, interfering with her ability to pray, and failing to provide routine religious accommodations such as baggy, modest clothing and a prayer mat. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1318 (10th Cir. 2010) (denying summary judgment to defendants who failed to provide an imprisoned person with halal meal); *Aigbekaen v. Warden*, No. 3:21-CV-01526 (JAM), 2023 WL 1780390, at *4 (D. Conn. Feb. 6, 2023) (allowing RFRA claims for denial of prayer mat); *Ward v. Rice*, No. 1:17-CV-01005, 2018 WL 1278197, at *6 (W.D. Ark. Mar. 12, 2018) (same). Ms. Kordia has repeatedly requested these items, but has been told the facility cannot provide them or received no response at all.

197.     In each of these infringements, Respondents-Defendants cannot demonstrate that they have a compelling interest in the continued denial of religious accommodations specifically

with respect to Ms. Kordia. *See Lozano v. Collier*, 98 F.4th 614, 624 (5th Cir. 2024) ("RLUIPA [and RFRA] require[] a tailored analysis of [a person's] individual situation. . . . [The prisoner] has presented sufficient evidence to raise a genuine issue of material fact on whether his ability to pray in accordance with his religious obligations has been substantially burdened.").

198.    Respondents-Defendants Bergami and Johnson's failure to accommodate Ms. Kordia's sincerely held religious beliefs violates the RFRA. And because of the rampant, chronic, and seemingly intentional nature of these violations, Respondents-Defendants should release Ms. Kordia so she may exercise her religious beliefs.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Ms. Kordia respectfully requests the following relief:

A.    Assume jurisdiction over this matter;

B.    Order the immediate release of Petitioner pending these proceedings;

C.    Issue an Order to Show Cause pursuant to 28 U.S.C. § 2243, directing Respondents to show cause why the petition for a writ of habeas corpus filed by Ms. Kordia pursuant to 28 U.S.C. § 2241 should not be granted within three days.

D.    Declare that Respondents' confinement of Ms. Kordia violates the First Amendment;

E.    Declare that Respondents' confinement of Ms. Kordia violates the Fifth Amendment;

F.    Declare Respondents-Defendants' actions violate the Religious Freedom and Restoration Act by substantially burdening Ms. Kordia's exercise of her sincere religious beliefs;

G.    Enjoin Respondents-Defendants from continuing to burden Ms. Kordia's sincerely held religious beliefs unless that burden serves a compelling government interest and is the least restrictive means of serving that interest.

H.    Prohibit the re-detention of Ms. Kordia unless and until the Respondents provide Ms. Kordia's counsel and a U.S. District Court with jurisdiction over Ms. Kordia notice of their intent to re-detain her and demonstrate by clear and convincing evidence at a hearing that the Court subsequently calendars that the re-detention of Ms. Kordia is the least restrictive means of preventing danger to the community and/or addressing risk of flight from immigration enforcement.

I.      Award reasonable attorneys' fees and costs for this action; and

J.      Grant such further relief as the Court deems just and proper.

(*Verification & Signatures on Following Page*)

## VII.    VERIFICATION

I have read the foregoing Petition for Writ of Habeas Corpus, Application to Show Cause, and Complaint for Declaratory and Injunctive Relief. I have personal knowledge of the factual allegations contained therein, and if called as a witness to testify I would competently testify as to the matters stated herein. This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Leqaa Kordia* (*signed by permission*)

Leqaa Kordia
Petitioner-Plaintiff

Despite reasonable diligence, I, Sabrine Mohamad, was unable to conduct an in-person meeting with Ms. Leqaa Kordia prior to filing. However, on April 29 and April 30, 2025, I had a telephone conference with Ms. Leqaa Kordia in which I read the above Petition for Writ of Habeas Corpus, Application to Show Cause, and Complaint for Declaratory and Injunctive Relief. Ms. Kordia confirmed the accuracy and truthfulness of the factual allegations contained therein, and authorized me to electronically affix her signature to the document.

*/s/ Sabrine Mohamad*
Sabrine Mohamad

DATED: April 30, 2025

Respectfully submitted,

*/s/ Charles S. Siegel*
Charles S. Siegel
Texas State Bar No. 18341875
Caitlyn Silhan
Texas State Bar No. 24072879
Waters Kraus Paul & Siegel
3141 Hood Street, Suite 200
Dallas, Texas 75219
Telephone: 214-357-6244
Facsimile: 214-357-7252
siegel@waterskraus.com
csilhan@waterskraus.com

Sabrine Mohamad*
Louisiana State Bar No. 39989
Southern Poverty Law Center
P.O. Box 57089
New Orleans, LA 70157
Telephone: 504-418-9877
sabrine.mohamad@splcenter.org

Arthur Ago*
District of Columbia Bar No. 463681
Southern Poverty Law Center
1101 17th Street, NW
Suite 550
Washington, DC 20036
Telephone: 202-961-9325
arthur.ago@splcenter.org

Travis Walker Fife
Texas State Bar No. 24126956
Randall Hiroshige
Texas State Bar No. 24124299
Texas Civil Rights Project
P.O. Box 1108
Houston, Texas 77251-1108
travis@texascivilrightsproject.org
randy@texascivilrightsproject.org

Molly Petchenik
Texas State Bar No. 24134321

Texas Civil Rights Project
1405 Montopolis
Austin, Texas 78741
Telephone: 512-474-5073
Facsimile: 512-474-0726
molly@texascivilrightsproject.org

Daniel Hatoum*
Texas State Bar No. 24099136
Erin D. Thorn*
Texas State Bar No. 24093261
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
Telephone: 512-474-5073
daniel@texascivilrightsproject.org
erin@texascivilrightsproject.org

Naz Ahmad*
New York State Bar No. 5327424
Amal Thabateh*
New York State Bar No. 5923826
CUNY School of Law
2 Court Square West, 5th Floor
Long Island City, NY 11101
(718) 340-4630
naz.ahmad@law.cuny.edu
amal.thabateh@law.cuny.edu

Golnaz Fakhimi*
New York State Bar No. 5063003
Sadaf Hasan*
New York State Bar No. 6046023
Muslim Advocates
1032 15th Street Northwest, Unit 362
Washington, D.C. 20005
(202) 655-2969
golnaz@muslimadvocates.org
sadaf@muslimadvocates.org

*PHV application forthcoming

**ATTORNEYS FOR PETITIONER-
PLAINTIFF**