UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-1072-L |
| | § | |
| KRISTI NOEM et al., | § | EXPEDITED HEARING |
| | § | REQUESTED |
| Respondents-Defendants. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

**MOTION FOR PRELIMINARY INJUNCTION ORDERING RELEASE PENDING
FINAL JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................................ii

TABLE OF AUTHORITIES ......................................................................................... iv

I. INTRODUCTION ....................................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................................... 3

    A.    Ms. Kordia Engages in Protected Expression.......................................................... 3

    B.    Respondents Begin the Targeted Suppression of Palestinian Rights Advocacy. ... 4

    C.    Ms. Kordia Is Confined as Part of the Crackdown and Transferred to Prairieland Confinement Center. ................................................................................................ 8

    D.    Ms. Kordia's Transfer to Texas Violated DHS's Own Policies. .......................... 10

    E.    Ms. Kordia Suffers Religious Deprivations in Horrendous Conditions While Confined................................................................................................................. 11

    F.    An Immigration Judge Grants Ms. Kordia Bond, But ICE Refused to Release Her. ............................................................................................................................... 14

III. NATURE & STAGE OF PROCEEDINGS........................................................... 17

IV. STANDARD OF REVIEW .................................................................................... 18

V. ARGUMENT ........................................................................................................... 19

    A.    Ms. Kordia's Petition Raises Substantial Claims that Are Likely to Succeed on the Merits. .................................................................................................................... 20

        1.    Ms. Kordia's Confinement Violates the First Amendment. ................................ 21

            i.    Ms. Kordia engaged in protected expression and her continued confinement would chill the expression of a person of ordinary firmness. ............................................................................................................... 22

            ii.    Respondents are confining Ms. Kordia because of her support for Palestinian rights................................................................................... 23

        2.    Ms. Kordia's Confinement Violates Her Right to Procedural Due Process........ 27

            iii.    Ms. Kordia has a Weighty Liberty Interest in Being Free From Confinement................................................................................................ 27

            iv.    The Automatic Stay Provision Creates a Substantial Risk of Erroneous Deprivation. ................................................................................................. 27

            v.    The Government's Interest in Retaining its Unilateral Stay Power Is Minimal........................................................................................................ 30

        3.    Ms. Kordia's Confinement Violates Her Right to Substantive Due Process........ 31

B.    The Equities Favor Preliminary Injunctive Relief and the Petition Presents Extraordinary Circumstances Supporting Release on Bail. .................................. 32

VI. CONCLUSION ........................................................................................................... 37

CERTIFICATE OF SERVICE ......................................................................................... 39

CERTIFICATE OF CONFERENCE ............................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas*,
441 U.S. 418 (1979)................................................................................................ 27

*Aigbekaen v. Warden*,
No. 3:21-CV-01526 (JAM), 2023 WL 1780390 (D. Conn. Feb. 6, 2023) ................. 34

*Ashley v. Ridge*,
288 F. Supp. 2d 662 (D.N.J. 2003) ......................................................................... 30

*Bello-Reyes v. Gaynor*,
985 F.3d 696 (9th Cir. 2021) .................................................................................. 21

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ................................................................................... 32

*Boumediene v. Bush*,
553 U.S. 723 (2008).................................................................................................. 18

*Bridges v. State of Cal.*,
314 U.S. 252 (1941)................................................................................................. 22

*Bridges v. Wixon*,
326 U.S. 135 (1945).................................................................................................. 22

*Calley v. Callaway*,
496 F.2d 701 (5th Cir. 1974) ................................................................................... 18

*Cantu-Delgadillo v. Holder*,
584 F.3d 682 (5th Cir. 2009) ................................................................................... 28

*City of Houston v. Hill*,
482 U.S. 451 (1987).................................................................................................. 26

*Counterman v. Colorado*,
600 U.S. 66 (2023).................................................................................................... 26

*Crawford–El v. Britton*,
523 U.S. 574 (1998).................................................................................................. 21

*Elrod v. Burns*,
427 U.S. 347 (1976).................................................................................................. 33

*Foucha v. Louisiana*,
504 U.S. 71 (1992).................................................................................. 31

*Gutierrez-Soto v. Sessions*,
317 F. Supp. 3d 917 (W.D. Tex. 2018).......................................... 22, 23, 24

*Hamama v. Adducci*,
No. 17-CV-11910, 2018 WL 1905074 (E.D. Mich. Apr. 23, 2018)............. 30

*Hart v. Hairston*,
343 F.3d 762 (5th Cir. 2003) ...................................................................... 3

*Hartman v. Moore*,
547 U.S. 250 (2006)........................................................................... 21, 23

*Hess v. Indiana*,
414 U.S. 105 (1973).................................................................................. 26

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995).................................................................................. 22

*In re Guerra*,
24 I. & N. Dec. 37 (BIA 2006). ................................................................ 31

*In re Joseph*,
22 I. & N. Dec. 660 (BIA 1999) ............................................................... 29

*Jones v. Cunningham*,
371 U.S. 236 (1963).................................................................................. 18

*Kambo v. Poppell*,
No. SA-07-CV-800-XR, 2007 WL 3051601 (W.D. Tex. Oct. 18, 2007)..... 32

*Keenan v. Tejeda*,
290 F.3d 252 (5th Cir. 2002) ............................................................. 21, 23

*Ky. Dep't of Corr. v. Thompson*,
490 U.S. 454 (1989).................................................................................. 27

*Mahdawi v. Trump*,
No. 25-cv-389, 2025 WL 1243135 (D. Vt. Apr. 30, 2025) ......... 7, 19, 25, 36

*Mapp v. Reno*,
241 F.3d 221 (2d Cir. 2001)............................................... 7, 18, 33, 36

*Matal v. Tam*,
582 U.S. 218 (2017)..................................................................................... 2, 26

*Mathews v. Eldridge*,
424 U.S. 319 (1976)............................................................................ 27, 28, 29

*McDonald v. Longley*,
4 F.4th 229 (5th Cir. 2021) ................................................................................ 35

*Mohammed H. v. Trump*,
No. 25-cv-1576, 2025 WL 1170448 (D. Minn. Apr. 22, 2025) ................................. 24

*Mote v. Walthall*,
902 F.3d 500 (5th Cir. 2018) .............................................................................. 22

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977)........................................................................................ 22

*Nat. Auto. Dealers Assoc. v. F.T.C.*,
127 F.4th 549 (5th Cir. 2025) ............................................................................ 36

*Nelson v. Davis*,
739 F. App'x 254 (5th Cir. 2018) ........................................................................ 18

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................................ 34

*Opulent Life Church v. City of Holly Springs*,
697 F.3d 279 (5th Cir. 2012) .............................................................................. 33

*Ozturk v. Trump*,
No. 2:25-cv-374, 2025 WL 1145250 (D. Vt. Apr. 18, 2025) ........................... 7, 19, 24

*Ragbir v. Homan*,
923 F.3d 53 (2d Cir. 2019)............................................................................ 22, 26

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)........................................................................................ 22

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)......................................................................................... 33

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995)........................................................................................ 21

*Sanchez v. Winfrey*,
No. CIV.A.SA04CA0293RFNN, 2004 WL 1118718 (W.D. Tex. Apr. 28, 2004) ............... 35, 36

*Singh v. Gillis*,
No. 5:20-CV-96-DCB-MTP, 2020 WL 4745745 (S.D. Miss. June 4, 2020) ............................ 19

*Snyder v. Phelps*,
562 U.S. 443 (2011) ................................................................................................................ 22

*Speaks v. Kruse*,
445 F.3d 396 (5th Cir. 2006) .................................................................................................. 19

*Tex. All. for Retired Ams. v. Hughs*,
No. 20-40643, 2020 WL 5814260 (5th Cir. Sept. 28, 2020) ................................................... 30

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
732 F.3d 535 (5th Cir. 2013) .................................................................................................. 35

*United States v. Ramon*,
86 F. Supp. 2d 665 (W.D. Tex. 2000) ..................................................................................... 26

*United States v. Schwimmer*,
279 U.S. 644 (1929) .................................................................................................................. 2

*Wang v. Holder*,
569 F.3d 531 (5th Cir. 2009) .................................................................................................. 29

*Ward v. Rice*,
No. 1:17-CV-01005, 2018 WL 1278197 (W.D. Ark. Mar. 12, 2018) ........................................ 34

*Zadvydas v. Davis*,
533 U.S. 678 (2001) .................................................................................................. 27, 31, 32

*Zavala v. Ridge*,
310 F. Supp. 2d 1071 (N.D. Cal. 2004) ............................................................................ 28, 29

**Statutes**

28 U.S.C. § 1651 ...................................................................................................................... 1
28 U.S.C. § 2241 ...................................................................................................................... 1

**Rules**

Fed. R. Civ. P. 65 ................................................................................................................... 19

**Regulations**

8 C.F.R. § 1003.19 ................................................................................... 17, 27, 30

8 C.F.R. § 1003.6 ....................................................................................... 17, 28

Petitioner Leqaa Kordia respectfully requests this Court exercise its authority under the All Writs Act, 28 U.S.C. § 1651, the habeas corpus statute, 28 U.S.C. § 2241, and its inherent equitable authority to issue a preliminary injunction directing Respondents to release her during the pendency of these proceedings and forbidding them from further confining her during the proceedings' pendency unless she receives constitutionally adequate procedural protections, including notice and a pre-deprivation judicial hearing.

Due to the urgent circumstances and important questions of constitutional law this case presents, Ms. Kordia requests an expedited hearing.

## I.    INTRODUCTION

This case challenges the government's retaliatory confinement of Ms. Kordia because of her constitutionally protected speech and association. Ms. Kordia is a Palestinian who has lost over 100 members of her family to state violence in the Gaza Strip ("Gaza") since October 2023. She has lived peacefully in the United States since 2016, surrounded by her family and community in Paterson, New Jersey. To mourn the dozens of family members and thousands of others killed by military violence in Gaza, Ms. Kordia has attended peaceful protests for Palestinian lives and freedom, including one near Columbia University in the spring of 2024.

