# EXHIBIT "1"

## *Petitioner-Plaintiff, Leqaa Kordia's Motion for Release Pending Final Judgment and Preliminary Injunction*

*Declaration of Georgina Guzman*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| KRISTI NOEM, et al., | § | |
| | § | |
| Respondents-Defendants | § | |

## DECLARATION OF GEORGINA GUZMAN

I, GEORGINA GUZMAN, hereby declare and state:

1.    I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

2.    I am the Supervising Paralegal with the Texas Civil Rights Project. I was given the assignment of accessing and verifying the contents of the websites listed in the table below. Print outs of these websites are now exhibits attached to Petitioner's Motion for Emergency Relief as exhibits to this declaration. Exhibits A – I.

3.    Exhibits A – I fairly and accurately reflect what I perceived when I accessed these websites.

4.    I have also reviewed the video embedded in Exhibit E of this declaration. The video represents Secretary of State Marco Rubio answering a question from a reporter. At approximately 1:38–1:48 of the video, Secretary Rubio states, "We gave you a visa to come and study and get a

1

degree not to become a social activist that tears up our university campuses, and if we've given you a visa and then you decide to do that we're going to take it away."

| Ex. No. | Date Accessed | Description |
|---|---|---|
| A | April 21, 2025 | *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, White House (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/ |
| B | April 21, 2025 | Donald J. Trump (@realdonaldtrump), Truth Social (Mar. 10, 2025), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782 |
| C | April 21, 2025 | Marco Rubio, X (formerly Twitter) (Mar. 9, 2025), https://x.com/marcorubio/status/1898858967532441945 |
| D | April 21, 2025 | Joseph Gedeon, *Rubio Boasts of Canceling More than 300 Visas Over Pro-Palestine Protests* (Mar. 27, 2025, 2:55 P.M.), https://www.theguardian.com/us-news/2025/mar/27/state-department-visas-pro-palestine-protesters |
| E | April 21, 2025 | *Secretary Rubio Defends Revoking Turkish Student's Visa*, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-studentsvisa/5158479 |
| F | April 21, 2025 | John Dawsey et. al, *Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/ |
| G | April 21, 2025 | *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dept. of Homeland Sec. (Mar. 14, 2025), https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and |
| H | May 1, 2025 | Sharon Otterman & Ana Ley, *Columbia Activist Arrested by ICE at His Appointment for Citizenship*, The New York Times (Apr. 14, 2025), https://www.nytimes.com/2025/04/14/nyregion/columbia-student-palestinian-arrested-ice.html |

2

| I | May 1, 2025 | *100 Days of Fighting Fake News*, Dep't of Homeland Sec. (Apr. 30, 2025), https://www.dhs.gov/news/2025/04/30/100-days-fighting-fake-news |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 1, 2025 in San Benito, Texas.

Georgina Guzman
Supervising Paralegal and
Paralegal, Beyond Borders Program
Texas Civil Rights Project

3

# EXHIBIT "1-A"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Exhibit "A" - Declaration of Georgina Guzman*

*Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism, White House (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/*

Case 3:25-cv-01963-L-RT        Document 13-2        Filed 05/05/25        Page 6 of 225        PageID.140

≡                    *The* WHITE HOUSE                    🔍

↖ **FACT SHEETS**

### Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism

The White House

January 30, 2025

**COMBATING ANTI-SEMITISM IN THE UNITED STATES:** Today, President Donald J. Trump signed an Executive Order to Combat Anti-Semitism.

- Expanding on his Executive Order 13899, President Trump's new Order takes forceful and unprecedented steps to marshal all Federal resources to combat the explosion of anti-Semitism on our campuses and in our streets since October 7, 2023.

- Every Federal executive department and agency leader will review and report to the White House within sixty days on *all* criminal and civil authorities and actions available for fighting anti-Semitism.

- Immediate action will be taken by the Department of Justice to protect law and order, quell pro-Hamas vandalism and intimidation, and investigate and punish anti-Jewish racism in leftist, anti-American colleges and universities.

- The Order demands the removal of resident aliens who violate our laws.

**GOING ON OFFENSE TO ENFORCE LAW AND ORDER AND TO PROTECT CIVIL RIGHTS:** Immediately after the jihadist terrorist attacks against the people of Israel on October 7, 2023, pro-Hamas aliens and left-wing radicals began a campaign of intimidation, vandalism, and violence on the campuses and streets of America.

- Celebrating Hamas' mass rape, kidnapping, and murder, they physically blocked Jewish Americans from attending college classes, obstructed synagogues and assaulted worshippers, and vandalized American monuments and statues.

- The Biden Administration turned a blind eye to this coordinated assault on public order; it simply refused to protect the civil rights of Jewish Americans, especially

Petitioner's Appendix Page 6

students. According to a December 2024 <u>U.S. House of Representatives Staff Report</u> on anti-Semitism, "the failure of our federal government departments and agencies is astounding."

**PRESIDENT TRUMP KEEPS HIS PROMISES AND BUILDS ON HIS SUCCESS:** In his first term, President Trump kept his biggest promises:

- He moved the American Embassy in Israel to Jerusalem: After decades of broken promises and despite much criticism, President Trump was the President who finally kept his commitment to Israel to move the American embassy from Tel-Aviv to Israel's true and rightful capital: Jerusalem.

- He established the Abraham Accords: President Trump delivered the greatest breakthrough for peace in the Middle East in decades by brokering the normalization of ties between Israel and the United Arab Emirates, Bahrain, Sudan, and Morocco, protecting Israel and Jews and spreading security and prosperity to the entire region.

Now, President Trump has promised that the Federal Government will:

- Protect the civil rights of our Jewish citizens: "My promise to Jewish Americans is this: With your vote, I will be your defender, your protector, and I will be the best friend Jewish Americans have ever had in the White House."

- Aggressively enforce the law, protect public order, and prosecute anti-Semitic crimes: "I will issue clear orders to my Attorney General to aggressively prosecute terroristic threats, arson, vandalism and violence against American Jews."

- Deport Hamas Sympathizers and Revoke Student Visas: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."

NEWS

Case 3:25-cv-04978-I-BT    Document 13-2    Filed 05/05/25    Page 8 of 225    PageID 150

ADMINISTRATION

ISSUES

CONTACT

EOP

VISIT

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

  

WH.GOV

Copyright

Petitioner's Appendix Page 8

Case 2:25-cv-01972-L-RT    Document 10-2    Filed 05/05/25    Page 9 of 225    PageID 151

Privacy



Petitioner's Appendix Page 9

# EXHIBIT "1-B"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Exhibit "B" - Declaration of Georgina Guzman*

*Donald J. Trump (@realdonaldtrump), Truth Social (Mar. 10, 2025),*
*https://truthsocial.com/@realDonaldTrump/posts/114139922625284782*



### ← Truth Details
4954 replies



**Donald J. Trump** ☑
@realDonaldTrump

Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you!

**11.3k** ReTruths  **50k** Likes                    Mar 10, 2025, 12:05 PM

# EXHIBIT "1-C"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Exhibit "C" - Declaration of Georgina Guzman*

*Marco Rubio, X (formerly Twitter) (Mar. 9, 2025),*
*https://x.com/marcorubio/status/1898858967532441945*



# EXHIBIT "1-D"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Exhibit "D" - Declaration of Georgina Guzman*

*Joseph Gedeon, Rubio Boasts of Canceling More than 300 Visas Over Pro-Palestine Protests (Mar. 27, 2025, 2:55 P.M.), https://www.theguardian.com/us-news/2025/mar/27/state-department-visas-pro-palestine-protesters*

**US immigration**

# Rubio boasts of canceling more than 300 visas over pro-Palestine protests

**Secretary of state called those with revoked visas 'lunatics' as video shows masked immigration officers sweeping people off streets**



📷 Marco Rubio speaks in Kingston, Jamaica, on Wednesday. Photograph: Nathan Howard/AFP via Getty Images

**Joseph Gedeon** *in Washington*

Thu 27 Mar 2025 14.55 EDT

The US state department is undertaking a widespread visa-review process, revoking hundreds of visas and placing hundreds more under scrutiny, targeting mostly foreign nationals engaged in pro-Palestine activism, according to official statements.

The secretary of state, Marco Rubio, confirmed the scale of the crackdown, announcing that he has canceled visas for more than 300 people he called "lunatics" connected to campus pro-Palestine protests in the US, with promises of action to continue daily.

Asked by reporters during a visit to Guyana in South America to confirm reports of 300 visas stripped, Rubio said: "Maybe more than 300 at this point. We do it every day, every time I find one of these lunatics."

One recent example of the policy's implementation has been US immigration authorities detaining Rumeysa Ozturk, a Turkish doctoral student at Tufts University on a Fulbright scholarship, in broad daylight by masked agents in plainclothes.

Her arrest and visa revocation came after she voiced support for Palestinians in Gaza in an op-ed she co-authored in her student newspaper. The Department of Homeland Security (DHS) claimed she "engaged in activities in support of Hamas", a justification being denounced as a direct assault on academic freedom and the erosion of free speech and personal liberties.

In addressing her case specifically, Rubio said: "We revoked her visa … once you've lost your visa, you're no longer legally in the United States … if you come into the US as a visitor and create a ruckus for us, we don't want it. We don't want it in our country. Go back and do it in your country."

But the visa-revocation campaign is just part of a broader, more aggressive deportation enforcement strategy that extends far beyond protest-related actions.

The Trump administration has simultaneously implemented other restrictive measures, including pausing green card processing for certain refugees and asylum seekers and issuing a global directive instructing visa officers to deny entry to transgender athletes, of which there are very few.

4/21/25, 8:03 AM      Rubio boasts of canceling more than 300 visas over pro-Palestine protests | US immigration | The Guardian

Case 3:25-cv-01072-L-BT    Document 13-2    Filed 05/05/25    Page 17 of 225    PageID 159

In a statement to Fox News, the state department claimed that it had "revoked the visas of more than 20 individuals", and said hundreds more were under consideration under the banner of what they call "national security concerns".

## Sign up to This Week in Trumpland

 Free newsletter

A deep dive into the policies, controversies and oddities surrounding the Trump administration

**Enter your email address**



**Privacy Notice:** Newsletters may contain info about charities, online ads, and content funded by outside parties. For more information see our Privacy Policy. We use Google reCaptcha to protect our website and the Google Privacy Policy and Terms of Service apply.

"Overall, we continue to process hundreds of visa reviews to ensure visitors are not violating terms of their visas and do not pose a threat to the United States and our citizens," the statement said.

The state department did not return a request for comment on whether these revocations were student visas, work visas or otherwise.

4/21/25, 8:03 AM    Rubio boasts of canceling more than 300 visas over pro-Palestine protests | US immigration | The Guardian

Case 3:25-cv-01072-L-BT    Document 13-2    Filed 05/05/25    Page 18 of 225    PageID 160

## Most viewed

# EXHIBIT "1-E"

*PETITIONER-PLAINTIFF, LEQAA KORDIA'S*
*MOTION FOR RELEASE PENDING FINAL JUDGMENT*
*AND PRELIMINARY INJUNCTION*

*Exhibit "E" - Declaration of Georgina Guzman*

*Secretary Rubio Defends Revoking Turkish Student's Visa, C-SPAN (Mar. 27, 2025), https://www.c-span.org/clip/news-conference/secretary-rubio-defends-revoking-turkish-studentsvisa/5158479*

Shop the C-SPAN Store - Great Gift Ideas

  278,231 hours of video 

📺 SCHEDULE 🖥 TV NETWORKS 📻 RADIO 🎙 PODCASTS 📱 CREATED BY CABLE IN 1979 **All Series ▾** **Congress** **DONATE**

  

American History TV

Book TV

Washington Journal

Supreme Court

  

**MARCH 27, 2025**

# Secretary Rubio Defends Revoking Turkish Student's Visa

During a news conference in Guyana, Secretary of State Marco Rubio defended revoking the visa of Turkish student Rumeysa Ozturk for participating in pro-Palestinian protests at Tufts University and writing an op-ed. Ozturk, a doctoral student, was arrested by plain-clothes agents near her home in Somerville, Massachusetts and is being detained in Louisiana. Rubio warned there would be more arrests and deportations and encouraged other countries to do the same.Show Less ⌃

   



✂ CLIPPING TOOL ⌄

**CLIP FROM**

▶ **Secretary Rubio News Conference with Guyanese President**



Advertisement

GALLERIES

Advertisement





Shop the C-SPAN Store - Great Gift Ideas

*Secretary Rubio Defends Revoking Turkish Student's Visa*    *Secretary Rubio Defends Revoking Turkish Student's Visa*

## RECOMMENDED



**MAR 26, 2025**

### Press Secretary Karoline Leavitt on MS-13 Leader Arrest

White House Press Secretary Karoline Leavitt spoke to reporters in the White House driveway about the arrest of a top MS-13 leader in Woodbridge, Virginia. She also touched on President Trump's auto tariffs and the Signal group chat security breach.



**MAR 24, 2025**

### DNI Director Gabbard, FBI Director Patel and Other National Security Officials Testfy on Global Threats

"I think this is one more example of sloppy, careless, incompetent behavior, particularly toward classified information, that this is not a one off, or a first-time error," said Senate Intelligence Committee Ranking Member Mark Warner (D-VA) of the recently-leaked ...



**MAR 24, 2025**

### President Trump Meets with U.S. Ambassadors at White House

National Security Adviser Michael Waltz "will continue to do a good job," President Trump said during a meeting at the White House, brushing aside worries that Mr. Waltz had discussed U.S. plans to strike Houthi rebels in Yemen days earlier in a group ...



**APR 5, 2025**

### President Trump Speaks to Reporters About Impact of Tariffs Policy

President Trump spoke to reporters aboard Air Force One en route to the White House, discussing the impact of his tariffs on the domestic and global economies. He focused on the U.S.'s trade deficits with other countries -- particularly China -- which ...

## TRENDING



**APR 20, 2025**

### Washington Journal 04/21/2025

Former Trump Veterans Affairs Secretary David Shulkin discusses proposed cuts to the VA and Scott Kennedy from the Center for Strategic & International Studies discusses the brewing trade war between the U.S. and China.



**APR 17, 2025**

### Washington Journal: Ann Coulter on Political News of the Day

Ann Coulter talked about the Trump administration's actions and political news of the day.



**APR 19, 2025**

### Washington Journal: Open Forum, Part 1

Viewers commented on whether their religious faith shapes their politics.



**APR 19, 2025**

### Washington Journal: Kim Wehle on President Trump's Use of Executive Power

Kim Wehle, a law professor, author, and ABC News legal contributor, talked about the Trump administration's use of executive power.


GALLERIES



Case 3:25-cv-01072-L-BT    Document 13-2    Filed 05/05/25    Page 22 of 225    PageID 164

**Shop the C-SPAN Store - Great Gift Ideas**



Advertisement

## ABOUT C-SPAN

Our Mission
Our History
Cameras In The Court
Milestones
Leadership
Jobs ↗
In The Community
Video Library
Viewer Guide

## RESOURCES

C-SPAN Classroom
Blog
Series A-Z
Press Center
FAQs
Contact Us
Shop
C-SPAN's Book Collection
World Legislatures

MyC-SPAN Login

C-SPAN Select App
C-SPAN Now App
 Download ↗
 Download ↗

 C-SPAN Podcasts

## FOLLOW C-SPAN



©2025 National Cable Satellite Corporation   |  Copyrights and Licensing  |  Terms and Conditions  |  Privacy


GALLERIES



# EXHIBIT "1-F"

## *PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR RELEASE PENDING FINAL JUDGMENT AND PRELIMINARY INJUNCTION*

*Exhibit "F" - Declaration of Georgina Guzman*

*John Dawsey et. al, Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators, Wash. Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/*

*Democracy Dies in Darkness*

# Trump told donors he will crush pro-Palestinian protests, deport demonstrators

Trump has waffled on whether the Israel-Gaza war should end. But speaking to wealthy donors behind closed doors, he said that he supports Israel's right to continue "its war on terror."

May 27, 2024

By Josh Dawsey, Karen DeYoung and Marianne LeVine

Former president Donald Trump promised to crush pro-Palestinian protests on college campuses, telling a roomful of donors — a group that he joked included "98 percent of my Jewish friends" — that he would expel student demonstrators from the United States, according to participants in the roundtable event with him in New York.

"One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave," Trump said on May 14, according to donors at the event.

When one of the donors complained that many of the students and professors protesting on campuses could one day hold positions of power in the United States, Trump called the demonstrators part of a "radical revolution" that he vowed to defeat. He praised the New York Police Department for clearing the campus at Columbia University and said other cities needed to follow suit, saying "it has to be stopped now."

"Well, if you get me elected, and you should really be doing this, if you get me reelected, we're going to set that movement back 25 or 30 years," he said, according to the donors, who spoke on the condition of anonymity to detail a private event.

Trump has waffled publicly about whether Israel should continue its war in Gaza, saying "get it over with ... get back to peace and stop killing people." Major Republican donors have lobbied him in recent months to take a stronger stance backing Israel and its prime minister, Benjamin Netanyahu.

The private New York meeting offers new insight into his current thinking. Speaking to wealthy donors behind closed doors, Trump said that he supports Israel's right to continue "its war on terror" and boasted of his White House policies toward Israel.

The former president didn't mention Netanyahu, whom he resents for acknowledging Joe Biden's victory in 2020 and hasn't spoken to in years.

Trump has offered few policy specifics about how he would treat Israel in a second term. He cast doubt on the viability of an independent Palestinian state in a recent Time magazine interview, saying he was "not sure a two-state solution anymore is gonna work," adding: "there may not be another idea." A two-state solution to the Israeli-Palestinian conflict has been the end goal of U.S. policy under Democratic and Republican presidents for decades.

Trump's campaign did not respond to detailed questions about The Washington Post's reporting. "When President Trump is back in the Oval Office, Israel will once again be protected, Iran will go back to being broke, terrorists will be hunted down, and the bloodshed will end," Karoline Leavitt, the campaign's national press secretary, wrote in an email.

Both Trump and Biden have struggled with the politics of the Israeli-Palestinian conflict on the campaign trail. Biden's base is deeply divided on the Israel-Gaza war, but Trump's rhetoric on the subject has limited his ability to capitalize on his opponent's problems.

Trump has repeatedly claimed in public statements and interviews that Hamas's Oct. 7 attack on Israel, which sparked the Gaza war, would have never happened if he were president.

But he has also criticized Israel's approach to the war, albeit in somewhat confusing terms. In a March interview with the Israeli newspaper Israel Hayom, Trump said, "You have to finish up your war. To finish it up. You gotta get it done." In April, he argued the war was bad for Israel's image, telling conservative talk show radio host Hugh Hewitt that Israel is "absolutely losing the PR war."

Trump took a different tone in the meeting with donors. Instead of saying it was time to wrap up the war, he said he supported Israel's right to continue its attack on Gaza.

"But I'm one of the only people that says that now. And a lot of people don't even know what October 7th is," Trump said.

Trump repeatedly listed for the donors everything he believed he had done for Israel in the White House. He moved the U.S. Embassy to Jerusalem, bucking decades of U.S. policy. He recognized the Golan Heights, which Israel seized from Syria in 1967, as an integral part of Israel after what he said was a five-minute conversation with David Friedman, his ambassador there.

He also polled the room if they liked Friedman.

"So I did Golan Heights. You know that's worth $2 trillion, they said, that piece, if you put it in real estate terms. But it's worth more than that. It is," Trump said, according to donors present.

Israel, Trump argued, needs his help. Street demonstrations for Israel get smaller crowds than his rallies, he said. In Washington, and particularly in Congress, "Israel is losing its power," he added. "It's incredible."

The former president repeatedly expressed frustration that Jewish Americans did not vote for him as much as he believes they should, the donors said.

"But how can a Jewish person vote for a Democrat, and Biden in particular — but forget Biden. They always let you down," he said, referring to Democrats.

Trump has made similar comments in public, occasionally triggering backlash. Some Jewish Americans have said that his rhetoric evokes the antisemitic idea that <u>American Jews are more loyal to their religion or to Israel than to the United States.</u>

Several influential Republican donors, including Miriam Adelson, have pressed Trump to publicly express support not only for Israel but also for Netanyahu, its embattled leader.

Trump never mentioned Netanyahu at the roundtable. But he has frequently complained about Netanyahu in public — particularly after the Israeli prime minister acknowledged Biden's victory in the 2020 election even as Trump was still fiercely challenging the results.

"Bibi Netanyahu rightfully has been criticized for what took place on October 7," Trump told Time, referring to the Israeli government's <u>failure to prevent</u> the surprise attack, in which Hamas militants killed about 1,200 Israelis and took 253 hostage. He also recalled that he had "a bad experience with Bibi," claiming that Israel had planned to participate in the 2020 U.S. strike that killed Iranian Gen. Qasem Soleimani but backed out at the last minute.

Trump's annoyance with Netanyahu dates to his time in the White House and his frustration that he felt he did not get enough credit for what he did for Israel and its leader when he was in office, John Bolton, Trump's former national security adviser, said in an interview.

"He doesn't like Netanyahu ... it's because Bibi is one of the premier democratic politicians in the world in terms of getting publicity about himself and Trump resents that," said Bolton, a frequent Trump critic. "Trump fundamentally sees Netanyahu as getting credit for things Trump thinks he ought to get credit for."

Until the 2020 election, the two leaders had a close working relationship, according to one person familiar with their relationship, who spoke on the condition of anonymity to describe the leaders' private conversations. But Trump was "taken aback" by a video Netanyahu made congratulating Biden on his victory. Trump, this person said, thought the video was a "little too cordial."

Sen. Lindsey Graham (R-S.C.), a Trump ally and sometimes critic, didn't directly address Trump's comments about Israel when asked about them in an interview. But he offered a broad assessment.

"We can have our opinions about our allies but I think they're in the middle of a fight for their life, there'll be plenty of time for the accountability to be had," he said. "The best route to deliver that accountability will be the Israeli people."

Trump and Netanyahu's relationship will "continue to prosper and flourish" if they're both in office at the same time again, Matthew Brooks, chief executive of the Republican Jewish Coalition, said in an interview.

"He's giving the Israelis a blank check to go in and do what they need to do to destroy Hamas and eliminate the threat in Gaza from Hamas. And what he's also saying, which is actually true, he said 'but do it quickly' because time is not Israel's ally right now," Brooks said.

"President Biden stands against antisemitism and is committed to the safety of the Jewish community and security of Israel. Donald Trump does not," James Singer, a spokesman for the Biden campaign, said in a statement earlier this month.

Top Trump allies recently visited Israel for meetings with Netanyahu and other officials in a delegation headed by Robert O'Brien, another of Trump's former White House national security advisers. The trip was organized by the pro-Israel American Israel Public Affairs Committee, and the group did not come bearing messages from Trump or speaking on behalf of the Trump administration, said Ed McMullen, who served as U.S. ambassador to Switzerland under the Trump administration.

The group watched gruesome footage of the Oct. 7 attack and toured parts of the country where Israelis had been killed or kidnapped, making for an "educational visit that was life-changing," McMullen said. The group is likely to debrief Trump on the trip at some point, he added.

At the donor roundtable, Trump said he had studied Jewish history and had thoughts about this moment in U.S. history.

"And you know, you go back through history, this is like just before the Holocaust. I swear. If you look, it's the same thing," Trump said. "You had a weak president or head of the country. And it just built and built. And then, all of a sudden, you ended up with Hitler. You ended up with a problem like nobody knew."

---

**What readers are saying**

The comments reflect a strong opposition to Donald Trump, with many expressing concerns about his potential re-election and the implications for democracy and civil rights. Several comments draw parallels between Trump and historical fascist leaders, emphasizing fears of... <u>Show more</u>

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT "1-G"

## PETITIONER-PLAINTIFF, LEQAA KORDIA'S
## MOTION FOR RELEASE PENDING FINAL JUDGMENT
## AND PRELIMINARY INJUNCTION

*Exhibit "G" - Declaration of Georgina Guzman*

*VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport, Dept. of Homeland Sec. (Mar. 14, 2025), https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and*

4/21/25, 8:07 AM          VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App...

Case 3:25-cv-01072-L-BT          Document 13-2          Filed 05/05/25          Page 29 of 225          PageID 171

Homeland
Security

U.S. Department of Homeland Security

# VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport

**Release Date:** March 14, 2025

*Another student who supported Hamas was arrested by ICE HSI for overstaying her student visa.*

WASHINGTON – Today, Secretary of Homeland Security Kristi Noem announced that one of the Columbia students who had her student visa revoked for advocating for violence and terrorism self-deported using the CBP Home App and ICE arrested a Palestinian student for overstaying her expired F-1 visa.

Ranjani Srinivasan, a citizen and national of India, entered the United States on an F-1 student visa as doctoral student in Urban Planning at Columbia University. Srinivasan was involved in activities supporting Hamas, a terrorist organization. The Department of Homeland Security has obtained video footage (https://x.com/Sec_Noem/status/1900562928849326488) of her using the CBP Home App to self-deport on March 11.

Another student Leqaa Kordia, a Palestinian from West Bank, was arrested by ICE HSI Newark officers for overstaying her expired F-1 student visa. Her visa terminated on January 26, 2022, for lack of attendance. Previously, in April 2024 Kordia was arrested for her involvement in pro-Hamas protests at Columbia University in New York City.

The below statement is attributable to Secretary Noem:

*"It is a privilege to be granted a visa to live and study in the United States of America. When you advocate for violence and terrorism that privilege should be revoked, and you should not be in this country. I am glad to see one of the Columbia University terrorist sympathizers use the CBP Home app to self-deport."*

## Topics

CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

## Keywords

DEPARTMENT OF HOMELAND SECURITY (DHS) (/KEYWORDS/DEPARTMENT-HOMELAND-SECURITY-DHS)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 03/21/2025

# EXHIBIT "1-H"

## *PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR RELEASE PENDING FINAL JUDGMENT AND PRELIMINARY INJUNCTION*

*Exhibit "H" - Declaration of Georgina Guzman*

*Sharon Otterman & Ana Ley, Columbia Activist Arrested by ICE at His Appointment for Citizenship, The New York Times (Apr. 14, 2025), https://www.nytimes.com/2025/04/14/nyregion/columbia-student-palestinian-arrested-ice.html*

# *Columbia Activist Arrested by ICE at His Appointment for Citizenship*

Mohsen Mahdawi, a legal permanent resident, has lived in the United States for 10 years and was arrested in Vermont. He has not been charged with a crime.

 **Listen to this article · 6:36 min**   Learn more

 

**By Sharon Otterman and Ana Ley**

April 14, 2025

Mohsen Mahdawi, an organizer of pro-Palestinian demonstrations last year at Columbia University, was detained by immigration officials on Monday after arriving for an appointment in Vermont that he thought was a step toward becoming a U.S. citizen, his lawyers said.

Hours later, Mr. Mahdawi's mother, older sister and lawyers were scrambling to find him after his abrupt detention at an immigration center in Colchester, Vt. His lawyers requested a temporary restraining order to prevent federal officials from transferring him to a more conservative jurisdiction — a tactic used in the detention and attempted deportation of at least four other college demonstrators.

A Vermont federal judge, William K. Sessions III, swiftly granted that request, ordering that Mr. Mahdawi, an outspoken critic of Israel's military campaign in Gaza, not be removed from the United States or transferred out of Vermont until he orders otherwise. His lawyers said that as of Monday afternoon, they had confirmed that he was still in Vermont.

"This is their M.O.," Mr. Mahdawi's lawyer, Luna Droubi, said. "They just continue to hide the individual to the point where their attorneys can't quite understand or identify where to file. And so, you know, we're operating blind, and they have all the information, and yet we're tasked with attempting to file in the right jurisdiction."

A green card holder for the past 10 years, Mr. Mahdawi is the latest Palestinian student to be caught in the Trump administration dragnet that has been targeting foreign students involved in pro-Palestinian organizing on U.S. college campuses.

Mr. Mahdawi was born and raised in a refugee camp in the West Bank, where he lived until he moved to the United States in 2014, according to a petition filed by his lawyers on Monday demanding his immediate release. His arrest was first reported by The Intercept.

He is finishing his undergraduate studies in philosophy at Columbia's School of General Studies and was planning to enroll as a master's degree student at its international affairs school in the fall.

Representatives for Columbia declined to comment, citing federal student privacy regulations.

Mr. Mahdawi has not been accused of a crime. According to his lawyers, the Trump administration appears to be seeking his removal from the country under the same legal provision that it is using to detain another recent Columbia student and Palestinian, Mahmoud Khalil, contending that his presence is a threat to the foreign policy and national security interests of the United States. Immigration officials have argued that pro-Palestinian demonstrators have enabled the spread of antisemitism, but they have not offered evidence to substantiate the claim.

After the Hamas attack on Israel on Oct. 7, 2023, Mr. Mahdawi, who is in his mid-30s, co-founded Dar: the Palestinian Student Society at Columbia University, with Mr. Khalil, to "celebrate Palestinian culture, history and identity," according to his

lawyers' petition. He also helped found Columbia University Apartheid Divest, a broader coalition that went on to lead many pro-Palestinian demonstrations on campus, pushing the university to divest from Israel.

But Mr. Mahdawi took a step back from student organizing in March 2024, before the establishment of encampments on campus and the takeover of a campus building, Hamilton Hall. In interviews at the time, he said this was driven in part by his immigration status and his beliefs as a practicing Buddhist. For two years, he was the president of the Columbia University Buddhist Association.

