# EXHIBIT "12"

### PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION
### FOR PRELIMINARY INJUNCTION

*Transcript of June 5, 2025 Motion Hearing*

```
 1                   IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
 2                             DALLAS DIVISION


 3

     LEQAA KORDIA,                      )
 4            PETITIONER,               )
                                        )
 5   VS.                                ) No. 3:25-CV-1072-L-BT
                                        )
 6   KRISTI NOEM, et al.,               )
              RESPONDENTS.              )
 7   _____)

 8

 9

10                       TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE REBECCA RUTHERFORD
11                   UNITED STATES MAGISTRATE JUDGE
                             JUNE 5, 2025
12                           DALLAS, TEXAS

13

14   A P P E A R A N C E S:

15   FOR THE PETITIONER:

16       CHARLES S SIEGEL
         WATERS & KRAUS LLP
17       3141 Hood Street
         Suite 700
18       Dallas, Texas 75219
         siegel@waterskraus.com
19       (214) 357-6244

20       CAITLYN E SILHAN
         WATERS & KRAUS LLP
21       3141 Hood Street
         Suite 700
22       Dallas, Texas 75219
         csilhan@waterskraus.com
23       (214) 357-6244

24
     (APPEARANCES CONTINUED ON NEXT PAGE)
25
```

```
 1      GOLNAZ FAKHIMI
        MUSLIM ADVOCATES
 2      1032 15th Street NW
        Unit 362
 3      Washington, DC 20005
        golnaz@muslimadvocates.org
 4      (202) 655-2969

 5      SABRINE MOHAMAD
        THE SOUTHERN POVERTY LAW CENTER
 6      PO Box 57089
        New Orleans, LA 70157
 7      (504) 418-9877

 8      TRAVIS WALKER FIFE
        TEXAS CIVIL RIGHTS PROJECT
 9      PO Box 1108
        Unit 362
10      Houston, TX 77251
        travis@texascivilrightsproject.org
11      (817) 991-4607

12

    FOR THE RESPONDENTS:
13
        BRIAN WALTERS STOLTZ
14      UNITED STATES ATTORNEY'S OFFICE
        NORTHERN DISTRICT OF TEXAS
15      1100 Commerce Street
        Third Floor
16      Dallas, TX  75242
        (214) 659-8626
17      brian.stoltz@usdoj.gov

18


19

    COURT REPORTER:
20
        MS. RACHEL BRAUN, RPR, CRR, CRC
21      United States Court Reporter
        1100 Commerce Street
22      Room 1315
        Dallas, Texas 75242
23      Rachel_braun@txnd.uscourts.gov

24
             Proceedings reported by mechanical stenography and
25      transcript produced by computer.
```

```
1                    (PROCEEDINGS BEGAN AT 10:05 AM.)

2                    THE COURT SECURITY OFFICER:  All rise.

3                    THE COURT:  Good morning.  Please have a seat.

4        All right.

5                    We are going to go on the record in

6        Kordia versus Noem, et al.  It is Northern District of Texas

7        Case 3:25-CV-1072-L-BT.

8                    Who is here for the Petitioner?

9                    MR. SIEGEL:  Your Honor, Charles Siegel with my

10       partner Caitlyn Silhan from Waters and Kraus here for the

11       Petitioner, and Travis Fife from Austin, Sabrine Mohamad from

12       New Orleans, and Golnaz Fakhimi from New York, will be

13       presenting argument.

14                   THE COURT:  Very well.  All three of you will

15       argue?

16                   MR. FIFE:  Just me, Your Honor.  Travis Fife from

17       the Texas Civil Rights Project.

18                   THE COURT:  Thank you.

19                   And for Respondent?

20                   MR. STOLTZ:  Brian Stoltz, Your Honor, on behalf

21       of the Respondents.

22                   THE COURT:  All right.  Thank you very much.

23                   I'm listening.

24                   MR. FIFE:  Your Honor, before we begin today, we

25       just had a couple of procedural housekeeping issues we'd like
```

```
 1    to take care of at the start, if that's all right with Your

 2    Honor.

 3            THE COURT:  Well, let's see what they are.

 4            MR. FIFE:  The first issue was just that, as the

 5    Court ordered, Ms. Kordia is listening from Prairieland

 6    Detention Facility.  We had two attorneys go there this

 7    morning to be with her, and we just wanted to identify that

 8    they emailed facility staff last night saying that they would

 9    be there.  And I had the chance to confer with opposing

10    counsel quickly before we went on the record today, and it

11    sounds like, from their perspective, there's nothing they can

12    do.  But we just wanted to put that on the record that the

13    two attorneys were denied access to Prairieland.

14            THE COURT:  So, I have -- I'm not sure what

15    you're asking me.  You just want to make a record of that?

16            MR. FIFE:  Yes, Your Honor.

17            THE COURT:  All right.

18            MR. FIFE:  It sounds like -- and correct me if

19    I'm wrong -- but there's nothing to be done right now, and

20    we're prepared to move forward.

21            THE COURT:  Are you asking me to try to do

22    something?

23            MR. FIFE:  No, Your Honor.  We are, like you

24    said, we are just making a record of it.

25            THE COURT:  Okay.
```

1          MR. FIFE:  The second quick procedural issue is,

2    again, just to confirm for subsequent proceedings of the

3    record on the Preliminary Injunction, we would move to admit

4    both parties' Appendices for the purposes of the Preliminary

5    Injunction.  Again, I conferred with opposing counsel, and it

6    sounds like there's no objection from them.  And, again, this

7    is just doing our due diligence.

8          THE COURT:  All right.  Is that the totality of

9    the evidence that the Petitioner will be presenting is

10   included in the Appendix?

11         MR. FIFE:  Yes, Your Honor.  And the Verified

12   Petition.

13         THE COURT:  And, for the Government, is the

14   entirety of the evidence that you want before the Court

15   included in the Appendix?

16         MR. STOLTZ:  Yes, Your Honor.

17         THE COURT:  Is that all?

18         MR. FIFE:  Yes, Your Honor.

19         THE COURT:  Okay.  I will request, since we are

20   livestreaming these proceedings, that you make your argument

21   from the podium because I think that that offers the

22   equipment the best opportunity to pick up the sound.

23         MR. FIFE:  Thank you, Your Honor.

24         Again, my name is Travis Fife from the Texas

25   Civil Rights Project representing Ms. Leqaa Kordia.

1              I'd like to make three points today:

2              Number one, this Court has jurisdiction and the

3    authority to grant the Preliminary Injunction Ordering

4    Release that we're here today to discuss.

5              Number two, Ms. Kordia has demonstrated a

6    substantial likelihood on the merits warranting interim

7    release.

8              Number three, the equities of this case present

9    extraordinary circumstances that demand immediate injunctive

10   relief to rectify irreparable harm.

11             But before I turn to the merits of the argument

12   before Your Honor, I'd like to just briefly introduce

13   Ms. Kordia.

14             Ms. Kordia is a 32-year-old Palestinian woman and

15   practicing Muslim.  Since 2016 when she lawfully entered the

16   United States, she's lived among family, close friends, and

17   her community.  We also have five family members here who

18   made the journey in a show of support for Ms. Kordia,

19   including her mother who she would live with if she were

20   released through this motion.

21             But today, Ms. Kordia is confined 1,500 miles

22   from home at the Prairieland Detention Facility because the

23   President disagrees with her support for Palestinian rights.

24   We know this through uncontested record evidence at

25   Petitioner's Exhibit 1-A through 1-I.  That includes a

1    statement from the campaign trail where then-candidate Donald

2    Trump said he sought to set the movement for Palestinian

3    rights back, quote, 25 to 30 years.  It includes Executive

4    Orders that authorize the Department of Homeland Security and

5    other immigration officers to investigate, arrest, and

6    detain, and attempt to deport non-citizens who demonstrated

7    in support of Palestinian rights.

8             And, of course, it includes two press releases

9    from DHS themselves naming Ms. Kordia and identifying her

10   support for Palestinian rights.

11            And, if the Court needed any more confirmation,

12   just two weeks ago, the Department of Justice filed a brief

13   in the Mahmoud Khalil case stating that Ms. Kordia's

14   confinement was, quote, related to the Israel-Palestine

15   conflict.

16            This case also presents extraordinary

17   circumstances.  As I said, Ms. Kordia is a practicing Muslim,

18   and since she's been confined, she has not had a single Halal

19   meal, and the conditions in the facility are so disgusting

20   that she feels unworthy of God and unable to pray.  What's

21   more, tonight, as she has for much of the last two and a half

22   months, she will sleep on the ground surrounded by

23   cockroaches and other bugs and wake up tomorrow morning

24   without the necessary requirements for her to practice her

25   faith.

 1          Now, first on jurisdiction.  This case falls
 2     squarely within the Court's core habeas jurisdiction under
 3     28 U.S.C. Section 2241.  In Respondents' view, what would
 4     otherwise be within the core of this Court's habeas
 5     jurisdiction, the INA strips this Court's jurisdiction
 6     because Section 1226(a), the statute allegedly authorizing
 7     Ms. Kordia's detention, uses the word "may."
 8          On their view, this "may" grants them unlimited
 9     discretion to detain people for whatever reason, whether that
10     be their protected speech, their religion, or the color of
11     their skin.
12          On their view, Sections 1226(e) and
13     1252(a)(2)(B), little Roman Numeral two, (ii), strip this
14     Court's jurisdiction because any detention decision they make
15     is discretionary.  That view is wrong and foreclosed by over
16     20 years of Supreme Court and Fifth Circuit precedent.
17          The first case that rejects their argument is
18     *Zadvydas*, which we cite in both our opening brief and reply
19     brief.  There in *Zadvydas*, the Government made exactly the
20     same argument, which is that Section 1231(a)(6), another
21     immigration detention statute, used the word "may," so the
22     prolonged confinement of people under Section 1231(a)(6) was
23     discretionary, and the Supreme Court lacked jurisdiction.
24     The Supreme Court rejected that argument and recognized that
25     where the habeas claim challenges the constitutional limits

1     of the Government's detention power, that that is not

2     discretionary because the Government lacks the discretion to

3     exceed its constitutional limitations.

4          Ms. Kordia's claims operate exactly the same way.

5     Her argument is not that Respondents have made an unwise or

6     unreasonable decision, but rather that they have exceeded the

7     constitutional limits of their power by using whatever

8     discretion they have under Section 1226(a) to suppress

9     protected activity, which violates the First Amendment, and

10    they don't have discretion to do.

11         The Supreme Court reiterated this view of habeas

12    jurisdiction in *Jennings versus Rodriguez*, which concerns

13    Section 1226(e).  There, a putative class of Petitioners,

14    including those detained under Section 1226(a), challenge the

15    Government's ability to detain them indefinitely without

16    periodic every-six-month bond hearings.  Again, the

17    Government said Section 1226(e) precludes the Court's review

18    because prolonged detention is discretionary.

19         The plurality of the Supreme Court said, similar

20    to *Zadvydas*, no, these Petitioners are challenging not your

21    exercise of lawful discretion, but rather the statutory

22    limits on your detention power in the first place, which

23    isn't discretionary because the Government lacks the

24    discretion to exceed the statutory or constitutional limits

25    of its power.

1          The last case that makes the jurisdictional

2     dispute open and shut in favor of Ms. Kordia is *Najera versus*

3     *United States*, which is the 2019 Fifth Circuit case we cite

4     in our reply brief.  There, the Plaintiff brought a false

5     arrest claim against the Government on the view that because

6     he had temporary protected status, his confinement was

7     illegal.

8          Once again, the Government's arguments in *Najera*

9     exactly match the Respondents' argument here, which is that

10    our decision to detain that person under Section 1226(a) is

11    discretionary.  The Fifth Circuit, in a unanimous panel

12    decision, said 1226(e) does not foreclose jurisdiction

13    because the Petitioner's challenge go to the statutory limits

14    of the Government's detention power.

15         Again, Ms. Kordia's claims here fall exactly

16    within that line of cases, which say, because she challenges

17    not the individual decision of the immigration judge or the

18    DHS officers that arrested her, but rather the constitutional

19    limits of Respondents' power.

20         Now, in large part, Respondents stake their

21    jurisdictional arguments on a 2000 case, *Loa-Herrera*.  As we

22    pointed out in our reply brief, that case predates not only

23    *Zadvydas*, *Jennings*, and *Najera*, but also other cases, *Demore*,

24    which we cite in our brief, and *Nielsen versus Preap,* which

25    is a 2019 decision reaching the same jurisdictional

1    conclusions that we've urged Your Honor to draw here today

2    and in the papers.

3            But I want to make an additional point than what

4    we raise in our briefs today, which is that their broad

5    reading of *Loa-Herrera* -- not even the own district court

6    cases that they rely on -- adopted such a broad view as

7    Respondents have.

8            In *Maramba*, for example -- that's the Judge

9    Stickney opinion that Respondents cite in their brief, and we

10   also identify as supporting our review in our reply -- in

11   *Maramba*, Judge Stickney was faced with two claims.  The first

12   was that the Petitioner had challenged the amount of bond the

13   immigration judge set because it was unaffordable for the

14   Petitioner.  I think it was about a hundred thousand dollars.

15   The second claim was that his detention under Section 1226(a)

16   exceeded constitutional limitations.

17           Judge Stickney recognized the holding in

18   *Loa-Herrera*, but narrowed it to only preclude the

19   discretionary bond decision; meaning, that a habeas court

20   cannot question the bond an immigration judge set or the way

21   that an immigration judge weighed the evidence.  But as to

22   the challenge under the Due Process Clause of prolonged

23   Section 1226(a) confinement, Judge Stickney exercised

24   jurisdiction and reached the merits of that claim.

25           The last point I'd make on jurisdiction is where

```
 1    I started, which is that on the Government's view, the
 2    Respondents can detain someone for any reason whatsoever
 3    regardless if they have a constitutional purpose, regardless
 4    of if it's in retaliation for speech, or regardless if it's
 5    based on the color of their skin.  The Supreme Court, since
 6    INS versus St. Cyr, through Jennings, has consistently
 7    instructed courts to reject such broad readings of the INA's
 8    jurisdiction stripping provisions because doing so would
 9    foreclose any avenue of judicial relief for Petitioners like
10    Ms. Kordia who present colorable constitutional claims.
11            And, if we just get really practical with what
12    Respondents' view would do, it would mean that there is no
13    forum to present Ms. Kordia's constitutional claims because
14    they've conceded that the IJ and the BIA in the agency
15    proceedings don't have jurisdiction to hear the
16    constitutional claims that are currently before the Court.
17    And, similarly, there's no meaningful Fifth Circuit review
18    because the INA -- the INA makes you go to the Fifth Circuit
19    at the end once you have a final order of removal.
20            And, so at that point Ms. Kordia would've already
21    had to suffer the prolonged unconstitutional confinement.
22    And, so, it wouldn't rectify the unconstitutional injuries.
23            Fifth Circuit review on a petition for review
24    also wouldn't be meaningful because, under Section 1252(a),
25    the Fifth Circuit is bound by the record developed in the
```

```
 1    immigration proceedings.  But, as Respondents recognize, at

 2    Page 10 to 11 of their brief, the bond proceedings; meaning,

 3    the proceedings that go to why and whether she should be

 4    confined, are totally separate from the removal proceedings.

 5             And, so if she were to bring her claims on a

 6    petition for review to the Fifth Circuit at the end of her

 7    immigration proceedings, there wouldn't be a record for the

 8    Fifth Circuit to review, and even if there were, they're not

 9    allowed to resolve fact disputes.

10             THE COURT:  But, I thought you told me you

11    weren't seeking judicial review of the bond determination.

12             MR. FIFE:  That's right, Your Honor.  And I'm

13    sorry if my explanation of that process caused confusion.

14             To be absolutely clear, nothing in this case

15    challenges the discretionary decision of the immigration

16    judge or her removal proceedings.  The only thing I meant was

17    about, if on Respondents' view, the only way we could seek

18    federal court review was at the end of the case that there

19    would be no record of why she was detained.

20             And, so my point was just to why the Fifth

21    Circuit -- why a petition for review to the Fifth Circuit

22    would not be meaningful judicial review for the

23    constitutional claims.

24             But, yes, Your Honor is absolutely correct.

25             And, so because, both as a legal matter and just
```

1    a practical matter, Respondents' view would foreclose any

2    judicial review of Ms. Kordia's constitutional claims.  It

3    would trigger all of the concerns that we identify in our

4    reply brief in terms of suspending the Writ of Habeas Corpus,

5    which, at its historical core, is to test the legality of

6    executive detention.

7              I'm happy to answer any further questions on

8    jurisdiction, but I'd also like to address this Court's

9    authority to issue the relief we seek, which I don't think

10   was really addressed in Respondents' brief, which is the

11   power of this Court sitting in habeas jurisdiction to issue

12   either a Preliminary Injunction Ordering Release or to, in

13   this Court's inherent equitable authority, ordering release

14   pending bail.

15             And the way that we think about the motion before

16   the Court is that it offers two sources -- is that our

17   opening brief offers two sources of authority for the Court

18   to order release on bail.

19             The first is Rule 65 of the Federal Rules of

20   Civil Procedure, which is the Ordinary Preliminary Injunction

21   factors: the likelihood of success on the merits, the

22   irreparable harm, and the equities, which, in this case,

23   merge because the Government is the opposing party; meaning,

24   is a Preliminary Injunction in the public interest.

25             The second source of authority is what the Fifth

```
1   Circuit identified in the Calley case we cite in both our
2   briefs, which says that, as incidental to this Court's habeas
3   jurisdiction, a habeas court also has the power to release a
4   Petitioner on bail if they demonstrate substantial claims
5   likely to succeed on the merits and extraordinary
6   circumstances.
7           Now, an important point about the Calley
8   framework is that it developed in the post-conviction
9   context; meaning, a post-conviction habeas Petitioner is
10  asking the Court to overrule what had already been full-blown
11  proceedings.  So, in Calley, for example, it was
12  post-conviction from a military tribunal where the Petitioner
13  had already had full-blown due process and a conviction on
14  the merits.
15          Here, though, immigration confinement is really
16  one of one in the sense that there is no judicial branch of
17  government that can check the Executive's decision and the
18  basis for continued confinement.
19          And, so we think that in this particular context,
20  the Preliminary Injunction factors and the substantial claims
21  and extraordinary circumstances wouldn't really make a
22  practical difference to the disposition of this case or the
23  weighing of the equities.  And that's because, at its core,
24  the Calley framework is really about is there some sort of
25  irreparable harm over and above the ordinary incidents of
```

1    incarceration that make this Court acting fast -- or that

2    make this Court's action necessary to prevent irreparable

3    harm.

4              And, as I'll get to in a moment, we think we've

5    presented those irreparable injuries and spades, and under

6    either Rule 65 of the Rules of Civil Procedure or the *Calley*

7    framework, that this Court has inherent authority to grant

8    the Preliminary Injunction and order release.

9              THE COURT:  All right.  Is that the only relief

10   you are requesting in the context of this Preliminary

11   Injunction?

12             MR. FIFE:  Yes, Your Honor.  Actually, I should

13   clarify.  As part of that relief, we're also requesting that

14   the Court require a Pre-Deprivation hearing and notice prior

15   to any attempt to re-confine Ms. Kordia.  And that is just to

16   protect the Court's jurisdiction as well as protect

17   Ms. Kordia's rights in the event that Respondents

18   post-Preliminary Injunction sought to re-detain her.

19             THE COURT:  And what is the extent of that order,

20   in your mind; that she cannot be detained in any

21   circumstance?

22             MR. FIFE:  No, absolutely not, Your Honor.

23   Our --

24             THE COURT:  Just with respect to -- well, you

25   tell me.

```
1              MR. FIFE:  Of course.
2              So, the order that we -- and this is in the
3   proposed order we submitted at Docket 13 -- but our vision
4   -- or request, rather, is that if circumstances change and
5   Respondents seek to re-confine Ms. Kordia, that they provide
6   this Court and counsel, at a minimum, notice.  And then,
7   within 48 hours, or however, we're willing to move as quickly
8   as possible, that the Court can then decide whether, okay,
9   are these reasons in furtherance of the unconstitutional
10  confinement, or do they have a bona fide legitimate
11  reason/change in circumstances that justifies re-confining
12  her?
13             And I'll just say that the other cases that we've
14  identified at the top of our reply brief have issued a
15  similar order as well.  And the reason for that is that, as
16  the Court is aware, our client has been retaliated against
17  for her protected speech.  And even in the bond proceedings,
18  their basis for detention is that she attended a protest, and
19  equating that with dangerousness.  And, so we would like some
20  sort of judicial review prior to her re-detention to --
21             THE COURT:  Go ahead.  Finish saying it out loud.
22             MR. FIFE:  No.  Well, I think that that is just
23  incidental to this Court's jurisdiction in terms of, if
24  Respondents have confined her for an unconstitutional reason,
25  and then they want to re-confine her, then they should have
```

1    to show their work to make sure that they're not perpetuating

2    that same unconstitutional basis for confinement.

3              And I will, of course, say that, if I can't

4    convince Your Honor on the Pre-Deprivation hearing, then, of

5    course, our client would request relief, and the

6    Pre-Deprivation hearing we were just discussing is in no way

7    necessary to granting the rest of the Preliminary Injunction,

8    which is just simple release, which is exactly what habeas

9    has historically for centuries been designed to do.

10             THE COURT:  Okay.  And, so you are seeking

11   release under Rule 65 and under the *Calley* framework?

12             MR. FIFE:  Yes, Your Honor.

13             And the other -- and I think if Your Honor has

14   hesitations in terms of the Pre-Deprivation hearing, we

15   would, of course -- we think that simple release can stand

16   alone.  It's not bound up with the notice and opportunity to

17   be heard.

18             THE COURT:  Okay.  I may have questions, but I

19   want both sides to go through their whole presentation,

20   because you may answer my questions during the course of your

21   presentation.

22             MR. FIFE:  And, so if I could quickly just turn

23   to the merits and the equities.  I understand Your Honor has

24   read the briefs, and, so I will do my best not to repeat

25   myself.

```
 1              THE COURT:  So, let me -- I'm less worried about
 2     you repeating yourselves.  I have infinite patience.  You
 3     need to make your record.  Both sides are aware that all I'm
 4     making is a recommendation.  Judge Lindsay will review
 5     whatever is in the record.  A lot of his determination will
 6     be de novo.  So if it is not in the record, it's not before
 7     Judge Lindsay, who has the authority to enter any order on
 8     your motion.  So, don't worry about boring me or repeating
 9     yourself.  You should be more concerned with making sure it's
10     in the record.
11              MR. FIFE:  Of course, Your Honor.  And we really
12     appreciate what you called patience.  Thank you.
13              So, turning to the merits, then.  We think the
14     most straightforward way to resolve this case on the merits
15     is the First Amendment retaliation claim.  Respondents in
16     their response did not contest the operative legal framework
17     or the volume of evidence that we've provided at Petitioner's
18     Exhibit 1-A through 1-I demonstrating retaliatory animus
19     towards those who advocate in support of Palestinian rights.
20              They also did not contest the declarations of the
21     immigration practitioners we submitted demonstrating just how
22     extraordinary Ms. Kordia's confinement is.  Nor did they
23     contest that the bond proceedings themselves reflected
24     viewpoint discriminatory animus in violation of the First
25     Amendment.
```

1          Thus, under the *Mt. healthy* framework that

2     provides the operative and controlling First Amendment

3     retaliation test, the burden shifted to the Government to

4     demonstrate that, irrespective of the protected activity,

5     they still would've taken the same -- they still would've

6     taken the same action; meaning, confining her.

7          Now, they did not submit any evidence to meet

8     that burden.  Instead, they made one conclusory assertion:

9     they had reason to believe she was removable.

10         But the Supreme Court, in a unanimous decision in

11    2024, rejected exactly that type of argument.  And we make

12    this point in our brief, but the point I really want to

13    stress, is that in *National Rifle Association versus Vullo*,

14    the Supreme Court considered retaliatory civil enforcement of

15    New York insurance law.  And there the record before the

16    Supreme Court was that the New York insurance regulator was

17    pursuing, quote, conceded illegality; meaning, there was no

18    dispute that the NRA and the insurance providers were

19    operating illegal insurance agreements.

20         And the Supreme Court unanimously said that even

21    where you have, quote, conceded illegality, that the

22    Government can't pursue civil enforcement in retaliation for

23    speech and to suppress speech.  We think that *Vullo* controls

24    and forecloses their arguments.

25         Now, I understand that they do quote the *AADC*

1    case, *Reno versus American-Arab Anti-Discrimination*

2    *Committee* -- I'll refer to it as *AADC* because it's a mouthful

3    -- and we think that *AADC* is plainly distinguishable.  It

4    arose in a different context.  It was a jurisdictional

5    holding, not a constitutional one.  And, more importantly,

6    Ms. Kordia doesn't assert a selective enforcement defense to

7    deportation.

8            The interest the Supreme Court identified in

9    removing non-citizens from the country doesn't apply to

10   confinement -- or to this habeas petition, because nothing in

11   Ms. Kordia's habeas petition challenges the removal

12   proceedings.  No matter what this Court recommends, and Judge

13   Lindsay ultimately decides, the removal proceedings will be

14   ongoing and unaffected by these habeas proceedings.  But,

15   again, we think that, in the context of retaliatory

16   confinement and civil enforcement, that *Vullo* provides the

17   more appropriate framework for assessing our arguments.

18           The last thing I would say on *AADC* is that, even

19   if there would otherwise be a lawful basis to confine

20   Ms. Kordia, they have not contested Petitioner's Exhibits 3

21   through 6 and 10, which are the declarations of immigration

22   practitioners with over a hundred years of collective

23   experience representing thousands of non-citizens in bond and

24   removal proceedings where the practitioners testified to the

25   fact that this is extraordinarily rare.

1          Number one, for them to transfer Ms. Kordia in

2    violation of their own policy that we attach at Petitioner's

3    Exhibit 9.

4          Number two is to confine a visa overstay case for

5    any meaningful amount of time.

6          And, number three is the invocation of the

7    automatic stay, which, as Petitioner's Exhibit 6 identifies,

8    it's a declaration from Jodi Goodwin, who the only examples

9    in her over 20 years of experience that she has had DHS

10   invoke the automatic stay were individuals accused of very,

11   very serious criminal wrongdoing.  But, of course, before the

12   Court, Ms. Kordia has no criminal history, and DHS

13   themselves, at Petitioner's Appendix 72 to 73, rated

14   Ms. Kordia low risk across the board.

15         Now, the point of bringing up these diversions

16   from policy isn't to have the Court question the wisdom or

17   judgment of each one of those things, but rather under the

18   First Amendment retaliation framework, the unusualness of

19   their enforcement actions against Ms. Kordia and the rareness

20   with which they exercise all of these options is significant

21   evidence in support of the retaliatory animus that

22   Respondents have towards Ms. Kordia and others who protest

23   and support Palestinian rights.

24         Now, the -- and if the Court has no questions on

25   the First Amendment claim, I'll move to substantive due

1    process, which we think that that claim is likely to succeed

2    on the merits under *Zadvydas*.

3              As we identify in our brief, *Zadvydas* says that,

4    in the context of civil immigration confinement, that the

5    Government cannot use that civil confinement as punishment;

6    it has to serve an adequate regulatory purpose.  And here,

7    Respondents have made no attempt to explain the basis for the

8    detention and what adequate regulatory purpose confinement

9    serves.

10             Under *Zadvydas*, using confinement as punishment

11   for protected activity is a straightforward violation of the

12   substantive Due Process Clause of the Fifth Amendment, and

13   Ms. Kordia is likely to succeed on that claim.

14             In terms of the other argument that Respondents

15   raise in response to the substantive due process and First

16   Amendment claims is exhaustion; meaning, that Ms. Kordia has

17   to go through the complete administrative process in order to

18   have this Court adjudicate her claims.  That is

19   straightforwardly wrong.  We identify in our briefs that,

20   number one, Ms. Kordia can't bring these claims in that

21   administrative process.  And the Fifth Circuit, in a variety

22   of contexts, has held that where the administrative agency

23   has no authority or jurisdiction to hear the claim, then you

24   don't have to exhaust, because there's nothing to exhaust;

25   the agency can't remedy the constitutional violation.

1        And the only other point I'd make today that we

2   didn't raise in our briefs is we cite the *McCarthy versus*

3   *Madigan* case, which is a Supreme Court case on exhaustion

4   from 1992.  There, the Supreme Court identified three

5   circumstances in which exhaustion is not necessary:

6        Number one, if the Plaintiff or Petitioner will

7   suffer irreparable harm waiting to exhaust.  Number two,

8   whether the agency can grant effective relief.  And, number

9   three, whether the agency has predetermined the issue before

10  it.

11       All three of these weigh in favor of rejecting

12  Respondents' exhaustion argument.

13       As we have explained in our brief, each day

14  Ms. Kordia is confined, she faces irreparable harm.

15       Number two, again, what I just said, the agency

16  has no power to address these constitutional issues.

