UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA,<br><br>   Petitioner-Plaintiff,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; PAMELA BONDI, in her official capacity as Attorney General; TODD LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement;<br><br>   Respondents,<br><br>JOSH JOHNSON, in his official capacity as Acting Director of Immigration and Customs Enforcement's Enforcement and Removal Operations Dallas Field Office; THOMAS BERGAMI, in his official capacity as Warden of the Prairieland Detention Facility,<br><br>   Respondents-Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |

**VERIFIED AMENDED PETITION FOR WRIT OF HABEAS CORPUS,
REQUEST FOR ORDER TO SHOW CAUSE, &
COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF**

## I. INTRODUCTION

1. Petitioner, Leqaa Kordia, has been confined in the Prairieland Detention Facility since March 14, 2025, over 1,500 miles from her home in New Jersey, because she attended an April 2024 protest to mourn over 100 family members in Palestine and over 34,000 other

1

Palestinians lost to military violence since October 7, 2023,[1] and sent money to her family in Palestine. Since her arrest, state violence has claimed close to 100 more members of Ms. Kordia's family in Palestine and many more thousands of Palestinians.[2]

2.    Through executive orders, public statements, the creation of new agency operating procedures, and related enforcement actions, President Donald J. Trump and the Department of Homeland Security ("DHS") have adopted an ideological immigration enforcement policy under which they target, investigate, surveil, arrest, and confine individuals because of their association with advocacy for Palestinian rights. Ms. Kordia is one such target of this policy.

3.    In the United States, Ms. Kordia has attended more than a dozen protests in support of the lives and freedom of the Palestinian people, and on April 30, 2024, she was arrested at one such protest outside of Columbia University. Those charges were later dismissed in the interests of justice.

4.    As a result of her association with this protest, on or about March 5, 2025, DHS began surveilling and investigating Ms. Kordia for allegedly violating the executive orders designed to crack down on speech and expression supportive of Palestinian rights.

5.    Recognizing that DHS was investigating her, Ms. Kordia voluntarily met with immigration officers on March 13, 2025. Because of the government's viewpoint-discriminatory policy, DHS not only took Ms. Kordia into custody but transferred her overnight, thousands of miles from home, for confinement at the Prairieland Detention Facility in Texas.

---

[1] Ibrahim Dahman and Kareem Khadder, *Death toll in Gaza Rises to 34,183 After 200 Days of Conflict, Health Ministry Says*, CNN (Apr. 23, 2024), https://www.cnn.com/world/live-news/israel-hamas-war-gaza-news-04-23-24#h_43af8ace0bf7f75ec767a7098a36ab3c.

[2] Wafaa Shurafa and Samy Magdy, *Palestinian death toll in Israel-Hamas war passes 60,000, Gaza Health Ministry says*, Associated Press (July 29, 2025), https://apnews.com/article/palestinians-death-toll-war-health-ministry-816d592952814db869924f9626ca8876.

6.      Since Ms. Kordia voluntarily presented herself to DHS officials in New Jersey, DHS has made multiple public statements smearing Ms. Kordia, claiming without evidence that she "supported Hamas," and making clear its viewpoint-driven intent in confining her.

7.      Respondents' continued confinement of Ms. Kordia has prevented her from attending lawful demonstrations in support of Palestinian rights by making it physically impossible to attend such demonstrations, which she would have done but for her confinement.[3]

8.      Ms. Kordia has fought to regain her liberty through every legal avenue at her disposal, by seeking custody redetermination before an immigration judge and seeking habeas relief. At every step, Respondents have stymied her efforts, including by administratively appealing and automatically staying an immigration judge's order allowing her release on bond. As a result, Ms. Kordia remains unconstitutionally confined after five months.

9.      What is more, since the start of Ms. Kordia's immigration confinement at the Prairieland Detention Facility on March 14, 2025, Warden Thomas Bergami and Acting Director of the Dallas Field Office of U.S. Immigration and Customs Enforcement ("ICE"), Josh Johnson ("Director Johnson"), have routinely violated Ms. Kordia's religious liberty. Since being confined, Ms. Kordia, a practicing Muslim, has only had a single halal meal on a religious holiday, even though the detention center accommodates the religious dietary needs of other people in custody, including Jewish people who observe a kosher diet.

10.     Ms. Kordia brings this consolidated habeas petition and civil complaint to remedy her unconstitutional confinement and seeks two forms of relief. First, under 28 U.S.C. § 2241, Ms. Kordia asks this Court to issue a writ of habeas corpus directing Respondents to release Ms. Kordia, because her continued confinement violates her constitutional rights to free expression and

---

[3] Throughout this hybrid habeas petition and civil rights complaint, references to "Respondents" include all named Respondents and Respondents-Defendants.

association, procedural due process, and substantive due process.

11.     Second, under the Religious Freedom Restoration Act (42 U.S.C. § 2000bb-1(c)), Ms. Kordia brings claims against Respondents Bergami and Johnson for substantially burdening her sincerely held religious beliefs without adequate justification, recognizing the Court has stayed those claims pending its resolution of her habeas claims, *see* Dkt. 68—through which she seeks her physical liberty.

## II. JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, and Article I, § 9, cl. 2 (the Suspension Clause). The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 1391, because Ms. Kordia is detained in the Prairieland Detention Facility in Alvarado, Texas, within the Northern District of Texas, Dallas Division.

## III.    PARTIES

14.     Petitioner, Leqaa Kordia, is a 32-year-old Muslim woman born in Palestine and lawfully admitted to the United States in 2016. Until her arrest and confinement by ICE, she had been living in New Jersey. Ms. Kordia has been in immigration confinement at the Prairieland Detention Facility in Alvarado, Texas, since March 14, 2025.

15.     Respondent Kristi Noem is named in her official capacity as the Secretary of DHS. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(a); is legally responsible for pursuing any effort to confine and remove Ms. Kordia; routinely transacts business in this District; and is a custodian of Ms. Kordia. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin

Luther King Jr. Ave. SE, Washington, D.C. 20528-0485.

16.  Respondent Pamela Bondi is named in her official capacity as Attorney General of the United States. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(g); routinely transacts business in this District; and is a custodian of Ms. Kordia. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530- 0001.

17.  Respondent Todd Lyons is named in his official capacity as Acting Director of ICE. In this capacity he is subject to the authority of Respondent Noem; exercises authority nationally for the administration and enforcement of U.S. immigration laws, including provisions concerning civil immigration confinement; routinely transacts business in this District; and is a custodian of Ms. Kordia. Respondent Lyons's address is Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement, 500 12th Street S.W., Mail Stop 5900, Washington, D.C., 20536.

18.  Respondent Josh Johnson is named in his official capacity as Acting Director of the ICE Enforcement & Removal Operations ("ERO") Dallas Field Office in Dallas, Texas. In this capacity, he is subject to the authority of Respondent Lyons; is responsible for the enforcement of U.S. immigration laws, including provisions concerning civil immigration confinement, in North Texas; routinely transacts business in this District; is a custodian of Ms. Kordia; acts under color of law as an official of the United States, 42 U.S.C. § 2000bb-2(1); and is responsible for ensuring compliance with federal religious liberty protections. Respondent Johnson's address is 8101 North Stemmons Freeway, Dallas, Texas 75247.

19.  Respondent Thomas Bergami is named in his official capacity as the Warden of Prairieland Detention Facility. In this capacity, he is subject to the authority of Respondent

Johnson; oversees the daily administration of the detention center where Ms. Kordia is in custody; is a custodian of Ms. Kordia; routinely transacts business in this District; acts under color of law as an official of the United States responsible for the administration of detention centers within the jurisdiction of the ICE ERO Dallas Field Office, 42 U.S.C. § 2000bb-2(1); and is responsible for ensuring compliance with federal religious liberty protections. Respondent Bergami's address is 1209 Sunflower Lane, Alvarado, Texas 76009.

## IV.     STATEMENT OF FACTS

### A. Ms. Kordia Is Legally Admitted to the United States and Has Lived Peacefully Among Her Community.

20.      Ms. Kordia is a thirty-two-year-old woman who was born in Jerusalem, Palestine, in 1992. Ms. Kordia grew up in the West Bank of Palestine. As a young girl, her parents divorced, and Ms. Kordia stayed in the West Bank with her father.

21.      On or around January 2016, Ms. Kordia applied for a B-2 visitor visa to travel to the United States. After Ms. Kordia's visa was granted, she lawfully entered the United States at John F. Kennedy Airport on or about March 19, 2016, on B-2 status.

22.      Once in the United States, Ms. Kordia was reunited in New Jersey with her mother, a U.S. citizen. From 2016 until she voluntarily met with immigration agents on March 13, 2025, Ms. Kordia lived among family, friends, and teachers in Paterson, New Jersey.

23.      In early 2017, Ms. Kordia adjusted her status to that of an F-1 international student to study English. Ms. Kordia studied English for seven years at two Student and Exchange Visitor Program-certified institutions in New Jersey—initially at Uceda Paterson and later at Bergen County Career Advancement Training, Inc.

24.      Around the same time, Ms. Kordia's mother filed a family-based visa petition on behalf of Ms. Kordia. The filing of that visa petition is the first step in a two-step process to gaining

Lawful Permanent Resident ("LPR") status. United States Citizenship and Immigration Services ("USCIS") received this petition on or about June 5, 2017, and approved it on or about May 6, 2021. Once a visa is available for Ms. Kordia, she can continue the process of gaining Lawful Permanent Resident status.

25.     Acting on incorrect advice from a teacher and mentor whom she trusted, Ms. Kordia believed that the approval of her mother's petition afforded her lawful immigration status while she awaited gaining lawful permanent residence. Relying on that advice, on January 24, 2022, she signed an official termination notice, which her school approved on January 26, 2022, and which withdrew her from her F-1 program and caused the termination of her F-1 status.

26.     Prior to ICE's initiation of removal proceedings against her, Ms. Kordia believed that she had lawful immigration status based on the incorrect information she received from her teacher and thought she was close to becoming an LPR.

27.     In addition to her family-based petition, Ms. Kordia has strong claims for asylum, withholding of removal, and protection under the Convention Against Torture pending in immigration court. Ms. Kordia is currently set for a hearing on August 28, 2025, where the immigration judge will hear evidence in order to decide the merits of her defenses to removal. *See also infra* § IV.G (describing developments in removal proceedings).

28.     Since coming to the United States, Ms. Kordia has taken an essential role in caring for family, among whom she lived in New Jersey, prior to her immigration confinement. Ms. Kordia's mother has health conditions which make many daily tasks, such as grocery shopping, prohibitive for her without help, which Ms. Kordia would routinely provide her.

29.     In addition, Ms. Kordia's half-brother is a person with mental disabilities who requires substantial care. Because of her mother's medical conditions and her stepfather's work

schedule, Ms. Kordia would regularly watch over her half-brother, often sitting with him and keeping him company.

30.    If Ms. Kordia were released from confinement, she would live with her family in New Jersey, a place she lived for many years before.

**B. Ms. Kordia Attends a Protest on a Matter of Dire Public Concern.**

31.    Ms. Kordia has regularly exercised her First Amendment rights by attending demonstrations in New York and New Jersey in support of Palestinian rights. Ms. Kordia's desire to voice her support for Palestinian rights has only intensified since October 7, 2023, after which Ms. Kordia has lost approximately 175 family members to the destruction and famine that state violence has inflicted on the people of Gaza—almost an entire generation of her family.

32.    In the weeks after October 7, 2023, Ms. Kordia attended several peaceful demonstrations in support of Palestinian human rights, as military violence exploded and Ms. Kordia began hearing stories of families dying from the violence.

33.    For example, Ms. Kordia attended the National March on Washington protest in January 2024, calling for a ceasefire. She also attended several demonstrations in Manhattan, Brooklyn, and New Jersey from November 2023 onwards.

34.    For Ms. Kordia, attending public demonstrations supporting Palestine is vital to who she is. When Ms. Kordia lived in the West Bank, she would see on television peaceful, mass demonstrations from across the world, including the United States, denouncing the state violence against her and her people. Seeing such demonstrations made her feel like she and her community were not alone, which brought her hope.

35.    Since coming to the United States, Ms. Kordia has wanted to offer the same hope to those who might see footage of mass demonstrations and see that they are not alone, either. For Ms. Kordia, peaceful, mass protests are uniquely meaningful and important, because they show

the collective power of many individuals who are committed enough to take time from their own lives to gather physically to exercise their right to uplift the rights of others, including Palestinians. However important comparable online or other expressions of support are to Ms. Kordia, they are not on par with the power that she has seen and felt in peaceful, in-person demonstrations.

36.     In the Spring of 2024, Columbia University students held a series of in-person demonstrations opposing military violence and supporting Palestinian rights, in parallel with students at dozens of college campuses across the country. At this time, Ms. Kordia was living in New Jersey. On April 30, 2024, while on a day trip to New York City, Ms. Kordia attended such a protest on a public street outside the closed gates of Columbia University, as she had done on other occasions elsewhere.

37.     Driving Ms. Kordia's motivation to join this demonstration and others are her overwhelming experiences of loss and a firm commitment to the lives and freedom not only of her family but of all Palestinians and all people. Joining this and other protests helped her begin to mourn the family she had lost and to uplift the dignity and rights of Palestinians, in solidarity with others. This protest, like the other ones she attended, involved a diverse group of peaceful advocates, ranging from Palestinians describing their own personal experiences to rabbis and many others from various walks of life—all urging an immediate end to the military devastation of Gaza. The demonstration, at least where Ms. Kordia stood, was nonviolent and peaceful. Ms. Kordia joined in the group's chanting "ceasefire now!" and "end the siege on Gaza!".

38.     New York Police Department ("NYPD") officers appeared at the protest and ordered the demonstrators to disperse. Before she could leave, though, officers arrested Ms. Kordia and placed her in a transport van with dozens of others. Officers transported Ms. Kordia along with a large group of others to a holding facility before releasing her the following day. Ms. Kordia

initially received a court date but later learned of the charges' dismissal, in the interest of justice, and without her ever having to appear in court.

### C. The Government Adopts a Policy Designed to Suppress and Punish Palestinian Rights Advocacy, First Targeting Mahmoud Khalil.