The Trump administration, through executive orders, public statements, and individual enforcement actions, has made clear that those who protest for Palestinian rights are not welcome in the United States because the administration disagrees with their point of view. Already, the Trump administration has reportedly cancelled the visas of over 300 people who attended demonstrations in support of Palestinian rights.

As a result of the Trump administration's viewpoint-discriminatory policy to weaponize immigration laws against those it perceives to be political dissidents, U.S. Department of Homeland Security ("DHS") agents investigated every aspect of Ms. Kordia's life and found no

evidence of wrongdoing. Ms. Kordia presented herself to DHS, only to find herself in an unmarked van headed 1,500 miles away to the Prairieland Detention Facility outside of Dallas.

The government's conduct against Ms. Kordia is flatly unconstitutional. Regardless of political party or views on the ongoing violence ravaging Palestinians in Gaza, it is an affront to our constitutional tradition to permit the Executive to round up and confine individuals because the administration does not like their point of view. Someday, someone else will be president, with their own set of ideological commitments and opinions about acceptable and unacceptable speech. But if the First Amendment stands for anything, it stands for the principle that "we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)).

Ms. Kordia's arrest at the April 30, 2024, protest resulted in a dismissal, and the government's own classification assessment rated her low risk concerning any danger to the community and flight risk. She has strong family ties in the United States and strong bases to defend against her removal proceedings and attend all hearings. The evidence DHS put forward to justify her confinement only underscored the retaliatory and viewpoint-discriminatory nature of the confinement.

The immigration judge ordered Ms. Kordia's release on bond; nonetheless, Ms. Kordia is confined in a detention center 1,500 miles from home because the government does not like her perspectives. That violates the First and Fifth Amendments because it is retaliation for speech and association accomplished through woefully inadequate procedures and otherwise with no constitutionally permissible reasons for depriving her of liberty.

What is more, since being confined, Respondents Bergami and Johnson have repeatedly violated Ms. Kordia's religious liberty. Ms. Kordia is a practicing Muslim, and her religious beliefs

compel her to eat halal foods, pray five times a day, and wear religious clothing that accommodates her beliefs. But despite being aware of her sincerely held beliefs, Bergami and Johnson's employees have repeatedly refused to accommodate them. Ms. Kordia has not received a *single* halal meal since being confined in Prairieland on March 14 and has lost approximately 30% of her body weight, as a result. Respondents' refusal to accommodate her prayer practices have forced her to stop praying altogether.

Respondents' continued confinement of Ms. Kordia violates the Constitution, and her treatment while confined violates basic principles of religious liberty. The Court should grant this Motion and order Respondents to release Ms. Kordia during the pendency of these proceedings and forbid their further confinement of her during the proceedings' pendency, unless she receives constitutionally adequate procedural protections, including notice and a pre-deprivation judicial hearing.

## II.    FACTUAL BACKGROUND

### A.  Ms. Kordia Engages in Protected Expression.

Ms. Kordia is a thirty-two year-old woman born in Jerusalem, Palestine. Verified Pet. for Writ of Habeas Corpus, Appl. for Order Show Cause, & Compl. for Declaratory and Injunctive Relief, Dkt. 1, ¶ 24 ("Verified Pet.").[1] For her entire childhood, she lived in Palestine's West Bank. *Id.* ¶ 24. Since October 7, 2023, Ms. Kordia has lost over 100 family members to the devastation in Gaza, nearly an entire generation of her family. *Id.* ¶ 32. On April 30, 2024, when she was on a day trip to New York City while living in New Jersey, she attended a protest for Palestinian rights on a public street near Columbia University. *Id.*  Ms. Kordia has attended multiple Palestinian rights demonstrations before and since, without incident, ¶¶ 32–33.

---

[1] "[F]actual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit." *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003).

For Ms. Kordia, protests for Palestinian rights, including the demonstration on April 30, 2024, were an opportunity to mourn the family and thousands of others who had died during Israel's military attacks in Gaza. *Id.* ¶ 34. The demonstration, at least where Ms. Kordia stood, was peaceful and nonviolent. *Id.* Ms. Kordia joined in the group's chanting "ceasefire now!" and "end the siege on Gaza!," among other slogans. *Id.* While Ms. Kordia was at the demonstration, she observed a peaceful gathering with diverse groups of people. *Id.*

New York Police Department ("NYPD") officers appeared and ordered the demonstrators to disperse. *Id.* ¶ 35. Ms. Kordia was unable to leave, and police officers transported Ms. Kordia along with a large group of others to a holding facility before releasing her the following day. *Id.* ¶ 35. Before Ms. Kordia ever had to appear in court for the case, she learned the charges had been dismissed in the "interest of justice." *Id.* ¶ 35; App. at 69–70 (PX 2-A, Decl. of Mallory Manfredini) ("Manfredini Decl.").

Other than that brief encounter at a demonstration, Ms. Kordia has never had any other police contact. She has no other criminal history, *id.* at 72–73, and has lived peacefully in the United States among her family since she was lawfully admitted in 2016, *id.* (rating Ms. Kordia low risk on all relevant factors).

## B. Respondents Begin the Targeted Suppression of Palestinian Rights Advocacy.

Then-candidate Trump promised his supporters that, should he be elected, "any student that protests [the military campaign in Gaza], I throw them out of the country." *Id.* at 24 (PX 1-F, Decl. of Georgina Guzman) ("Guzman Decl."); Verified Pet. ¶ 40. He specifically targeted students from foreign countries, saying "[T]here are a lot of foreign students. As soon as they hear that, they're going to behave." *Id.*

Since his election, President Trump has made good on his promise to suppress expression he opposes, particularly the speech of those associated with advocacy in support of Palestinian

human rights. On January 29, 2025, President Trump issued Executive Order 14188, Fed. Reg. 8847 (Jan. 29, 2025), directing agency heads to "identify[] all civil and criminal authorities . . . that might be used to combat anti-Semitism." Verified Pet. ¶ 43. The Executive Order also specifically authorized the Department of Homeland Security and Secretary of State to investigate and remove noncitizens believed to be engaged in antisemitic activity. *Id.*

The Executive Order, under the banner of prohibiting "antisemitism," relied on a 2019 Executive Order's definition of antisemitism that included lawful, protected speech such as "claiming that the existence of a State of Israel is a racist endeavor" and "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis," among other examples, E.O. 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019) (incorporating International Holocaust Remembrance Alliance's definition of antisemitism, *available at*: https://holocaustremembrance.com/resources/working-definition-antisemitism). Verified Pet. ¶ 44. Thus, the Executive Order, and the individual enforcement actions taken pursuant to it, specifically target protected First Amendment activity with which this administration disagrees, chilling the speech of both citizens and noncitizens alike.

Confirming the viewpoint-discriminatory nature of the Executive Order, the Trump administration decried "leftist, anti-American colleges and universities," and said, "to all the resident aliens who joined in the pro-jihadist protests," "we will find you, and we will deport you." *Id*. ¶ 45; App. at 6–7 (PX 1-A, Guzman Decl.). For students on visas, President Trump promised to "quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." Verified Pet. ¶ 45; App. at 7 (PX 1-A, Guzman Decl.).

Since the issuance of the January 29 Executive Order, multiple officials at the highest levels of government have made explicit statements to confirm there is a widespread policy of targeting

noncitizens for arrest, transfer and immigration confinement far away from community or family, and eventual deportation. For example, on March 10, 2025, President Trump announced that U.S. Immigration and Customs Enforcement ("ICE") "proudly apprehended . . . a Radical Foreign Pro-Hamas Student," and warned that immigration officers would "find, apprehend, and deport" similar students who "engaged in pro-terrorist, anti-Semitic, anti-American activity." Verified Pet. ¶¶ 62–63; App. at 11 (PX 1-B, Guzman Decl.). For his part, Secretary of State Marco Rubio announced the day before that he would "revok[e] the visas and/or green cards of Hamas supporters," App. at 13 (PX 1-C, Guzman Decl.), without explaining how or on what evidence the government would determine that a person is allegedly a "Hamas supporter," *cf. id.*

Secretary Rubio claimed to have cancelled over 300 student visas for students involved in protests for Palestinian rights. *Id.* at 14–15 (PX 1-D, Guzman Decl.). According to Secretary Rubio, such people are "lunatics" just in the United States to "create a ruckus." *Id.* at 15. At a March 27 press conference, Secretary Rubio confirmed that these actions were a direct response to protected speech saying, "We gave you a visa to come and study and get a degree not to become a social activist that tears up our university campuses. And if we've given you a visa and then you decide to do that we're going to take it away." *Id.* at 2–3 (PX 1, Guzman Decl. ¶ 4).

Beginning on March 8, 2025, and continuing to the present, the federal government has targeted multiple non-citizens for arrest, detention, transfer, and eventual deportation. Verified Pet. ¶¶ 62–99 (describing government efforts against Mahmoud Khalil, Ranjani Srinivasan, Dr. Badar Khan Suri, Yunseo Chung, Momodou Taal, Rümeysa Öztürk, and Mohsen Mahdawi).

After Ms. Kordia's arrest, Respondents and others continued their efforts to target noncitizens associated with Palestinian human rights advocacy. ICE agents arrested Rümeysa Öztürk, a Tufts University Ph.D. student in Somerville, Massachusetts, the evening of March 25,

2025. *Ozturk v. Trump*, No. 2:25-cv-374, 2025 WL 1145250, at *2 (D. Vt. Apr. 18, 2025) *app. filed*, No. 25-1019 (2d Cir.)*;* Verified Pet. ¶ 86. The government does not dispute that ICE arrested her because she co-authored an op-ed in a student newspaper, which criticized the university's response to student senate resolutions concerning Palestine and divestment from Israel. *Ozturk*, 2025 WL 1145250, at *3; Verified Pet. ¶¶ 87–88. Just as with Ms. Kordia, Mr. Khalil, and Dr. Suri, ICE confined Ms. Öztürk thousands of miles from her home, across multiple state lines, to Louisiana. *Ozturk*, 2025 WL 1145250, at *3–4. On April 18, 2025, a court in the District of Vermont held that Ms. Öztürk raised substantial questions as to whether her confinement violated the Constitution and ordered a bail hearing. *Id.* at *1; Verified Pet. ¶ 89.