He spoke publicly about his experience as a child seeing his best friend killed by an Israeli soldier, mentioning it during a "60 Minutes" interview in December 2023. But he also said he wanted a peaceful end to the Israeli-Palestinian conflict.

"My motivation comes out of love now, not out of anger, not out of hate," he said in an interview.

As with Mr. Khalil, several hard-line pro-Israel groups have been agitating online for Mr. Mahdawi's detention and deportation since President Trump's return to the White House.

Betar USA, one of those groups, posted on X on Jan. 30 that "visa holder Mohsen Mahdawi is on our deport list." In March, they repeated that, posting "Mohsen Mahdawi is next and also on the deport list."

He was also profiled by Canary Mission, another group naming students and calling for action to be taken against those they assert are pro-Hamas.

On Monday morning, Mr. Mahdawi turned up for an interview he had been told was related to his naturalization. Instead, immigration officers, some with their faces covered, placed Mr. Mahdawi in handcuffs and arrested him, according to a statement Monday from Vermont's two senators, Bernie Sanders, an Independent, and Peter Welch, a Democrat, and Representative Becca Balint, a Democrat.

Mr. Mahdawi, whose permanent address is in White River Junction, Vt., had sought help from the lawmakers before his appointment, fearing the worst.

They denounced his arrest and demanded his release.



A demonstration organized by Jewish Voice for Peace outside the Manhattan offices of Immigration and Customs Enforcement called for the release of Mahmoud Khalil, a former Columbia University student who is facing deportation.   Hilary Swift for The New York Times

"This is immoral, inhumane, and illegal," the three lawmakers said in a statement. "Mr. Mahdawi, a legal resident of the United States, must be afforded due process under the law and immediately released from detention."

Mr. Mahdawi's friend Mikey Baratz described him as deeply empathetic and said that, at his core, Mr. Mahdawi believed that all humans deserved to be treated with dignity. Mr. Mahdawi reached out to Mr. Baratz about six months ago because he wanted to meet Israeli students at Columbia — Mr. Baratz is Jewish and was born and raised in Israel until he left at the age of 12.

They would spend hours talking about their lives and found surprising common ground. Mr. Baratz, who graduated from Columbia in December with a master's degree in international security policy, recently applied for a job at The New York

Times.

"This is a Palestinian. I'm an Israeli. Our people are at war," Mr. Baratz, 31, said. "And his willingness to actually hear and actively learn and understand the Israeli experience — I mean, I've never met anyone who so quickly was willing to take feedback."

Jonah E. Bromwich contributed reporting.

**Sharon Otterman** is a Times reporter covering higher education, public health and other issues facing New York City.

**Ana Ley** is a Times reporter covering immigration in New York City.

A version of this article appears in print on , Section A, Page 20 of the New York edition with the headline: Activist Is Held Before Meeting On Citizenship

# EXHIBIT "1-I"

*PETITIONER-PLAINTIFF, LEQAA KORDIA'S*
*MOTION FOR RELEASE PENDING FINAL JUDGMENT*
*AND PRELIMINARY INJUNCTION*

*Exhibit "I" - Declaration of Georgina Guzman*

*100 Days of Fighting Fake News, Dep't of Homeland Sec. (Apr. 30, 2025), https://*
*www.dhs.gov/news/2025/04/30/100-days-fighting-fake-news*

U.S. Department of Homeland Security

# 100 Days of Fighting Fake News

**Release Date:** April 30, 2025

*From Stories on Criminals to Statistics, DHS has been Holding the Media Accountable for Spreading Disinformation to the American people*

WASHINGTON— During President Trump's 100 days in office, the Department of Homeland Security published a non-exhaustive list of facts, to help set the record straight on numerous false and misleading stories that have spread around news coverage and social media.

The list can be found below:

## The Facts on Noteworthy Individuals Deported or Prevented from Entering the U.S.

- **The Deportation Of American Citizens**
  - The media has FALSELY claimed that ICE is deporting US citizen children of illegal aliens. This is false.
  - In both cases the mother made the determination to take her children with her back to Honduras.
  - DHS takes our responsibility to protect children seriously and will continue to work with federal law enforcement to ensure that children are safe and protected.
  - The Trump Administration is giving parents in this country illegally the opportunity to self-deport and take control of their departure process with the potential ability to return the legal, right way and come back to live the American dream. The CBP Home app is a free and easy way to self deport.
- **Kilmar Abrego Garcia - The "Maryland Man"**
  - Garcia is NOT an American citizen. He is a citizen of El Salvador who had been living in the country illegally.
  - In 2019, two courts – an immigration court and an appellate immigration court – ruled that he was not only a member of MS-13, but that he was in our country illegally. There was a deportation order for him dating back to 2019.
  - Further details about Garcia's history prove that he is far from innocent.
    - In 2020, his wife filed a petition for protection citing three separate instances of violence
    - In 2021, his wife filed for a restraining order against him due to domestic violence.
    - In 2022, Garcia was pulled over by Tennessee Highway Patrol with 8 people crammed into one car. Despite telling the officers that they were going on a trip from Houston, Texas to Temple Hills, Maryland, there was no sign of luggage in the car.
    - It was later revealed that the vehicle Garcia was driving during this stop was registered to another illegal alien who had been convicted of human trafficking, Jose Roman Hernandez Reyes.
  - The media further claimed that the Supreme Court ordered the Trump Administration to return Garcia to the United States. This is another falsehood.
  - The Supreme Court unanimously overturned that judge's ruling but instead said that the United States should "facilitate" Garcia's return. This would only be possible if the government of El Salvador decided to return him, in which case the United States would have to provide transportation.
  - It's up to Salvadoran President Nayib Bukele and the government of El Salvador if they want to return him. But as President Bukele said during his Oval Office visit with President Trump, he has no intention of releasing a terrorist and sending him back to the United States.
  - When President Trump declared MS-13 a foreign terrorist organization, Abrego Garcia became no longer eligible for any form of immigration relief in the United States. He had a valid deportation order.
  - Furthermore, the Supreme Court also held that EVEN IF El Salvador returned this MS-13 member to the United States, we could deport him a second time. NO version of this legally ends with him ever living in the U.S., because he is a citizen of El Salvador.
  - The foreign policy of the United States is conducted by the President – not by a court – and no court in the United States has the power to conduct the foreign policy of the United States.
- **Dr. Rasha Alawieh - "The Brown University Assistant Professor"**
  - Dr. Rasha Alawieh was an assistant professor at Brown University. She was in the United States with an H-1B visa.
  - She was deported back to her home country of Lebanon after she admitted to attending the funeral of Hassan Nasrallah, a brutal terrorist who led Hezbollah and was responsible for killing hundreds of Americans.

- The media tried to portray Alawieh's case as an example of a "lawful immigrant" being deported. But they completely ignored her direct and alarming ties to radical Islamic terrorism, including her veneration of a dead terrorist leader.

- **Alfredo "Alex" Orellana - "The Caregiver"**
  - Alfredo "Alex" Orellana has multiple charges on his record from 2012 to 2019, including: distributing drugs, drug possession, assault and battery, failure to appear to court (twice), theft at the second degree, and larceny.
  - He has since been arrested and faces deportation.
  - The New York Times wrote a lengthy article on Orellana's case. Their article painted a picture of a loving 31-year-old caregiver who was the "best friend" of a 28-year-old autistic man. They also pointed to the fact that Orellana had a green card. The press tried to paint him as a victim who was a caretaker, despite violent charges on his record.

- **Jerce Reyes Barrios - "The Venezuelan Soccer Player"**
  - Jerce Reyes Barrios was in the United States illegally. He was a member of the vicious Tren de Aragua gang, and he was deported to El Salvador.
  - He has tattoos that are consistent with those indicating membership in the vicious Tren de Aragua gang.
  - His own social media indicates that he is a Tren de Aragua member.
  - That hasn't stopped the media, however. They tried to whip up a frenzy over this deported criminal gang member, publishing wild claims that he was deported because of a tattoo of a soccer team on his arm.
  - The facts are the facts. Our intelligence assessments go beyond just social media and tattoos. We are confident in our findings.

- **Nascimento Blair - "The Ex-Con"**
  - Blair was an illegal alien living in the United States who was tried and convicted for kidnapping and sentenced to 15 years in prison.
  - The New York Times published a fawning profile about this criminal illegal alien.
  - In 2008, he was ordered removed out of the country. However, because of the Biden administration's open border policies, this criminal illegal alien was released onto the streets of New York.
  - The Trump administration is putting the American people first by getting this criminal illegal alien off the streets and out of our country.

- **"The French Scientist Denied Entry Over His Political Views"**
  - In March, a French scientist was denied entry into the United States.
  - The researcher in question was in possession of confidential information on his electronic device from Los Alamos National Laboratory.
  - This was in clear violation of a non-disclosure agreement - something he admitted to taking without permission and attempted to conceal to authorities.
  - The mainstream media ran with the baseless narrative that this individual was blocked from entering the U.S. because of social media posts that were critical of President Trump.
  - This lie was even echoed by France's Minister for Higher Education, Philippe Baptiste.
  - His political beliefs were not considered at all in his removal.

- **Marie Lepère and Charlotte Pohl – "German Tourists Turned Away on Vacation"**
  - Two German tourists were denied entry after attempting to enter the U.S. under false pretenses.
  - Both claimed they were touring California but later admitted that they intended to work.
  - One used a Visitor visa, while the other used the Visa Waiver Program. Under U.S. immigration laws, work is prohibited for these visas.
  - The media version of events depicted two young women who tried to go on a five-week backpacking trip through the United States. The media claimed that the two – aged 18 and 19 – were "deported" because they simply wanted to go on a fun, loosely-planned trip.
  - These travelers weren't deported—they were denied entry. And the reason for their removal was visa fraud, not because of the planning nature of their so-called "vacation."

- **Jose Hermosillo – "The American Citizen Detained by Border Patrol"**
  - Hermosillo turned himself in to immigration authorities on April 8. He approached Border Patrol in Tucson, Arizona and declared that he had entered the U.S. illegally.
  - He completed a sworn statement identifying as a Mexican citizen who had entered unlawfully. He was processed and appeared in court on April 11. Afterwards, he was held by the U.S. Marshals in Florence, Arizona.
  - A few days later, his family presented documents showing U.S. citizenship. The charges were dismissed, and he was released to his family.
  - The media, instead of reporting the facts, created a false and baseless story that an American citizen was illegally detained.
  - Hermosillio's arrest was the direct action of his own actions and statements. When his citizenship was confirmed, he was promptly released back to his family.

- **Kseniia Petrova - "The Russian Scientist Trying to Cure Cancer"**
  - Kseniia Petrova, a Russian researcher working for Harvard University, was lawfully detained after lying to federal officers about carrying substances into the country. A subsequent K9 inspection uncovered undeclared petri dishes, containers of unknown substances, and loose vials of embryonic frog cells, all without proper permits.
  - Messages found on her phone revealed she planned to smuggle the materials through customs without declaring them.
  - She knowingly broke the law and took deliberate steps to evade it.
  - But upon her detainment, the media rushed to defend her by claiming that her research could help to cure cancer.

- ○ The facts of the matter are simple: Petrova broke the law and actively planned to do so. Her research does not make her exempt from the laws of our country.
- **Renato Subotic – "The MMA Coach"**
  - ○ Subotic is an MMA coach who entered the United States under a visa waiver program that prohibits compensation – only travel reimbursements are allowed.
  - ○ When Subotic was detained under American law, the media claimed that he was thrown in prison and deported for no real reason. Here are the facts: Subotic couldn't meet the requirement to prove he wasn't being compensated for participating at a high-dollar, multi-day event.
  - ○ The law is clear: the burden of proof is on the traveler. Since he couldn't provide detailed answers or the necessary documentation for compensation related to the work event, he was held until the next available flight out the following day.
- **Ricardo Jesus Prada Vasquez – The "Disappearing" Delivery Driver**
  - ○ Yet again, the media has manufactured a fake controversy on behalf of a terrorist gang member and criminal illegal alien.
  - ○ Ricardo Jesus Prada Vasquez is a Venezuelan national and confirmed member of Tren De Aragua. He entered the United States illegally on November 29, 2024 at the Brownsville, Texas Port of Entry via the CBP One App.
  - ○ The Biden administration, like it did with so many other dangerous criminals, released Prada Vasquez back into the United States.
  - ○ On January 15th, Prada was encountered trying to enter the U.S. from Canada. He was detained, investigated, and confirmed as a member of TDA and a public safety threat. On February 27, a judge ordered him removed from the U.S. He was then removed to El Salvador.
  - ○ The media, however, has falsely claimed that Prada Vasquez was an innocent delivery driver who was "disappeared" by the government.
  - ○ Prada Vasquez was living and working in the U.S. illegally, he was a member of a criminal gang designated as a terrorist organization, and was deported with full compliance with American law.
- **Jeanette Vizguerra – The Activist Who Needed Sanctuary"**
  - ○ Jeanette Vizguerra is a convicted criminal alien from Mexico who has a final order of deportation issued by a federal immigration judge. She illegally entered the United States near El Paso, Texas, on Dec. 24, 1997, and has received legal due process in U.S. immigration court.
  - ○ The media, however, has tried to turn her into a martyr. They claim she was an "activist" who needed "sanctuary." In reality, she getting famous and making money for breaking the law.
  - ○ Under President Trump, this is a nation of laws. We will find, arrest, and deport illegal aliens, no matter how famous the media thinks they are.
  - ○ Vizguerra was in the United States illegally. She was convicted of breaking the law. She was deported.
  - ○ If you come to our country illegally, we will deport you, and you will never return. The safest option for illegal aliens is to self-deport, so they still have the opportunity to return and live the American dream.

## The Facts on Those Who Have Abused The Privilege of a Student Visa

- **Yunseo Chung – "The Columbia Student"**
  - ○ Yunseo Chung, who was born in South Korea, is a Columbia University student who engaged in concerning conduct on-campus. This includes her being arrested by NYPD during a pro-Hamas protest at Barnard College.
- **Mahmoud Khalil - "The Activist Leader at Columbia"**
  - ○ Mahmoud Khalil, a former Columbia University graduate student from Syria, is one of the ringleaders of the vicious, anti-American, anti-Semitic protests at Columbia University. His activities are aligned with Hamas, a designated terrorist organization.
  - ○ On March 9, 2025, in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State, U.S. Immigration and Customs Enforcement arrested Khalil.
  - ○ But upon his arrest, radical student protesters at Columbia and across the country have attempted to turn him into a martyr, waving signs and banners bearing his likeness.
  - ○ Taking over private buildings, inciting violence, harassing Jewish students, defacing buildings, and passing out terrorist propaganda do not constitute free speech.
  - ○ A judge ruled that Khalil's deportation can move forward. He will be removed from our country.
- **Mohsen Mahdawi – "The Palestinian at Columbia University"**
  - ○ Mahdawi is a Palestinian who has been living in the United States on a visa while he was studying at Columbia University.
  - ○ Like many other anti-Israel student protesters, supporters in the media tried to claim that Mahdawi was a victim of political persecution. But his rhetoric on the war in Israel proves his terrorist sympathies.
  - ○ In the wake of October 7, Mahdawi said he could empathize with Hamas's attack on Israel.
  - ○ He appeared on "60 Minutes" justifying the massacre.
  - ○ He organized and led pro-Hamas protests on Columbia University's campus, harassed Jewish students, and openly displayed his support for a terrorist organization.
- **Leqaa Kordia – "The Palestinian at Columbia University"**

- Leqaa **Kordia** was another Columbia student who actively participated in anti-American, pro-terrorist activities on campus.
  - However, her arrest had nothing to do with her radical activities.
  - **Kordia** was arrested for immigration violations due to having overstayed her F-1 student visa, which had been terminated on January 26, 2022 for lack of attendance

- **Dogukan Gunaydin - "The University of Minnesota Student"**
  - Dogukan Gunaydin, a graduate student at the University of Minnesota, was arrested after a visa revocation by the State Dept. related to a prior criminal history for a DUI.
  - Contrary to the mainstream media's quick speculation that he was arrested due to his involvement in student protests, his protest activity had nothing to do with his detainment.

- **Badar Khan Suri – "The Georgetown Foreign Exchange Student"**
  - Suri was a foreign exchange student at Georgetown University actively spreading Hamas propaganda and promoting antisemitism on social media.
  - The media calls him a "scholar" who was innocent of any wrongdoing, even though he was married to the daughter of a senior advisor for to Hamas terrorist group.

- **Momodou Taal – "The Cornell University Student"**
  - Taal was unapologetic in his pro-terrorist views.
  - Taal, a foreign student studying at Cornell University, participated in pro-Hamas protests on campus.
  - He has a pinned post on his X profile that talks about a so-called "Zionist genocide," and also states "Long live the student intifada!"

## Other Fake News Narratives Corrected

- **The Biden Administration's inflated deportation numbers**
  - DHS uncovered what should be a massive scandal: the Biden administration was cooking the books on ICE arrest data. They were purposefully misleading the American public by categorizing individuals processed and released into the interior of the United States as ICE arrests.
  - Of course, the media ignored this fact. Instead, they falsely claimed that the Biden administration had carried out more arrests than the Trump administration.
  - Tens of thousands of cases recorded as "arrests" were, in fact, instances where illegal aliens were simply processed and released into American communities.
  - Many of these were violent criminals and gang members.
  - The previous administration counted these as arrests even though no immigration enforcement action was taken.
  - During fiscal year 2024, ICE made 113,431 arrests but the vast majority of those were what we call "pass-through" arrests.
  - They are called pass-through arrests because ICE didn't take enforcement actions against these aliens. They just passed through ICE before they were released in the U.S. interior and told to report to an ICE office.
  - None of the arrests made by ICE since January 20th are pass-through arrests.
  - The difference between recent arrests and those from Biden's last year is that, now we're taking enforcement actions against each and every illegal alien arrested.

- **ICE Boston Militia rumors:**
  - The media eagerly fed and spread a false social media rumor that an ICE agent who conducted arrests of criminal illegal aliens in New England was a "militia leader" from Arizona.
  - The reality? He is a federal law enforcement office who has worked with ICE to help keep New England communities safe for years.
  - This claim was not only false, but also inflammatory and places the safety of federal officers in jeopardy.
  - Our ICE officers are facing 300% increase in assaults while carrying out enforcement operations.

- **Due process and treatment rumors in CECOT:**
  - These aliens HAVE had due process – we have a stringent law enforcement assessment in place that abides by due process under the U.S. Constitution.
  - The reality is that prison isn't supposed to be fun. It's a necessary measure to protect society and punish bad guys. It is not meant to be comfortable.
  - What's more: prison can be avoided by self-deportation. CBP Home makes it simple and easy.
  - If you are a criminal alien and we have to deport you, you could end up in Guantanamo Bay or CECOT. Leave now.

- **DOGE and ICE allegedly collecting sensitive data from the Centers for Medicare and Medicaid Services**
  - The Biden administration flooded the U.S. with tens of millions of illegal immigrants, many of which are exploiting the American taxpayer by illegally getting Medicare and other benefits meant for law-abiding Americans.
  - President Trump consistently promised to protect Medicare for eligible beneficiaries.
  - To keep that promise, DOGE, CMS, and DHS are exploring an initiative to ensure that illegal aliens are not receiving these benefits not meant for them.

- The media claimed that ICE is working with the Department of Government Efficiency (DOGE) to access sensitive personal information in order to identify illegal aliens. These claims are meant to frighten the American people, when in reality this process is working to keep them and their benefits safe from exploitation by illegal aliens.
- **ICE HSI presence at schools**
  - ICE's Homeland Security Investigations (HSI) works relentlessly to protect Americans, especially children, who are put in danger by illegal alien activity. This includes investigations into potential child sex trafficking.
  - But the media has tried to spin their investigative work into the idea that they are going to elementary schools to arrest children.
  - **HD Cooke Elementary School, Washington D.C.**
    - At the HD Cooke Elementary School in Washington D.C., ICE did not conduct any enforcement action at the school. HSI agents were present at the school unrelated to any kind of enforcement action.
  - **Russel Elementary and Lillian Elementary in Los Angeles:**
    - At two different elementary schools in Los Angeles, California, HSI officers were conducting wellness checks on children who arrived unaccompanied at the border. It had nothing to do with immigration enforcement.
  - DHS is leading efforts to conduct welfare checks on these children to ensure that they are safe and not being exploited, abused, and sex trafficked.
  - Unlike the previous administration, President Trump and Secretary Noem take the responsibility to protect children seriously and will continue to work with federal law enforcement to reunite children with their families.
  - In less than 70 days, Secretary Noem and Secretary Kennedy have already reunited nearly 5,000 unaccompanied children with a relative or safe guardian.
- **Immigrant children detained at Old McDonald Farm in New York**
  - In early April, a raid was carried out on a dairy farm in New York after the execution of a federal criminal warrant for an illegal alien in possession of + distributing child sexual abuse materials.
  - Upon the execution of the search warrant at Old McDonalds Farm in Sackets Harbor, New York, authorities encountered seven additional illegal aliens on the premises, including a mother and her three children. We immediately began conducting an investigation to ensure these children are not being sexually exploited.
  - But rather than address the very real evidence of child sexual abuse, the media chose to focus on the fact that a woman and her three children were taken into custody.
  - DHS takes its responsibility to protect children seriously and our ICE officers are working every day to remove pedophiles from American communities.
- **TDA members being identified via tattoos**
  - Some have claimed that DHS' assessments of TDA and other gang memberships are based solely on the tattoos that certain illegal aliens have.
  - DHS intelligence assessments go well beyond just gang affiliate tattoos and social media.
  - Tren De Aragua is one of the most violent and ruthless terrorist gangs on planet earth. They rape, maim, and murder for sport. President Trump and Secretary Noem will not allow criminal gangs to terrorize American citizens.
  - We are confident in our law enforcement's intelligence, and we aren't going to share intelligence reports and undermine national security every time a gang member denies he is one. That would be insane.

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)    HOMELAND SECURITY ENTERPRISE (/TOPICS/HOMELAND-SECURITY-ENTERPRISE)
HUMAN TRAFFICKING (/TOPICS/HUMAN-TRAFFICKING)    IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)    BORDER WALL (/KEYWORDS/BORDER-WALL)
CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)
DEPARTMENT OF GOVERNMENT EFFICIENCY (DOGE) (/KEYWORDS/DEPARTMENT-GOVERNMENT-EFFICIENCY-DOGE)
DEPARTMENT OF HOMELAND SECURITY (DHS) (/KEYWORDS/DEPARTMENT-HOMELAND-SECURITY-DHS)    DEPORTATION (/KEYWORDS/DEPORTATION)
HOMELAND SECURITY INVESTIGATIONS (HSI) (/KEYWORDS/HOMELAND-SECURITY-INVESTIGATIONS-HSI)
IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 05/01/2025

# EXHIBIT "2"

***PETITIONER-PLAINTIFF, LEQAA KORDIA'S***
***MOTION FOR RELEASE PENDING FINAL JUDGMENT***
***AND PRELIMINARY INJUNCTION***

*Declaration of Mallory Manfredini*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| KRISTI NOEM, et al., | § | |
| | § | |
| Respondents-Defendants | § | |

## DECLARATION OF MALLORY MANFREDINI

I, Mallo ly Manfredini, hereby declare and state:

1    I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set folth in this declaration are based on my personal knowledge, unless othelwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to dedare to the facts stated herein.

2    I am Malloly Manfredini with the Southern Povelty Law Center ("SPLC"). I was given the assignment of accessing and verifying the contents of celtain documents produced during the course of Ms. Kordia's immigration proceedings, *In de Matter ofieqaa Kordia,* A-

███ **Ms** Kordia's immigration proceedings are cmTently pending in the Polt Isabel Immigration Comt. SPLC is counsel of record in those proceedings and, as such, can access the docket of documents, orders, and opinions regarding Ms. Kordia's immigration matters.

3    Attached to Petitioner's Motion for Emergency Relief as exhibits to this declaration are Exhibits A - E described below. Exhibits A - D fairly and accurately reflect the documents filed regarding Ms. Kordia's request for a custody redetennination (commonly called a bond hearing). However, Exhibit A excludes Form I-589.

1

4.      Exhibit E is a true and accurate audio recording of the bond hearing held on April 3, 2025. As stated on the recording itself, the proceeding was recorded by the immigration court. Two copies of these proceedings were mailed to the Clerk's Office of the United States District Court for the Northern District of Texas. A copy was also electronically transmitted to counsel for Respondents.

| Ex. No. | Description |
|---|---|
| A | *In the Matter of Leqaa Kordia*, Respondent's Motion for Bond and Custody Redetermination, *as filed on* Mar. 27, 2025 |
| B | *In the Matter of Leqaa Kordia*, Dep't of Homeland Sec. Notice of Filing, *as filed on* Apr. 2, 2025 |
| C | *In the Matter of Leqaa Kordia*, Bond Memo., *as ordered on* Apr. 16, 2025 |
| D | *In the Matter of Leqaa Kordia*, Notice of Appeal from a Decision of an Immigration Judge, *as filed on* Apr. 15, 2025 |
| E | Audio Recording of April 3, 2025 Bond Hearing |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 28, 2025, in New Orleans, Louisiana

*Mallory Manfredini*

Mallory Manfredini
Investigator
Southern Poverty Law Center

2

# EXHIBIT "2-A"

### *PETITIONER-PLAINTIFF, LEQAA KORDIA'S*
### *MOTION FOR RELEASE PENDING FINAL JUDGMENT*
### *AND PRELIMINARY INJUNCTION*

*Exhibit "A" - Declaration of Mallory Manfredini*

*In the Matter of Leqaa Kordia, Respondent's Motion for Bond and Custody Redetermination, as filed on Mar. 27, 2025*

Attorneys for Respondent                                    DETAINED
S. Michael Musa Obregon, Esq.
Omar Chaudhry, Esq
Musa-Obregon Law PC
55-21 69th St 2nd floor
Maspeth, NY 11378

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## PORT ISABEL IMMIGRATION COURT

In the Matter of

LEQAA KORDIA                              File No: A ███████
In Removal Proceedings.

### RESPONDENT'S MOTION FOR BOND AND CUSTODY REDETERMINATION

Immigration Judge: TBD                    Next Hearing: TBD

1

In the Matter of

**LEQAA KORDIA**

File No: A ▮▮▮▮▮▮▮

Respondent
In Removal Proceedings.

## RESPONDENT'S MOTION FOR BOND AND CUSTODY REDETERMINATION

### I. INTRODUCTION

Respondent, Ms. LEQAA KORDIA, by and through undersigned pro bono counsel, respectfully moves this Honorable Court to schedule a custody redetermination hearing pursuant to 8 C.F.R. § 1003.19 and INA § 236(a) to consider her release on conditional parole, or, in the alternative, set a reasonable bond in this matter.

Statements of counsel herein are made upon information and belief, investigations of counsel, conversations with individuals, review of government documents and the case file, and such statements are believed to be true.

### II. STATEMENT OF FACTS

Ms. Kordia is a 33-year-old woman of Palestinian origin who lawfully entered the United States on March 19, 2016, on a B-2 visitor vis. Sher came to be reunited with her mother in New Jersey after a forced separation of twenty years. **See Exhibits A and B**. Since arriving in the United States, Ms. Kordia has not only established herself as an upstanding member of her community in Paterson, New Jersey. She remained committed to complying with U.S. immigration laws, proactively extending her status to an F2 visa for seven years at two SEVP-certified institutions to study English— initially at Uceda Paterson and later at Bergen County Career Advancement Training, Inc. (BCCAT). **See Exhibit C.**

On May 6, 2021, the family-based immigrant petition (Form I-130) her mother filed on her behalf was approved, with a priority date of June 5, 2017.[1] **See Exhibit D.** Acting on incorrect advice from her school, Ms. Kordia believed that this approved petition allowed her to remain in lawful status while she awaited adjustment of status. In reliance on that belief, on January 24, 2022, she signed an official termination notice withdrawing from her F-1 program, which was approved by her school on January 26, 2022. **See Exhibit E.**

---

[1] As of March 2025, the Filing Date for the F2B category (unmarried adult children of U.S. permanent residents) is January 1, 2017. https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2025/visa-bulletin-for-march-2025.html

2

During the COVID years, Ms. Kordia's father had passed away in the West Bank. She continued living with her mother in New Jersey to the very present. Later after October 2023, the devastating attacks on Gaza resulted in the loss of nearly an entire generation of her extended family.

Thereafter, President Biden issued the Deferred Enforced Departure (DED)[2] plan for eligible Palestinian nationals on February 14, 2024. Believing that she was still in status because of her mother's approved I-130, Mr. Kordia did not apply for DED nor for asylum - in detrimental reliance on the information she had received at school. However, DED protects all Palestinian nationals from removal who qualify. DED is therefore an additional defense to the current removal proceedings.