17       And, lastly, number three, the agency doesn't

18  even -- her confinement is predetermined in the sense that

19  it's DHS's unilateral authority, under the automatic stay

20  provision, to keep her confined.  And there is no process by

21  which she could challenge her current confinement.

22       And, so we think that, for the reasons we stated

23  in our brief and the lessons and principles in *McCarthy*

24  *versus Madigan,* that imposing an exhaustion requirement is

25  clearly inappropriate here, and the Court should reject their

1    argument.

2            The last merits claim I'd like to address is our

3    procedural due process claim.  And, first, I'd -- which --

4    and Ms. Kordia's likely to succeed on the merits of that

5    claim because the invocation of the automatic stay offers

6    literally no procedures by which Ms. Kordia can contest her

7    confinement during the automatic stay period.  Respondents

8    have identified other procedural safeguards within

9    immigration bond proceedings, but they have not contested at

10   all the fact that there are no procedures during the

11   automatic stay provision.

12           And consider how the automatic stay provision

13   works in practice.  So, when a non-citizen is initially

14   arrested by DHS, they'll make a custody determination, at

15   which point Ms. Kordia and other non-citizens have a right to

16   seek a custody redetermination hearing.

17           Ms. Kordia exercised that right, and an

18   immigration judge promptly held that hearing.  She requested

19   the redetermination on March 27th and was before the

20   immigration judge on April 3rd at the bond hearing.  And

21   there, both DHS and Ms. Kordia can present evidence, call

22   witnesses, cross-examine witnesses, and make arguments to the

23   Court, at which point the Court makes an individualized

24   determination.

25           But what the automatic stay does is it perverts

1   that process by allowing the same person that was trying to

2   confine Ms. Kordia at the immigration hearing to file a

3   single slip of paper and prevent the immigration judge's

4   order from going into effect.  And then all they have to do

5   after that is file a Notice of Appeal.

6          And that's what DHS did here.  They had to make

7   no showing on the merits.  There's no judge that considers

8   the propriety of an automatic stay.  And what's more is that

9   DHS also has the unilateral authority to continue to extend

10  that automatic stay provision.  So, even if a couple weeks

11  from now the BIA affirms the immigration judge's order, they

12  can extend that automatic stay provision even further by

13  referring the case to the Attorney General, who would make

14  the ultimate determination.

15         Two court -- two different district judges in

16  Minnesota, within the last month, have considered the exact

17  arguments I'm making here today and have found that in the

18  particular case -- in the cases before them, that the

19  automatic stay provision, to quote Mohammed H., "operates by

20  fiat."  It allows the prosecutor to make the detention

21  decision, therefore undermining the custody redetermination

22  process.

23         Under *Mathews v. Eldridge*, this process is

24  unconstitutional.  Number one, Ms. Kordia has, as the Court

25  recognized in *Zadvydas*, a substantial private interest in

1    remaining free from detention and back with her family.

2    Number two, not even the Government contests that the

3    automatic stay provision has a high risk of erroneous

4    deprivation because there is no neutral arbiter who decides

5    on the proprietary of this stay, and there is no check other

6    than the prosecutor's own judgment.  Lastly, they have

7    conceded that the burden on the Government in just seeking a

8    discretionary stay would be low.

9            I'd point the Court to Petitioner's Exhibit 10,

10   which is the declaration of Kerry Doyle.  She was a formal

11   Principal Legal Advisor for I.C.E., and attested to the fact

12   that it's not that burdensome for DHS to just seek a

13   discretionary stay where at least Ms. Kordia and others like

14   her would have the opportunity to be heard at the BIA, and

15   the BIA can decide those stays very quickly in an expedited

16   fashion.  And, so invalidating the automatic stay in this

17   case would impose no substantial burden on DHS.

18           Lastly, I'd like to turn to the equities.  On the

19   equities and extraordinary circumstances, the touchstone for

20   this Court is whether there is irreparable injury that will

21   occur in the interim between now and a final judgment on the

22   merits.

23           We have identified three irreparable injuries

24   that, together, both warrant a preliminary injunction and

25   constitute extraordinary circumstances under *Calley:*

```
 1              Number one, as the Government has -- as

 2    Respondents have utilized the immigration process to suppress

 3    speech with which they disagree, this has caused a chilling

 4    effect not only on Ms. Kordia, who is literally confined for

 5    her speech, but has also sent a message across the country to

 6    millions of people who take to the streets each year, that

 7    this Administration can and will use any tool at their

 8    disposal to suppress disfavored speech.

 9              Now, it is uncontested that in the Fifth Circuit

10    a First Amendment injury like this not only constitutes

11    irreparable harm, but safeguarding the First Amendment rights

12    of Ms. Kordia and countless others also serves the public

13    interest.

14              Second, is the religious liberty violations we

15    have identified.  Again, as Ms. Kordia has for the last two

16    and a half months, she will be continued to be deprived Halal

17    food, and she will continue to sleep on the floor surrounded

18    by bugs and other insects, while she feels so dirty that she

19    feels unworthy of God and unable to pray.

20              The Fifth Circuit in the *Navy SEALs 1-26* case

21    recognize that even where the Government asserts a more

22    substantial interest than Respondents have asserted here,

23    that rectifying violations of religious liberty prevents

24    irreparable harm and is in the public interest.  The same is

25    true here, and a court decision preventing that harm both
```

1    prevents Ms. Kordia's irreparable harm and is in the public

2    interest.

3              Lastly, on the equities, is Ms. Kordia's health.

4    As the Court is aware, because of the lack of Halal food and

5    the dirty conditions, she feels dizzy, has constant

6    headaches, colds, sore throats, and at one point even fainted

7    in the shower.  As both *Calley* and the ordinary preliminary

8    injunction tests identify, those are irreparable injuries

9    that require immediate relief from this Court.

10             On the other side of the ledger, the Government

11   asserts two interests: number one, they have an interest in

12   immigration enforcement, and, number two, they have an

13   interest in confining non-citizens who are removable.

14             The most important point to both of these

15   interests is, as I said before, no matter what this Court

16   decides, and no matter what Judge Lindsay ultimately decides,

17   her removal proceedings will remain ongoing.  We are, of

18   course, confident in our defenses in that removal

19   proceedings, but none of that is before the Court.  And, so

20   an injunction would not affect those interests because they

21   could continue immigration the same removal proceedings

22   against Ms. Kordia that they have been going on since

23   March 13th.

24             Further, it's black letter law that an agency has

25   no lawful interest in violating the law.  And, so, if this

1    Court finds that Ms. Kordia is likely to succeed on the

2    merits, then the Government has no interest in perpetuating

3    unlawful confinement, and it's in the public interest for a

4    court to remedy that unlawful agency action.

5            Over the last month, six different courts in

6    three different circuits have seen a similar factual record

7    and similar arguments in the equities, and they have all

8    released the Petitioner on bail, because they recognize that

9    when the Government confines someone, they cannot use their

10   considerable power to suppress a disfavored viewpoint.  That

11   is exactly what Respondents are doing here by keeping

12   Ms. Kordia confined 1,500 miles from home, in violation of

13   their own process.

14           And, to be frank, Your Honor, Respondents in

15   particular, DHS, have told us why Ms. Kordia's confined and

16   why they arrested her, which is that she attended a protest

17   in support of Palestinian rights on April 30th, 2024.  The

18   Government apparently disagrees with the viewpoint she

19   expressed, but, nonetheless, she has the First Amendment

20   right to say it.

21           This Court should affirm Ms. Kordia's First and

22   Fifth Amendment rights and recommend granting the Motion for

23   Preliminary Injunction.

24           Thank you.

25           MR. STOLTZ:  May it please the Court.

```
 1              I think, conceptually, it's helpful to think of

 2   the claims in this case as fallen into sort of two groups.

 3   And that's how I'm going to present our argument today.

 4              The first such group relates to claims to the

 5   extent they're challenging the fact that the Petitioner is

 6   currently defined.  So there is a challenge to the decision

 7   that has been made thus far.  We don't have a final

 8   administrative decision, but there is a challenge to the

 9   decision that's been made thus far to detain her.  And

10   whether that's considered a First Amendment issue or

11   substantive due process, it's basically the same genre of

12   claim that she's being detained and they're challenging that

13   decision.  So that's sort of the first thing.

14              The second thing is a procedural issue, a

15   procedural due process issue relating to the automatic stay

16   provision in the immigration proceedings.  That's the

17   provision that allows DHS to appeal the immigration judge's

18   decision and to keep Ms. Kordia in detention for a 90-day

19   period pending further review.  So that's sort of the second

20   thing, procedural due process.

21              And I'm going to explain why, in the Government's

22   view, both sets of claims fail for slightly different

23   reasons, and she's not entitled to a preliminary injunction

24   on either.

25              So, first, relating to the decision to detain
```

```
1   her.  The Supreme Court has made clear, for example in the
2   Demore case, that detention during removal proceedings is a
3   constitutionally valid part of the process.  That's what the
4   Supreme Court has said.  Detention during removal proceedings
5   is a constitutionally valid part of the process.  So that's
6   sort of the backdrop.
7                And then there are several statutory provisions
8   that I'm going to go through that, in fine detail, talk about
9   this detention issue.
10               The first of those is 8 U.S.C. 1226(a).  That's
11  the statute that authorizes the Attorney General to arrest
12  and detain an alien -- and that's what the statute says,
13  "an alien" -- pending a decision on whether to remove them.
14  And that statute says that the alien of the Attorney General
15  may continue to detain the person or may release the person
16  on bond or parole.
17               Now, in that same subsection, Subsection(e) of
18  that same statute, in 1226, there's a provision that says the
19  Attorney General's discretionary judgment shall not be
20  subject to review in this regard.  No court may set aside any
21  action or decision regarding the detention of any alien or
22  the revocation or denial of bond or parole.
23               So that Section 1226(e) is very clear that
24  judicial review is not available for decisions to deny bond,
25  to deny parole.
```

1            And, finally, 8 U.S.C. 1252(a)(2)(B) is a

2    provision that was later added, I think, in the 2005 era that

3    makes clear that there is no judicial review of any

4    discretionary decision that's made by the Attorney General

5    under this group of statutes.  And that statute at

6    1252(a)(2)(B) specifically references and displaces habeas

7    jurisdiction.  So that satisfies the sort of clear statement

8    rule that the courts require in order to displace habeas

9    jurisdiction.

10           So, 1226 and 1252(a) working together, basically,

11   insulate the Attorney General's discretionary decision on a

12   bond or a detention issue from review.

13           And I also want to point out, too, that Congress

14   knows how to change that.  Very recently in a law that was

15   passed earlier this year, called the Laken Riley Act,

16   Congress actually modified 1226 to permit judicial review of

17   decisions by the Attorney General to release an alien.  So

18   there's actually a new provision in 1226(e) and (f).  They

19   changed the language of (e), and they added the provision in

20   (f) that actually permits judicial review of the

21   discretionary decision to release an alien.

22           You know, crucially, though, they did not create

23   judicial review for the opposite of that, which is a decision

24   to detain.  So I think that's very telling.

25           Now, how do these provisions work in practice?

```
1              Well, in the Fifth Circuit's Loa-Herrera case --
2    which has been discussed by Petitioner, and that we cite --
3    the Fifth Circuit was very clear that this provision in
4    1226(a) relates to the Attorney General's discretionary
5    judgment regarding the application of parole, and parole and
6    bond are the two options in the statutes other than
7    detention.  And the Fifth Circuit said, including the manner
8    in which that discretionary judgment is exercised.  And that
9    is not subject to judicial review.
10             So, for example, in the Loa-Herrera case, the
11   Fifth Circuit was already explicit that they were not going
12   to reach the merits of the Plaintiff's constitutional claims
13   because they just couldn't do it.  And the Fifth Circuit went
14   on to say, essentially, to be sure, the Executive Branch has
15   a duty and an obligation to adhere to the Constitution, but
16   that does not change the fact that there's no judicial review
17   available.  The Fifth Circuit specifically recognized that.
18             Now, Loa-Herrera was not itself a habeas case,
19   but it speaks to the fact that the Fifth Circuit is very
20   clear that this decision about whether to grant release or
21   not is a discretionary judgment.  It's a discretionary
22   decision.  And under 1252(a)(2)(B), that discretionary
23   decision is insulated from judicial review including on
24   habeas.
25             That's true in the decision from Judge Stickney
```

```
 1   and Judge Kinkeade's decision, the Maramba decision, which

 2   counsel cited.  There was no jurisdiction to review a denial

 3   of release on bond in that case.  And it's true that there

 4   was some kind of alternative discussion in that case of

 5   whether the Petitioner had a constitutional claim that

 6   indefinite detention, you know, to the extent the statute

 7   allows indefinite detention, perhaps that was

 8   constitutionally suspect.

 9            That gets into, essentially, what's a framework

10   challenge; it's a challenge to the overall framework of the

11   system rather than an individualized determination.  And, so,

12   that's different.  And I'll talk a little bit more about

13   framework challenges when we talk about the procedural due

14   process issue.

15            But the fact that a framework challenge may be

16   permissible does not mean that what they are asking for here

17   in terms of the decision to detain the Petitioner -- which is

18   an individualized bond determination; essentially, it's an

19   individualized custody determination for one specific

20   Petitioner.  Nothing in the cases that allow so-called

21   framework challenges authorizes judicial review of that

22   individualized decision.

23            And I think a little of the discussion that, you

24   know, counsel had when counsel was up here, kind of shows

25   that what they're really asking for is, essentially, a bond
```

1    determination by this Court on these specific facts, and

2    including, you know, possibly, you know, whether the person

3    should be re-detained at a later date.  But this Court is not

4    an immigration court.  This Court is not the Board of

5    Immigration Appeals.  That's not this Court's job.  And the

6    statutory framework is very clear on that.

7            So, for all those reasons, we think that there is

8    just simply no jurisdiction to review the decision to detain

9    Ms. Kordia.  And that decision is -- it's the Attorney

10   General's decision -- the Attorney General and now the

11   Secretary of Homeland Security under the split into DHS --

12   but it's, ultimately, the Attorney General's decision.

13           The Attorney General has, essentially, delegated

14   people to make that decision at different points in the

15   process.  You know, we have DHS that makes an initial

16   decision.  We have the immigration judge.  We have the Board

17   of Immigration Appeals, which is more or less the final

18   decisionmaker, unless, personally, the Attorney General

19   intervenes.  Those decisions -- any one of those decisions at

20   the time it's made is considered the decision of the Attorney

21   General, and it's a discretionary decision, and it's,

22   therefore, not subject to judicial review.

23           So, again, that's all the sort of jurisdictional

24   issue.  I think it's fairly straightforward.

25           I will say this, too -- to the extent this kind

```
 1    of gets into the merits, but it also informs on why there is

 2    no jurisdiction -- is if you were to believe there was

 3    jurisdiction, then that opens up a whole host of problems,

 4    practically speaking.

 5            For example, whose decision is being reviewed

 6    right now, right?  We have -- there is no final decision;

 7    it's pending with the Board of Immigration Appeals.  Do we

 8    review the DHS decision?  Do we review the immigration

 9    judge's decision?  The immigration judge, obviously, found

10    that this person could be released, right?  So how does that

11    play into this notion that there is some improper government

12    retaliation going on if one of the decisionmakers has said,

13    no, this person can be released.

14            There is sort of this internal dispute, which, I

15    think, goes to show, one, that it's not the place for this

16    Court to intervene in that due to there not being

17    jurisdiction.  But, two, it also sort of rebuts this notion

18    that there is a -- you know, that the fix is in.

19            I think it's also important to realize that all

20    the cases that they cite, particularly on their reply brief

21    at the opening page -- and there's been a flurry of cases --

22    all those cases are from other circuits.  None of them have

23    the very -- as far as I know -- have the very clear case law

24    of the Fifth Circuit from *Loa-Herrera* talking about how this

25    is a discretionary judgment.
```

1          Additionally, in each one of those cases, the

2     facts are just not the same.  In this case, it is

3     uncontested, you know, the grounds for the removal proceeding

4     of the Petitioner and therefore her detention -- because we

5     know that detention is a constitutionally valid part of

6     removal proceedings -- the grounds for her removal

7     proceedings are uncontested and are totally unrelated to

8     anything the Government has done, or did, or is alleged to

9     have done.

10          She had a student visa.  She left school.  That

11     caused her student visa to, essentially, lapse.  My

12     understanding of how that works is the colleges report,

13     essentially, to some database; these people are still

14     enrolled, these people are no longer enrolled, and therefore

15     there is a, you know, you can essentially find who are the

16     people who had student visas that are no longer, you know,

17     they're no longer enrolled and therefore are out of lawful

18     status.  She does not contest that she lost her lawful status

19     several years ago in 2022, and it had nothing to do with

20     anything that the Government has done.

21          In contrast, all the cases that are cited in the

22     reply brief -- in the opening page of the reply brief --

23     those are all cases where it's alleged that -- well, the

24     person had lawful status, essentially, up until very

25     recently, and it's alleged that, you know, within the last

1   month or two months, or however long, the Government sort of

2   simultaneously terminated, took away that lawful status by,

3   for example, revoking a student visa for allegedly invalid

4   reasons or terminating, you know, a protected status for

5   allegedly invalid reasons.  Some of those cases involve

6   determinations by the Secretary of State that the person's

7   presence in America would harm American foreign policy

8   interests.  And, so that's a specific statute that allows

9   that.

10          Anyway, all of those cases have to do with

11   situations where a person was in lawful status as of 2025,

12   and the Government is alleged to have gone in and done

13   something to terminate that status for an improper reason and

14   then place the person in removal proceedings and detain them.

15          So, that is not what we have here.  This case is

16   not here.  And I understand why counsel wants to sort of lump

17   the Petitioner into that group because those people have

18   obtained relief from other districts.  And I think some of

19   those cases are on appeal, and it's not yet clear how that's

20   all going to shake out.  But even if those decisions stick,

21   it's not the same as this Petitioner, because we don't have

22   this scenario of lawful status and allegedly improper

23   termination, and then now you're in removal proceedings.

24   That's just not what we have here.

25          Let me say this, too, and this will also kind of

1   bleed into the second group of claims dealing with the sort

2   of procedural issue.  So, counsel relies on a number of these

3   Supreme Court cases to say that they allow for jurisdiction

4   over constitutional claims.  That's not -- that's too broad.

5   That's not what those cases stand for.

6          The *Demore* case, for example, is a very good

7   example.  In that case, the aliens were challenging,

8   essentially, the statutory framework that allowed them to be

9   subject to mandatory detention.  And the Supreme Court was

10  very careful to refer to this notion that it was a framework

11  challenge.  So you're not challenging your specific

12  circumstances how it's applied to you; your challenge is the

13  existence of, essentially, this statute that allows you to be

14  detained, that allows this or that.

15         And, so that sort of framework challenge is

16  permissible according to the Supreme Court.  The Supreme

17  Court also, though, said it nonetheless fails on the merits

18  because detention during deportation proceedings is

19  constitutionally valid.

20         The same is true of the *Zadvydas* case -- I think

21  that's how you say it *Zadvydas* -- in *Zadvydas*, the situation

22  was aliens who already had an order of removal, and they were

23  in detention pending execution of that removal; so, pending

24  the arrangements to actually get them back to their home

25  country.  The statute says that they can be detained, and

1    they are detained for an initial 90-day period, and then they

2    may be detained longer, you know, as necessary to actually

3    effectuate the removal.

4            So the challenge in *Zadvydas* was whether, you

5    know, the statute basically authorized an indefinite

6    detention past the 90 days, and then just on till infinity,

7    for an alien who there was no reasonable prospect of actually

8    being able to remove them to the country for logistical

9    reasons; you know, the country isn't accepting aliens.

10           So that was very much a framework challenge.  It

11   was the notion of does this statute allow the indefinite

12   detention of, essentially, any alien when you're not able to

13   remove them.  And the Supreme Court said, no, the statute

14   implicitly contains a sort of presumptive period of six

15   months of detention, and after that there's sort of

16   presumption that you shouldn't be detained anymore unless

17   there is some prospect.

18           Again, though, that is not the same thing as what

19   we have here where we're talking about a very discretionary

20   decision on the front end at the beginning of a removal

21   proceeding for a specific person to detain them.  It's just

22   not the same.

23           The *Jennings* case is another case that was cited.

24   And *Jennings* was also a framework challenge.  These were a

25   group of aliens that were basically -- had argued and had

1    convinced some courts in the Ninth Circuit to hold -- that

2    while they were detained pending their removal proceedings --

3    that new bond hearings were required in front of the

4    immigration judge every six months.  And, so the Ninth

5    Circuit has, essentially, grafted onto the statute a new

6    procedural requirement and said, yeah, the statute allows

7    these people to be detained, but we're going to also say they

8    need new bond hearings every six months.

9            The Supreme Court reviewed that issue -- it's

10   very much a framework issue of the overall process -- and the

11   Supreme Court said, essentially, no, those hearings aren't

12   required.  But I think it's telling, though, is even when the

13   Ninth Circuit said you have to have these hearings, it was a

14   hearing that was going to be in immigration court; it was not

15   a federal Article III court that was going to review that

16   issue.

17           So these are all framework challenges.  What we

18   have here is not -- it's very much not a framework challenge.

19   It's not a framework challenge because they are relying

20   specifically on circumstances related to this particular

21   Petitioner and the specific decision to detain her.

22           They're not saying that the statute, insofar as

23   the statute allows for detention; that's unconstitutional.

24   They couldn't make that argument because the Supreme Court

25   had already said that detention during removal proceedings is

```
 1    a constitutionally valid part of the process.

 2              The last Supreme Court case I want to mention

 3    right now is the *Reno versus Arab-American*

 4    *Anti-Discrimination Committee*, referred to by counsel as

 5    *AADC*.  *Reno*, of course, would be Janet Reno, attorney general

 6    during the Clinton Administration.  And I think that's

 7    interesting because it kind of goes to show that these

 8    arguments are not necessarily new, although there is, you

 9    know, there's always certain new facts and circumstances.

10              But in the *AADC* case, the argument was very

11    similar here.  It was an argument that a group of people had

12    been targeted for deportation proceedings because of their

13    support for Palestinian causes.  So that was exactly the

14    argument.  It was, essentially, an issue of selective

15    prosecution, you know, you're looking to get me specifically

16    because I've supported Palestinians.

17              The Supreme Court was very clear that -- and

18    again, this case was also long before many of the further --

19    the later statutory changes that have restricted review.  But

20    the Supreme Court was very clear that this notion that, you

21    know, what they referred to as an ongoing violation of a

22    person being unlawfully present in the country must be

23    allowed to continue because it has somehow been improperly

24    selected.  And the Supreme Court said that was not a

25    powerfully appealing proposition.
```

```
 1              And the Supreme Court also discussed all the sort
 2   of practical reasons that I think are also inherent in this
 3   case as to why this is just not the sort of thing that the
 4   Courts weighed into.  Because the Supreme Court talks about,
 5   well, whose decision is it, who are we going to look to.  I
 6   mean, here, is it the initial I.C.E. officer, is it the
 7   immigration judge, is it the ultimate Board of Immigration
 8   Appeals panel?
 9              There's all these practical problems.  And then
10   there's also the problems of sort of probing, you know,
11   allegedly subjective beliefs of individual decisionmakers.
12   And, just, that's not the type of thing that the federal
13   court is built for, and that's not how this system is set up.
14              Sort of a couple last issues in terms of the what
15   I call the substantive claims or the claims challenging the
16   decision to detain, is there has not been an exhaustion of
17   administrative remedies.  And that is something that, for
18   example, in the Judge Stickney/Judge Kinkeade decision that
19   they specifically talked about administrative remedies.
20   That's normally required.  And here we have an ongoing
21   administrative process that will determine what the Attorney
22   General's final decision is about this detention.
23              And it's not unusual that -- you know, I think
24   they try to make it sound like the Writ of Habeas Corpus has
25   been suspended, and that's just not the case.  There is
```

```
 1   judicial review available after the removal proceeding has

 2   concluded.  In the meantime, though, she's subject to the

 3   proceeding and to detention.

 4           And that's really no different than, for example,

 5   a habeas review of state court convictions.  A person can be

 6   charged in state court allegedly for improper reasons,

 7   allegedly without any evidence.  You know, they may be

 8   convicted, they may have an appeal pending.  During this

 9   time, if they try to come into federal court and say you need

10   to hear my federal writ now, they're not going to be allowed

11   because they have to exhaust administrative remedies.  That's

12   not a suspension of the Writ of Habeas Corpus; it's just a

13   recognition that the system needs to play out.

14           And as far as what counsel mentioned about

15   immigration practitioners and their experience, you know,

16   over many, many years, I don't think any of that's really

17   relevant.  It's no secret that the Government right now is

18   very focused on immigration enforcement.  And, so there's

19   nothing unusual about the fact that there are people who,

20   perhaps in the past, were not, you know, in immigration

21   proceedings that now are in those proceedings.  But that's

22   just a function of the leadership of the Government right now

23   and what decisions they've made, and that's all within their

24   sort of executive power to decide those priorities that they

25   want to do.
```

```
 1              So I think that is our argument -- those are our

 2   arguments on the bucket of claims that challenge the actual

 3   decision to not release her at this time.

 4              Now, there's a second issue which is the sort of

 5   procedural due process issue that has to do with this

 6   automatic stay provision.  The automatic stay refers to if

 7   the immigration judge decides to grant a release, the

 8   automatic stay gives DHS the right to appeal to the Board of

 9   Immigration Appeals, and during that appeal -- for a limited

10   period during that appeal -- to, essentially, stay the

11   person's release pending the Board of Immigration Appeals is

12   a review.  This is in 8 CFR 1003.19.  And there's also 8 CFR

13   1003.6.

14              One thing that's interesting -- and this is not

15   in our brief, but I think it's sort of the legislative

16   history, if you will, or the regulatory history of this

17   particular regulation.  This automatic stay provision, if you

18   actually go back and look, it's existed in one form or

19   another for many, many years.

20              Originally, it did not contain a time duration.

21   So, if DHS -- or back then INS, or whoever it was -- invoked

22   the automatic stay, the immigration judge's decision was put

23   on hold, and it basically remained on hold for however long.

24              There were some courts in the early 2000s that

25   took issue with that, again, which is very much a framework
```

```
 1   issue, you know, the framework that allows this, does that
 2   satisfy due process.  That's different than, you know, a
 3   discretionary decision that's being challenged.  Some courts
 4   took issue with that, though, and they said this automatic
 5   stay provision is not consistent with due process insofar as
 6   it allows basically anybody at DHS or INS to just right now
 7   to slip a paper and therefore overrule the immigration
 8   judge's decision indefinitely, right?
 9               So, in 2006, the regulation was actually amended
10   to take into account these concerns.  And in 2006, that's
11   when the regulation was added.  They incorporated this 90-day
12   time limit in there.  So it's no longer an indefinite
13   duration.  It is a 90-day discrete limited amount of time.
14   And the regulation also added the requirement that this could
15   not be simply done at the whim of any detention officer or
16   any I.C.E. agent or officer.  It actually requires a
17   high-level supervisory review.  The supervisory DHS has to
18   certify specifically -- and that's in the record here -- that
19   they have reviewed this case, and they are, you know, opting
20   for the automatic stay.
21               So, the regulation was amended to take, you know,
22   to basically take account of these due process issues, and it
23   was done so in a way that addressed the concerns that the
24   Courts had raised.
25               And I think, also, if you look at those early
```

```
 1   decisions where the courts were looking at the prior version
 2   of the administrative stay, the relief that they actually
 3   granted was very limited in scope.  So, the relief was not,
 4   okay, you now are entitled to be released, essentially,
 5   forever until your proceeding's over.  The relief instead was
 6   that the courts imposed some sort of durational limit on the
 7   length of the stay, and they basically said, okay, this
 8   automatic stay can only continue for 30 more days.  And
 9   during that time, DHS needs to either, you know, seek a
10   discretionary stay from the BIA or, you know, at that point
11   the automatic stay will basically expire.
12           That limited scope of relief, though, is now what
13   is essentially in the regulation itself.  So the regulation
14   already provides that result by saying at the conclusion of
15   this 90-day period -- and I think we're already approximately
16   halfway through that period -- the stay expires.
17           So, to the extent that even if this Court were
18   convinced that the automatic stay in its current form
19   violates due process -- which I don't think it does -- it
20   very expressly allows for plenty of process; there's the BIA
21   gets to decide it.  And it's a time-limited duration.  The
22   relief would, essentially, be the relief that the regulation
23   already provides.
24           I think the other thing on the automatic stay is
25   that, you know, counsel suggested that there is no process,
```

1    there's no decisionmaker.  And that's just not true.  There

2    is a decisionmaker.  The Board of Immigration Appeals is

3    going to look at this.  And if they don't do it quickly

4    enough, the automatic stay will expire.

5            It's really no different than when DHS makes an

6    initial custody determination in the case.  There is a period

7    of time where the person is in custody pursuant to that

8    determination before the immigration judge looks at it.