39.     Through presidential executive orders, the adoption of new agency operating procedures, public statements, and individual enforcement actions, the executive branch adopted a policy of suppressing advocacy supporting Palestinian rights ("the suppression policy"), by arresting, confining, and attempting to deport noncitizens associated with the advocacy, starting with Mahmoud Khalil, and with Ms. Kordia second in line.

> *1.  President Trump issues executive orders censoring lawful advocacy in support of Palestinian rights.*

40.     When running for president in 2023 and 2024, then-candidate Trump repeatedly told his supporters that he would use immigration enforcement measures against noncitizen students supportive of Palestinians or critical of the actions of the Israeli government, routinely smearing them and their lawful protest to be supportive of Hamas.

41.     For example, at a rally in Las Vegas on October 28, 2023, then-candidate Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our college campuses, out of our cities, and get them the hell out of our country."[4]

42.     After the student movement to bring attention to atrocities in Gaza ramped up in spring 2024, then-candidate Trump promised campaign donors, should he be elected, "any student that protests [the military campaign in Gaza], I throw them out of the country."[5] He specifically

---

[4] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro- Palestinian protesters*, Reuters (Jan. 29, 2025), https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.

[5] John Dawsey et. al, *Trump Told Donors He Will Crush Pro-Palestinian Protests, Deport Demonstrators*, Wash. Post (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

targeted students from foreign countries, saying "[T]here are a lot of foreign students. As soon as they hear that [they will be targeted], they're going to behave."[6]

43.    Candidate Trump made clear that he intended to stifle advocacy for Palestinian rights, stating: "If you get me reelected, we're going to set that movement [for Palestinian rights] back 25 or 30 years."[7]

44.    At least one cabinet-level official currently in the Trump Administration expressed similar views during this time. On October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. government should "[c]ancel the visa of every foreign national out there supporting Hamas and get them out of America."[8]

45.    Once he assumed office, President Trump made good on his promise to target advocates by issuing executive orders calling for arrest, confinement, and deportation of noncitizens who expressed support for Palestinian rights. On January 29, 2025, for example, President Trump issued Executive Order 14188, Fed. Reg. 8847 (Jan. 29, 2025), directing agency heads to "identify[] all civil and criminal authorities . . . that might be used to combat anti-Semitism." The Executive Order also specifically authorizes DHS and the Secretary of State to investigate and remove noncitizens believed to be engaged in "antisemitic" activity. *Id.*

46.    The Executive Order, under the banner of prohibiting antisemitism, relies on a 2019 Executive Order's definition of antisemitism that includes lawful, protected speech such as "claiming that the existence of a State of Israel is a racist endeavor" and "[d]rawing comparisons

---

[6] *Id.*

[7] *Id.*

[8] Marco Rubio, *X* (Oct. 15, 2023, 4:24 p.m.), https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go." *Id.*

of contemporary Israeli policy to that of the Nazis," among other examples, E.O. 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019) (incorporating International Holocaust Remembrance Alliance's definition of antisemitism[9]). Thus, the Executive Order, and the individual civil and/or criminal enforcement actions taken pursuant to it, specifically targets the protected First Amendment activity of both citizens and noncitizens with whom this administration disagrees.

47.    Confirming the viewpoint-discriminatory nature of the Executive Order, President Trump issued a fact sheet decrying "leftist, anti-American colleges and universities," and warning "all the resident aliens who joined in the pro-jihadist protests," "we will find you, and we will deport you."[10] For students on visas, President Trump promised to "quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."[11]

48.    Executive Order 14188 followed an even broader executive order that targets *any* protected speech of noncitizens if the administration views it to reflect "hateful ideology" or "hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." Fed. Reg. 14161 (Jan. 20, 2025). The terms of this order are so broad that they target a diverse array of protected speech, including constitutionally protected advocacy for Palestinian rights. The Executive Order targets, for example, "hostile attitudes" towards American "institutions" in the form of reasonable, lawful disagreement with government policy. Or, as is the case here, "hateful ideology," in the President's view, may include a Palestinian woman mourning

---

[9] *Available at*: https://holocaustremembrance.com/resources/working-definition-antisemitism.

[10] *Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism*, White House (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.

[11] *Id.*

family she has lost as a result of military violence by saying, "Ceasefire Now."

49.     Through his comments as a candidate, and then through his executive orders as President, President Trump sought to silence what he smeared as "pro-jihadist protests" without differentiating between natural concern for the human toll of state violence and allegedly pro-terrorist speech. That the President believes expressing concern for Palestinians constitutes "pro-jihadist protest" does not give him authority to enforce that view on the rest of the country by punishing perspectives with which he disagrees.

> 2.  *The Department of Homeland Security implements these executive orders by creating new policies, procedures, and practices to investigate, surveil, and take enforcement action against noncitizens associated with advocacy for Palestinian rights.*

50.     Following the issuance of Executive Orders 14161 and 14188, in March of 2025, the Homeland Security Council, a formal council that is part of the Executive Office of the President, convened a series of interagency meetings to discuss "student protesters," App. at 421, 423 (PX 29, July 11, Trial Tr. Vol. 1, *AAUP v. Rubio*, No. 1:25-cv-10685 (D. Mass.) at 42:3–6, 44:1–5) ("July 11 Tr. Vol. 1"), and included DHS officials, *id.* at 421 (July 11 Tr. Vol. 1 at 42:17–19).

51.     Based on these interagency meetings, and pursuant to the viewpoint-based executive orders, DHS's Homeland Security Investigations ("HSI"), a sub-agency of ICE, began identifying individuals whom HSI believed to have advocated in support of Palestinian rights on or around college campuses.

52.     Historically, HSI's Office of Investigation researched "criminal networks, criminal conspiracies, [and] those engaged in criminal conduct." *Id.* at 328 (PX 25, July 9, Trial Tr. Vol. 1, *AAUP v. Rubio*, No. 1:25-cv-10685 (D. Mass.) at 56:2–5) ("July 9 Tr. Vol. 1"). HSI was not historically involved in civil immigration enforcement, except as it incidentally touched on

criminal investigations. *Id.* at 457–58 (PX 31, July 15, Trial Tr. Vol. 2, *AAUP v. Rubio*, No. 1:25-cv-10685 (D. Mass.) at 105:24–106:4) ("July 15 Tr. Vol. 2"). However, the Office of Investigation received no guidance on whether protest activity "support[ed] terrorist organization," *id.* at 349 (PX 26, July 9, Trial Tr. Vol. 2, *AAUP v. Rubio*, No. 1:25-cv-10685 (D. Mass.) at 91:3–7) ("July 9 Tr. Vol. 2"), and, according to one official, this was the first time the office had been instructed to investigate protest activity, *id.* at 333 (PX 25, July 9 Tr. Vol. 1 at 66:9–10).

53.     In early March of 2025, senior DHS officials instructed the Office of Investigation's Assistant Director to "develop reports of analysis on the protesters," including those who "supported[ed] terrorist organizations." *Id.* at 338 (July 9 Tr. Vol. 1 at 74:12–24). The reports of analysis focus on protestors for Palestinian rights broadly and not just students, faculty, or other people with affiliations to campuses on or near where protests occur. *Id.* at 319, 323 (July 9 Tr. Vol. 1 at 45:15–17; 49:21–25). And the reports do not otherwise vary according to the protestors' particular immigration status. *Id.* at 390 (PX 27, July 10, Trial Tr. Vol. 1, *AAUP v. Rubio*, No. 1:25-cv-10685 (D. Mass.) at 61:05–11) ("July 10 Tr. Vol. 1")

54.     The Office of Investigation received protestors' names from a variety of sources, including the websites of anti-Palestinian extremist entities like Betar USA and Canary Mission. *Id.* at 359–60 (PX 26, July 9, Trial Tr. Vol. 2, *AAUP v. Rubio*, No. 1:25-cv-10685 (D. Mass.) at 117:13–118:23) ("July 9 Tr. Vol. 2"). Analysts at the Office of Investigation also got the names of protestors by receiving "a list from a police department if any protesters were arrested." *Id.* at 360 (July 9 Tr. Vol. 2 at 118:21–22). The Office of Investigation also looked to publicly available social-media content and other information available online. *Id.* at 384 (July 10 Tr. Vol. 1 at 55:12–20). Within its reports, it noted facts about protestors' speech, including phrases like "Free Palestine." *Id.* at 353 (July 9 Tr. Vol. 2 at 95:11– 96:10).

14

55.    Due to the volume of protesters, the Office of Investigation was tasked with analyzing, HSI created a "Tiger Team" of analysts to create reports of analysis about protestors. *Id.* at 411 (PX 28, July 10, Trial Tr. Vol. 2, *AAUP v. Rubio*, No. 1:25-cv-10685 (D. Mass.) at 87:15–17) ("July 10 Tr. Vol. 2"). The Tiger Team was specifically directed to "look at protesters," *id.* at 412 (July 10 Tr. Vol. 2 at 88:10–13), resulting in approximately 200 reports of analysis on protesters, *id.* at 407–08 (July 10 Tr. Vol. 2 at 83:22–84:1). The Tiger Team's reports of analysis included any information the analyst could find regarding the person's participation in a protest, including protest chants, public writings and statements on social media, membership in groups associated with Palestinian rights advocacy, or even the person's views on Israel. *Id.* at 408–411 (July 10 Tr. Vol. 2 84:20–87:3). In short, the Tiger Team would compile reports of a person's lawful, protected activity and viewpoints as potentially justifying immigration enforcement, including arrest and confinement, against the person.

56.    As part of these investigations, at least in some cases, officers would conduct "pattern of life surveillance" directed by HSI senior leadership. *Id.* at 453 (PX 31, July 15 Tr. Vol. 2 at 101:21–23). These surveillance operations included going to a person's known addresses to identify the person and locate them. *Id.* at 436, 440 (PX 30, July 15, Trial Tr. Vol. 1, *AAUP v. Rubio*, No. 1:25-cv-10685 (D. Mass.) at 27:2–11; 73:2–6) ("July 15 Tr. Vol. 1").

57.    Once HSI finalized its report of analysis, it would refer that report to HSI's National Security Division, where its agents would work with ICE's Office of the Principal Legal Advisor to determine whether to refer the case to the Secretary of State for potential visa revocation or otherwise to recommend enforcement action against a person. *Id.* at 474, 478, 489, 491, 493, 498–97 (PX 32, July 17, Trial Tr, *AAUP v. Rubio*, No. 1:25-cv-10685 (D. Mass.) at 26:16–20; 30:1–3; 46:3–7; 48:5–15; 50:1–13; 66:25–67:2) ("July 17 Tr."). HSI's National Security Division

identifies potential national security risks for people entering, exiting, and remaining in the United States. *Id.* at 483 (July 17 Tr. 35:9–36:3).

>       3.  *President Trump, Secretary Rubio, and Respondent Noem publicly announce the suppression policy.*

58.     Contemporaneously with the establishment of the Tiger Team, the Department of State, DHS, and President Trump publicly announced the adoption of a policy or practice of identifying, investigating, arresting, and confining noncitizens supportive of Palestinian rights because of their protected expression. Specifically, on March 6, 2025, the Department of State informed Fox News that it had revoked the student visa of a noncitizen who was "cited for criminal behavior in connection with Hamas-supporting disruptions. This individual was a university student. ICE will proceed with removing this person from the country."[12]

59.     Government officials confirmed that they would conduct an AI-assisted review of "tens of thousands of student visa holders' social media accounts," to look for evidence of "alleged terrorist sympathies."[13] The announcement did not clarify how the government would determine whether someone holds "terrorist sympathies."

60.     Government officials also said they would be reviewing civil lawsuits brought against organizations and individuals engaged in or perceived to be engaged in advocacy for Palestinian human rights that purport to "highlight foreign nationals allegedly engaged in antisemitic activity without consequence."[14]

---

[12] Louis Casiano, Bill Melugin, *State Department revokes first visa of foreign student linked to "Hamas-supporting disruptions,"* Fox News (Mar. 6, 2025), https://www.foxnews.com/politics/state-department-revokes-first-visa-foreign-student-linked-hamas-supporting-disruptions.

[13] *Id.*

[14] *Id.*

*4. Mahmoud Khalil is the administration's first target under the suppression policy.*

61.     On March 6, 2025, HSI's Office of Intelligence prepared a report of analysis about Mahmoud Khalil. App. at 375–76 (PX 27, July 10 Tr. Vol. 1 at 46:19–47:5). Mr. Khalil is a U.S. lawful permanent resident and was then a master's student at Columbia's School of International and Public Affairs.[15] Mr. Khalil has been an outspoken advocate for Palestinian human rights.[16]

62.     On March 7, 2025, HSI New York received instructions from headquarters to locate Mr. Khalil and "establish a pattern of life with surveillance." *Id.* at 453, 448 (PX 31, July 15 Tr. Vol. 1 at 101:16–24; 86:12–14).

63.     On March 8, 2025, HSI agents arrested Mr. Khalil in the vestibule of his apartment building near Columbia University, at approximately 8:30 p.m.[17]

64.     After his arrest, and similar to the press release made about Ms. Kordia, multiple government officials made public statements confirming that Mr. Khalil had been targeted for immigration arrest and confinement for his speech and protest activity. For example, on March 9, 2025, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he smeared as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University."

65.     The President emphasized that Mr. Khalil's immigration arrest was "the first of many to come," declaring that his Administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-

---

[15] McKinnon de Kuyper, *Mahmoud Khalil's Lawyers Release Video of His Arrest*, N.Y. Times (Mar. 15, 2025), https://www.nytimes.com/video/us/politics/100000010054472/mahmoud-khalils-arrest.html.