On April 14, 2025, ICE agents arrested Mohsen Mahdawi after he completed an interview pursuant to his application for U.S. citizenship. *See* Opinion, *Mahdawi v. Trump*, No. 25-cv-389, 2025 WL 1243135 at * 2 (D. Vt. Apr. 30, 2025); Verified Pet. ¶ 95. Mr. Mahdawi is a Palestinian lawful permanent resident, a student at Columbia University, and associated with the movement for Palestinian human rights and peace. *Mahdawi*, 2025 WL 1243135, at *1; Verified Pet. ¶¶ 96–97. ICE agents immediately attempted to transfer Mr. Mahdawi outside of Vermont, but a court prevented them from doing so. *Mahdawi*, 2025 WL 1243135, at *2; Verified Pet. ¶ 98. The government reportedly seeks to deport Mr. Mahdawi because of his speech and protest activities in support of Palestinian human rights. App. at 33 (PX 1-H, Guzman Decl.); Verified Pet. ¶ 99. On April 30, 2025, a court in the District of Vermont ordered Mr. Mahdawi released on bail pursuant to *Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001)*,* finding both that he had raised substantial claims that he was being confined in retaliation for his First Amendment activity in support of Palestinian human rights, and that there were extraordinary circumstances justifying his release. *Mahdawi*, 2025 WL 1243135, at *12–13; Verified Pet. ¶ 99.

Today, immigration agents have exercised extraordinary and unprecedented power by arresting, confining, and initiating deportation proceedings against immigrants whom the administration considers political dissidents. This includes individuals like Ms. Kordia who have leaved peacefully in the community for years and who would not typically face immigration confinement, but for their association with advocacy for Palestinian rights. Verified Pet. ¶ 100; App. at 165–67 (PX 3, Decl. of Anne Chandler ¶¶ 7–8, 11) ("Chandler Decl."); *id.* at 170–71 (PX 4, Decl. of Cori Hash ¶¶ 5–6, 9) ("Hash Decl."); *id.* at 175 (PX 5, Decl. of Charles Gillman ¶ 5); *id.* at 179 (PX 6, Decl. of Jodi Goodwin ¶¶ 7–8, 10) ("Goodwin Decl."). The recent crackdown represents a stark and unprecedented departure from prior ICE detention practices. *Id.* at 165–67 (Chandler Decl. ¶¶ 7–8, 11); *id.* at 170–71 (Hash Decl. ¶¶ 5–6, 9); *id.* at 175 (Gillman Decl. ¶ 5); *id.* at 179 (Goodwin Decl. ¶ 7–8, 10); *id*. at 211 (PX 10, Decl. of Kerry Doyle ¶ 7) ("Doyle Decl.").

President Trump has made good on his promise and unleashed an all-out assault on noncitizens lawfully admitted to this country because he disagrees with their lawful viewpoints supporting Palestinian rights. The confinement of Ms. Kordia and others like her literally constrains their associational activities and nationwide is chilling people, citizens and noncitizens alike, who fear the most politically powerful man in the country could wrongly punish them, too, for protected First Amendment activity.

## C. Ms. Kordia Is Confined as Part of the Crackdown and Transferred to Prairieland Confinement Center.

As the Trump administration was publicly declaring its First Amendment-suppression plan, local Homeland Security Investigation ("HSI") agents were investigating Ms. Kordia for overstaying her student visa and purported "national security" concerns. Verified Pet. ¶ 101. App. at 97 (PX 2-B, Manfredini Decl.). As part of this investigation, agents interrogated several alleged associates of Ms. Kordia and family members, set up a trace on Ms. Kordia's WhatsApp messaging

account, subpoenaed MoneyGram and the New York City Police Department ("NYPD"), and spoke with Ms. Kordia over the phone. Verified Pet. ¶¶ 101–104; App. at 97–136 (PX 2-B, Manfredini Decl.).

This investigation did not reveal any "national security" concerns and was closed upon Ms. Kordia's transfer to confinement in Texas. Verified Pet. ¶ 106; App. at 136 (PX 2-B, Manfredini Decl.). The only thing the investigation did reveal was lawful First Amendment association: Ms. Kordia's sending a payment to her a family member living in Palestine in 2022. App. at 128–134 (PX 2-B, Manfredini Decl.).

Knowing that HSI agents were trying to contact her, Ms. Kordia went to the ICE Field Office in Newark, New Jersey on March 13, 2025, for what she believed was a simple interview. Verified Pet. ¶¶ 105–106. What she did not realize was that, after the interview was complete, agents would force her into an unmarked van to fly her to Texas, over 1500 miles from her home, family, friends, and her then-immigration counsel. *Id.* ¶ 107. Since March 14, 2024, ICE has ben confining her in Texas. *Id.* ¶ 1.

The day after Ms. Kordia voluntarily presented herself to ICE, Respondent Noem and DHS issued a press release announcing ICE's arrest of her and referring to her "arrest" by local police but omitting that all charges had been immediately dropped. *Id.* ¶ 108; App. at 29 (PX 1-G, Guzman Decl.). In the press release, DHS says Ms. Kordia "support[s] Hamas" and notes that Ms. Kordia was "arrested for her involvement in pro-Hamas protests at Columbia University in New York City." App. at 29 (PX 1-G, Guzman Decl.). Respondent Noem said, "When you advocate for violence and terrorism [your visa] should be revoked." *Id.* And on the day Ms. Kordia filed this case, DHS labeled her a "Columbia Student who actively participated in anti-American, pro-terrorist activities on campus." *Id.* at 39–40 (PX 1-I, Guzman Decl.) Ms. Kordia is not a Columbia

student.

The facts and circumstances surrounding Ms. Kordia's confinement confirm the viewpoint-discriminatory nature of Respondents' actions. Four Texas-based immigration practitioners, with collectively over 100 years of immigration law experience representing thousands of clients in removal and bond proceedings, stated that, with one unique exception, they have never had a client or reviewed a case like Ms. Kordia's, where someone lawfully admitted to the country without any criminal history and with credible defenses to removal was confined for any meaningful amount of time. *Id.* at 165–67 (PX 3, Chandler Decl. ¶¶ 7–8, 11); *id.* at 170–71 (PX 4, Hash Decl. ¶¶ 5–6, 9); *id.* at 175 (PX 5, Gillman Decl. ¶ 5); *id.* at 179 (PX 6, Goodwin Decl. ¶ 7–8, 10). And none of them, across thousands of clients collectively, had DHS issue a press release about a client without criminal history, let alone criticize one of their clients' protected speech. *Id.* at 160 (PX 3, Chandler Decl. ¶ 10); *id.* at 171 (PX 4, Hash Decl. ¶ 8); *id.* at 175 (PX 5, Gillman Decl. ¶ 6) *id.* at 179 (PX 6, Goodwin Decl. ¶ 9).

### D.  Ms. Kordia's Transfer to Texas Violated DHS's Own Policies.

Ms. Kordia's transfer to Texas for immigration confinement violates DHS's own policies, further underscoring the baseless and retaliatory nature of the confinement. Verified Pet. ¶¶ 109–114. Specifically, directives issued in 2019 under the prior Trump administration, and in 2021, instruct ICE agents not to consider First Amendment protected activity when considering enforcement actions, including the decision whether to confine an individual. App. at 183, 191 (PX 7 & 8, DHS First Amendment Guidance).

Additionally, ICE Policy 11022.1, "Detainee Transfers," prohibits the transfer of individuals out of a given Field Office's area of responsibility if, within that area, *inter alia*, they have immediate family, an attorney of record, pending or ongoing removal proceedings, or if they have been granted bond or scheduled for a bond hearing—unless a Field Office Director or their

designee deems the transfer necessary for one of the seven reasons identified in the policy. *Id.* at 196–99 (ICE Policy 11022.1); Verified Pet. ¶ 112. At the time of her transfer to Texas, Ms. Kordia's mother, stepfather, step-siblings, and other family all lived in New Jersey, and her attorney of record was in New York. Verified Pet. ¶ 115. ICE did not provide Ms. Kordia with an explanation for the transfer, and the transfer was unnecessary under the policy's terms. *Id.* ¶ 116.

Nothing about Ms. Kordia's continued confinement reflects standard agency process. In the average visa overstay case, a noncitizen charged as removable is virtually never detained, particularly where the person has no criminal history and ICE themselves rated her as low risk. And DHS has weaponized nearly every weapon in its disposal—including the automatic stay and overnight transfer to a facility halfway across the country in violation of policy—to continue punishing Ms. Kordia for her protected activity.

### E. Ms. Kordia Suffers Religious Deprivations in Horrendous Conditions While Confined.

Since being confined, Respondents-Defendants Bergami and Johnson and their employees consistently have failed to provide Ms. Kordia a humane place to live and have violated her religious liberty. Verified Pet. ¶¶ 117–148. When Ms. Kordia arrived at Prairieland Detention Facility on March 14, 2025, the facility was severely overcrowded. *Id.* ¶ 117. One of fifty-five people in a twenty-person room, she was forced to sleep on the ground, *id.*, surrounded by other people, cockroaches, and other bugs, *id.* ¶ 122. For days she slept on the concrete floor, with only a thin mattress and blanket, surrounded by other women. *Id.* As a result of these conditions, she developed a rash that bled when touched. *Id.* ¶ 118. She only received a bed assignment on or around April 14, 2025, approximately a month after her arrival. *Id.* ¶ 120. The bed she received, though, was directly under an industrial-sized air-conditioning unit that made sleeping so miserable that she requested to sleep on the floor. *Id.* After ICE processed more people into her

dorm, it moved Ms. Kordia back to the floor, forcing her to sleep on the cold concrete, again surrounded by cockroaches and other insects. *Id.* ¶ 121.