Ms. Kordia also has recently filed an affirmative asylum application with USCIS under the "extraordinary circumstances" exception, because of her well-founded fear of persecution based on nationality, gender, and political opinion. If returned to the West Bank and or Gaza, she would face grave threats, including the risk of gender-based violence and persecution. **See Exhibit F.**

On March 13, 2024, several working days after being summoned by ICE officers and overcoming significant difficulties in securing appropriate legal counsel, Ms. Kordia appeared with legal counsel at a pre-arranged meeting, at the Immigration Enforcement office in Newark, New Jersey to be processed for removal proceedings. She was taken into custody and served with a Notice to Appear (NTA), charging her as removable under Section 237(a)(1)(C)(i) for failing to maintain her nonimmigrant status. **See Exhibit G.**

Initially, she was given an NTA and scheduled to appear at the Batavia Immigration Court in Buffalo, NY but that was changed - allegedly because of bed space[3], and she was immediately put on a plane and flown to Texas. If bedspace was the true reason for the interstate transfer to Texas from New Jersey, that goal has sorely missed, since from day one and for more than a week Ms. Kordia has been sleeping on the floor with another approximately 20 women, who are also without beds at that facility. Proceedings commenced at the Prairieland Detention Facility in Los Fresnos, Texas, halfway across the nation and almost 1500 miles from her home in New Jersey - under the jurisdiction of the Port Isabel Immigration Court - with a master calendar hearing set for March 27, 2025.

To date, the government has provided no justification for her transfer or continued detention at Prairieland, which has caused extreme hardship by separating her from her lawyers and interpreters, and family and witnesses on her case. This has prevented her from receiving effective legal representation and ultimately, due process. This instant request for conditional release and or bond, is straightforward and should be treated as any other bond request under similar circumstances: Ms. Kordia has substantial community ties, compelling legal relief, is not a flight risk, nor a danger to the community. She was a student who only recently fell out of (a seven-year period) of compliant student visa status. Furthermore, Ms. Kordia has an approved I-130 pending visa soon to become available from her U.S. citizen mother, no criminal history, and a very compelling asylum claim. She is further protected by her prima facie eligibility for Deferred Enforced Departure (DED) and the benefits that come with it, including protection from removal.

---

[2] DED Covered Population – Palestinians |USCIS, USCIS (2024), https://www.uscis.gov/humanitarian/deferred-enforced-departure/ded-covered population-Palestinians (last visited Mar 22, 2025).

[3] Undesigned counsel was told by the ICE agent that the sudden change of destination was the lack of bedspace in both NJ and Buffalo. It is hard to imagine that bedspace was the overwhelming concern, considering the extreme lack of bedspace at the current facility in Texas since she arrived on March 13th.

**MS. KORDIA IS NEITHER A FLIGHT RISK NOR A DANGER TO THE COMMUNITY, AND HER CONTINUED DETENTION IS UNWARRANTED UNDER THE CIRCUMSTANCES OF HER CASE.**

Under INA § 236(a), the Immigration Judge has broad discretion to grant release on bond or parole. In assessing custody redeterminations, the Court must consider whether a respondent (1) poses a danger to the community or (2) is a flight risk. See 8 C.F.R. § 1236.1(c)(8); Matter of Guerra, 24 I&N Dec. 37, 40 (BIA 2006). Here, both factors weigh strongly in Ms. Kordia's favor.

## MS. KORDIA IS NOT A DANGER TO THE COMMUNITY

As an initial matter, Ms. Kordia's only contact with law enforcement occurred during a peaceful protest on April 30, 2024. The charges of a petty ordinance infraction of disorderly conduct for allegedly obstructing vehicular traffic were fully dismissed by the district attorney's motion "in the interests of justice" with only a minimal educational condition -where she was required to watch a type of "Know Your Rights video" - which she completed. **See Exhibit H.**

Notably, Ms. Kordia's continued detention is both unwarranted and unsupported by the government's own "Risk Classification Assessment" (RCA), dated March 13, 2025, which clearly concludes that she is not a danger to the community. **See Exhibit I.** Specifically, the RCA found that Ms. Kordia has no relevant criminal history, no history or pattern of violence, no gang affiliation. Moreover, she is not subject to mandatory detention, and no history of absconding. These findings—entirely based on the government's own evaluation—confirm that continued detention is unnecessary and unjustified on public safety grounds.

The sole charge stems from her termination of student status, which occurred not through willful misconduct, but an unintentional consequence of misinformation—rather than a deliberate violation. Courts have long recognized that noncitizens should not be penalized for acting on incorrect guidance from those in positions of authority, including DSOs. See Matter of Lozada, 19 I&N Dec. 637 (BIA 1988). As such, ICE's justification for detaining Ms. Kordia under INA § 237(a)(1)(C)(i)—for an unintentional lapse in nonimmigrant status due to inaccurate guidance— is wholly disproportionate.

## MS. KORDIA IS NOT A FLIGHT RISK

Ms. Kordia's longstanding compliance with American immigration laws, her voluntary surrender, and her willingness to fully submit to the legal process all demonstrate her respect for the law and unequivocally confirm that she is not a flight risk. If the Court has any concerns regarding compliance, such concerns can be fully addressed by imposing reasonable conditions of release, such as supervision, check-ins, or setting a low bond. Matter of Patel, 15 I&N Dec. 666 (BIA 1976) (release may be granted where conditions can mitigate risk of flight or danger).

## MS. KORDIA'S STRONG ELIGIBILITY FOR RELIEF

In addition to DED for Palestinians, Ms. Kordia is the beneficiary of an approved I-130 family-based immigrant petition filed by her U.S. citizen mother (with a priority date that will soon be

6

current), and a pending asylum application under the "extraordinary circumstances" exception, supported by a well-founded fear of persecution based on nationality, gender, and political opinion. If returned, she would face grave threats, including the risk of gender-based violence and persecution. See *Matter of Andrade,* 19 I&N Dec. 488 (BIA 1987) (holding that when relief is prima facie available, bond should not be denied solely on removability grounds).

### MS. KORDIA'S VERY STRONG COMMUNITY TIES

Beyond her eligibility for legal relief, the overwhelming support from her family and community makes clear that Ms. Kordia has very strong community ties. She is a valued and trusted member of her community, whose recent absence has caused significant hardship to those who depend on her. **See Exhibits J - L.** Her mother, a U.S. citizen who suffers from severe asthma and has great difficulty walking, has provided a heartfelt plea on her behalf, describing their trauma due to a past painful forced separation for nearly two decades and the immeasurable role Ms. Kordia has played in their family since reuniting almost nine years ago. **See Exhibit J.**

Perhaps most movingly, Ms. Kordia's sister Yasmine Salem highlights the unique role her sister has played in her life. Having grown up without an older sister, Yasmine never understood the unbreakable bond that such a relationship could provide - until she met Ms. Kordia. Since then, Yasmine has experienced unconditional love, protection, and support of a sister for the first time in her life. Now, with her sister's detention, Yasmine describes feeling like she is losing a part of herself. **See Exhibit K.**

Thus, given her unblemished record, consistent compliance, and eligibility for Deferred Enforced Departure (DED) as a Palestinian national, there is no basis for continued detention on public safety grounds, and thus, she should be released under the least restrictive conditions necessary.

### V. CONCLUSION

WHEREFORE,

Respondent respectfully requests that this Honorable Court release her on conditional parole or at the lowest possible bond so that she can defend her case effectively while at liberty, in the same way that any other similarly-situated student with an expired student visa would be.

Students who have overstayed their student visas such as Ms. Kordia who have compelling pending immigration applications are almost universally released by the Immigration Courts throughout this nation. They are almost never incarcerated by ICE in the first instance.

For these very compelling reasons this Court should release Ms. Kordia to her family.

Dated: 03/26/2025                                  Respectfully submitted,
                                                  S. Michael Musa-Obregon, Esq.
                                                  M. Omar Chaudhry, Esq.
                                                  Musa-Obregon Law PC

7

**EXHIBIT LIST IN SUPPORT OF RESPONDENT'S MOTION FOR CUSTODY AND BOND RETERMINATION**

| Tab No. | Description |
|---|---|
| A. | Respondent's Sworn Declaration in Support Of Motion For Custody And Bond Re-Determination |
| B. | Evidence of Identity, Residence. and Lawful Entry |
| C. | Approval Notice to Extend/Change Nonimmigrant Status (EAC███████) and Compliance with SEVIS |
| D. | Approval Notice for I-130, Petition for Alien Relative. (WAC███████) |
| E. | Proof of the government's approval to change status. |
| F. | I-589 Asylum Application with Acknowledgements of Receipt and biometrics notice |
| G. | Notices to Appear |
| H. | Appearance tickets and Certificates of Disposition for April 30, 2024 incident |
| I. | Risk Classification Assessment (RCA) |
| J. | Letter from █████████ Ms. Kordia's mother. |
| K. | Letter from █████████ Ms. Kordia's sister. |
| L. | Letter from █████████████████ UCEDA INTERNATIONAL |
| M. | Other letters from Ms. Kordia's community attesting to her character and pleading for her release including: <br><br> Letter from ███████████ <br> Letter from ████████ <br> Letter from ██████████ <br> Letter from ████████ <br> Letter from ███████ <br> Letter from █████████ <br> Letter from ███████████ |



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

**In the Matter of**

**LEQAA KORDIA**                                      File No: A███████

**In Removal Proceedings.**


**RESPONDENT'S SWORN DECLARATION IN SUPPORT OF MOTION FOR**
**CUSTODY AND BOND RETERMINATION**

I, LEQAA KORDIA state that the following information is true and correct to the best
of my knowledge:

1.  I lawfully entered the United States on a B-2 visitor visa on March 19, 2016. where I was
    finally reunited with my mother after twenty years of forced separation. Since that time, I
    have lived continuously in ███████████████ transitioning to an F-student visa and
    enrolling in an SEVP-certified institutions to study English.

2.  After the death of my father in December 2020, returning to my home country no longer
    felt safe or viable for me specially as a divorced woman in her thirties without an older
    male guardian or any remaining nuclear family members to speak of.  That status would
    cause me to face acute personal safety risks, including vulnerability to coercion, abuse,
    and gender-based violence, with little to no protection from either Israeli forces or
    Palestinian authorities.

3.  In March 2021, I re-enrolled as an F-1 nonimmigrant student through the Student and
    Exchange Visitor Information System (SEVIS) and continued my education at Bergen
    County Career Advancement Training, Inc. (BCCAT), fully complying with all visa
    conditions and maintaining lawful status for a continuous period of seven years.

4.  When the I-130 family-based petition my mother filed on my behalf was approved in
    May 2021, I believed I was finally on a definite path to lawful permanent residency.
    Based on this belief—and mistaken advice from my school—I proactively terminated my
    F-1 status, thinking the approved petition permitted me to remain lawfully in the U.S.
    while awaiting my green card.

10

5. However, even as I tried to rebuild my life in the U.S., the war in Gaza especially the events since late 2023 —where I lost nearly an entire generation of my extended family—left a wound too deep to ignore.

6. On April 30, 2024, I came to a peaceful protest outside Columbia University, in mourning for the dozens of my family members recently killed and in solidarity with thousands of other Palestinian civilians— especially women and children—who were killed following the October 7, 2023 attacks.

7. Many people came out to protest in support of human rights, including many Jewish students and civilians.

8. When I was there, I saw peaceful and harmonious interactions amongst the diverse types of people participating in the protest.

9. From what I could see, the people protesting outside and inside the campus were all protesting the tens of thousands of people that were being killed in my ancestor's land, the Gaza Strip.

10. Suddenly, NYPD police officers appeared and began ordering the crowd to disperse. As I was preparing to leave, the blaring sirens and the roar of helicopters overhead intensified the chaos. I became overwhelmed and dizzy, collapsed to the ground, and was briefly unable to move.

11. While I was still on the ground, officers picked me up, handcuffed me, and detained me along with others. I believe I was charged with trespassing—even though I was not on Columbia University's campus but on Amsterdam Avenue, a public city street, outside the university gate. As I had also explained in my asylum application, my first lawyer later informed me that because I was innocent, the charges had been completely dismissed and that I was not required to appear in court.

12. Three weeks ago and almost one year later, on or about Thursday March 6, 2025, ICE visited my mother at our home inquiring about my whereabouts. At first, she was overjoyed, thinking the call related to the approval of my green card.

13. She handed me the phone to speak with the officer who informed me that there was an issue with my application, and we tentatively agreed to meet.

14. I was surprised that they had come to my mother's house and was told that this was not a normal routine visit and was advised by several people and family to immediately seek legal counsel which I tried to do by seeking to speak to several lawyers immediately and the next day Friday and throughout the weekend.

15. I was eventually able to attempt to contact my current attorney S. Michael Musa-Obregon after the weekend, on that Monday. He was only able to get back to me and speak to me

11

on the following evening, Tuesday. He explained to me that he would call the officers and arrange a meeting with them as soon he could and after that he would get a sense of what was going on.

16. My lawyer also informed me although I had an approved I-130 which had been filed in 2016, I was not yet in lawful status. After interviewing me about my circumstances, he also stated that based on my well-founded fear of return and other exceptional circumstances, I qualified for asylum protection and that I should apply for asylum, which I immediately did.

17. With his guidance, my asylum application was filed online that Wednesday, March 12.

18. My lawyer contacted the ICE agents on my behalf that day, who requested that I appear at their office in Newark the following day on Thursday, which I did.

19. The next day, March 13, I presented myself to ICE in Newark, New Jersey, with counsel from my lawyers office.

20. Despite my voluntary appearance, ICE chose to detain me and served me with a Notice to Appear (NTA), charging me as removable for allegedly failing to maintain my nonimmigrant status.

21. Even though my original NTA indicated that my case would be heard in New York, I was immediately flown to Prairieland Detention Center in Los Texas—a remote location 1500 miles from my home in New Jersey where the conditions at the facility are inhumane and severely overcrowded. The terrible conditions at this prison have been amply publicly documented.

22. This transfer of my person has cut me off from my family, I have very limited access to legal counsel, and has severely cut off my ability to even minimally prepare my case with my two attorneys, who do not speak Arabic, and are generously representing me *pro bono.*

23. Even trying to update my meal designation has been nearly impossible from within the facility. I have had to rely on my family and my attorneys to advocate on my behalf from the outside—an effort that has proven extremely difficult and slow.

24. Additionally, due to a lack of available beds, many detainees, about twenty of them, including myself, are forced to sleep on the floor, which has caused me to develop painful skin rashes—to the point of bleeding.

25. While I consider myself somewhat conversant n English, the complexity of my case— combined with the emotional burden of reliving past trauma—makes it extremely difficult to communicate effectively in anything other than my native language Arabic,

12

especially through virtual means.

26. I am unable to afford legal fees in this case. I am unable to pay for my lawyers to travel with me to Texas.

27. I am also unable to afford paying an Arabic interpreter. I have been unable to obtain local counsel in Texas or to have anyone visit me in jail since I have been here over 2 weeks.

28. I know no one in Texas that can assist me, or that can visit me or that can help me prepare for my case.

29. If I am free at liberty and I will able to go home and see my family. I can raise funds to be able to pay for my defense.

30. I will be able to locate Arabic interpreters that can help me speak to my lawyers so that I can understand all the complicated terms in the legal terminology of my case.

31. Although I have lived here for several years, the legal system for me here is foreign. I do not know how to defend myself in this legal system.

32. As such, I can only rely on my family and my friends and any good lawyers that can help me, but there's still there is only so very little much any of them can do for me from 1500 miles away.

33. I've been told that my case will require hundreds of hours of in-person preparation with my lawyers at their office.

34. I cannot prepare even minimally from the back of the small room talking to my lawyers via internet video for limited bursts of time only in short, pre-set scheduled appointments.

35. I am deeply sorry for any unintentional violation of the immigration law. I never meant to harm or disrespect the United States, a country that I deeply respect and has given me great opportunities. The US has offered me refuge and a sense of safety from a home I am no longer able to return to.

36. I always strove to follow the immigration laws, even so far as matriculating in school for seven continuous years, under difficult economic circumstances , so as never to fall out of status.

37. Aside from my brief, dismissed accusation for being at a public demonstration in support of human rights on April 30, I have never had any police contact.

13

38. I have always strived to be a positive person in my community and a role model to my younger sister and extended family, who have supported me wholeheartedly over the past nine years.

39. Many of them are willing to submit affidavits of support and serve as sponsors should the Court require it.

40. However, neither they nor I have the financial means to pay for interpreters to visit me in detention and my lawyers do not have the resources to cover the significant costs for travel to this remote facility.

41. I recognize the gravity of this process and respectfully ask for the opportunity to present my case with fairness and dignity.

42. Reuniting me with my loved ones would allow me to work closely with counsel in pursuing the protection I urgently need.

43. I implore you to consider this matter with the sensitivity, compassion and fairness it deserves, and to grant me the freedom to seek safety in a country that made me feel truly secure and at home.

CONCLUSION

For the foregoing reasons, I respectfully request that the Court grant this motion. Date: 03/25/2025

Signature: _____    LEQAA KORDIA

14



Paterson, NJ | Passaic, NJ | Morristown, NJ | New Brunswick, NJ | Perth Amboy, NJ | Red Bank, NJ | Lakewood, | NJ Danbury, CT |
Stamford, CT | Falls Church, VA | Silver Spring, MD | StudyUSA@uceda.edu  |  www.uceda.edu

March 17, 2025

Re:   Name:        Kordia, Leqaa M A
      SEVIS ID:    N███████
      DOB:         ██████████

To whom it may concern:

This letter is to certify that Ms. Kordia was enrolled and attended as a full-time student in the Intensive English Program at UCEDA International from February 06th, 2017 to March 18th, 2021.

UCEDA International is accredited by the Commission on English Language Program Accreditation (CEA) and is authorized by the U.S. Student and Exchange Visitor Program (SEVP) to enroll international students through the F-1 visa program. The student was maintaining an ACTIVE STATUS I 20 Certificate of Eligibility for Nonimmigrant F-1 Student Status attending 18 hours/week.

Ms. Kordia's SEVIS ID was released to Bergen County Career Advancement Training, Inc. on March 18th, 2021.

Should you have any questions, please do not hesitate to contact us.

Sincerely,

Gabriela Tasayco
International Student Services Manager/DSO
UCEDA International
████████████████████
+1 866-823-3299


**BCCAT / Fort Lee**

**Leqaa Kordia** — Student Report

## Class Enrollments:
These are all of the classes the student has been enrolled in over time.

| Class | Schedule | Teacher | Start | End | Lessons | Absences |
|-------|----------|---------|-------|-----|---------|----------|
| Intermediate (21 Fall) (Group) | daily 20.0 h/wk | Rodolfo Beltran | 09/01/21 | 12/17/21 | 72 | 17 |
| Intermediate (21 Spring) (Group) | daily 20.0 h/wk | Rodolfo Beltran | 03/29/21 | 06/04/21 | 38 | 4 |

## Attendance Summary:
Hours attended versus hours expected based on the class enrollments mentioned above, split by month.
note: lab/self study are counted in the total amount of hours but not in the lesson count

| Month | Lessons attended | Expected hrs | Attended hrs | Attendance Rate |
|-------|------------------|--------------|--------------|-----------------|
| March 2021 | 0 out of 0 | 0h | 0h | N/A |
| April 2021 | 14 out of 15 | 60h | 56h | 93% |
| May 2021 | 16 out of 19 | 76h | 64h | 84% |
| June 2021 | 4 out of 4 | 16h | 16h | 100% |
| September 2021 | 17 out of 21 | 84h | 64h | 76% |
| October 2021 | 17 out of 20 | 80h | 67h | 84% |
| November 2021 | 11 out of 18 | 72h | 44h | 61% |
| December 2021 | 10 out of 13 | 52h | 40h | 77% |
| **Total** | **89 out of 110** | **440h** | **351h** | **80%** |

Attendance rate in the past four weeks: %

**BCAT**

www.bccatschool.com • register@bccatschool.com  t 973 471 4800, 973 471 4802, 877 222 2806 (877 BCCAT 06) • f 973 471 5585 • 60 Saddle River Ave., S. Hackensack, NJ 07606

# OFFICIAL TERMINATION NOTICE

*DATE:*  January - 24 - 2022

*REASON:*
- [ ] Change of Status Approved
- [ ] Financial Reason
- [ ] Lack of Attendance
- [✓] Other ( Applying for Green card )

I, Legas Kordia _____ understand my F-1 status will
        *(STUDENT'S NAME)*

be terminated on  January - 24 - 2022
                  *(DATE)*

*STUDENT SIGNATURE:* _____

*OFFICER SIGNATURE:* _____

An official website of the U.S. government · Skip Navigation

(b)(6) (b)(7)(C)

Get Plug-Ins

Student & Exchange Visitor
Information System

Enter SEVIS ID

Main  Schools  Students  Employment  Programs  Exchange Visitors  Reports  Message Board  Change Password

## Student Information

Return To Search Results

**View:**
Event History

Form I-17

Request/Authorization Details

Transfer History

Employment Information

Corrections

F-1 STUDENT
**Kordia, Leqaa M A**

Bergen County Career Advancement
Training, Inc. - BCCAT
Start Date: **March 29, 2021**  End Date:
**December 31, 2023**

I-901 Fee Paid

Status: **TERMINATED**
Status Change Date: **January 26,
2022**

SEVIS ID: **N**

I-20 ISSUE REASON: **CONTINUED ATTENDANCE**
TERMINATION REASON: **CHANGE OF STATUS
APPROVED**

## Personal / Contact

Gender
**FEMALE**
Date of Birth                    **Age 32**

City of Birth

Country of Birth
**WEST BANK**
Country of Citizenship
**WEST BANK**
U.S. Telephone
Foreign Telephone

Email Address

U.S. Address

Address Status
**Valid S - Mailbox at a street address**
Foreign Address

**WEST BANK**

## Overall Remarks

Program

Registration

# DEPARTMENT OF HOMELAND SECURITY

**NOTICE TO APPEAR**

Event No: XNK2503000016

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: ▇▇▇▇

In the Matter of:

FIN ▇▇▇▇

File No ▇▇▇▇

Respondent: LEQAA KORDIA AKA: Kordia, Leqaa M A

▇▇▇▇ ▇▇▇▇ _____ currently residing at:

(Number, street, city, state and ZIP code)    (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of STATELESS and a citizen of STATELESS;

3. You were admitted to the United States at Jamaica, New York on or about March 19, 2016, as a B-2 non-immigrant;

4. You were granted a change of status to a F-1 non-immigrant student;

5. You were terminated by Bergen County Career Advancement Training, Inc. - BCCAT on January 26, 2022.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

4250 FEDERAL DR RM F108 BATAVIA NY 14020. EOIR SPC Batavia, NY

(Complete Address of Immigration Court, including Room Number, if any)

on March 24, 2025 at 1:00 PM to show why you should not be removed from the United States based on the
(Date)    (Time)

charge(s) set forth above.

T 6544 COUNTERMINE - Supervisory Special Agent

(Signature and Title of Issuing Officer)

Date: March 13, 2025

Newark, NJ

(City and State)

DHS Form I-862 (6/22)

Page 1 of 3

DEPARTMENT OF HOMELAND SECURITY

## NOTICE TO APPEAR

DOB: ▆▆▆

Event No: XNK2503000016

---

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID ▆▆▆▆▆▆                    FINS: ▆▆▆▆▆          File No: ▆▆▆▆▆

In the Matter of:

Respondent: **LEQAA KORDIA AKA: KORDIA, Leqaa M A** _____ currently residing at:

▆▆▆▆▆▆▆▆▆▆                                              ▆▆▆▆▆▆▆

(Number, street, city, state and ZIP code)                          (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of STATELESS and a citizen of STATELESS;

3. You were admitted to the United States at Jamaica, New York on or about September 18, 2016 as a unknown manner;

4. You were granted a change of status to a F-1 non-immigrant student;

5. You were terminated by Bergen County Career Advancement Training, Inc. - BCCAT on January 26, 2022.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD, LOS FRESNOS, TEXAS 78566. PRAIRIELAND DETENTION CTR
(Complete Address of Immigration Court, including Room Number, if any)

on __M A Y 6, 2025__ at __8:30 am__ to show why you should not be removed from the United States based on the
   (Date)              (Time)

charge(s) set forth above.         E #6885 KLEIN - (a)SDDO
                                   (Signature and Title of Issuing Officer)

Date: __March 15, 2025__                  Dallas, Texas
                                          (City and State)

DEPARTMENT OF HOMELAND SECURITY

**NOTICE TO APPEAR**

DOB:

Event No: XNK2503000016

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: 398195275                    FINS: 1200761066              File No:

In the Matter of:

Respondent: LEQAA KORDIA AKA: KORDIA, Leqaa M A                                   currently residing at:

(Number, street, city, state and ZIP code)                      (Area code and phone number)

[ ] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[X] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of STATELESS and a citizen of STATELESS;

3. You were admitted to the United States at Jamaica, New York on or about March 19, 2016, as a B-2 non-immigrant;

4. You were granted a change of status to a F-1 non-immigrant student;

5. You were terminated by Bergen County Career Advancement Training, Inc. - BCCAT on January 26, 2022.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:          [ ] 8CFR 208.30        [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD LOS FRESNOS TX 78566. EOIR SPC Los Fresnos, TX
_(Complete Address of Immigration Court, including Room Number, if any)_

on  April 30, 2025  at   8:30 AM      to show why you should not be removed from the United States based on the
     _(Date)_           _(Time)_

charge(s) set forth above.                    T 6544 COUNTERMINE - Supervisory Special Agent
                                              _(Signature and Title of Issuing Officer)_

Date:   March 13, 2025                                    HSI Newark
                                                      _(City and State)_

DHS Form I-862 (6/22)

Page 1 of 3

Petitioner's Appendix Page 68

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATE OF DISPOSITION
NUMBER: 63946

**H**

THE PEOPLE OF THE STATE OF NEW YORK
VS

**NO FEE**

**KORDIA, LEOVAA**

DEFENDANT

DATE OF BIRTH

ADDRESS

04/30/2024

CITY          STATE   ZIP          ISSUE DATE

DOCKET NUMBER: 2024SN010394          SUMMONS NUMBER: 4444949820

PL 240.20 06 0V

ARRAIGNMENT CHARGES

CASE DISPOSITION INFORMATION:

| DATE | COURT ACTION | JUDGE | PART |
|------|-------------|-------|------|
| 05/20/2024 | DISM-INTEREST JUSTIC CPL170.40 | MCGRATH,K | SAP-D |

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN THIS COURT.

_____          03/17/2025
COURT OFFICIAL SIGNATURE AND SEAL          DATE

All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20, PL 221.35 or PL 221.40 - including any appearing on this certificate of disposition - are vacated, dismissed, sealed and expunged. It is an unlawful discriminatory practice for any entity to make any inquiry about such an expunged conviction or to use such an expunged conviction adversely against an individual in any form of application or otherwise-unless specifically required or permitted to do so by statute

Pursuant to section 70.15 of the Penal Law, any misdemeanor sentence with a jail term of "1 year", "12 months", or "365 days" is, by operation of law, deemed to be a sentence of 364 days. Any Certificate of Disposition indicating a jail sentence of "1 year", "12 months", "52 weeks", or "365 days" for a misdemeanor conviction shall be interpreted as a sentence of 364 days.

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE
          COURT SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATE OF DISPOSITION
NUMBER: 63947

THE PEOPLE OF THE STATE OF NEW YORK
VS.

**NO FEE**

KORDIA, LEOVAA

DEFENDANT

DATE OF BIRTH

ADDRESS

CITY              STATE   ZIP

04/30/2024
ISSUE DATE

DOCKET NUMBER: 2024SN010396

SUMMONS NUMBER: 4455809932

PL 240.20 05 0V

ARRAIGNMENT CHARGES

CASE DISPOSITION INFORMATION:

| DATE | COURT ACTION | JUDGE | PART |
|------|-------------|-------|------|
| 05/20/2024 | DISM-INTEREST JUSTIC CPL170.40 | MCGRATH,K | SAP-D |

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN THIS COURT.

_____        03/17/2025
COURT OFFICIAL SIGNATURE AND SEAL          DATE

All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20, PL 221.35 or PL 221.40 - including any appearing on this certificate of disposition - are vacated, dismissed, sealed and expunged. It is an unlawful discriminatory practice for any entity to make any inquiry about such an expunged conviction or to use such an expunged conviction adversely against an individual in any form of application or otherwise-unless specifically required or permitted to do so by statute

Pursuant to section 70.15 of the Penal Law, any misdemeanor sentence with a jail term of "1 year", "12 months", or "365 days" is, by operation of law, deemed to be a sentence of 364 days. Any Certificate of Disposition indicating a jail sentence of "1 year", "12 months", "52 weeks", or "365 days" for a misdmeanor conviction shall be interpreted as a sentence of 364 days.