9    Well, now we're also there's been another custody

10   determination, and there's still another period of time

11   before the next decisionmaker looks at it.  The statute, or

12   the regulation, was amended to make sure that that decision,

13   you know, occurred relatively quickly within 90 days.  And,

14   so that is, essentially, what the Due Process Clause

15   requires.

16           You can imagine a world where the immigration

17   judge made the decision, and if DHS wanted to appeal, there

18   was a panel of the BIA that was sitting next door, and you

19   could immediately go next door, and within two hours you

20   could have a decision from the BIA.  I think nobody could

21   argue that that was somehow violative of due process, that

22   the person was kept in custody for an additional two hours

23   while the BIA ruled.

24           Okay.  So, it's not two hours; it's 90 days.  And

25   the question is: does that violate due process?  And I think

```
 1   the case, as we've cited, explained why it does not.  Because

 2   much longer periods of detention, you know, during removal

 3   proceedings, 12 months, you know, more than a year, have been

 4   held to be reasonable and to not violate due process.  So the

 5   relatively limited 90 days here does not.

 6              But I think that the old cases on the prior

 7   version of the automatic stay that found that that version

 8   without a time limit was improper, and then those cases

 9   usually then impose some kind of time limit going forward

10   that say, okay, it's going to expire now in 30 days.

11   And, of course, the case is already pending, so I think the

12   person there was probably held in detention for longer than

13   90 days, anyway, while the case worked its way through.

14              So I think there's just no -- there's no showing

15   that the automatic stay framework, if you will, somehow

16   violates due process.  It doesn't.  And I think also looking

17   at the automatic stay framework in that sense really sharpens

18   the distinction between the claims that challenge that

19   framework and her other claims.  Because the other claims are

20   unlike the framework challenge.  Those claims challenge a

21   very discrete decision that's discretionary, and,

22   essentially, asks this Court to look into the minds of

23   unknown decisionmakers including some people who haven't even

24   issued a decision yet.  So, the automatic stay framework is

25   just a different kind of challenge.
```

1          And I would also say, too, to the extent that the

2     Petitioner is claiming that DHS somehow acted improperly in

3     invoking the automatic stay, that's the sort of claim -- you

4     can see the distinction there, I think -- that's not a

5     framework claim; that's a claim to a discretionary decision.

6          DHS, including that high-level supervisor who the

7     regulation requires to consider this, DHS had to sit down,

8     look at the facts of the case, and decide are we going to

9     invoke the automatic stay or not.  And they made a decision

10    to invoke it.  So that decision to invoke the automatic

11    stay -- just like the initial decision to the initial custody

12    determination to not grant bond -- that decision is protected

13    because that is a -- it's protected from judicial review --

14    that is a decision that is, you know, a discretionary

15    decision of one of the Attorney General's delegated

16    decisionmakers.

17          I'm happy to answer any questions that the Court

18    has.  But, otherwise, we would ask, for all these reasons,

19    that the Motion be denied.

20          THE COURT:  Okay.  So let me make sure I am not

21    misunderstanding you.  You do not dispute that the procedural

22    due process claim is a framework challenge over which the

23    Court would have jurisdiction?

24          MR. STOLTZ:  I think that's right.  Correct.

25    We've said that framework challenges are okay, with the

```
 1   caveat that the decision to invoke the stay is not a

 2   framework challenge.  But, just, does this regulation comply;

 3   that's a framework issue.  Yes, Your Honor.

 4            THE COURT:  Okay.  And then with respect to the

 5   First Amendment and the substantive due process claims.  You

 6   dispute the characterization of those claims as challenging

 7   the constitutionality of the detention.

 8            MR. STOLTZ:  I guess I wouldn't -- she's

 9   mentioned the First Amendment; that's part of the

10   Constitution.  So I'm not disputing that she's cast those

11   claims with a constitutional tenor.  I guess what I'm saying

12   is not every claim that has a constitutional tenor or label

13   associated with it is a constitutional framework claim that

14   is subject to review.

15            So there's -- and I think that's clear in the

16   Loa-Herrera case where that was -- there's some

17   constitutional claims that are not subject to review; they're

18   not a framework claim.

19            Does that make sense or answer your question?

20            THE COURT:  It's getting closer, but it's not

21   quite there yet.

22            MR. STOLTZ:  Okay.  I guess we don't --

23            THE COURT:  So, Petitioner has represented that

24   she is not seeking review of the decision -- not seeking

25   judicial review of the discretionary decision to detain her.
```

1    Instead, she has brought a habeas claim alleging that her

2    confinement was in retaliation of the First Amendment, and is

3    seeking release because her confinement violates the

4    Constitution.

5              MR. STOLTZ:  I guess my response to that is that

6    is nothing more than a challenge to the decision to detain

7    her.  If you're saying that I'm being detained for

8    retaliatory reason, you're saying, literally, that there's

9    some decisionmaker who looked at something that I've done or

10   in my views and decided on that basis to detain me.  That is

11   a discretionary decision to detain the person.  And,

12   regardless of whether she says it violates the First

13   Amendment or violates anything else, it still is that sort of

14   discretionary decision that is not subject to judicial

15   review.

16             THE COURT:  And is that because it is an

17   individualized decision with respect to the Petitioner; it

18   doesn't relate to anyone who might be subject to the

19   framework of the statute in regulation?

20             MR. STOLTZ:  So I think it's -- I mean, it is not

21   a challenge to the framework of any statute or regulation.

22   So, in that sense, it's not a framework statute.

23             Now, I understand she's saying that the

24   Government has done this to me and also to a score of other

25   people.  I'm not saying that it -- I understand that there's

1    other people who are maybe bringing similar claims.  But I

2    don't think that removes it from an individualized

3    discretionary decision.  Because each of these people is

4    going to have different facts and circumstances.

5              So, if what Your Honor is asking is: does the

6    fact that she claim that this is part of some overall policy

7    to disfavor a particular viewpoint or group?  That does not

8    remove it from the fact that it still is, with respect to

9    her, a discretionary decision that's not subject to removal.

10             THE COURT:  Pursuant to those -- 1226(a) and (e)

11   and 1252(a)?

12             MR. STOLTZ:  Yes, Your Honor.

13             THE COURT:  All right.

14             Now, I appreciate that the Government -- that the

15   Respondents are not yet required to respond.  But in terms of

16   filing a response to the Petition, that deadline hasn't

17   expired yet.  But there was a lot of argument from the

18   Petitioner about things that the Government does not dispute,

19   facts that the Government does not dispute.  Does the

20   Government want to dispute any of the facts that the

21   Petitioner has identified as undisputed?

22             MR. STOLTZ:  Right.  I mean, I would say we

23   don't -- I disagree with the notion that we have conceded or,

24   you know, agreed to their characterization of the facts.

25   Part of this issue is that this is not a bond hearing; this

1    is not an evidentiary hearing about the subjective intent of

2    any decisionmaker.  So none of that is really before this

3    Court.  But I will say on the, sort of, that merits thing,

4    no, we don't agree.

5            For example, if you look at Page 40 of the

6    Appendix that the Petitioner filed, that's a press release

7    that does mention this particular Petitioner.  That press

8    release, though, talks about needing to correct the record

9    about people who have been placed in removal proceedings.

10   And, with respect to this particular Petitioner, it actually

11   says, yeah, she was at this protest where she was arrested,

12   but it says but actually that has nothing to do with her

13   removal; it's because she's a student visa overstay.

14           So the Government has pointed that out, even in

15   that press release, where it was talking about all its

16   efforts in regard to immigration enforcement, that her case

17   was actually just a visa overstay case.

18           I would also say that some of the allegations

19   about what's going on at the facility itself in terms of

20   religious accommodations, you know, bed issues, those issues,

21   as we said in our response to the Motion, are conditions of

22   confinement issues, and so they're not really part of the

23   habeas inquiry at all.  And there's Fifth Circuit case on

24   that that we cite.  In fact, I've had cases before where

25   people have lumped together conditions of confinement habeas

1    claims, and the Court will usually sever them.  So there's a

2    separate civil rights action that involves conditions of

3    confinement because it just has no part in habeas.

4            I don't have -- we are not here to put on

5    evidence about the conditions of the floor.  I didn't hear

6    counsel say that she actually does not have a bed; it sounded

7    like it was more of a decision to sleep on the floor.  I

8    don't know anything about that.  But we certainly -- we're

9    not conceding her account of events, but we're also, more

10   importantly, I think, legally those do not relate to the

11   matter that's before the Court right now.

12           THE COURT:  So, with respect to those allegations

13   concerning her conditions of confinement, the Petitioner

14   represented at the outset of the hearing that her Preliminary

15   Injunction relates only to her habeas claims.  So, the

16   condition of confinement claim is not at issue, but they want

17   to use her -- verify the allegations in her Verified Petition

18   as evidence of the extraordinary circumstances that might

19   justify relief on one of these other habeas claims.

20           MR. STOLTZ:  I understand that, Your Honor.  I

21   think that my view on that is what we essentially said in our

22   response is that the Fifth Circuit is very clear that

23   conditions of confinement is separate than habeas.  This came

24   up during the COVID pandemic where there were a lot of claims

25   for detainees saying you have to essentially release me from

```
 1    detention because the conditions in here are so dangerous,

 2    and with respect to COVID -- and the Fifth Circuit was very

 3    clear -- that that is just not a ground for habeas.

 4              So our view is that, essentially, you can't sort

 5    of backdoor those same arguments into habeas through the

 6    remaining prongs of a P.I. Motion, because it's just not part

 7    of the thing.  So that's our point on that.

 8              THE COURT:  All right.  And you mentioned that in

 9    a lot of cases in the Fifth Circuit where there are actions

10    that bring both habeas claims and conditions of confinement

11    claims, the Court severs those.  In my experience, most of

12    those cases are brought by pro se litigants, and the Court

13    does that to assist them.

14              Should the Court sua sponte do that in this

15    case?

16              MR. STOLTZ:  I'd defer to the Court.  I recall a

17    case, I believe with Judge Lynn, where there was an

18    immigration detainee who was represented by counsel who

19    claimed that she had a brain aneurism, or something, that

20    required her release because she wasn't being treated

21    properly.  And I think -- don't quote me on this -- but I

22    think that Judge Lynn -- and if I'm remembering correctly if

23    it was Judge Lynn -- I think severed those cases.

24              So, I'm not saying that it's a pro se -- I think

25    it happens regardless of pro se or not.  I mean, it is --
```

```
 1    yeah, I'd defer to the Court on that.
 2            THE COURT:  I was trying to figure out if the
 3    Government was requesting that the Court at least sever those
 4    at this time.
 5            MR. STOLTZ:  I guess I have not made that request
 6    at this time.  I think that's something we would do once
 7    we're sort of formally at the point where we need to respond
 8    to the Petition.  And, at that point, I would probably
 9    research and refresh my recollection.
10            The reason I mention this is just for the point
11    that these are two different sets of claims, regardless if
12    they are consolidated into a single action or not, frankly.
13    But they're different claims, they're different types of
14    relief.  The remedy for a condition of confinement claim is
15    not release; it is, you know, essentially, an Injunction to
16    direct the person to correct the thing.
17            THE COURT:  Right.  Which the Petitioner has not
18    asked for --
19            MR. STOLTZ:  Correct.
20            THE COURT:  -- at this stage.
21            MR. STOLTZ:  Correct.
22            THE COURT:  With respect to the Affidavits from
23    the immigration attorneys that are included in the Appendix,
24    Petitioner has represented that the Government doesn't
25    dispute any of that evidence or contradict any of that
```

1    evidence; is that correct?

2            MR. STOLTZ:  We have not filed countervailing

3    Affidavits from other immigration practitioners.  So, I guess

4    we haven't done that.  There's not a battle of the experts,

5    or anything like that.

6            I think my response to that is, one, that it's

7    not unexpected that conditions now in the current era of

8    immigration enforcement are different than they may have been

9    historically.  That was, frankly, a big part of the current

10   administration's goals was to say, no, we need to enforce

11   these things more rigorously.

12           I don't necessarily agree -- you know, there are

13   cases in the past, there's decisions that you can look up

14   where people were, for example, challenging the automatic

15   stay provision, including the prior version of the automatic

16   stay where it was an indefinite detention.  So, to that

17   extent, I think the sort of legal record, or the case law,

18   shows that this is not a new thing.

19           Now, whether it's accelerated in intensity, my

20   guess is a lot of immigration practitioners will say that

21   their practice is very different right now than it was six

22   months ago.  And I don't necessarily dispute that; I don't

23   have grounds to dispute that.  But I also think it's sort of

24   irrelevant.  It doesn't prove anything in the Petitioner's

25   favor.  That's just a question of, you know -- a huge swath

```
 1   of the immigration laws are discretionary, because, they're

 2   essentially, it's a law enforcement prosecutorial-type issue

 3   where the Executive decides how they're going to focus their

 4   resources on doing it.  And during a time when the Executive

 5   has made clear that it's going to put its resources to

 6   enforcing those laws, I'm not surprised that immigration

 7   practitioners see things differently on the ground.  But I

 8   also don't think that proves anything in the Petitioner's

 9   favor, to be clear.

10            THE COURT:  All right.  Is there anything else

11   you want to put on the record before I give Petitioner an

12   opportunity to make a brief reply?

13            MR. STOLTZ:  No, Your Honor.  Thank you for your

14   time.

15            THE COURT:  Thank you.

16            MR. FIFE:  Thank you, Your Honor.

17            Once again, I'll be addressing the jurisdictional

18   arguments of Respondents responding to their merits

19   arguments, and then concluding with the equities and

20   extraordinary circumstances.

21            On jurisdiction, the INA could not be more clear

22   that the immigration process in the petition for review to

23   the Fifth Circuit at the end of the immigration proceedings

24   is no adequate alternative for habeas jurisdiction.  A,

25   because the Fifth Circuit lacks meaningful power over that
```

1   bond decision at the end after a final petition for review.

2   And, B, that the Fifth Circuit, even if they had

3   jurisdiction, couldn't review any of the facts.

4          I heard Respondents' counsel say, oh, well, this

5   just needs to be at the end of the case after the final order

6   of removal as the INA requires.  But that flips habeas

7   exactly backwards, which is that habeas is designed to test

8   the constitutionality of executive detention.

9          In *Boumediene,* the Supreme Court recognized that

10  habeas has a particular force and extra-valuable role where

11  you're challenging not post-conviction detention after an

12  order from a judge, but when it's unilateral executive

13  detention.  And that's exactly what we have here.

14         Second, on the INA provisions, the Government

15  rests on manufactured distinction between framework

16  challenges and individual challenges.  That distinction,

17  while clever, is impossible to square with the case law.

18         Respondents' counsel mentioned *Zadvydas*.  But

19  *Zadvydas* points in our direction.  Because, if you look at

20  *Zadvydas*, what the Supreme Court instructed lower courts to

21  do when evaluating *Zadvydas* claims, is to look at is removal

22  reasonably foreseeable; meaning, does the continued

23  confinement serve an adequate regulatory purpose.  And, so a

24  court conducting a *Zadvydas* review will inevitably have to

25  look at the individual circumstances of the Petitioner while

```
1    testing whether the Government's continued detention matches

2    constitutional standards.

3           In this way, the Government's framework for

4    individual case distinction is a distinction without a

5    jurisdictional difference, because, at some point, a court

6    sitting in habeas jurisdiction will inevitably have to

7    consider the individual circumstances.

8           But the question before the Court on jurisdiction

9    isn't whether the Court has to -- is looking at Ms. Kordia's

10   individual circumstances, the question is whether the

11   decision we're challenging is discretionary within the

12   meaning of Section 1226(e) and 1252(a)(2)(B). *Zadvydas* makes

13   clear that even where you have to look at is removal

14   reasonably foreseeable, that the constitutional claim is not

15   challenging discretion because it goes to the constitutional

16   limits of the Executive's authority.

17          And, like I said in my opening, that is exactly

18   what Ms. Kordia does. She's not challenging: was the

19   immigration judge's decision unwise, or was DHS right or

20   wrong in invoking the automatic stay. Her only argument is:

21   does Section 1226(a) give Respondents the authority to detain

22   someone in retaliation for their First Amendment speech.

23   That is a legal constitutional question that, yes, in some

24   very general sense requires identifying her -- or requires

25   working through her individual circumstances, but *Zadvydas*
```

```
1    makes clear that that is not discretionary within the meaning

2    of the statute.

3              I also heard Respondents' counsel say that

4    Jennings supported their framework versus individual

5    distinction.  I recognize, just candidly, that there is some

6    language in the Jennings plurality that might be able to

7    support Respondents' view.  But whatever ambiguity they're

8    picking up on in Jennings was resolved in Ms. Kordia's favor

9    by Najera v. United States, which is a case that I didn't

10   hear Respondents address and is impossible to square with

11   their distinction between framework and individual cases.

12             In Najera, the Petitioner -- or the Plaintiff,

13   rather -- challenged the legality of his individual

14   confinement as a violation of the Temporary Protected Status

15   statute.  The Fifth Circuit relying on Jennings said this is

16   not discretionary within the meaning of Section 1226(e)

17   because the Plaintiff is challenging the legal limits either

18   statutorily or constitutionally in the legal limits of the

19   Executive's power to detain him as a TPS holder.  Similarly,

20   yes, this case is about Ms. Kordia, but the legal claims only

21   touch on what is the constitutional limits on Respondents'

22   authority under Section 1226(a).

23             Respondents point out that -- or, in response to

24   Your Honor's question, they said that they disagree that you

25   can just dress up constitutional -- or, rather, "give claims
```

1    of constitutional tenor," is the quote I wrote down.  But the

2    *Gutierrez-Soto* case we cite in both our briefs, which is a

3    Judge Guaderrama decision out of El Paso, dealt exactly with

4    this issue.

5            Our argument is not that say the word

6    "constitution" in your claims section of your petition and

7    you get into federal court.  Our argument is that when the

8    character of the claim goes to the extent of the Executive's

9    power and not its individualized determination in the agency

10   proceedings, that that falls squarely within the Court's

11   habeas jurisdiction.

12           I bring up *Gutierrez-Soto* because it is the

13   perfect one-to-one match that rejects Respondents' arguments.

14   There, the Petitioner, among many claims, brought, one, a

15   First Amendment retaliation claim, and, number two, a

16   procedural due process claim.

17           Now, as we have identified in our briefs, Judge

18   Guaderrama exercised jurisdiction over the First Amendment

19   retaliation claim, acknowledging the exact line we're

20   drawing, that challenges to the constitutional limits of the

21   Executive's power are within this Court's jurisdiction.

22           But as to the procedural due process claim, Judge

23   Guaderrama looked at the character and substance of that

24   claim and said, look, you're just challenging how I.C.E.

25   weighed these factors that they were supposed to weigh

1  according to regulations.  And that is squarely

2  discretionary, and the Court lacked jurisdiction over it.

3  So, we think, from following *Zadvydas* to *Jennings* to *Najera*

4  and then supplemented by Judge Guaderrama's reason decision

5  in *Gutierrez-Soto*, their arguments are foreclosed by Supreme

6  Court, Fifth Circuit, and persuasive authority from other

7  districts, and the Court should reject them.

8             Lastly, on *Loa-Herrera*, again, this case predates

9  every one of those cases that I was just discussing.

10  Respondents read that language of, we can't challenge the

11  manner in which the Government exercises its authority, for

12  all it's worth.  And they have not identified a single case

13  after *Loa-Herrera* that adopts their broad reading of it.

14             And, as I heard Respondents' counsel concede,

15  even Judge Stickney and Judge Kinkeade in the *Maramba*

16  decision didn't go as far as Respondents' counsel would have

17  this Court go.  *Loa-Herrera* predates all of the relevant

18  modern authority on this -- or recent authority -- on this

19  question, and even the other cases they cite in their brief

20  reject such a broad reading.

21             Next, on the merits.  On the First Amendment

22  claim, Respondents, in passing -- or Respondents' counsel, in

23  passing, mentioned that he disagrees with the

24  characterization of the DHS press releases.  At bottom,

25  though, what I heard him say was, yes, I have not -- or we

1  don't agree with your characterization of the facts, but we

2  haven't presented any evidence on it.  And their brief is

3  silent on the factual questions underlying the First

4  Amendment claim.

5          To recap, starting as a candidate, President

6  Trump stated his intent to set the movement for Palestinian

7  rights back, quote, 25 to 30 years.  Then, as soon as he took

8  office, he issued an Executive Order directing not only

9  immigration officials but other law enforcement officers to

10  find ways to target supporters of Palestinian rights.  And,

11  as we've made clear, they have -- Attorney General Bondi,

12  Secretary Rubio, and DHS Secretary Noem have used that

13  authority to target other similarly situated non-citizens.

14  Again, *Gutierrez-Soto* is directly on point here.

15          The Government's argument there exactly match

16  what Respondents' counsel has said today, which is that

17  Ms. Kordia lacked lawful status, so what are we doing here in

18  federal court.  *Gutierrez-Soto* said, no, you have

19  presented -- the Petitioners have presented contemporaneous

20  statements of immigration officers talking about and

21  targeting the Petitioner activist there.

22          Number two, that their communications about the

23  case from the Government.  And in that case, the Petitioners

24  were subject to a final order of removal, and so they had

25  their bond revoked.  Which, here, it's the exact same thing.

```
 1   The Government alleges that Ms. Kordia lacks lawful status,
 2   but that doesn't foreclose her --
 3              THE COURT:  Do you dispute that?
 4              MR. FIFE:  We dispute that she's removable, but
 5   we have not contested that she had a lapse in lawful status
 6   starting in 2022.
 7              THE COURT:  Is that a significant distinguishing
 8   fact for her case with respect to the other similarly
 9   situated cases that you've brought us?
10              MR. FIFE:  No, Your Honor.  Because I think, as
11   Respondents' counsel seem to recognize, is that in each of
12   those cases, the Government had asserted that the Petitioners
13   were removable.  Some, they had their visas revoked, others
14   they had their LPR status revoked.  And in each of those
15   cases, just like Ms. Kordia -- just like I've said here today
16   and we've made clear in the papers, those Petitioners weren't
17   contesting their removal proceedings.  It was purely --
18   because -- if I can try to explain, if I can try to explain.
19              The similar cases we've identified in those
20   cases, each of the Petitioners swore off a challenge to their
21   removal proceedings because of the jurisdictional bars.
22              And, even in Dr. Suri's case, the Eastern
23   District of Virginia case, the Government, at oral argument
24   in that case, said he's challenging -- Dr. Suri is
25   challenging the removal proceedings.  And they had amended
```

1  their petition to make clear that, no, no, no, this was just

2  about confinement.  And, so for each of those Petitioners

3  that were released, each of them still have a separate fight

4  on their removal proceedings.

5          And I do understand that in those cases it is

6  admittedly harder to distinguish between the basis for

7  removal and the retaliatory confinement.  But I think, if

8  anything, that just makes clear how much easier this case is

9  on the jurisdictional issues before the Court.

10          And, ultimately -- and, so I think the other

11  point -- just a factual clarification -- I think regardless

12  that those cases are similar for the reasons I've identified.

13  But Ms. Kordia, I believe, as of this week, the Family-Based

14  Lawful Permanent Resident visa became current, and so she's

15  currently sitting in detention with a visa available for her.

16  And they still have to go through the process to do that, but

17  it's not as if this is someone who had just openly flouted

18  immigration laws; this was someone who thought she had lawful

19  status.  And I'd just point that out, to make the record

20  clear, that she is actively pursuing lawful status and

21  defenses to removal.

22          I want to address a couple other cases.  So, on

23  the *AADC* case, Respondents have offered that there are

24  difficult questions of intent and you have to go into the

25  mind of the Executive.  But I'd point the Court to the

```
 1    Supreme Court's decision in Lozman, L-O-Z-M-A-N, versus

 2    Riviera Beach, 585 U.S. 87, 2018, which is a First Amendment

 3    retaliation case in the law enforcement context.  And what

 4    the Court held in Lozman is that when you allege a First

 5    Amendment retaliation case predicated on a policy or practice

 6    of high-ranking individuals within a government -- there, it

 7    was city council members -- that those difficult problems of

 8    causality that appear in an individual arrest case where you

 9    have to go subjectively into the mind of the officer, that

10    doesn't apply in a policy or practice First Amendment

11    retaliation case, because, there, the type of evidence you're

12    normally relying on is objective evidence.

13            We're not trying to depose the DHS officials

14    involved in her arrest, or anything like that.  What you have

15    instead is objective evidence where DHS and Secretary Rubio

16    and President Trump have told the Court and the public

17    exactly what they're doing; that, we want to set the movement

18    for Palestinian rights back 25 to 30 years, and you have

19    similar enforcement actions across the country, and, as I

20    said, in three different circuits with six different District

21    Judges.  And that is compounded by the additional evidence

22    from the immigration practitioners.

23            And I heard my opposing counsel say that, well,

24    of course, things have gotten more intense.  But you have no

25    evidence in the record connecting the increased severity of
```

1    immigration enforcement with visa overstay cases.  And,

2    instead, the only evidence you have is immigration

3    practitioners with over a hundred years of collective

4    experience who said that they have never seen a case like

5    Ms. Kordia's where a visa overstay --

6              THE COURT:  Go ahead.

7              MR. FIFE:  Oh.  I was going to finish and say

8    where the Government has treated visa overstay case so

9    punitively and so intensely.

10              Did Your Honor have questions on that point?

11              THE COURT:  No.

12              MR. FIFE:  And I'll just make clear that our

13    First Amendment claim, it does not rise or fall on the

14    immigration practitioner's declaration, but rather they are

15    just another indicia that when you have DHS and other

16    high-ranking members targeting Ms. Kordia in press releases

17    saying she attended an April 30th, 2024, protest, that it's

18    the protected speech doing the work in confining her, not her

19    immigration status.

20              THE COURT:  I think her Verified Petition alleges

21    that she engaged in protected speech other than attending the

22    April 30th protest; is that correct?

23              MR. FIFE:  That's correct, Your Honor.  She had

24    been to several other similar peaceful demonstrations and

25    continues to be an advocate for Palestinian rights.

 1              And I think that that -- and I think that also

 2    really goes -- what I was just saying about the practitioner

 3    declarations is that it also goes to why Respondents'

 4    reliance on *Demore* is just entirely in opposite.

 5              I heard Respondents' counsel quote the line from

 6    *Demore* that says, "Detention is an ordinary part of the

 7    immigration process," and applies that to Ms. Kordia's case.

 8              But, number one, *Demore* was not a First Amendment

 9    retaliation case and had no similar allegations about the

10    Executive's practice and policy of targeting those who

11    support Palestinian rights.

12              But, number two, Respondents' argument here today

13    committed the exact error that the Fifth Circuit reversed a

14    district court for in the oo-ay -- *Oyelude* case.

15              I'm sorry.

16              THE COURT:  I can see it in my head.

17              MR. FIFE:  It's in our reply brief a couple

18    times.

19              And, in that case, the Fifth Circuit said, oh,

20    well, the District Court relied on that exact line from

21    *Demore* and said that the District Court had a strawman, that

22    line from *Demore,* and that *Demore* was in the context of

23    certain classes of serious criminal aliens under

24    Section 1226(c).  But this is a Section 1226(a) case.  And

25    that was the basis on which the Fifth Circuit reversed the

1    District Court in *Oyelude*.

2                I'm saying it different every time.  I'm sorry.

3                And, so, all that to say, I think, A, *Demore* is

4    in opposite because it doesn't address the claims at issue

5    here, and, B, Respondents have mischaracterized its holding.

6                On the automatic stay provision, the only point

7    that I think -- there's only a couple of small details I'd

8    like to clean up.  Number one is that Petitioner -- or

9    Respondents cite the regulation's history.  And that is

10   entirely irrelevant to the claims at issue here.  Because the

11   issue is what procedures -- or rather -- let me recite that,

12   I apologize, Your Honor -- is that is irrelevant here, as the

13   Courts in *Mohammed H.* and *Gunaydin* -- which we identify at

14   the top of our reply brief -- explain, it is true -- and we

15   acknowledge this in our opening brief -- that the *Zavala* and

16   *Ashley versus Ridge* cases did involve a prior version of the

17   automatic stay.

18                But what you can see in the *Mohammed H.* opinion

19   and the *Gunaydin* opinion is that even though it's up to a

20   130-day period, that it operates the exact same.  Respondents

21   rely on the certification from a high-ranking legal officer.

22   But all that requirement does is restate the requirements

23   under Rule 11, which is to be open and candid with the Court

24   and not make frivolous legal arguments.  And, so, that is

25   little assurance that this automatic stay provision is

1    actually being used for a justified reason.

2           And the point that I would leave this Court on

3    is -- on the automatic stay -- is that Respondents equivocate

4    two hours of confinement with up to 120 days.  That is

5    obviously wrong and unnecessarily -- Respondents are right

6    that no one is here complaining about two hours of detention.

7    But, rather it's up to 120 days with no procedure whatsoever

8    by which she can challenge that 120 days.