[16] *Id.*

[17] *Id.*

American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[18]

66.    The same day, DHS issued a statement through its social media account on X, confirming Mr. Khalil's arrest by ICE was carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also baldly smeared Mr. Khalil as having "led activities aligned to [sic] Hamas, a designated terrorist organization," and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[19]

67.    In a press conference regarding Mr. Khalil on March 12, 2025, Secretary of State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . antisemitic activities," and "if you end up having a green card . . . we're gonna kick you out."[20]

68.    On March 16, 2025, Secretary Rubio appeared on CBS's *Face the Nation*. The "bottom line," he said, was: "If you are in this country to promote Hamas, to promote terrorist organizations, to participate in vandalism, to participate  . . . in acts of rebellion and riots on campus, we never would have let you in if we had known that, and now that we know it, you're going to leave."[21]

---

[18]    Donald    J.    Trump,    Truth    Social    (Mar.    10,    2025,    1:05    p.m.), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

[19] Dep't of Homeland Sec., *X* (Mar. 9, 2025, 9:29 p.m.), https://x.com/DHSgov/status/1898908955675357314; *see* Surina Venkat, *Department of Homeland Security confirms arrest of Palestinian activist Mahmoud Khalil, SIPA '24*, Colum. Spectator (Mar. 10, 2025), https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/.

[20] *Secretary of State Marco Rubio Remarks to Press*, U.S. Dep't of State (Mar. 12, 2025), http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/.

[21] *Transcript: Secretary of State Marco Rubio on "Face the Nation with Margaret Brennan," March 16, 2025*, CBS News (Mar. 16, 2025), https://www.cbsnews.com/news/marco-rubio-secretary-of-state-face-the-nation-transcript-03-

69.     On April 9, 2025, DHS Assistant Secretary for Public Affairs, Tricia McLaughlin, stated in an agency press release: "There is no room in the United States for the rest of the world's terrorist sympathizers, and we are under no obligation to admit them or let them stay here . . . Sec[retary] Noem has made it clear that anyone who thinks they can come to America and hide behind the First Amendment to advocate for anti-Semitic violence and terrorism—think again. You are not welcome here."[22]

70.     On May 8, 2025, DHS Assistant Secretary McLaughlin reposted a post about "anti-Israel students" at Columbia University on the agency's official account on X, and added: "If you are pushing Hamas propaganda, glorifying terrorists that relish the killing of Americans, harassing Jews, taking over buildings, or other anti-American actions that we have seen lately on these campuses, you can book yourself a ticket home."[23]

71.     On June 20, 2025, a federal District Court in New Jersey ordered Mr. Khalil's immediate release, citing the "overwhelming unlikeliness the [sic] detention would be sought in a case of this sort" and the "chilling effect" of his confinement. App. at 308 (PX 24, June 20, 2025 Hr'g Tr. at 62:15–25, *Khalil v. Joyce*, 2:25-cv-1963 (D.N.J.)). The Third Circuit denied the government's motion to stay the order releasing Mr. Khalil pending appeal. *Id.* at 303 (PX 23, Order, *Khalil v. Joyce*, Nos. 25-2162 & 25-2357 (3d Cir. July 30, 2025)).

**D. Ms. Kordia is the Second Person Whom the Administration Confines Pursuant to Its Suppression Policy.**

72.     Ms. Kordia was the second person arrested by DHS and confined pursuant to its

---

16-2025/.

[22] *DHS to Begin Screening Aliens' Social Media Activity for Antisemitism*, U.S. Dep't of Homeland Sec. (Apr. 9, 2025),        https://www.uscis.gov/newsroom/news-releases/dhs-to-begin-screening-aliens-social-media-activity-for-antisemitism.

[23] Tricia McLaughlin, *X* (May 8, 2025 9:26 A.M.), https://x.com/TriciaOhio/status/1920485393390027131.

suppression policy. Ms. Kordia checked all the boxes the government utilized to identify and assess noncitizen protest activity under the suppression policy: she attended demonstrations supporting Palestinian rights, her name was available via an arrest record (concerning dismissed charges) relating to her attendance of a protest just outside Columbia University, and she had expressed her support for Palestinian rights on social media.

73.     Thus, shortly after DHS created the Tiger Team to track noncitizen protestors, HSI launched an investigation into Ms. Kordia for "national security violations to include possible student visa violations and violation of executive orders," App. at 68 (PX 2, DHS Notice of Filing) ("DHS Bond Opposition"), using the same pattern-of-life surveillance process HSI used when arresting Mr. Khalil and others. *See supra* ¶¶ 57, 63 (describing surveillance efforts); *infra* ¶¶ 94–95, 102, 115, 133 (same). The supposed "violation of executive orders" referenced in the investigation seemingly refers to Executive Orders 14161 and 14188.

74.     Upon information and belief—based on the policy announced by the Trump administration, testimony from DHS officials describing the policy, and Ms. Kordia's support for Palestinian rights—the Tiger Team targeted Ms. Kordia via an HSI investigation as part of its suppression policy.

75.     At no point in their investigation did HSI agents find, identify, or define these supposed national security violations, nor find evidence of them. From March 5 through 13, 2025, HSI agents spoke with multiple people associated with Ms. Kordia, including her mother, uncle, a clothing store owner, and tenants of an apartment she briefly rented. They also subpoenaed records from MoneyGram and Western Union, established a trace on her WhatsApp messaging account, and requested records from the NYPD related to the April 2024 demonstration for Palestinian rights. *See id.* at 69–111 (PX 2, DHS Bond Opposition) (describing HSI investigation into Ms.

Kordia).

76.     There is still no evidence that agents found any indication of "national security violations." Instead, it appears the "national security" and "violation of executive orders" underlying the investigation merely referred to Ms. Kordia's involvement in a protest supporting Palestinian rights. Tellingly, the agents took a photo of Ms. Kordia's mother's front porch, where "Palestine" was written. *Id.* at 96 (PX 2, DHS Bond Opposition).

77.     As part of their surveillance efforts, on March 6, 2025, HSI agents visited Ms. Kordia's mother's home and interrogated her. *Id.* at 71. Her mother, nervous about talking to the police and struggling to speak English, her second language, called Ms. Kordia in the agents' presence. *Id.* The agents told Ms. Kordia over the phone that there was an issue with her immigration status and that they needed to speak with her. *Id.* at 71. Initially, Ms. Kordia agreed to meet the agents alone. *Id.* After consulting others, though, she decided to hire an attorney first to have representation prior to any conversation with immigration officers.

78.     Once Ms. Kordia retained an attorney, her attorney arranged a meeting with HSI agents. Ms. Kordia voluntarily presented herself, with counsel, to agents at the Newark Field Office of ICE ERO on March 13, 2025. While ICE agents processed her arrest, they conducted a standard Risk Classification Assessment ("RCA"), on which ICE relies in making custody determinations and assessing conditions for release, including bond. Ms. Kordia's RCA rated her as low risk across all risk factors, including risk to public safety, flight risk, and criminal history. *Id.* at 41–42 (PX 1, Motion for Bond and Custody Redetermination) ("Kordia Bond Mot."). Indeed, Ms. Kordia has never been convicted of a crime, and her RCA lists no criminal history. *Id.* Despite the RCA's determination of low risk and her long ties to her community, ICE confined her without bond. *Id.*

79.    ICE agents issued Ms. Kordia a Notice to Appear ("NTA"), notifying her of the initiation of removal proceedings against her. When she submitted to ICE's custody, her original NTA scheduled her to appear at the Batavia Immigration Court in Buffalo, New York. *Id.* at 35.

80.    After receiving the NTA, ICE agents asked her if she knew where she was going. Relying on the NTA, Ms. Kordia responded, "Yes, Batavia." Surprisingly, though, the agents told her she was going to Texas and she would leave for her flight in 30 minutes. They further told Ms. Kordia, "I don't understand anything about your file." Three officers placed her in an unmarked vehicle and transported her to an airport.

81.    When Ms. Kordia landed in Texas, the agents she flew with from Newark handed her off to different ICE agents. One of the agents who had flown with her said to the receiving ICE agents, "Good luck understanding anything in this file," referring to Ms. Kordia's immigration file.

82.    The day after Ms. Kordia voluntarily met with DHS, Respondent Noem publicly announced Ms. Kordia's "arrest." Respondent Noem accused Ms. Kordia, without evidence, of "support[ing] Hamas" and added that Ms. Kordia "was arrested for her involvement in pro-Hamas protests at Columbia University in New York City,"[24] omitting that the NYPD had dropped all charges.

83.    On April 30, 2025, DHS again reiterated publicly that it had surveilled, arrested, and confined Ms. Kordia because of its perception that she advocated for Palestinian rights on Columbia's campus. In its "100 Days of Fighting Fake News" Press Release, DHS described Ms.

---

[24] *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dep't of Homeland Sec. (Mar. 14, 2025), https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and.

Kordia as "another Columbia Student who actively participated in anti-American, pro-terrorist activities on campus."[25] That same day, via X, DHS again described Ms. Kordia as a "Columbia student who actively participated in anti-American, pro-terrorist activities on campus."[26] In its X post, DHS included a Newsweek headline referring to Ms. Kordia as the "Second Pro-Palestinian Protester at Columbia Arrested by Trump Officials."[27] Although Ms. Kordia was not, and has never been, a Columbia student, DHS's description of her (1) revealed that its actions against Ms. Kordia were predicated on her involvement in a protest for Palestinian rights just outside the gates of Columbia's campus and (2) evinced its targeting of her under its viewpoint-discriminatory suppression policy. In subsequent litigation regarding Mr. Khalil, the government described Ms. Kordia's confinement as "related to" the "Israel-Palestine conflict."[28]

84.     Ms. Kordia's transfer to Texas for immigration confinement violated DHS's own policies, further underscoring the baseless and retaliatory nature of the confinement. Specifically, directives issued in 2019 under the prior Trump administration, and in 2021, instruct ICE agents not to consider First Amendment protected activity when considering enforcement actions, including the decision whether to confine an individual. App. at 274, 283 (PX 20 & 21, 2019 DHS Memo. Re First Amendment Activity & 2021 ICE Memo. Re First Amendment Activity).

85.     Additionally, ICE Policy 11022.1, "Detainee Transfers," prohibits the transfer of individuals out of a given Field Office's area of responsibility if, within that area, *inter alia*, they have immediate family, an attorney of record, or pending or ongoing removal proceedings, or if

---

[25] U.S. Dep't of Homeland Sec., *100 Days of Fighting Fake News* (Apr. 30, 2025), https://www.dhs.gov/news/2025/04/30/100-days-fighting-fake-news.

[26] Dep't of Homeland Sec., *X* (Apr. 30, 2025, 5:09 P.M.), https://x.com/DHSgov/status/1917702798273306765.

[27] *Id.*

[28] Suppl. Br. at 16, *Khalil v. Joyce*, 2:25-cv-01963, Dkt. 256 (D.N.J. May 14, 2025).

they have been granted bond or scheduled for a bond hearing—unless a Field Office Director or their designee deems the transfer necessary for one of the seven reasons identified in the policy. *Id.* at 288–89 (PX 22, ICE Policy 11022.1: Detainee Transfers). At the time of her transfer to Texas, Ms. Kordia's mother, stepfather, and half-siblings all lived in New Jersey, and her attorney of record was in New York. ICE did not provide Ms. Kordia with an explanation for the transfer, and the transfer was unnecessary under the policy's terms.

86.     Nothing about Ms. Kordia's continued confinement reflects individualized and non-discriminatory assessment by ICE of relevant facts concerning any danger or flight risk. Indeed, until the new administration took power, ICE seldom confined noncitizens charged as removable for overstaying a visa, particularly where the person had no criminal history and ICE itself had rated her as low risk. *Id.* at 249–50 (PX 14, Decl. of Cori Hash ¶¶ 5–9); *id.* at 253–55 (PX 15, Decl. of Anne Chandler ¶¶ 7–11); *id.* at 258–60 (PX 16, Decl. of Jodi Goodwin ¶¶ 6–10); *id.* at 263–64, 268–69 (PX 17 & 18 Decls. of Kerry Doyle). Here, DHS has leveraged nearly every weapon in its disposal—including overnight transfer to a facility halfway across the country in violation of policy and administratively appealing and automatically staying an immigration judge's order allowing Ms. Kordia's release on bond—to continue punishing Ms. Kordia for her protected activity.

### E. The Administration Targets at Least Nine Other Noncitizens Under the Suppression Policy.

87.     In addition to the actions taken against Mr. Khalil and Ms. Kordia, Respondents Noem and Bondi, along with Secretary Rubio and President Trump, have taken enforcement actions against many other noncitizens perceived to be associated with advocacy for Palestinian rights. These actions closely mirror the enforcement actions taken against Mr. Khalil and Ms. Kordia, and the administration executed them pursuant to its policy to suppress and punish lawful

activity supporting Palestinian rights. In each case, the government arrested or attempted to arrest the noncitizen, and in most, confined them thousands of miles away from their family and community, issued press releases tying the person to the suppression policy, initiated removal proceedings against them, and defended their confinement or targeting on the basis of the person's alleged removability.

### *Ranjani Srinivasan*

88.    On March 5, 2025, the Department of State informed a graduate student at Columbia University, Ranjani Srinivasan, that her F-1 student visa had been cancelled. The U.S. Consulate in Chennai did not explain why her visa had been cancelled.[29] On March 9, 2025, Columbia personnel informed Ms. Srinivasan that DHS had terminated her student status.[30]

89.    Between March 5 and March 14, 2025, DHS attempted to locate and arrest Ms. Srinivasan.[31]

90.    On March 14, 2025, Secretary of Homeland Security Kristi Noem issued a post on X, accompanied by a video of Ms. Srinivasan: "I'm glad to see one of the Columbia University terrorist sympathizers use the CBP Home app to self deport."[32]

91.    That same day, DHS issued a press release, smearing Ms. Srinivasan and Ms. Kordia as Hamas supporters and referencing their protected activity.

---

[29] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html.

[30] *Id.*

[31] *Id.*

[32] Kristi Noem, *X* (Mar. 14, 2025, 11:01 a.m.), https://x.com/Sec_Noem/status/1900562928849326488.

92.    The DHS press release described Ms. Srinivasan as having "advocat[ed] for violence and terrorism" and as being "involved in activities supporting Hamas, a terrorist organization," without providing any description or information to support such a claim.[33] Later reporting confirmed DHS's primary motivation for identifying and targeting Ms. Srinivasan to be its perception of her involvement in student protests at Columbia University; and, critically, it based its perception on her arrest in April 2024, the same day that NYPD arrested Ms. Kordia outside Columbia University's gates.[34] Ms. Srinivasan has since stated repeatedly that she was trying to return home after a departmental picnic that day, when she was caught between protesters and the police barricades.[35]

### *Dr. Badar Khan Suri*

93.    Dr. Badar Khan Suri is a post-doctoral fellow scholar from India at Georgetown University in Washington, D.C.

94.    On March 10, 2025, HSI's Office of Intelligence created a report of analysis about Dr. Suri. App. at 381 (PX 27, July 10 Tr. Vol. 1 at 52:9–25). The report noted that Dr. Suri "appears to post pro-Palestinian content." *Id.* at 385 (July 10 Tr. Vol. 1 at 56:14–23).