In addition to the generally deplorable conditions, Ms. Kordia has faced ongoing burdens on her religious expression spanning the duration of her immigration confinement. Ms. Kordia is a practicing Muslim and has faced countless barriers to her religious practice in ICE custody, such that she is unable to engage in protected religious expression and activity.

**First**, Respondents have prohibited Ms. Kordia from accessing food that complies with her religious exercise. Over the course of six weeks in confinement, she has not received a *single* halal meal. *Id.* ¶ 126. For Muslims who follow halal dietary restrictions, certain foods are prohibited, and other food must follow specific preparations, most notably related to the raising and slaughtering of meat. *Id.* ¶¶ 126–127. Like many practicing Muslims, Ms. Kordia follows these restrictions. *Id.* ¶ 126.

When Ms. Kordia arrived at Prairieland, on March 14, 2025, she requested halal meals and has continued requesting halal meals ever since, to no avail. *Id.* ¶ 127. Warden Bergami and Director Johnson and their staff have only offered her kosher meals, even though kosher and halal diets are different. *Id.* ¶ 127–128. The two diets have different requirements, including following different rules surrounding the slaughtering of animals for meat. *Id.* Further, while somewhat overlapping, the two diets allow and prohibit different lists of foods, such that some foods that are allowed under a kosher diet are impermissible for a person who keeps a halal diet and vice versa. *Id.* ¶ 128.

Officers are aware of Ms. Kordia's need for halal food yet have not accommodated her reasonable requests for it. *Id.* ¶ 126-128. Around the week of April 14, 2025, they provided her with a box of food with "halal" written on the Styrofoam container. *Id.* ¶ 129. However, the food

inside is labeled "kosher." *Id.* This kosher food does not meet the requirements of Ms. Kodia's sincerely held religious beliefs and interferes with her religious practice. *Id.* ¶ 128. When she raised this issue with staff, an officer told her, "This food is not meant to fill you up. You should be lucky that you are even getting food. People cross the border illegally and then complain about the food." *Id.* ¶ 129. In a subsequent complaint to detention center officials, Ms. Kordia, and several other Muslim women, explained that kosher food is not halal and vice versa. Now guards write "Halal/Kosher" on the Styrofoam box while continuing to serve only kosher food to incarcerated Muslim women. *Id.*

Ms. Kordia's experience during the holy month of Ramadan, lasting through most of the month of March 2025, reflected Respondents-Defendants Bergami and Johnson's indifference to Ms. Kordia's religious exercise. *Id.* ¶ 131. Observance of Ramadan is fundamental to Ms. Kordia's religious practice and requires her to fast from sunrise to sunset for the entire month. *Id.* She has observed Ramadan in this manner since childhood. *Id.* But Respondents-Defendants prevented Ms. Kordia from eating during these permitted times, despite her requests to hold on to her food for the appropriate times. *Id.* ¶ 131–133.

The burden on her religious expression has also taken a physical toll on Ms. Kordia. Because of Respondents-Defendants' failure to accommodate her dietary needs, according to facility records, in the weeks since she her confinement began, she has lost 49 pounds, dropping from 170 to 121 pounds. *Id.* ¶ 134. More recently, she felt so lightheaded that, on one occasion, she fainted in the shower. *Id.* She also experiences near-daily migraines and dizziness. *Id.* ¶ 147.

**Second,** Respondents-Defendants have interfered with Ms. Kordia's ability to pray. *Id.* ¶ 135. The filthy conditions and lack of a symbolically pure space to pray has made Ms. Kordia feel unworthy of God, and, on April 10, 2025, she stopped praying altogether. Ms. Kordia is unable

to access a mat for prayer. *Id.* ¶ 137–38. She, like other Muslims, prays with her knees and forehead on the ground, and uses a prayer mat in this position. *Id.* ¶ 137. The mat assists in creating a symbolically pure space for the prayer ritual, particularly in her dorm with cold concrete. *Id.* But when she requested to use a prayer mat, the Chaplain told Ms. Kordia that, while the confinement center had mats available, they were only for men, and only for Friday prayer. *Id.* ¶ 138. Tellingly, when ICE processed a different Muslim woman into the facility in late April 2025, that woman received a prayer mat within 24 hours of requesting one. *Id.* ¶ 139.

Ms. Kordia's religious beliefs also require her to clean herself, specifically by washing her hands, mouth, nose, face, arms, forehead, ears, and feet before prayers, and to wear clothing that covers her back during prayer. *Id.* ¶ 142. Facility staff have failed to accommodate these requirements: they have failed to assist in providing any appropriate, clean space for prayer; they have failed to enable her to clean herself properly for prayer by leaving unrepaired the broken fixtures in her dorm and forcing her to spend weeks sleeping on the cockroach-riddled floor; and they have refused to provide her with any garment that will cover her back while she prays or even allowed her to purchase such a garment at commissary. *Id.* ¶ 137–143. Ms. Kordia has requested cleaner living spaces and different clothing options, but nothing has changed. *Id.* ¶ 196.

These failures to accommodate Ms. Kordia's religious expression have taken a severe physical and spiritual toll on Ms. Kordia. *Id.* ¶ 143–44. On April 10, Ms. Kordia stopped praying, rather than continue to attempt her prayers in a manner that she believes is unworthy of God. *Id.* ¶ 144.

### F. An Immigration Judge Grants Ms. Kordia Bond, But ICE Refused to Release Her.

Recognizing the government had no lawful basis for her confinement, Ms. Kordia, through counsel, sought a bond hearing before an immigration judge. Verified Pet. ¶ 150. In support of her custody redetermination, she submitted several letters from friends and family members attesting

to her character and establishing she presents neither a danger to the community nor a risk of flight from immigration enforcement. *Id*.; *See* App. at 74–88 (PX 2-A, Manfredini Decl.). She also submitted her initial custody assessment, called a Risk Classification Assessment ("RCA"), in which ICE itself rated her as low risk on every relevant bond factor, including risk of flight, public safety, and criminal history. App. at 72–73 (PX 2-A, Manfredini Decl.). The government, for its part, submitted the HSI investigation conducted from March 5 to March 13, 2025, *id.* at 97–136 (PX 2-B, Manfredini Decl.), and Ms. Kordia's NYPD history, which, as expected, revealed she had never been convicted of a crime nor been approached by the police, aside from the brief NYPD encounter at the April 2024 demonstration for Palestinian rights, *id.* at 139–42.

Relying on the HSI investigation, DHS alleged, contrary to its own evidence, that Ms. Kordia had been sending money to Palestine and Jordan in support of supposed terrorist activity. *Id.* at 131. According to DHS's own records, however, Ms. Kordia had sent a single payment to a family member for $1,000 in 2022. *Id.* As to the NYPD records, DHS could not muster any explanation for how her arrest charges for a local ordinance violation, which were dismissed in the interest of justice, bore on either Ms. Kordia's flight risk or danger to the community. *Id.* at 145 (PX 2-C, Manfredini Decl.)

The immigration judge, recognizing the government's paltry evidence, continued to press DHS's counsel on how a payment to a family member and a single arrest for a local ordinance violation could justify her continued confinement. *Id.* at 162 (PX 2-E, Manfredini Decl. at 29:15– 31:20) (submitted via USPS on USB flashdrive). Remarkably, DHS's counsel could not muster a response and demurred that DHS would "defer" to the court and "[its] decision on the danger[ousness inquiry]." *Id.* (timestamp: 31:05–31:20); Verified Pet. ¶ 152.

DHS's own evidence at the bond hearing demonstrates that it is confining Ms. Kordia for

her First Amendment speech (the protest) and association (sending money to family). DHS conceded that it had no other evidence beyond this protected activity to allege Ms. Kordia to be a supposed danger to her community. App. at 162 *(*PX 2-E, Manfredini Decl. at 31:05–31:20).

The immigration judge concluded that Ms. Kordia presents no danger to the community and ordered Ms. Kordia releasable on a $20,000 bond. *Id.* at 146 (PX 2-C, Manfredini Decl.); Verified Pet. ¶ 154.   Ms. Kordia, through her family, posted the bond the day after the hearing. Verified Pet. ¶ 155. In her written opinion, the immigration judge correctly concluded that "[s]tanding in a crowd of around 100 people in a protest does not show that she is a danger to the community." App. at 145 (PX 2-C, Manfredini Decl.). As to Ms. Kordia's money transfer to a Palestinian relative, "the Court [could not] find that Respondent is supporting a terrorist organization by sending money to a family member in Palestine." *Id.* Finally, the Court deemed Ms. Kordia releasable because of her significant family support, multiple avenues to reobtain lawful status, and ties to the United States. *Id.* at 146.

Had it not been for Ms. Kordia's attendance at a protest and her association with her family in Palestine, the immigration judge's decision would have resulted in Ms. Kordia's release from confinement. *Id.* at 165–67 (PX 3, Chandler Decl. ¶¶ 7–8, 11); *id.* at 170–71 (PX 4, Hash Decl. ¶¶ 5–6, 9); *id.* at 175 (PX 5, Gillman Decl. ¶ 5); *id.* at 179 (PX 6, Goodwin Decl. ¶ 7–8, 10). Instead, DHS doubled down on its retaliatory confinement of Ms. Kordia by seeking, on April 15, 2025, an automatic stay of the bond decision. Verified Pet. ¶ 159; App. at 149 (PX 2-D, Manfredini Decl.). The automatic stay and resultant appeal automatically prevent the bond order from going into effect for up to 130 days, beyond which ICE can seek to prolong confinement discretionarily. *Id.* In bond cases where DHS disagrees with an immigration judge's decision, the bond order becomes stayed, meaning the person remains confined, if DHS: (1) files a notice of intent to appeal

the custody redetermination within one business day, 8 C.F.R. § 1003.19(i)(2), and (2) effectuates the appeal by filing a notice of appeal within ten days, *id.* § 1003.6(c)(1). Then, before the 90-day stay expires, DHS can seek a discretionary stay from the BIA, which continues the automatic stay for another 30 days while the BIA decides the discretionary appeal. These combined procedures can result in upwards of 130 days of continued confinement with no process to vacate or challenge the stay and without DHS's having to make any showing on the merits of confinement. *Id.* § 1003.6(c); *id.* § 1003.19(i)(2).