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE
COURT SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)



(b)(7)(E)

United States Department of Homeland Security
Immigration & Customs Enforcement
ENFORCEMENT AND REMOVAL OPERATIONS

**Kordia, Leqaa 235 642 062**

Person ID:    DOB      Current Age: 32   COB: STATE   COC: STATE
Sex: F

Subject ID : 398199275   Processing Disposition: Notice to Appear Detained (I-862)

Case       Case Category: 2A   Docket: NEW - ELZ-DOCC_XFR to Another AOR



---

## Status as of 03/13/2025 1712 : Custody Classification Level Supervisory Approval Complete

Initialized On: 03/13/2025
Last Decision Date: 03/13/2025
Special Vulnerabilities: None

Man Det Stat/Alleg: No
Risk to Public Safety: Low
Risk of Flight: Low

Custody Decision: Detained by the Department o
Custody Classification: Low

### Recommendations and Decision Results as of 03/13/2025 1712

| Date / Time | Decision | Recommendation(Rec.)/Decision Outcome | Man Det Stat/Alleg | Special Vulner. | Risk to Public Safety | Risk of Flight | Decision By |
|---|---|---|---|---|---|---|---|
| 03/13/2025 1712 | Custody Classification Level Decision | Low | No | None | | | |
| 03/13/2025 1712 | Submitted for Custody Classification Supervisory Approval | Rec: Low | No | None | | | |
| 03/13/2025 1711 | Detain / Release Decision | Detained by the Department of Homeland Security | No | None | | | |
| 03/13/2025 1700 | Submitted for Detain/Release Supervisory Approval | Rec: Supervisor to Determine - Detain or Release on Community Supervision | No | None | | | |
| 03/13/2025 1655 | Risk Classification Assessment Initiated | N/A | N/A | N/A | | | |

### Special Vulnerabilities as of 03/13/2025 1712

None

| Added On | Added By | Description |
|---|---|---|
| 03/13/2025 1711 | | None |

(b)(6) (b)(7)(C)

Additional information relevant to the users observations and assessment:
N/A

*The values above represent all special vulnerabilities that existed on the assessment as of 03/13/2025 1712 .*

### Mandatory Detention per Statutes and Allegations as of 03/13/2025 1712

| Evaluation Criteria | Outcome |
|---|---|
| Is the alien subject to mandatory detention based on statutes and allegations? | Not subject to mandatory detention per statutes and allegations |
| Is the alien's case in a final order of removal status? | No |
| Is the final order date within 90 days of the current date? | N/A |
| If the final order date is outside 90 days of the current date, is the alien's removal likely in the reasonably foreseeable future? | N/A |
| Is the alien a re-entry after a previous removal order (executed Final Order)? | No |

*The values above represent the results of the mandatory detention per statutes and allegations and all case status checks on the assessment as of 03/13/2025 1712 .*

*** The table below lists all INA charges that have been added to the arrest record (encounter associated with the risk classification assessment).**

| Charged On | Section | Description |
|---|---|---|
| 03/13/2025 | 237a1Ci | NONIMMIGRANT STUDENT OUT OF STATUS: FAILURE TO ATTEND |

★ indicates an INA charge that will flag the alien as mandatory detention per statutes and allegations.

### Risk to Public Safety as of 03/13/2025 1712

Risk to Public Safety: Low

| Criminal Record Evaluation Criteria | Outcome |
|---|---|
| Severity of pending charges or convictions associated with the ICE encounter. | No relevant criminal history *(a) |
| Number of special public safety factors (such as DUI) (excluding those used above). | No relevant criminal history *(b) |
| Single most serious conviction remaining in criminal history (excluding those used above). | No relevant criminal history *(c) |
| Number of felony / misdemeanor convictions remaining (excluding those used above). | No relevant criminal history *(d) |
| History/Pattern of Violence (excluding those used above). | No relevant criminal history. Minimum Threshold: 2 *(e) |

The table below lists all criminal charges and convictions used in the criminal record checks described above.

| Date Added | NCIC | Description | Offense Severity | Charge Date | Conviction Date | Disposition | Sentence Length |
|---|---|---|---|---|---|---|---|

*(a) indicates a conviction used to score the severity of crimes associated with the ICE encounter check (if applicable).
*(b) indicates convictions used to score the number of special public safety factors check (if applicable).

(b)(7)(E)

**Petitioner's Appendix Page 72**

*(c) Indicates the single conviction used to score the remaining most serious conviction check (if applicable).
(e) Indicates charges used to score the remaining violent criminal charges check (if applicable).

| Other Public Safety Factors Evaluation Criteria | Outcome |
|---|---|
| Type of open wants / warrants. | None |
| Supervision history (e.g., bond breaches, conditions of supervision violations). | None |
| Security Threat Group (STG) status. | No confirmed or suspected STG/gang affiliation |

| Disciplinary Infraction Information Evaluation Criteria | Outcome |
|---|---|
| Number of additional sustained disciplinary infractions involving violence or behavior representing a threat to the facility (manual entry) | 0 Sustained Infractions |
| Are any of the above disciplinary infractions combative in nature? | N/A |
| Number of historic sustained disciplinary infractions involving violence or behavior representing a threat to the facility (captured in EADM) | 0 Sustained Infractions |
| Known history of combative behavior in historic infractions in a previous facility stay (captured in EADM) | N/A |
| Number of current sustained disciplinary infractions involving violence or behavior representing a threat to the facility (captured in EADM) | 0 Sustained Infractions |
| Combative behavior related to disciplinary infractions in current detention stay (captured in EADM) | N/A |
| History of violent crimes (derived from alien's criminal history and any open wants / warrants) | No known violent history |

*The values above represent the results of the Public Safety Factors evaluation criteria results on the assessment as of 03/13/2025 1712.*

---

### Risk of Flight as of 03/13/2025 1712

| Immigration / Substance Abuse / Identification Evaluation Criteria | Outcome |
|---|---|
| Immigration violation history. | Lawfully entered country |
| History of absconding. | |
| Substance abuse history. | Not a Current Drug User |
| The individual possesses a valid government issued document from their COC. | No |
| Does the individual possess invalid identification documents (IDs) from any country? | No Number of unique names/aliases: N/A |
| Immigration case status. | No Final Order |

(b)(7)(E)

| Home Stability Evaluation Criteria |
|---|
| The individual has a stable address, but has lived there less than 6 months |

| Ties To Local Community Evaluation Criteria |
|---|
| The individual has family or support in local community. |
| The individual has no established family or community support |

*The values above represent the results of the Flight Risk Factors evaluation criteria results on the assessment as of 03/13/2025 1712.*

---

The following scoring and list of value (LOV) versions were utilized at the time this decision was completed and data snapshot was stored.
- RCA Scoring Version 6.7
- Special Vulnerabilities Version 1.0
- Subject to Mandatory Detention Version N/A
- Disciplinary Infractions Version N/A

(b)(7)(E)

Dear Honorable Margaret R. MacGregor,

I respectfully submit this letter in full support of my daughter, Leqaa Kordia, and her request for bond. ███████████████, and I am writing as a mother who has spent years longing to be reunited with my child. No words can fully describe the love, pain, and longing that define our relationship. Leqaa is not just my daughter—she is a part of me, my heart, and my greatest blessing.

Leqaa has endured significant hardship throughout her life. As a child, she was taken from me following my divorce and forced to live with her father and his new wife, who cruelly isolated her from me. For years, she suffered in silence, deprived of the love and comfort of a mother. Later, she was pressured into an arranged marriage, but she bravely chose to leave, seeking a life of dignity and self-determination.

When she was finally able to come to the United States on a tourist visa, it felt like I was reclaiming a part of my soul. I immediately petitioned for her legal residency through an I-130 application, believing with all my heart that she had the right to stay in this country, where she belongs. However, due to a misunderstanding about filing an additional visa extension, she now finds herself in detention—a devastating and unjust consequence for someone who has done everything in her power to comply with the legal process.

Leqaa is not a flight risk, nor is she a danger to the community. On the contrary, she has dedicated herself to bettering her life and contributing positively to those around her. ████ ████████████████████████████████████████████████████ before continuing her education at BCCAT in Fort Lee. She has worked tirelessly to build a future, staying on the path toward legal residency with unwavering faith in the system.

Beyond her personal ambitions, Leqaa is the cornerstone of our family. 

If granted bond, Leqaa would live with me at ████████████████████, where I will ensure she complies with all bond conditions. She has nowhere else to go—this is her home. Her deep ties to our family and community reinforce her strong commitment to remaining in full compliance with immigration proceedings.

As a mother, I am begging you—please allow my daughter to return home. She is a responsible, hardworking, and loving individual who deserves the opportunity to continue building her life here.

Thank you for your time and consideration.

**Sincerely,**



March 15, 2025

March 16, 2025

Dear Honorable Margaret R. MacGregor,

My name is ███████████, and I am the sister of Leqaa Kordia. I am writing this letter to express how much she means to me, our family, and our community. Leqaa is not just my sister—she is my best friend, my role model, and the heart of our family. Her detention has devastated me, and I cannot imagine my life without her here.

Leqaa is a woman of incredible strength, kindness, and unwavering moral character. She has always carried herself with dignity and respect, no matter what hardships she has faced. Despite the struggles she endured in her life, she has never allowed them to define her. Instead, she has remained compassionate, hardworking, and deeply committed to those she loves.

One of the qualities I admire most about Leqaa is her selflessness. She is always the first to help others, whether it's taking care of our mother, being a second mother to my younger brother, or volunteering to help family friends whenever they need her. She is the epitome of a villager—giving without expecting anything in return, and her kindness leaves an impact on everyone she meets.

Leqaa has always had an incredible eye for crafts and creativity. She loves making things with her hands, and she once took me to a pottery painting studio where we spent hours decorating mugs together. She was so precise and patient, making sure each brushstroke was perfect, while I was just having fun splashing colors everywhere. In the end, our mugs turned out adorable, and it's a memory I cherish deeply. It's little moments like that—her ability to make simple activities feel special—that make her such a wonderful person to be around.

She is also incredibly generous. Every time we go out, she insists on paying, even when I try to argue with her about it. It's just who she is—she loves taking care of the people she loves, and she always puts others before herself. But more than just material things, she takes care of me in the way a big sister should. She checks up on me, gives me advice, and makes sure I never feel alone.

This means the world to me because growing up, I didn't have a sister. I never knew what it felt like to have that kind of bond until I met Leqaa. She gave me the experience of having an older sister—the kind of unconditional love, protection, and care that I had never known before. Losing her, even temporarily, feels like losing a part of myself.

Leqaa is also incredibly responsible and dedicated. She spent years studying English and working hard to better herself, never once taking shortcuts or trying to bypass the system.

She trusted the process, believing that as long as she followed the rules, she would one day secure her place in this country—the only home she knows now. Her mistake was not one of willful disobedience but a simple misunderstanding based on the guidance she received. She would never purposely do anything to jeopardize her status, and anyone who knows her can attest to that. One of her dreams was to become a business owner and open her own café. I hope she gets to bring that dream into fruition and more.

Beyond her character, Leqaa is deeply rooted in this community. She has family here, including myself and our mother, who need her more than words can express. She is my support system, the person I turn to in difficult times. Knowing she is in detention breaks my heart because I know she doesn't deserve this and can't handle it. She has always followed the rules, respected the law, and worked hard to build a future here. She has high morals, integrity, and a genuine heart. This is someone who wouldn't even take an extra bag out of the vending machine if it accidentally gave her two.

Leqaa has tried hard these last seven years to establish herself in ████████ She is not a flight risk. She has nowhere else to go—this is her home. She has strong family ties, a support system, and a future here. Nor is she a danger to the community; in fact, she is the opposite. She is a kind, generous, and responsible person who only seeks to live her life in peace with the people she loves.

I ask you with all my heart to please grant her release. She deserves to be with her family, where she is loved, needed, and belongs.

Sincerely,





# UCEDA
### INTERNATIONAL

111 Ellison Street, Paterson, NJ 07505 ○ (866) 823-3299 ○ studyusa@uceda.edu ○ www.uceda.edu

March 17, 2025

U.S. Citizenship and Immigration Services
Attn: Status Verification Unit
970 Broad St. 11th Floor
Newark, NJ 07102

RE:    **Kordia, Leqaa M A** (SEVIS ID: N )

To Whom It May Concern:

As a Designated School Official at UCEDA INTERNATIONAL, I am writing to attest to Ms. Leqaa Kordia's academic standing and character during her time as a student at our institution. From **February 6, 2017, to January 31, 2021**, she was an active student in good academic standing, consistently maintaining a full course of study.

Based on conversations with her former instructors and classmates, Ms. Kordia was a dedicated and hardworking student who took her language studies seriously, making significant progress throughout her coursework. She was well-respected by both faculty and peers and contributed positively to our diverse learning environment.

As someone who upholds the values of due process and the principles upon which this nation was built, I trust that her case will be handled in a manner that reflects fairness and respect for individual rights. If any further information is needed, please feel free to contact me at your convenience.

Sincerely,

Richard Rylaner
Vice President/ DSO
UCEDA INTERNATIONAL

March 16, 2025

Honorable Immigration Judge,

My name is ▮▮▮▮▮▮▮▮▮▮, and I have had the absolute privilege of knowing Leqaa Kordia for the past seven years. We met when she came to my husband's store to buy Turkish sweets, and from that day forward, our friendship blossomed into something truly special. Leqaa has been a constant source of love, kindness, and support in my life, and I cannot imagine what I would do without her.

From the very beginning, Leqaa felt like family. When my children were small, she was always there to help me take care of them, never expecting anything in return. She is someone I can trust wholeheartedly—someone who has been there for me in my darkest moments. When I lost my brother, his wife, and their baby in the devastating earthquake in Turkey, I was an emotional wreck. I felt like my world had shattered, and I didn't know how I would get through it. But Leqaa was there, standing by my side, helping me grieve, holding me up when I felt like I couldn't keep going. She was my rock during that time, offering comfort and support in ways I can never fully express in words.

Leqaa is not just my best friend—she is family to me. I don't have any relatives in ▮▮▮▮▮▮▮▮▮ and because my husband travels for work frequently, she has been my only real support system. She has been there for me through everything, from the everyday challenges of raising my kids to the most painful experiences of my life. She has babysat for me without hesitation, without ever asking for anything in return, simply because she cares. When I was finishing my clinical psychology master's degree, she stepped in and helped with my children so I could focus on my studies. She always believed in me, constantly encouraging me and reminding me that I could accomplish my dreams. Now, as I work toward completing my MA in Clinical Psychology, I know I couldn't have made it this far without her support.

I am not just losing my best friend and sister—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Every single day, they ask me when she is coming back, and I have no words to comfort them. They have grown up with her love, care, and presence, and I cannot bear the thought of them losing her. Leqaa has been a maternal figure to them, someone they trust and feel safe with, and her absence has left a painful void in their hearts. She is not just important to me—she is deeply cherished by my children, and they need her just as much as I do.

Leqaa is a person of incredible integrity, patience, and kindness. She is never one to argue or cause problems. In all the years I have known her, we have never once fought—our friendship has always been filled with mutual love and understanding. Whether it was road trips to the beach, spending time together at home, or simply supporting one another through life, every moment with her has been easy and full of warmth. She is one of the cleanest, most polite, and most respectful people I know, making every experience with her a joy.

Beyond just our friendship, Leqaa has been a mentor to others. She has helped many people navigate life in the United States, guiding them toward the right language schools and providing support whenever she could. She is someone who genuinely wants to see others succeed, and she takes the time to help them however she can.

The thought of losing Leqaa from my life is unbearable. She is not a flight risk—she has built a life, a community, and a family here. She is not a danger—she is the exact opposite. She is a person who gives selflessly, who supports others, who uplifts those around her. Her presence in my life, in my children's lives, and in our community is invaluable. I urge you with all my heart to grant her release and allow her to stay where she belongs—with the people who love and need her.

*Sincerely,*



Dear Immigration Judge,

My name is ███████████, and I am currently a ████████████████████████. I grew up in ████████████████████, the same neighborhood as Leqaa Kordia. Our families have known each other since I was a child, but I became especially close to Leqaa during my undergraduate years when I began my professional journey in the summer of 2017.

At that time, I worked in the same plaza where she spent countless hours studying. I remember seeing her in the café almost every day, sitting with her textbooks, completely focused, working tirelessly toward her future. During my breaks, I would sit with her, and we would talk—sometimes about our studies, sometimes about life. She always struck me as someone with an incredibly strong moral compass, someone who truly valued hard work and doing things the right way.

One memory that has always stayed with me is when I told her about how ████████████ ████████████████████████████████████ Without hesitation, she told me how wrong that was—that learning isn't just about passing a test, but about growing and bettering yourself. She specifically said she would rather fail an exam than cheat just to pass. That one statement speaks volumes about her character. She truly believes that integrity is more important than any grade. She even spent her own time, unpaid, helping classmates who were struggling—simply because she cared. She didn't just want to succeed alone; she wanted those around her to succeed, too.

That's who Leqaa is. She is someone who gives selflessly to others, someone whose presence makes the people around her better. She belongs in this community, uplifting those who need it, demonstrating a rare kind of kindness that is hard to come by.

Beyond her generosity, Leqaa is a rule follower in the truest sense. I cannot emphasize this enough. She does everything by the book, not because she has to, but because she genuinely believes in doing what is right. She has never been the type to cut corners or break rules, even in the smallest ways. I remember offering to drive her home countless times because she didn't have a car, and every single time, she would remind me to drive carefully. Once, I crossed a yellow light, and she immediately scolded me, reminding me that pedestrians often start walking when they see the light turn yellow and that I could hurt someone. It wasn't just a casual comment—it was genuine concern. That's the kind of person she is. She isn't reckless. She isn't irresponsible. And she most certainly is not a danger to society.

The fact that she is being detained is not only heartbreaking—it is entirely unjust. She is not a flight risk. This is her home. She has spent years patiently waiting for her legal status to be resolved, always complying with the process, never once straying from the path of compliance. She has deep ties to this community, to the people who love her and need her. Her mother and younger brother rely on her in immeasurable ways, and her absence has left a hole in their lives that no one else can fill.

The idea that someone like Leqaa—someone who has spent her life proving her integrity, selflessness, and dedication to her community—could be considered a risk or a danger is beyond comprehension. I urge you to look at the person she truly is. She has never been anything but a law-abiding, kind-hearted, and responsible individual. If released, I have no doubt that she will comply with all bond conditions, because that is simply who she is.

I ask you, with all sincerity, to grant Leqaa bond and allow her to return home, where she belongs. Our community needs her. Her family needs her. And above all, she deserves the chance to continue the life she has worked so hard to build.

Thank you for your time and consideration.

Sincerely,



March 16, 2025
date

March 16, 2025

Dear Immigration Judge,

My name is ███████████, and I am writing this letter in full support of Leqaa Kordia, my husband's niece. To me, she has been like a daughter. In all the years I have known her, I have never met a more kindhearted, selfless, and compassionate person.

I have had the privilege of knowing Leqaa for over seven years. Every time she visited our home or we visited hers, she brought nothing but warmth, love, and support. I have a child ███████ ████████████████████████████████████, Leqaa had a remarkable ability to calm and comfort him—a feat that not many can accomplish. She also dedicated her time to sitting with him, helping him with his homework, ensuring he understood his assignments whenever I was busy. Her patience, kindness, and willingness to help without hesitation speak volumes about the kind of person she is.

Leqaa's own life has not been without hardship. As a child, she endured an incredibly painful separation from her mother due to a difficult divorce. At the tender age of five, she was taken from her mother and had no way of contacting her, spending years without the love and guidance of a mother. When she grew older and was finally on her own, she was able to visit her mother and, by the grace of God, reunited with her. I remember wanting to call the news channel to come meet them at the airport because I was so moved by their story. I cannot imagine the pain of losing her mother once again.

Leqaa is not a danger to anyone. On the contrary, she is a source of support, love, and generosity to those around her. She has always put others before herself, offering help in any way she could, whether to family, friends, or even strangers. The fact that she willingly turned herself in only further proves her integrity and willingness to abide by the law.

The issue surrounding her visa status is one big misunderstanding. Her mother, a U.S. citizen, applied for her legal status when she first arrived in the country. Upon completing her education, Leqaa reached out to immigration multiple times, only to be told she needed to wait for the process to be completed. She was also informed that, because her mother had already applied for her, she did not need to file for a visa extension. She has done everything she was told to do and has never attempted to evade the system.

Leqaa is not a flight risk. Her entire family is here—her mother, her loved ones, and her support system. She has nowhere else to go. Her father has passed away, and deporting her would once again rip a family apart, causing irreparable harm.

I plead with you from the depths of my heart to allow Leqaa to stay. She has worked hard to build a future here, and she dreams of becoming a successful, contributing member of this country. She has committed no crime—this is simply an unfortunate misunderstanding regarding her pending status.  Thank you for taking the time to read my letter. I understand that your job carries great responsibility, and I do not make this request lightly. But I beg you, with all the sincerity in my heart, to grant Leqaa the chance to remain with her family and continue the life

she has worked so hard to build.

Sincerely,





To Whom It May Concern:

My name is ██████████ and it is my absolute honor to write this character testimonial for my friend Leqaa Kordia.

I live in ██████████ was introduced to Leqaa by a mutual friend during a day trip to ████████████████████ in December 2023, where she lives. Leqaa was thrilled to hear that it was my first time in ████████ and provided us with numerous recommendations about what restaurants to try and which businesses to patronize. It was clear even then that Leqaa is someone with deep roots in and a profound love for her community in ████████ A few months later, I traveled to Washington, DC with the same mutual friend, and Leqaa was there as well. Over the course of the trip there and back, I came to be impressed by Leqaa's generosity, grace, patience, and friendliness while navigating a long and stressful bus journey. When the community group I was a part of organized a food distribution event in the heart ████████ he same generosity impressed itself deeply on me when Leqaa donated food, paying for the food out of her own pocket.

It will be abundantly clear that I have met Leqaa only a handful of times. I am positive that she has many, many family members, friends and loved ones who have known her deeply over many years, and who be able to testify far more strenuously to the depth of Leqaa's character and her deep roots in her community. However, I wanted to write this letter to explain how clear and certain Leqaa's character is to me, as someone who is only a very marginal character in her life, and how deeply her compassion, integrity and generosity was impressed upon me during the sparse handful of times that I had met her.

Leqaa is not an untrustworthy person, nor is she a flight risk. With respect to both conditions, the truth of who Leqaa is and what she means to so many people in her life cannot be understated. I urge you with all my heart to grant Leqaa's release so that she can return to the life and home she has built here in Paterson, New Jersey, amongst the people and community she loves and who love her back unreservedly.

Sincerely,





March 16, 2025

March 16, 2025
Re: Leqaa Kordia

To whom it may concern:

I am writing this correspondence to advocate for the release of Ms. Kordia on bond. I have had interactions with Ms. Kordia at our local mosque i█████████ ver several community events. She is always helpful coordinating, organizing and actively seeking to assist in matters that impact our community. I can say with full confidence she does not deserve to be treated like this and hope that you grant her the grace to remain part of this community. Her devotion to improving the conditions for her local community includes work that protect the rights and services of others, she is an asset to all walks of faith and representative of why people seek to study here in the United States. Ms. Kordia is not a flight risk or a danger to anyone in the United States, on the contrary, she is exactly who we need during these turbulent times to shed light on the humanity of the people she represents.

I urge you to consider granting her release and to understand how people like Ms. Kordia are already dehumanized by political bodies seeking to stoke flames of hatred towards marginalized people. She has not committed a crime to my knowledge and her character reflects the goodness of people who want to act with dignity, honor and respect.

Thank you for your consideration in this important matter.

Sincerely ,



March 16, 2025

Re    Leqaa Kordia

To whom it may concern:

I am writing this letter in full support of Leqaa Kordia, respectfully requesting her release on bond. I have known the family of Leqaa (i.e., mother and younger brother) vis a vis attendance at the two major ███████████████████████████████████████████ and ███████████████ I regularly prayed at █████████████ while I had office in █████████████ section. Additionally, I lived near the █████████████ for 2 years while repairing my home in █████████████ I attended classes at ████ where often I came across her sibling in the for over six years, having met her through other █████ members who knew the family. She had a good reputation as a good young sister since she was a major factor in the emotional and medical support of her mom.

I can say with absolute confidence that Leqaa is not a danger to society. On the contrary, she is the kind of person who strengthens and uplifts her community. She gives back in every way she can—offering a helping hand, emotional support, and genuine care to those around her. Her presence brings warmth and positivity, and her absence has left a noticeable void in the lives of everyone who knows and loves her. Losing her would not only be a devastating personal loss for her mom and brother but also a significant loss for the community as a whole.

Leqaa is also not a flight risk. She has deep and unshakable ties to this community, including close family members who rely on her and a strong support system that cares for her deeply. She has always been responsible, respectful, and fully compliant with all legal requirements. She is not trying to escape her circumstances, she simply wants the opportunity to remain in the country she calls home and continue being the kind, giving, and law-abiding person she has always been.

I sincerely urge you to consider granting Leqaa bond. She is a valuable member of this community, and those of us who know her can attest to the goodness in her heart and her unwavering commitment to doing what is right. If you require any further information, please do not hesitate to contact me.

Thank you in advance for your time and careful consideration of this request.

Sincerely,




March 17, 2025

To Whom It May Concern,

I am writing in full support of Leqaa Kordia and respectfully request that she be granted release on bond. Although she is my cousin, I have had the privilege of knowing Leqaa for nearly a decade since she first moved to the United States. She is one of the kindest, most selfless, and compassionate individuals I have ever met.

Leqaa has been a pillar of support in my life, always showing up for others in their most difficult moments. She has a heart of gold and consistently prioritizes the well-being of those around her. Whether it's offering emotional support, lending a helping hand, or showing kindness to strangers, she embodies the very best qualities of a caring and responsible member of society.

I can say with absolute confidence that Leqaa is an asset to her community—not a danger. She gives back in every way possible, and her absence has left a noticeable void in the lives of those who love and depend on her. Her loss would not only be deeply felt by her family and friends but also by the broader community that benefits from her presence, generosity, and goodwill.

Furthermore, Leqaa is not a flight risk. She has deep and unshakable ties to this community, including family members who rely on her and a strong support system committed to her well-being. She has always been responsible, respectful, and fully compliant with all legal requirements. She is not seeking to evade accountability —she simply wants the opportunity to remain in the country she calls home and continue living as the kind, giving, and law-abiding person she has always been.

I sincerely urge you to consider granting Leqaa bond. She is a valued and integral part of this community, and those of us who know her can attest to her unwavering integrity and commitment to doing what is right. If you require any further information, please do not hesitate to contact me.

Thank you for your time and consideration.

Sincerely,



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

In the Matter of:     LEQAA KORDIA
A

<u>**ORDER OF THE IMMIGRATION JUDGE**</u>

Upon consideration of the **RESPONDENT'S MOTION ON ELIGIBILITY FOR BOND AND CUSTODY REDETERMINATION** , it is HEREBY ORDERED that the Motion be **GRANTED    DENIED** because:

    ☐  DHS does not oppose the motion.

    ☐  The respondent does not oppose the motion.

    ☐  A response to the motion has not been filed with the court.

    ☐  Good cause has been established for the motion.

    ☐  The court agrees with the reasons stated in the opposition to the motion.

    ☐  The motion is untimely per _____.

    ☐  Other: .

    ☐  The date of the rescheduled individual hearing is _____.

Deadlines:

    ☐  The application(s) for relief must be filed by _____.

    ☐  The respondent must comply with DHS biometrics instructions by _____.


Date: _____        _____
                                             Immigration Judge [NAME]

---

**Certificate of Service**

This document was served by:  [  ] Mail     [  ] Personal Service

To:        [  ] Alien      [  ] Alien c/o Custodial Officer      [  ] Alien's Atty/Rep      [  ] DHS


    Date: _____        By: Court Staff_____

10

**PROOF OF SERVICE**

On March 26, 2025, I, S. Michael Musa Obregon, served a copy of the Respondent's Motion on

Eligibility for Bond and Redetermination of Bond and any attached pages to the Department of

Homeland Security Counsel, Office of Chief Counsel at the following address:

> U.S. Department of Homeland Security Counsel
> Immigration and Customs Enforcement
> Office of the Chief Counsel
> Port Isabel Detention Center
> 27991 Buena Vista Blvd
> Los Fresnos, TX 78566
> United States

by the following method:

_____ Hand Delivery

_____ U.S. Mail, 1st Class postage pre-paid

_____ Facsimile

_____ Express Mail

__x__ ECAS

(SIGNATURE)                                                    03/27/2025

11

# EXHIBIT "2-B"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Exhibit "B" - Declaration of Mallory Manfredini*

*In the Matter of Leqaa Kordia, Dep't of Homeland Sec. Notice of Filing, as filed on Apr. 2, 2025*

Stacy Norcross                                                          **DETAINED**
Assistant Chief Counsel
Office of the Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
Port Isabel Detention Center
27991 Buena Vista Blvd.
Los Fresnos, Texas 78566

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## PORT ISABEL DETENTION CENTER

_____
                                         )
In the Matter of:                        )
                                         )
Kordia, Leqaa                            )    File No: A███████
Respondent                               )
                                         )
In Removal Proceedings                   )
_____)

Immigration Judge Naselow-Nahas

Next Hearing: April 3, 2025 at 10:30AM

## DEPARTMENT OF HOMELAND SECURITY

## NOTICE OF FILING

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**PORT ISABEL DETENTION CENTER**

_____
                                                    )
In the Matter of:                              )
                                                    )
Kordia, Leqaa                                 )          File No:  A███████████
Respondent                                    )
                                                    )
In Removal Proceedings                   )
_____)

**DEPARTMENT OF HOMELAND SECURITY**

**NOTICE OF FILING**

Comes  now  the  U.S.  Department  of  Homeland  Security,  Immigration  and

Customs Enforcement, by and through its undersigned counsel, and respectfully submits

the following documents for the Court's consideration in the above-styled case.