9           And just like the Court in *Mohammed H.* found, it

10   operates by fiat.  So when it says it's an automatic stay, it

11   literally is automatic in the sense that no court, not

12   Ms. Kordia, not the immigration judge, or the BIA, have any

13   role to play.  All the DHS prosecutor has to do is file a

14   slip of paper called the EOIR-43 within 24 hours.  That

15   ministerial task is an insufficient showing to justify

16   120 days of detention.

17          Lastly, I'd just like to --

18          THE COURT:  In every case or just in this case?

19          MR. FIFE:  As to the procedural?

20          THE COURT:  Correct, the automatic stay.

21          MR. FIFE:  Yes.  We are making as-applied

22   challenge to the regulation.

23          Our argument -- and you can really get this from

24   the Petitioner's Exhibit 6, which is the declaration of Jodi

25   Goodwin that talks about in the ordinary -- and she has

1    practiced for, you know, over 20 years, but in the cases in

2    which DHS has exercised its automatic stay power, it has

3    exclusively been for individuals with really, really serious

4    criminal offenses.

5              And, you know, the automatic stay can come up in

6    a variety of other contexts.  So, for example, if someone is

7    held on 1226(c), the mandatory provision, they're entitled to

8    a Joseph hearing, and there's a similar automatic stay

9    provision under -- stemming from the Joseph hearing.  So, if

10   an immigration judge -- and, so, our challenge is we don't

11   ask the Court to rule on that at all.  We're seeking a narrow

12   ruling on the automatic stay provision; that is, as-applied

13   in this case the lack of procedures violates procedural due

14   process.

15             THE COURT:  In the context of a framework claim

16   that the Court doesn't have to worry about any jurisdictions

17   stripping statute?

18             MR. FIFE:  Exactly.  Your Honor could write a

19   very narrow opinion because, as we've discussed today,

20   Respondents have conceded jurisdiction over that claim.

21   And -- yeah, that's exactly right.  It would be an as-applied

22   claim that there's no dispute the Court has jurisdiction over

23   it.

24             And, if I could just conclude very briefly with

25   the equities, which I heard -- so, on the equities, we have

1   identified the irreparable harm to Ms. Kordia and countless

2   others' protected expression, the violations of her religious

3   liberty.  Respondents' counsel, when Your Honor asked: are

4   you contesting those allegations, equivocated and said, well,

5   we're not necessarily agreeing with that characterization,

6   but we also don't have anything to say about it.  Which, in

7   this particular context where they've had a full opportunity

8   to respond to the Motion for Preliminary Injunction, that

9   sounds like a concession to me.

10          And the last point is -- the last point is in

11  terms of her health, which is that she is sleeping on the

12  floor -- and Respondents' counsel is right that there is a

13  thin mattress -- she is sleeping on the floor on a thin

14  mattress surrounded by bugs and insects and other people, and

15  that those three things, both individually and combined,

16  constitute an irreparable injury.

17          And, similarly, for the reasons the Fifth

18  Circuit's explained in the cases in our reply brief,

19  protecting the First and Fifth Amendment and preventing

20  religious liberty violations is always in the public

21  interest.

22          Now, there was a discussion about whether these

23  religious liberty violations are cognizable in habeas.  And I

24  think we've been candid throughout these proceedings, which

25  is we identified in the initial petition that the RFRA claim,

```
1    the Religious Freedom Restoration Act claim, was a
2    stand-alone civil claim that doesn't provide an independent
3    basis for habeas relief.
4              And, similarly, in our reply, we also recognize
5    that, well, yes, this is an independent reason why her
6    confinement is unlawful.  But when the Court gets to the
7    equities, the analysis is exactly that, it's equitable;
8    meaning, that the Court should look at the totality of
9    circumstances.  And I think whether we're proceeding under
10   Rule -- whether we're in Rule 65 or the Calley framework,
11   that's exactly what the Court should do.
12             And, so do I think if we only won on the
13   religious liberty violations, that we would have a habeas
14   claim?  No.  But do I think that at the equity stage that the
15   Court can account for the conditions in which Ms. Kordia is
16   confined, absolutely.
17             THE COURT:  But it is correct that you are not
18   seeking preliminary injunctive relief with respect to any of
19   the alleged RFRA violations or conditions of confinement?
20             MR. FIFE:  Absolutely, Your Honor.
21             I am familiar with the COVID cases that
22   Respondents' counsel mentioned, and we are not moving for a
23   Preliminary Injunction on those claims.
24             But I think the same way, if you have a
25   Preliminary Injunction and you're asking what are the harms
```

1    to the moving party or what are the harms to Respondents,

2    you're not just bound by the merits claims, you're also

3    conducting an equitable analysis of the totality of the

4    circumstances.  And, so we think there it is appropriate.

5              And, if I could, Your Honor, I would just like to

6    end where I've started, which is that Ms. Kordia is a

7    32-year-old Palestinian woman confined 1,500 miles from home

8    because she attended a protest in support of Palestinian

9    rights.  Tonight, she will sleep on a cold concrete floor on

10   a thin mattress surrounded by bugs and insects, as she has

11   done almost every night for the last two and a half months.

12   And she will wake up tomorrow, as she has every morning for

13   the last two months, without any Halal food, all because the

14   most powerful man in the country disagreed with her protected

15   expression.

16             That is as extraordinary as it is

17   unconstitutional, and the Court should recommend granting

18   Ms. Kordia's Motion.

19             THE COURT:  Thank you.  The Court will take this

20   matter under advisement and endeavor to get a written

21   recommendation filed as soon as possible.