95.    Even prior to the revocation of his visa, HSI began surveillance of Dr. Suri. *Id.* at 463 (PX 31, July 15 Tr. Vol. 2 at 115:23–116:2).

---

[33] *VIDEO: Columbia University Student Whose Visa Was Revoked for Supporting Hamas and Terrorist Activities Used CBP Home App to Self-Deport*, Dep't of Homeland Sec. (Mar. 14, 2025), https://www.dhs.gov/news/2025/03/14/video-columbia-university-student-whose-visa-was-revoked-supporting-hamas-and.

[34] Luis Ferre-Sadurni & Hamed Aleaziz, *How a Columbia Student Fled to Canada After ICE Came Looking for Her*, N.Y. Times (Mar. 15, 2025), https://www.nytimes.com/2025/03/15/nyregion/columbia-student-kristi-noem-video.html ("The department did not state how the two summonses made her a terrorist sympathizer.").

[35] *Id.*

96.     On March 17, 2025, ICE arrested Dr. Suri. Agents arrested him outside his home in Arlington, Virginia, where he lives with his U.S. citizen wife and their three children.[36] Later, DHS Spokesperson Tricia McLaughlin claimed, without substantiation, that Dr. Suri, an Indian national, "was spreading Hamas propaganda and promoting antisemitism on social media."[37]

97.     Similar to ICE's treatment of Ms. Kordia and Mr. Khalil, within twenty-four hours of his arrest, ICE transferred Dr. Suri halfway across the country. Following the decision to confine Dr. Suri, DHS agents told him that his visa had been revoked.[38]  ICE confined Dr. Suri at the same facility where it has confined Ms. Kordia, the Prairieland Detention Facility, in Alvarado, Texas.[39]

98.     A federal District Judge ordered Dr. Suri released on May 14, 2025, after finding that it could rule on the question of the lawfulness of his confinement, because it was "independent of, and collateral to, [his] removal process,"[40] and finding that the government had confined Dr. Suri in violation of his First Amendment rights.[41] The Fourth Circuit denied the government's motion to stay that order pending its appeal.[42]

---

[36] Kyle Cheney & Josh Gerstein, *Trump is seeking to deport another academic who is legally in the country, lawsuit says*, Politico (Mar. 19, 2025), https://www.politico.com/news/2025/03/19/trump-deportation-georgetown-graduate-student-00239754.

[37] *Id.*

[38] *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *1 (4th Cir. July 1, 2025).

[39] Am. Pet., *Suri v. Trump*, No. 25-cv-480 (E.D.Va. Apr. 8, 2025), ECF No. 34, ¶ 66–67.

[40] *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *7 (4th Cir. July 1, 2025) (citing *Öztürk v. Hyde*, 136 F.4th 382, 397–98 (2d Cir. 2025)).

[41] *Id.* at *1.

[42] *Id.* at *7.

99.     No government official explained whether or how Dr. Suri's civil immigration confinement prevented danger to the community or a risk of flight from immigration enforcement, nor why he was confined hundreds of miles away from his wife and their young children.

### *Yunseo Chung*

100.    Yunseo Chung is a 22-year-old LPR and rising senior at Columbia University.[43]

101.    On March 5, 2025, Ms. Chung was arrested outside a building on the Columbia University campus.[44] Students and other protesters had staged a sit-in inside an academic building (Milstein) at Barnard College on March 5, 2025, to demand that Barnard reverse the expulsions of three students.[45] Ms. Chung did not organize the protest, speak to the media about it, or otherwise play a leading role. Rather, she was one participant among many protesting the university's handling of student discipline over Palestine-related speech.

102.    On March 6, 2025, the day after her arrest, HSI's Office of Intelligence prepared a Report of Analysis concerning Ms. Chung, which included discussion of news articles referring to Ms. Chung as being part of a protest. App. at 396 (PX 27, July 10 Tr. Vol. 1 at 67:7–12).

103.    On March 9, 2025, the day after agents arrested Mahmoud Khalil, an ICE agent informed an attorney for Ms. Chung that "due to the situation with the protesting"[46] the Department of State could revoke her LPR status.

---

[43] Unless otherwise noted, all references to Ms. Chung's circumstances are pulled from the complaint in *Chung v. Trump*, No. 25-cv-2412 (S.D.N.Y. Mar. 24, 2025), ECF No. 1.

[44] These charges were dismissed on April 14, 2025. *See Chung v. Trump*, No. 25-cv-2412 (Apr. 29, 2025), ECF No. 41-1.

[45] Sarah Huddleston, *Pro-Palestinian protesters stage sit in in Milstein lobby*, Colum. Spectator (Mar. 5, 2025), https://www.columbiaspectator.com/news/2025/03/05/pro-palestinian-protesters-stage-sit-in-in-milstein-lobby/.

[46] Ex. M, Dec. of Sonya Levitova, Mot. for Temporary Restraining Order, *Chung v. Trump*, No. 25-cv-2412 (S.D.N.Y. Mar. 24, 2025), ECF No. 9-13, ¶ 8.

104.    On March 25, 2025, a federal District Court issued a temporary restraining order, prohibiting ICE from placing Ms. Chung in immigration confinement.[47]

105.    After Ms. Chung filed suit, the government submitted documentation in her case confirming that they were looking to confine and deport her because of her "beliefs, statements, or associations."[48]  To this day, ICE remains enjoined from "detaining and/or arresting" Ms. Chung.[49]

### *Momodou Taal*

106.    Momodou Taal, came to the United States as an F-1 student visa holder in order to pursue a PhD in Africana Studies from Cornell University. Beyond his academic work and other service at Cornell, Mr. Taal was active in student protests of U.S. foreign policy, particularly its military and financial support for the Israeli government.[50]

107.    As Mr. Taal became more prominent in his advocacy, groups and organizations opposed to Palestinian rights began calling on ICE to target, arrest, and deport Mr. Taal for his participation in protests. On March 13, 2025, for example, Betar USA posted on X a "Deport Alert" that specifically named Mr. Taal as a target.[51]

108.    In response to these impending threats, on March 15, 2025, Mr. Taal and two others filed a lawsuit in the Northern District of New York, seeking an injunction against the

---

[47] Order, *Chung v. Trump*, No. 25-cv-2412 (S.D.N.Y. Mar. 25, 2025), ECF No. 19.

[48] Ex. A, Dec. of Marina Vides, Motion to Dismiss, *Chung v. Trump*, No. 25-cv-2412 (S.D.N.Y. April 11, 2025), ECF No. 34.

[49] Order, *Chung v. Trump*, No. 25-cv-2412 (S.D.N.Y. June 5, 2025), ECF No. 57.

[50] *See* Pet. ¶ 32, ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00355 (N.D.N.Y. Mar. 13, 2025).

[51] Betar USA (@Betar_USA), X, Mar. 13, 2025 (10:38 a.m.), https://x.com/Betar_USA/status/1900194755050434943 ("Deport alert: Momodou Taal Affiliation: Cornell University Role: Graduate student Countries of Origin: Gambia and the United Kingdom"); *see also* Pet. ¶¶ 36–38, ECF No. 1, *Taal et al. v. Trump et al*, No. 3:25-00355 (N.D.N.Y. Mar. 13, 2025) (describing concerted campaign targeting Mr. Taal for deportation under the Policy).

implementation of Executive Order 14188 and Executive Order 14188 and against the application of the aforementioned suppression policy to Mr. Taal.[52] The court issued an order setting an in-person hearing on March 25, 2025, to address the merits of the legal claims.[53]

109.    On the morning of March 19, 2025, as part of the administration's ongoing effort to enforce its suppression policy, and in response to Mr. Taal's efforts to seek the court's protection, two undercover law enforcement officers appeared in the parking lot of Mr. Taal's residence.[54] The same day, Mr. Taal filed an emergency motion, again seeking the court's protection via an injunction.[55]

110.    In response to Mr. Taal's effort at self-protection against retaliation, the administration doubled down. In the early hours of March 21, 2025, attorneys from the U.S. Department of Justice emailed counsel for Mr. Taal, informing counsel that ICE intended to arrest and confine Mr. Taal, and inviting Mr. Taal to surrender to HSI.[56]

111.    Later, government officials conceded in filings to the Northern District of New York that DHS agents had identified Mr. Taal by conducting a review of publicly available information, in line with the directives of Executive Order 14188 on antisemitism. An HSI official confirmed to the Court that it had referenced this Executive Order when communicating with the State Department concerning Mr. Taal.[57]

---

[52] See Pet., ECF No. 1, *Taal et al. v. Trump et al*, Civ. No. 25-00355 (N.D.N.Y. Mar. 13, 2025).

[53] See ECF No. 19, *Taal et al. v. Trump et al*, Civ. No. 25-00355 (N.D.N.Y. Mar. 19, 2025).

[54] Malcolm Ferguson, *The Sinister Way Trump's DOJ Tried to Deport Cornell Student Protester*, New Republic (Mar. 21, 2025), https://newrepublic.com/post/193038/justice-department-deport-cornell-palestine-student-protester-momodou-taal.

[55] *Id.*

[56] See ECF No. 25, *Taal et al. v. Trump et al*, Civ. No. 25-00355 (N.D.N.Y. Mar. 19, 2025).

[57] See Decl. of Roy Stanley, Defendants' Opp. to Mot. for Preliminary Inj. and Temporary Restraining Order, *Taal et al. v. Trump et al.*, Civ. No. 25-00355 (N.D.N.Y. Mar. 19, 2025), ECF No. 30-2.

112.    Mr. Taal has since decided to leave the United States, stating: "Given what we have seen across the United States, I have lost faith that a favourable ruling from the courts would guarantee my personal safety and ability to express my beliefs," and "I have lost faith I could walk the streets without being abducted. Weighing up these options, I took the decision to leave on my own terms."[58]

### Rümeysa Öztürk

113.    Rümeysa Öztürk is a PhD student at Tufts University. Ms. Öztürk is from Turkey.[59]

114.    On March 26, 2024, almost exactly one year before her arrest, Ms. Öztürk co-authored an op-ed in *The Tufts Daily*. The piece criticized Tufts University's response to several student Senate resolutions concerning human rights violations in Gaza. The authors urged meaningful engagement by the University administration with the Senate resolutions. In early 2025, the Canary Mission website targeted Ms. Öztürk, claiming she had engaged in "anti-Israel activism" for co-authoring the op-ed.

115.    On March 17, 2025, the Office of Intelligence prepared a report of analysis concerning Ms. Öztürk, including reference to the above-mentioned op-ed. App. at 370–71 (PX 27, July 10 Tr. Vol. 1 at 31:24–32:4). From there, HSI issued a recommendation to the State Department to revoke her visa. *Id.* at 502 (PX 32, July 17 Tr. at 75:14–25).

116.    On March 25, 2025, at approximately 5:15 p.m., a hooded, plainclothes officer approached Ms. Öztürk near her Somerville, Massachusetts, apartment. Five other agents surrounded her, took her phone, and whisked her away in a car. On the evening of Ms. Öztürk's

---

[58] Momodou Taal, *X*, (Mar. 31, 2025, 6:55 P.M.), https://x.com/MomodouTaal/status/1906842790778057173.

[59] Unless otherwise noted, all facts related to Ms. Öztürk's arrest and detention come from *Öztürk v. Trump*, 2025 WL 1145250 (D. Vt. Apr. 18, 2025).

immigration arrest, ICE transported Ms. Öztürk to Lebanon, NH, and then later to St. Albans, VT. In the early morning of March 26, 2025, agents placed Ms. Öztürk on a flight out of Burlington, VT, and then, eventually, to a detention center in Louisiana, over 1000 miles from home, following the pattern of ICE's swift and faraway transfers of Ms. Kordia, Mr. Khalil, and Dr. Suri.

117.    Subsequent to its decision to confine Ms. Öztürk, DHS initiated removal proceedings against her. In those removal proceedings, DHS submitted a memo from a Department of State employee, which laid out the reasoning for targeting her, specifically due to her associations, "*including* co-authoring an op-ed that found common cause with an organization that was later temporarily banned from campus."

118.    On March 28, 2025, Secretary of State Marco Rubio delivered remarks to the press regarding Ms. Öztürk's confinement.[60] Secretary Rubio stated in response to a question about Ms. Öztürk, "The activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States." Secretary Rubio further indicated that Ms. Öztürk's confinement was part of a larger effort of the government "basically asking them [protestors] to leave the country." He explicitly noted that "that's why they've been detained."

119.    On April 18, 2025, the District of Vermont held that Ms. Öztürk raised substantial questions as to whether her confinement violated the Constitution and that the Court could reach, given that her "detention did not flow naturally as a consequence of her removal proceedings"— pointing out that the decision to place her in removal proceedings occurred after the initiation of

---

[60] U.S. Department of State, *Secretary of State Marco Rubio Remarks to the Press* (Mar. 28, 2025), https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-3.

her immigration custody.[61] The District Judge later ordered Ms. Öztürk immediately released, finding that her continued confinement violated the First Amendment. *See generally Ozturk v. Trump*, No. 2:25-cv-374, 2025 WL 1420540 (D. Vt. May 16, 2025). The Second Circuit declined to stay the District Court's order to transfer Ms. Ozturk to Vermont. *Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025).

### *Aditya Wahyu Harsono*

120.    On March 27, 2025, plainclothes ICE agents arrested Aditya Wahyu Harsono at his place of employment, a hospital, by threatening legal consequences against his coworkers, unless they assisted in luring Mr. Harsono to the basement for a "meeting."[62]

121.    Mr. Harsono is Indonesian and entered the United States on an F-1 student visa. At the time of his arrest, he was working lawfully under that visa as a part of Optional Practical Training ("OPT"). His wife, a U.S. citizen, had also petitioned for him to become an LPR.