It is exceedingly rare for DHS to ever exercise its right to automatically stay a bond order. Verified Pet. ¶ 156; App. at 211 (PX 10, Doyle Decl. ¶ 7). Across nearly 50 years of experience, two immigration law practitioners could only recall DHS's exercising the automatic stay provision three times and only in cases where the person had extensive or extreme criminal history. App. 171 (PX 4, Hash Decl. ¶ 10); *id.* at 178–79 (PX 6, Goodwin Decl. ¶ 6). And a former Principal Legal Advisor of ICE, when reviewing a similar invocation of the automatic stay provision, called the government's invocation of the automatic stay provision based on a low-level misdemeanor "highly unusual." *Id.* at 212 (Doyle Decl. ¶ 11).

### III.    NATURE & STAGE OF PROCEEDINGS

Ms. Kordia filed her Petition for Writ of Habeas Corpus, Application for Order to Show Cause, and Complaint for Declaratory and Injunctive Relief, Dkt. 1 ("the Petition"), on April 30, 2025. The next morning, Ms. Kordia's counsel emailed a copy of the Petition to George Padis and Brian Stoltz, Assistant United States Attorneys for the Northern District of Texas and requesting to confer on the present Motion. Mr. Padis confirmed receipt of the Petition and stated that Respondents were opposed to this Motion. Mr. Padis also stated that once an attorney was assigned to this case, the government would respond to Ms. Kordia's request for an expedited hearing on this Motion. Ms. Kordia respectfully requests a fair opportunity to supplement the record of these

proceedings, including after the occurrence of an expedited hearing on this Motion, should the Court grant that request. Her counsel are diligently undertaking relevant investigations on her behalf that are complicated by the limits on their access to her and to relevant witnesses.

## IV.    STANDARD OF REVIEW

"The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom." *Boumediene v. Bush*, 553 U.S. 723, 739 (2008). "[C]ommon-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed depending upon the circumstances." *Id.* at 779. Thus, as codified in 28 U.S.C. 2241, habeas corpus has "never been a static, narrow, formalistic remedy." *Jones v. Cunningham*, 371 U.S. 236, 243 (1963). Rather, habeas's "scope has grown to achieve its grand purpose[:] the protection of individuals against erosion of their right to be free from wrongful restraint[]." *Id.*

The Fifth Circuit has recognized that, as part of the Court's inherent authority to issue writs of habeas corpus, a habeas petitioner should be released pending resolution of her habeas petition where "the petitioner has raised substantial constitutional claims upon which [s]he has a high probability of success" and "when extraordinary or exceptional circumstances exist." *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974). Exceptional circumstances include "serious deterioration of the petitioner's health while incarcerated." *Id.*; *see also Nelson v. Davis*, 739 F. App'x 254, 254–55 (5th Cir. 2018) (restating test from *Calley*). The Second Circuit has employed a similar framework when considering requests for release from immigration confinement pending disposition of the underlying habeas petition, *see Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001), including releasing habeas petitioners on bond pending appeal where the petition challenges DHS's automatic stay authority, App. at 214–225 (PX 11, Pet. & Order in *Vacchio v. Ashcroft*,

No. 03-2004 (2d Cir.).[2] District Courts within the Fifth Circuit have recognized and applied the legal framework of *Calley* and *Mapp* to determine release pending disposition of noncitizens' habeas petitions challenging immigration confinement. *See, e.g.*, *Singh v. Gillis*, No. 5:20-CV-96-DCB-MTP, 2020 WL 4745745, at *2 (S.D. Miss. June 4, 2020) (collecting cases).

Similarly, under Federal Rule of Civil Procedure 65, this Court can issue temporary injunctive relief. To enter a preliminary injunction, the Court must find four factors, on balance, weigh in Plaintiffs' favor:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006) (quotations omitted).

## V.    ARGUMENT

Ms. Kordia meets the standard for release pending the Court's resolution of this case and for a preliminary injunction. The Court should release Ms. Kordia.[3] *See, e.g.*, *Mahdawi*, 2025 WL 1243135, at *15 ("The court orders the release of Mohsen Madawi on his personal recognizance during the pendency of this habeas proceeding."); *Ozturk*, 2025 WL 1145250, at *25 (setting a bail hearing, and setting expedited merits hearing).

**First**, Ms. Kordia raises substantial constitutional questions about her confinement, which are likely to succeed on the merits. Respondents have weaponized federal immigration law against

---

[2] To counsel's knowledge, the Second Circuit's order releasing the petitioner on bond pending appeal is not available on Westlaw or Pacer. Ms. Kordia attaches it as Exhibit 11 for convenience.

[3] Petitioner respectfully submits that she is suitable for release on recognizance or otherwise on reasonable conditions. Her family can substantiate (1) having already posted the $20,000 bond amount set by the immigration judge but likewise (2) appreciating the chance to recoup immediately any portion of that considerable sum, since it was not easy for them to amass it. To the extent the Court deems it necessary to condition Petitioner's release on payment of a monetary bond, Petitioner asks the Court to find that condition met through what her family has already posted and to consider reducing the bond amount, so that her family may immediately recoup at least some of the $20,000 already posted.

Ms. Kordia as retaliation for attending a protest supporting Palestinian rights and for sending money to a family member. Verified Pet. ¶¶ 38–100. She is in custody despite an immigration judge's determination that Ms. Kordia does not pose a danger and is releasable based on her family and community ties. Verified Pet. ¶¶ 153-154.   Indeed, DHS's arguments against bond only reaffirm the retaliatory and punitive nature of her confinement.

**Second**, this case presents extraordinary circumstances because of the profound constitutional claims underlying the Petition, the daily and ongoing religious deprivations Ms. Kordia's continued confinement forces her to endure, and her rapidly deteriorating health. Verified Pet. ¶190.

### A. Ms. Kordia's Petition Raises Substantial Claims that Are Likely to Succeed on the Merits.

Petitioner's case squarely implicates the unconstitutionality of the Executive Branch's weaponization of the immigration laws against perceived dissidents to punish and silence them for having viewpoints it does not like. Ms. Kordia's Petition thus presents strong and substantial claims on the merits:

**First,** Ms. Kordia's First Amendment retaliation claim presents a substantial constitutional question and is likely to succeed on the merits. Respondents are confining Ms. Kordia in retaliation for her support for Palestinian rights. Respondents Trump and Noem, and Secretary Rubio, have publicly announced their desire to censor through immigration confinement and the institution of deportation proceedings any noncitizen who dares express her support for Palestinian rights. Such blatant viewpoint discrimination is a textbook First Amendment violation for both citizens and noncitizens alike.

**Second**, Ms. Kordia's procedural due process claim presents a substantial constitutional question and is likely to succeed on the merits. She has no fair or meaningful opportunity to

20

administratively challenge her ongoing confinement, and the BIA, the forum hearing the government's appeal of the immigration judge's bond order, has no authority to release her pending DHS's appeal. Instead, she is left in procedural limbo without any of the hallmarks of constitutional due process.

**Third,** Ms. Kordia's substantive due process claim presents a substantial constitutional question and is likely to succeed on the merits. The government is confining her without any constitutionally adequate reason but instead punishing her for her protected speech.

### 1. Ms. Kordia's Confinement Violates the First Amendment.

Ms. Kordia's confinement violates the First Amendment because the reason she is confined is that she attended a protest in support of Palestinian rights and sent money to a Palestinian family member, clearcut examples of viewpoint-discriminatory retaliation. Verified Pet. ¶¶ 10, 32–36. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). "Discrimination against speech because of its message is presumed to be unconstitutional." *Id.* Thus, "[o]fficial reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (alteration in original) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588 n. 10 (1998)).

In the Fifth Circuit, Respondents' retaliatory actions violate the First Amendment where (1) Ms. Kordia engaged in protected activity; (2) Respondents' actions would "chill a person of ordinary firmness from continuing to engage in that activity;" and (3) Respondents' "adverse actions were substantially motivated against [Ms. Kordia's] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002); *see, e.g.*, *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (applying the same three-part framework to First Amendment retaliation claim challenging "revocation of [noncitizen's] bond"). Once Petitioner makes that

showing, Respondents must showS "by a preponderance of the evidence that [they] would have

reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch.*

*Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

> i.   <u>Ms. Kordia engaged in protected expression and her continued confinement</u>
>       <u>would chill the expression of a person of ordinary firmness.</u>

**First,** Ms. Kordia indisputably engaged in protected activity by being present at a protest

to mourn the deaths of dozens of her family members and thousands of other Palestinians who

were killed following October 7, 2023. Verified Pet. ¶ 34; *See Hurley v. Irish-Am. Gay, Lesbian*

*& Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). Such speech and association "implicate[] the

apex of protection under the First Amendment." *Ragbir v. Homan*, 923 F.3d 53, 69 (2d Cir. 2019)

*vacated on other grounds sub. nom.*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020); *see also Snyder v.*

*Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the

hierarchy of First Amendment values, and is entitled to special protection."). Ms. Kordia also

engaged in protected activity by sending money to a Palestinian relative. Verified Pet. ¶¶ 7, 10,

161; *see, e.g.*, *Virden v. City of Austin, Texas*, 127 F.4th 960, 962–63 (5th Cir. 2025) ("[T]he First

Amendment protects recipients as well as donors."); *Mote v. Walthall*, 902 F.3d 500, 507 (5th Cir.

2018) ("[T]he [F]irst [A]mendment protects the right of all persons to associate together in groups

to further their lawful interests." (quotation omitted)); *see also Riley v. Nat'l Fed. of the Blind of*

*N.C., Inc.*, 487 U.S. 781, 789 (1988) ("Our prior cases teach that the solicitation of charitable

contributions is protected speech.").