Respectfully Submitted,

ANASTASIA     Digitally signed by
                         ANASTASIA S NORCROSS
S NORCROSS     Date: 2025.04.02
                         17:03:21 -05'00'

_____              _____
Date                                 Stacy Norcross
                                        Assistant Chief Counsel
                                        Office of the Chief Counsel
                                        U.S. Immigration and Customs Enforcement
                                        U.S. Department of Homeland Security
                                        Port Isabel Detention Center
                                        27991 Buena Vista Blvd.
                                        Los Fresnos, Texas 78566

EOIR – 2 of 51

2

## TABLE OF CONTENTS

| Tab | Document | Pages |
|---|---|---|
| A | **Homeland Security Investigations Reports of Investigation** | **1-40** |
| B | **NYPD Report** | **41-45** |

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing which relates to the following case:

Respondent:          Leqaa Kordia
Alien Number:        A███████████

to be served on the respondent's counsel by the following means:

☐      by first-class mail, postage pre-paid, to [address of party served].

☐      by first-class mail, postage pre-paid to [address of party served], by placing into my office's receptacle designated for official "out-going" first class mail.

☐      by personally delivering a true copy thereof to the person set forth above via custodial officer.

☐      by electronic service, with prior consent, at the following e-mail address: [email address of party served].

☐      by eService pursuant to the Terms and Conditions agreed to between the parties.

☒      through the EOIR Courts and Appeals System (ECAS), which will automatically send service notifications to both parties that a new document has been filed.

on this 2nd day of April 2025.

ANASTASIA
S NORCROSS
Digitally signed by
ANASTASIA S NORCROSS
Date: 2025.04.02 17:03:50
-05'00'

DHS/ICE



EOIR — 5 of 51

B

EOIR — 46 of 51

ENTITY - DETAILED REPORT



# LEQAA KORDIA


**NYPD**
New York City Police Department



NO IMAGE AVAILABLE

| PROFILE | | | |
|---|---|---|---|
| Name | KORDIA, LEQAA | NYSID | |
| Alias | | Date of Birth | 32 yrs) |
| Sex | Female | Race | Asian / Pac. Isl. |
| Height | | Weight | |
| Eye Color | N/A | Hair Color | N/A |
| FBI Number | | Phone Number | |
| Tattoo / Marks | | | |

| OFFICER SAFETY | |
|---|---|
| Gun Charge History | No |
| Assault on PO | No |
| Escape | No |
| Resisting Arrest | No |
| EDP / Suicide History | No |
| CEW Used | No |

| QUICK LOOK | | | |
|---|---|---|---|
| Shooting / Hom Hist | No | | |
| ECMS Criminal Group | No | MTA Ban | No |
| Narco History | No | Pattern History | No |
| SOMU | No | | |
| State / City Custody | | Local DNA on File | No |
| Open Cases | No | NY Registered Vehicle | No |

| STATS | | | | | | |
|---|---|---|---|---|---|---|
| ARREST 0 | WARRANT 0 | I-CARD 0 | DIR 0 | COMPLAINT 0 | PROBATION NO | PAROLE NO |
| Felony 0 | Arrest 0 | PC 0 | Offender 0 | Perp 0 | Sentenced | Released |
| Misd 0 | Bench 0 | Suspect 0 | Victim 0 | Victim 0 | Exp Date | Exp Date |
| Viol / Inf 0 | Summons 0 | Witness 0 | N Of Kin 0 | Witness 0 | Res. Pct | Res. Pct |
| C-Sum 2 | Other 0 | Closed 0 | Arrests 0 | Reporter 0 | Crime: | Crime: |
| Oath 0 | Closed 0 | | | | | |

## SHOOTING / HOMICIDE INCIDENTS
NO RECORD FOUND

## I-CARD HISTORY
NO RECORD FOUND

## WARRANT HISTORY
NO RECORD FOUND

## ARRESTS
NO RECORD FOUND

## PATTERNS
NO RECORD FOUND

## RECIDIVIST LISTS
NO RECORD FOUND



# LEQAA KORDIA



| COMPLAINTS |
|---|
| NO RECORD FOUND |

| AIDED CASES |
|---|
| NO RECORD FOUND |

| DOMESTIC INCIDENTS |
|---|
| NO RECORD FOUND |

| PAROLE HISTORY |
|---|
| NO RECORD FOUND |

| PROBATION HISTORY |
|---|
| NO RECORD FOUND |

| OCA - OPEN CASES |
|---|
| NO RECORD FOUND |

EOIR — 48 of 51

42

Report Generated by PO JOEL GUACH for ENTITY 341488554 at 15:44 hours on 03/14/2025     **Petitioner's Appendix Page 139**     page 2 of 4

Uploaded on: 04/02/2025 at 05:04:56 PM (Central Daylight Time), Base City: PEP



# ENTITY - DETAILED REPORT

# LEQAA KORDIA



New York City Police Department

## ADDITIONAL ANALYSIS

### NAMES

| First Name | Last Name | Frequency | | Last Reported Source | Last Reported Date |
|---|---|---|---|---|---|
| LEQAA | KORDIA | 2 | ███████ | Summons | 04/30/2024 |

### DATES OF BIRTH

| Date Of Birth | | Frequency | | Last Reported Source | Last Reported Date |
|---|---|---|---|---|---|
| ███████ | | 2 | ███████ | Summons | 04/30/2024 |

### IDENTIFICATION NUMBERS

NO RECORD FOUND

### ADDRESSES

| Type | Address | Frequency | | Last Reported Source | Last Reported Date |
|---|---|---|---|---|---|
| | W 116 ST &amp; MANHATTAN, NEW YORK 10027 UNITED STATES | 2 | ███████ | Summons | 04/30/2024 |

### PHONE NUMBERS

| Type | Phone Number | Frequency | | Last Reported Source | Last Reported Date |
|---|---|---|---|---|---|
| PH | ███████ | 2 | ███████ | Summons | 04/30/2024 |

### ARREST ASSOCIATES

NO RECORD FOUND

### POSSIBLE ASSOCIATES

| Name | Entity ID | Relationship |
|---|---|---|
| ███████ | ███████ | Other Number Only |

### EVENT SUMMARY

| Event Type | Count | Last Event Date |
|---|---|---|
| C-Summons | 2 | 04/30/2024 |

### TIMELINE

| Event ID & Date | Event Type | Role | NYSID | Name | DOB | Address |
|---|---|---|---|---|---|---|
| 4444949820 04/30/2024 | C-Summons | Respondent | | LEQAA KORDIA | | ███████ |
| 4455809932 04/30/2024 | C-Summons | Respondent | | LEQAA KORDIA | | ███████ |

NOTE: This "Entity" report attempts to find and consolidate all of the NYPD's records about a person across many different data sources by using names, dates of birth, addresses, phone numbers, identification numbers (NYSID, SSN), and other data points. This report may fail to incorporate records of the person of interest and/or incorrectly include records relating to a different person. As a result, all data in this report should be independently verified before any police action is taken.



**ENTITY - DETAILED REPORT**

# LEQAA KORDIA



New York City Police Department

Please contact the ITB Help Desk at 646-610-MISD (6473) to report any errors or inconsistencies in this report.

**Click here to generate the NYPD Extended Report for LEQAA KORDIA**

EOIR — 50 of 51

Report Generated by PO JOEL GUACH for ENTITY 341488554 at 15:44 hours on 03/14/2025     **Petitioner's Appendix Page 141**     44     page 4 of 4

Uploaded on: 04/02/2025 at 05:04:56 PM (Central Daylight Time)   Base City: PEP

## Search Results

Total Records:2                                        NYPDFINEST\GUACH944617  03/14/2025 15:42:17

**No Image Available**

**Person**                KORDIA, LEQAA
                          C-SUMMONS
**Event Type**                                         **Role**    RESPONDENT
                                                       **Date**    TUES  04/30/2024 21:10:00
ID: 444949820 - PEOPLE: KORDIA, LEQAA (RESPONDENT); AT TPO I OBSERVED THE DEF. WITH APPROX. 100 STANDING /YELLING, BLOCKING THE GATE @
SAID LOCATION PREVENTINGN ANYONE FROM ENTERING & EXITING @ SAID LOCATION. I OBSERVED NYPD PERSONAL REQUEST DEF. DISPURSE & DEFT
FAILED TO COMPLY WITH SAID COMMAND.

**No Image Available**

**Person**                KORDIA, LEQAA
                          C-SUMMONS
**Event Type**                                         **Role**    RESPONDENT
                                                       **Date**    TUES  04/30/2024 21:10:00
ID: 445809932 - PEOPLE: KORDIA, LEQAA (RESPONDENT); AT TPO I OBSERVED THE DEF. WITH APPROX. 100 STANDING /YELLING, BLOCKING THE GATE @
SAID LOCATION PREVENTINGN ANYONE FROM ENTERING & EXITING @ SAID LOCATION. I OBSERVED NYPD PERSONAL REQUEST DEF. DISPURSE & DEFT
FAILED TO COMPLY WITH SAID COMMAND.

45

# EXHIBIT "2-C"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Exhibit "C" - Declaration of Mallory Manfredini*

*In the Matter of Leqaa Kordia, Bond Memo., as ordered on Apr. 16, 2025*

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | IN BOND PROCEEDINGS |
| | ) | |
| **KORDIA, Leqaa** | ) | A ███████ |
| | ) | |
| RESPONDENT | ) | **DETAINED** |

**ON BEHALF OF RESPONDENT**:          **ON BEHALF OF THE DEPARTMENT**:
Shauky Michael Musa-Obregon, Esq.          Stacy Norcross, Esq.
Musa-Obregon Law PC                              Assistant Chief Counsel
55-21 69th St., 2nd Fl.                              27991 Buena Vista Blvd.
Maspeth, NY 11378                                    Los Fresnos, TX 78566

**BOND MEMORANDUM**

     Respondent is a thirty-two-year-old female, native and citizen of stateless. Exhibit (Exh.) 1-B, Tab G. The Department placed Respondent in custody following an encounter on March 13, 2025, in Newark, New Jersey. Exh. 3-B at 23. On March 27, 2025, Respondent filed a bond redetermination request. Exh. 1-B. At the bond hearing on April 3, 2025, the Court granted Respondent's request for a change in custody status, setting her bond at $20,000. *See* Order of the Immigration Judge (April 3, 2025). This memorandum provides the basis for the Court's grant of bond.

     In a custody determination, the Court should first determine whether an alien poses a danger to the community, and, if not, whether she is likely to appear for future proceedings before the Court. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). The Constitution does not guarantee an alien in removal proceedings a right to release on bond. *Carlson v. Landon*, 342 U.S. 524, 534 (1952). An applicant bears the burden to establish she merits release on bond. *Matter of Guerra*, 24 I&N Dec. at 40; *Matter of Adeniji*, 22 I&N Dec. 1102, 1112 (BIA 1999). When an alien is not subject to mandatory detention, the Court has broad discretion in deciding whether she will be released. *Matter of Guerra*, 24 I&N Dec. at 39; *see also Carlson v. Landon*, 342 U.S. at 540. An alien who poses a danger to persons or property shall not be released during pending removal proceedings. *See Matter of Drysdale*, 20 I&N Dec. 815 (BIA 1994). In the absence of a conviction, evidence of serious criminal conduct, including police reports, which is "probative and specific" to the danger a respondent poses to her community may outweigh other factors and provide a reasonable basis for denying bond. *Matter of Guerra*, 24 I&N Dec. at 40; *see also Matter of Siniauskas*, 27 I&N Dec. 207, 208-09 (BIA 2018) (stating immigration judges may consider both arrests and convictions in custody determinations).

     Where an immigration judge concludes an applicant is not a danger to the community, the Court must next consider whether the applicant is a flight risk unlikely to appear for future proceedings. *See Matter of Patel*, 15 I&N Dec. 666 (1976) (factors unique to each noncitizen must be evaluated in determining suitability for release from custody). In making this decision, the Court

Petitioner's Appendix Page 144

can consider many factors including: (1) whether the applicant has a fixed address in the United States; (2) her length of residence in the United States; (3) her family ties in the United States, and whether they may entitle her to reside permanently in the United States in the future; (4) her employment history; (5) her record of appearance in court; (6) her criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) her history of immigration violations; (8) any attempts to flee prosecution or otherwise escape from authorities; and (9) her manner of entry to the United States. *Matter of Guerra*, 24 I&N Dec. at 40. This list of factors is not exhaustive, and any reliable evidence in the record may be considered. 8 C.F.R. § 1003.19(d). An immigration judge may give greater or lesser weight to any given factor or factors, provided the ultimate conclusion is reasonable. *Matter of Guerra*, 24 I&N Dec. at 40. Family and community ties may demonstrate the applicant is not a flight risk but generally do not demonstrate she is not a danger to the community. *Siniauskas*, 27 I&N Dec.at 209-210.

Here, the Court finds that Respondent is not a danger to the community. The Department argues that Respondent is a danger to the community because of her arrest at a protest and because she has sent money to someone in Palestine. Neither of these arguments are persuasive. First, the Department argues that the facts surrounding Respondent's arrest demonstrate that she is a danger. Respondent attended a protest outside of Columbia University on April 30, 2024. Exh. 1-B at 11. She was cited for public disturbance, but the charges were dropped in the interest of justice. Exh. 1-B, Tab H. The police report states that she was with approximately 100 other people and was blocking the gate to keep anyone from entering or exiting. Exh. 3-B at 45. The Department provided no evidence that Respondent specifically threatened the police officers or was involved in any dangerous activity. Standing in a crowd of around 100 people in a protest does not show that she is a danger to the community.

Next, the Department argues that Respondent may have been providing support to terrorist organizations such as Hamas by sending money overseas. To support this claim, the Department submitted a Homeland Security Investigation (HSI) report stating that Respondent and another individual named Abushaban were involved in numerous transactions sending funds to individuals in the Palestinian Authority. Exh. 3-B at 4. The investigation stated that the most recent transaction Respondent initiated through Western Union was on February 25, 2025. *Id.* However, the report gives no details about how much money was sent, why the money was sent, nor the recipient of the funds. The Department also provided a list of MoneyGram transactions from Respondent's mother's address from March 5, 2018, to March 5, 2025. *Id.* at 32. Over these seven years, Respondent's name is listed only once, on March 13, 2022.[1] *Id.* at 35. Respondent claims that she was sending money to her relatives in Palestine. The Department admitted that they do not know any information about the person listed as the recipient of this transaction. There is no evidence in the record that this person supports Hamas or is a member of a terrorist organization. In the absence of evidence of any connection to terrorist organizations, the Court cannot find that Respondent is supporting a terrorist organization by sending money to a family member in Palestine.

---

[1] The Court notes that there are several MoneyGram transactions from ████████████ where Respondent resided with her family. Exh. 3-B, at 35-37. However, Respondent testified that her parents rent the second floor of the house, and the Department submitted no evidence to connect these transactions to Respondent or to a terrorist organization.

Respondent presented evidence of her good character, including letters from her family, friends, and school. *See* Exh. 1-B, Tabs J- M. She has been in the U.S. since 2016, and has not had any encounters with law enforcement other than at the protest in 2024. Thus, Respondent has met her burden to show that she is not a danger to the community, and the Department has not presented evidence to show otherwise. Upon careful consideration of the entire record, the Court concludes that Respondent is not a danger to the community. *See Guerra*, 24 I&N Dec. at 40.

The Court further finds Respondent is not a significant flight risk. Respondent entered the United States in 2016, and has remained in the U.S. since that time. She has lived with her mother in New Jersey since entering and plans to return to her mother's house after being released from detention. Respondent has family ties in the U.S., and specifically in the New York/New Jersey area. She lives with her U.S. citizen mother, stepfather, and brother, and testified that her sister often comes over to visit. Respondent also has a U.S. citizen aunt and uncle and multiple cousins in the U.S. *See* Exh. 1-B. Respondent submitted letters from her friends and family, attesting that she is a valued member of their community and an integral part of her family. Exh. 1-B, Tabs J-M. Respondent did not submit evidence of her family's ability to financially support her, but she testified that she has been employed as a waitress and was trying to start her own business before being detained. Further, her uncle testified that he and Respondent's mother own their own homes and that they will financially support Respondent. Finally, Respondent has multiple avenues for relief which incentivize her appearance at future hearings. Respondent's mother filed an I-130 petition on Respondent's behalf. Exh 1-B, Tab D. The I-130 was approved on May 5, 2021, and Respondent is waiting for her visa to become current. *Id.* Respondent is also *prima facie* eligible for asylum, withholding of removal, and protection under the Convention Against Torture. Exh. 1-B, Tab F. Considering all these factors, the Court concludes Respondent is likely to appear for future proceedings and is not a significant flight risk.

In sum, Respondent met her burden of demonstrating to the Court she is not a danger to the community, and the Department failed to provide evidence that shows otherwise. Further, the Court finds Respondent is not such a flight risk based on her family ties and eligibility for future relief that no bond is appropriate. Accordingly, the Court grants the Respondent's application for custody redetermination and sets her bond amount at $20,000.

Accordingly, the following order shall be entered:

## <u>ORDER</u>

**IT IS HEREBY ORDERED** Respondent be **RELEASED** from custody of the Department upon the payment of a **$20,000 BOND**.

**Dated:** April 16, 2025

_____
**Tara Naselow-Nahas**
**Assistant Chief Immigration Judge**

Petitioner's Appendix Page 146

**Order of the Immigration Judge**

Immigration Judge: NASELOW-NAHAS, TARA  04/16/2025

**Certificate of Service**

This document was served:
Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service
To: [ M ] Noncitizen | [  ] Noncitizen c/o custodial officer | [  E ] Noncitizen atty/rep. | [ E ] DHS
Respondent Name : KORDIA, LEQAA | A-Number : ███████

Riders:

Date:  04/17/2025  By:  French, Annette , Court Staff

# EXHIBIT "2-D"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Exhibit "D" - Declaration of Mallory Manfredini*

*In the Matter of Leqaa Kordia, Notice of Appeal from a Decision of an Immigration Judge, as filed on Apr. 15, 2025*

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB# 1125-0002

**Notice of Appeal from a Decision of an Immigration Judge**

*(vertical text, left margin)* Staple Check or Money Order Here. Include Name(s) and "A" Number(s) on the face of the check or money order.

**1.** | List Name(s) and "A" Number(s) of all Respondent(s)/Applicant(s): | For Official Use Only

Kordia, Leqaa    A ███████████

**!** **WARNING:** Names and "A" Numbers of **everyone** appealing the Immigration Judge's decision must be written in item #1. The names and "A" numbers listed will be the only ones considered to be the subjects of the appeal.

**2.** I am  ☐ the Respondent/Applicant    ☒ DHS-ICE *(Mark only one box.)*

**3.** I am  ☒ DETAINED    ☐ NOT DETAINED *(Mark only one box.)*

**4.** My last hearing was at  Prairieland Detention Center, Alvarado, TX    *(Location, City, State)*

**5.** **What decision are you appealing?**

*Mark only one box below. If you want to appeal more than one decision, you must use more than one Notice of Appeal (Form EOIR-26).*

☐ I am filing an appeal from the Immigration Judge's decision *in merits proceedings* (example: removal, deportation, exclusion, asylum, etc.) dated_____.

☒ I am filing an appeal from the Immigration Judge's decision *in bond proceedings* dated
April 3, 2025_____. (For DHS use only: Did DHS invoke the automatic stay provision before the Immigration Court? ☒ Yes. ☐ No.)

☐ I am filing an appeal from the Immigration Judge's decision *denying a motion to reopen or a motion to reconsider* dated_____.

*(Please attach a copy of the Immigration Judge's decision that you are appealing.)*

*(vertical text, left margin)* EOIR — 1 of 13

**6.** **State in detail the reason(s) for this appeal. Please refer to the General Instructions at item F for further guidance. You are not limited to the space provided below; use more sheets of paper if necessary. Write your name(s) and "A" number(s) on every sheet.**

See attached.

*(Attach additional sheets if necessary)*

**!** **WARNING:** You must clearly explain the specific facts and law on which you base your appeal of the Immigration Judge's decision. The Board may summarily dismiss your appeal if it cannot tell from this Notice of Appeal, or any statements attached to this Notice of Appeal, why you are appealing.

**7.** Do you desire oral argument before the Board of Immigration Appeals? ☐ Yes ☒ No

**8.** Do you intend to file a separate written brief or statement after filing this Notice of Appeal? ☐ Yes ☒ No

**9.** If you are unrepresented, do you give consent to the BIA Pro Bono Project to have your case screened by the Project for potential placement with a free attorney or accredited representative, which may include sharing a summary of your case with potential attorneys and accredited representatives? *(There is no guarantee that your case will be accepted for placement or that an attorney or accredited representative will accept your case for representation)* ☐ Yes ☒ No

**!** **WARNING:** If you mark "Yes" in item #7, you should also include in your statement above why you believe your case warrants review by a three-member panel. The Board ordinarily will not grant a request for oral argument unless you also file a brief.

If you mark "Yes" in item #8, you will be expected to file a written brief or statement after you receive a briefing schedule from the Board. The Board may summarily dismiss your appeal if you do not file a brief or statement within the time set in the briefing schedule.

**10.** **Print Name:** Anastasia Norcross

**11.** **Sign Here:** ▶ **X** ANASTASIA S NORCROSS
Digitally signed by ANASTASIA S NORCROSS
Date: 2025.04.15 09:26:01 -05'00'

4/15/2025

Signature of Person Appealing
*(or attorney or representative)*

Date

Petitioner's Appendix Page 150

Form EOIR-26
Rev. Nov. 2022
Exp. Jan. 2026

**12.**

| Mailing Address of Respondent(s)/Applicant(s) | Mailing Address of Attorney or Representative for the Respondent(s)/Applicant(s) |
|---|---|
| Leqaa Kordia | Muhammad Omar Chaudhry |
| (Name) | (Name) |
| ▮▮▮▮▮▮ | 55-21 69th St. |
| (Street Address) | (Street Address) |
| ▮▮▮▮ Room Number) | 2nd Floor |
| | (Suite or Room Number) |
| ▮▮▮▮▮ | Maspeth, NY 11378 |
| (City, State, Zip Code) | (City, State, Zip Code) |
| (Telephone Number) | (Telephone Number) |

**NOTE:** You must notify the Board within five (5) working days if you move to a new address or change your telephone number. You must use the Change of Address Form/Board of Immigration Appeals (Form EOIR-33/BIA).

**NOTE:** If an attorney or representative signs this appeal for you, he or she must file *with this appeal*, a Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals (Form EOIR-27).

**13.**

### PROOF OF SERVICE (You Must Complete This)

I Anastasia Norcross _____ mailed or delivered a copy of this Notice of Appeal
        (Name)

on _____ to _____
        (Date)              (Opposing Party)

at _____
        (Number and Street, City, State, Zip Code)

☒ No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

| SIGN HERE ➤ | X ANASTASIA S NORCROSS | Digitally signed by ANASTASIA S NORCROSS Date: 2025.04.15 09:26:29 -05'00' |
|---|---|---|
| | Signature | |

**NOTE:** If you are the Respondent or Applicant, the "Opposing Party" is the Assistant Chief Counsel of DHS - ICE.

**WARNING:** If you do not complete this section properly, your appeal will be rejected or dismissed.

**WARNING:** If you do not attach the fee payment receipt, fee, or a completed Fee Waiver Request (Form EOIR-26A) to this appeal, your appeal may be rejected or dismissed.

### HAVE YOU?

☐ Read all of the General Instructions.
☐ Provided all of the requested information.
☐ Completed this form in English.
☐ Provided a certified English translation for all non-English attachments.
☐ Signed the form.

☐ Served a copy of this form and all attachments on the opposing party, if applicable.
☐ Completed and signed the Proof of Service
☐ Attached the required fee payment receipt, fee, or Fee Waiver Request.
☐ If represented by attorney or representative, attach a completed and signed EOIR-27 for each respondent or applicant.

Form EOIR-26
Rev. Nov. 2022
Exp. Jan. 2026

## INTRODUCTION

The U.S. Department of Homeland Security (DHS) respectfully submits this Notice of Appeal in lieu of a brief from the immigration judge's April 3, 2025, decision granting the respondent's request for a change in custody status and setting bond in the amount of $20,000 pursuant to Section 236(a) of the Immigration and Nationality Act (INA).[1] The immigration judge erred in ordering the respondent released on bond and setting bond at $20,000 because the respondent failed to meet her burden of establishing she is not a danger to persons or property and that she is not a danger to the community. The immigration judge further erred in finding that the respondent does not pose a flight risk. The DHS respectfully requests that the Board of Immigration Appeals (Board) reverse the immigration judge's order granting the respondent's request for a change in custody status.

DHS further requests that this case be adjudicated by a three-member panel. The instant appeal meets the criteria for three-member panel review because the facts and circumstances of this case present: (1) the need to review a decision by an Immigration Judge that is not in conformity with the law or with applicable precedents; and (2) the need to reverse a decision of an Immigration Judge, other than a reversal under 8 C.F.R. § 1003.1(e)(5); 8 C.F.R. § 1003.1(e)(6)(iii), (v)–(vi).

### ISSUES PRESENTED

1. Did the immigration judge erroneously order the respondent released on bond in the amount of $20,000, where the respondent failed to meet her burden of establishing that she is not a danger to the community, when the respondent disregarded police orders to disperse from a protest and when she is sending payments to unknown individuals in Palestine?

---

[1] As noted on Form EOIR-26 at question 8, DHS will not be filing a brief in this case. Thus, this Notice of Appeal includes the entirety of DHS's arguments on appeal.

A██████

EOIR – 4 of 13

2. Did the immigration judge erroneously order the respondent released on bond in the amount of $20,000 where the respondent failed to meet her burden of establishing that she does not pose a flight risk despite intentionally evading detection by DHS, failing to provide any financial information, and remaining out of legal status for over 3 years?

## STANDARD OF REVIEW

The Board reviews an immigration judge's findings of fact, which includes predictive findings of what may or may not occur in the future, under a clearly erroneous standard of review. 8 C.F.R. § 1003.1(d)(3)(i); *Matter of Z-Z-O-*, 26 I&N Dec. 586, 587–90 (BIA 2015). Inferences from direct and circumstantial evidence are also reviewed for clear error. The Board reviews all questions of law, discretion, judgment, and all other issues on appeal de novo. 8 C.F.R. § 1003.1(d)(3)(ii)).

The issue of whether the respondent is a danger to the community is a predictive finding of fact that the Board reviews for clear error. *See Jurek v. Texas*, 428 U.S. 262, 275 (1976). While the issue of whether the respondent poses a flight risk is also a predictive finding of fact that the Board reviews for clear error, the factors that the immigration judge considers in setting a bond amount for risk of flight are discretionary and thus reviewed de novo. *See Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (stating that an immigration judge has broad discretion in deciding the factors that he may consider in custody redeterminations); *Matter of R-A-V-P-*, 27 I&N Dec. 803, 805 (BIA 2020) (citing *Guerra*, 24 I&N Dec. at 40)).

## SUMMARY OF THE ARGUMENT

The immigration judge erroneously granted the respondent's request for a change in custody status and set bond in the amount of $20,000 after finding that she met her burden in demonstrating that she is not a danger to the community under INA § 236(a). Specifically, the immigration judge found that the respondent did not pose a danger to the community after being arrested for disorderly conduct at a protest near Columbia University after disregarding the police

2

A█████████

officers' orders to disperse. Moreover, the immigration judge found that the respondent did not pose a danger to the community despite having sent numerous large payments to individuals in Palestine and Jordan while not having work authorization or any proof of income. Assuming *arguendo* that the respondent demonstrated she was not a danger to the community, the immigration judge erred in finding that the respondent established she is not a flight risk. Here, the immigration judge found that the respondent's family ties to the United States and potential relief outweighed the fact that she initially hid from and evaded detection from Homeland Security Investigations (HSI), and failed to provide any evidence of a financial sponsor or her and her family's financial resources. As such, the Board should reverse the immigration judge's finding that the respondent met her burden establishing she is not a danger to the community and does not pose a risk of flight, and order that the respondent be held without bond.

**STATEMENT OF FACTS**

The respondent, a stateless native and citizen, last entered the United States as a B2 nonimmigrant visitor on March 19, 2016. Exh. 1. The respondent adjusted her status to an F-1 nonimmigrant on or about January 23, 2017. *Id.* On or about June 5, 2017, the respondent's United States citizen mother submitted a Form I-130, Petition for Alien Relative, on the respondent's behalf. *Id.* The petition was approved but a visa is not yet available for the respondent to adjust status. *Id.* On or about March 18, 2021, the respondent's F-1 visa was terminated in the Student & Exchange Visitor Information System (SEVIS) for failure to maintain her student status. *Id.* The respondent's F-1 visa was reinstated on or about May 5, 2021; however, it was again terminated in SEVIS on or about January 26, 2022, for failure to maintain her student status. *Id.* The respondent has no lawful status in the United States and has been unlawfully present in the United States since approximately January 26, 2022. *Id.* On or about March 15, 2025, DHS issued the

3

respondent a Notice to Appear (NTA) charging her as removable from the United States under INA § 237(a)(1)(C)(i) for failure to maintain her F-1 status. *Id.* On April 3, 2025, the immigration judge granted the respondent's release from custody under a bond of $20,000. The immigration judge did not issue a written decision. The DHS argued that the respondent is a danger to the community given her arrest on April 30, 2024, at a protest that involved "yelling/blocking location and not following orders of police officers." Exh. 3 at 45. The DHS argued that this conduct shows a disregard for law enforcement authority and the laws of this country. The DHS also argued that the evidence shows the respondent is sending large amounts of money to individuals in the Palestinian Authority and Jordan, but she does not have work authorization and provided no evidence of the source of these funds. Moreover, the evidence shows that the respondent's landlord and possible employer is a Hamas sympathizer. The respondent claimed that the money was sent to her family, specifically her aunt, and she was doing her mom a favor by going and sending the money on her behalf.