22             MR. FIFE:  Thank you.

23             THE COURT:  We're adjourned.

24             THE COURT SECURITY OFFICER:  All rise.

25             (Proceedings adjourned at 11:59 AM.)

```
 1                        CERTIFICATION

 2       I, Rachel C. Braun, United States Court Reporter for

 3  the United States District Court in and for the Northern

 4  District of Texas, Dallas Division, hereby certify that the

 5  above and foregoing contains a true and correct transcript

 6  of the proceedings in the above entitled and numbered cause.

 7       WITNESS MY HAND on this 12th day of June, 2025.

 8

 9

10

11

12                      /s/ Rachel C. Braun_____
                        RACHEL C. BRAUN, RPR, CRR, CRC
13                      United States Court Reporter
                        1100 Commerce St., Room 1315
14                      Dallas, Texas 75242
                        (214) 753-2170
15                      Rachel_Braun@txnd.uscourts.gov

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT "13"

## PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR PRELIMINARY INJUNCTION

*Department of Homeland Security Motion for Discretionary Stay (July 2, 2025)*

Jo Ann McLane                                          **DETAINED**
Chief Counsel
Emily Swanson
Deputy Chief Counsel
Carlos A. Rodriguez Jr
Assistant Chief Counsel
U.S. Department of Homeland Security
U.S. Immigration & Customs Enforcement
Office of the Principal Legal Advisor
1015 Jackson-Keller Road, Suite 100
San Antonio, Texas 78213

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## BOARD OF IMMIGRATION APPEALS

_____ )
                                )
In the Matter of:               )
                                )
KORDIA, Leqaa                   )          File No.: ███████
                                )
In bond proceedings             )
_____ )

## DEPARTMENT OF HOMELAND SECURITY
## EMERGENCY DISCRETIONARY STAY MOTION IN EOIR-43 CASE

## INTRODUCTION

Pursuant to 8 C.F.R. § 1003.19(i)(1), the Department of Homeland Security (DHS) respectfully requests that the Board of Immigration Appeals (Board) issue, on an emergency basis, a discretionary stay of the Immigration Judge's April 3, 2025, order granting the respondent bond in the amount of $20,000. This case involves an EOIR-43 Automatic Stay, which expires on July 2, 2025. *See* 8 CFR 1003.19(i)(2). DHS requests the instant discretionary stay, pursuant to 8 C.F.R. § 1003.6(c)(5).. A Notice of Appeal of the immigration judge's bond decision was previously filed and accepted by the Board on April 15, 2025. A briefing schedule was issued on April 17, 2025, and a decision from the Board remains pending.

The Immigration Judge erred in ordering the respondent released on bond and setting bond at $20,000 because the respondent failed to meet her burden of establishing she is not a danger to persons or property and that she is not a danger to the community. The Immigration Judge further erred in finding that the respondent does not pose a flight risk. The DHS respectfully requests that the Board reverse the Immigration Judge's order granting the respondent's request for a change in custody status.

## STANDARD OF REVIEW

The Board has the authority to stay an Immigration Judge's order redetermining custody when DHS appeals the custody decision or on its own motion. 8 C.F.R. § 1003.19(i)(1). DHS may seek a discretionary stay (whether or not on an emergency basis) from the Board in connection with such an appeal at any time. *Id.* The Board reviews an immigration judge's findings of fact, which includes predictive findings of what may or may not occur in the future, under a clearly erroneous standard of review.  8 C.F.R. § 1003.1(d)(3)(i); *Matter of Z-Z-O-*, 26 I&N Dec. 586, 587–90 (BIA 2015).  Inferences from direct and circumstantial evidence are also reviewed for

1

Petitioner's Appendix Page 307

clear error. The Board reviews all questions of law, discretion, judgment, and all other issues on

appeal de novo. 8 C.F.R. § 1003.1(d)(3)(ii)).

The issue of whether the respondent is a danger to the community is a predictive finding

of fact that the Board reviews for clear error. *See Jurek v. Texas*, 428 U.S. 262, 275 (1976). While

the issue of whether the respondent poses a flight risk is also a predictive finding of fact that the

Board reviews for clear error, the factors that the Immigration Judge considers in setting a bond

amount for risk of flight are discretionary and thus reviewed de novo. *See Matter of Guerra*, 24

I&N Dec. 37, 40 (BIA 2006) (stating that an immigration judge has broad discretion in deciding

the factors that he may consider in custody redeterminations); *Matter of R-A-V-P-*, 27 I&N Dec.

803, 805 (BIA 2020) (citing *Guerra*, 24 I&N Dec. at 40)).

## SUMMARY OF THE ARGUMENT

The Immigration Judge erroneously granted the respondent's request for a change in

custody status and set bond in the amount of $20,000 after finding that she met her burden in

demonstrating that she is not a danger to the community under INA § 236(a). Specifically, the

Immigration Judge found that the respondent did not pose a danger to the community after being

arrested for disorderly conduct at a protest near Columbia University after disregarding the police

officers' orders to disperse. Moreover, the Immigration Judge found that the respondent did not

pose a danger to the community despite having sent numerous large payments to individuals in

Palestine and Jordan while not having work authorization or any proof of income. Assuming

*arguendo* that the respondent demonstrated she was not a danger to the community, the

Immigration Judge erred in finding that the respondent established she is not a flight risk. Here,

the Immigration Judge found that the respondent's family ties to the United States and potential

relief outweighed the fact that she initially hid from and evaded detection from Homeland Security

2

Petitioner's Appendix Page 308

Investigations (HSI), and failed to provide any evidence of a financial sponsor or her and her family's financial resources. As such, the Board should reverse the Immigration Judge's finding that the respondent met her burden establishing she is not a danger to the community and does not pose a risk of flight, and order that the respondent be held without bond.

**STATEMENT OF FACTS**

The respondent, a stateless native and citizen, last entered the United States as a B2 nonimmigrant visitor on March 19, 2016. Exh. 1. The respondent adjusted her status to an F-1 nonimmigrant on or about January 23, 2017. *Id.* On or about June 5, 2017, the respondent's United States citizen mother submitted a Form I-130, Petition for Alien Relative, on the respondent's behalf. *Id.* The petition was approved but a visa is not yet available for the respondent to adjust status. *Id.* On or about March 18, 2021, the respondent's F-1 visa was terminated in the Student & Exchange Visitor Information System (SEVIS) for failure to maintain her student status. *Id.* The respondent's F-1 visa was reinstated on or about May 5, 2021; however, it was again terminated in SEVIS on or about January 26, 2022, for failure to maintain her student status. *Id.* The respondent has no lawful status in the United States and has been unlawfully present in the United States since approximately January 26, 2022. *Id.* On or about March 15, 2025, DHS issued the respondent a Notice to Appear (NTA) charging her as removable from the United States under INA § 237(a)(1)(C)(i) for failure to maintain her F-1 status. *Id.* On April 3, 2025, the immigration judge granted the respondent's release from custody under a bond of $20,000. The immigration judge did not issue a written decision. The DHS argued that the respondent is a danger to the community given her arrest on April 30, 2024, at a protest that involved "yelling/blocking location and not following orders of police officers." Exh. 3 at 45. The DHS argued that this conduct shows a disregard for law enforcement authority and the laws of this country. The DHS also argued that

Petitioner's Appendix Page 309

the evidence shows the respondent is sending large amounts of money to individuals in the Palestinian Authority and Jordan, but she does not have work authorization and provided no evidence of the source of these funds. Moreover, the evidence shows that the respondent's landlord and possible employer is a Hamas sympathizer. The respondent claimed that the money was sent to her family, specifically her aunt, and she was doing her mom a favor by going and sending the money on her behalf.

The immigration judge found that the DHS evidence only shows at most two transactions that the respondent sent over the past few years. The immigration judge found that based on the record, mainly the HSI investigation reports submitted by DHS, she does not believe that there is sufficient evidence to show that the respondent poses a danger to the United States. The immigration judge found that the DHS cannot make connections to show the respondent is giving material support to a terrorist organization without more evidence of who received the money.

With respect to flight risk, the immigration judge found that the respondent has extensive family ties, support in this country, and potential relief in this country if a visa becomes available through her approved Form I-130 Petition. The respondent also filed an I-589, Application for Asylum and for Withholding of Removal. The DHS argued that the respondent did not submit evidence of an immigration sponsor or any evidence of financial stability from anyone in the respondent's family. Moreover, the respondent has been working unlawfully in the United States and has been unlawfully present in the United States since January 26, 2022. Additionally, the respondent has not tried to gain lawful status since that time, until being detained by DHS. The respondent also refused to voluntarily meet with HSI agents, and it took her approximately one week to surrender herself to authorities. The evidence shows that the respondent was hiding from immigration officials and intentionally evading detection.

4

Petitioner's Appendix Page 310

The immigration judge found that a bond of $20,000 is an appropriate amount to mitigate the flight risk and ensure that the respondent appears for future hearings, and it would also be a little sacrifice to the family if she does not show up and bond forfeited.

## ARGUMENT

### 1.  THE IMMIGRATION JUDGE ERRED WHEN HE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE IS NOT A DANGER TO THE COMMUNITY.

An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a danger to persons or property. *Matter of Siniauskas*, 27 I&N Dec. 207 (BIA 2018).  To evaluate whether an alien has met this burden, the Immigration Judge must consider whether he or she poses a threat to national security, a danger to the community at large, is likely to abscond, or is otherwise a poor bail risk. *Guerra*, 24 I&N Dec. at 40.

The question of whether an alien is a danger to the community is broader than determining if the record contains evidence of past violence or direct evidence of an inclination toward violence. *Matter of Fatahi*, 26 I&N Dec. 791, 795 (BIA 2016).  An Immigration Judge should consider any evidence in the record that is probative and specific when determining whether an alien is a danger to the community.  *Guerra*, 24 I&N Dec. at 41.  This includes the "specific circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount.  *Siniauskas*, 27 I&N Dec. at 208.  The Immigration Judge should also consider:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal history, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee

EOIR – 6 of 35

prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*Guerra*, 24 I&N Dec. at 40.

An Immigration Judge may not disregard or ignore relevant and material evidence when determining whether an alien is a danger to the community. *See generally* 8 C.F.R. § 1240.1(c) (requiring the Immigration Judge to receive and consider material and relevant evidence in removal proceedings); *see also Matter of Herrera Del Orden*, 25 I&N Dec. 589, 593–94 (BIA 2011) (instructing that an Immigration Judge should consider any relevant and probative evidence in a removal proceeding). If an alien cannot demonstrate that he or she is not a danger to the community, no bond should be set. *Fatahi*, 26 I&N Dec. at 793–94; *see also Urena*, 25 I&N Dec. at 141 ("An Immigration Judge should only set a bond if he first determines that the alien does not present a danger to the community.").

Here, the respondent has failed to establish that she is not a danger to the community. Evidence submitted by the DHS shows that between January 2021 to January 2025, the respondent made numerous transactions sending funds to individuals located in the Palestinian Authority and Jordan, some as large as $2,000. Exh. 3 at 4. The source and recipients of the funds remain under investigation by the DHS. The DHS evidence also shows that the respondent's landlord and possible employer is a Hamas sympathizer. Exh. 3 at 14, 16. Moreover, there has been no evidence presented in the instant matter, other than a statement from the claimant's attorney claiming that the money was sent to relatives, to negate or diminish any of the information contained in HSI's reports submitted to the court.

Moreover, the DHS evidence further shows that New York Police Department (NYPD) officers apprehended the respondent on April 30, 2024. Exh. 3 at 43–45. The incident record shows

Petitioner's Appendix Page 312

she was apprehended because she was "blocking a gate . . . preventing anyone from entering & exiting" and that she "failed to comply" with police commands to disperse. Exh. 3 at 45.

As the respondent has not met her burden in establishing that she is not a danger to the community, the Immigration Judge erred in ordering the respondent released on bond in the amount of $20,000.

## 2. THE IMMIGRATION JUDGE ERRED WHEN HE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE DOES NOT POSE A FLIGHT RISK.

Even assuming, *arguendo*, that the respondent met her burden to establish that she is not a danger to the community, the Immigration Judge nonetheless erred in granting her request for a change in custody status and setting bond in the amount of $20,000 because the respondent failed to show she is not a flight risk. Only if an alien demonstrates that he or she is not a danger to the community should an immigration judge then determine the extent of flight risk posed by the alien. *Urena*, 25 I&N Dec. at 141 (citing *Matter of Drysdale*, 20 I&N Dec. 815, 817–18 (BIA 1994)). An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a risk of flight and is likely to attend future immigration proceedings. *R-A-V-P-*, 27 I&N Dec. at 804 (citing *Siniauskas*, 27 I&N Dec. at 207); 8 C.F.R. § 1236.1(c)(8)). In determining whether an alien is a flight risk, the Immigration Judge may consider "any 'probative and specific' evidence." *Id.* (citing *Guerra*, 24 I&N Dec. at 40-41). Similar to a dangerousness determination, this includes considering the "specific circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208; *see also Guerra*, 24 I&N Dec. at 40. An Immigration Judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations. *Guerra*,

Petitioner's Appendix Page 313

24 I&N Dec. at 40.  An Immigration Judge may decide to give greater weight to one factor over others, but the decision must be reasonable.  *Id.*

      Here, the respondent has failed to establish that she does not pose a flight risk because she intentionally evaded detection by DHS. On March 6, 2025, a special agent with HSI contacted the respondent and told her that they needed to speak with her about her immigration status. Exh. 3 at 6. The respondent told the agent that she would meet him in the next 30 minutes, but she did not arrive. Exh. 3 at 6. The respondent's refusal to meet with HSI required an extensive investigation into her whereabouts. Exh. 3 at 6–21. *See Guerra*, 24 I&N Dec. at 40 (holding attempts by the alien to flee prosecution or otherwise escape from authorities is a relevant factor to find a flight risk). On March 13, 2025, the respondent finally self-surrendered to HSI. The DHS evidence indicates that the respondent was intentionally evading HSI agents and actively concealed herwhereabouts to avoid detection and apprehension for her immigration violations. Exh. 3 at 6–24.

      Moreover, the respondent has failed to provide evidence demonstrating that a financial sponsor in the United States will ensure she appears at all future proceedings. As noted by the immigration judge, there is no information about what the respondent, her mother, or her uncle, who claims to have the money for her bond, do for work and how they support themselves. As such, the Immigration Judge did not have sufficient information to assess an appropriate bond amount to ensure that the respondent would show up for future proceedings and that it would be a disincentive to the family if she were to not show up to future proceedings.

      Additionally, the respondent has provided no proof of any legal work history in the United States and has repeatedly violated the United States' immigration laws by falling out of her student visa status and continuing to reside in the United States without any legal status for over three

Petitioner's Appendix Page 314

years. *Guerra*, 24 I&N Dec. at 40 (holding alien's history of immigration violations and employment history are relevant factors for bond proceedings). As the respondent has not met her burden in establishing that she does not pose a flight risk, the Immigration Judge erred in ordering the respondent released on bond in the amount of $20,000.

The Department of Homeland Security ("DHS"), by and through its Assistant Chief Counsel, attaches the following documents in support of the present Discretionary Stay Motion in EOIR-43 Case.

## **TABLE OF CONTENTS**

| TAB | Document |
|-----|----------|
| A | Form EOIR-26, Notice of Appeal |
| C | Immigration Judge Decision June 28, 2025 |
| D | Form I-862, Notice to Appear |

## **CONCLUSION**

The Immigration Judge erroneously granted the respondent's request for a change in custody status by setting bond in the amount of $20,000, because the respondent failed to meet her burden of establishing that she is not a danger to the community and does not pose a flight risk. Based on the foregoing facts, DHS respectfully requests that the Board, on an emergency basis, issue a discretionary stay of the Immigration Judge's April 3, 2025, order granting the respondent bond.

Respectfully submitted on the 2nd day of July, 2025.

CARLOS A
RODRIGUEZ JR

Digitally signed by CARLOS A
RODRIGUEZ JR
Date: 2025.07.02 16:14:11
-05'00'

Carlos A Rodriguez Jr
Assistant Chief Counsel

EOIR – 10 of 35

David Wallen
Deputy Chief Counsel
Jo Ann McLane
Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Petitioner's Appendix Page 316

# TAB A

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB# 1125-0002

**Notice of Appeal from a Decision of an Immigration Judge**

---

*Staple Check or Money Order Here. Include Name(s) and "A" Number(s) on the face of the check or money order.*

**1.**  List Name(s) and "A" Number(s) of all Respondent(s)/Applicant(s):

Kordia, Leqaa ▇▇▇▇▇▇▇

For Official Use Only

**!** **WARNING:** Names and "A" Numbers of **everyone** appealing the Immigration Judge's decision must be written in item #1. The names and "A" numbers listed will be the only ones considered to be the subjects of the appeal.

**2.**  I am  ☐ the Respondent/Applicant  ☒ DHS-ICE *(Mark only one box.)*

**3.**  I am  ☒ DETAINED  ☐ NOT DETAINED *(Mark only one box.)*

**4.**  My last hearing was at  Prairieland Detention Center, Alvarado, TX  *(Location, City, State)*

**5.**  **What decision are you appealing?**

*Mark only one box below. If you want to appeal more than one decision, you must use more than one Notice of Appeal (Form EOIR-26).*

☐ I am filing an appeal from the Immigration Judge's decision *in **merits** proceedings* (example: removal, deportation, exclusion, asylum, etc.) dated_____.

☒ I am filing an appeal from the Immigration Judge's decision *in **bond** proceedings* dated
April 3, 2025_____. (For DHS use only: Did DHS invoke the automatic stay provision before the Immigration Court?  ☒ Yes.  ☐ No.)

☐ I am filing an appeal from the Immigration Judge's decision *denying a motion to reopen or a motion to reconsider* dated_____.

*(Please attach a copy of the Immigration Judge's decision that you are appealing.)*

EOIR – 13o6f135

**Page 1 of 3**

Petitioner's Appendix Page 318  Form EOIR-26
Rev. Nov. 2022
Exp. Jan. 2026

**6.** **State in detail the reason(s) for this appeal. Please refer to the General Instructions at item F for further guidance. You are not limited to the space provided below; use more sheets of paper if necessary. Write your name(s) and "A" number(s) on every sheet.**

See attached.

*(Attach additional sheets if necessary)*

> **!** **WARNING:** You must clearly explain the specific facts and law on which you base your appeal of the Immigration Judge's decision. The Board may summarily dismiss your appeal if it cannot tell from this Notice of Appeal, or any statements attached to this Notice of Appeal, why you are appealing.

**7.** Do you desire oral argument before the Board of Immigration Appeals?  ☐ Yes  ☒ No

**8.** Do you intend to file a separate written brief or statement after filing this Notice of Appeal?  ☐ Yes  ☒ No

**9.** If you are unrepresented, do you give consent to the BIA Pro Bono Project to have your case screened by the Project for potential placement with a free attorney or accredited representative, which may include sharing a summary of your case with potential attorneys and accredited representatives? *(There is no guarantee that your case will be accepted for placement or that an attorney or accredited representative will accept your case for representation)*  ☐ Yes  ☒ No

> **!** **WARNING:** If you mark "Yes" in item #7, you should also include in your statement above why you believe your case warrants review by a three-member panel. The Board ordinarily will not grant a request for oral argument unless you also file a brief.
>
> If you mark "Yes" in item #8, you will be expected to file a written brief or statement after you receive a briefing schedule from the Board. The Board may summarily dismiss your appeal if you do not file a brief or statement within the time set in the briefing schedule.

**10.** **Print Name:**    Anastasia Norcross

**11.** **Sign Here:** ▶  X  ANASTASIA S NORCROSS   Digitally signed by ANASTASIA S NORCROSS   Date: 2025.04.15 09:26:01 -05'00'    4/15/2025

Signature of Person Appealing
*(or attorney or representative)*    Date

EOIR – 24o6f135

**12.**

| Mailing Address of Respondent(s)/Applicant(s) | Mailing Address of Attorney or Representative for the Respondent(s)/Applicant(s) |
|---|---|
| Leqaa Kordia | Muhammad Omar Chaudhry |
| (Name) | (Name) |
| ▉▉▉▉▉▉▉. | 55-21 69th St. |
| (Street Address) | (Street Address) |
| | 2nd Floor |
| (Apartment or Room Number) | (Suite or Room Number) |
| ▉▉▉▉▉▉▉ | Maspeth, NY 11378 |
| (City, State, Zip Code) | (City, State, Zip Code) |
| (Telephone Number) | (Telephone Number) |

**NOTE:** You must notify the Board within five (5) working days if you move to a new address or change your telephone number. You must use the Change of Address Form/Board of Immigration Appeals (Form EOIR-33/BIA).

**NOTE:** If an attorney or representative signs this appeal for you, he or she must file *with this appeal*, a Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals (Form EOIR-27).

**13.**

## PROOF OF SERVICE (You Must Complete This)

I Anastasia Norcross _____ mailed or delivered a copy of this Notice of Appeal
      (Name)

on _____ to _____
   (Date)         (Opposing Party)

at _____
      (Number and Street, City, State, Zip Code)

[X] No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

| SIGN HERE ➤ | X ANASTASIA S NORCROSS | Digitally signed by ANASTASIA S NORCROSS Date: 2025.04.15 09:26:29 -05'00' |
|---|---|---|
| | Signature | |

**NOTE:** If you are the Respondent or Applicant, the "Opposing Party" is the Assistant Chief Counsel of DHS - ICE.

**WARNING:** If you do not complete this section properly, your appeal will be rejected or dismissed.

**WARNING:** If you do not attach the fee payment receipt, fee, or a completed Fee Waiver Request (Form EOIR-26A) to this appeal, your appeal may be rejected or dismissed.

## HAVE YOU?

☐ Read all of the General Instructions.
☐ Provided all of the requested information.
☐ Completed this form in English.
☐ Provided a certified English translation for all non-English attachments.
☐ Signed the form.

☐ Served a copy of this form and all attachments on the opposing party, if applicable.
☐ Completed and signed the Proof of Service
☐ Attached the required fee payment receipt, fee, or Fee Waiver Request.
☐ If represented by attorney or representative, attach a completed and signed EOIR-27 for each respondent or applicant.

Petitioner's Appendix Page 320
Form EOIR-26
Rev. Nov. 2022
Exp. Jan. 2026

## INTRODUCTION

The U.S. Department of Homeland Security (DHS) respectfully submits this Notice of Appeal in lieu of a brief from the immigration judge's April 3, 2025, decision granting the respondent's request for a change in custody status and setting bond in the amount of $20,000 pursuant to Section 236(a) of the Immigration and Nationality Act (INA).[1] The immigration judge erred in ordering the respondent released on bond and setting bond at $20,000 because the respondent failed to meet her burden of establishing she is not a danger to persons or property and that she is not a danger to the community. The immigration judge further erred in finding that the respondent does not pose a flight risk. The DHS respectfully requests that the Board of Immigration Appeals (Board) reverse the immigration judge's order granting the respondent's request for a change in custody status.

DHS further requests that this case be adjudicated by a three-member panel. The instant appeal meets the criteria for three-member panel review because the facts and circumstances of this case present: (1) the need to review a decision by an Immigration Judge that is not in conformity with the law or with applicable precedents; and (2) the need to reverse a decision of an Immigration Judge, other than a reversal under 8 C.F.R. § 1003.1(e)(5); 8 C.F.R. § 1003.1(e)(6)(iii), (v)–(vi).

## ISSUES PRESENTED

1. Did the immigration judge erroneously order the respondent released on bond in the amount of $20,000, where the respondent failed to meet her burden of establishing that she is not a danger to the community, when the respondent disregarded police orders to disperse from a protest and when she is sending payments to unknown individuals in Palestine?

---

[1] As noted on Form EOIR-26 at question 8, DHS will not be filing a brief in this case. Thus, this Notice of Appeal includes the entirety of DHS's arguments on appeal.

EOIR — 46o6f135

2.  Did the immigration judge erroneously order the respondent released on bond in the amount of $20,000 where the respondent failed to meet her burden of establishing that she does not pose a flight risk despite intentionally evading detection by DHS, failing to provide any financial information, and remaining out of legal status for over 3 years?

## STANDARD OF REVIEW

The Board reviews an immigration judge's findings of fact, which includes predictive findings of what may or may not occur in the future, under a clearly erroneous standard of review. 8 C.F.R. § 1003.1(d)(3)(i); *Matter of Z-Z-O-*, 26 I&N Dec. 586, 587–90 (BIA 2015).  Inferences from direct and circumstantial evidence are also reviewed for clear error. The Board reviews all questions of law, discretion, judgment, and all other issues on appeal de novo.  8 C.F.R. § 1003.1(d)(3)(ii)).

The issue of whether the respondent is a danger to the community is a predictive finding of fact that the Board reviews for clear error. *See Jurek v. Texas*, 428 U.S. 262, 275 (1976). While the issue of whether the respondent poses a flight risk is also a predictive finding of fact that the Board reviews for clear error, the factors that the immigration judge considers in setting a bond amount for risk of flight are discretionary and thus reviewed de novo.  *See Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (stating that an immigration judge has broad discretion in deciding the factors that he may consider in custody redeterminations); *Matter of R-A-V-P-*, 27 I&N Dec. 803, 805 (BIA 2020) (citing *Guerra*, 24 I&N Dec. at 40)).

## SUMMARY OF THE ARGUMENT

The immigration judge erroneously granted the respondent's request for a change in custody status and set bond in the amount of $20,000 after finding that she met her burden in demonstrating that she is not a danger to the community under INA § 236(a).  Specifically, the immigration judge found that the respondent did not pose a danger to the community after being arrested for disorderly conduct at a protest near Columbia University after disregarding the police

2

EOIR — 57o6f135

officers' orders to disperse. Moreover, the immigration judge found that the respondent did not pose a danger to the community despite having sent numerous large payments to individuals in Palestine and Jordan while not having work authorization or any proof of income. Assuming *arguendo* that the respondent demonstrated she was not a danger to the community, the immigration judge erred in finding that the respondent established she is not a flight risk. Here, the immigration judge found that the respondent's family ties to the United States and potential relief outweighed the fact that she initially hid from and evaded detection from Homeland Security Investigations (HSI), and failed to provide any evidence of a financial sponsor or her and her family's financial resources. As such, the Board should reverse the immigration judge's finding that the respondent met her burden establishing she is not a danger to the community and does not pose a risk of flight, and order that the respondent be held without bond.

## STATEMENT OF FACTS

The respondent, a stateless native and citizen, last entered the United States as a B2 nonimmigrant visitor on March 19, 2016. Exh. 1. The respondent adjusted her status to an F-1 nonimmigrant on or about January 23, 2017. *Id.* On or about June 5, 2017, the respondent's United States citizen mother submitted a Form I-130, Petition for Alien Relative, on the respondent's behalf. *Id.* The petition was approved but a visa is not yet available for the respondent to adjust status. *Id.* On or about March 18, 2021, the respondent's F-1 visa was terminated in the Student & Exchange Visitor Information System (SEVIS) for failure to maintain her student status. *Id.* The respondent's F-1 visa was reinstated on or about May 5, 2021; however, it was again terminated in SEVIS on or about January 26, 2022, for failure to maintain her student status. *Id.* The respondent has no lawful status in the United States and has been unlawfully present in the United States since approximately January 26, 2022. *Id.* On or about March 15, 2025, DHS issued the

EOIR — 18o6f135

respondent a Notice to Appear (NTA) charging her as removable from the United States under INA § 237(a)(1)(C)(i) for failure to maintain her F-1 status. *Id.* On April 3, 2025, the immigration judge granted the respondent's release from custody under a bond of $20,000. The immigration judge did not issue a written decision. The DHS argued that the respondent is a danger to the community given her arrest on April 30, 2024, at a protest that involved "yelling/blocking location and not following orders of police officers." Exh. 3 at 45. The DHS argued that this conduct shows a disregard for law enforcement authority and the laws of this country. The DHS also argued that the evidence shows the respondent is sending large amounts of money to individuals in the Palestinian Authority and Jordan, but she does not have work authorization and provided no evidence of the source of these funds. Moreover, the evidence shows that the respondent's landlord and possible employer is a Hamas sympathizer. The respondent claimed that the money was sent to her family, specifically her aunt, and she was doing her mom a favor by going and sending the money on her behalf.

The immigration judge found that the DHS evidence only shows at most two transactions that the respondent sent over the past few years. The immigration judge found that based on the record, mainly the HSI investigation reports submitted by DHS, she does not believe that there is sufficient evidence to show that the respondent poses a danger to the United States. The immigration judge found that the DHS cannot make connections to show the respondent is giving material support to a terrorist organization without more evidence of who received the money.

With respect to flight risk, the immigration judge found that the respondent has extensive family ties, support in this country, and potential relief in this country if a visa becomes available through her approved Form I-130 Petition. The respondent also filed an I-589, Application for Asylum and for Withholding of Removal. The DHS argued that the respondent did not submit

EOIR — 19o6f135

evidence of an immigration sponsor or any evidence of financial stability from anyone in the respondent's family. Moreover, the respondent has been working unlawfully in the United States and has been unlawfully present in the United States since January 26, 2022. Additionally, the respondent has not tried to gain lawful status since that time, until being detained by DHS. The respondent also refused to voluntarily meet with HSI agents, and it took her approximately one week to surrender herself to authorities. The evidence shows that the respondent was hiding from immigration officials and intentionally evading detection.

The immigration judge found that a bond of $20,000 is an appropriate amount to mitigate the flight risk and ensure that the respondent appears for future hearings, and it would also be a little sacrifice to the family if she does not show up and bond forfeited.

**ARGUMENT**

1. **THE IMMIGRATION JUDGE ERRED WHEN SHE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE IS NOT A DANGER TO THE COMMUNITY.**

An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a danger to persons or property. *Matter of Siniauskas*, 27 I&N Dec. 207 (BIA 2018). To evaluate whether an alien has met this burden, the immigration judge must consider whether he or she poses a threat to national security, a danger to the community at large, is likely to abscond, or is otherwise a poor bail risk. *Guerra*, 24 I&N Dec. at 40.

The question of whether an alien is a danger to the community is broader than determining if the record contains evidence of past violence or direct evidence of an inclination toward violence. *Matter of Fatahi*, 26 I&N Dec. 791, 795 (BIA 2016). An immigration judge should consider any evidence in the record that is probative and specific when determining whether an alien is a danger to the community. *Guerra*, 24 I&N Dec. at 41. This includes the "specific

circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208. The immigration judge should also consider:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal history, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*Guerra*, 24 I&N Dec. at 40.

An immigration judge may not disregard or ignore relevant and material evidence when determining whether an alien is a danger to the community. *See generally* 8 C.F.R. § 1240.1(c) (requiring the immigration judge to receive and consider material and relevant evidence in removal proceedings); *see also Matter of Herrera Del Orden*, 25 I&N Dec. 589, 593–94 (BIA 2011) (instructing that an immigration judge should consider any relevant and probative evidence in a removal proceeding). If an alien cannot demonstrate that he or she is not a danger to the community, no bond should be set. *Fatahi*, 26 I&N Dec. at 793–94; *see also Urena*, 25 I&N Dec. at 141 ("An Immigration Judge should only set a bond if he first determines that the alien does not present a danger to the community.").

Here, the respondent has failed to establish that she is not a danger to the community. Evidence submitted by the DHS shows that between January 2021 to January 2025, the respondent made numerous transactions sending funds to individuals located in the Palestinian Authority and Jordan, some as large as $2,000. Exh. 3 at 4. The source and recipients of the funds remain under investigation by the DHS. The DHS evidence also shows that the respondent's landlord and

possible employer is a Hamas sympathizer. Exh. 3 at 14, 16. Moreover, there has been no evidence presented in the instant matter, other than a statement from the claimant's attorney claiming that the money was sent to relatives, to negate or diminish any of the information contained in HSI's reports submitted to the court.

Moreover, the DHS evidence further shows that New York Police Department (NYPD) officers apprehended the respondent on April 30, 2024. Exh. 3 at 43–45. The incident record shows she was apprehended because she was "blocking a gate . . . preventing anyone from entering & exiting" and that she "failed to comply" with police commands to disperse. Exh. 3 at 45.

As the respondent has not met her burden in establishing that she is not a danger to the community, the immigration judge erred in ordering the respondent released on bond in the amount of $20,000.

**2. THE IMMIGRATION JUDGE ERRED WHEN SHE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE DOES NOT POSE A FLIGHT RISK.**

Even assuming, *arguendo*, that the respondent met her burden to establish that she is not a danger to the community, the immigration judge nonetheless erred in granting her request for a change in custody status and setting bond in the amount of $20,000 because the respondent failed to show she is not a flight risk. Only if an alien demonstrates that he or she is not a danger to the community should an immigration judge then determine the extent of flight risk posed by the alien. *Urena*, 25 I&N Dec. at 141 (citing *Matter of Drysdale*, 20 I&N Dec. 815, 817–18 (BIA 1994)). An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a risk of flight and is likely to attend future immigration proceedings. *R-A-V-P-*, 27 I&N Dec. at 804 (citing *Siniauskas*, 27 I&N Dec. at 207); 8 C.F.R. § 1236.1(c)(8)). In determining whether an alien is a flight risk, the immigration judge may consider "any 'probative

EOIR — 22 of 35

and specific' evidence." *Id.* (citing *Guerra*, 24 I&N Dec. at 40-41).  Similar to a dangerousness determination, this includes considering the "specific circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208; *see also Guerra*, 24 I&N Dec. at 40.  An immigration judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations. *Guerra,* 24 I&N Dec. at 40.  An immigration judge may decide to give greater weight to one factor over others, but the decision must be reasonable. *Id.*

Here, the respondent has failed to establish that she does not pose a flight risk because she intentionally evaded detection by DHS. On March 6, 2025, a special agent with HSI contacted the respondent and told her that they needed to speak with her about her immigration status. Exh. 3 at 6. The respondent told the agent that she would meet him in the next 30 minutes, but she did not arrive. Exh. 3 at 6. The respondent's refusal to meet with HSI required an extensive investigation into her whereabouts. Exh. 3 at 6–21. *See Guerra*, 24 I&N Dec. at 40 (holding attempts by the alien to flee prosecution or otherwise escape from authorities is a relevant factor to find a flight risk). On March 13, 2025, the respondent finally self-surrendered to HSI. The DHS evidence indicates that the respondent was intentionally evading HSI agents and actively concealed here whereabouts to avoid detection and apprehension for her immigration violations. Exh. 3 at 6–24.

Moreover, the respondent has failed to provide evidence demonstrating that a financial sponsor in the United States will ensure she appears at all future proceedings. As noted by the immigration judge, there is no information about what the respondent, her mother, or her uncle, who claims to have the money for her bond, do for work and how they support themselves. As such, the immigration judge did not have sufficient information to assess an appropriate bond

Petitioner's Appendix Page 328

amount to ensure that the respondent would show up for future proceedings and that it would be a disincentive to the family if she were to not show up to future proceedings.

Additionally, the respondent has provided no proof of any legal work history in the United States and has repeatedly violated the United States' immigration laws by falling out of her student visa status and continuing to reside in the United States without any legal status for over three years. *Guerra*, 24 I&N Dec. at 40 (holding alien's history of immigration violations and employment history are relevant factors for bond proceedings). As the respondent has not met her burden in establishing that she does not pose a flight risk, the immigration judge erred in ordering the respondent released on bond in the amount of $20,000.

## CONCLUSION

The immigration judge erroneously granted the respondent's request for a change in custody status by setting bond in the amount of $20,000, because the respondent failed to meet her burden of establishing that she is not a danger to the community and does not pose a flight risk. The DHS therefore requests that the Board reverse the immigration judge's order granting the respondent's request for a change in custody status.

Respectfully submitted on April 15, 2025,

ANASTASIA S NORCROSS
Digitally signed by ANASTASIA S NORCROSS
Date: 2025.04.15 09:23:05 -05'00'

Stacy Norcross
Assistant Chief Counsel
Mary Jane Zamarripa
Deputy Chief Counsel
Jo Ann McLane
Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security



## EOIR-43 Senior Legal Official Certification

I certify that I have approved the filing of the notice of appeal in this case according to review procedures established by U.S. Immigration & Customs Enforcement of the Department of Homeland Security.

I further certify that I am satisfied that the evidentiary record supports the contentions justifying the continued detention of the alien and the legal arguments are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing precedent or the establishment of new precedent. Further, the legal arguments, as specifically warranted above, may be premised on the alien being subject to mandatory detention pursuant to 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c).

EMILY B SWANSON

Digitally signed by
EMILY B SWANSON
Date: 2025.04.14
15:38:27 -05'00'

April 14, 2025
Date

*Emily B. Swanson*
Acting Chief Counsel, OPLA San Antonio
U.S. Immigration & Customs Enforcement

EOIR — 25 of 35

# TAB B

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## PORT ISABEL IMMIGRATION COURT

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | IN BOND PROCEEDINGS |
| | ) | |
| **KORDIA, Leqaa** | ) | A ███████ |
| | ) | |
| RESPONDENT | ) | **DETAINED** |

**ON BEHALF OF RESPONDENT**:
Shauky Michael Musa-Obregon, Esq.
Musa-Obregon Law PC
55-21 69th St., 2nd Fl.
Maspeth, NY 11378

**ON BEHALF OF THE DEPARTMENT**:
Stacy Norcross, Esq.
Assistant Chief Counsel
27991 Buena Vista Blvd.
Los Fresnos, TX 78566

### BOND MEMORANDUM

Respondent is a thirty-two-year-old female, native and citizen of stateless. Exhibit (Exh.) 1-B, Tab G. The Department placed Respondent in custody following an encounter on March 13, 2025, in Newark, New Jersey. Exh. 3-B at 23. On March 27, 2025, Respondent filed a bond redetermination request. Exh. 1-B. At the bond hearing on April 3, 2025, the Court granted Respondent's request for a change in custody status, setting her bond at $20,000. *See* Order of the Immigration Judge (April 3, 2025). This memorandum provides the basis for the Court's grant of bond.

In a custody determination, the Court should first determine whether an alien poses a danger to the community, and, if not, whether she is likely to appear for future proceedings before the Court. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). The Constitution does not guarantee an alien in removal proceedings a right to release on bond. *Carlson v. Landon*, 342 U.S. 524, 534 (1952). An applicant bears the burden to establish she merits release on bond. *Matter of Guerra*, 24 I&N Dec. at 40; *Matter of Adeniji*, 22 I&N Dec. 1102, 1112 (BIA 1999). When an alien is not subject to mandatory detention, the Court has broad discretion in deciding whether she will be released. *Matter of Guerra*, 24 I&N Dec. at 39; *see also Carlson v. Landon*, 342 U.S. at 540. An alien who poses a danger to persons or property shall not be released during pending removal proceedings. *See Matter of Drysdale*, 20 I&N Dec. 815 (BIA 1994). In the absence of a conviction, evidence of serious criminal conduct, including police reports, which is "probative and specific" to the danger a respondent poses to her community may outweigh other factors and provide a reasonable basis for denying bond. *Matter of Guerra*, 24 I&N Dec. at 40; *see also Matter of Siniauskas*, 27 I&N Dec. 207, 208-09 (BIA 2018) (stating immigration judges may consider both arrests and convictions in custody determinations).

Where an immigration judge concludes an applicant is not a danger to the community, the Court must next consider whether the applicant is a flight risk unlikely to appear for future proceedings. *See Matter of Patel*, 15 I&N Dec. 666 (1976) (factors unique to each noncitizen must be evaluated in determining suitability for release from custody). In making this decision, the Court

can consider many factors including: (1) whether the applicant has a fixed address in the United States; (2) her length of residence in the United States; (3) her family ties in the United States, and whether they may entitle her to reside permanently in the United States in the future; (4) her employment history; (5) her record of appearance in court; (6) her criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) her history of immigration violations; (8) any attempts to flee prosecution or otherwise escape from authorities; and (9) her manner of entry to the United States. *Matter of Guerra*, 24 I&N Dec. at 40. This list of factors is not exhaustive, and any reliable evidence in the record may be considered. 8 C.F.R. § 1003.19(d). An immigration judge may give greater or lesser weight to any given factor or factors, provided the ultimate conclusion is reasonable. *Matter of Guerra*, 24 I&N Dec. at 40. Family and community ties may demonstrate the applicant is not a flight risk but generally do not demonstrate she is not a danger to the community. *Siniauskas*, 27 I&N Dec.at 209-210.

Here, the Court finds that Respondent is not a danger to the community. The Department argues that Respondent is a danger to the community because of her arrest at a protest and because she has sent money to someone in Palestine. Neither of these arguments are persuasive. First, the Department argues that the facts surrounding Respondent's arrest demonstrate that she is a danger. Respondent attended a protest outside of Columbia University on April 30, 2024. Exh. 1-B at 11. She was cited for public disturbance, but the charges were dropped in the interest of justice. Exh. 1-B, Tab H. The police report states that she was with approximately 100 other people and was blocking the gate to keep anyone from entering or exiting. Exh. 3-B at 45. The Department provided no evidence that Respondent specifically threatened the police officers or was involved in any dangerous activity. Standing in a crowd of around 100 people in a protest does not show that she is a danger to the community.

Next, the Department argues that Respondent may have been providing support to terrorist organizations such as Hamas by sending money overseas. To support this claim, the Department submitted a Homeland Security Investigation (HSI) report stating that Respondent and another individual named ███████ were involved in numerous transactions sending funds to individuals in the Palestinian Authority. Exh. 3-B at 4. The investigation stated that the most recent transaction Respondent initiated through Western Union was on February 25, 2025. *Id.* However, the report gives no details about how much money was sent, why the money was sent, nor the recipient of the funds. The Department also provided a list of MoneyGram transactions from Respondent's mother's address from March 5, 2018, to March 5, 2025. *Id.* at 32. Over these seven years, Respondent's name is listed only once, on March 13, 2022.[1] *Id.* at 35. Respondent claims that she was sending money to her relatives in Palestine. The Department admitted that they do not know any information about the person listed as the recipient of this transaction. There is no evidence in the record that this person supports Hamas or is a member of a terrorist organization. In the absence of evidence of any connection to terrorist organizations, the Court cannot find that Respondent is supporting a terrorist organization by sending money to a family member in Palestine.

---

[1] The Court notes that there are several MoneyGram transactions from ███████ where Respondent resided with her family. Exh. 3-B, at 35-37. However, Respondent testified that her parents rent the second floor of the house, and the Department submitted no evidence to connect these transactions to Respondent or to a terrorist organization.

Respondent presented evidence of her good character, including letters from her family, friends, and school. *See* Exh. 1-B, Tabs J- M. She has been in the U.S. since 2016, and has not had any encounters with law enforcement other than at the protest in 2024. Thus, Respondent has met her burden to show that she is not a danger to the community, and the Department has not presented evidence to show otherwise. Upon careful consideration of the entire record, the Court concludes that Respondent is not a danger to the community. *See Guerra*, 24 I&N Dec. at 40.

The Court further finds Respondent is not a significant flight risk. Respondent entered the United States in 2016, and has remained in the U.S. since that time. She has lived with her mother in New Jersey since entering and plans to return to her mother's house after being released from detention. Respondent has family ties in the U.S., and specifically in the New York/New Jersey area. She lives with her U.S. citizen mother, stepfather, and brother, and testified that her sister often comes over to visit. Respondent also has a U.S. citizen aunt and uncle and multiple cousins in the U.S. *See* Exh. 1-B. Respondent submitted letters from her friends and family, attesting that she is a valued member of their community and an integral part of her family. Exh. 1-B, Tabs J- M. Respondent did not submit evidence of her family's ability to financially support her, but she testified that she has been employed as a waitress and was trying to start her own business before being detained. Further, her uncle testified that he and Respondent's mother own their own homes and that they will financially support Respondent. Finally, Respondent has multiple avenues for relief which incentivize her appearance at future hearings. Respondent's mother filed an I-130 petition on Respondent's behalf. Exh 1-B, Tab D. The I-130 was approved on May 5, 2021, and Respondent is waiting for her visa to become current. *Id.* Respondent is also *prima facie* eligible for asylum, withholding of removal, and protection under the Convention Against Torture. Exh. 1-B, Tab F. Considering all these factors, the Court concludes Respondent is likely to appear for future proceedings and is not a significant flight risk.

In sum, Respondent met her burden of demonstrating to the Court she is not a danger to the community, and the Department failed to provide evidence that shows otherwise. Further, the Court finds Respondent is not such a flight risk based on her family ties and eligibility for future relief that no bond is appropriate. Accordingly, the Court grants the Respondent's application for custody redetermination and sets her bond amount at $20,000.

Accordingly, the following order shall be entered:

## ORDER

**IT IS HEREBY ORDERED** Respondent be **RELEASED** from custody of the Department upon the payment of a **$20,000 BOND**.

**Dated:** April 16, 2025

_____

**Tara Naselow-Nahas**
**Assistant Chief Immigration Judge**

EOIR – 29 of 35

Petitioner's Appendix Page 334

## Order of the Immigration Judge

Immigration Judge: NASELOW-NAHAS, TARA  04/16/2025

### Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service

To: [ M ] Noncitizen | [  ] Noncitizen c/o custodial officer | [  E  ] Noncitizen atty/rep. | [ E ] DHS

Respondent Name : KORDIA, LEQAA | A-Number : █████████

Riders:

Date:  04/17/2025  By:  French, Annette , Court Staff

EOIR — 30 of 35

# TAB C

Filed at 11:00 on 03/10/2025 at 05:15:02 PM (Eastern Daylight Time) Base City: PEP
Case 3:25-cv-01072-L-BT   Document 59-2   Filed 07/07/25   Page 112 of 194   PageID 1056
Designated Country: ISRAEL |

**DEPARTMENT OF HOMELAND SECURITY**

**NOTICE TO APPEAR**

DOB:

Event No: XNK2503000016

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID:          FINS:          File No:

In the Matter of:

Respondent: **LEQAA KORDIA AKA: KORDIA, Leqaa M A**          currently residing at:

 

(Number, street, city, state and ZIP code)          (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of STATELESS and a citizen of STATELESS;

3. You were admitted to the United States at Jamaica, New York on or about September 18, 2016 as a unknown manner;

4. You were granted a change of status to a F-1 non-immigrant student;

5. You were terminated by Bergen County Career Advancement Training, Inc. - BCCAT on January 26, 2022.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD,    LOS FRESNOS, TEXAS 78566. PRAIRIELAND DETENTION CTR

(Complete Address of Immigration Court, including Room Number, if any)

on **May 6, 2025** at **8:30 am** to show why you should not be removed from the United States based on the
   (Date)        (Time)

charge(s) set forth above.

E #6885 KLEIN - (a)SDDO

(Signature and Title of Issuing Officer)

Date:    **March 15, 2025**          Dallas, Texas

(City and State)

**Petitioner's Appendix Page 337**
Page 1 of 3

Alleged ...  in the ... against you in removal proceedings.    by Court on 2/7/25
Designated Country: ISRAEL

**Notice to Respondent**

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you will have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

**Request for Prompt Hearing**

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____    _____
                                                                      *(Signature of Respondent)*

_____    Date: _____
*(Signature and Title of Immigration Officer)*

---

**Certificate of Service**

This Notice To Appear was served on the respondent by me on __March 15, 2025__, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person   [ ] by certified mail, returned receipt # _____ requested   [ ] by regular mail
[ ] Attached is a credible fear worksheet.
[X] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the __English__ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

K8224 GATES-JONES - Deportation Officer

_____    _____
*(Signature of Respondent if Personally Served)*    *(Signature and Title of officer)*

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

Leqaa Kordia



## PROOF OF SERVICE

On July 2, 2025, I caused a copy of this Emergency Discretionary Stay Motion in EOIR-43 Case and any attached pages to Sabrine Mohamad at the following address: PO Box 57089, New Orleans, LA 70157 by first-class mail.

_____
Carlos A. Rodriguez Jr.
Assistant Chief Counsel

EOIR — 35 of 35

# EXHIBIT "14"

## *PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR PRELIMINARY INJUNCTION*

*Board of Immigration Appeals Order Granting Stay (July 3, 2025)*



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

_____

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**Mohamad, Sabrine**                          **DHS/ICE OFFICE OF CHIEF COUNSEL - PEP**
**Southern Poverty Law Center**              **27991 BUENA VISTA BLVD**
**Po Box 57089**                             **LOS FRESNOS TX 78566**
**New Orleans  LA  70157**


**Name: KORDIA, LEQAA**                       **A** ▮▮▮▮▮▮


**Date of this Notice:**   **7/3/2025**


Enclosed is a copy of the Board's stay decision.


Sincerely,

John Seiler
Acting Chief Clerk


Enclosure



Userteam:  <u>Paralegal</u>



**Petitioner's Appendix Page 342**

NOT FOR PUBLICATION

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

MATTER OF:

Leqaa KORDIA, A██████████

Respondent

┌─────────────────┐
│     **FILED**       │
│   Jul 03, 2025   │
└─────────────────┘

ON BEHALF OF RESPONDENT: Sabrine Mohamad, Esquire

ON BEHALF OF DHS: Anastasia S. Norcross, Assistant Chief Counsel

IN BOND PROCEEDINGS
On Motion for Stay of Removal before the Board of Immigration Appeals

Before: Mullane, Appellate Immigration Judge

Opinion by Appellate Immigration Judge Mullane

MULLANE, Appellate Immigration Judge

STAY ORDER

The Department of Homeland Security has filed a motion for an emergency stay of the Immigration Judge's bond order, issued on April 3, 2025, ordering the respondent released from custody upon posting a bond of $20,000. After consideration of all information, the Board has concluded that the motion for emergency stay of the bond order will be granted.

ORDER: The motion for stay of execution of the bond order is granted.

# EXHIBIT "15"

## PETITIONER-PLAINTIFF, LEQAA KORDIA'S MOTION FOR PRELIMINARY INJUNCTION

*June 20, 2025 Hearing Transcript,* Khalil v. Joyce*, 2:25-cv-1963 (D.N.J.)*

1              **UNITED STATES DISTRICT COURT**
2            **FOR THE DISTRICT OF NEW JERSEY**

3    _____

4    MAHMOUD KHALIL,

5         Plaintiff,                    CIVIL ACTION NUMBER:

6              vs.                      2:25-cv-1963-MEF

7    Deputy Director William P.    Oral Argument
     Joyce, in his official
     capacity as Acting Field
8    Office Director of New York,
     Immigration and Customs
9    Enforcement, et al.,

10        Defendants.

11   _____

          **Frank R. Lautenberg Post Office and Courthouse**
12        **Two Federal Square**
          **Newark, New Jersey  07102**
13        **June 20, 2025**

14   **B E F O R E:**            **THE HONORABLE MICHAEL E. FARBIARZ,**
                                 **UNITED STATES DISTRICT COURT JUDGE**
15
     **A P P E A R A N C E S:**
16
          IMMIGRATION RIGHTS CLINIC, BY:
17        ALINA DAS, ESQ.
          NYU School of Law
18        245 Sullivan Street
          5th Floor
19        New York, New York  10012

20           appeared on behalf of Petitioner;

21           Lisa Larsen, RPR, RMR, CRR, FCRR
                  Official Court Reporter
22           Lisa_Larsen@njd.uscourts.gov
                    (973)776-7741
23

24
          **Proceedings recorded by mechanical stenography.**
25        **Transcript produced by computer-aided transcription.**

```
 1   A P P E A R A N C E S: (Cont'd.)

 2        UNITED STATES DEPARTMENT OF JUSTICE, BY:
          BY:  DHRUMAN Y. SAMPAT, SENIOR LITIGATION COUNSEL
 3             SARAH S. WILSON, ASST. DIRECTOR
               P.O. Box 878
 4             Ben Franklin Station
               Washington, D.C.  20044
 5
               appeared on behalf of Respondents; and
 6
     A L S O   P R E S E N T:
 7
          Amy Greer
 8        Amy Belsher
          Veronica Salama
 9        Robert Hodgson
          Omar Jadwat
10        Esha Bhandari
          Noor Zafar
11        Brian Hauss
          Brett Kaufman
12        Baher Azmy
          Samah Sisay
13        Naz Ahmad
          Ramzi Kassem
14        Mudassar Toppa
          Diala Shamas
15        Marc Van Der Hout
          Johhny Sinodis
16        Oona Cahill
          Jeanne LoCicero
17        Liza Weisberg

18

19

20

21

22

23

24

25
```

```
 1            (PROCEEDINGS held via Teams before the

 2            HONORABLE MICHAEL E. FARBIARZ, United States

 3            District Court Judge, on June 20, 2025.)

 4       THE COURT:  Good afternoon.  This is Judge Farbiarz.

 5       I'll ask will the courtroom deputy please confirm that

 6   the court reporter is on the line.