122.    Prior to his confinement, officials at the U.S. State Department "silently" revoked his student visa—meaning that, at the time of his arrest, he was unaware that there was any issue with his student visa or his OPT.

123.    During his time in the United States, Mr. Harsono has been a vocal advocate for social justice. As a part of the social-media branding for this clothing brand, Mr. Harsono included images of a Palestinian flag and the words "Free Palestine" in the Arabic language. In 2021, Mr. Harsono was arrested at a protest, and that charge was dismissed.

---

[61] *Öztürk v. Trump*, 2025 WL 1145250 (D. Vt. Apr. 18, 2025) at *13.

[62] Unless otherwise noted, all references to Mr. Harsono's circumstances are pulled from the order of the District Court ordering him released, *Aditya W. H. v. Trump*, No. 25-CV-1976, 2025 WL 1420131 (D. Minn. May 14, 2025).

124.    Similar to Ms. Kordia, Mr. Harsono sought custody redetermination before an immigration judge. Despite the immigration judge's granting him release on bond, DHS prevented his release, as in the case of Ms. Kordia, by invoking an automatic administrative stay.

125.    On May 14, 2025, a federal District Judge ordered the government to release Mr. Harsono, finding that his confinement was unconstitutional under the First and Fifth Amendments and noting that "for those who did not engage in protected speech, Mr. H[arsono] ha[d] shown that the government's enforcement stopped short of arrest and detention."[63]

### Mohammad Hoque

126.    On March 28, 2025, ICE agents arrested Mohammad Hoque, purportedly due to the revocation of his student visa.[64] Subsequent to his arrest and confinement, the records related to the maintenance of his student status were terminated, and he was placed in removal proceedings.

127.    Mr. Hoque, who hails from Bangladesh, had posted publicly on social media regarding his support for Palestinian human rights and criticizing the violence in Gaza. The recorded justification for the State Department's revocation of Mr. Hoque's visa was a previous criminal charge.

128.    Similar to Ms. Kordia, Mr. Hoque sought custody redetermination before an immigration judge. Despite the immigration judge's granting him release on bond, DHS prevented his release, as in the case of Ms. Kordia, by invoking an automatic administrative stay.

129.    On May 5, 2025, a federal District Court ordered Mr. Hoque released, finding that it had jurisdiction over his claims that his confinement was unconstitutional under the First and

---

[63] *Id.* at *11.

[64] Unless otherwise noted, all references to Mr. Hoque's circumstances are pulled from the order of the District Court ordering him released, *Mohammed H. v. Trump*, No. 25-CV-1576, 2025 WL 1334847 (D. Minn. May 5, 2025).

Fifth Amendments, because he was not seeking to invalidate his removal proceedings, vacate any underlying executive determinations, or disturb any removal orders, and instead "[sought] an end to his allegedly unlawful detention."[65] The Court also found his claims under the First and Fifth Amendments likely to succeed on the merits. Specifically, despite "the existence of a facially valid arrest basis," the Court found Mr. Hoque's First Amendment retaliation claim likely to succeed on the merits, where the action "was driven by political speech and followed by detention unsupported by any individualized showing of danger to the public or flight risk."[66]

130.    On June 17, 2025, the District Judge issued the final judgment, granting the petition and finding that the "Petitioner was arrested and detained because he expressed pro-Palestinian views and criticized violence in Gaza."[67]

### Mohsen Mahdawi

131.    Mr. Mahdawi is Palestinian; in March 2025 he was a student at Columbia University and an LPR.

132.    Mr. Mahdawi has participated in protests and demonstrations supporting Palestinian human rights. In early 2025, Betar USA, one of the extremist organizations on whose smears of advocates for Palestinian rights the administration relies for its suppression policy, had targeted Mr. Mahdawi, arguing that he should be next on the administration's list of people to deport.[68]

---

[65] *Mohammed H. v. Trump*, No. 25-CV-1576, 2025 WL 1334847, at *6 (D. Minn. May 5, 2025).

[66] *Id.* at *5

[67] *Mohammed H. v. Trump*, No. 25-CV-1576, 2025 WL 1692739 (D. Minn. June 17, 2025) *app. filed*, No. 25-2516 (8th Cir.).

[68] Pet., *Mahdawi v. Trump*, No. 25-cv-389 (D. Vt. Apr. 14, 2025), ECF No 1, ¶¶ 41, 49.

133.    On March 12, 2025, HSI's Office of Intelligence created a report of analysis about Mr. Mahdawi. App. at 388 (PX 27, July 10 Tr. Vol. 1 at 59:21-60:3).

134.    On April 14, 2025, ICE agents arrested Mr. Mahdawi immediately after he completed an interview for his application for U.S. citizenship, shoving into his pocket thereafter a Notice to Appear, commencing his removal proceedings.[69]

135.    ICE agents immediately attempted to transfer Mr. Mahdawi outside of Vermont to a remote detention facility—as ICE had done with Ms. Kordia, Mr. Khalil, Dr. Suri, and Ms. Öztürk—but a federal District Court enjoined ICE from doing so.[70] The administration confined and seeks to deport Mr. Mahdawi because of his speech and protest activities in support of Palestinian human rights. The Court ordered Mr. Mahdawi released pursuant to *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), on April 30, 2025, finding that it could reach the question of the constitutionality of his confinement because it was distinct from the institution of removal proceedings against him, and, that his confinement amounted to retaliation against him for his protected speech and to a violation of due process.[71] The Second Circuit denied the government's motion to stay Mr. Mahdawi's release pending its appeal of the district judge's release order. *Mahdawi v. Trump*, 136 F. 4th 443 (2d Cir. 2025).

### *Efe Ercelik*

136.    Mr. Ercelik is Turkish and entered the United States on a student visa in 2022. In November 2023, Mr. Ercelik was arrested at a protest, where he had expressed views supportive of Palestinian human rights.

---

[69] *See* Order, *Mahdawi v. Trump*, No. 25-cv-389 (D. Vt. Apr. 24, 2025), ECF No. 34, at 1-2.

[70] *See* Order, *Mahdawi v. Trump*, No. 25-cv-389 (D. Vt. Apr. 24, 2025), ECF No. 34, at 1.

[71] *Mahdawi v. Trump, et al.*, 2025 WL 1243135, at *8 (D.Vt., 2025).

137.    On May 7, 2025, ICE agents arrested Mr. Ercelik at a Massachusetts state courthouse, where he was attending a hearing on pending criminal charges.[72]

138.    After his arrest in November 2023, a profile of Mr. Ercelik appeared on the Canary Mission website; and later in 2025, Betar USA claimed online that Mr. Ercelik's name had been "submitted for deportation."[73] The smears of both extremist groups against advocates for Palestinian rights are among the information on which the administration relies in pursuing its suppression policy.

139.    A federal district judge ordered Mr. Ercelik released on May 8, 2025, after finding that it could rule on the question of the lawfulness of his confinement, because it was "independent" of the removal process,[74] and that Mr. Erecelik had demonstrated a likelihood of success on the merits of his First Amendment claim that he was confined in retaliation for his political speech and of his Fifth Amendment claim that his confinement was punitive.[75]

\*\*\*

140.    Ultimately, immigration officials have abused extraordinary and unprecedented power by arresting, transferring, confining, and initiating removal proceedings against noncitizens whom the administration perceives as political dissidents. This includes confining individuals like Ms. Kordia, Mr. Khalil, Dr. Suri, Ms. Öztürk, Mr. Harsono, Mr. Hoque, Mr. Mahdawi, and Mr. Ercelik—for all of whom the administration lacks an individualized and non-discriminatory basis for using confinement to prevent danger or flight risk.

---

[72] Unless otherwise noted, all references to Mr. Ercelik's circumstances are pulled from the order of the District Court ordering him released, *Ercelik v. Hyde*, No. 25-CV-11007, 2025 WL 1361543 (D. Mass. May 8, 2025).

[73] *Ercelik v. Hyde*, No. 25-CV-11007, 2025 WL 1361543, at * 9 (D. Mass. May 8, 2025).

[74] *Ercelik v. Hyde*, No. 25-CV-11007, 2025 WL 1361543, at * 8 (D. Mass. May 8, 2025).

[75] *Id.* at *10–13.

**E. The Government's Punishment of Advocacy Supportive of Palestinian Rights Has Suppressed the First Amendment Activity of Ms. Kordia and Countless Others.**

141.    Respondents' retaliatory confinement has had its intended effect by chilling the protected speech and association of Ms. Kordia and countless others.

142.    For Ms. Kordia, her confinement prevents her from standing, chanting, or advocating together with others, physically, in public spaces—because ICE has purposefully cast her away behind the fences and bars of a detention center. Nor does the detention center permit confined individuals to host demonstrations. Ms. Kordia's retaliatory confinement serves as a deterrent to others who are chilled from speaking and effectuates the unconstitutional objective of censoring lawful political speech.

143.    In just the last few months, community members in the New Jersey and New York area from which Ms. Kordia hails have hosted dozens of demonstrations in support of Palestinian human rights, which, but-for Ms. Kordia's confinement, Ms. Kordia could have attended. In her local community in Paterson, New Jersey, for example, Ms. Kordia could not attend the annual Palestine Day celebration on Palestine Way, which occurred on May 18, 2025. Similarly, in New York, had Ms. Kordia not been confined, she would have attended demonstrations, such as the Global Day of Action that occurred on April 25, 2025, which brought together communities across the world who rallied for an end to the military violence and blockade on Gaza. Even more recently, and as state-sanctioned starvation and famine in Gaza have intensified, Ms. Kordia would have, but could not, attend the Mass March for Humanity in Bryant Park in New York City on August 16, 2025. The event brought together a large coalition of voices, ranging from associations of healthcare workers and doctors to Jewish Voice for Peace, calling for an end to the military violence against the people of Gaza.

144.    Ms. Kordia's desire to participate in peaceful, in-person demonstrations for

Palestinian rights has only intensified as reports have surfaced that the Israeli government has been effectively blocking humanitarian aid from entering Gaza, resulting in widespread starvation and famine for the people living there.

145.    That Ms. Kordia may engage in some other forms of protected expression—such as speaking with other confined individuals in conversation, writing letters, or acting through her family or attorneys—is no answer to this censorship. Ms. Kordia wants to attend in-person demonstrations to inspire the same hope and joy she felt living in Palestine and seeing images from around the world of others taking time from their own lives to physically gather in support of Palestinians.

146.    The arrest of Ms. Kordia and others under the administration's suppression policy has reverberated throughout the country by broadly chilling lawful protected expression of both citizens and noncitizens alike, particularly on college campuses.

147.    Following the arrest of Mahmoud Khalil, and then of Ms. Kordia shortly thereafter as the second person arrested under the suppression policy, reports surfaced of student organizations, faculty, and others self-censoring their otherwise protected expression for fear of retaliation.[76] And immigration practitioners have reported a substantial increase in prospective

---

[76] Faiza Patel, *U.S. AI-driven "Catch and Revoke" Initiative Threatens First Amendment Rights*, Brennan Center for Justice (Mar. 20, 2025), https://www.brennancenter.org/our-work/analysis-opinion/us-ai-drivencatch-and-revoke-initiative-threatens-first-amendment-rights; Lubna Kably, *Hundreds of international students wake up to an email asking them to self deport for campus activism*, The Times of India (Mar. 29, 2025), https://timesofindia.indiatimes.com/world/us/hundreds-ofinternational-students-are-waking-up-to-an-email-asking-them-to-self-deport-for-campus-activism-or-even-sharingposts-on-social-media/articleshow/119679695.cms; Sanya Mansoor, *Will ICE Come to My Dorm Today?*, The Cut, Mar. 26, 2025, https://www.thecut.com/article/pro-palestine-student-protesters-worry-will-ice-come-for-me.html; Daniella Silva et al., *Trump takes aim at foreign-born college students, with 300 visas revoked*, NBC News (Mar. 27, 2025), https://www.nbcnews.com/news/us-news/trump-administration-takes-aim-immigrant-students-rcna198346; Vimal Patel, Miriam Jordan, and Halina Bennet, *Nearly 300 students have had visas revoked and could face deportation*, N.Y. Times (Apr. 7, 2025), https://www.nytimes.com/2025/04/07/us/student-visas-revoked-trumpadministration.html; Center for Constitutional rights, et al., *Entrenching Authoritarianism: Expanding the Terrorism Framework and the Infrastructure of Surveillance to Repress Expression and Stifle Dissent* 10 – 13, Jt. Submission to the U.N. Hum. Rights Council Reviewing the U.S. Nat'l Report Under the Universal Periodic Review (Apr. 7, 2025), https://ccrjustice.org/sites/default/files/attach/2025/04/UPR%20Joint%20Submission%20Entrenching%20Authoritar

clients requesting advice about how otherwise lawful First Amendment activity may impact themselves or their noncitizen spouses since March 2025. App. at 197–99 (PX 11, Dec. of Victoria Porell ¶¶ 17–29). The chilling effect has also affected student-run newspapers such as *The Stanford Daily*, which had its writers seek to pull down previously posted articles and photographs for fear of retaliation from the administration.[77]

148.    Associations of college faculty have also self-censored in light of the administration's crackdown on First Amendment activity supportive of Palestinian rights. For example, the general counsel of the American Association of University Professors ("AAUP") described AAUP's members' fears that the crackdown on activity supportive of Palestinian rights, or critical of the Israeli government, would harm their economic livelihoods and personal lives. *Id.* at 212– 227 (PX 12, Decl. of Veena Dubal ¶¶ 14–68). As a result of these fears, AAUP members, including U.S. citizens, have altered their research, stopped hosting certain events on their respective campuses, and declined professional opportunities for fear of retribution against them or their associates. *Id.*

149.    Similarly, the Middle East Studies Association of North America ("MESA") has

---

ianism%20April%202025.pdf; *Id.*, Appx. at 34–37; Dawn White, *Trump administration revokes almost 80 North Texas student visas*, CBS News Texas (Apr. 10, 2025), https://www.cbsnews.com/texas/news/trumpadministration-revokes-almost-80-north-texas-student-visas/; Killian Baarlaer, *Amid free speech concerns, pro-Palestinian students take caution on Kentucky campuses*, Courier-Journal (May 9, 2025), https://www.courierjournal.com/story/news/education/2025/05/09/pro-palestinian-students-concerned-about-free-speech-at-kentuckycolleges/83049198007/; Trevor Hughes, *19 State AGs ask federal judge to block Trump's student visa cancellations*, Courier-Journal, (Apr. 11, 2025), https://www.courier-journal.com/story/news/nation/2025/04/11/attorneys-generallawsuit-trump-student-visa0cancellations/83048386007/; Brandon Drenon and Robin Levinson-King, *Anxiety at US colleges as foreign students are detained and visas revoked*, BBC (Apr. 18, 2025), https://www.bbc.com/news/articles/c20xq5nd8jeo; Adrian Florido, *These students protested the Gaza war. Trump's deportation threat didn't silence them*, NPR (May 21, 2025), https://www.npr.org/2025/05/21/nx-s1-5400644/thesestudents-protested-the-gaza-war-trumps-deportation-threat-didnt-silence-them; Emewodesh Eshete, *Fearing Deportation, International Students Go Silent at California's Universities*, KQED CalMatters (Aug. 9, 2025), https://www.kqed.org/news/12051638/fearing-deportation-international-students-go-silent-at-californias-universities.