For decades, these First Amendment principles have applied to noncitizens admitted into

the United States. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and press is

accorded aliens residing in this country." (citing *Bridges v. State of Cal.*, 314 U.S. 252 (1941));

*see, e.g.*, *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 934 (W.D. Tex. 2018) (denying

summary judgment where petitioner "could establish that [immigration officers] retaliated against immigrant activists who criticized the government's policies").

**Second,** a person of ordinary firmness would cease the protected activity. "Decisions of [the Fifth Circuit] and other circuits have found that various concrete intimidating tactics would have deterred ordinary persons from criticizing government officials," including withholding advertising funds from a newspaper, releasing confidential and humiliating information, and denying a land use permit. *Keenan*, 290 F.3d at 258. Ms. Kordia's confinement is miles more severe than the retaliatory actions catalogued in *Keenan*. And Ms. Kordia's confinement has, in fact, prevented her from attending any other demonstrations.

ii.   Respondents are confining Ms. Kordia because of her support for Palestinian rights.

**Third,** Respondents' continued confinement of Ms. Kordia is substantially motivated by her protected activity. *See id.* Causation, in this context, is "but-for" causation, meaning "without [the retaliatory motive] the adverse action would not have been taken." *Hartman*, 547 U.S. at 260.

Since the arrest of Ms. Kordia on March 13, ICE agents have continued this pattern of "retaliat[ing] against immigrant activists who criticized the government's policies" in regards to Palestinian rights. *See Gutierrez-Soto*, 317 F. Supp. 3d at 934. As of March 27, 2025, Secretary Rubio had reportedly cancelled over 300 student visas for students involved in protests for Palestinian rights. App. at 15–16 (PX 1-D, Guzman Decl.). The arrest, detention, transfer, and attempted removal (or attempts at all the same) of Mahmoud Khalil, Ranjani Srinivasan, Dr. Badar Khan Suri, Yunseo Chung, Momodou Taal, Rümeysa Öztürk, and Mohsen Mahdawi, and others, Verified Pet. ¶¶ 62–99, in similar circumstances establish that Respondents and others have implemented a retaliatory policy, which they applying to Ms. Kordia.

In *Gutierrez-Soto*, Judge Guaderrama considered a habeas petition by noncitizens who

alleged the revocation of their humanitarian parole and immigration confinement were retaliation for their First Amendment activity criticizing United States immigration policy. 317 F. Supp. 3d at 934. In denying the government's motion for summary judgment, the Court found the petitioners had established a factual dispute on their First Amendment claim where: a) there was close "temporal proximity between" the protected speech and the parole revocations; b) the "pattern of conduct" where ICE targeted "five other vocal activists" near the same time; and c) contemporaneous comments of immigration officials. *Id.* at 934-35.

Consistent with *Gutierrez-Soto*, in the District of Minnesota, a court similarly found that another individual had plausibly alleged that DHS targeted him "based on his public expression of support for Palestinian human rights and his criticism of violence in Gaza." *Mohammed H. v. Trump*, No. 25-cv-1576, 2025 WL 1170448 (D. Minn. Apr. 22, 2025). That court also noted that the targeting of that student, "aligns with a broader pattern of surveillance and punitive immigration enforcement against similarly situated students, as documented by DHS policy memoranda and public statements by federal officials." *Id.* Similarly, on April 18, 2025, a district court in Vermont evaluated virtually identical evidence to what Ms. Kordia has presented here and found such evidence raised serious constitutional questions warranting a hearing for release *pendente lite. See Ozturk*, 2025 WL 1145250, at *19 ("Administration officials have identified her speech as the reason her visa was revoked."); *id.* at *20 ("In the absence of additional information from the government, the Court's habeas review is likely to conclude that Ms. Ozturk has presented a substantial [First Amendment retaliation] claim.").

On April 30, 2025, the same day Ms. Kordia filed her petition, a different court in the District of Vermont granted release to Mr. Mohsen Mahdawi, another lawful permanent resident that the government targeted for arrest, detention, transfer, and eventual deportation. *Mahdawi*,

24

2025 WL 1243135, at *11. That court specifically found that he had raised substantial claims concerning his confinement violating the First Amendment and the Fifth Amendment. *Id.* ("Immigration detention cannot be motivated by a punitive purpose. Nor can it be motivated by the desire to deter others from speaking.").

The material facts of *Gutierrez-Soto*, *Ozturk, Mohammed H.,* and *Mahdawi* are indistinguishable from the present case. On March 10, 2025, President Trump announced that "ICE proudly apprehended . . . a Radical Foreign Pro-Hamas Student[,]" and warned that immigration officers would "find, apprehend, and deport" similar students who "engaged in pro-terrorist, anti-Semitic, anti-American activity." Verified Pet. ¶¶ 62–63; App. at 11 (PX 1-B, Guzman Decl.). His statement followed Secretary Rubio's proclamation a day earlier that he would "revok[e] the visas and/or green cards of Hamas supporters." App. at 13 (PX 1-C, Guzman Decl.).

Pursuant to this statement of intent to "find, apprehend, and deport" people engaged in First Amendment activity, ICE agents began surveilling Ms. Kordia and interviewing her family and associates. *Id.* at 97–131 (PX 2-B, Manfredini Decl.); Verified Pet. ¶ 104. Recognizing that ICE agents were trying to arrest her, Ms. Kordia presented herself in the Newark, New Jersey field office on March 13, 2025. Verified Pet. ¶ 105. Respondent Noem announced Ms. Kordia's "arrest" the next day, calling Ms. Kordia a "Hamas supporter" and stating that Ms. Kordia "was arrested for her involvement in pro-Hamas protests at Columbia University in New York City." App. at 29 (PX 1-G, Guzman Decl.); Verified Pet. ¶ 108. On April 30, 2025, the administration identified Ms. Kordia in a press release "100 Days of Fighting Fake News" and itself put forward false facts, that Ms. Kordia was a student at Columbia University, and claiming she had "participated in anti-American, pro-terrorist activities on campus." *Id.* 39–40 (PX 1-I, Guzman Decl.). Statements from officials at the highest level of government, concerning Ms. Kordia and others, confirm that her

confinement is intended as punishment for her speech and association.

The arguments DHS has put forward to confine Ms. Kordia are only admissions of Respondents' retaliatory policy. Before the immigration judge, DHS argued Ms. Kordia posed a danger based on two pieces of evidence: "[a] her arrest at a protest and [b] because she has sent money to someone in Palestine." Verified Pet. ¶ 152; App. at 145 (PX 2-C, Manfredini Decl.) As the immigration judge found, neither piece of evidence establishes Ms. Kordia is a danger. Verified Pet. ¶¶ 153–154; App. at 145 (PX 2-C, Manfredini Decl.) Both pieces of evidence do, though, morph protected speech (the protest) and association (sending money to family) into indicia of dangerousness, which the First Amendment forbids. *See Counterman v. Colorado*, 600 U.S. 66, 76 (2023) ("[T]he First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." (quoting *Hess v. Indiana*, 414 U.S. 105, 109 (1973)); *United States v. Ramon*, 86 F. Supp. 2d 665, 676 (W.D. Tex. 2000) ("A governmental policy of detaining individuals on suspicion of criminal activity based solely on the exercise of such symbolic speech therefore violates the Free Speech Clause[.]").

Ms. Kordia is confined 1,500 miles from home because the President of the United States does not approve of her view on Palestinian rights. "[B]ut the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal*, 582 U.S. at 246 (quotation omitted). Protecting the right to express disfavored views "without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 463 (1987). Because Ms. Kordia's continued confinement "would broadly chill protected speech, among not only activists subject to final orders of deportation but also those citizens and other residents who would fear retaliation against others." *Ragbir*, 923 F.3d at 71, her First Amendment claim presents a substantial question and is likely to

succeed on the merits.

2.  *Ms. Kordia's Confinement Violates Her Right to Procedural Due Process.*

Respondents' continued confinement of Ms. Kordia by executing an automatic stay violates her right to procedural due process. When the Government deprives someone of a liberty interest, "the procedures attendant upon that deprivation [must be] constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citation omitted). The constitutional sufficiency of procedures is determined by weighing three factors: (i) the private interest that will be affected by the official action, (ii) the risk of erroneous deprivation of that interest through the available procedures, and (iii) the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Each factor weighs in Ms. Kordia's favor.

iii.    <u>Ms. Kordia has a Weighty Liberty Interest in Being Free From Confinement.</u>

Ms. Kordia has a weighty interest in being free from confinement. The Supreme Court has decreed that "civil commitment for any purpose constitutes a *significant* deprivation of liberty that requires due process protections." *Addington v. Texas*, 441 U.S. 418, 425 (1979) (emphasis added); *see also Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (freedom "from government. . . detention. . . lies at the heart of the liberty [the Due Process] Clause protects."). Accordingly, the deprivation at stake in this case necessitates additional procedural safeguards.

iv.    <u>The Automatic Stay Provision Creates a Substantial Risk of Erroneous Deprivation.</u>

DHS's automatic stay power is a regulation that authorizes 130 days of confinement without any procedures at all. Any time DHS believes a non-citizen "should not be released," DHS's filing of an appeal automatically prevents the immigration judge's bond order from going into effect. 8 C.F.R. § 1003.19(i)(2). This means the person will remain in custody until either the

BIA decides the bond appeal or ninety days pass. *Id.* § 1003.6(c)(4). Since DHS has ten days to file the notice of appeal, this stay provision creates a 100-day due-process-free zone where there is no ability to be heard at a meaningful time nor present argument to a neutral arbiter. *Id.* § 1003.6(c)(1). And at the end of the automatic stay period, the immigration judge's release order remains stayed for up to thirty more days if DHS requests a discretionary stay. *Id.* § 1003.6(c)(5). At no point in this 130-day process does the non-citizen have an opportunity to contest the stay nor does DHS have to justify the stay. It is, as the name suggests, automatic and, as a result, lacks any procedural safeguards, creating a high risk of erroneous deprivations.