The immigration judge found that the DHS evidence only shows at most two transactions that the respondent sent over the past few years. The immigration judge found that based on the record, mainly the HSI investigation reports submitted by DHS, she does not believe that there is sufficient evidence to show that the respondent poses a danger to the United States. The immigration judge found that the DHS cannot make connections to show the respondent is giving material support to a terrorist organization without more evidence of who received the money.

With respect to flight risk, the immigration judge found that the respondent has extensive family ties, support in this country, and potential relief in this country if a visa becomes available through her approved Form I-130 Petition. The respondent also filed an I-589, Application for Asylum and for Withholding of Removal. The DHS argued that the respondent did not submit

4    A

Petitioner's Appendix Page 155

evidence of an immigration sponsor or any evidence of financial stability from anyone in the respondent's family. Moreover, the respondent has been working unlawfully in the United States and has been unlawfully present in the United States since January 26, 2022. Additionally, the respondent has not tried to gain lawful status since that time, until being detained by DHS. The respondent also refused to voluntarily meet with HSI agents, and it took her approximately one week to surrender herself to authorities. The evidence shows that the respondent was hiding from immigration officials and intentionally evading detection.

The immigration judge found that a bond of $20,000 is an appropriate amount to mitigate the flight risk and ensure that the respondent appears for future hearings, and it would also be a little sacrifice to the family if she does not show up and bond forfeited.

## ARGUMENT

**1. THE IMMIGRATION JUDGE ERRED WHEN SHE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE IS NOT A DANGER TO THE COMMUNITY.**

An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a danger to persons or property. *Matter of Siniauskas*, 27 I&N Dec. 207 (BIA 2018). To evaluate whether an alien has met this burden, the immigration judge must consider whether he or she poses a threat to national security, a danger to the community at large, is likely to abscond, or is otherwise a poor bail risk. *Guerra*, 24 I&N Dec. at 40.

The question of whether an alien is a danger to the community is broader than determining if the record contains evidence of past violence or direct evidence of an inclination toward violence. *Matter of Fatahi*, 26 I&N Dec. 791, 795 (BIA 2016). An immigration judge should consider any evidence in the record that is probative and specific when determining whether an alien is a danger to the community. *Guerra*, 24 I&N Dec. at 41. This includes the "specific

5

A████

circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208. The immigration judge should also consider:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal history, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*Guerra*, 24 I&N Dec. at 40.

An immigration judge may not disregard or ignore relevant and material evidence when determining whether an alien is a danger to the community. *See generally* 8 C.F.R. § 1240.1(c) (requiring the immigration judge to receive and consider material and relevant evidence in removal proceedings); *see also Matter of Herrera Del Orden*, 25 I&N Dec. 589, 593–94 (BIA 2011) (instructing that an immigration judge should consider any relevant and probative evidence in a removal proceeding). If an alien cannot demonstrate that he or she is not a danger to the community, no bond should be set. *Fatahi*, 26 I&N Dec. at 793–94; *see also Urena*, 25 I&N Dec. at 141 ("An Immigration Judge should only set a bond if he first determines that the alien does not present a danger to the community.").

Here, the respondent has failed to establish that she is not a danger to the community. Evidence submitted by the DHS shows that between January 2021 to January 2025, the respondent made numerous transactions sending funds to individuals located in the Palestinian Authority and Jordan, some as large as $2,000. Exh. 3 at 4. The source and recipients of the funds remain under investigation by the DHS. The DHS evidence also shows that the respondent's landlord and



possible employer is a Hamas sympathizer. Exh. 3 at 14, 16. Moreover, there has been no evidence presented in the instant matter, other than a statement from the claimant's attorney claiming that the money was sent to relatives, to negate or diminish any of the information contained in HSI's reports submitted to the court.

Moreover, the DHS evidence further shows that New York Police Department (NYPD) officers apprehended the respondent on April 30, 2024. Exh. 3 at 43–45. The incident record shows she was apprehended because she was "blocking a gate . . . preventing anyone from entering & exiting" and that she "failed to comply" with police commands to disperse. Exh. 3 at 45.

As the respondent has not met her burden in establishing that she is not a danger to the community, the immigration judge erred in ordering the respondent released on bond in the amount of $20,000.

**2. THE IMMIGRATION JUDGE ERRED WHEN SHE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE DOES NOT POSE A FLIGHT RISK.**

Even assuming, *arguendo*, that the respondent met her burden to establish that she is not a danger to the community, the immigration judge nonetheless erred in granting her request for a change in custody status and setting bond in the amount of $20,000 because the respondent failed to show she is not a flight risk. Only if an alien demonstrates that he or she is not a danger to the community should an immigration judge then determine the extent of flight risk posed by the alien. *Urena*, 25 I&N Dec. at 141 (citing *Matter of Drysdale*, 20 I&N Dec. 815, 817–18 (BIA 1994)). An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a risk of flight and is likely to attend future immigration proceedings. *R-A-V-P-*, 27 I&N Dec. at 804 (citing *Siniauskas*, 27 I&N Dec. at 207); 8 C.F.R. § 1236.1(c)(8)). In determining whether an alien is a flight risk, the immigration judge may consider "any 'probative

7

A█████

and specific' evidence." *Id.* (citing *Guerra*, 24 I&N Dec. at 40-41). Similar to a dangerousness determination, this includes considering the "specific circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208; *see also Guerra*, 24 I&N Dec. at 40. An immigration judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations. *Guerra,* 24 I&N Dec. at 40. An immigration judge may decide to give greater weight to one factor over others, but the decision must be reasonable. *Id.*

Here, the respondent has failed to establish that she does not pose a flight risk because she intentionally evaded detection by DHS. On March 6, 2025, a special agent with HSI contacted the respondent and told her that they needed to speak with her about her immigration status. Exh. 3 at 6. The respondent told the agent that she would meet him in the next 30 minutes, but she did not arrive. Exh. 3 at 6. The respondent's refusal to meet with HSI required an extensive investigation into her whereabouts. Exh. 3 at 6–21. *See Guerra*, 24 I&N Dec. at 40 (holding attempts by the alien to flee prosecution or otherwise escape from authorities is a relevant factor to find a flight risk). On March 13, 2025, the respondent finally self-surrendered to HSI. The DHS evidence indicates that the respondent was intentionally evading HSI agents and actively concealed here whereabouts to avoid detection and apprehension for her immigration violations. Exh. 3 at 6–24.

Moreover, the respondent has failed to provide evidence demonstrating that a financial sponsor in the United States will ensure she appears at all future proceedings. As noted by the immigration judge, there is no information about what the respondent, her mother, or her uncle, who claims to have the money for her bond, do for work and how they support themselves. As such, the immigration judge did not have sufficient information to assess an appropriate bond

Petitioner's Appendix Page 159

amount to ensure that the respondent would show up for future proceedings and that it would be a disincentive to the family if she were to not show up to future proceedings.

Additionally, the respondent has provided no proof of any legal work history in the United States and has repeatedly violated the United States' immigration laws by falling out of her student visa status and continuing to reside in the United States without any legal status for over three years. *Guerra*, 24 I&N Dec. at 40 (holding alien's history of immigration violations and employment history are relevant factors for bond proceedings). As the respondent has not met her burden in establishing that she does not pose a flight risk, the immigration judge erred in ordering the respondent released on bond in the amount of $20,000.

## CONCLUSION

The immigration judge erroneously granted the respondent's request for a change in custody status by setting bond in the amount of $20,000, because the respondent failed to meet her burden of establishing that she is not a danger to the community and does not pose a flight risk. The DHS therefore requests that the Board reverse the immigration judge's order granting the respondent's request for a change in custody status.

Respectfully submitted on April 15, 2025,

ANASTASIA S NORCROSS ⟩ Digitally signed by ANASTASIA S NORCROSS
Date: 2025.04.15 09:23:05 -05'00'

Stacy Norcross
Assistant Chief Counsel
Mary Jane Zamarripa
Deputy Chief Counsel
Jo Ann McLane
Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

9



**Petitioner's Appendix Page 160**

A

## EOIR-43 Senior Legal Official Certification

I certify that I have approved the filing of the notice of appeal in this case according to review procedures established by U.S. Immigration & Customs Enforcement of the Department of Homeland Security.

I further certify that I am satisfied that the evidentiary record supports the contentions justifying the continued detention of the alien and the legal arguments are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing precedent or the establishment of new precedent. Further, the legal arguments, as specifically warranted above, may be premised on the alien being subject to mandatory detention pursuant to 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c).

EMILY B
SWANSON

Digitally signed by
EMILY B SWANSON
Date: 2025.04.14
15:38:27 -05'00'

April 14, 2025
Date

*Emily B. Swanson*
Acting Chief Counsel, OPLA San Antonio
U.S. Immigration & Customs Enforcement

EOIR – 13 of 13

# EXHIBIT "2-E"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Exhibit "E" - Declaration of Mallory Manfredini*

*Audio Recording of April 3, 2025 Bond Hearing*

*Video file sent via USPS to the Clerk's Office of the United States District Court for the Northern District of Texas*

# EXHIBIT "3"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Declaration of Anne Chandler*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |

**<u>DECLARATION OF ANNE CHANDLER</u>**

I, ANNE CHANDLER, here by declare and state:

1.      I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

2.      I am a resident of Austin, Texas. I have been a licensed attorney in Texas since 1998. Over the past 25 years, I have focused my career on helping immigrants navigate the complexities of the immigration system, including obtaining or maintaining legal status. My legal specialty is immigration law. I am currently the Founding Executive Director of the Texas Immigration Law Council ("TxILC"), a nonpartisan, statewide immigrant legal resource and advocacy organization.

3.      Prior to founding TxILC, I served as the Director of the Immigration Legal Services of the YMCA International Services of Greater Houston where I was the sole attorney, overseeing a department of seven individuals that provided free or low cost representation to over 550 immigrant clients, most of whom were seeking to adjust their status to become legal permanent

1

residents based on an approved family petition or because they were statutorily eligible to do so due to their status as refugees or asylees.

4.    After practicing immigration law at the YMCA International Services, I became an Associate Clinical Professor of the University of Houston Law Center (2002-2009) where I taught immigration law and supervised law students enrolled in the Law Center's Immigration Clinic. Over my seven years at the Immigration Clinic of the Law Center, I represented or supervised the representation of over 380 immigrant clients and provided legal information or assisted pro se services to over 2,000 individuals who were detained by the Immigration Customs Enforcement ("ICE").

5.    In 2009, I became the Founding Executive Director of the Houston Office of the Tahirih Justice Center, an immigration legal services organization that partners with pro bono attorneys to deliver free immigration legal services. Over the ten years when I was at the Tahirih Justice Center, we represented over 900 immigrant clients in a broad range of immigration matters.

6.    Since I became an attorney in 1998, I have been involved in representing thousands of immigrants who had cases before the DOJ Executive Office of Immigration Review and in affirmative cases before USCIS. In cases involving detained clients in civil detention centers across Texas, I, or pro bono attorneys and law students under my supervision, frequently served as legal counsel before ICE to secure our clients release from civil detention.

7.    My work has focused on delivering immigration legal services to immigrants who were seeking to obtain legal status or adjust their status to become a legal permanent resident. I have represented, supervised, or assisted in the legal representation of hundreds of immigrants who were originally admitted to the United States on F-1 student visas, B-2 tourist visas, or K-1 fiancé visas. I have also represented, supervised, or assisted in the legal representation of hundreds of

2

adults who were detained for various reasons, such as failure to be properly inspected and admitted into the United States or because they engaged, or were believed to have engaged, in criminal conduct. With one exception, I have never had a client—who was of sound mind, properly admitted on a visa, and with no criminal history—be detained for any extended period.

8.      When employed full-time by the University of Houston Law Center, our Immigration Clinic received DOJ grant funding to provide Know Your Rights presentations and pro se legal help to adult immigrants detained in the Houston area. Through this program, my students and I had access to immigration records and charging documents of over 2,000 detained adults. The majority had not been properly admitted into the United States on visas or as legal permanent residents. Those who had been admitted often had significant criminal histories that subjected them to mandatory detention or removal. When we identified cases where we believed the law was not being accurately applied, our Clinic frequently represented individuals in bond or merits hearings before immigration judges. Across hundreds of cases, I never had a client—lawfully admitted with no criminal history and with credible evidence—detained for more than a few days. I also never had a client in that category, with an approved I-130 petition, detained within a few days.

9.      I am familiar with the facts of Ms. Leqaa Kordia's case. I understand that she has an approved I-130 that forms the bases of her ability to adjust status to lawful permanent residency, but that she allegedly overstayed her student visa. I understand that she has been detained since March 13, 2025, after voluntarily presenting herself to authorities. I also understand that Ms. Kordia has never been convicted of a crime.

10.     I have never had DHS or any other federal agency issue a press release about one of my detained clients, which I understand happened to Ms. Kordia.

3

11.    In my 25+ years of experience, Ms. Kordia's prolonged detention is unprecedented. I have never had a client who was lawfully admitted into the United States with no allegation of fraud, without any criminal history, and with an approved I-130, be detained for any meaningful length of time, let alone for over a month.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 19, 2025, in Austin, Texas.

_____
Name: Anne Chandler
Title:   Executive Director, TxILC

4

# EXHIBIT "4"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Declaration of Cori Hash*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

## **DECLARATION OF CORI HASH**

I, Cori Hash, here by declare and state:

    1.    I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

    2.    I am a resident of Austin, Texas. I am an attorney licensed by the State of Texas. I am also licensed in Kentucky and Virginia, though I currently have inactive status in both states. I have been practicing immigration law for the past twenty years. I practiced immigration law in Kentucky from 2004 until 2014. In 2014, I relocated to the Washington, DC area where I worked for a non-profit organization representing asylum seekers and mentoring pro bono attorneys handling asylum cases. I worked in Washington, DC for just under five years. During the time I worked in Kentucky and Washington, DC, I occasionally represented individuals detained in Texas. In 2018, I moved to Austin, Texas where I practiced immigration law, including numerous individuals in removal proceedings, until 2024.

3.     I am currently a Senior Staff Attorney at Immigrant Legal Resource Center ("ILRC"). In my current role, I provide technical assistance and training to attorneys and accredited representatives around the country working on immigration cases. This includes drafting guidance on immigration practice. Further, as part of this practice, I participate in the "attorney of the day program," which is where ILRC attorneys consult with immigration attorneys and accredited representatives who want technical assistance on a particular case. I usually participate in this program about three times a month, but it can be more. On any one day where I work on that program, I get anywhere from two to twenty cases to review. Also, as part of my role, I monitor listservs where immigration attorneys reach out for additional assistance and review the various facts of many cases from around the country.

4.     In my practice as an immigration attorney, I have worked with many clients who have held non-immigrant visas. I have worked specifically with students dealing with immigration issues related to student and other temporary visas, including students utilizing the F-1 program. I have represented dozens of students with F-1 visas seeking other immigration status, including those applying for Lawful Permanent Resident Status, and those who overstay their visa or face other complications maintaining lawful status. I have worked with students who have fallen out of status and were later placed in removal proceedings, with some of those following an ICE encounter. Leqqa Kordia's case is out of the ordinary based on my experience.

5.     In my experience, most students who are a "visa overstay," are issued a Notice to Appear in immigration court, and are rarely detained unless they have a criminal conviction. I can only recall one student visa holder who was detained by ICE without a criminal conviction, and that individual was arrested in a county that turns people over to ICE before an initial hearing in criminal state court. Further, in that instance's immigration case, an Immigration Judge granted a

bond, and ICE did not appeal, nor did ICE use their automatic stay powers to prolong the detainee's detention. This case is memorable to me because it was so out of the ordinary.

6.      Absent the above exception, in my 20 years of practice, I have not seen a case where DHS has detained an individual student visa holder, absent that exception.

7.      Further, based on my experience, it is extraordinary that DHS would target for investigation and prioritize someone who was a prior F-1 visa holder and whose status had lapsed, with the exception of individuals who were being held in jail pursuant to state criminal arrests.

8.      I have never had DHS make a press release for one of my clients. I have seen DHS release press releases for the arrest of immigrants in the past, but almost all of those arrests pertained to serious criminals who appeared to be part of a broader strategic arrest plan.

9.      Across hundreds of cases I have been a part of, I have rarely encountered a student visa holder with no criminal history being detained for overstaying his or her student visa for more than a few days, and certainly not where that student has credible defenses to removal. As an immigration law practitioner, the Petitioner's continued detention, which, as I understand, has now lasted over a month, represents a stark departure from standard practice over my 20 years of experience.

10.      As to the auto stay utilized by DHS in this case, in my experience use of the auto stay by DHS has not been a common practice. To trigger the auto stay, DHS has to timely file the EOIR-43 and then file the appeal notice with the Board of Immigration Appeals within ten days (rather than the standard thirty-day window in which to file a notice of appeal), among other requirements. In all of the immigration bond cases I have worked on, DHS filed the EOIR-43 one time and then did not comply with the requirement to file the appeal notice within the ten-day timeline, so the automatic stay lapsed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of April, 2025 in Austin, Tx.

_____

Cori Hash
Senior Staff Attorney, ILRC

# EXHIBIT "5"

### *PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR RELEASE PENDING FINAL JUDGMENT AND PRELIMINARY INJUNCTION*

*Declaration of Charles Gillman*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LEQAA KORDIA,                          §
                                       §
                    Petitioner,        §
                                       §
v.                                     §
                                       §   CIVIL ACTION NO. _____
KRISTI NOEM et al.,                    §
                                       §
           Respondents-Defendants.     §
                                       §
                                       §

## DECLARATION OF CHARLES GILLMAN

I, Charles Gillman, here by declare and state:

      1.     I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

      2.     I am a resident of Houston, Texas. I am an attorney licensed by New York State since June 1994 and am admitted to practice in the United States District Court for the Southern District of New York. I have practiced immigration law for thirty (30) years. I am currently a Partner at Gonzalez Olivieri LLC in Houston, Texas.

      3.     My practice focuses exclusively on U.S. immigration law and compliance.

      4.     I have also worked with students dealing with immigration issues related to student visas and other temporary visas, specifically including students utilizing the F-1 student visa program. I have represented international students regarding their F-1 student visas, including filing for adjustment of status, obtaining lawful permanent residence, and those that overstay their visa or face other complications maintaining lawful status.

5.     Across dozens of clients that I have represented, I have never encountered a student with no criminal history being detained for overstaying his or her student visa and certainly not where that student has credible defenses to removal. As an immigration law practitioner, the Petitioner's continued detention, which as I understand has now lasted over a month, represents a stark departure from standard practice over my thirty years of experience.

6.     Similarly, I have never had the Secretary of the Department of Homeland Security provide a press release about one of my clients, which I understand Secretary Kristi Noem made about Ms. Kordia.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 22nd of April 2025 in Houston, Texas.

_____

Charles Gillman
Partner

# EXHIBIT "6"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S
### MOTION FOR RELEASE PENDING FINAL JUDGMENT
### AND PRELIMINARY INJUNCTION

*Declaration of Jodi Goodwin*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

## **DECLARATION OF JODI GOODWIN**

I, JODI GOODWIN, hereby declare and state:

1.      I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

2.      I am a resident of Harlingen, Texas. I am an attorney licensed by the State of Texas. I am Board Certified in Immigration and Nationality Law through the Texas Board of Legal Specialization. I obtained my Juris Doctor degree from St. Mary's University School of Law in 1995. Following my graduation, I was a Judicial Law Clerk with the U.S. Department of Justice Executive Office for Immigration Review, providing legal research and writing support for Immigration Judges at the Harlingen, Texas and Port Isabel Service Processing Center Immigration Courts.  After leaving this position, I established my own firm, the Law Office of Jodi Goodwin, based in the Rio Grande Valley. Through this practice, I serve clients worldwide.

3.      I have practiced immigration law exclusively for nearly 29 years. Through my law practice, I have assisted clients at virtually every step of the immigration process. It is my estimate

that I have worked with approximately 5,000 clients over the course of my practice. This includes cases involving complex removal defense, applications for humanitarian protection, applications for waivers of inadmissibility, naturalization, family-based petitions, business immigration visas, consular processing, and varied requests for non-immigrant status. I have represented these clients at nearly every level of the court system, resulting in numerous published decisions issued by the Board of Immigration Appeals and Federal Courts of Appeals.

4.      Throughout my career, I have been an active member of the immigration bar. I have mentored dozens of immigration practitioners informally, and through formal mentorship programs. I am a past Chair of the Texas, Oklahoma, and New Mexico Chapter of the American Immigration Lawyers Association, and past Director of the Cameron County Bar Association. I have also served on national and local liaison committees with Customs and Border Protection and Immigration and Customs Enforcement. For my decades of work in immigration law, I have received the Arthur C. Helton Award for Advancement of Human Rights, and the Michael Maggio Memorial Pro Bono Award from the American Immigration Lawyers Association.

5.      A significant portion of my practice involves complex removal defense of individuals who are detained by Immigration and Customs Enforcement (ICE). This practice frequently involves requests for custody redeterminations in the form of bond proceedings. Since establishing my practice, I estimate that I have participated in, as lead counsel or as a mentor, in 700-800 bond proceedings over the course of my career. Many of these bond proceedings have been conducted by Immigration Judges sitting at the Port Isabel Detention Center.

6.      In my nearly thirty years of experience in immigration law, the use of the automatic stay provision housed in 8 C.F.R. 1003.19(i)(2) is exceedingly rare. I have been successful in obtaining release on bond for hundreds of clients over the course of my career. In each of these

occasions, ICE has had the option to seek the automatic stay. Despite this, I have memory of only two cases in which the government has invoked this stay. These cases involved individuals with extensive or extreme criminal history. I have never been involved in a case where the government invoked the automatic stay against an individual with no criminal history.

7.      Furthermore, in my experience, it is highly unusual for the government to detain an individual in Ms. Kordia's position all together. I have represented hundreds of individuals seeking to obtain and/or maintain lawful status who have been issued a Notice to Appear in immigration court following an encounter with immigration officials. This includes individuals who, like Ms. Kordia, have fallen out of F-1 student visa status. Because of the particular geographical area in which I practice, I most often come into contact with individuals with lapsed F-1 status who were attempting to cross a Customs and Border Protection checkpoint after having vacationed south of the checkpoint. In each of these cases, although my clients were detained by ICE, I have been able to have them released on their own recognizance or on a minimum $1,500 bond. I have never had ICE invoke the automatic stay in any of these cases.

8.      In my experience, it is out of the ordinary for ICE to detain anyone whose lawful immigration status has lapsed absent some other factor, such as criminal history.

9.      It is also highly unusual for an individual with Ms. Kordia's history to be named in a Department of Homeland Security press release. ICE press releases have been reserved for the clients I have represented whose immigration cases touched on matters of grave consequence, such as government informants, individuals designated under the Foreign Narcotics Kingpin Designation Act, and those accused of extensive ties to drug- and human- smuggling operations.

10.     The government's choice to detain Ms. Kordia, an individual with a lapsed immigration status and several avenues for relief in front of the immigration court, half way across

the country from her family, is extraordinarily out of the typical course of conduct that I have observed in my decades of practice of immigration law in a detained and non-detained setting.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 29, 2025 _____ in Harlingen, TX.


_____
Jodi Goodwin
Law Office of Jodi Goodwin

# EXHIBIT "7"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR RELEASE PENDING FINAL JUDGMENT AND PRELIMINARY INJUNCTION

*2019 DHS Memorandum re First Amendment Activity*

Secretary
U.S. Department of Homeland Security
Washington, DC 20528



**Homeland Security**

May 17, 2019

MEMORANDUM FOR:     All DHS Employees

FROM:               Kevin K. McAleenan
                    Acting Secretary

SUBJECT:            Information Regarding First Amendment Protected Activities

I am proud of the work you do every day to protect our Homeland. You serve as America's Frontline and your commitment to the highest ethical and moral principles is a testament to each of you, the founding values of our Department, and our nation. It is in this spirit that I write to you today to emphasize – as you all know – that the privilege of administering and enforcing federal laws carries with it the responsibility for upholding the principles of professionalism, impartiality, courtesy, and respect for civil rights and civil liberties.

DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights.[1] Under the Privacy Act of 1974, all DHS personnel[2] are prohibited from maintaining records that describe how a U.S. citizen (USC) or alien lawfully admitted for permanent residence (LPR)[3] exercises his or her First Amendment rights, "unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."[4]

Information, in any form, regarding how an individual exercises First Amendment rights shall include (among other things):

1. Information about an individual's religious beliefs and practices;
2. Information about an individual's political or personal beliefs or associations, academic or scientific inquiries, or the expressions thereof;

---

[1] The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

[2] For purposes of this memorandum, "DHS personnel" includes all DHS employees, including those who are law enforcement agents and officers and those in the intelligence community, as well as those performing work on behalf of DHS employees, such as contractors.

[3] To the extent that a person's status is unknown or unclear, for the purposes of this policy that person shall be treated as an "individual" covered by the Privacy Act. 5 U.S.C. § 552a(a)(2).

[4] 5 U.S.C. § 552a(e)(7).

FOR OFFICIAL USE ONLY

3. Information about an individual's (including journalists, attorneys, academics, representatives of non-governmental organizations, etc.) reporting activities and documentation; or,

4. Information about an individual's associations with others for lawful purposes, including participation in protests or other non-violent demonstrations against government policy or actions.

Individuals' First Amendment rights are protected regardless of the medium of their communications. These principles apply to communications such as oral or written speech (both in paper and electronic form); non-verbal communications such as art works; and, in some instances, to commercial speech and gestures (such as physical rituals associated with prayer).

With those First Amendment rights in mind, I direct that DHS personnel shall not collect, maintain in DHS systems, or use information protected by the First Amendment *unless* (a) an individual has expressly granted their consent for DHS to collect, maintain, and use that information; (b) maintaining the record is expressly authorized by a federal statute; or (c) that information is relevant to a criminal, civil, or administrative activity relating to a law DHS enforces or administers. In addition, DHS personnel should not pursue by questioning, research or other means, information relating to how an individual exercises his or her First Amendment rights unless one or more of the same conditions applies.

**Express Statutory Authorization**

DHS agencies may collect and maintain records regarding First Amendment activity when doing so is *expressly authorized by statute*. As explained in longstanding guidance from the Office of Management and Budget (OMB), a statute need not specifically address the maintenance of records of First Amendment activities if it references activities that are relevant to a determination concerning an individual.[5] Thus, for example, DHS personnel may collect information on First Amendment protected activity when that activity is relevant to the granting or denial of a pending application.

**Consent of the Individual**

Records on First Amendment activity may be maintained if the individual voluntarily provides it, thereby consenting to its use by DHS. For example, "if an individual volunteers information on civic or religious activities in order to enhance his chances of receiving a benefit, such as

---

[5] Privacy Act Implementation, Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,965 (July 9, 1975) (hereinafter OMB Guidelines). The Guidelines specifically cite to the Immigration and Nationality Act (INA) as an example: "[S]ince the Immigration and Nationality Act makes the possibility of religious or political persecution relevant to a stay of deportation, the information on these subjects may be admitted in evidence, and therefore would not be prohibited by [subsection (e)(7)]." OMB Guidelines, at 28,965. Many other INA provisions potentially involve consideration of First Amendment activity. E.g., 8 U.S.C. 1101(a)(43) (definition of refugee, for purpose of refugee and asylum eligibility determinations, includes persecution based on membership in social group, religion, or political opinion); 8 U.S.C. 1182(a)(3)(B) (inadmissibility of any alien who, inter alia, "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization"); 8 U.S.C. 1182(a)(3)(D) (ground of inadmissibility for membership or affiliation with the Communist or other totalitarian party); 8 U.S.C. 1182(a)(3)(F) (ground of inadmissibility for association with terrorist organizations); 8 U.S.C. 1227(a)(4)(B) (deportability of aliens admitted to the United States if described in terrorism-related grounds of inadmissibility); 8 U.S.C. 1424 (prohibition upon the naturalization of persons opposed to government or law, or who favor totalitarian forms of government).

executive clemency, the agency may consider information thus volunteered."[6] As applied to DHS, individuals may voluntarily provide consent in submitting their associations and beliefs when applying for naturalization pursuant to filing USCIS Form N-400[7] or may proactively provide information in written materials, including correspondence, or during an inspection or encounter.