 7       THE DEPUTY CLERK:  Good afternoon, Judge.  Yes, Lisa

 8   Larsen is on the Teams conference.

 9       THE COURT:  Thanks very much.

10       We are here for Khalil v. Trump, et al.

11       I want to go around the horn and get appearances but,

12   given the number of lawyers I know who have appeared on this

13   case, I'm gonna do what I did last time, which is I'm simply

14   going to ask the lawyer or lawyers who expect to speak to the

15   pending motion to introduce just themselves and we'll take it

16   from there.

17       First, the lawyer or lawyers who will be appearing --

18   rather, speaking today, for the petitioner.

19       MS. DAS:  Good afternoon, Your Honor.  This is Alina

20   Das from the NYU Immigrant Rights Clinic, Washington Square

21   Legal Services.  I'll be arguing on behalf of the petitioner

22   today.

23       THE COURT:  Ms. Das, good afternoon to you.

24       And for the respondents.

25       MR. SAMPAT:  Good afternoon, Your Honor.  Dhruman
```

1   Sampat and I'll be arguing on behalf of the respondents today.

2        THE COURT:  Good afternoon to you.

3        What I'll ask you to do, the lawyer for the petitioner

4   and also the lawyer for the respondent, just so the record is

5   complete, could I ask you to please at the end of today's

6   proceeding file a very simple one-sentence letter that

7   indicates all of your colleagues who are on the phone so we

8   have a full and complete record of everybody who has appeared.

9        Can I ask you to do that, please.

10       MS. DAS:  Yes, Your Honor.

11       MR. SAMPAT:  Of course, Your Honor.

12       THE COURT:  Thanks a lot.  I appreciate it.

13       I want to start out -- let's just start out for half a

14   moment as to where we are.  Motion for -- a letter with

15   respect to bail and release was filed on Monday from

16   petitioner, including a short letter brief, the respondents

17   responded on Tuesday, the petitioner filed his response on

18   Wednesday, yesterday was of course a court holiday, and today,

19   Friday noon, we are here for oral argument with respect to the

20   motion for bail or for release.  That's where we are.

21       In the interest of saving us some time, I want to

22   address at the outset an argument that was made by the

23   respondents that I don't find persuasive.  I want to just

24   explain my reasons so that we not invest our time on it.

25       The respondents essentially argue, among other things,

1  that the petitioners have simply made what functions as a

2  motion for reconsideration of my Friday decision, which is to

3  say my decision of seven days ago.

4      I think that's simply not right.  What happened a week

5  ago, a week ago today, is that as of 9:30 in the morning I

6  preliminarily enjoined certain things, detention as to and

7  efforts to remove as to the Secretary of State's determination

8  as to the petitioner here.

9      An hour or so later the petitioner filed a letter

10  saying, given the Court's decision as to the Secretary of

11  State's determination, the petitioner needed to be released on

12  the other ground he was held.

13      That is simply not persuasive, and it's not persuasive

14  because the fact that a person cannot be held or removed on

15  one charge simply does not logically imply that he or she

16  cannot be held or removed on another charge.

17      If this were a criminal case, which it's of course not,

18  the court held that a person -- a charge of theft could not go

19  forward.  That would not imply that the other charge in the

20  case, pretend it's robbery, could not go forward.  That

21  doesn't follow logically.

22      As of Friday, that was the only argument that the

23  petitioner had made, as I understood it, and as I do

24  understand it now.

25      Over the weekend the petitioner apparently developed

1    and on Monday filed a different argument.  That argument is

2    not that the preliminarily enjoining of the Secretary of

3    State's determination charge, that that preliminary enjoining

4    implied logically that another charge could not go forward;

5    rather, it's a different argument.

6            The Monday argument is that the remaining charge is one

7    as to which the petitioner is entitled to either release or

8    removal -- excuse me, release or -- not "removal," forgive me,

9    release or transfer to this district.

10           So they're just simply different things.  The Friday

11   argument was that there is a logical reason why enjoining

12   Charge A requires not going forward on Charge B.  That's not

13   logical.

14           The argument made Monday and the one we are here

15   principally to discuss, the argument as to bail, is an

16   argument simply that as to Charge B there is a request for

17   bail the petitioner.

18           I do not understand the petitioner to be making a

19   motion for reconsideration.  I think that's a misunderstanding

20   of the argument that was pressed by the petitioner last week

21   and a misunderstanding of the decision I made on Friday.

22           So I wanted to say all that at the outset, Mr. Sampat,

23   so we don't spend any time on it because I don't view it as a

24   meaningful -- not that it's not meaningful but it's just an

25   argument that I don't think is persuasive.  So I wanted to say

1    that from the outset.

2         I'll ask Ms. Das if I could just get an update from you

3    as to where things stand in terms of the process of seeking

4    bail in front of the immigration judge.

5         MS. DAS:  Yes, Your Honor, and thank you.

6         So on Friday, as you know, immigration counsel sought

7    release directly from the DHS.  That was denied on Monday.  On

8    Tuesday immigration counsel filed a motion for a bond hearing

9    with the immigration judge.

10        As of this morning or just before this hearing, we have

11   not heard back as to whether that bond hearing has been

12   scheduled.  In addition, Mr. Van Der Hout had also asked DHS

13   on Friday if it would direct the immigration judge to this

14   Court's opinion and indicate that it would be withdrawing or

15   dismissing that charge so that the case could move forward.

16        As far as we know, there has not been a filing from DHS

17   to the immigration judge about that matter, either.

18        THE COURT:  Can you explain a little bit -- I

19   understood from Exhibit C to your Wednesday filing, Ms. Das,

20   that Mr. Van Der Hout, who I believe is the immigration

21   counsel you alluded to, that Mr. Van Der Hout was seeking an

22   immigration judge proceeding as soon as this coming Monday.

23        So, first, I hear you to be saying that that has not

24   yet been scheduled.

25        Do I have that right?

1          MS. DAS:  That's right, Your Honor.

2          THE COURT:  What was the second point, if you could

3    just slow it down a bit and explain that a little more fully.

4          MS. DAS:  Absolutely, Your Honor.

5          In the same letter to -- the e-mail to the Department

6    of Homeland Security where Mr. Van Der Hout attached the

7    request for release directly to DHS, there was also a request

8    to DHS that they indicate to the immigration court that they

9    will be dismissing or withdrawing the foreign policy ground or

10    otherwise not relying on it, given this Court's order.

11          In our view, that would facilitate the bond hearing for

12    the Government to actually be conveying to the immigration

13    judge that it can go forward on the bond hearing.  Of course

14    Mr. Van Der Hout has also given the court ruling to the

15    immigration court and has sought reconsideration of her prior

16    determination directly, just to cover all bases; but I just

17    wanted to indicate that as far as we know we're not aware of

18    DHS submitting any filings with respect to our request for

19    bond to the immigration judge or any filings related to the

20    foreign policy ground.

21          THE COURT:  Right.  But what I'm just not fully

22    understanding is why it matters.  It sounds like the

23    petitioner has himself conveyed to the immigration judge that

24    the charge that rests on the Secretary of State's

25    determination has been preliminarily enjoined.

1          What difference does it make if DHS also says something

2     about that to the immigration judge?

3          MS. DAS:  Your Honor, it may not make a difference.

4     It's certainly our position that the immigration judge should

5     grant a motion for a bond hearing and hold that bond hearing

6     as quickly as possible; but in our experience in litigating

7     these issues, the immigration judge generally

8     does like to hear from both sides, and so that's why we

9     suggested it.

10         THE COURT:  That makes sense.  I wondered if there was

11    something else I was missing, but I do appreciate how that

12    makes sense.

13         One other -- Mr. Sampat, is there anything about what

14    Ms. Das just said that is inaccurate, from your perspective?

15         Mr. Sampat, we don't hear you, if you're speaking.

16         MR. SAMPAT:  Sorry, Your Honor.  I was muted and I lost

17    Your Honor's questions when I was trying to un-mute.  I

18    apologize.

19         THE COURT:  Not at all.  No worries.

20         Is there anything in what Ms. Das said that is

21    inaccurate, from your perspective?

22         MR. SAMPAT:  Not that I know of.  I will say that from

23    my understanding the bond hearing -- I agree with Ms. Das that

24    the bond hearing has not yet been scheduled in front of the

25    immigration judge, but I can represent that they are usually

1    scheduled pretty quickly.  So if it's not scheduled for this

2    upcoming Monday, as per Mr. Khalil's request, we anticipate it

3    should be scheduled pretty soon.

4         THE COURT:  Okay.  All right.  I appreciate that.

5         Ms. Das, I'm going to come back to you for half a

6    moment.

7         Do you have an understanding as to what your

8    expectation is as to how an immigration judge detention

9    hearing would go, which is to say, live witnesses, a decision

10   in one day?

11        What is your expectation based on experience with this

12   particular judge in general, et cetera?

13        MS. DAS:  Yes, Your Honor.

14        So it can go in different ways, so it's not precisely

15   clear.  But as a general matter, when an immigration judge

16   receives a request to schedule a bond hearing, the immigration

17   judge will typically set a date for that hearing.

18        The parties are generally given the opportunity to

19   submit bond submissions.  In a bond hearing the immigration

20   judge would put the burden on the non-citizen respondent to

21   demonstrate lack of flight risk and danger, and in addition to

22   written submissions to that effect the immigration judge would

23   typically take testimony at a bond hearing, although there are

24   occasions where they will simply rely on argumentation from

25   both sides.

1          In the typical case, an immigration judge would rule on

2    bond on that day, but there are instances where a judge will

3    reserve decision and take some time to issue a decision on

4    bond.

5          As we noted in our papers, what we have seen most

6    recently with respect to students in particular engaged in

7    political speech is that the Government has been filing an

8    automatic stay.  If they file an appeal of the bond decision

9    within one day of the decision, they receive an automatic stay

10   where the bond decision would not be implemented while the

11   Department of Homeland Security pursued an appeal to the Board

12   of Immigration appeals which is a process that typically takes

13   months to resolve.

14         THE COURT:  Mr. Sampat, do the respondents have a

15   position as to what they would do with respect to the

16   referenced automatic stay if an immigration judge granted

17   release here?

18         MR. SAMPAT:  No, Your Honor, we don't have a position

19   because we think it's speculative at this moment.  We still

20   don't know what the immigration judge is gonna do.

21         THE COURT:  All right.  I got it.

22         Mr. Sampat, just to round it out, anything that

23   Ms. Das said that strikes you as inaccurate in terms of

24   characterization of the process?

25         MR. SAMPAT:  No.  The only note that I had was noting

1   that sometimes bond decisions can be reserved, but Ms. Das

2   said that so I think we're good on our end.

3        THE COURT:  Thanks very much.

4        This is the petitioner's motion, so ordinarily I'd have

5   the petitioner go first in terms of argument, but the

6   respondents here have a number of threshold issues that they

7   press.

8        The first and most important is, as always,

9   jurisdiction, not most important but necessarily first, which

10  is to say an argument under 1226(e).  There's also an argument

11  about exhaustion.

12       Mr. Sampat, I wanted to hear you out on one or both of

13  those arguments at the outset.  Why don't you just give me a

14  few moments on your position now.

15       MR. SAMPAT:  Of course, Your Honor.

16       Understanding that we're not gonna talk about the

17  motion for reconsideration, so on the 1226(e), Your Honor --

18       THE COURT:  Mr. Sampat, let me stop you for a second.

19  There is no motion for reconsideration.  My point was that

20  I do not view what was filed by the petitioner on Monday as a

21  motion to reconsider my Friday decision.  I view it as just

22  simply a separate motion that progresses a different theory.

23       The Friday theory was, in my judgment, not persuasive

24  because, as I said, analogically, not being able to go forward

25  on theft does not mean that somebody cannot go forward on

1  robbery.  Those are simply separate.

2      This is a different argument, so I just want to be

3  crystal clear, Mr. Sampat, my point is that I do not view the

4  Monday motion by the petitioner as a motion for

5  reconsideration.

6      With that, back to you.

7      MR. SAMPAT:  I appreciate that, Your Honor.  I was only

8  characterizing what our position was in our papers.

9  Understood.

10      On 1226(e), Your Honor, we think the text is pretty

11  clear.  It sets forth that the Attorney General's

12  discretionary judgment regarding the application of this

13  section shall not be subject to review and that no court may

14  set aside an action or decision under this section regarding

15  the detention of any alien.

16      Mr. Khalil is currently detained pursuant to 1226(a) in

17  light of the fraud and willful misrepresentation charge.

18  Congress has authorized the executive to detain aliens if

19  they're deemed removable or inadmissible.  That decision is

20  not subject for review and a court order requiring release

21  would offend 1226(e).

22      We think that the Third Circuit's decision in *Borbot v.*

23  *The Warden* at 906 F.3d 274 says exactly that.  So we think the

24  release request is actually foreclosed by Third Circuit law,

25  as well.

```
 1          THE COURT:  Here is the thing I don't get about that:

 2          You briefed that argument without saying anything about

 3   the Supreme Court's decision in St. Cyr in 2001 or the Supreme

 4   Court's decision in Demore in 2003.

 5          As you know, those decisions stand for the

 6   proposition -- well, step back.  As we know from Colorado

 7   River and many other cases, federal courts have a, quote,

 8   unquote, virtually unflagging obligation to exercise their

 9   jurisdiction.

10          United States Congress has given the court habeas

11   jurisdiction.  The Supreme Court in St. Cyr said that

12   jurisdiction stripping or habeas jurisdiction stripping in the

13   immigration context has to be extraordinarily clear.

14          The Supreme Court said in St. Cyr that jurisdiction was

15   not stripped as to a passage that was headed "elimination of

16   custody review by habeas corpus."  That's what Congress had

17   written, and the Supreme Court said it wasn't clear enough.

18          Then in 2003 in Demore, Chief Justice Rehnquist says

19   that as to 1226(e), which is the portion of the statute that

20   you're invoking, that it, quote, contains no explicit

21   provision barring habeas review.

22          So what I don't fundamentally understand is how it can

23   be that the Supreme Court has said in general as to the

24   immigration statute and in particular as to this portion of

25   the immigration statute that it's not clear enough to vitiate
```

1    habeas and -- to eliminate habeas jurisdiction and yet you're

2    arguing here today that 1226(e) does strip away habeas

3    jurisdiction.

4         How do those live together?

5         MR. SAMPAT:  So, Your Honor, to take Your Honor's

6    points in turn, *St. Cyr* pre-dated the REAL ID Act which

7    obviously curtails federal court's habeas jurisdiction moving

8    forward where removal orders were now channeled through the

9    petition for review process.

10        *Demore* talks about 1226(e), but I think it's important

11   to note that *Borbot* post-dates all of those decisions.  And

12   the Third Circuit was clear on -- that a challenge to a

13   particular action or decision to detain would be barred under

14   1226(a).

15        THE COURT:  I don't think any of that is right.  I

16   think the problem you have is that there is a longstanding

17   idea -- well, let's step back for half a moment.

18        The fact that *St. Cyr* pre-dates the REAL ID I think

19   cuts strongly against your position because what it suggests

20   is that Congress was well aware of the requisite level of

21   specificity that it required if it was gonna strip habeas

22   jurisdiction and 1226(e) is not particularly specific.

23        There are circuit courts all over the country --

24   Second, Ninth, the Fifth, the Seventh -- all of whom have held

25   that 1226(e) does not bar the exercise of habeas jurisdiction.