[77] *See, e.g.*, Verified Compl., *Stanford Daily Publishing Co. v. Rubio*, No. 5:25-cv-06618, 13–15 (N.D. Cal Aug. 6, 2025), ECF 1;

described the suppression policy as chilling its members from even organizing ordinary academic programming that may touch on the issue of Palestine. *Id.* at 232 (PX 13, Decl. of Asli Bali ¶ 9). MESA reports its noncitizen faculty members and students as self-censoring their research, public speeches, social media, and broader participation in university life. *Id.*

150.    Independent of its impact on First Amendment activity regarding Palestine and Israel specifically, the suppression policy is an afront to the First Amendment rights of noncitizens and citizens alike, by sending the message that lawful, protected expression and association can justify the arrest, confinement, and attempted removal of noncitizens expressive of or associated with views that the administration disfavors.

### F. Ms. Kordia's Immigration Confinement Violates the Religious Freedom Restoration Act.[78]

151.    Since arriving at the Prairieland Detention Facility on or about March 14, 2025, Respondents Bergami and Johnson, through their agents and employees, have substantially burdened the exercise of Ms. Kordia's sincerely held religious beliefs as a Muslim by failing to accommodate her repeated requests for religious accommodations. Specifically, they have failed to provide: (1) halal food and (2) necessary items and living spaces required for her religious exercise.

152.    **Halal diet.** Most alarmingly, Ms. Kordia has received one, single halal meal since her confinement began on March 14, 2025. Halal is an Arabic word that means lawful or permitted. For Muslims observing a halal diet, permissible foods are defined by Islamic teachings, which

---

[78] Ms. Kordia recognizes, as this Court has observed, that "allegations that challenge the fact or duration of confinement are properly brought in habeas petitions, while allegations that challenge rules, customs, and procedures affecting conditions of confinement are properly brought in civil rights actions." Dkt. 68 at 2 (quoting *Barbosa v. Barr*, 502 F. Supp. 3d 1115, 1120 (N.D. Tex. 2020)). However, because the Court has stayed adjudication of Ms. Kordia's RFRA claim, *infra* Count V ¶¶ 219–24, Ms. Kordia pleads these allegations to preserve her RFRA claim for future adjudication after final judgment on her habeas claims (Counts I–IV).

restrict observers of halal diets from eating certain foods and ingredients that are "haram," meaning prohibited. Halal also prescribes a certain way of raising and slaughtering meat prior to cooking it. Ms. Kordia, consistent with her faith, avoids prohibited ingredients and non-halal meats.

153.    Despite Ms. Kordia's repeatedly requesting halal food, Warden Bergami, Director Johnson, and their staff have only provided, at best, kosher options. Kosher and halal diets have important differences. Most obviously, they are governed by different religious traditions with different sets of guidelines. For example, kosher preparations of permitted meats must be prepared by a Jewish person who is trained in the specific laws of shechita. Halal has a similar set of guidelines for Muslims, requiring the person slaughtering the animal to be Muslim and recite a specific prayer.

154.    Similarly, the two religious dietary restrictions permit and prohibit different foods. Muslims keeping a halal diet can eat certain foods and ingredients that Jews keeping kosher cannot, and vice versa.

155.    After Ms. Kordia requested halal food throughout her first few weeks of confinement, the officers bringing Ms. Kordia her Styrofoam box of food began writing "halal" on the top of the container. When Ms. Kordia opens the packaging, though, the food is pre-packaged with a label on the pre-packaged food that says, "kosher." Apparently, Warden Bergami and Director Johnson would rather their staff force Ms. Kordia to eat religiously prohibited food than accommodate Ms. Kordia's sincerely held beliefs. Ms. Kordia has pointed out the kosher labels on her food to multiple officers. At least one guard told her, "We don't know what halal means." Another officer told her, "This food is not meant to fill you up. You should be lucky that you are even getting food. People cross the border illegally and then complain about the food." Since April 17, 2025, guards have been writing "kosher/halal" or just "halal" on the outside of the

box, even though the food contained inside is only kosher. Many times, Ms. Kordia receives no food at all or several hours after other people in custody receive their food.

156.    Warden Bergami and Director Johnson's food service puts Ms. Kordia in the exact position religious freedom laws prohibit: either violate her religious commitments or go without eating. And the failure to serve Ms. Kordia halal meals obviously does not serve any government interest, because Warden Bergami and Director Johnson accommodate requests for kosher meals. Ms. Kordia, then, is forced to choose between her faith and food, while other people in custody can eat consistent with their religious commitments.

157.    Ms. Kordia's experience during Ramadan, which this year occurred from February 28 to March 29, was especially reflective of Warden Bergami and Director Johnson's failure to accommodate Muslim religious traditions. Ramadan is the ninth month of the Islamic calendar and is a time of fasting, celebration, and community among Muslims. To observe the holiday, Ms. Kordia fasted from dawn through sunset, as she has during Ramadan her whole life. Despite her repeated requests to receive her food at times when she could eat the food, or for her to hold on to the food until she could eat, the facility staff refused. One officer told her twice that she "hates Ramadan." For all of Ramadan, then, Ms. Kordia had to either forgo one of the most sacred rituals in her religion or go hungry.

158.    Since being confined on March 14, 2025, the only halal meal Ms. Kordia has received was on or about June 6, 2025, during Eid al-Adha.

159.    **Daily Burdens on Modesty and Prayer.** Warden Bergami and Director Johnson's staff have also failed to accommodate Ms. Kordia's religious exercise by making it unnecessarily difficult for her to observe her religious belief in modesty and pray in line with her faith. Ms. Kordia's observance of Islam includes several widely practiced customs of modesty. For instance,

Ms. Kordia must wake up before the rest of the dorm to shower before other people rise, so that she does not need to undress in front of others.

160.    In accordance with her faith, Ms. Kordia must also wear a hijab, a garment covering her hair, around men. Since her confinement at the Prairieland Detention Facility, men regularly enter her dorm unannounced. On April 16, 2025, for example, a man came into the dorm to do repairs when Ms. Kordia did not have her hijab on. Another time, a lieutenant walked into the dorm unannounced while Ms. Kordia had her hijab off. Ms. Kordia had to sprint across the room, in full view of the lieutenant, to retrieve her hijab. Ms. Kordia complained about these burdens on her religious beliefs to the chaplain and a lieutenant, but men continue entering her room unannounced while she is not wearing her hijab. These violations have persisted throughout her confinement.

161.    Ms. Kordia's religious beliefs require the preservation of modesty in the course of daily prayers, which require prostrations. Prior to her confinement, Ms. Kordia would pray in loose fitting clothes that cover her back when she kneels down for prayer. Despite her requests to the facility and otherwise purchasing the best option available from the commissary, the facility does not have such clothing, forcing Ms. Kordia to expose her back every time she prays, in violation of her religious beliefs.

162.    Further, Warden Bergami and Director Johnson have failed to provide adequate conditions in which Ms. Kordia feels worthy of prayer. As a practicing Muslim, Ms. Kordia prays five times a day at specific times based on the position of the sun and the rotation of the Earth. Ms. Kordia, like many Muslims, must approach prayer in a state of worthiness, including by creating a symbolically pure place to pray. But because her living conditions contain many broken shower fixtures and faucets, it is difficult for Ms. Kordia to remain clean. And since confined individuals

eat meals in the same place they sleep, the living quarters are regularly infested with cockroaches, spiders, other bugs, and, at least once, a snake.

163.    For nearly two months, from March 14, 2025, until shortly after filing this case, the detention center chaplain refused to provide her a prayer mat, which aids Muslims in creating a symbolically pure space for prayer. At first, the chaplain said the prayer mats were only for men and during Friday prayer. But on or about April 27, 2025, a woman entered the detention center and was immediately provided a prayer mat. Shortly after filing this lawsuit, Ms. Kordia was provided a prayer mat. During the same time period, the chaplain refused to provide Ms. Kordia with a prayer calendar, meaning Ms. Kordia did not know when she should pray.

164.    For a stretch of several weeks, Ms. Kordia stopped praying altogether because of these burdens. But even when Ms. Kordia does pray, she is continually reminded of the disgusting conditions. On one occasion, Ms. Kordia was praying in the detention center's laundry room. As she knelt down with her eyes closed, another person in custody came into the room and yelled, "There is a snake!" Ms. Kordia looked up and saw a snake slithering towards her, interrupting her prayer and making her fearful when she went to bed.

165.    The daily indignities, hardships, and violations of her religious liberty have taken a toll on Ms. Kordia. She suffers from near-daily migraines and dizziness from the lack of appropriate food and, according to facility records, has lost significant body weight. She struggles to stay clean from the insect-infested living area and broken bathroom fixtures; the prevalence of cockroaches exacerbates her experience of uncleanliness and its impacts on her religious exercise. Since being arrested and confined, she has felt severely depressed and alienated due to her inability to express her sincerely held religious beliefs, lack of nutritious halal food, and being so far from her family and community, who are unable to visit regularly.

**G. Ms. Kordia Continues to Exercise Every Legal Tool at Her Disposal to Regain Her Liberty and Defend Against Removal.**

166.    Consistent with its legal obligations to assess dangerousness and flight risk on an individualized and non-discriminatory factual basis, ICE should have released Ms. Kordia on her own recognizance or subject to reasonable conditions. Instead, it has confined her thousands of miles away from her family and community and stymied every administrative avenue for her release. Since being served with an NTA on March 13, 2025, Ms. Kordia has utilized every legal tool available to regain her liberty and defend against removal.

167.    **Custody proceedings.** Ms. Kordia promptly exercised her right to seek a bond determination on March 26, 2025. In order to grant release on bond, an immigration judge must determine that an individual is neither a danger to the community nor a flight risk. *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006). Neither the immigration judge nor the BIA on appeal has jurisdiction to assess the constitutionality of Ms. Kordia's confinement or of the statutes and regulations governing her confinement. Thus, a federal court sitting in habeas jurisdiction is the only forum in which Ms. Kordia can meaningfully challenge the constitutionality of her confinement pending her ongoing removal proceedings.

168.    In support of her request for release on bond, Ms. Kordia submitted numerous letters of support from friends and family members, showing the extensive community she has built in New Jersey. App. at 43–57 (PX 1, Kordia Bond Mot.). This includes multiple United States citizen family members, including her mother, who suffers hardship caused by her daughter's confinement. *Id.*

169.    At the April 3, 2025, bond hearing, DHS argued that Ms. Kordia was both a danger to the community and a flight risk. In claiming that Ms. Kordia was a danger to the community, DHS relied on two premises: (1) Ms. Kordia was briefly arrested in connection with a protest near

Columbia University in 2024, and (2) she had sent money to individuals in Palestine. When pressed, DHS could not identify on which dates it believed Ms. Kordia had sent funds, the total amount, or why the identity of the recipient rendered Ms. Kordia a potential danger, except to insinuate that *any* transfer of funds to persons in Jordan, the West Bank, Gaza, or Turkey[79] was somehow suspect and indicative of support for terrorism. *See generally*, *Id.* at 113–15 (PX 3, Bond Memo.).

170.    At the conclusion of the bond hearing, the immigration judge issued an oral decision, permitting Ms. Kordia's release on bond. Thereafter, on April 16, 2025, the immigration judge issued a written decision memorializing the grant of bond. *Id.* The immigration judge recognized that Ms. Kordia bore "the burden to establish she merits release on bond." *Id.* at 113.

171.    Specifically, the immigration judge found, in connection with the April 30, 2024, NYPD arrest, no evidence that Ms. Kordia had threatened police or engaged in any dangerous activity. *Id.* at 114. Similarly, the immigration judge rejected DHS's baseless suggestion that Ms. Kordia may have provided support to a terrorist group, noting that the government admitted it does not know any information about the recipients of at most two transactions the government's evidence could attribute to Ms. Kordia. *Id.* Neither of these allegations could form the basis of a finding of danger to the community; so, in conjunction with her extensive community ties and several bases for potential immigration relief, the immigration judge ordered Ms. Kordia releasable on a bond of $20,000. *Id.* at 114–15.

172.    By regulation, though, DHS may unilaterally prevent the immigration judge's order from going into effect whenever DHS believes a noncitizen "should not be released." 8 C.F.R. §

---

[79] The records DHS submitted indicated transfers to Turkey, Jordan, and Palestine but do not specify which ones are attributed to Ms. Kordia, save for one on February 25, 2025, App. at 69 (PX 2, DHS Bond Opposition), and one on March 13, 2022, *id*. at 100.

1003.19(i)(2). This means the person will necessarily remain in custody until either the Board of Immigration Appeals ("BIA") decides the bond appeal or ninety days pass. *Id.* § 1003(c)(4). Since DHS has ten days to file the notice of appeal before the ninety-day clock, this stay provision creates a 100-day due-process-free zone where there is no ability to be heard at a meaningful time, nor present argument to a neutral arbiter. *Id.* And at the end of the automatic stay period, the immigration judge's order to release a noncitizen on bond remains stayed for up to thirty days while the BIA considers any discretionary stay. *Id.* § 1003(c)(5). Thus, the regulations permit a 130-day period of confinement without any procedures to contest or challenge that confinement.