**First**, the "opportunity to be heard 'at a meaningful time'" is a "fundamental requirement of due process." *Mathews*, 424 U.S. at 333 (quotation omitted). Compared to her bond hearing where "[t]he opportunity to be heard, to present evidence, and to conduct cross-examination was afforded both [DHS] and [Ms. Kordia]," *Zavala v. Ridge*, 310 F. Supp. 2d 1071, 1078 (N.D. Cal. 2004),[4] Ms. Kordia has no opportunity to contest her confinement pending appeal. Ms. Kordia's ability to respond to DHS's contentions on the merits in the bond appeal does not constitute an opportunity to be heard at a meaningful time because the deprivation occurs during the time it takes the BIA to reach a decision. Even if the BIA finds that DHS's contentions are meritless, the damage will already have been done. Moreover, the BIA will not consider Ms. Kordia's constitutional claims concerning the unlawfulness of her detention. *See Cantu-Delgadillo v. Holder*, 584 F.3d 682, 687 (5th Cir. 2009) (noting that "the BIA lacked jurisdiction to consider [petitioner's due process] challenges."); *see also* 8 C.F.R. § 1003.1(d) (narrowly defining the BIA to be an "appellate body charged with the review of those administrative adjudications under the

---

[4] This case considered a previous version of the regulation where the automatic stay remained in effect for the pendency of the BIA appeal. *See Zavala*, 310 F. Supp. 2d at 1074. In 2006, the regulation was amended to allow for an automatic stay of up to 90 days after the Notice of Appeal is filed.

[Immigration and Nationality] Act that the Attorney General may by regulation assign to it.").

**Second**, Ms. Kordia must be heard "in a meaningful manner." *Mathews*, 424 U.S. at 333 (quotation omitted). But here, DHS confined her unilaterally without review. Unlike stays pending appeal in federal court that "require[] the demonstration of likelihood of success on the merits and irreparable harm, the automatic stay provision does not demand *any* showing." *Zavala*, 310 F. Supp. 2d at 1078 (emphasis added). Nor could Ms. Kordia challenge the stay before the BIA because the DHS regulations do not permit Ms. Kordia to vacate the stay or seek release pending appeal.

In order for Ms. Kordia to be heard in a meaningful manner, DHS's request for continued confinement must also be tested by a neutral arbiter. DHS's automatic stay power is particularly problematic because it "conflates the functions of adjudicator and prosecutor." *Zavala*, 310 F. Supp. 2d at 1078; *see also Wang v. Holder*, 569 F.3d 531, 540 (5th Cir. 2009) (recognizing that "a due process violation can be premised upon the absence of a neutral arbiter" when an immigration judge takes on the role of a prosecutor). Here, the very attorney who did not prevail before the immigration judge as prosecutor "effectively overruled the decision as the adjudicator by invoking the automatic stay." *Zavala*, 310 F. Supp. 2d at 1078.

Thus, the automatic stay provision really is *automatic* in the sense that neither the immigration judge nor the BIA nor Ms. Kordia has a role to play. All DHS has to do is perform the "ministerial act" of filing a Form EOIR-43. *In re Joseph*, 22 I. & N. Dec. 660, 666 (BIA 1999), *decision clarified sub nom. Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999). These non-existent procedures create an especially high risk of erroneous deprivation because, by definition, a non-citizen has exercised her right to a bond hearing and an immigration judge has determined she was entitled to bond and ordered her release.

v.     <u>The Government's Interest in Retaining its Unilateral Stay Power Is Minimal.</u>

The government's interest in using these procedures and the administrative burdens of instituting an alternative are minimal. For one, "an immigration judge has already made a bail determination" that accounts for the DHS's safety and flight concerns. *Ashley v. Ridge*, 288 F. Supp. 2d 662, 671 (D.N.J. 2003). To the extent DHS believes the immigration judge made an erroneous decision, it can seek an emergency stay under 8 C.F.R. § 1003.19(i)(1). Under that provision, and unlike the automatic stay provision, the adjudication of whether the non-citizen should remain confined pending appeal is made by an independent arbiter, the BIA. App. at 212 (Doyle Decl. ¶ 12). The BIA could also ensure that DHS has a brief period of time to request and receive an emergency stay by issuing administrative stays akin to those issued by federal courts "to allow sufficient time to consider the emergency stay [pending appeal]." *Tex. All. for Retired Ams. v. Hughs*, No. 20-40643, 2020 WL 5814260, at *1 (5th Cir. Sept. 28, 2020) (granting administrative stay and requesting response the following day). Alternatively, a substantially shorter automatic stay window could achieve this purpose. *See*, *e.g.*, *Hamama v. Adducci,* No. 17-CV-11910, 2018 WL 1905074, at *2 (E.D. Mich. Apr. 23, 2018) (concluding that reducing the automatic stay to 30 days would "allow the Government sufficient time to file a motion for discretionary stay, the detainee sufficient time to respond, and the BIA sufficient time to reach a decision."), *vacated on other grounds by* 946 F.3d 875 (6th Cir. 2020). Or, at a minimum, DHS could at least permit non-citizens to ask the BIA to vacate an automatic stay.

Since the government can address its concerns at bond hearings before immigration judges and the alternative safeguard of seeking an emergency stay already exists under 8 C.F.R. § 1003.19(i)(1), relying on existing procedures would not pose undue burdens on the government.

DHS unilaterally confined Ms. Kordia pending appeal without having to make any showing that it was entitled to stay the immigration judge's decision or providing Ms. Kordia with any

opportunity to be heard. Therefore, Ms. Kordia has raised a substantial claim that her continued confinement pursuant to the (non-existent) procedures of the automatic stay provision violates her procedural due process rights.

3.   *Ms. Kordia's Confinement Violates Her Right to Substantive Due Process.*

Ms. Kordia's continued confinement violates her right to substantive due process. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action," and it is unquestionably a fundamental right. *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). "[G]overnment detention violates [substantive due process] unless. . . a special justification. . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Zadvydas*, 533 U.S. at 690 (quotation omitted). The Supreme Court has recognized two such justifications for immigration confinement: preventing flight and preventing danger to the community. *See id*. Respondents' continued confinement of Ms. Kordia is wholly unjustified with respect to either justification because, as in all instances in which DHS invokes the automatic stay, an immigration judge has already determined that Ms. Kordia is not a flight risk or danger.

At her bond hearing, Ms. Kordia bore the burden of establishing "to the satisfaction of the Immigration judge" that she is neither a flight risk nor danger to the community. *In re Guerra*, 24 I. & N. Dec. 37, 38 (BIA 2006). Despite its own RCA rating Ms. Kordia as low risk on every relevant bond factor, including risk of flight, public safety, and criminal history, *see* Verified Pet. ¶ 105; App. at 72 (PX 2-A, Manfredini Decl.), DHS argued that Ms. Kordia is a danger to the community because 1) she was briefly arrested in connection with a protest near Columbia University in 2024 and 2) she had sent money to a family member living in Palestine. Verified Pet. ¶ 152; App. at 145 (PX 2-C, Manfredini Decl.). With respect to her arrest and dismissed citation, the Immigration Judge found that merely standing in a crowd at a protest is not evidence of

dangerousness. App. at 145 (PX 2-C, Manfredini Decl.). As to Ms. Kordia's money transfer, DHS baselessly insinuated that this transfer amounted to support for a terrorist organization but admitted it had no information about the recipient. *Id.* The court, therefore, could not "find that [Ms. Kordia] is supporting a terrorist organization by sending money to a family member in Palestine." *Id.* Additionally, Ms. Kordia submitted evidence of her pending immigration applications and numerous letters of support from her friends, family, and school, demonstrating that she is a valued and integral member of her family and community. *Id.* at 74–88 (PX 2-A, Manfredini Decl.). The Immigration Judge found that Ms. Kordia met her burden of showing she is neither a danger nor a flight risk, and DHS had not presented evidence to show otherwise. Verified Pet. ¶¶ 153-154. Far from proving dangerousness or flight risk, DHS's evidence revealed it was confining her because DHS disagrees with her speech and association, which is an impermissible justification. *Supra* § V.A.1.

Nevertheless, DHS invoked its automatic stay power to keep Ms. Kordia confined for up to 130 days pending the resolution of its own appeal. Verified Pet. ¶159. However, "the Government must still justify its continued detention with an adequate regulatory purpose." *Kambo v. Poppell*, No. SA-07-CV-800-XR, 2007 WL 3051601, at *20 (W.D. Tex. Oct. 18, 2007) (citing *Zadvydas*, 533 U.S. at 699–70). Ms. Kordia's continued confinement cannot be justified in light of the immigration judge's findings, and all the available evidence of Respondents' public statements about Ms. Kordia confirm that she is being confined for an improper purpose. Therefore, it violates her right to substantive due process. *See Zadvydas*, 533 U.S. at 690.

## B. The Equities Favor Preliminary Injunctive Relief and the Petition Presents Extraordinary Circumstances Supporting Release on Bail.

The remaining factors favor granting a preliminary injunction, *Book People, Inc. v. Wong*, 91 F.4th 318, 340–41 (5th Cir. 2024) (affirming grant of preliminary injunction and considering

"irreparable harm," "the equities," and the "public interest"), and this case presents exceptional circumstances warranting release, *see Mapp*, 241 F.3d at 226.

**First,** irreparable harm. Each day Ms. Kordia is confined inflicts irreparable harm and exacerbates her physical deterioration. Thus, this case presents exceptional circumstances: (1) Ms. Kordia is confined in violation of her First Amendment rights, which is itself irreparable harm; (2) These First Amendment concerns are magnified where, as here, the conditions of Ms. Kordia's confinement violate her religious liberties; and (3) Ms. Kordia's continued confinement will keep inflicting severe harms to her health.

The Fifth Circuit has made clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). This is true whether the "First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought." *Elrod*, 427 U.S. at 373.