## Relevant to Law Enforcement Activity

If the use of information regarding First Amendment protected activities is not otherwise covered by one or both of the exceptions discussed above (explicit statutory authority and consent), DHS personnel may include such information in DHS systems if the information is pertinent to and within the scope of an authorized criminal, civil, or administrative law enforcement activity.[8]

For example, information about First Amendment protected activities is pertinent to and within the scope of DHS's administration or enforcement of a statute, regulation, or executive order when all DHS personnel:

1. Document questions and responses relating to an individual's occupation, purpose for international travel, or any merchandise the individual seeks to bring across the border;
2. Document questions, responses, or other information to validate information supplied by an individual or determine whether potential criminal, civil, or administrative violations exist relating to the laws that DHS enforces or administers;
3. Document journalistic or scientific research, academic inquiry, and/or analysis or questions and responses relating to information regarding an individual indicating a potential violation of a law DHS enforces or administers, or a threat to border security, national security, officer safety, or public safety;
4. Document research and/or analysis relating to activities protected by the First Amendment to the extent that it may facilitate an individual's travel by, for example, verifying information provided by the individual —(e.g., validating a visa based on a religious purpose); or,
5. Take into account information regarding religion in order to identify whether a reasonable accommodation for an individual's religious beliefs would be appropriate. This may include subsequent documentation of relevant information in DHS records regarding the action (for example, noting that a certain action was undertaken as an accommodation or noting that an accommodation was requested or deemed appropriate).

Each of us is called to do an extraordinarily important job for our nation. In executing this mission, it is my job to ensure that you are empowered to do so in accordance with our highest moral, ethical, and legal obligations. To this end, I have tasked the DHS Office for Civil Rights and Civil Liberties and the DHS Privacy Office to review existing guidance and develop new

---

[6] OMB Guidelines, at 28965.

[7] It must be noted that DHS/USCIS may also collect this information pursuant to its statutory authority in determining whether the applicant comes under section 313 of the INA's (8 U.S.C. 1424) prohibition upon the naturalization of persons opposed to government or law, or who favor totalitarian forms of government  Thus, collecting and maintaining this information is lawful both because of express statutory authorization as described above, and because the applicant consented to providing it by signing and filing the application.

[8] DHS may still maintain records consistent with 552a(e)(7) even if there is no ongoing or current law enforcement investigation.

guidance, where appropriate, to assist the operational components in implementing this memorandum.[9]

As you execute your mission each day, our Privacy and Civil Rights and Civil Liberties colleagues stand by to assist with any further questions or concerns you may have on this topic. Please contact Jonathan R. Cantor, Acting Chief Privacy Officer and Peter Mina, CRCL Deputy Officer for Programs and Compliance, and their staffs with those questions. Please contact your Component Counsel Offices with any legal questions.

---

[9] Nothing in this policy memorandum or tasking otherwise impairs the statutory or delegated authorities and responsibilities of the Privacy Office or the Office for Civil Rights and Civil Liberties, including the authority to "investigate complaints and information indicating possible abuses of civil rights or civil liberties" under 6 U.S.C. § 345 or investigate noncompliance DHS privacy policies under 6 U.S.C. § 142.

# EXHIBIT "8"

## *PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR RELEASE PENDING FINAL JUDGMENT AND PRELIMINARY INJUNCTION*

*2021 ICE Memorandum re First Amendment Activity*



U.S. Department of Homeland Security
Washington, DC 20528

September 30, 2021

MEMORANDUM TO:     Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

CC:                Troy Miller
                   Acting Commissioner
                   U.S. Customs and Border Protection

                   Ur Jaddou
                   Director
                   U.S. Citizenship and Immigration Services

                   Robert Silvers
                   Under Secretary
                   Office of Strategy, Policy, and Plans

                   Katherine Culliton-González
                   Officer for Civil Rights and Civil Liberties
                   Office for Civil Rights and Civil Liberties

                   Lynn Parker Dupree
                   Chief Privacy Officer
                   Privacy Office

FROM:              Alejandro N. Mayorkas
                   Secretary

SUBJECT:           Guidelines for the Enforcement of Civil Immigration Law

This memorandum provides guidance for the apprehension and removal of noncitizens.

I am grateful to you, the other leaders of U.S. Immigration and Customs Enforcement, and our
frontline personnel for the candor and openness of the engagements we have had to help shape this
guidance. Thank you especially for dedicating yourselves – all your talent and energy – to the
noble law enforcement profession. In executing our solemn responsibility to enforce immigration

1

law with honor and integrity, we can help achieve justice and realize our ideals as a Nation. Our colleagues on the front lines and throughout the organization make this possible at great personal sacrifice.

## I. Foundational Principle: The Exercise of Prosecutorial Discretion

It is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders. The exercise of prosecutorial discretion in the immigration arena is a deep-rooted tradition. The United States Supreme Court stated this clearly in 2012:

> "A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."

In an opinion by Justice Scalia about twelve years earlier, the Supreme Court emphasized that enforcement discretion extends throughout the entire removal process, and at each stage of it the executive has the discretion to not pursue it.

It is estimated that there are more than 11 million undocumented or otherwise removable noncitizens in the United States. We do not have the resources to apprehend and seek the removal of every one of these noncitizens. Therefore, we need to exercise our discretion and determine whom to prioritize for immigration enforcement action.

In exercising our discretion, we are guided by the fact that the majority of undocumented noncitizens who could be subject to removal have been contributing members of our communities for years. They include individuals who work on the frontlines in the battle against COVID, lead our congregations of faith, teach our children, do back-breaking farm work to help deliver food to our table, and contribute in many other meaningful ways. Numerous times over the years, and presently, bipartisan groups of leaders have recognized these noncitizens' contributions to state and local communities and have tried to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens.

The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them. We will use our discretion and focus our enforcement resources in a more targeted way. Justice and our country's well-being require it.

By exercising our discretionary authority in a targeted way, we can focus our efforts on those who pose a threat to national security, public safety, and border security and thus threaten America's well-being. We do not lessen our commitment to enforce immigration law to the best of our ability. This is how we use the resources we have in a way that accomplishes our enforcement mission most effectively and justly.

2

## II. Civil Immigration Enforcement Priorities

We establish civil immigration enforcement priorities to most effectively achieve our goals with the resources we have.  We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security.

### A.  Threat to National Security

A noncitizen who engaged in or is suspected of terrorism or espionage, or terrorism-related or espionage-related activities, or who otherwise poses a danger to national security, is a priority for apprehension and removal.

### B.  Threat to Public Safety

A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal.

Whether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories.  It instead requires an assessment of the individual and the totality of the facts and circumstances.

There can be aggravating factors that militate in favor of enforcement action.  Such factors can include, for example:

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record.

Conversely, there can be mitigating factors that militate in favor of declining enforcement action. Such factors can include, for example:

- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;
- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;

- time since an offense and evidence of rehabilitation;
- conviction was vacated or expunged.

The above examples of aggravating and mitigating factors are not exhaustive. The circumstances under which an offense was committed could, for example, be an aggravating or mitigating factor depending on the facts. The broader public interest is also material in determining whether to take enforcement action. For example, a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct. The specific facts of a case should be determinative.

Again, our personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly. The overriding question is whether the noncitizen poses a current threat to public safety. Some of the factors relevant to making the determination are identified above.

The decision how to exercise prosecutorial discretion can be complicated and requires investigative work. Our personnel should not rely on the fact of conviction or the result of a database search alone. Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue. The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort.

C. Threat to Border Security

A noncitizen who poses a threat to border security is a priority for apprehension and removal.

A noncitizen is a threat to border security if:

(a) they are apprehended at the border or port of entry while attempting to unlawfully enter the United States; or

(b) they are apprehended in the United States after unlawfully entering after November 1, 2020.

There could be other border security cases that present compelling facts that warrant enforcement action. In each case, there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action. Our personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly.

4

Petitioner's Appendix Page 190

### III.  Protection of Civil Rights and Civil Liberties

We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it.  A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action.  A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action.  We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

This guidance does not prohibit consideration of one or more of the above-mentioned factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit. For example, religion or political beliefs are often directly relevant in asylum cases and need to be assessed in determining a case's merit.

State and local law enforcement agencies with which we work must respect individuals' civil rights and civil liberties as well.

### IV.  Guarding Against the Use of Immigration Enforcement as a Tool of Retaliation for the Assertion of Legal Rights

Our society benefits when individuals – citizens and noncitizens alike – assert their rights by participating in court proceedings or investigations by agencies enforcing our labor, housing, and other laws.

It is an unfortunate reality that unscrupulous employers exploit their employees' immigration status and vulnerability to removal by, for example, suppressing wages, maintaining unsafe working conditions, and quashing workplace rights and activities.  Similarly, unscrupulous landlords exploit their tenants' immigration status and vulnerability to removal by, for example, charging inflated rental costs and failing to comply with housing ordinances and other relevant housing standards.

We must ensure our immigration enforcement authority is not used as an instrument of these and other unscrupulous practices.  A noncitizen's exercise of workplace or tenant rights, or service as a witness in a labor or housing dispute, should be considered a mitigating factor in the exercise of prosecutorial discretion.

### V.  The Quality and Integrity of our Civil Immigration Enforcement Actions

The civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel.

5

To ensure the quality and integrity of our civil immigration enforcement actions, and to achieve consistency in the application of our judgments, the following measures are to be taken before the effective date of this guidance:

### A. Training

Extensive training materials and a continuous training program should be put in place to ensure the successful application of this guidance.

### B. Process for Reviewing Effective Implementation

A review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance. The review process should seek to achieve quality and consistency in decision-making across the entire agency and the Department. It should therefore involve the relevant chains of command.

Longer-term review processes should be put in place following the initial 90-day period, drawing on the lessons learned. Assessment of implementation of this guidance should be continuous.

### C. Data Collection

We will need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions we take pursuant to this guidance, both to ensure the quality and integrity of our work and to achieve accountability for it.

Please work with the offices of the Chief Information Officer; Strategy, Policy, and Plans; Science and Technology; Civil Rights and Civil Liberties; and Privacy to determine the data that should be collected, the mechanisms to collect it, and how and to what extent it can be made public.

### D. Case Review Process

We will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken. Discretion to determine the disposition of the case will remain exclusively with the Department.

## VI. Implementation of the Guidance

This guidance will become effective in sixty (60) days, on November 29, 2021. Upon the effective date, this guidance will serve to rescind (1) the January 20, *2021 Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* issued by then-Acting Secretary David Pekoske, and (2) the *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* issued by Acting ICE Director Tae D. Johnson.

6

We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively. Our assessment will be informed by feedback we receive from our law enforcement, community, and other partners.

This guidance is Department-wide. Agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly.

### VII. Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

# EXHIBIT "9"

## *PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR RELEASE PENDING FINAL JUDGMENT AND PRELIMINARY INJUNCTION*

*ICE Policy 11022.1: Detainee Transfers*

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

## Policy 11022.1: Detainee Transfers

|              |                                                                   |
|--------------|-------------------------------------------------------------------|
| **Issue Date:** | **January 4, 2012** |
| **Effective Date:** | **January 4, 2012** |
| **Superseded:** | All Immigration and Customs Enforcement (ICE) documents that reference or provide guidance related to detainee transfers must be revised in accordance with this Directive. |

**Federal Enterprise Architecture Number:** 306-112-002b

1.  **Purpose/Background.** This Directive establishes new prioritized transfer determinations that are meant to minimize, to the extent possible, detainee transfers outside the area of responsibility and to provide cost savings to the agency.

    This Directive consolidates and revises existing policies on how field offices make detainee transfer determinations and conducts transfers out of the Area of Responsibility (AOR). Transfers of detainees within the AOR are not covered by this Directive.

    This Directive establishes responsibilities and procedures for ICE employees who perform detainee transfers and does not govern contract staff. ICE employees are advised that responsibilities and procedures for contract staff can be found in their respective vendor agreements

2.  **Policy.** All detainee transfers and transfer determinations will be based on a thorough and systematic review of the most current information available.

3.  **Definitions.** The following definitions apply for purposes of this Directive only.

3.1. **Area of Responsibility (AOR).** The geographic area of responsibility under the authority of a Field Office Director (FOD).

3.2. **Detainee transfer.** The transfer of a detainee from one AOR to another. The term does not include intake processing, or the transfer of aliens from facilities that are authorized for less than 72 hours, hold rooms, U.S. Customs and Border Protection Border Patrol stations, or Ports of Entry. The term detainee transfer does not include the transfer of aliens to staging areas or facilities for the purpose of facilitating a scheduled final removal of aliens from the United States, nor does it include the final removal of aliens from the United States.

3.3. **Immediate family.** This may include: mothers, fathers, step-parents, foster parents, brothers, sisters, stepbrothers, stepsisters, biological and adopted children, stepchildren, foster children, and spouses, including common-law marriage or civil unions and

cohabitating domestic partnerships legally recognized by a state or other governmental entity (e.g. District of Columbia, Puerto Rico, Guam).

**3.4.** **Workday(s).** Monday through Friday excluding holidays or other local Enforcement and Removal Operations (ERO)/Executive Office for Immigration Review (EOIR) office closures.

**4.** **Responsibilities.**

**4.1.** **FODs, Supervisory Immigration Officers, Attorneys, Immigration Officers and Medical Staff** are responsible for complying with the policy and procedures set forth in this Directive.

**4.2.** **FODs** are responsible for disseminating and enforcing this Directive and in conjunction with the Office of the Principal Legal Advisor (OPLA), developing protocols with EOIR court administrators within their AOR that ensure a regular exchange of timely and accurate hearing and detainee transfer schedule information.

**5.** **Procedures.**

**5.1.** **Filing of the Notice to Appear (NTA) for Transfers.** Unless impracticable because of logistical or other compelling factors that delay submission on a temporary or ongoing basis, NTAs will be submitted to EOIR within five (5) workdays of the NTA being served on the alien, or upon the alien entering ICE custody, whichever is later. Proper submission of an NTA does not require delivery confirmation, receipt or further action by EOIR. NTAs mailed to EOIR will only require postmark within the five (5) workdays to be considered timely. All NTAs mailed will utilize a service which tracks mailing and receipt dates.

As a general rule, detainees will not be transferred without the A-Files, T-Files, or work folders. If an A-File, T-File, or work folder does not accompany the transferred alien, the five (5) workdays provided for submitting the NTA to EOIR will not begin until the appropriate case officer, agent or other ICE employee who submits NTAs to EOIR receives the A-File, T-File or work folder.

**5.2.** **Transfer Determinations.**

1) Unless a transfer is deemed necessary by a FOD or his or her designee under paragraph (3) of this section, ICE Supervisory Immigration Officer(s) will not transfer a detainee when there is documentation to support the following:

a) Immediate family within the AOR;

b) An attorney of record (Form G-28, *Notice of Entry of Appearance as Attorney or Accredited Representative* on file) within the AOR;

    c) Pending or on-going removal proceedings, where notification of such proceedings has been given, within the AOR; or

    d) Been granted bond or has been scheduled for a bond hearing.

2) The Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File.

3) A transfer may be deemed necessary by a FOD or his or her designee for any of the following reasons:

    a) To provide appropriate medical or mental health care to the detainee.

    b) To fulfill an approved transfer request by the detainee.

    c) For the safety and security of the detainee, other detainees, detention personnel or any ICE employee.

    d) At ICE's discretion, for the convenience of the agency when the venue of EOIR proceedings is different than the venue in which the alien is detained.

    e) To transfer to a more appropriate detention facility based on the detainee's individual circumstances and risk factors.

    f) Termination of facility use due to failure to meet ICE detention standards, lack of sufficient use of the facility by ICE, or emergent situations.

    g) To relieve or prevent facility overcrowding; in such cases, efforts should first be made to identify for transfer those detainees who do not meet any of the criteria listed in section 5.2(1).

4) *Orantes* Class Members.

    a) ICE is prohibited from transferring Salvadoran class members who are not represented by counsel, from the judicial district of their apprehension for at least seven days to afford them the opportunity to secure counsel.

        i) The only exception to this rule applies to class members who are subject to expedited removal final orders. See *Orantes-Hernandez v. Gonzales*, No. 82-01107, Modified Consolidated Injunction, at paragraph 11.b. (C.D. Cal. Nov. 26, 2007*)*.

    b) Salvadoran class members who *are* represented by counsel or obtain representation within the seven-day period can be transferred to other locations, but venue remains in the judicial district where each member's counsel is located.

    c) For any questions regarding the treatment of Salvadoran nationals in ICE custody, pursuant to the requirements of the *Orantes* settlement agreement, please contact the local ICE Office of Chief Counsel.

5) ICE Supervisory Immigration Officers will conduct a thorough review of the most current information available to make all detainee transfer determinations.

## 5.3.  Notifications in the Event of a Detainee Transfer.

1) ICE will ensure that all necessary notifications are made to detainees and their attorneys when detainees are transferred.  ICE is not required to notify family members or other third parties of a transfer.

2) <u>Attorney notification</u>.  If a detainee has an attorney of record (Form G-28 on file), the sending field office will:

    a) Notify the attorney that the detainee is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours after the transfer occurs.

    b) Document the notification in:

        i) The Detainee Transfer Check List; and

        ii) The appropriate comments screen in ENFORCE.

    c) Delay the notification when there are special security concerns, but only for the period of time justified by those concerns.

    d) Appropriately document concerns in the detainee's A-File and the appropriate comments screen in ENFORCE.

3) <u>Detainee notification</u>.  Immediately prior to transfer, the sending field office will ensure that the detainee is informed, in a language or manner he/she can understand, that he/she is being transferred to another facility and is not being removed (if applicable).

    a) To ensure the safety of ICE personnel, ICE will ensure that specific plans and time schedules are not discussed with detainees and that following notification, the detainee:

---

Detainee Transfers

    i)  Is not permitted to make or receive any telephone calls until the detainee reaches the destination facility;

    ii)  Does not have contact with any detainee in the general population until the detainee reaches the destination facility; and

    iii) Is notified that upon admission into the receiving facility, the detainee may place a domestic phone call, at no expense to the detainee.

b)  The sending office will ensure that the detainee notification is documented in:

    i)  The Detainee Transfer Notification form; and

    ii)  The appropriate comments screen in ENFORCE.

c)  At the time of the transfer, ICE will provide the detainee, in writing, the name, address, and telephone number of the facility to which they are being transferred, using the Detainee Transfer Notification form. ICE place a copy of the form in the detainee's A-File.

d)  ICE will make sure that the detainee acknowledges, in writing, that they have received the transfer destination information and that it is their responsibility to notify family members if so desired, upon admission into the receiving facility.

4)  <u>EOIR notification</u>. If a detainee has pending proceedings before EOIR, ICE must submit Form I-830, *Notice to EOIR: Alien Address*. If the alien has an appeal pending with Bureau of Immigration Appeals (BIA), the BIA must be notified. In all cases, a copy of Form I-830 will be placed in the A-file.

## 5.4.  Requests for Bed/Designation Transfers from Field Office to Field Office.

1)  FODs or their designees are responsible for ensuring that field offices which routinely transfer cases:

a)  Establish a means of communication so that receiving field offices provide sending field offices daily information regarding available bed space; and

b)  Provide the names and contact numbers of staff responsible for handling transfers.

2)  While field offices are encouraged to communicate directly regarding available bed space, the headquarters Removal Management Division (RMD) is available to assist a field office that has unsuccessfully attempted to locate space.

3)  Field offices seeking bed space in other field office jurisdictions should phone the request (or e-mail with a follow-up phone call) with sufficient details of the case to the designated field office contact.

4) Once a field office has preliminarily agreed to accept a detainee from another office, ICE will ensure that:

   a) The Form I-216, *Record of Persons and Property Transfer* is completed;

   b) Complete information detailing the alien's criminal history, medical or mental health concerns, or security risks is provided.

   c) Medical or mental health problems or prescribed medications are documented, either on Form USM-553 (or equivalent), *Medical Summary of Federal Prisoner/Alien in Transit*, or Form I-794, *In-Processing Health Screening*, and the form accompanies Form I-216;

   d) Security concerns are outlined on a separate page and attached to Form I-216; and

   e) A copy of the age verification documentation is attached if it is suspected that the detainee is a juvenile.

5) The FOD(s) or their designee(s) will arrange a method of providing medical histories to Intergovernmental Service Agreement (IGSA) facilities if the IGSA requires that the medical unit review medical histories prior to accepting a transfer.

6) The receiving field office will ensure that Form I-216 is reviewed for consistency with information previously communicated. If there are issues that were not previously relayed to the receiving field office, ICE Supervisory Immigration Officers at the receiving field office will ensure that the sending field office is notified that the transfer request may be declined unless the issues are resolved.

7) Once the receiving field office has agreed to accept the transfer of the detainee on Form I-216, the sending field office will communicate a mutually agreeable estimated time of arrival. The sending field office may not substitute any detainee on Form I-216 without prior approval of the receiving field office.

### 5.5. Detainee Transfer Checklist and Transfer Notification Form.

1) ICE will ensure that both the Detainee Transfer Checklist and Transfer Notification Form are completed and placed in the detainee's A-File or work folder; and that the A-File or work folder accompanies the detainee to the receiving facility.

2) If the Detainee Transfer Checklist cannot be completed prior to transfer, the detainee may be transferred only if the authorized receiving FOD or his or her designee has expressly waived that procedure. The sending field office will note any such waiver in the A-File.

## 5.6.    A-File.

1) Prior to transfer, the sending field office will ensure that the A-File is obtained and, in accordance with the appropriate procedures of the ICE Policy Directive titled, "Alien Registration File (A-File) Creation, Maintenance, Organization, and Disclosure of Information":

   a) Forward the A-File to USCIS for consolidation; and

   b) Attach all documents and forms on the proper side of the A-File.

2) The sending field office will ensure that the A-File includes copies of the following properly executed documents, fastened in the file:

   a) I-216 and appropriate copies of Form I-77, Baggage Check (or IGSA equivalent);

   b) Form USM-553 or local Medical Transfer Summary form;

   c) Copy of Form I-213, *Record of Deportable Alien Form*;

   d) Original or photocopy of Form I-203/203A, *Order to Detain/Release Alien*;

   e) Detainee Transfer Checklist;

   f) Age verification documents (if applicable);

   g) A copy or printout of all previous Post Order Custody Reviews (POCRs) and travel document requests in a property envelope fastened to the file;

   h) Classification sheet;

   i) Charging documents/records of proceedings;

   j) Certified copies of convictions;

   k) Fingerprint cards;

   l) Photographs; and,

   m) Printouts from the Central Index System (CIS), ENFORCE and the FBI NCIC database.

3) If the sending field office is unable to obtain the A-File (and does not have a fully documented Temporary File), the detainee may not be transferred unless the receiving

Petitioner's Appendix Page 201

field office, before the transfer takes place, accepts a work folder created by the sending field office that includes, at a minimum:

a) Certified copies of convictions or information as addressed in section 5.8;

b) Printouts from the Central Index System (CIS), ENFORCE, and the Federal Bureau of Investigation's (FBI) National Crime Information Center (NCIC) database;

c) Charging documents/copies of the EOIR record of proceedings;

d) Photographs and fingerprints;

e) A Computer Linked Application Information Management System (CLAIMS) printout;

f) A Treasury Enforcement Communications System (TECS) printout; and

g) Any other documents reasonably requested by the receiving field office.

4) The sending field office will ensure that the A-File or work folder accompanies the transfer, except for cases where the receiving field office requests that the A-File or work folder be mailed by overnight express to a particular location. If requested, the sending field office will ensure that it is mailed no later than the following business day.

5) The sending field office shall communicate as soon as possible any anticipated significant delays in the arrival time of the detainees or their files.

**5.7.    Charging Documents/Record of Proceeding.**

1) Before the transfer, all charging documents will be issued and signed by the individual with signatory authority for the sending field office.

2) If applicable, prior to transfer, all charging documents will be served on the detainee, including, but not limited to:

a) Form I-862, *Notice to Appear*;

b) Form I-200, *Warrant of Arrest*;

c) Form I-205, *Warrant of Removal*;

d) Form I-286, *Notification of Custody Decision*; and

e) Form I-826, *Notice of Rights*.

---

3) ICE will ensure that original charging documents or copies, if the originals have been submitted to EOIR (indicating proper service), are included in the A-File. A copy of the charging documents will be provided to the detainee.

**5.8.** **Certified Copies of Convictions.** A detainee may not be transferred if the certified copies of conviction relating to the charging document are not included in the A-File or work folder, unless the receiving field office has agreed in writing in advance to accept the case. In such instances, the sending field office will provide the Detainee Transfer Checklist point-of-contact names and phone numbers provided for:

1) The person at the sending field office responsible for obtaining the conviction record; and

2) An individual at the respective court or clerk's office where the record is located.

**5.9.** **Fingerprint Cards.** The sending field office will send the completed fingerprint cards in the A-File or work folder as noted below:

1) The cards will be signed by the alien and the official taking the fingerprints;

2) The cards will be completely filled out except for the address block requesting a disposition from the FBI;

3) The completed cards will be left in the A-File or work folder for the receiving field office to fill in the response address block and submit to the FBI and DHS Biometrics Support Center (when appropriate), unless the detainee is a Room-and-Board case (short-term staging); and

4) One fingerprint card should remain in the A-File or work folder at all times.

**5.10.** **Photographs.** The sending field office will take four (1 sheet of 4) new, standard booking-size photographs on photo quality paper and include any photos not needed for the transfer in the A-File or work folder.

**5.11.** **Medical Procedures and Information Required for Transfer.**

1) In advance of the transfer, ICE will ensure that the receiving facility is provided the USM-553 (facsimile or email is acceptable)

2) Transfer of the Detainee's Medical Record.

    a) When a detainee is transferred within the ICE Health Service Corps (IHSC) system, IHSC will provide:

        i) Form USM-553, or equivalent Medical Transfer Summary, and a copy of the detainee's full medical record; and

---

Detainee Transfers

    ii)  The full medical record in a sealed envelope or other container labeled with the detainee's name and A-number and marked "MEDICAL CONFIDENTIAL."

b)  When a detainee is transferred to an IGSA detention facility, ICE will ensure that the Transfer Summary will accompany the detainee. Whenever possible, a copy of the full medical record should accompany each detainee during transfer. If the full medical record is not available, it must be sent as soon as possible. FODs will work with IGSAs to make arrangement for the transfer of the full medical record.

3)  <u>Medical Transfer Summary</u>.

    a)  The sending facility's medical staff will prepare a Medical Transfer Summary that must accompany the detainee. Either Form USM-553 or a facility-specific form may be used, provided it shows:

        i)  Tuberculosis (TB) clearance, including Purified Protein Derivative (PPD) with the test dates, and chest x-ray results if the detainee has received a positive PPD reading;

        ii)  Current mental and physical health status, including all significant health issues;

        iii) Current medications, with specific instructions for medications that must be administered en route; and

        iv) The name and contact information of the transferring medical official.

    b)  The transporting officer may not transport a detainee without the Medical Transfer Summary.

    c)  The transporting officer will review the information for completeness and make sure that he or she has the in-transit supplies required to provide to the detainee as indicated on the USM-553 or equivalent Medical Transfer Summary.

    d)  Medical information is available to staff only on a need-to-know basis.

        i)  Any officer who reviews the Medical Transfer Summary will protect the privacy of the detainee's medical information to the greatest extent possible.

        ii)  Personnel may not share medical information unless necessary to safely fulfill transportation responsibilities.

e)  The transporting officer will deliver the Medical Transfer Summary to medical personnel, if practicable, or other staff at the receiving facility and will advise them of any medications provided to the detainee in transit.

4)  Medical or Psychiatric Alert.

a)  Appropriate medical staff will notify the facility administrator when they determine that a detainee's physical or mental condition requires:

i)  Clearance by the medical staff prior to transfer; or

ii)  Medical escort and specialized care (e.g. dialysis) during transfer.

5)  Medications.

a)  Prior to transfer, medical staff will provide the transporting officers instructions and, if applicable, medication(s) for the detainee's care in transit.

b)  Medical staff will ensure that the detainee is transferred with, at a minimum, seven (7) days worth of prescription medications (for TB medications, up to 15 days' supply) to guarantee the continuity of care throughout the transfer and subsequent intake process.

c)  ICE will ensure that medications:

i)  Are placed in a property envelope labeled with the detainee's name and A-number and appropriate administration instructions;

ii)  Accompany the transfer; and

iii) If unused, are turned over to the receiving medical personnel.

**5.12.  Other Transfer Paperwork.**

1)  ICE will ensure that no detainee is transferred without a properly executed Form G-391, I-213, I-216, I-203/I-203A, or equivalent.  IGSA facilities may use a local form as long as the form provides the required information.

2)  ICE Supervisory Immigration Officers will ensure that records are checked to ascertain if the alien has a criminal history, is dangerous, or has an escape record or medical condition.  Any information of an adverse nature must be clearly indicated on the Form G-391, I-216, I-203, or equivalent, and the escorting officers will be notified of the risk and warned to take the necessary precautions.

3)  Before beginning the transfer or the detail, the escorting and transportation officers will read their instructions and clearly understand the purpose for which the detainee

is being removed from the facility. The officers will also discuss emergency contingency plans with a supervisor and/or authorized ICE official before departure.

4) ICE will ensure that Form I-216:

    a) Includes the detainee's name, A-number and detention category;

    b) Indicates if the detainee has a criminal conviction, a history of violence, is an escape risk, or has a medical condition that may require attention during the transfer;

    c) Notes whether the detainee is on prescription medication; and

    d) Indicates the time of arrival estimated by the sending field office.

5) ICE will ensure that Form G-391, I-203/I-203A, or equivalent:

    a) Is properly signed and clearly indicates the name and A-number of the detainee(s);

    b) Indicates the place or places to be escorted; and

    c) Notes the purpose of the trip and other information necessary to efficiently carry out the transfer, or detail.

6) The receiving field office may request that copies of Form I-203/I-203A or I-213 be transmitted directly from the sending field office to the receiving facility.