```
 1        I'll just say the names of those cases so we have them.
 2   The Second Circuit is Ozturk, O-Z-T-U-R-K.  The Ninth Circuit
 3   is Martinez, citing the Singh case, S-I-N-G-H.  The Fifth
 4   Circuit is Najera, N-A-J-E-R-A, and the Seventh Circuit is
 5   Al-Siddiqui, which I think is an especially helpful case,
 6   A-L, dash, S-I-D-D-I-Q-U-I, all of which emphasizes that
 7   Demore has a clear -- that St. Cyr requires a clear statement.
 8   Demore makes it clear that there's no clear statement in
 9   1226(e) so there's no stripping of habeas jurisdiction.
10        And to close it out, federal courts have held for --
11   since the 19th century that one of the incidents of habeas
12   jurisdiction is the ability to grant or not grant bail pending
13   resolution of a habeas case.
14        You cited in your March filing the Third Circuit's
15   Johnston decision on that from the '50s.  The Second Circuit's
16   Mapp v. Reno case collects decisions way back to the
17   19th century.
18        I have Judge Posner -- I scribbled a note to myself --
19   from 2007 for the Second Circuit talking about the possibility
20   of bail in the habeas context being a, quote, natural
21   incident, end quote, of habeas jurisdiction.
22        So I think the problem you have fundamentally,
23   Mr. Sampat, is that over and over again the circuit courts of
24   the United States have held that there's insufficient clarity
25   in 1226(e) under St. Cyr to strip habeas jurisdiction, and a
```

1    core aspect of habeas jurisdiction -- in the Third Circuit,

2    *Lucas*, *Landano*, *Johnston* -- throughout the United States a

3    core incident of habeas jurisdiction is the possibility of

4    admitting somebody into bail.

5        So I don't see 1226(e) as being clear enough under

6    *Demore* to strip habeas jurisdiction; and if it does not strip

7    habeas jurisdiction, 1226(e) does not strip one of the basic

8    incidents of habeas jurisdiction, which is the ability of a

9    federal court to grant someone bail in advance of a final

10    decision as to the habeas claim.

11        Anything else you want to add on this, Mr. Sampat?

12        MR. SAMPAT:  Yeah, Your Honor.  Yes, Your Honor.  Just

13    on the *Demore* point.

14        THE COURT:  Sure.

15        MR. SAMPAT:  I very quickly pulled it up, and it seems

16    like the Court's reasoning on 1226(e) was that because Mr. Kim

17    there was not challenging the individual judgment or decision

18    to detain, that it was rather challenging the statutory

19    framework --

20        THE COURT:  Mr. Sampat, Mr. Sampat, this is what

21    happens when you pull things up during oral argument.

22        There's a reason I cited you to *Al-Siddiqui* out of the

23    Seventh Circuit in particular.  It makes it crystal clear that

24    there are -- it is true that in *Demore* itself that was the

25    issue, but, number one, Chief Justice Rehnquist said -- this

1    is why I quoted this particular line that, quote,

2    Section 1226(e) contains no explicit provision barring habeas

3    review.

4        Under *St. Cyr* that is dispositive, whether the case is

5    one that challenges a regulation or challenges something as

6    applied.

7        That's number one.

8        Number two, that's why the *Al-Siddiqui* case out of the

9    Seventh Circuit matters.  It collects a number of cases that

10   emphasize that *Demore's* holding is controlling regardless of

11   the nature of the challenge.

12       Now, there are gonna be some outer limits aspects to

13   that, but the problem is Congress needs to speak clearly.  And

14   having not spoken clearly, that is, under the cases I have

15   cited, even under Chief Justice Rehnquist's quote that I read

16   to you from the Supreme Court, that's in my judgment the end

17   of the matter.

18       Anything else, Mr. Sampat?

19       MR. SAMPAT:  Not on that, Your Honor.  I think we have

20   exhausted our arguments on 1226.

21       THE COURT:  Fair enough.

22       I do not view 1226(e) as a jurisdictional bar here to

23   admitting or not admitting the petition to bail.

24       What's the exhaustion argument?  Is that an argument

25   you're making, Mr. Sampat, that there's administrative

1    exhaustion?  What's your position on that?

2          MR. SAMPAT:  So, Your Honor, our position is that as a

3    prudential matter it makes for sense for Mr. Khalil to avail

4    himself at the administrative process and to avoid conflicting

5    decisions between this Court and the immigration judge.

6          He's currently -- as we know, he has filed for a motion

7    of custody re-determination before the immigration Judge.

8    He's availing himself to those processes.  It makes more sense

9    for him to go through that process right now than it is for

10   Your Honor to weigh in.

11         THE COURT:  Okay.  What is the -- that argument proves

12   very little in the sense that it says nothing about why I

13   should wait for the immigration judge versus why the

14   immigration judge should wait for me.

15         What is the argument for why I should wait for the

16   immigration judge?

17         MR. SAMPAT:  Well, Your Honor, it goes back to some of

18   the cases that we have cited in our briefs where judges within

19   the district have said that they won't exercise habeas

20   jurisdiction or won't review claims absent a petitioner

21   exhausting administrative remedy.

22         I'll also point Your Honor to a decision that just came

23   out a few days ago out of the Southern District of New York.

24   The name of the case is *Guzman vs. Joyce*, which can be found

25   at 2025 Westlaw 1696891.

1          That case, Your Honor, discusses and supports the fact

2     that exhaustion is an important part of this process before a

3     party was to run into federal court because if the issue can

4     be resolved administratively it is better for -- it's a better

5     course of action than expending judicial resources here.

6          THE COURT:  I hear that, but I think it's a -- look,

7     you invoke in your papers and you invoked at the outset of

8     what you just said two District of New Jersey cases.  There's

9     the opinion from Judge McNulty and there's the opinion from

10    Judge Wigenton.

11         I think the problem you have is that both of those

12    cases rely on *DeValle* and *Yi*, which are Third Circuit cases

13    that say that administrative exhaustion is jurisdiction.  But

14    of course -- and I'm honestly surprised that nobody brings

15    these cases to my attention in these papers, but such is life.

16    It's the same issue I have with *Demore*.  Again, nobody brings

17    this up.

18         In 2023 the Supreme Court held, as we all know, that

19    the exhaustion provisions such as they are of 8 U.S.C.

20    1252(d)(1), that those exhaustion provisions are not

21    jurisdiction.

22         And so the cases, Mr. Sampat, you're citing are -- they

23    just look a whole lot different.  They are based on a

24    Third Circuit conception that administrative exhaustion is

25    jurisdiction; but after those district court decisions came

1    down, the United States Supreme Court explicitly held in 2023

2    that 1252(d)(1) is not jurisdiction.

3         Instead, the conclusion from the Supreme Court is that

4    there is, if anything, some kind of common law exhaustion

5    required.  I don't know if that common law exhaustion is in

6    play here or not.

7         The Third Circuit in *DeValle* suggested that 1252(d)(1)

8    requires exhaustion, even in the context of something that

9    long pre-dates review of a final order.  One can look at that

10   in many different ways, and one can look at that as surviving

11   or not surviving the Supreme Court's decision in

12   *Santos-Zacaria* of 2023.

13        But assuming arguendo Santos-Zacaria applies here, then

14   exhaustion is only a prudential issue, which is how you

15   started off, Mr. Sampat.

16        First, let me just say I'm not sure under *DeValle* that

17   there is a need for prudential exhaustion before the entry --

18   before the entry of an order of final removal.  I don't know

19   the answer to that.

20        But even assuming arguendo that there is some need

21   for that kind of exhaustion, all of the factors that

22   Justice Jackson for the Supreme Court in *Santos-Zacaria*

23   pointed out, all of those factors weigh heavily in the

24   direction of me taking this issue on.

25        Supreme Court Justice Jackson speaks about the, quote,

Add.021    Petitioner's Appendix Page 365

1    unquote, orderly progression of the litigation.  Here there

2    are bail arguments that have been made in front of me.  There

3    has not even been a scheduled bail hearing in front of the

4    immigration judge so it's hard to know why orderly progression

5    does not cut in favor of me simply resolving the issue.

6         The Supreme Court in *Santos-Zacaria* invokes efficiency,

7    it invokes, quote, unquote, waste of work.  That would seem to

8    cut in favor of me resolving the issue here as well.

9         There's been many, many, many pieces of evidence filed.

10   There has been a great deal of litigation on this particular

11   issue.

12        Hard to know why at this stage it's more efficient in

13   terms of the judicial resources you alluded to, Mr. Sampat,

14   for me not to just take the case and resolve it myself.

15        Finally, there is something of a futility reason to

16   avoid exhaustion.  I have to say that with respect to that

17   there is a very strong and uncontested record here as to lack

18   of flight risk and lack of dangerousness.

19        Given that strong and uncontested record, it becomes

20   hard to know what the reason, other than waste of time, is to

21   send this to an immigration judge who will look at those same

22   two factors under C.F.R. 1003.19(h)(3) and will come to what I

23   imagine is a pretty obvious solution.

24        I think the New Jersey cases you cite rest on Third

25   Circuit decisions that themselves treat exhaustion as

1   jurisdiction.  The Supreme Court in 2023 made crystal clear

2   that exhaustion is not jurisdictional.

3        To the extent that exhaustion is required, in contexts

4   like this one it is required as a prudential matter; and if

5   it is required, if it is required as a prudential matter, for

6   all the reasons I have just mentioned, I don't understand why

7   it would be required here under the factors set out in

8   *Santos-Zacaria* in 2023.

9        So it's a prudential matter, it's a discretionary

10  matter, and I will not exercise my discretion to avoid this

11  decision, given where things are postured.

12       Mr. Sampat, anything else you want to add on

13  exhaustion?

14       MR. SAMPAT:  Nothing else, Your Honor.

15       THE COURT:  Mr. Sampat, I'm going to keep sticking with

16  you because a lot of the preliminary things run through

17  arguments the respondents have made.

18       The standard here with respect to bail, I want to

19  understand where you're coming from on this.

20       MR. SAMPAT:  On the extraordinary circumstances

21  standard, Your Honor?

22       THE COURT:  Yeah, what the key case is and what the

23  substantive standard that that case or cases stands for.

24       MR. SAMPAT:  Yes, Your Honor.

25       So *Landano* sets forth the extraordinary circumstances

1   standard, and we think that means, you know, it is something

2   in the form of severe health complication or something that

3   would be irreparable in a case where an individual would

4   not -- further delay would severely prejudice a petitioner.

5        We don't have that here.  Mr. Khalil, again, is before

6   an immigration judge, is receiving his due process.  If he's

7   released, his case would be transferred to the non-detained

8   docket, so those proceedings would remain ongoing.

9        It's a pretty high burden, and we don't think

10  Mr. Khalil has made it.  We think a lot of that is rooted in

11  our March 23rd filing on the opposition for his motion for

12  release.

13       THE COURT:  Why do you think *Landano* provides the

14  standard?  Let me step back even further.

15       What is the standard that you view as the one that

16  you've made?

17       MR. SAMPAT:  I'm sorry, Your Honor.  Give me one

18  moment.

19       THE COURT:  Let me explain to you why I'm asking the

20  question.

21       In your March 23rd filing you just alluded to, at

22  page 17 you indicate that the standard that needs meeting here

23  is what you described as the *Landano* standard, and you say

24  that it is, quote, unquote, conjunctive, that there needs to

25  be a showing of both high probability of success on

1   substantial claims and extraordinary circumstances.
2        I'm not sure -- is that your position today, or do you
3   have a different position?
4        MR. SAMPAT:  No, that is our position today.  That is
5   a -- it is a conjunctive standard, Your Honor.
6        THE COURT:  So in other words, your judgment is that
7   there needs to be a showing of extraordinary circumstances,
8   whatever that means, plus there needs to be a high
9   probability -- let's pretend that's 51 percent -- of winning
10  on a substantial claim.  Is that --
11       MR. SAMPAT:  Yes.
12       THE COURT:  I'm not sure I understand how you get that
13  out of the case.  I think the problem you have with that is to
14  make that argument you pin cite to a particular page in
15  *Landano* but that particular page in *Landano* is simply reciting
16  the standard set out by the Fifth Circuit circuit.
17       And a couple paragraphs later the circuit says, well,
18  gee, we, the Third Circuit, have set out a standard in *Lucas*
19  previously.  And the *Lucas* standard is not conjunctive.  The
20  *Lucas* standard does not say something about high probability
21  and also extraordinary circumstances.  The *Lucas* standard
22  simply says extraordinary circumstances.
23       So I'm not sure why the *Landano* court's simple
24  citation -- the *Landano* court literally says this is how other
25  courts have done it and then cites the Fifth Circuit's

1  conjunctive standard but then two paragraphs later has what I

2  take to be a contrast with its own pre-*Landano* statement in

3  *Lucas* which is simply about extraordinary circumstances, not

4  about the merits.

5      I'm not sure why I read *Landano* as displacing by mere

6  citation to the Fifth Circuit the Third Circuit's *Lucas*

7  position.

8      MR. SAMPAT:  Your Honor, so we cited -- there are a

9  couple cases that we cited in our March 23rd filing where

10  courts within the circuit have used it as a conjunctive

11  standard.  That's in *Ingram* where the court denied bail after

12  a state prisoner failed to establish both prongs.

13      There's also the *Hudler* case out of the Middle District

14  of Pennsylvania where it was denied.  I'm sorry, Your Honor.

15  I don't mean to --

16      THE COURT:  No, no, no, go on.

17      MR. SAMPAT:  Sure.

18      So *Hudler* was denied on the basis that petitioner had

19  failed to establish a substantial constitutional claim.  I

20  will also note that when we briefed the release motion back in

21  March, the fraud and willful misrepresentation charge wasn't

22  before the Court or had not been briefed in the PI or in the

23  operative pleadings that were tethered to the motion, so we

24  haven't had a chance to actually brief it.

25      We don't think it's necessary because at the end of the

1  day we think this is a discretionary decision obviously, but

2  this is just a separate independent charge that continues to

3  justify Mr. Khalil's detention today.

4        THE COURT:  What I would say that -- I read all the

5  district court opinions you cited and they're thoughtful, of

6  course.  They're my colleagues throughout the circuit thinking

7  this through very carefully, no doubt about it.

8        It's just that when I read *Landano*, I do not see a

9  Third Circuit adapting the Fifth Circuit's conjunctive

10 two-part test.  In fact, I see it as very explicitly drawing a

11 contrast with the Third Circuit's own *Lucas* test, which is

12 simply focused on extraordinary circumstances.

13       I think that -- so I think that my own judgment is that

14 what governs here is the *Lucas* standard, not the *Landano*

15 standard.  The thing that's a little complicated is what

16 extraordinary circumstances mean.  And I appreciate that the

17 Second Circuit in *Mapp v. Reno* has said that extraordinary

18 circumstances means something like circumstances so

19 extraordinary that the habeas writ would be ineffective if

20 bail were not granted.

21       But I don't see that in the Third Circuit's binding

22 *Lucas* decision.  I don't see the extraordinary circumstances

23 are limited to that qualification.

24       I'll go even further.  The *Mapp v. Reno* decision is

25 itself based on an older Second Circuit decision, two of them.

1   One of them is *Iuteri*, I-U-T-E-R-I.  And that seems like one

2   of the cases that *Lucas* explicitly walked away from.

3        So I'm left with two complexities in terms of the

4   standard here.  First, I think *Lucas* controls and not *Landano*.

5   I appreciate that many colleagues or some colleagues in the

6   Third Circuit, other district judges, have seen it perhaps

7   differently; but I think the most faithful read of the

8   circuit's precedence is that *Lucas* controls.

9        I am left with two issues.  The first is extraordinary

10   circumstances as to what?  *Mapp v. Reno* or the Second Circuit

11   based on *Iuteri* says that it's extraordinary circumstances

12   that are specifically tied to the efficacy of a later habeas

13   remedy, but the Third Circuit did not say that in *Lucas* and

14   has not said that in its case law, so far as I have been able

15   to see it.

16        In addition, and I think this is quite important, *Mapp*

17   *v. Reno* requires some showing of meatiness to the underlying

18   claim.  It doesn't seem like *Lucas* requires that.

19        Now, if *Landano* was the law in the Third Circuit, there

20   would need to be some kind of, quote, unquote, high

21   probability showing, but I don't think *Landano* is the law.  I

22   think *Lucas* is the law.

23        Under *Lucas*, what I take away is the extraordinary

24   circumstances do not need to be focused on the preservation of

25   the habeas remedy.  The Third Circuit in *Lucas* left open a

1   broader remit for federal judges considering bail to simply

2   assess extraordinary circumstances and all of the possible

3   permutations that might arise, and the *Lucas* court did not

4   seem to take the step that the Second Circuit did.  That is to

5   say the *Lucas* court did not seem to require that there be some

6   showing of likelihood of success on the merits or some showing

7   of even a substantial claim on the merits.

8       So my judgment is *Lucas* controls here and that *Lucas*

9   has a very broad idea of extraordinary circumstances, not one

10  tethered, as in *Mapp v. Reno*, to the efficacy or non-efficacy

11  of the habeas remedy.  And at least within its four corners

12  *Lucas* does not seem to require any sort of showing that there

13  is a kind of level of strength in the underlying claims.

14      I'll note two other things about *Lucas*.  First of all,

15  it seems to me that the Third Circuit almost surely takes the

16  view -- would take the view, excuse me, that the standard set

17  out for bail in habeas criminal cases is higher than the

18  standard that would apply here, and that's in part based on a

19  simple a fortiori assessment, which is that in a criminal

20  context somebody has, by hypothesis, been convicted with all

21  the guarantees that the Constitution implies.  And there are

22  in the state criminal context imported federalism issues.

23      None of that is present of course in the immigration

24  context.  There are not criminal protections, there is not a

25  criminal judgment, and there are not federalism issues.

1    The a fortiori, by that I mean whatever the standard

2    for release is, in criminal habeas is higher than the standard

3    for release in immigration habeas.

4    The buttress for that a fortiori argument is what the

5    Third Circuit in *Landano* cites, which is Justice Douglas's

6    opinion *in Aronson*, his in-Chambers opinion in 1964.

7    I'll also note that *Landano* and *Lucas* seem hesitant

8    about the idea of tying the standard of -- for granting bail

9    in the habeas context.  They seem hesitant about tying it to

10    the substantive likelihood of success.

11    One of the things that is said in one of those cases is

12    exhaustion doesn't generally turn on whether you have a good

13    claim or not, which is really what we're talking about here.

14    So, bottom line, I think the *Lucas* standard controls,

15    not *Landano*.  I think the *Lucas* standard under the reasoning

16    of Justice Douglas as cited in *Landano* is almost surely higher

17    than the standard that is in play here.

18    The *Lucas* standard is about extraordinary

19    circumstances.  Period.  Full stop.  The *Lucas* standard is not

20    about extraordinary circumstances related to ultimate efficacy

21    of a habeas decision.  That's the Second Circuit's perspective

22    but it's not what *Lucas* says.

23    Finally, *Lucas* is not about the strength of the

24    underlying claim.  That is *Iuteri* out of the Second Circuit,

25    that is *Mapp* out of the Second Circuit, but that is not what

1   the Third Circuit said in *Lucas*.  And of course it's my job to

2   faithfully apply the standard set out by the circuit and not

3   to subtract from them and not to add to them.  That's where I

4   stand on the standard.

5       Mr. Sampat, do you have anything you want to add on any

6   of this?

7       MR. SAMPAT:  Yes, Your Honor, if I may, understanding

8   Your Honor's point that you believe that *Lucas* is the standard

9   and not *Landano*.

10      THE COURT:  Right, right.

11      MR. SAMPAT:  I think it's important to note that if

12  *Lucas* is the standard, anyone would be able to just file a

13  habeas petition and just say their case is different, it's

14  special enough, there's extraordinary circumstances, and that

15  standard is met.

16      I think *Landano* was meant to say that it needs to be

17  tethered to the underlying claims that's raised in the

18  petition itself.  It makes logical sense for -- we think that

19  it makes logical sense to read *Landano* that way because at the

20  end of the day release pending habeas review is, in effect,

21  sort of an injunctive relief.

22      There needs to be some sort of showing that there's a

23  likelihood of success on the merits before we go forward and

24  before release actually results.  What the Third Circuit has

25  said repeatedly is an exceptional form of relief of release on

1    bail pending habeas.

2        THE COURT:  I hear all that, but my responses are

3    twofold.  First, maybe the Third Circuit should have

4    articulated a different standard, but that's ultimately not my

5    job.  My job is to faithfully follow the circuit's standard as

6    I understand it.

7        The second point I would make is extraordinary

8    circumstances is a pretty high standard.  It is certainly the

9    case that litigants all over the country can make any claim

10   they want, but the fact that claims are makeable doesn't mean

11   that claims win, and extraordinary circumstances sets a pretty

12   high bar.

13       The third problem with what you've said about the idea

14   that bail pending a determination is analogous to an

15   injunctive remedy and therefore a likelihood of success is

16   necessary, there are a bunch of problems with that.  I'll take

17   two.

18       Problem one is that the Third Circuit -- forgive me for

19   not recalling if it's in *Landano* or *Lucas*, I think it's in

20   *Landano* -- has explicitly said no to that, has explicitly said

21   we don't think of likelihood of success on the merits as the

22   key issue.

23       The second thing is, the only circuit court that has

24   specifically addressed the question of bail in the habeas

25   context, which is to say the Second Circuit in *Mapp v. Reno*,

1   the only modern circuit that's done it, they too have not

2   followed what you suggested.

3       They haven't required a likelihood of success on the

4   merits.  They have required something quite a bit lower.  They

5   have required something like a substantial claim.  I'm

6   quoting, I think, there.

7       So, maybe, but that's just not the state of the law,

8   and it's the state of the law as it stands today that I'm

9   bound to apply here.

10      The other problem I think you have to deal with is the

11  a fortiori point that I alluded to earlier and that is central

12  to *Landano*'s citation of Justice Douglas, which is that if the

13  standard doesn't include -- and it doesn't, the *Lucas* standard

14  does not include likelihood of success on the merits in a

15  criminal case, why would we imagine a higher standard in an

16  immigration case?

17      Indeed the logic -- not the implicit logic but the

18  explicit logic of *Landano* would seem to be that immigration is

19  a lower standard because, by hypothesis, nobody has received

20  the very strict protections associated with a criminal

21  conviction, including the full range of constitutional rights

22  that are triggered there.

23      So, ultimately, I'm not persuaded by what you're saying

24  on that point, Mr. Sampat, but I appreciate it.

25      Anything else you want to add?

1          MR. SAMPAT:  No, Your Honor.  Thank you.

2          THE COURT:  Thank you.

3          So those were a whole bunch of preliminary issues, and

4    they are complicated in this case in part for a reason that

5    Mr. Sampat alluded to.  These are -- extraordinary

6    circumstances a high standard, it's hard to meet, and there

7    are simply not a lot of cases in this area, in part because

8    it's hard to meet and in part because generally this sort of

9    litigation goes forward not in a federal district court but in

10   front of an immigration judge.

11         Ms. Das, I haven't heard from you.  We're now at the

12   merits of your argument with respect to release.  I won't ask

13   you to repeat everything you've said in your papers, but I'd

14   like to hear from you on the extraordinary circumstances

15   argument, anything else you want to say, and then I'll ask

16   Mr. Sampat to be heard as well at that point.

17         MS. DAS:  Thank you, Your Honor.

18         Yes, we certainly are able to address the extraordinary

19   circumstances, which we would essentially put into

20   three buckets at this point.

21         One is certainly the fact that this is a First

22   Amendment case, and the Government's most recent actions

23   underscore our First Amendment concerns, which I will address

24   in a moment.  The other, as you've already noted, is that this

25   is a case where there is extensive evidence in the record,

1  much of which goes to flight risk and danger, and that's

2  evidence that the Government has not controverted.

3        Finally, there's a whole set of harms related to what

4  this has meant to Mr. Khalil and his family and the prejudice

5  that further delay would cause him.

6        Taking the first point on the First Amendment issues

7  first, certainly for more than three months the Government has

8  relied on a rarely used and unconstitutionally vague foreign

9  policy ground to justify its detention of Mr. Khalil.

10        When this Court enjoined that detention and removal on

11  that ground, ICE made the extraordinary decision this past

12  Friday not to release Mr. Khalil as it would in an ordinary

13  case but now to detain him on the basis of the separate

14  immigration application charge, a charge that the evidence we

15  presented already shows is rarely, if ever, used as a basis to

16  detain lawful permanent residents like Mr. Khalil.

17        So the Government's latest actions confirm what we have

18  alleged in this petition all along that retaliatory detention

19  is the Government's goal, that the purpose of every step that

20  the Government has taken in this case has been to ensure that

21  Mr. Khalil remains locked away until he is deported as

22  retaliation and punishment for his speech and viewpoint.

23        So at this stage of the case the Court does have the

24  power and the sufficient evidentiary record to grant bail in

25  light of that extraordinary circumstance.  His petition has

1  been verified.  He submitted extensive evidence of the

2  Government's own statements about his protected political

3  speech, the timing and baselessness of these

4  characterizations, and the extraordinary irregularity of the

5  Government's latest justification for his detention.

6      It's clear that this case is core about detention.

7  It is a rare case where there's actually direct evidence of

8  First Amendment retaliation from day one.  The Government's

9  own statements and their supplemental charging document make

10  explicit that they have been targeting Mr. Khalil from the

11  start based on his speech and viewpoint.

12      This Court has made findings with respect to the fact

13  that Mr. Khalil has engaged in protected speech and the fact

14  that the Government has now swapped in what we would argue to

15  be an even weaker justification for his continuing detention,

16  because this Court's injunction has forced them to do so,

17  doesn't break that causal chain.  If anything, it

18  strengthens it.

19      THE COURT:  May I ask you something on that for the

20  moment?

21      MS. DAS:  Yes.

22      THE COURT:  There are two charges here and one of them

23  has been enjoined.  The second charge was not filed last

24  Friday.  It was filed many months ago.  So I'm a little bit

25  not exactly sure what you mean by swapping out a

1    justification.

2        I would imagine -- the Department of Homeland Security,

3    I imagine, saw itself as justified in proceeding on both

4    charges and there's just -- one is now preliminary enjoined

5    and the other one wasn't invented on Friday.  It's been on the

6    books for months.

7        MS. DAS:  Yes, Your Honor.  Absolutely.

8        To be sure -- and this Court has made clear that First

9    Amendment issues regarding the charge itself will require

10   further development, and we, you know, intend to file those

11   submissions promptly.

12       But with respect to detention itself, the Government

13   has only relied on the foreign policy ground for detention and

14   we know that because when in our bail briefing we argued,

15   well, he's not a flight risk and danger and the Government has

16   not contested that in these proceedings, the Government's

17   response was that it was relying on the foreign policy ground,

18   that this was somehow in the category of security cases where

19   flight risk and dangerousness was unnecessary to detention.

20       We also know that based on the Government's letter on

21   Friday that they are taking the position that they are now

22   relying on the immigration application charge as the basis of

23   his detention.  So it's really the Government's actions that

24   are bringing the detention part of this case based on the

25   willful misrepresentation charge to the forefront.

1    But even if this issue has been in the case all

2    along -- and certainly we have argued that retaliation is the

3    goal and that it really doesn't matter which charge the

4    Government is relying on, regardless of whether charges

5    themselves are valid and give the Government discretion to

6    detain an individual in removal proceedings, the First

7    Amendment itself forbids the Government from exercising that

8    discretion in retaliation for someone's speech and the Fifth

9    Amendment forbids the Government from exercising that

10   discretion to punish someone.

11   And given the fact that these issues have been

12   developed in the evidence, that both sides have submitted

13   evidence, including all the immigration filings, this issue

14   has been teed up, and the fact that there is a strong First

15   Amendment issue that will be litigated over the course of this

16   case is an extraordinary circumstance such that Mr. Khalil

17   should not be remaining in detention, having his First

18   Amendment rights be impaired as these issues are further

19   litigated.

20   THE COURT:  What do you do with the argument that

21   Mr. Sampat has made that is essentially the consequences for

22   this petitioner of being detained are, while difficult for him

23   undoubtedly, quite a bit like the consequences for many, many,

24   many detainees?

25   And in terms of showing that they are, quote, unquote,

1    extraordinary as the law requires, why is this petitioner's

2    situation any different or worse than that of many, many, many

3    other people who are in detention who have their own

4    collateral consequences, who have their own life disruptions?

5        MS. DAS:  Well, Mr. Khalil's case is unique because

6    this is a First Amendment case.

7        THE COURT:  I've got you on that.  Bracket that for

8    half a moment if you could, but I took Mr. Sampat to be saying

9    in the brief he filed in March on this subject that the normal

10   extraordinary circumstance is something like a person who is

11   very ill and at the end of their life and they can't wait for

12   a habeas remedy because they will otherwise not make it, they

13   need to go to a hospital or something like that, and that

14   there's nothing like that that you all have put forward with

15   respect to the petitioner here.

16       What do you do with that argument, Ms. Das?

17       MS. DAS:  Our position in this case has been all along

18   that both the retaliation and the punishment are the two

19   impermissible motivations and goals behind what the Government

20   is doing.  And if he has to remain in detention only to get a

21   victory on those claims, you know, several months from now,

22   then the Government wins.

23       If the argument is, no, he should have never been

24   detained, that they are doing this to punish him for speaking

25   out about issues that he cares about, matters of pressing

Case: 25-2162    Document: 16-2    Page: 41    Date Filed: 06/26/2025
Case 3:25-cv-01072-L-BT    Document 59-2    Filed 07/07/25    Page 159 of 194    PageID 11024

40

1   public concern, the fact that he will have to remain in

2   detention for those punitive or retaliatory reasons, that is

3   the extraordinary circumstance and that his ability to live

4   his life freely is the controversy that preceded all of this.

5   That is the status quo to which he should be restored.

6       I think in this case that is not true for every

7   non-citizen who faces detention and there are processes that

8   are available to them in the ordinary course, but for

9   Mr. Khalil this has never been an ordinary immigration case.

10      Our entire theory is that the Government is abusing the

11  ordinary processes of immigration court of putting someone in

12  removal proceedings, of detaining them for a constitutionally

13  improper purpose.

14      And of course in Mr. Khalil's case we have alleged that

15  there are the kinds of concerns that are extraordinary, that

16  the loss that he's already suffered in terms of his ability to

17  be there for the birth of his first child, to attend his

18  graduation.  These are the punitive experiences he's

19  experienced, again, not just in the way that every person who

20  is detained experiences them but because that is part of the

21  punishment.

22      That's what makes this case extraordinary.  I am aware,

23  you know, in my 20 years of representing immigrants of no

24  other case where the Government announced the day that it

25  detains someone that they were detaining them in order to send

1    a message that their arrest would be the first of many, that

2    they were going after student protestors.

3        That chilling effect has made this case an

4    extraordinary case, and it's something that's been recognized

5    in the small handful of cases that have emerged over the last

6    several months that have dealt with similar issues, in the

7    *Ozturk* case, *Concerti*, *Mahdawi*, *Aditya*, *Muhammad*, these are

8    all cases where the First Amendment concerns, the chilling

9    effect, the punitive effect it's having on the individuals

10   have demonstrated extraordinary circumstances.

11       I certainly agree that in the Third Circuit the

12   standard here is a very capacious one and that goes back not

13   just to *Lucas* but to *Johnston v. Marsh*, really talking about

14   the inherent power to grant petitioner's bail in the exercise

15   of the judge's discretion.

16       I think in some of the other cases some of the

17   extraordinary circumstances have been really discussed more as

18   a kind of interest of justice model.  Here we can see, given

19   the extensive record, including the record on lack of a flight

20   risk or dangerousness, of the Government never coming forward

21   with a valid justification for why Mr. Khalil must remain

22   detained while we litigate these very weighty issues.  Those

23   are all extraordinary circumstances that set this case apart.

24       I think one very illustrative case is the *Ozturk* case

25   in many ways.  It's very similar to what we are seeing here.

1    In her case, Ms. *Ozturk*, like Mr. Khalil, she was originally

2    detained based on these foreign policy allegations; but in her

3    case her student visa was revoked and ICE ultimately decided

4    to pursue removal proceedings on the basis of the revoked visa

5    charge alone and not the foreign policy ground.

6        She raised her First Amendment and due process

7    challenges to detention.  Initially the district court in

8    Ms. Ozturk's case concluded it was too soon to consider bail,

9    given the foreign policy allegations and the limited factual

10   record; but after the Government declined to present any

11   evidence to controvert Ms. Ozturk's allegations and

12   submissions, the court granted bail and did so even when the

13   immigration judge had denied bail.

14       It held that Ms. Ozturk had raised substantial claims

15   that her detention violated First Amendment and due process

16   and that there were several extraordinary circumstances,

17   including the chilling effect that her detention had on her

18   speech.

19       So this is a case in which those extraordinary

20   circumstances are clear from every method that the Government

21   has used and every decision they have made in this case to

22   pursue Mr. Khalil's detention and their plan to remove him.

23       THE COURT:  Ms. Das, anything else you want to add?

24       MS. DAS:  I wanted to address the idea about waiting

25   for immigration court bond proceedings.

1        I think, as the Court has already noted, there is no

2   statutory exhaustion requirement in this case.  I would also

3   note that the 1252(d) exhaustion requirements do not apply to

4   detention matters because there's no avenue in which detention

5   issues ever get to a court of appeals on a petition for review

6   because it's not --

7        THE COURT:  Ms. Das, let me pause you there.  I see the

8   argument you're making, and on a blank slate it's not clear

9   how to think about it.  The complexity is that in *DeValle* the

10  Third Circuit suggested that decisions on the way to a final

11  order of removal may require a kind of common law exhaustion.

12       How *DeValle* might or might not play in a detention

13  context and how *DeValle* might or might not work as to that

14  point, as to that point, after the Supreme Court's decision in

15  *Santos-Zacaria*, I don't know the answer to that.  But that's

16  why I presumed arguendo that prudential exhaustion is required

17  in the circumstances; but, as you've heard, I've determined

18  that on the facts of this case, given when the record was

19  built, how thickly the record has been developed, how much

20  time has been put into it, and what the record shows about

21  flight and dangerousness, which are those same two things the

22  immigration judge would need to look to, given all of that, I

23  have concluded that -- even assuming arguendo that there is an

24  exhaustion obligation under *DeValle* there is no need for

25  exhaustion here under the factors laid out by the

1    United States Supreme Court in *Santos-Zacaria* in 2023.

2            So that's where we are on that.  I mention all that at

3    this moment, Ms. Das, because I think that if you want to tell

4    me that there's no exhaustion in the detention -- excuse me,

5    in the habeas bail context, you're gonna have to explain to me

6    why *DeValle* doesn't work.  I don't know if you want to do that

7    or not, but that's the key data point here.

8            MS. DAS:  No, Your Honor.  I simply -- to the extent

9    that there is a prudential exhaustion requirement in the

10   detention context, our position would be that it doesn't stem

11   from 1252.  It's a prudential exhaustion requirement that may

12   stem from general principles, and we would agree that

13   exceptions -- normal exceptions would certainly apply here on

14   this record, so I don't need to belabor that particular point.

15           We are concerned that the ordinary immigration court

16   processes will not provide Mr. Khalil with the opportunity to

17   protect his rights, and certainly this is a case -- and this

18   is something that was also considered in the *Ozturk*

19   decision -- where it's not fair that an immigration court

20   proceeding could ever be a substitute for this Court's

21   consideration of release since an executive branch employee

22   would not be able to address First and Fifth Amendment issues,

23   powerless to consider constitutional claims, and certainly it

24   would be unusual for them to be considering evidence of the

25   executive branch as retaliatory or punitive motives.

1    So it just isn't a substitute for the power that this

2    Court has and the issues that this Court would be considering.

3    Fundamentally, you know, we would just ask that this

4    Court grant Mr. Khalil bail, and, you know, we certainly

5    believe that ordering Mr. Khalil's return to this jurisdiction

6    in the alternative would be appropriate if the Court were not

7    to grant bail.  And I'd be happy to address any concerns the

8    Court has about that.

9    But release at this stage, given the development of the

10   record and the opportunity that both sides have had to explain

11   why Mr. Khalil is being detained and given all of the harms

12   that he suffered over the 104 days that he's been in

13   detention, we hope that this Court will grant his immediate

14   release on bail.

15   THE COURT:  Ms. Das, thank you very much.

16   Mr. Sampat, over to you.

17   MR. SAMPAT:  Thank you, Your Honor.

18   If I may just make a quick point on factual -- a

19   factual point that my friend made on the other side regarding

20   the *Ozturk* case.

21   THE COURT:  Sure.

22   MR. SAMPAT:  If I remember that case correctly, I don't

23   believe Ms. Ozturk was held on the foreign policy ground.  I

24   think there was some debate as to whether she was or was not

25   being held on that ground; but I think at the end of the day

1   when the Government submitted its briefing, it was the fact

2   that she was out of status after her student visa was

3   terminated.  That was the reason that she was detained and

4   placed into proceedings.

5        I wanted to make that point very quickly.

6        As to the extraordinary circumstances, Your Honor, I

7   think it's important to note, at least on the Fifth Amendment

8   issue, that the detention -- detention of aliens has been

9   upheld by the Supreme Court as being constitutional.  It's

10  part of the process.

11       It's integral to determine whether somebody is --

12  should be found removable, is removable, and then is

13  ultimately ordered removed.  I think that's an important point

14  to note as the Court is considering the Fifth Amendment

15  issues.

16       On the First Amendment issues, I'll just note that the

17  Court hasn't ruled on the First Amendment issues yet.

18  Obviously my concern -- you know, the Government's concern

19  with the argument that Mr. Khalil -- that the petitioner is

20  posing here is that it kind of invites a magic word test where

21  petitioners could raise First Amendment claims in habeas and

22  then that by itself would be deemed extraordinary

23  circumstances.

24       I don't think that's what the Third Circuit had in mind

25  when it kept saying that the extraordinary circumstances

1  standard is a very high bar, that that high bar could be

2  circumvented by some sort of artful pleading or coloring their

3  claims in constitutional guard that way.

4      THE COURT:  The problem with that -- look, I think that

5  is potentially your real issue.  And Ms. Das left out one of

6  the key First Amendment cases in this area which is the case I

7  believe she litigated, the *Ragbir* case, in front of the Second

8  Circuit.

9      It is the case that treating First Amendment chilling

10  as potentially a basis for extraordinary circumstances could

11  open the door to more people seeking extraordinary

12  circumstances, but there are two answers to that.

13      The first is, it is then on district judges to not

14  simply accept magic words and be done with it.

15      As you know, Mr. Sampat, I previously found that the

16  petitioner here -- I found as a matter of fact that the

17  petitioner here engaged in, quote, unquote, political speech

18  within the meaning of the Supreme Court's jurisprudence; and I

19  found as a matter of fact that he wishes to and would return

20  to such speech.  So it's not simply a question of magic words.

21      But the other point is that the mere -- we had this

22  back-and-forth, you and I, in our first interaction with

23  Mr. Flentje, but the mere fact that a claim might be made

24  under a standard is not an argument against that standard.

25  It's just a fact of the standard, number one.

1        Number two, I'm not in the standard-making business.

2   I'm in the standard-applying business.  So Ms. Das's argument

3   that First Amendment chilling is an extraordinary

4   circumstances, that argument may work or may not, but the fact

5   that it might doesn't tell me whether it should or should not.

6   It's simply a restatement of the question.

7        Her argument is that First Amendment chilling might

8   count as an extraordinary circumstances, and what you're

9   saying back is, well, if it does, that would allow those

10  claims to go forward.  True, but that doesn't tell me

11  anything.  That just restates the issue.

12       If what it means to tell me is that people could use

13  magic words, well, then, A, it's over to district judges to

14  not simply accept magic words, and, B, you know the factual

15  findings I've made here as to First Amendment speech.

16       I'm not sure I'm fully persuaded by the argument, at

17  least as you've made it until now, on that particular piece.

18       MR. SAMPAT:  I absolutely hear you, Your Honor.  I

19  would just say that, you know, if we're gonna get to the First

20  Amendment issue, we are getting to the merits of his First

21  Amendment claim which then goes back to our point of, like,

22  why just extraordinary circumstances by itself can't be the

23  standard for bail pending -- in a habeas case that needs to be

24  likelihood of success on the merits, as well.  This is how it

25  all -- we think that it all sort of ties together.