173.    Incredibly, and in a departure from prior agency practice, DHS exercised its automatic stay power in Ms. Kordia's case, despite her lack of criminal history and the agency's own rating of her as low risk. App. at 118 (PX 4, DHS Notice of Appeal) (invoking automatic stay provision). In effectuating the automatic stay, DHS did not have to make any showing, and Ms. Kordia did not have any chance to respond. DHS merely had to file a piece of paper to keep Ms. Kordia confined.

174.    As noted, DHS has used the automatic stay against Ms. Kordia and other individuals associated with protest activity. *See supra* ¶¶ 120–30 (elaborating DHS's invocation of automatic administrative stays to keep Mr. Harsono and Mr. Hoque confined).  In the months since the arrests of Ms. Kordia, Mr. Harsono, and Mr. Hoque, DHS has ramped up usage of the automatic stay to prevent the release of others granted bond by immigration judges. *See Maldonado v. Olson*, No. 25-cv-3142, 2025 WL 2374411 (D. Minn. Aug. 14, 2025); *Jimenez v. Kramer*, No. 25-cv-3162, 2025 WL 2374223 (D. Neb. Aug. 14, 2025); *Anicasio v. Kramer*, No. 25-cv-3158, 2025 WL 2374224 (D. Neb. Aug. 14, 2025). DHS appears now to be using the automatic stay categorically to prevent the release of noncitizens granted bond by immigration

judges where, unlike in Ms. Kordia's case, DHS believes such individuals are ineligible for custody redetermination and subject to mandatory confinement. *See* Compl., *Bautista v. Noem*, No. 5:25-cv-01873 (C.D. Cal. July 28, 2025), ECF No. 1 ¶ 48.

175.    On June 27, 2025, the magistrate judge issued a Recommendation finding the automatic stay provision likely unconstitutional as violating Ms. Kordia's right to procedural due process. Dkt. 53. DHS, though, almost immediately tried to thwart the Recommendation by seeking a discretionary stay from the BIA on July 2, 2025. App. at 132 (PX 5, DHS Emergency Mot. for Discretionary Stay). Even though the mere filing of a motion for a discretionary stay keeps the automatic stay in effect for thirty days while the BIA decides whether to issue a discretionary stay, the BIA granted the discretionary stay the next day, in an unreasoned decision, and without affording Ms. Kordia an opportunity to respond. *Id.* at 169 (PX 6, BIA Order Granting Discretionary Stay).

176.    On August 11, 2025, the BIA issued its opinion in DHS's appeal of the immigration judge's bond decision. The BIA remanded the administrative custody proceedings back to the immigration judge for the issuance of a new decision after further fact-finding, placing the burden of proof on Ms. Kordia.[80] *Id.* at 173–75 (PX 7, BIA Bond Dec. Remanding Custody Determination). Specifically, as to Ms. Kordia's involvement in the April 2024 protest, the BIA found "no clear error in the Immigration Judge's findings that [Ms. Kordia's] conduct during the April 30, 2024" provided no basis for confinement. *Id.* at 174. As to the money transfers, though, the BIA remanded "to make more complete findings of fact . . . regarding the extent of the money transfers from [Ms. Kordia] to persons in the Palestinian Authority." *Id.* Crucially, though, in administrative bond proceedings, the "burden is on [Ms. Kordia] to prove that her release would

---

[80] Because Ms. Kordia was not released and the BIA remanded the decision, her family's payment of the $20,000 bond was returned.

not pose a danger," and DHS has no burden to "prove that [Ms. Kordia] is a danger." *Id.* at 175. Thus, the BIA remanded so that Ms. Kordia can provide "more corroboration of her claims . . . that the money she transferred was sent to her family members." *Id.* The BIA, therefore, appeared to accept DHS's discriminatory conjecture that the mere fact of any monetary transfer to Palestine could somehow render an individual a potential danger, despite no evidence or even claim in the record that the recipients have known associations with criminal or terrorist activity.

177.    In the event of another decision from the immigration judge permitting Ms. Kordia's release, DHS can invoke another automatic stay from the BIA of the immigration judge's order.

178.    **Removal proceedings**. Since being served an NTA in March 2025, Ms. Kordia, through immigration counsel, has been preparing applications for humanitarian relief, including asylum, withholding of removal, and protection under the Convention Against Torture. However, on June 27, 2025, the immigration judge issued a removal order against Ms. Kordia based on the judge's belief that Ms. Kordia's two immigration lawyers at the time had missed a deadline to submit an application for protection from removal. *Id.* at 179–80 (PX 8, Removal Order from Immigration Judge). Ms. Kordia moved for reconsideration of that order, which the immigration judge denied. *Id.* at 184–85 (PX 9, Order Denying Motion to Reconsider). Shortly thereafter, Ms. Kordia retained new immigration counsel and filed a motion to reopen the removal order, based on ineffective assistance from her prior two immigration attorneys. The immigration judge granted that motion to reopen on July 28, 2025, thereby vacating the June 27, 2025, removal order. *Id.* at 190–92 (PX 10, Order Granting Ms. Kordia's Motion to Re-Open).

179.    Ms. Kordia has a merits hearing set for August 28, 2025, on her applications for relief from removal. *Id.* at 191–92. At the hearing, the immigration judge may either issue an oral

decision on the day of the hearing or take the case under advisement to issue a written decision. Regardless of the outcome, any decision could then be the subject of further review by the BIA, and if the BIA upholds a removal order against Ms. Kordia, she can petition for review of the removal order by a federal court of appeals.

180.    Of note, even if the immigration judge grants Ms. Kordia relief, DHS may keep her confined while it determines whether it will appeal such order and during the pendency of any appeal. *See* 8 C.F.R. § 1003.6(a).

181.    Thus, even if the immigration judge grants Ms. Kordia protection from deportation, or again orders her release on bond or other reasonable conditions, DHS may prevent Ms. Kordia's release while it pursues appeal and could invoke another automatic stay from the BIA against any further order from the immigration judge compelling or permitting her release.

## V.    CLAIMS FOR RELIEF

### Count I. First Amendment
### (Habeas Corpus, 28 U.S.C. § 2241)

182.    Ms. Kordia incorporates by reference the preceding paragraphs.

183.    The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and press is accorded [noncitizens] residing in this country." (citing *Bridges v. State of Cal.*, 314 U.S. 252 (1941)).

184.    Respondents' retaliatory actions violate the First Amendment where (1) Ms. Kordia engaged in protected activity; (2) Respondents' actions would "chill a person of ordinary firmness from continuing to engage in that activity;" and (3) Respondents' "adverse actions were

substantially motivated against [Ms. Kordia's] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002); *see, e.g.*, *Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (applying the same three-part framework to First Amendment retaliation claim challenging "revocation of [noncitizen's] bond"). Once Ms. Kordia makes that showing, Respondents must by show "by a preponderance of the evidence that [they] would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

185.     **First,** Ms. Kordia attended the April 30, 2024, protest to mourn family members and thousands of other Palestinians killed in Gaza since October 7, 2023. She was undeniably engaged in speech on a matter of vital public concern—Israeli military actions in Gaza. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."). Even in the underlying bond proceedings, the only evidence of "dangerousness" DHS presented relies on Ms. Kordia's speech and association, which itself violates the First Amendment. *See Mote v. Walthall*, 902 F.3d 500, 506–07 (5th Cir. 2018); *see, e.g.*, *United States v. Ramon*, 86 F. Supp. 2d 665, 676 (W.D. Tex. 2000).

186.     **Second,** Respondents' actions of confining her would deter anyone from engaging in similar expression again. *Keenan*, 290 F.3d at 258.

187.     **Third,** Respondents would not be confining her right now had it not been for her protected activity. *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287. As a candidate, and then as President, President Trump promised to do exactly what Respondents are doing to Ms. Kordia here—implement a suppression policy to arrest and confine noncitizens associated with advocacy in support of Palestinian rights. *See Lozman v. Riviera Beach*, 585 U.S. 87, 100 (2018)

("An official retaliatory policy is a particularly troubling and potent form of retaliation[.]"). Pursuant to this policy, in early March 2025, DHS created a Tiger Team designed to effectuate this viewpoint-discriminatory policy, which targeted Ms. Kordia based on dismissed arrest charges arising from her participation at an April 30, 2024, protest and based on information about her on social media. And upon her being confined, Respondent Noem twice smeared Ms. Kordia publicly, without evidence, in press releases as supporting Hamas for having participated in a protest for Palestinian rights.

188.    Nothing about Ms. Kordia's continued confinement reflects individualized and non-discriminatory evidence of danger or flight risk, particularly given that Ms. Kordia has no criminal history, and ICE itself rated her as low risk. And DHS has utilized nearly every weapon at its disposal—including the automatic stay, seeking a discretionary stay after a preliminary ruling against the automatic stay issued, and overnight transfer to a facility halfway across the country in violation of a policy limiting transfers—to continue punishing Ms. Kordia for her protected activity.

189.    Because Respondents have custody over Ms. Kordia in violation of her First Amendment rights, the Court should issue a writ of habeas corpus directing Respondents to release Ms. Kordia to safeguard her constitutional liberties. 28 U.S.C. § 2241.

### Count II. Fifth Amendment – Substantive Due Process
### (Habeas Corpus, 28 U.S.C. § 2241)

190.    Ms. Kordia incorporates by reference the preceding paragraphs.

191.    The Due Process Clause of the Fifth Amendment provides that no state shall deprive any person of liberty without due process of law. U.S. Const. amend. V.

192.    The "Due Process Clause applies to all persons within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent."

*Zadvydas*, 533 U.S. at 690. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id.*

193.    Confinement for noncriminal purposes is only allowed "in narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (internal quotations and citations omitted).

194.    With respect to immigration confinement, the Supreme Court has recognized two special justifications: preventing danger to the community or flight from immigration enforcement. *See id.*

195.    Respondents' confinement of Ms. Kordia is wholly unjustified with respect to either justification.

196.    Soon after arresting Ms. Kordia, ICE determined that Ms. Kordia is a low risk of flight and a low risk to public safety according to *its own* Risk Classification Assessment. Nevertheless, ICE took her into custody and continues to keep her confined.

197.    At her bond hearing, Ms. Kordia bore the burden of establishing "to the satisfaction of the Immigration judge" that she is neither a flight risk nor a danger to the community. *Guerra*, 24 I. & N. Dec. at 38. Ms. Kordia did just that. Only after Respondents were forced to manufacture some justification for her continued confinement, in the face of their own original determination that Ms. Kordia represented a low risk of flight or danger, did DHS raise baseless arguments focused solely on her advocacy and support of Palestinian people and her association with Palestinian family members. Nevertheless, Ms. Kordia met her burden, and the Immigration judge granted her bond.

198.    Ms. Kordia's family posted the bond set by the Immigration judge.

199.    Respondents' continued immigration confinement of Ms. Kordia, therefore, no longer bears a "reasonable relation" to any legitimate, nonpunitive government purpose. *Zadvydas*, 533 U.S. at 690. Indeed, as discussed above, *supra* § IV.C, the apparent basis for her continued confinement is Respondents' desire to punish her for her speech in support of Palestinian rights— a constitutionally impermissible purpose.

200.    Because Respondents have custody over Ms. Kordia in violation of her Fifth Amendment rights, the Court should issue a writ of habeas corpus directing Respondents to release Ms. Kordia to safeguard her constitutional liberties. 28 U.S.C. § 2241.

### Count III.  Fifth Amendment Procedural Due Process
### (Automatic Stay, as applied)
### (Habeas Corpus, 28 U.S.C. § 2241)

201.    Ms. Kordia incorporates by reference the preceding paragraphs.

202.    When the government interferes with a liberty interest, "the procedures attendant upon that deprivation [must be] constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). The constitutional sufficiency of procedures is determined by weighing three factors: (1) the private interest that will be affected by the official action, (2) the risk of erroneous deprivation of that interest through the available procedures, and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

203.    Ms. Kordia has a weighty liberty interest as her freedom "from government . . . detention . . . lies at the heart of the liberty that [the Fifth Amendment] protects." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

204.    The risk of erroneous deprivation of Ms. Kordia's liberty is extremely high, given that the Government has already used the automatic stay provision to unilaterally override the

Immigration judge's determination without any procedural protections at all. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 333 (quotation omitted), yet the Government's decision to seek an automatic stay is not subject to review by an impartial adjudicator, and Ms. Kordia cannot even contest it. *See generally* Dkt. 53 at 15–19 (finding the automatic stay provision likely violates procedural due process).

205.    Finally, the Government's interest in preserving its unilateral authority to prevent the release of noncitizens who have already shown they are neither a flight risk nor a danger is minimal. Providing additional procedural protections here introduces no additional administrative burdens because the regulations *already* provide the Government with the opportunity to seek a discretionary or emergency stay of a bond decision. Unlike the automatic stay provision here, a discretionary stay requires DHS to justify the confinement of the individual to the BIA and gives the noncitizen the opportunity to respond. Permitting the BIA to determine whether a stay of release is in fact warranted reduces the risk of erroneous deprivation without any meaningful costs to the government.

206.    Given that the BIA has remanded the bond determination to the IJ for further factfinding, there remains a considerable risk that DHS will once again invoke an automatic administrative stay to keep Ms. Kordia confined by unilaterally overriding the immigration judge's determination, if she recommends release, and an invoking an automatic administrative stay of it.

207.    Because Respondents have custody over Ms. Kordia in violation of her Fifth Amendment rights, the Court should issue a writ of habeas corpus directing Respondents to release Ms. Kordia to safeguard her constitutional liberties. 28 U.S.C. § 2241. *See, e.g.*, *Aditya W. H*, 2025 WL 1420131, at *14; *Mohammed H.*, 2025 WL 1692739, at *5; *Maldonado*, 2025 WL 2374411,

at *16; *Anicasio*, 2025 WL 2374224, at *5.