Ms. Kordia's conditions of confinement also severely burden her religious freedom, magnifying the necessity of release. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("There can be no question that the challenged restrictions [on religious practice], if enforced, will cause irreparable harm.") She has been denied halal meals, Verified Pet. ¶¶ 126–130, and, since April 10, 2025, has not prayed once because of the deplorable and dirty conditions in which Respondents are holding her, *id.* ¶¶ 143–44.  During Ramadan, she could hardly eat anything because Warden Bergami's staff refused to provide her meals at times when she could actually eat. *Id.* ¶¶ 131–33. Now, rather than accommodate the exercise of her religious beliefs, staff are trying to mislead Ms. Kordia by providing kosher meals the staff have as labeled "halal." *Id.* ¶ 129.

Further, Respondents have interfered with Ms. Kordia's ability to observe the five daily prayer times. *Id.* ¶ 135. Until just this week, Ms. Kordia had been unable to pray properly because detention facility staff refused to provide her prayer times, which is essential because those times are based on the position of the sun and Earth. *Id.* But even with the times, the filthy conditions, including the presence of cockroaches and bugs in her dorm room and her inability to properly clean before prayer make her feel she cannot engage in prayer in a state of worthiness. *Id.* ¶¶ 142–43, 147. Respondents-Defendants Bergami and Johnson are also denying her a prayer mat, which is essential to maintaining comfort on the concrete floors and creating a symbolically pure space for her to pray. *See Aigbekaen v. Warden*, No. 3:21-CV-01526 (JAM), 2023 WL 1780390, at *4 (D. Conn. Feb. 6, 2023) (allowing RFRA claims for denial of prayer mat); *Ward v. Rice*, No. 1:17-CV-01005, 2018 WL 1278197, at *6 (W.D. Ark. Mar. 12, 2018) (same). Ms. Kordia has requested a prayer mat on multiple occasions. Verified Pet. ¶ 137. At first, she was told mats were only for men for Friday prayer. *Id.* ¶ 138. However, within the last week, another Muslim woman came to the facility and received one immediately. *Id.* ¶ 139. It appears, then, Respondents-Defendants, through their employees, are intentionally depriving Ms. Kordia of a prayer mat. *Id.* This inflicts irreparable harm and bolsters the likelihood she is being targeted for supporting Palestinian rights and association with her family members, who are also Palestinian.

These religious liberty violations are also worsening Ms. Kordia's health. According to facility records, she has lost 30% of her body weight, and struggles through migraines, dizziness, and illness every day, both as a result of the unclean conditions and because of the lack of halal food. *Id.* ¶ 147.

**Second**, the equities. The hardships and public interest "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government

has no interest in her continued confinement.

For starters, "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quotation omitted). And here, an immigration judge already weighed the government's interest in her confinement and found that Ms. Kordia should be released on bond pending her removal proceedings. App. at 146 (PX 2-C, Manfredini Decl.). Because Ms. Kordia's confinement violates the Constitution, the government's only real interest is to confine her "in violation of the [Constitution] which is really 'no harm at all.'" *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021) (quotation omitted). Additionally, this Court can order release subject to financial and non-financial conditions to protect whatever interest the government has. *See Sanchez v. Winfrey*, No. CIV.A.SA04CA0293RFNN, 2004 WL 1118718, at *3 (W.D. Tex. Apr. 28, 2004).

Further, DHS's own policies recognize that Ms. Kordia should not be confined, particularly 1,500 miles from home. DHS Secretaries under both Trump and Biden administrations have issued guidance prohibiting DHS from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." Verified Pet. ¶110; App. at 182 (PX 7, 2019 DHS Memorandum re First Amendment Activity); *see also id.* at 191 (PX 8, 2021 ICE Memorandum re First Amendment Activity) (similar). ICE policy also prohibited Ms. Kordia's transfer to Prairieland because all of her family lives in New Jersey and her then-attorney of record resided in New York, but ICE transferred her without making any of the findings required by policy. Verified Pet. ¶ 115; App. at 196–99 (PX 9, ICE Policy 11022.1: Detainee Transfers) (prohibiting transfer of individuals from one ICE Field Office to another under such circumstances). Thus, DHS cannot have an interest in Ms. Kordia's continued confinement in Texas in violation of the First Amendment because "[i]t is a given of administrative law that

agencies must follow their own regulations." *Nat. Auto. Dealers Assoc. v. F.T.C.*, 127 F.4th 549, 553 (5th Cir. 2025) (citation omitted).

Ms. Kordia's case also presents extraordinary circumstances warranting relief under *Calley* and *Mapp*. When evaluating exceptional circumstances, the key inquiry is whether "the grant of bail [is] necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 230 (quotation omitted). In *Sanchez*, the court ordered immigration officers to release an individual during the pendency of her habeas petitioner where the "applicant's petition present[ed] a substantial claim" on the merits. 2004 WL 1118718, at *3. And the case presented extraordinary circumstances because the petitioner's "residence, employment, relationships, and financial conditions [were] exceedingly stable," she had "never been convicted of any criminal offense," she "appeared at every hearing," and she presented "not a hint of danger." *Id.* Thus, "[t]he interests of justice dictate[d] granting of bond in th[at] case." *Id.*

Specifically as the appropriateness of release on bail where a habeas petitioner is confined under the automatic stay provision, the Second Circuit held that the "internal [DHS] regulation neither purports to alter nor actually alters the inherent authority of this Court to grant bail a habeas petition being detained by [DHS]." App. at 225 (PX 11, Pet. & Order in *Vacchhio v. Ashcroft*, No. 03-2004 (2d Cir.)).

And in a similar case, on April 30, 2025, in *Mahdawi*, a federal district court released a petitioner accused of being a danger on the basis of First Amendment activity on bail in eerily similar circumstances. The district court considered: (1) the petitioner's danger or risk of flight; (2) the extraordinary nature of Respondents' attack on speech; and (3) whether relief was necessary to make the habeas remedy effective. *See Mahdawi*, 2025 WL 1243135, at *12–13.

These cases support release here:  Ms. Kordia has already demonstrated she is neither a

danger nor a flight risk and has strong ties to her community living among her family; her continued confinement is explicitly targeted and viewpoint-discriminatory to chill the speech of her and others who seek to support Palestinian rights; and relief is necessary to make the habeas remedy effective because detaining her to punish her protected speech chills not only her speech, but also others who wish to speak freely.

Ms. Kordia's case is even more exceptional than *Mahdawi* because, in addition to the likelihood of success on the merits, her continued confinement inflicts repeated, daily violations of her religious liberty. Since April 10, 2025, Ms. Kordia has not prayed once because the facility is so dirty and refused to provide her necessary materials she has requested. Verified Pet. ¶¶ 143–44. She is also sleeping on a thin mattress on cold concrete, among cockroaches and other insects every night. *Id.* ¶¶ 117, 121. And the lack of halal food has caused her to lose significant weight, putting her physical health in jeopardy. *Id.* ¶ 134. These conditions, combined with the extraordinary circumstances of her retaliatory confinement, make this an exceptional case warranting immediate relief.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant this Motion and order Respondents to release Ms. Kordia pending resolution of this case on the merits and prohibit them from further confining her during the proceedings' pendency unless she receives constitutionally adequate procedural protections, including notice and a pre-deprivation judicial hearing.

Dated: May 5, 2025

Respectfully submitted,
*/s/ Charles S. Siegel*
Charles S. Siegel
Texas State Bar No. 18341875
Caitlyn Silhan
Texas State Bar No. 24072879
Waters Kraus Paul & Siegel
3141 Hood Street, Suite 200
Dallas, Texas 75219
Telephone: 214-357-6244
Facsimile: 214-357-7252
siegel@waterskraus.com
csilhan@waterskraus.com

Sabrine Mohamad*
Louisiana State Bar No. 39989
Southern Poverty Law Center
P.O. Box 57089
New Orleans, LA 70157
Telephone: 504-418-9877
sabrine.mohamad@splcenter.org

Arthur Ago*
District of Columbia Bar No. 463681
Southern Poverty Law Center
1101 17th Street, NW
Suite 550
Washington, DC 20036
Telephone: 202-961-9325
arthur.ago@splcenter.org

Travis Walker Fife
Texas State Bar No. 24126956
Randall Hiroshige
Texas State Bar No. 24124299
Texas Civil Rights Project
P.O. Box 1108
Houston, Texas 77251-1108
travis@texascivilrightsproject.org
randy@texascivilrightsproject.org

Molly Petchenik
Texas State Bar No. 24134321

Texas Civil Rights Project
1405 Montopolis
Austin, Texas 78741
Telephone: 512-474-5073
Facsimile: 512-474-0726
molly@texascivilrightsproject.org

Daniel Hatoum*
Texas State Bar No. 24099136
Erin D. Thorn*
Texas State Bar No. 24093261
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
Telephone: 512-474-5073
daniel@texascivilrightsproject.org
erin@texascivilrightsproject.org

Naz Ahmad*
New York State Bar No. 5327424
Amal Thabateh*
New York State Bar No. 5923826
CUNY School of Law
2 Court Square West, 5th Floor
Long Island City, NY 11101
(718) 340-4630
naz.ahmad@law.cuny.edu
amal.thabateh@law.cuny.edu

Golnaz Fakhimi*
New York State Bar No. 5063003
Sadaf Hasan*
New York State Bar No. 6046023
Muslim Advocates
1032 15th Street Northwest, Unit 362
Washington, D.C. 20005
(202) 655-2969
golnaz@muslimadvocates.org
sadaf@muslimadvocates.org

*PHV application forthcoming*
**ATTORNEYS FOR PETITIONER-PLAINTIFF**

## CERTIFICATE OF SERVICE

I certify that on May 5, 2025, a true and correct copy of this document was properly

served on all counsel of record served in accordance with the Federal Rules of Civil Procedure.

*/s/ Charles S. Siegel*
Charles S. Siegel

## CERTIFICATE OF CONFERENCE

I certify that on May 1, 2025, Travis Fife for Petitioner-Plaintiff and George Padis for

Respondents conferred via email. Respondents are opposed.

*/s/ Charles S. Siegel*
Charles S. Siegel