## 5.13. Property.

1) Before transfer, the sending facility will ensure that all funds and small valuables are properly documented and closed out on Form G-589/I-77 (or local IGSA property receipt form).

2) If the receiving facility does not accept excess, oversized or bulky belongings (including, but not limited to, suitcases, cartons, televisions, etc.), the sending facility will:

    a) Arrange to store the property elsewhere; or

    b) Process the excess property in accordance with the ICE National Detention Standards (NDS) or Performance Based National Detention Standards (PBNDS) related to the destruction of contraband or abandoned property.

3) If the detainee refuses to provide an appropriate mailing address, or is financially able but unwilling to pay for shipping, ERO may dispose of the property after providing

the detainee written notice in accordance with the ICE National Detention Standards (NDS) or Performance Based National Detention Standards (PBNDS) related to the destruction of contraband or abandoned property.

**5.14.    Movements via ICE-Managed Aircraft.** When detainees are being transported by the ERO Flight Operations Unit, ICE will adhere to protocols established for ICE chartered removals

**5.15.    Post Transfer Activities.**

    1)  Detainee Phone Calls.

        a)  After admission into the receiving facility the FOD will ensure that all detainees are given the opportunity to make a phone call at the government's expense.

    2)  ENFORCE.

        a)  The sending field office will ensure that appropriate screens in ENFORCE are complete, updated, and accurate.

        b)  Once the detainee reaches his or her destination, the receiving field office will update the appropriate screens in ENFORCE.

**5.16.    Quality Assurance Review.** Consistent with the terms of this Directive, the FOD shall maintain statistics on transfers and have a quality assurance process in place to monitor all transfer decisions.

**6.    Authorities/References.**

**6.1.**    Immigration and Nationality Act, Pub. L. No. 82-414, §236(a) (1952) (codified as amended at 8 U.S.C. §§ 1101 et seq).

**6.2.**    ICE Policy Directive No. 1-32.0, "Alien Registration File (A-File) Creation, Maintenance, Organization, and Disclosure of Information" (Oct. 2, 2009).

7.    **Attachments.**

**7.1.**    Detainee Transfer Notification.

**7.2.**    Detainee Transfer Checklist.

**8.**    **No Private Right Statement.**   This Directive is an internal policy statement of ICE.   It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

**John Morton**
**Director**
**U.S. Immigration and Customs Enforcement**

# EXHIBIT "10"

## *PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR RELEASE PENDING FINAL JUDGMENT AND PRELIMINARY INJUNCTION*

*Declaration of Kerry Doyle*

## <u>DECLARATION OF KERRY DOYLE</u>

I, Kerry Doyle, certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Kerry Doyle.  I am currently Of Counsel with Green and Spiegel, LLC, which is an immigration firm based in Philadelphia, Pennsylvania. I graduated cum laude from American University, Washington College of Law with a J.D. and The George Washington University with a B.A. in Political Science.  I am a member of the Commonwealth of Massachusetts Bar, the Supreme Court Bar and the bars of Several Federal Courts of Appeals and U.S. District Courts.

2. I have practiced immigration, asylum and refugee law since 1993. I have served in the government and worked in both the non-profit and private sector. I served as Principal Legal Advisor (PLA), for Immigration Customs Enforcement (ICE) from September 2021 through September 2024. During that time, I served on detail as Acting Deputy General Counsel, Office of General Counsel (OGC), Department of Homeland Security (DHS) from February 2024 through May 2024 and as Deputy General Counsel from October 2024 through December 2024.  I was appointed as an Immigration Judge and served in that position from December 2024 through mid-February 2025. I managed Graves and Doyle, a private immigration firm, in Boston, MA for twenty years after working in the non-profit sector for almost ten years. I have taught immigration, asylum and refugee law as an adjunct professor at both University of Miami School of Law and Suffolk University School of Law. I previously served as Chair of the New England Chapter of the American Immigration Lawyers Association (AILA).

3. I am a recognized expert in complex immigration issues, including immigration court removal proceedings. I have been a frequent speaker at immigration conferences and national lawyer trainings, including recurring trainings co-hosted by the Boston Immigration Court (part of the Executive Office for Immigration Review (EOIR)) and the New England chapter of AILA, with a specific focus on training pro-bono attorneys volunteering to represent noncitizens in immigration bond hearings. I have been recognized as an expert witness on immigration law topics before both state and federal courts. In light of my expertise, while in private practice, I was selected by the Immigration Court to represent detained individuals who have been deemed incompetent through the National Qualified Representative Program. In the past, I worked closely with the Massachusetts Immigrant and Refugee Advocacy Coalition and the Massachusetts Law Reform Institute providing technical assistance and public testimony on various immigration-related policy issues before the state legislature and the Boston City Council. More recently, I have testified before the Federal Law Enforcement subcommittee of the Government Oversight Committee in the U.S. House of Representatives.

4. As the PLA, I served as general counsel for ICE supporting the Acting Director of ICE and other leaders in ICE and the Department of Homeland Security, providing legal advice on a wide variety issues, including immigration litigation and prosecutorial strategy and policy. I oversaw the 1,500 attorneys and staff who work for the Office of the Principal Legal Advisor (OPLA) across the country. As PLA, I was responsible for establishing the direction and priorities of our office in alignment with OGC, ICE and

DHS leadership.

5.  I am providing this declaration in my personal capacity. The opinions here should not be construed to represent the position of the Department of Homeland Security or any components therein, the Department of Justice or Green and Spiegel, LLC.

6.  I am familiar with the regulation at 8 C.F.R. § 1003.19(i)(2) that permits a United States government immigration prosecutor from one of OPLA's Offices of the Chief Counsel (OCC), the ability to file a unilateral "automatic stay" to override an Immigration Judge's order granting bond to a noncitizen while an appeal to the Board of Immigration Appeals (BIA) is pending.

7.  In the twenty plus years I practiced immigration law prior to my government service, I have represented many hundreds of noncitizens in removal proceedings. During the same period, I also observed and consulted with countless professional colleagues on their own immigration removal cases across the country. I have never seen an OPLA prosecutor file an automatic stay in any of my own client's cases, nor am I personally aware of any automatic stays having been filed in any other cases. Overall, I am generally aware, from my years of private law practice, that OPLA's use of the automatic stay regulation to unilaterally prevent an Immigration Judge's bond order from taking effect has been extraordinarily rare.

8.  I am also aware that in the past two months, DHS has terminated thousands of international student records in the Student and Exchange Visitor Information Systems (SEVIS) system. I base this statement upon my personal knowledge of DHS's actions as a result of the international students I have spoken to, the information my colleagues have gathered from international students, and based upon reports from immigration colleagues and organizations working with students and educational institutions across the country. Many of the students who have had their SEVIS records terminated appear to have been targeted based upon extremely minor interactions with the criminal justice system.  Impacted international students include some previously arrested, but never charged with any crime, some victims of domestic violence, individuals with minor misdemeanors, and also some international students with no discernible history of contact with the criminal justice system or police.  None of the cases that I am personally aware of have any incidents that would form a legal basis for SEVIS termination.

9.  While thousands of international students have had their SEVIS records terminated by DHS in the past two months, I am aware of only a small number of international students and teachers who DHS has also arrested and detained during this period. I am aware that in the past month, DHS has detained four international students in Minnesota, while also terminating their F-1 records in the SEVIS system, and each had misdemeanor convictions in the past. It is my understanding and belief that immigration judges in Minnesota have issued orders granting bonds to each of these four students, after which DHS reserved appeal of the bond orders and then invoked the automatic stay regulation 8 C.F.R. § 1003.19(i)(2) to unilaterally prevent any release of the students from ICE custody while DHS appealed that decision to the BIA, a process that often lasts a period of months, even when expedited.

10. While I do not represent ████████████ and I have no first-hand knowledge of the

facts of his case, I do understand from his counsel that Mr. ████ is one of the four international students who DHS arrested and detained in Minnesota in the past month, while also terminating their SEVIS student visa records. It is my understanding that Mr. ████ only criminal history was a speeding ticket and a single misdemeanor charge for simple assault in 2023, which was dismissed, at which point he pleaded guilty to a separate misdemeanor disorderly conduct charge under Minnesota Statute 609.72.1(3), paid a small fine, received a 90-day stayed sentence, and completed one year of unsupervised probation. It is my understanding and belief that Mr. ████ was never arrested in connection with this incident and was never jailed. It is also my understanding, as noted above, that in the past two weeks Mr. ████ received a bond hearing before an Immigration Judge in Minnesota, who granted him a bond, at which point OPLA's Office of Chief Counsel invoked the automatic stay regulation 8 C.F.R. § 1003.19(i)(2).

11. Based upon the information that has been provided to me, it is my professional opinion that the minor misdemeanor conviction Mr. ████ received does not impose immigration consequences in terms of triggering inadmissibility to or deportability from the United States. In my professional experience based upon the more than twenty years of private practice as an immigration attorney, it is highly unusual for the government to invoke an automatic stay to prevent an individual like Mr. ████ from posting a bond and being released pursuant to an Immigration Judge's favorable bond order.

12. I have had clients in my private practice who had much more serious criminal convictions than Mr. ████, who receive bond without the invocation of 8 C.F.R. § 1003.19(i)(2) by the government. In those cases, if the government had ongoing concerns over serious and significant public safety or flight risks, they have instead filed an emergency appeal of the Immigration Judge bond order to the BIA, and simultaneously sought a discretionary stay from the BIA of that bond order, pursuant to the separate regulatory provision 8 C.F.R. § 1003.19(i). Unlike an automatic stay unilaterally imposed by DHS pursuant to 8 C.F.R. § 1003.19(i)(2), when DHS files an emergency motion for a discretionary stay of an Immigration Judge's bond order pursuant to 8 C.F.R. § 1003.19(i), the detained noncitizen has the opportunity to reply in opposition to DHS's emergency motion before the BIA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.


Dated: April 21, 2025                    _____/s/ Kerry E. Doyle_____
                                         Kerry Doyle

# EXHIBIT "11"

## *PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR RELEASE PENDING FINAL JUDGMENT AND PRELIMINARY INJUNCTION*

*Petition for Writ of Habeas Corpus & Second Circuit's Order of Release on Bail in* Vacchio v. Ashcroft, *No. 03-2004 (2d Cir.)*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

Nov 5  12 23 PM '02

BY _____ *PD*
DEPUTY CLERK

| | |
|---|---|
| **TULLIO VACCHIO,**<br>　　　　　　**Petitioner** | ) |
| | ) |
| | ) |
| 　　　　**V.** | )　　**Civil Action File No. 1·02·cv·29 3** |
| | ) |
| **JOHN ASHCROFT,**<br>**as Attorney General,**<br>**U.S. Department of Justice,**<br>**950 Pennsylvania Avenue, NW,**<br>**Washington, D.C.  20530-0001;** | )<br>)<br>)<br>)<br>) |
| | ) |
| **JAMES W. ZIGLAR,**<br>**as Commissioner of the Immigration and**<br>**Naturalization Service,**<br>**425 I Street, NW, Room 3260,**<br>**Washington, D.C.  20536;** | )<br>)<br>)<br>)<br>) |
| | ) |
| **JEAN R. OUELETTE,**<br>**as District Director of the Immigration**<br>**and Naturalization Service,**<br>**Portland, Maine District Office,**<br>**176 Gannett Drive,**<br>**South Portland, ME  04106;** | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| **JAMIE SHEA,**<br>**as Lead Detention Officer of the**<br>**Franklin County Detention Facility,**<br>**P.O. Box 367,**<br>**30 Lincoln Avenue,**<br>**St. Albans, VT  05478;** | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| 　　　　　　　　**Respondents** | )<br>) |

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

## PETITION FOR WRIT OF HABEAS CORPUS

　　1.　　　Petitioner, Tullio Vacchio, respectfully petitions this Honorable Court for a writ

of habeas corpus releasing him from unlawful and unconstitutional detention by the Immigration

and Naturalization Service (INS) at the Franklin County Detention Facility in St. Albans, Vermont.

### Jurisdiction

2.      This petition is filed pursuant to 28 U.S.C. 2241, et. seq., Article I, section 9, clause 2 and the V Amendment of the United States Constitution (the Due Process Clause).

3.      This court has jurisdiction over this action pursuant to 28 U.S.C. 1331 (federal question), section 1651 (writ), section 2241 et seq. (writ of habeas corpus), 28 U.S.C. section 2201, and 5 U.S.C. section 702.

### Venue

4.      Venue is proper in this court pursuant to 28 U.S.C. section 1391(e).

### Parties

5.      Petitioner, Tullio Vacchio, is an Italian citizen and has been a permanent resident of the United States since July 19, 1970, when he was five years old.

6.      Petitioner is married to a United States citizen and they reside in Swanton, Vermont.

7.      Petitioner has been detained by the INS in St. Albans, Vermont since September 7, 2002.

8.      Respondent, John Ashcroft, is the Attorney General of the Department of Justice of the United States of America, which includes the INS.

9.      Respondent, James W. Ziglar, is the Commissioner of the INS, Department of Justice.

10.     Respondent, Jean R. Ouellette, is the Director of the Portland, Maine District of the INS, which District includes the INS sub-office located in St. Albans, Vermont.

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

2

11.     Respondent Jamie Shea is the Lead Detention Officer of the Franklin County Detention Facility in St. Albans, where Petitioner is detained by the INS. Upon information and belief, this is a facility under contract with the Department of Justice to hold INS detainees.

### Statement of Facts

12.     Petitioner is a permanent resident of the United States and has been a permanent resident since he was five (5) years old. His wife, and eight of his nine living siblings are United States citizens. His father is deceased and his mother is a lawful permanent resident of the United States. She is terminally ill and currently hospitalized at St. John's Hospital of Far Rockaway in New York. She is too ill to visit Petitioner at the Franklin County Detention Facility and, therefore, there is grave risk that she will never see her son again if he is not released from custody.

13.     Petitioner grew up in New York and moved with his wife to Swanton, Vermont on November 4, 2001. The couple purchased their home in Swanton at that time, and Petitioner worked as an auto mechanic and lived a law-abiding life in Vermont until he was abruptly placed in detention by the INS on September 7, 2002. The INS detained Petitioner on the alleged basis that he is subject to removal from the United States based on two old misdemeanor marijuana convictions.

14.     The convictions relied on by the INS were for Criminal Sale of Marijuana in the Fourth Degree, in violation of Section 221.40 of the New York penal laws. The first conviction took place on June 22, 1992, and the second on August 31, 1999. Although the convictions were for "criminal sale", no proof of remuneration is needed for a conviction under New York law. NYPL 220.00(1). The convictions were for very small quantities of marijuana--between 2 and 25 grams. NYPL 221.35-45. These convictions are considered Class A misdemeanors, with a maximum penalty of one year in jail. NYPL section 10.00-4. Petitioner was sentenced to a term

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

3

of probation of three years for the 1992 conviction and a term of imprisonment of fourteen (14) days for the 1999 conviction.

15.    Petitioner has no criminal record other than the two misdemeanor marijuana convictions.

16.    The INS has charged that Petitioner is subject to removal based on two grounds: (1) that he has been convicted of a drug offense (8 U.S.C. 1227(a)(2)(B)), and (2) that the drug convictions constitute "aggravated felonies"(8 U.S.C. 1227(a)(2)(A)(iii)). The Government has also concluded that Petitioner is subject to mandatory detention pursuant to 8 U.S.C. 1226(c) and, therefore, it has held Petitioner in detention in St. Albans since September 7, 2002.

17.    The Removal case is pending in the Executive Office for Immigration Review ("Immigration Court') in Boston, Massachusetts. The Immigration judge presiding over the Removal action has ruled that Petitioner's misdemeanor marijuana convictions do not constitute aggravated felonies as defined by 8 U.S.C. 1227(a)(2)(A)(iii) and 8 U.S.C. 1101(a)(43)(B), because his convictions do not constitute felonies under federal or state law. This decision is thoroughly supported by case law. In re Nabil Ahmed Elgendi, 23 I&N Dec. 515 (BIA 10/31/02); United States v. Pornes-Garcia, 171 F.3d 142 (2nd Cir. 1999); United States v. Polanco, 29 F.3d 35 (2nd Cir. 1994); Steele v. Blackman, 236 F.3rd 130 ( 3rd Cir. 2001).

18.    The Immigration judge has further found that Petitioner is eligible to apply for discretionary relief from removal under 8 U.S.C. 1229b(a)(3) ("cancellation of removal") because he has not been convicted of an aggravated felony. A hearing on Petitioner's application for cancellation of removal is scheduled for February 11, 2003. If he prevails at that hearing, Petitioner will retain his lawful permanent resident status and will be permitted to stay in the United States.

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

4

19.    On September 16, 2002, the Immigration Judge conducted a bond hearing and found that Petitioner should be released on a $2500 bond during the pendency of his removal case because he does not pose a danger to the community and there is no risk that he will flee. The INS does not contest this finding but contends that the Immigration judge had no jurisdiction to conduct a bond hearing or to set a bond because Petitioner is subject to mandatory detention pursuant to 8 U.S.C. 1226(c). Therefore, despite the ruling of the Immigration judge, and Petitioner's tender of the bond, the INS has continued to detain Petitioner. This detention is a violation of Petitioner's Constitutional rights.

### Procedural History

20.    On September 17, 2002, the INS filed with the Immigration Court in Boston, a "Notice of Intent to Appeal Custody Redetermination" to the Board of Immigration Appeals (BIA) and asserted that the filing of that form constituted an automatic stay of the Immigration Judge's custody redetermination decision pursuant to 8 C.F.R. 3.19(i)(2).

21.    On September 20, 2002, Petitioner filed a memorandum in opposition to the INS' declaration of a stay of the bond ruling with the BIA. The BIA refused to consider or rule on the stay issue because the INS had not yet filed a notice of appeal with the BIA, and it had 30 days from September 16th to do so. At the same time, the Immigration judge ruled in a hearing on September 30, 2002, that she had no jurisdiction to consider a motion to lift the stay because the INS had filed its notice of intent to appeal the bond decision.

22.    The INS did not file its notice of appeal of the bond ruling with the BIA until October 4, 2002. The INS contends that the Immigration judge had no authority to set a bond because detention is mandatory pursuant to 8 U.S.C. 1226(c). Mandatory detention applies pursuant to that statute, according to the Government, because of Petitioner's 1999 drug

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

5

conviction (8 U.S.C. 1226(c) and 8 U.S.C. 1227(a)(2)(B)) and/or because this conviction

allegedly constitutes an aggravated felony (8 U.S.C. 1226(c) and 8 U.S.C. 1227(a)(2)(A)(iii)).

23.    The INS further contends that, due to its appeal, the Immigration Judge's bond

ruling is automatically stayed until the Board of Immigration Appeals issues a ruling on the

appeal. There is no statutory authority for this automatic stay. Rather, the INS relies solely on 8

C.F.R. 3.19(i)(2).

24.    On October 8, 2002, Petitioner filed a Motion for Lift of Stay and Affirmance of

Immigration Judge's Bond Ruling, with the BIA. In support of this motion, Petitioner has argued

that the mandatory detention statute, 8 U.S.C. 1226(c), is unconstitutional because it deprives

lawful permanent residents the due process right to have an individualized hearing to establish

that they should be released on bond because they do not pose a flight risk or danger to the

community. Several Federal Circuit Courts have recently found the mandatory detention statute

unconstitutional with respect to the detention of lawful permanent residents prior to the entry of a

final order of removal. Patel v. Zemski, 275 F.3d 299 (3dCir.2001); Welch v. Ashcroft, 293 F.3d

213 (4th Cir.2002); Hoang v. Comfort, 282 F.3d 1247(10th Cir.2002); Kim v. Ziglar, 276 F.3d

523(9th Cir.2002). The United States Supreme Court has accepted the Kim case for review on a

writ of Certiorari filed by the government. Only one Circuit court has found the mandatory

detention statute constitutional, Parra v. Perryman, 172 F.3d 954 (7th Cir. 1999). However, that

decision is in doubt because it was reached prior to the decision of the United States Supreme

Court in the case of Zadvydas v. Davis, 121 S.Ct. 2491 (2001) where the high court found that

the indefinite detention of removable aliens, without the right to a bond hearing, violates the

aliens' due process rights.

25.    BIA precedent requires the Board to follow the rulings of the majority of the

Circuit courts. In In re Ismael Yanez-Garcia, 23 I&N Dec.390 (May 13, 2002) and in In re Nabil

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

6

Ahmed Elgendi, 23 I&N Dec. 515 (October 31, 2002), the BIA ruled that in situations such as this where the Circuit having jurisdiction over a case has not yet ruled, the Board will follow the majority rule. Therefore, the BIA must follow the rulings of the majority of the Circuit Courts and find that the mandatory detention statute is unconstitutional in the context of this case.

26.    Despite its own mandate, the BIA has failed to rule either on Petitioner's motion to lift the automatic stay of the bond ruling or on the INS' appeal of that ruling. The BIA has failed to rule even though Petitioner has requested expedited review due to his mother's terminal illness. Due to the BIA's inaction, Petitioner has been forced to remain in INS custody for over seven (7) weeks subsequent to the Immigration Judge's bond ruling.

27.    Upon information and relief, the BIA has no rules or procedures establishing guidelines or time-lines for reviewing or deciding bond appeals or on motions to lift stays of bond rulings. Therefore, Petitioner may be held in INS detention indefinitely until the BIA chooses to rule on the appeal. Due to a backlog of cases before the BIA, the Board frequently takes more than one year to rule on appeals.

28.    Due to the BIA's inaction in this case, and its lengthy processing delays in virtually all of its cases , Petitioner has been and will continue to be effectively denied the right to be released on bond, even if he eventually prevails before the Board. It is extremely unlikely that the BIA will issue a ruling on the INS appeal prior to Petitioner's hearing on the merits of his petition for cancellation of removal which is scheduled for February 11, 2003. By that time, there is a strong likelihood that Petitioner's mother will be deceased.

### Grounds for Relief

(28 U.S.C. 2241 et. seq.; Art I, Sec. 9, cl. 2 and the V Amendment of the Constitution)

29.    Petitioner hereby incorporates paragraphs 1-28 as if set forth, in full, herein.

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

7

30.     The application of the mandatory detention statute, 8 U.S.C. 1226(c), to

Petitioner, a lawful permanent resident eligible to apply for discretionary relief from removal,

violates petitioner's Constitutional right to procedural and substantive due process.

31.     The  automatic stay regulation, 8 C.F.R. 3.19(i)(2), is unconstitutional on its face

and in its application here.  The automatic stay regulation grants the INS the unfettered power to

overturn a bond ruling by an immigration judge upon the mere filing of a notice of an intent to

appeal .  The regulation fails to set forth any procedure permitting an alien to request, and the

BIA to grant, a lift of the stay pending a determination on the merits of the appeal.  The

automatic stay regulation is, therefore, unconstitutional on its face and in its application in this

case, where Petitioner has compelling reasons to support a lift of the stay.

### Prayer for Relief

Petitioner respectfully requests that the Court:

1.     Issue a writ of habeas corpus to Respondents directing them to release Mr.

Vacchio immediately because:

a.     The mandatory detention statute violates  Mr. Vacchio's right to

substantive and procedural Due Process under the Fifth Amendment because it deprives him of

his liberty by subjecting him to indefinite detention during the pendency of his removal case,

without the right to an individualized hearing to establish that he does not pose a risk of flight or

danger to the community.

b.     The automatic stay regulation is unconstitutional both on its face and in its

application here because it requires the indefinite detention of Mr. Vacchio during the pendency

of the appeal filed by the INS, even though the Immigration Judge has found him eligible for

bond.

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

8

2.      Grant Petitioner such other relief as the Court finds appropriate, including but not limited to reasonable attorneys' fees.

## Verification

I, Tullio, Vacchio, Petitioner, under penalty of perjury, verify that the facts as alleged herein, are true and accurate to the best of my knowledge.

Dated:  November ___, 2002.

Tullio Vacchio
Respondent


Respectfully submitted,

Dated:  November ___, 2002.

Sandra A. Strempel, Esq.
Dinse, Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT   05402-0988
802-864-5751

Dinse,
Knapp & McAndrew, P.C.
209 Battery Street
P.O. Box 988
Burlington, VT 05402-0988
(802) 864-5751

9

D. Vt. (Brattleboro)
02-CV-293
Murtha, J.

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse, Foley Square, in the City of New York, on the 5th day of Feb, two thousand and three,

PRESENT:

Hon. Dennis Jacobs,
Hon. Rosemary S. Pooler,
Hon. Sonia Sotomayor,
*Circuit Judges.*



---

TULLIO VACCHIO,

*Petitioner-Appellant,*

v.

No. 03-2004

JOHN ASHCROFT, as Attorney General; JAMES
W. ZIGLAR, as Commissioner of the Immigration
and Naturalization Service; JEAN R. OUELETTE,
as District Director of the Immigration and
Naturalization Service,

*Respondents-Appellees.*



---

Petitioner Tullio Vacchio, a lawful permanent resident alien ("LPR"), moves to be released on bail during the pendency of his appeal from the district court's denial of his habeas petition. It is ORDERED that this motion is GRANTED. We impose the following conditions for bail, to which the parties have agreed:

(1) Vacchio will post bond of $2500;
(2) Vacchio will report once a month to the Detention and
Deportation Section of the Immigration and Naturalization Service
in St. Albans, Vermont; and

-1-

(3) Vacchio will not commit any offense in violation of federal,
state, or local law while on release.

The required bond shall be paid to, and any necessary documentation regarding bail shall be filed
with, Richard P. Wasko, Clerk of Court of the United States District Court for the District of
Vermont.

The Immigration Judge ("IJ") held that Vacchio was not subject to the mandatory
detention provision in § 236(c) of the Immigration and Naturalization Act ("INA"), *codified at* 8
U.S.C. § 1226(c), on the grounds that (1) Vacchio had not been convicted of an aggravated
felony, *see Steele v. Blackman*, 236 F.3d 130, 136-37 (3d Cir. 2001); and (2) although Vacchio
did violate a state law regarding controlled substances, he was not taken into custody by the
Immigration and Naturalization Service ("INS") "when . . . released" from his criminal
incarceration, as required by § 236(c)(1). The IJ's determination as to the applicability of
§ 236(c) is on appeal to the Board of Immigration Appeals ("BIA"), but the BIA has not yet
heard that appeal, so we assume for purposes of this motion that Vacchio is not subject to
mandatory detention pursuant to § 236(c).

We have inherent authority to grant bail to a habeas petitioner being detained by
the INS. *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001). In order to do so, we must find that
(1) the petitioner raises a substantial claim for relief, and (2) "extraordinary circumstances exist[]
that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (quoting
*Iuteri v. Nardoza*, 662 F.2d 159, 161 (2d Cir. 1981)) (alteration in original).

The two elements of this test are plainly met here. Vacchio's claim on the merits
in his habeas petition involves a number of substantial constitutional and statutory issues. He
initially relies on the IJ's finding that § 236(c) does not apply where, as here, the INS failed to
take an alien into custody immediately upon the alien's release from incarceration. This
determination involves a substantial issue of statutory interpretation. Vacchio's habeas claim
also raises the argument that § 236(c) is unconstitutional as applied to LPRs like himself. This
very question has split the circuit courts and is currently under review by the Supreme Court.
*Compare Hoang v. Comfort*, 282 F.3d 1247 (10th Cir. 2002) (holding that mandatory detention
pursuant to § 236(c) violates Fifth Amendment due process and is unconstitutional as applied to
LPRs); *Kim v. Ziglar*, 276 F.3d 523 (9th Cir. 2002) (same), *cert. granted sub nom. Demore v.
Kim*, 122 S. Ct. 2696 (June 28, 2002) (No. 01-1491); *and Patel v. Zemski*, 275 F.3d 299 (3d Cir.
2001) (same); *with Parra v. Perryman*, 172 F.3d 954 (7th Cir. 1999) (holding that mandatory
detention under § 236(c) does not violate due process). *See also Welch v. Ashcroft*, 293 F.3d 213
(4th Cir. 2002) (holding that § 236(c) is unconstitutional as applied to an LPR detained for
fourteen months without a bond hearing, because such detention constituted punishment without
the benefit of a trial).

It is also clear that "extraordinary circumstances" exist that make bail necessary
pending review of the district court's denial of his habeas petition. If this Court ultimately holds,
on review of the district court's denial of Vacchio's habeas petition, that the district court was in
error, Vacchio will have been substantially harmed by his continued detention during the delay.
Vacchio's release on bond is thus necessary in order to make his habeas remedy effective.

The "automatic stay" provision, 8 C.F.R. § 3.19(i)(2), does not alter our authority
to release a habeas petitioner on bail. The automatic stay provision is an INS regulation
requiring that where a district director of the INS has determined that an alien should not be

-2-

released, any order by an IJ authorizing release is to be stayed pending INS appeal to the BIA. *See id.* This internal INS regulation neither purports to alter nor actually alters the inherent authority of this Court to grant bail to a habeas petitioner being detained by the INS. *See id.*; *Mapp*, 241 F.3d at 231.

Our rulings are without prejudice to reconsideration by the merits panel.

FOR THE COURT:
Roseann B. MacKechnie, Clerk

By: _Lucille Carr_

Roseann B. Mackechnie, Clerk

By _Lislane Phillip_
Deputy Clerk

Date: _2/5/03_ A True Copy

Petitioner's Appendix Page 225