```
 1         THE COURT:  I want to just say, Mr. Sampat, that's why
 2   we spent so much time discussing the standard.  I appreciate
 3   that point, which is to say I have held that the petitioner
 4   has failed to develop any likely to succeed argument on
 5   anything other than the vagueness ground as to the Secretary
 6   of State's determination.  And Ms. Das, 15 minutes ago, noted
 7   the petition has been verified.
 8         But as we all understand, the petition was very
 9   belatedly verified.  It was -- in Mr. Khalil's latest
10   declaration, there was a reference in sentence two or three
11   to:  And, yes, I have gone back and verified the petition.
12         But the point is, in terms of the materials I've had
13   before me in a merits-type context, I have indeed found that
14   there is no factual evidence because at the relevant point no
15   one had put any evidence in front of me, including no verified
16   petition, and no meaningful legal arguments had been made.
17         So I have already held that there is no likelihood of
18   success as developed by the petitioner on those things.
19         So I agree with you, Mr. Sampat, that the standard here
20   matters a great deal, because if the standard requires
21   likelihood of success on an underlying claim, as I've already
22   held, that has simply not been shown by the petitioner to this
23   point.
24         So I think you're right to say it all flows together,
25   but that's of course why it was so important to spend time and
```

1    explain, in my judgment, why *Lucas* does not involve likelihood

2    of success on the merits and indeed even *Mapp* doesn't.  That's

3    part of how I'm thinking about the situation that the case is

4    currently in.

5         Mr. Sampat, back to you.

6         MR. SAMPAT:  Thank you, Your Honor.  If I may have just

7    a quick moment to just consult my notes.

8         THE COURT:  Of course, of course.  Take your time.

9         MR. SAMPAT:  Thank you.

10        MS. DAS:  Your Honor, I don't want to interrupt

11   Mr. Sampat, but there is a development in the immigration case

12   that's relative.

13        THE COURT:  Hang on for just one second.  Let

14   Mr. Sampat do his thinking and we'll get to it in a half a

15   moment.

16        MS. DAS:  Yes, Your Honor.

17        THE COURT:  Thanks.

18           (Brief pause.)

19        MR. SAMPAT:  Thank you, Your Honor.

20        I don't think we have anything else to add on the

21   extraordinary circumstances point, other than what's in our

22   briefing; but if Your Honor has questions, we're of course --

23   I'm ready to answer them.

24        THE COURT:  Okay.  No.  I appreciate that.

25        Mr. Sampat, while you're looking at your notes, Ms. Das

1    had something that she wanted to bring to all of our

2    attention.

3         Ms. Das, over to you.

4         MS. DAS:  Mr. Khalil's immigration counsel just

5    informed me that the immigration judge has just denied a bond

6    hearing, relying on the foreign policy ground.

7         THE COURT:  Okay.

8         MS. DAS:  So I think that alone is an extraordinary

9    circumstances that would be relevant both to, even if there

10   were at the highest level, the *Landano* substantial

11   constitutional claim that Your Honor has already found.  And

12   it goes to demonstrate that there's no administrative

13   proceeding that will otherwise resolve this being an

14   extraordinary circumstance.

15        It also appears that she's found him removable on the

16   remaining charge and denied asylum, but we can certainly --

17   obviously this is coming in now.  We can send a letter to the

18   Court immediately with these developments.

19        THE COURT:  Right.  I appreciate that.

20        Mr. Sampat, do you know anything about any of that?

21        MR. SAMPAT:  No, Your Honor.  I'm hearing it for the

22   first time right now.

23        THE COURT:  I get it.  If we were in court physically

24   with nobody checking their phones, we wouldn't have known

25   this, but here we are remotely, and at least Ms. Das had some

52

 1   information.  Okay.

 2       Ms. Das, we've heard from yourself, we've heard from

 3   Mr. Sampat.

 4       Anything else that you feel compelled to add at this

 5   point?

 6       MS. DAS:  Just briefly, Your Honor.

 7       I would note that in addition to the verified petition

 8   much of the evidence that we referred to in our latest letter

 9   also comes from the submissions that were attached to the

10   declaration, I believe at ECF-284, which go to the

11   irregularities around the foreign policy ground, around the

12   misrepresentation charge.

13       And certainly the fact now that it appears that the

14   Government or at least the immigration court is not complying

15   with this Court's injunction is another extraordinary

16   circumstances, so we do believe that the factual record at

17   this stage has been sufficiently developed under any standard

18   that's applicable to bail.

19       THE COURT:  I appreciate all that.

20       I want to learn more before suggesting even for a

21   moment that anyone has not complied with the judgment order,

22   but we'll learn more.

23       Ms. Das, you indicated you would file a letter, and I'm

24   sure you and Mr. Sampat can huddle after today's proceeding

25   just so we have a fuller understanding of what's going on with

1    the immigration judge and what advice is being provided to the

2    immigration judge about the meaning of the Court's preliminary

3    injunction.

4        Let me take you through my thinking as to the

5    compliance with the relevant standards here, which is to say

6    the standards set out in *Lucas* and subject to the full

7    discussion we had earlier about *Landano* and about *Mapp v. Reno*

8    and *Iuteri* and all the rest of it.

9        The first thing that I just want to indicate here is

10   that there is -- you know, here is some of the evidence in the

11   record:

12       That the petitioner is married to a United States

13   citizen, that he is the parent of a child in the United States

14   who is -- the child is itself a United States citizen, the

15   petitioner's wife is employed in the United States, the

16   petitioner has pursued education in the United States, has had

17   United States career plans which may be displaced at this

18   point.  In fact, some of them were displaced, which I

19   previously found.

20       In addition, the petitioner has made himself into a

21   highly public figure from the very get-go of the case.  In the

22   first and timely verified petition, there are references to

23   his speaking to the media, et cetera.

24       All of that suggests very low flight risk, connections

25   to the United States and publicness in terms of his person.

1  There are any number of sources for what I have laid out.

2  They are in the petition itself, they're in the petitioner's

3  various declarations, they're in the petitioner's wife's, one

4  of her declarations, one of them doesn't speak to it.  It's at

5  ECF 56-6.  The first letter speaks to some of these

6  connections to the community, but that's just a portion of it.

7      There is strong evidence of lack of flight risk.  All

8  of this is drawn from sworn affidavits that were put forward

9  March 15, March 20, May 8th, June 4th by petitioner; and as to

10  all of that, the respondents have opted not to controvert any

11  of the evidence.

12      And so I find as a matter of fact that the petitioner

13  here, based on the evidence that has been put in front of me,

14  is not a flight risk.  The respondents have opted not to

15  controvert the evidence, as Ms. Das noted, and the

16  uncontroverted evidence points in only one direction.

17      The second issue here that is relevant -- and I'll

18  come in a moment as to how all of this is relevant -- is

19  danger to the public, danger to the community.

20      Again we're in a place where the petitioner has put in

21  sworn evidence March 15, March 20, May 8th, June 4th, and the

22  respondents have simply opted not to take on any of this

23  evidence.  They haven't argued through affidavits, through

24  declarations, through any other evidentiary means that the

25  evidence put forward by the petitioner is wrong, is

1    unreliable.

2          They haven't attempted to put in their own evidence.

3    They have done nothing of the kind.  And so we're left with

4    what the evidence that has been put forward by the petitioner

5    that is uncontroverted shows.

6          That evidence shows that the petitioner has no criminal

7    record.  And there is some evidence in the record from

8    which -- well, let me just emphasize what it is.

9          Exhibits 93 -- excuse me.  Forgive me.  ECF 93-1, that

10   is ECF 93-1, the first letter and the third letter; ECF 56-1,

11   ECF 56-1, letter 4, letter 7, letter 9.  All of these shed

12   evidentiary light on the petitioner's actions in what everyone

13   assumes is the relevant context.

14         And the evidence that all of those -- excuse me.  What

15   all of that evidence adds up to is a lack of violence, a lack

16   of property destruction, a lack of anything that might be

17   characterized as incitement to violence.

18         All of that is simply uncontroverted here by the

19   respondents.  That evidence has been put before the Court in

20   affidavits, in declarations, in letters that are sworn to, and

21   the respondents have opted to say nothing in response of an

22   evidentiary nature.  And so where we are is similar to where

23   we are, risk of flight.

24         All of the evidence in the record points to lack of

25   danger to the community; that is, all evidence that has been

1  put on by the petitioner.  It might have been challenged as

2  unreliable, it might have been challenged as an incomplete

3  picture, but no such challenge has been made, even as there

4  have been many opportunities for the respondents to do that.

5       So what I find as a matter of fact, given the evidence

6  before me as it's been developed by the petitioner and as the

7  respondents have simply opted not to develop anything on the

8  flipside, is that the evidence, I find, is that the petitioner

9  is not a flight risk, and the evidence that has been presented

10 to me, at least, is that he is not a danger to the community.

11 Period.  Full stop.

12      So, given those findings of fact, that is highly,

13 highly unusual that in those settings the respondents and in

14 particular the Secretary of the Department of Homeland

15 Security would continue to seek the detention of a person in

16 that setting.

17      It is of course the case that in the beginning of a

18 proceeding there is ample room -- and the United States

19 Supreme Court has made this clear in a set of recent opinions.

20 There is ample room for a presumption of flight risk or a

21 presumption of danger to justify short-term detention.

22      And in the first days or weeks or even beyond, the

23 Supreme Court has made clear that that's consistent with the

24 law.  But at this point what we have is a thick record that

25 has not been objected to by the respondents, that has not been

1  supplemented by the respondents, and where we are is that it's

2  not the first day or week or month.  There's been ample time

3  to make a contrary submission if that was wanted.

4      So given the fact that, in my judgment, the standards

5  for detention would clearly not be met in front of an

6  immigration judge, it is highly, highly, highly unusual to be

7  seeking the detention of the petitioner, given the factual

8  record as of today.

9      That unusualness is amplified by the findings of fact

10  that I made during the middle of last week, and those findings

11  of fact were based on three declarations by seasoned, expert

12  practitioners.

13      Those declarations were simply not objected to

14  factually, they were not controverted in any way factually by

15  the respondents, and those added up to the idea that it's

16  overwhelming unlikely, I found, that a lawful permanent

17  resident would be detained on the remaining available charge

18  here -- not "available," the remaining charge here, which is

19  to say a charge of failing to fill out accurately and honestly

20  certain particular pieces of the LPR application, certain

21  particular pieces of the LPR application as to things like

22  groups, et cetera.

23      So where we are is that, given the evidence it is, as I

24  said, highly unusual that there would be detention, which is

25  to say the evidence that I have found as to flight risk and

1   danger.  And layered on top of that is the highly unusual

2   aspect of seeking detention and of keeping someone detained,

3   given the background charges here and in particular the pieces

4   of the LPL application that this lawful permanent resident did

5   not allegedly fill out properly.

6       That's another factor that leans in the direction of a

7   finding of extraordinary circumstances: evidence of no flight

8   risk, evidence of no danger, and evidence that I have already

9   found is that it's overwhelming unlikely that a person would

10  be detained on the charge that is not currently enjoined.

11      There are a couple of other things here.  One of them

12  is that there is an extraordinary circumstance that flows in

13  part from a chilling effect.  I have found previously that

14  this petitioner, as I alluded to with Mr. Sampat a few moments

15  ago, that this petitioner engaged in what counts as political

16  speech under the Supreme Court's jurisprudence and would seek

17  to return to it in a form that is inconsistent with detention,

18  which is to say the petitioner has engaged in protests, and

19  that is something that is not doable from inside of custody.

20      So it's a kind of chilling that is not obviated, for

21  example, by giving an interview from a detention facility or

22  sending a communication from a detention facility.

23      So another part of the extraordinary circumstances

24  calculus here is a finding of fact that I make and that I

25  previously made that the petitioner is being prevented from

1    engaging in his speech and that that chilling effect is

2    another part of the extraordinary circumstance that is here.

3        I also agree that another piece of the extraordinary

4    circumstance is that part of the theory here for release would

5    require assessment by the immigration judge of issues that the

6    immigration judge is almost surely not legally permitted to

7    consider, which is whether or not detention continues to be

8    appropriate or if release is more appropriate when those kinds

9    of questions are bottomed on alleged constitutional

10   violations.

11       It's an extraordinary circumstance if the argument that

12   might be made is one -- if the argument for release that might

13   be made is one that the immigration judge literally cannot

14   address.  That is both an additional argument for

15   non-exhausting remedies but it's also part of what makes this

16   circumstance unusual.

17       The final thing I want to note is that while it seems

18   to me that *Lucas* does not require any showing of some kind of

19   substantialness to the underlying legal claim, I see of course

20   that the law is not thickly developed in this area and that it

21   might be that *Mapp v. Reno* at least in part is relevant; and

22   *Mapp v. Reno* suggests there needs to be some kind of showing

23   as to the underlying merits of the claim.

24       There needs to be some kind of showing that there's

25   something to them, that they're not trivial, that they're

1    serious, et cetera.

2        I don't take *Mapp v. Reno* as suggesting they need to be

3    likely to succeed on the merits, not at all.  If I took *Mapp*

4    *v. Reno* as governing, point one, and if I took *Mapp v. Reno* as

5    requiring likelihood on the merits, point two, well, then,

6    there could be no release here for the petitioner because, as

7    I've already held, there has been no showing by the petitioner

8    of likelihood of success on the merits as to the lawful

9    permitting application charge, but that's not -- *Mapp v. Reno*

10   is not obviously governing and that's not what *Mapp v. Reno*

11   says.  It requires some kind of substantialness but not all

12   the way to likelihood of success on the merits.

13       What I would say as to the claims here, Ms. Das today

14   invokes a First Amendment claim and a due process punishment

15   claim.  The due process punishment claim is based, as we know,

16   on the idea -- and it's in the petition, of course.  It's at

17   pages 25 or 26 of the petition.

18       But the due process punishment idea is that, as the

19   Supreme Court held in the 19th century in the *Wong* case, as

20   it's held more recently in the *Zadvydas* case, the criminal law

21   is for punishment, the criminal law with all of its

22   protections.

23       The civil law, including immigration law -- and that's

24   what those Supreme Court cases hold -- are not a place for

25   punishment.  They're a place for effectuating other government

1    interests.

2         One of the arguments the petitioner has made here is

3    that he is being punished, that there is a disapproval of

4    certain things he has said and done in the past, and that the

5    immigration process is being used not to vindicate the

6    immigration laws but to punish the petitioner for those

7    things.

8         The petition has -- the verified petition has facts

9    along those lines at paragraphs 33 and 73 and 82 and 83 and

10   84.  And when you combine those facts with the current fact,

11   which is that the petitioner -- the respondent, one of them,

12   the Department of Homeland Security Secretary, is detaining

13   and seeking to keep detained the petitioner in the absence --

14   not "in the absence," in the face of thick evidence that has

15   not been controverted as to flight, as to dangerousness, and

16   is keeping and seeking to keep the petitioner detained in

17   light of strong evidence that I have found, that this is

18   overwhelming unlikely to be the ordinary course.

19        All of that, the evidence that strongly suggests that

20   there is no basis for detention here, combined with the

21   paragraphs I've mentioned in the petition at 33 and 73 and 82

22   and 83 and 84, when you put all those together, they suggest

23   that there is at least something to the underlying claim that

24   there is an effort to use the immigration charge here to

25   punish the petitioner, and of course that would be

1    unconstitutional.

2        There is at least enough to that claim that even if

3    *Mapp v. Reno* were to apply here and even if there is some need

4    to show a meaningful move in the direction of meritoriousness

5    in the substantial claim, that part of the *Mapp v. Reno* test

6    would be satisfied.

7        I do not hold that there is a likelihood of success on

8    the merits based on what I have just said.  It's a question

9    that I don't need to reach in light of what I've said about

10   the standard; and it's indeed a question that, as I have made

11   clear in a prior decision, at least in the absence of all the

12   extra things we now have would not have been made out by the

13   petitioner.

14       So my finding is that there are extraordinary

15   circumstances here.  They relate to my findings on risk of

16   flight, my finding on dangerousness to the community, my

17   finding on the overwhelming unlikeliness the detention would

18   be sought in a case of this sort in a context like this one,

19   my finding as to chilling effect, my finding as to the

20   inability of an immigration judge to take on these issues,

21   and, finally, my finding that while it does not rise to the

22   likelihood of success level, the claim that there is a due

23   process violative effort to punish the petitioner is

24   substantial enough that even if *Mapp v. Reno* is in play here,

25   there would be enough as to that claim to justify release.

1          So given all of those factual findings, I'm gonna

2     exercise the discretion that I have to order the release of

3     the petitioner in this case.

4          I don't plan to write an opinion on this.  I will

5     simply issue a very brief release order, and I'll do it

6     shortly, and refer the Court of Appeals, should there be an

7     effort to take an appeal, back to today's transcript.

8          I haven't been reading from an opinion, as I'm sure

9     you've all perceived, so things will be -- I'm sure the

10    transcript will reflect that.  But I'm hopeful that should

11    there be an effort to seek review from the Third Circuit, this

12    will give the Third Circuit a strong sense of my own factual

13    findings and the basis for my exercise of discretion here as

14    well as my decisions as to jurisdiction and exhaustion and the

15    relevant standard.

16         So that's my decision, that the petitioner's motion for

17    release will be granted and that obviates the need for

18    consideration of the petitioner's motion to transfer.

19         Mr. Sampat, let me go to you for half a moment.  Are

20    there any conditions that the respondents would seek be

21    imposed after the entry of the release order?

22         MR. SAMPAT:  Your Honor, I think we would need time to

23    consult with our clients on that to see what conditions would

24    be appropriate, but what we would also ask is, understanding

25    Your Honor's order granting the motion, we would ask that the

1  Court stay the effect of that order for seven days so that the

2  respondents could seek emergency appeal and stay if so

3  necessary.

4      THE COURT:  Let's stick with the first one, though,

5  Mr. Sampat.

6      MR. SAMPAT:  Sure.

7      THE COURT:  I would -- the question of the conditions

8  that are imposed upon a release, they're not usually very

9  complicated.  I deal with criminal cases every single day.

10      They're usually about things like limits on where

11  someone might travel to and they're usually about things like

12  surrendering of a passport and they're usually about things

13  like no applications for further travel documents, and that's

14  usually the end of it.

15      I will also say that in my experience those things are

16  usually pretty quickly consented to between the parties.

17  You'll take whatever position you want, of course.  I respect

18  that entirely.  But what I would just suggest is this probably

19  doesn't take a whole lot of consultation with your client.

20      How long do you think you need to figure those things

21  out?

22      MR. SAMPAT:  Your Honor, I think it's a little

23  difficult to say how much time we need.  I'd say probably at

24  least the rest of the day.  Understanding Your Honor's point

25  on the criminal context in criminal proceedings, the

1   conditions are pretty quick.

2       I will just note that immigration detention -- when

3   individuals are released, there's report requirements and

4   things like that that we would have to consult with our

5   clients about what would be appropriate, especially in light

6   of the fact --

7       THE COURT:  But my point, Mr. Sampat, is not that it's

8   easy or hard, and I hope I wasn't misunderstood that way, and

9   if I was, my apologies.

10      My point is, these are high-volume affairs and they're

11  pretty standard approaches in our country to release

12  conditions, and so I would urge you to consult very quickly

13  with respect to that because this is not the first time anyone

14  has thought through these issues of what to do with a person

15  who is released.

16      You know, for example, the reporting requirements you

17  alluded to, these are pretty standard operating procedure

18  things.  So let's just -- let's pause for a moment on that.

19      Ms. Das, I'm imagining that you will not have any

20  issues with -- and you'll correct me if I'm wrong.  Just as

21  with the respondents, the position is for you to formulate.

22      But I'm presuming you would not have issues with some

23  reasonable geographic limitations on where the petitioner

24  might go and the need for him to surrender his passport and to

25  not apply for any new travel documents.

1          Would there be any disagreement with those things?

2          MS. DAS:  Your Honor, we would agree to reasonable

3   conditions in terms of travel and the issues related to the

4   passport.  I think in addition to that, we would hope that the

5   order would specify that he should be released on his own

6   recognizance, that there would be no electronic monitoring,

7   and that there would be a 72-hour notice prior to

8   re-detention.

9          Those are some of the grounds that were issued in other

10  cases such as *Chung*, *Concerti*, *Mahdawi*.  They had different

11  formulations of that, but essentially to ensure that the

12  individual could travel and would be released on recognizance

13  without GPS monitoring were particularly important.

14         THE COURT:  Right.  So what I would say is that there

15  has been a thick record developed here with respect to the

16  relevant bail considerations.  There is simply nothing that

17  even begins to suggest that an electronic bracelet is

18  appropriate or necessary.

19         With respect to the 72 hours before re-detention, I

20  don't understand the basis for something like that.  There may

21  be any number of reasons why a person is detained, and I'm not

22  gonna presume that other bases that might be put forward are

23  somehow infirm.

24         The idea of enjoining the United States, slowing it

25  down from doing something it might do when I don't know what

1    that thing it might do is strikes me as not grounded in the

2    record and something that would cause real problems in terms

3    of this Court's ability, for example, under *Lyons* and under

4    the limits of its own injunctive power as to prospective

5    things.

6        So I'm not gonna go that way, Ms. Das.  I will not tell

7    the United States that it can't proceed in certain ways.  If

8    the United States proceeds in certain ways that are illegal,

9    we will take it from there, Ms. Das.

10       MS. DAS:  Thank you, Your Honor.  That's understood.

11   Two quick issues.

12       THE COURT:  Sure.

13       MS. DAS:  With respect to the passport, in our recent

14   experience, he may need that passport to travel back to his

15   home in New York.  So if there could be a period of time by

16   which that has to be surrendered, that would be helpful.

17       THE COURT:  That's exactly why I'm a little bit

18   surprised that this seems complicated.  The normal thing one

19   would have expected would be something like limits on travel

20   from Louisiana back to New York and surrender of passport

21   immediately upon return to New York, something like that.

22       But these are the kinds of things that parties just

23   work out between themselves.  This is not the kind of thing

24   that a judge generally gets involved in.  Because while

25   Mr. Sampat -- and I respect his position -- doesn't agree with

1    where I've ruled, it's not usually very tricky to fix these

2    things between thoughtful lawyers such as yourself, Ms. Das,

3    and such as Mr. Sampat.  I'm confident you all can figure that

4    out.

5        MS. DAS:  Yes, Your Honor.  I think that's what we've

6    done in the normal course.  If Your Honor were willing, we

7    would ask that there be an order of his release immediately

8    and then that release can start getting processed right away,

9    and during that processing time we could work out with the

10   Government if there are -- what those reasonable terms

11   would be.

12       THE COURT:  Mr. Sampat, what is the argument for a

13   seven-day stay?  What is that about?

14       MR. SAMPAT:  Your Honor, that's to give us enough time

15   to process Your Honor's order and go through the necessary

16   channels that we need to to get authorization -- to seek

17   whether or not an appeal is warranted; and if so, then to go

18   through the necessary channels to get authorization to pursue

19   that appeal, Your Honor, and then potentially seek a stay of

20   Your Honor's order at the Third Circuit, as well.

21       THE COURT:  Ms. Das, your view?

22       MS. DAS:  Your Honor, we don't think a stay is

23   warranted for the reasons that Your Honor has already made

24   with respect to the findings.  There's no risk of flight or

25   dangerousness.

1    Ultimately, if the Government prevails on some sort of

2  appeal, it has the ability to re-detain the petitioner, so

3  there's no reason for this Court to stay its order based on

4  the substantial findings it's already made.

5    THE COURT:  Mr. Sampat, what is -- the standard kind of

6  argument for a district judge to stay its own order generally

7  runs through, among other things, the applicant for the stay,

8  this would be you here, being irreparably injured by the

9  non-entry of a stay.

10    What would be the irreparable injury here?

11    MR. SAMPAT:  It is the release, Your Honor.  Obviously

12  we're also seeking -- we're contemplating the appeal of

13  Your Honor's PI order, as well.

14    THE COURT:  Sure.

15    MR. SAMPAT:  So it's whether or not -- that irreparable

16  injury would be the potential that Mr. Khalil would be

17  released and we wouldn't be able to re-detain him.

18    THE COURT:  But the problem with that argument is that,

19  as Ms. Das has pointed out, the factual record here doesn't

20  suggest any risk of flight.  To the extent the United States

21  had that kind of concern, well, the time for putting in

22  evidence on that was not -- it's not today or tomorrow.  It's

23  over the course of these last days and weeks.

24    So if the irreparable injury is the concern that the

25  Third Circuit will undo what I have done and you will not be

1   able to find and re-detain the petitioner, there's just no

2   evidence of that.  And there was ample opportunity for the

3   respondents to build an evidentiary record that might have

4   suggested that.

5       Any other irreparable injury here?

6       MR. SAMPAT:  Nothing that I can find, Your Honor, but

7   I'm consulting my notes, just making sure that I haven't

8   missed anything.

9       THE COURT:  Take your time.  I don't mean to rush you.

10      (Brief pause.)

11      MR. SAMPAT:  Your Honor, just a couple points on

12  irreparable injury.  There's also irreparable injury when

13  courts do enjoin the effectuating of statutes enacted by

14  Congress.  That's *Maryland v. King* at 567 --

15      THE COURT:  But the problem with that, Mr. Sampat, as

16  you know, is that the Second Circuit in *Ozturk* made pretty

17  quick work of that.  I'm not enjoining any statute, far from

18  it.  I'm not saying a statute is unconstitutional, I'm not

19  enjoining a statute, not in the slightest.  I'm simply

20  ordering that a person be granted bail.

21      If it were the case that every time a federal litigant

22  loses a granular decision like a bail decision they could say

23  there's irreparable injury, there would be nothing left to the

24  irreparable injury standard.  It would simply mean that there

25  is a stay of a judicial decision every time a federal litigant

```
 1   loses.  That's not the law.

 2        MR. SAMPAT:  Nothing else to add, Your Honor.  Thank

 3   you.

 4        THE COURT:  All right.  So I'm going to issue a release

 5   order.

 6        Mr. Sampat, I don't want to put you in a difficult spot

 7   in terms of consultation, but what I'm gonna do is there's a

 8   United States magistrate judge on this case who you all have

 9   dealt with a little bit, Judge Hammer, who has been working on

10   the case and who is, like all United States magistrate judges,

11   enormously experienced with respect to issues of where a

12   passport will go, what travel restrictions make sense.

13        I'm really hopeful the parties can simply agree to

14   reasonable restrictions here, but if need be, there will be an

15   order releasing the petitioner by a time certain today subject

16   to conditions that Judge Hammer can impose if the parties are

17   not themselves able to agree to, you know, reasonable

18   conditions together.

19        I think that will allow everybody to have a little bit

20   of time for consultation, but, candidly, these are just not

21   issues that are so terribly complex that they require a great

22   deal more than that.

23        Mr. Sampat, anything that you want to add before we

24   wrap up?

25        MR. SAMPAT:  Not from the Government, Your Honor.
```

```
 1   Thank you for your time this afternoon.
 2        THE COURT:  Mr. Sampat, thank you, as always.
 3        Ms. Das, from your perspective, anything that you want
 4   to add before we wrap up?
 5        MS. DAS:  No, Your Honor.  But just to clarify, I
 6   understand that some of the conditions we may need to hash out
 7   as part of the release order, but our understanding is that
 8   Your Honor would be issuing an order that he be released by a
 9   time certain today.  And we're hoping that that order would
10   specify that he would not be subject to electronic monitoring
11   and would be allowed to travel to New York with his passport,
12   and then any other conditions that we need to negotiate we
13   could speak to the magistrate judge about.  I just wanted to
14   clarify that point.
15        THE COURT:  Two things:  First, I'm going to write the
16   order.  It will take a few moments to write.  I haven't
17   pre-written it or anything like that.
18        It will direct that the petitioner be released today,
19   subject to the conditions that are set today by the
20   United States magistrate judge.
21        It just seems, to me, pretty straightforward that you
22   all, Ms. Das, and you, Mr. Sampat, should rapidly consult as
23   to these issues so that the United States magistrate judge has
24   the benefit of your thoughts on these subjects and hopefully
25   your agreement.
```

1          I don't want to micromanage the process.  There are

2   things I don't know.  For instance, I don't know if the

3   petitioner's passport is in his pocket or is somewhere in

4   New York.  There are just things I don't know.

5          Those are not the kind of things that judges should

6   take the first cut at.  Those are things that you all should

7   work together on, but the release order will be drafted

8   shortly by me and it will hit the docket and you'll see it,

9   Ms. Das, and Mr. Sampat, as well.

10         MR. SAMPAT:  Thank you, Your Honor.

11         THE COURT:  As to the stay application, it's simply

12  denied.  The stay factors are ones I understand.  There's no

13  need, I don't think, to cite them here.  One of the two key

14  stay factors -- I'm thinking, for example, of the *Hilton* case,

15  which is the Supreme Court's case from 1987 that relates to

16  this, and *United States v. Smith*, which is the Third Circuit's

17  1987 decision.  The stay applicants here are the respondents

18  and their arguments as to irreparable injury, given the

19  factual record that's been built here, that they haven't

20  contested, there's just not an argument to move for a stay.

21         I appreciate that that means that the respondents will

22  have to work quickly to seek an appeal, should they wish to,

23  but that is a little bit the wages of having not contested

24  over the course of this period the record and having the

25  record lean in one direction with respect to the relative ease

1    of the re-detaining issue should the Third Circuit indicate

2    that its decision will order him detained.

3         I also don't think that there's been the requisite

4    showing by the respondents as to the likelihood of success as

5    to jurisdiction, as to exhaustion, as to the standard, as to

6    my factual findings, and as to exercise of discretion as to

7    detention.

8         So the application for a stay is denied, as we just

9    discussed, and an order will follow shortly with respect

10   to the granting of a motion for release.

11        Having said that all, Ms. Das, any final things you

12   wanted to convey, Ms. Das?

13        MR. SAMPAT:  No.  Thank you so much, Judge.

14        THE COURT:  Mr. Sampat, any final things that you

15   wanted?

16        MR. SAMPAT:  Nothing from the Government, Your Honor.

17   Thank you.

18        THE COURT:  Thank you all very much.  And I will

19   prepare the order in a short while.  Thank you all very much.

20   Appreciate it.

21            (Which were all the proceedings held in the

22             above-entitled matter on said date.)

23

24

25

75

1          __FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE__

2

3          I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court

4     Reporter of the United States District Court for the District

5     of New Jersey, do hereby certify that the foregoing

6     proceedings are a true and accurate transcript from the

7     record of proceedings in the above-entitled matter.

8

9

10              _/S/Lisa A. Larsen, RPR, RMR, CRR, FCRR_

11          Official U.S. District Court Reporter ~

12               District of New Jersey

13

14          DATED this June 21, 2025

15

16

17              *    *    *    *    *

18

19

20

21

22

23

24

25