### Count IV. Fifth Amendment Procedural Due Process
### (Burden of Proof, as applied)
### (Habeas Corpus, 28 U.S.C. § 2241)

208.    Ms. Kordia incorporates by reference the preceding paragraphs.

209.    When the government interferes with a liberty interest, "the procedures attendant upon that deprivation [must be] constitutionally sufficient." *Thompson*, 490 U.S. at 460. The constitutional sufficiency of procedures is determined by weighing three factors: (1) the private interest that will be affected by the official action, (2) the risk of erroneous deprivation of that interest through the available procedures, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. *See Mathews*, 424 U.S. at 335.

210.    Applying the *Matthews v. Eldridge* factors, Ms. Kordia's continued confinement violates her right to procedural due process because the BIA unconstitutionally placed the burden on Ms. Kordia to justify why she should not be confined rather than on the government to justify the necessity of confinement.

211.    Under BIA precedent, when a person seeks release from immigration confinement by seeking a bond hearing before an immigration judge, the noncitizen bears the burden to establish that they are neither a danger to the community nor a flight risk. *J.G. v. Warden, Irwin Cnty. Det. Ctr.*, 501 F. Supp. 3d 1331, 1342 (M.D. Ga. 2020) (quoting *Matter of Adeniji*, 22 I. & N. Dec. 1102, 1113 (B.I.A. 1999)); *see also Guerra*, 24 I. & N. Dec. at 40. Here, the BIA allocated that burden to Ms. Kordia by reversing the immigration judge's decision granting bond, even while acknowledging that DHS's evidence of danger—two payments sent to Palestine—"do not identify the recipients of the money transfers." The BIA therefore remanded the bond decision back to the

immigration judge, because it "is not on DHS to prove that the respondent is a danger," but rather on Ms. Kordia "to prove her release would not pose a danger to the community."

212.    The BIA's allocation of the burden of proof in custody redetermination hearings violates procedural due process as applied to Ms. Kordia because, for civil confinement, the Due Process Clause of the Fifth Amendment to the Constitution requires that the government bear the burden of justifying confinement.

213.    **First,** Ms. Kordia has a weighty liberty interest as her freedom "from government . . . detention . . . lies at the heart of the liberty that [the Fifth Amendment] protects." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

214.    **Second,** the risk of erroneous deprivation of Ms. Kordia's liberty is extremely high. "In cases involving individual rights, whether criminal or civil, '[t]he standard of proof [at a minimum] reflects the value society places on individual liberty.'" *Addington v. Texas*, 441 U.S. 418, 425 (1979) (quotation omitted). Courts across the country, and in the Fifth Circuit, have found that, at least in certain circumstances, procedural due process requires the government to justify civil confinement by affirmatively establishing the person poses a danger or is a flight risk. *See, e.g.*, *Hernandez-Lara v. Lyons*, 10 F. 4th 19 (1st Cir. 2021); *Velasco Lopez v. Decker*, 978 F. 3d 842 (2d Cir. 2020); *Ayobi v. Castro*, No. SA-19-CV-01311-OLG, 2020 WL 13411861, at *7 (W.D. Tex. Feb. 25, 2020); *L.G. v. Choate*, 744 F. Supp. 3d 1172, 1183–84 (D. Colo. 2024); *Hulke v. Schmidt*, 572 F. Supp. 3d 593, 600–01 (E.D. Wis. 2021).[81]

215.    Under this scheme, the noncitizen must "prov[e] a negative," *L.G.*, 744 F. Supp. 3d at 1184, which "can often be more difficult than proving a cause for concern," *id.* (quoting

---

[81] Ms. Kordia does not ask this Court to decide whether a clear-and-convincing or preponderance-of-the-evidence standard applies in immigration custody decisions.

*Hernandez-Lara*, 10 F.4th at 31). Proving a negative is especially difficult in the civil immigration context, in which the government holds many of the relevant evidentiary cards. *J.G.*, 501 F. Supp. 3d at 1337 ("Limited resources and investigative tools increase the likelihood that the factual record developed at the bond hearing will be incomplete."); *see, e.g.*, *Velasco Lopez*, 978 F.3d at 853 ("ICE refused to provide [petition] with his own DACA records."). In some cases, the government can even withhold "important information indicating" a person's suitability for release on bond. *Id.* Thus, "[t]here is quite a bit of room for 'erroneous deprivation' of liberty under this standard." *Hulke*, 572 F. Supp. 3d at 599.

216.    The risk of erroneous deprivation in Ms. Kordia's case is especially pronounced. At her bond hearing, Ms. Kordia presented letters from her family, friends, and community members attesting to why she presents no danger or flight risk. She also submitted DHS's own Risk Classification Assessment, classifying her as low risk across the board, and documents reflecting her non-existent criminal history. Nonetheless, DHS purported to justify her confinement by submitting evidence of two money transfers by Ms. Kordia. DHS used these records to speculate that money transfers to Palestine, in themselves, could indicate Ms. Kordia's support for dangerous individuals. When pushed during the custody redetermination hearing, DHS could not even identify how many times Ms. Kordia had sent money, or to whom, or why those transfers rendered her a danger, other than vague and discriminatory assertions implying that *any* person in Palestine could reasonably be assumed to be connected to dangerous activity. In virtually any other context where the government seeks to confine someone, that would have been woefully insufficient. But because of the BIA's allocation of the burden on Ms. Kordia, DHS may continue confining her on the basis of its baseless conjecture.

217.    **Third,** forcing the government to justify its decision to confine someone, which the

government bears in every other context, would not unreasonably burden the government. Having the government justify civil confinement would "limit[] the resources expended on erroneous deprivations." *J.G.*, 501 F. Supp. 3d at 1340. And, at bond hearings, the government "is always represented by an attorney who is (presumably) prepared to address" whether a person is a danger or flight risk. *Hulke*, 572 F. Supp. 3d at 600. Where the government seeks to confine someone without evidence demonstrating the person is a flight risk or danger, then its interest "in securing appearance at removal proceedings" cannot "hold sway." *Hernandez-Lara*, 10 F.4th at 33. Finally, "unnecessary detention imposes substantial societal costs," because it "separates families and removes from the community breadwinners, caregivers, parents, siblings and employees." *Id.* (quoting *Velasco Lopez*, 978 F.3d at 855).

218.    Because Respondents have custody over Ms. Kordia in violation of her Fifth Amendment rights, the Court should issue a writ of habeas corpus (1) directing Respondents to release Ms. Kordia to safeguard her constitutional liberties or otherwise (2) ordering a Constitutionally adequate custody hearing at which the government bears the burden of proving the necessity of confinement to prevent danger or flight risk. 28 U.S.C. § 2241.

### Count V.  Religious Freedom Restoration Act (42 U.S.C. § 2000bb-1(c))[82] *Against Respondents Bergami & Johnson*

219.    Ms. Kordia incorporates by reference the preceding paragraphs.

220.    The Religious Freedom Restoration Act ("RFRA") prohibits Respondents from "substantially burden[ing] a person's exercise of religion" unless they can "demonstrate[] that the application of the burden to the person:" (a) is "in furtherance of a compelling government

---

[82] The Court has stayed consideration of this claim pending its disposition of Ms. Kordia's habeas claims. Dkt. 68. Ms. Kordia re-pleads this claim to preserve it for future adjudication.

interest;" and (b) "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a-b).

221.   Respondents Bergami and Johnson face a high bar in justifying actions that substantially burden the exercise of religion and cannot rest on "broadly formulated interests[.]" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014). Rather, they must identify a compelling interest in infringing the religious exercise of "the particular claimant whose sincere exercise of religion is being substantially burdened" considering the "marginal interest" in enforcing the challenged infringements against the specific claimant in question. *Holt v. Hobbs*, 574 U.S. 352, 362–63 (2015); *Burwell*, 573 U.S. at 726. Moreover, "[t]he least-restrictive-means standard is exceptionally demanding[.]" *Burwell*, 573 U.S. at 728.

222.   Here, Bergami and Johnson have forced Ms. Kordia to endure conditions that substantially burden her exercise of Islam, which cannot be justified by any compelling interest, and are unnecessarily restrictive even if they could articulate any supposed justification. These burdens include Respondents' failure to provide halal meals, interfering with her ability to pray, and failing to provide routine religious accommodations such as baggy, modest clothing and a prayer mat. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1318 (10th Cir. 2010) (denying summary judgment to defendants who failed to provide an imprisoned person with halal meal); *Aigbekaen v. Warden*, No. 3:21-CV-01526 (JAM), 2023 WL 1780390, at *4 (D. Conn. Feb. 6, 2023) (allowing RFRA claims for denial of prayer mat); *Ward v. Rice*, No. 1:17-CV-01005, 2018 WL 1278197, at *6 (W.D. Ark. Mar. 12, 2018) (same). Ms. Kordia has repeatedly requested halal meals and modest clothing but has been told the facility cannot provide them or received no response at all.

223.   In each of these infringements, Respondents cannot demonstrate that they have a

compelling interest in the continued denial of religious accommodations specifically with respect to Ms. Kordia. *See Lozano v. Collier*, 98 F.4th 614, 624 (5th Cir. 2024) ("RLUIPA [and RFRA] require[] a tailored analysis of [a person's] individual situation. . . . [The prisoner] has presented sufficient evidence to raise a genuine issue of material fact on whether his ability to pray in accordance with his religious obligations has been substantially burdened.").

224.    Respondents Bergami and Johnson's failure to accommodate Ms. Kordia's sincerely held religious beliefs violates RFRA. And because of the rampant, chronic, and seemingly intentional nature of these violations, Respondents should release Ms. Kordia so she may exercise her religious beliefs.

## VI. PRAYER FOR RELIEF

WHEREFORE, Ms. Kordia respectfully requests the following relief:

A.    Assume jurisdiction over this matter;

B.    Issue an Order to Show Cause pursuant to 28 U.S.C. § 2243, directing Respondents to show cause why the petition for a writ of habeas corpus filed by Ms. Kordia pursuant to 28 U.S.C. § 2241 should not be granted within three days.

C.    Declare that Respondents' confinement of Ms. Kordia violates the First Amendment and issue a writ of habeas corpus ordering Respondents to release her immediately;

D.    Declare that Respondents' confinement of Ms. Kordia violates her right to substantive due process under the Fifth Amendment and issue a writ of habeas corpus ordering Respondents to release her immediately;

E.    Declare that Respondents' confinement of Ms. Kordia violates her right to procedural due process under the Fifth Amendment and issue a writ of habeas corpus by:

    a.    Ordering Respondents to release Ms. Kordia upon receipt of payment of the $20,000 bond originally ordered by the immigration judge or, in the alternative, hold a constitutionally adequate custody redetermination proceeding at which DHS bears the burden of justifying Ms. Kordia's detention by clear and convincing evidence;

    b.    Enjoining Respondents from re-invoking the automatic stay against Ms. Kordia in any future custody redetermination hearing; and

    c.  Enjoining the BIA from granting a discretionary stay of any custody redetermination order absent a meaningful opportunity for Ms. Kordia to oppose and the issuance of a reasoned decision justifying the grant;

F.    Prohibit the re-detention of Ms. Kordia unless and until the Respondents provide Ms. Kordia's counsel and a U.S. District Court with jurisdiction over Ms. Kordia notice of their intent to re-detain her and demonstrate by clear and convincing evidence at a hearing that the Court subsequently calendars that the re-detention of Ms. Kordia is the least restrictive means of preventing danger to the community and/or addressing risk of flight from immigration enforcement.

G.    Declare Respondents-Defendants' actions violate the Religious Freedom Restoration Act by substantially burdening Ms. Kordia's exercise of her sincere religious beliefs;

H.    Enjoin Respondents-Defendants from continuing to burden Ms. Kordia's sincerely held religious beliefs unless that burden serves a compelling government interest and is the least restrictive means of serving that interest.

I.    Award reasonable attorneys' fees and costs for this action; and

J.    Grant such further relief as the Court deems just and proper.

## VI.    VERIFICATION

I have read the foregoing Amended Petition for Writ of Habeas Corpus, Application to Show Cause, and Complaint for Declaratory and Injunctive Relief. Except where otherwise noted via a citation to the accompanying Appendix or footnote to another source, I have personal knowledge of the factual allegations contained therein, and if called as a witness to testify I would competently testify as to the matters stated herein. This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

_____    8-18-2025

Leqaa Kordia
Petitioner-Plaintiff

DATED: August 18, 2025

Respectfully submitted,

*/s/ Travis Walker Fife*
Travis Walker Fife
Texas State Bar No. 24126956
Randall Hiroshige
Texas State Bar No. 24124299
Texas Civil Rights Project
P.O. Box 1108
Houston, Texas 77251-1108
travis@texascivilrightsproject.org
randy@texascivilrightsproject.org

Charles S. Siegel
Texas State Bar No. 18341875
Caitlyn Silhan
Texas State Bar No. 24072879
Waters Kraus Paul & Siegel
3141 Hood Street, Suite 200
Dallas, Texas 75219
Telephone: 214-357-6244
Facsimile: 214-357-7252
siegel@waterskraus.com
csilhan@waterskraus.com

Molly Petchenik
Texas State Bar No. 24134321
Texas Civil Rights Project
1405 Montopolis
Austin, Texas 78741
Telephone: 512-474-5073
Facsimile: 512-474-0726
molly@texascivilrightsproject.org

Daniel Hatoum
Texas State Bar No. 24099136
Erin D. Thorn*
Texas State Bar No. 24093261
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
Telephone: 512-474-5073
daniel@texascivilrightsproject.org
erin@texascivilrightsproject.org

Naz Ahmad*
New York State Bar No. 5327424
Amal Thabateh*
New York State Bar No. 5923826
CUNY School of Law
2 Court Square West, 5th Floor
Long Island City, NY 11101
(718) 340-4630
naz.ahmad@law.cuny.edu
amal.thabateh@law.cuny.edu

Golnaz Fakhimi*
New York State Bar No. 5063003
Sadaf Hasan*
New York State Bar No. 6046023
Muslim Advocates
1032 15th Street Northwest, Unit 362
Washington, D.C. 20005
(202) 655-2969
golnaz@muslimadvocates.org
sadaf@muslimadvocates.org

*Admitted to practice PHV*

**ATTORNEYS FOR PETITIONER-PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that on August 18, 2025 a true and correct copy of this document was properly

served on all counsel of record served in accordance with the Federal Rules of Civil Procedure.

*Travis Walker Fife*
Travis Walker Fife

66