# Petitioner's Appendix

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |
| | § | |
| KRISTI NOEM, et al., | § | |
| | § | |
| Respondents-Defendants. | § | |

## PETITIONER'S APPENDIX
## TABLE OF CONTENTS

| Exhibit | Description | App. Vol. | App. Page No. |
|---------|-------------|-----------|---------------|
| 1 | Leqaa Kordia's Motion for Bond and Custody Redetermination, as filed on Mar. 27, 2025, except for Form I-589 | 1 | 14–59 |
| 2 | Dep't of Homeland Sec. Notice of Filing, as filed on Apr. 2, 2025 | 1 | 60–111 |
| 3 | Bond Memo., as ordered on Apr. 16, 2025 | 1 | 112–116 |
| 4 | Dep't of Homeland Sec.'s Notice of Appeal from a Decision of an Immigration Judge, as filed on Apr. 15, 2025 | 1 | 117–130 |
| 5 | Dep't of Homeland Sec.'s Emergency Motion for Discretionary Stay, as filed July 2, 2025 | 1 | 131–166 |
| 6 | Board of Immigration Appeals Order Granting Discretionary Stay, as ordered on July 3, 2025 | 1 | 167–169 |
| 7 | Board of Immigration Appeals Decision Remanding Custody Determination, as ordered on Aug. 11, 2025 | 1 | 170–175 |

| 8 | Removal Order from Immigration Judge, as ordered June 27, 2025 | 1 | 176–180 |
|---|---|---|---|
| 9 | Order Denying Motion to Reconsider, as ordered July 10, 2025 | 1 | 181–186 |
| 10 | Order Granting Ms. Kordia's Motion to Re-Open, as ordered July 28, 2025 | 1 | 187–191 |
| 11 | Declaration of Victoria Purell | 1 | 193–205 |
| 12 | Declaration of Veena Dubal | 1 | 206–227 |
| 13 | Declaration of Asli Bali | 1 | 228–246 |
| 14 | Declaration of Cori Hash | 1 | 247–250 |
| 15 | Declaration of Anne Chandler | 1 | 251–255 |
| 16 | Declaration of Jodi Goodwin | 1 | 256–260 |
| 17 | Declaration of Kerry Doyle | 1 | 261–264 |
| 18 | Supplemental Declaration of Kerry Doyle | 1 | 265–269 |
| 19 | Declaration of Charles Gillman | 1 | 270–272 |
| 20 | 2019 DHS Memorandum re First Amendment Activity | 2 | 273–277 |
| 21 | 2021 ICE Memorandum re First Amendment Activity | 2 | 278–285 |
| 22 | ICE Policy 11022.1: Detainee Transfers | 2 | 286–300 |
| 23 | Order, *Khalil v. Trump*, Nos. 25-2162 & 25-2357 (3d Cir. July 30, 2025) | 2 | 301–303 |
| 24 | June 20, 2025 Hr'g Tr., *Khalil v. Trump*, No. 2:25-cv-1963 (D.N.J.) | 2 | 304–310 |
| 25 | *AAUP v. Rubio* Trial Tr., July 9, 2025 Vol. 1 | 2 | 311–341 |
| 26 | *AAUP v. Rubio* Trial Tr., July 9, 2025 Vol. 2 | 2 | 342–363 |
| 27 | *AAUP v. Rubio* Trial Tr., July 10, 2025 Vol. 1 | 2 | 364–400 |
| 28 | *AAUP v. Rubio* Trial Tr., July 10, 2025 Vol. 2 | 2 | 401–414 |

| 29 | *AAUP v. Rubio* Trial Tr., July 11, 2025 Vol. 1 | 2 | 415–429 |
|----|----|----|----|
| 30 | *AAUP v. Rubio* Trial Tr., July 15, 2025 Vol. 1 | 2 | 430–443 |
| 31 | *AAUP v. Rubio* Trial Tr., July 15, 2025 Vol. 2 | 2 | 444–467 |
| 32 | *AAUP v. Rubio* Trial Tr., July 17, 2025 | 2 | 468–504 |

3

Petitioner's Appendix 4

# Page intentionally left blank

# Page intentionally left blank

# Page intentionally left blank

# Page intentionally left blank

# Page intentionally left blank

# Page intentionally left blank

# Page intentionally left blank

# Page intentionally left blank

# Page intentionally left blank

# EXHIBIT 1

Attorneys for Respondent                                    DETAINED
S. Michael Musa Obregon, Esq.
Omar Chaudhry, Esq
Musa-Obregon Law PC
55-21 69th St 2nd floor
Maspeth, NY 11378

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
PORT ISABEL IMMIGRATION COURT

In the Matter of

LEQAA KORDIA                          File No: A█████████
In Removal Proceedings.

RESPONDENT'S MOTION FOR BOND AND CUSTODY REDETERMINATION

Immigration Judge: TBD              Next Hearing: TBD

1

In the Matter of

LEQAA KORDIA

Respondent
In Removal Proceedings.

File No: A ▉▉▉▉▉

---

**RESPONDENT'S MOTION FOR BOND AND CUSTODY REDETERMINATION**

## I. INTRODUCTION

Respondent, Ms. LEQAA KORDIA, by and through undersigned pro bono counsel, respectfully moves this Honorable Court to schedule a custody redetermination hearing pursuant to 8 C.F.R. § 1003.19 and INA § 236(a) to consider her release on conditional parole, or, in the alternative, set a reasonable bond in this matter.

Statements of counsel herein are made upon information and belief, investigations of counsel, conversations with individuals, review of government documents and the case file, and such statements are believed to be true.

## II. STATEMENT OF FACTS

Ms. Kordia is a 33-year-old woman of Palestinian origin who lawfully entered the United States on March 19, 2016, on a B-2 visitor vis. Sher came to be reunited with her mother in New Jersey after a forced separation of twenty years. **See Exhibits A and B**. Since arriving in the United States, Ms. Kordia has not only established herself as an upstanding member of her community in Paterson, New Jersey. She remained committed to complying with U.S. immigration laws, proactively extending her status to an F2 visa for seven years at two SEVP-certified institutions to study English— initially at Uceda Paterson and later at Bergen County Career Advancement Training, Inc. (BCCAT). **See Exhibit C.**

On May 6, 2021, the family-based immigrant petition (Form I-130) her mother filed on her behalf was approved, with a priority date of June 5, 2017.[1] **See Exhibit D.** Acting on incorrect advice from her school, Ms. Kordia believed that this approved petition allowed her to remain in lawful status while she awaited adjustment of status. In reliance on that belief, on January 24, 2022, she signed an official termination notice withdrawing from her F-1 program, which was approved by her school on January 26, 2022. **See Exhibit E.**

---

[1] As of March 2025, the Filing Date for the F2B category (unmarried adult children of U.S. permanent residents) is January 1, 2017. https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2025/visa-bulletin-for-march-2025.html

2

During the COVID years, Ms. Kordia's father had passed away in the West Bank. She continued living with her mother in New Jersey to the very present. Later after October 2023, the devastating attacks on Gaza resulted in the loss of nearly an entire generation of her extended family.

Thereafter, President Biden issued the Deferred Enforced Departure (DED)[2] plan for eligible Palestinian nationals on February 14, 2024. Believing that she was still in status because of her mother's approved I-130, Mr. Kordia did not apply for DED nor for asylum - in detrimental reliance on the information she had received at school. However, DED protects all Palestinian nationals from removal who qualify. DED is therefore an additional defense to the current removal proceedings.

Ms. Kordia also has recently filed an affirmative asylum application with USCIS under the "extraordinary circumstances" exception, because of her well-founded fear of persecution based on nationality, gender, and political opinion. If returned to the West Bank and or Gaza, she would face grave threats, including the risk of gender-based violence and persecution. **See Exhibit F.**

On March 13, 2024, several working days after being summoned by ICE officers and overcoming significant difficulties in securing appropriate legal counsel, Ms. Kordia appeared with legal counsel at a pre-arranged meeting, at the Immigration Enforcement office in Newark, New Jersey to be processed for removal proceedings. She was taken into custody and served with a Notice to Appear (NTA), charging her as removable under Section 237(a)(1)(C)(i) for failing to maintain her nonimmigrant status. **See Exhibit G.**

Initially, she was given an NTA and scheduled to appear at the Batavia Immigration Court in Buffalo, NY but that was changed - allegedly because of bed space[3], and she was immediately put on a plane and flown to Texas. If bedspace was the true reason for the interstate transfer to Texas from New Jersey, that goal has sorely missed, since from day one and for more than a week Ms. Kordia has been sleeping on the floor with another approximately 20 women, who are also without beds at that facility. Proceedings commenced at the Prairieland Detention Facility in Los Fresnos, Texas, halfway across the nation and almost 1500 miles from her home in New Jersey - under the jurisdiction of the Port Isabel Immigration Court - with a master calendar hearing set for March 27, 2025.

To date, the government has provided no justification for her transfer or continued detention at Prairieland, which has caused extreme hardship by separating her from her lawyers and interpreters, and family and witnesses on her case. This has prevented her from receiving effective legal representation and ultimately, due process. This instant request for conditional release and or bond, is straightforward and should be treated as any other bond request under similar circumstances: Ms. Kordia has substantial community ties, compelling legal relief, is not a flight risk, nor a danger to the community. She was a student who only recently fell out of (a seven-year period) of compliant student visa status. Furthermore, Ms. Kordia has an approved I-130 pending visa soon to become available from her U.S. citizen mother, no criminal history, and a very compelling asylum claim. She is further protected by her prima facie eligibility for Deferred Enforced Departure (DED) and the benefits that come with it, including protection from removal.

---

[2] DED Covered Population – Palestinians |USCIS, USCIS (2024), https://www.uscis.gov/humanitarian/deferred-enforced-departure/ded-covered population-Palestinians (last visited Mar 22, 2025).

[3] Undesigned counsel was told by the ICE agent that the sudden change of destination was the lack of bedspace in both NJ and Buffalo. It is hard to imagine that bedspace was the overwhelming concern, considering the extreme lack of bedspace at the current facility in Texas since she arrived on March 13th.

**MS. KORDIA IS NEITHER A FLIGHT RISK NOR A DANGER TO THE COMMUNITY, AND HER CONTINUED DETENTION IS UNWARRANTED UNDER THE CIRCUMSTANCES OF HER CASE.**

Under INA § 236(a), the Immigration Judge has broad discretion to grant release on bond or parole. In assessing custody redeterminations, the Court must consider whether a respondent (1) poses a danger to the community or (2) is a flight risk. See 8 C.F.R. § 1236.1(c)(8); Matter of Guerra, 24 I&N Dec. 37, 40 (BIA 2006). Here, both factors weigh strongly in Ms. Kordia's favor.

## MS. KORDIA IS NOT A DANGER TO THE COMMUNITY

As an initial matter, Ms. Kordia's only contact with law enforcement occurred during a peaceful protest on April 30, 2024. The charges of a petty ordinance infraction of disorderly conduct for allegedly obstructing vehicular traffic were fully dismissed by the district attorney's motion "in the interests of justice" with only a minimal educational condition -where she was required to watch a type of "Know Your Rights video" - which she completed. **See Exhibit H.**

Notably, Ms. Kordia's continued detention is both unwarranted and unsupported by the government's own "Risk Classification Assessment" (RCA), dated March 13, 2025, which clearly concludes that she is not a danger to the community. **See Exhibit I.** Specifically, the RCA found that Ms. Kordia has no relevant criminal history, no history or pattern of violence, no gang affiliation. Moreover, she is not subject to mandatory detention, and no history of absconding. These findings—entirely based on the government's own evaluation—confirm that continued detention is unnecessary and unjustified on public safety grounds.

The sole charge stems from her termination of student status, which occurred not through willful misconduct, but an unintentional consequence of misinformation—rather than a deliberate violation. Courts have long recognized that noncitizens should not be penalized for acting on incorrect guidance from those in positions of authority, including DSOs. See Matter of Lozada, 19 I&N Dec. 637 (BIA 1988). As such, ICE's justification for detaining Ms. Kordia under INA § 237(a)(1)(C)(i)—for an unintentional lapse in nonimmigrant status due to inaccurate guidance— is wholly disproportionate.

## MS. KORDIA IS NOT A FLIGHT RISK

Ms. Kordia's longstanding compliance with American immigration laws, her voluntary surrender, and her willingness to fully submit to the legal process all demonstrate her respect for the law and unequivocally confirm that she is not a flight risk. If the Court has any concerns regarding compliance, such concerns can be fully addressed by imposing reasonable conditions of release, such as supervision, check-ins, or setting a low bond. Matter of Patel, 15 I&N Dec. 666 (BIA 1976) (release may be granted where conditions can mitigate risk of flight or danger).

## MS. KORDIA'S STRONG ELIGIBILITY FOR RELIEF

In addition to DED for Palestinians, Ms. Kordia is the beneficiary of an approved I-130 family-based immigrant petition filed by her U.S. citizen mother (with a priority date that will soon be

6

current), and a pending asylum application under the "extraordinary circumstances" exception, supported by a well-founded fear of persecution based on nationality, gender, and political opinion. If returned, she would face grave threats, including the risk of gender-based violence and persecution. See _Matter of Andrade,_ 19 I&N Dec. 488 (BIA 1987) (holding that when relief is prima facie available, bond should not be denied solely on removability grounds).

### MS. KORDIA'S VERY STRONG COMMUNITY TIES

Beyond her eligibility for legal relief, the overwhelming support from her family and community makes clear that Ms. Kordia has very strong community ties. She is a valued and trusted member of her community, whose recent absence has caused significant hardship to those who depend on her. **See Exhibits J - L.** Her mother, a U.S. citizen who suffers from severe asthma and has great difficulty walking, has provided a heartfelt plea on her behalf, describing their trauma due to a past painful forced separation for nearly two decades and the immeasurable role Ms. Kordia has played in their family since reuniting almost nine years ago. **See Exhibit J.**

Perhaps most movingly, Ms. Kordia's sister Yasmine Salem highlights the unique role her sister has played in her life. Having grown up without an older sister, Yasmine never understood the unbreakable bond that such a relationship could provide - until she met Ms. Kordia. Since then, Yasmine has experienced unconditional love, protection, and support of a sister for the first time in her life. Now, with her sister's detention, Yasmine describes feeling like she is losing a part of herself. **See Exhibit K.**

Thus, given her unblemished record, consistent compliance, and eligibility for Deferred Enforced Departure (DED) as a Palestinian national, there is no basis for continued detention on public safety grounds, and thus, she should be released under the least restrictive conditions necessary.

### V. CONCLUSION

WHEREFORE,

Respondent respectfully requests that this Honorable Court release her on conditional parole or at the lowest possible bond so that she can defend her case effectively while at liberty, in the same way that any other similarly-situated student with an expired student visa would be.

Students who have overstayed their student visas such as Ms. Kordia who have compelling pending immigration applications are almost universally released by the Immigration Courts throughout this nation. They are almost never incarcerated by ICE in the first instance.

For these very compelling reasons this Court should release Ms. Kordia to her family.

Dated: 03/26/2025

Respectfully submitted,
S. Michael Musa-Obregon, Esq.
M. Omar Chaudhry, Esq.
Musa-Obregon Law PC

7

**EXHIBIT LIST IN SUPPORT OF RESPONDENT'S MOTION FORCUSTODY AND BOND RETERMINATION**

| Tab No. | Description |
|---|---|
| A. | Respondent's Sworn Declaration in Support Of Motion For Custody And Bond Re-Determination |
| B. | Evidence of Identity, Residence. and Lawful Entry |
| C. | Approval Notice to Extend/Change Nonimmigrant Status (EAC█████████) and Compliance with SEVIS |
| D. | Approval Notice for I-130, Petition for Alien Relative. (WAC█████████) |
| E. | Proof of the government's approval to change status. |
| F. | I-589 Asylum Application with Acknowledgements of Receipt and biometrics notice |
| G. | Notices to Appear |
| H. | Appearance tickets and Certificates of Disposition for April 30, 2024 incident |
| I. | Risk Classification Assessment (RCA) |
| J. | Letter from █████████ Ms. Kordia's mother. |
| K. | Letter from █████████ Ms. Kordia's sister. |
| L. | Letter from █████████████████<br>UCEDA INTERNATIONAL |
| M. | Other letters from Ms. Kordia's community attesting to her character and pleading for her release including:<br>Letter from ███████████<br>Letter from ██████████<br>Letter from ██████████<br>Letter from █████████<br>Letter from ███████<br>Letter from █████████<br>Letter from ██████████ |

9



**EXHIBIT**

**A**

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
PORT ISABEL IMMIGRATION COURT

In the Matter of

**LEQAA KORDIA**                                    File No: A ▮▮▮▮▮▮

In Removal Proceedings.

**RESPONDENT'S SWORN DECLARATION IN SUPPORT OF MOTION FOR
CUSTODY AND BOND RETERMINATION**

I, LEQAA KORDIA state that the following information is true and correct to the best
of my knowledge:

1. I lawfully entered the United States on a B-2 visitor visa on March 19, 2016. where I was
   finally reunited with my mother after twenty years of forced separation. Since that time, I
   have lived continuously in ▮▮▮▮▮▮▮▮▮▮ transitioning to an F-student visa and
   enrolling in an SEVP-certified institutions to study English.

2. After the death of my father in December 2020, returning to my home country no longer
   felt safe or viable for me specially as a divorced woman in her thirties without an older
   male guardian or any remaining nuclear family members to speak of. That status would
   cause me to face acute personal safety risks, including vulnerability to coercion, abuse,
   and gender-based violence, with little to no protection from either Israeli forces or
   Palestinian authorities.

3. In March 2021, I re-enrolled as an F-1 nonimmigrant student through the Student and
   Exchange Visitor Information System (SEVIS) and continued my education at Bergen
   County Career Advancement Training, Inc. (BCCAT), fully complying with all visa
   conditions and maintaining lawful status for a continuous period of seven years.

4. When the I-130 family-based petition my mother filed on my behalf was approved in
   May 2021, I believed I was finally on a definite path to lawful permanent residency.
   Based on this belief—and mistaken advice from my school—I proactively terminated my
   F-1 status, thinking the approved petition permitted me to remain lawfully in the U.S.
   while awaiting my green card.

10

5.  However, even as I tried to rebuild my life in the U.S., the war in Gaza especially the events since late 2023 —where I lost nearly an entire generation of my extended family—left a wound too deep to ignore.

6.  On April 30, 2024, I came to a peaceful protest outside Columbia University, in mourning for the dozens of my family members recently killed and in solidarity with thousands of other Palestinian civilians— especially women and children—who were killed following the October 7, 2023 attacks.

7.  Many people came out to protest in support of human rights, including many Jewish students and civilians.

8.  When I was there, I saw peaceful and  harmonious interactions amongst the diverse types of people participating in the protest.

9.  From what I could see, the people protesting outside and inside the campus were all protesting the tens of thousands of people that were being killed in my ancestor's land, the Gaza Strip.

10. Suddenly, NYPD police officers appeared and began ordering the crowd to disperse. As I was preparing to leave, the blaring sirens and the roar of helicopters overhead intensified the chaos. I became overwhelmed and dizzy, collapsed to the ground, and was briefly unable to move.

11. While I was still on the ground, officers picked me up, handcuffed me, and detained me along with others. I believe I was charged with trespassing—even though I was not on Columbia University's campus but on Amsterdam Avenue, a public city street, outside the university gate.  As I had also explained in my asylum application, my first lawyer later informed me that because I was innocent, the charges had been completely dismissed and that I was not required to appear in court.

12. Three weeks ago and almost one year later, on or about Thursday March 6, 2025, ICE visited my mother at our home inquiring about my whereabouts. At first, she was overjoyed, thinking the call related to the approval of my green card.

13. She handed me the phone to speak with the officer who informed me that there was an issue with my application, and we tentatively agreed to meet.

14. I was surprised that they had come to my mother's house and was told that this was not a normal routine visit and was advised by several people and family to immediately seek legal counsel which I tried to do by seeking to speak to several lawyers immediately and the next day Friday and throughout the weekend.

15. I was eventually able to attempt to contact my current attorney S. Michael Musa-Obregon after the weekend, on that Monday. He was only able to get back to me and speak to me

11

on the following evening, Tuesday. He explained to me that he would call the officers and arrange a meeting with them as soon he could and after that he would get a sense of what was going on.

16. My lawyer also informed me although I had an approved I-130 which had been filed in 2016, I was not yet in lawful status. After interviewing me about my circumstances, he also stated that based on my well-founded fear of return and other exceptional circumstances, I qualified for asylum protection and that I should apply for asylum, which I immediately did.

17. With his guidance, my asylum application was filed online that Wednesday, March 12.

18. My lawyer contacted the ICE agents on my behalf that day, who requested that I appear at their office in Newark the following day on Thursday, which I did.

19. The next day, March 13, I presented myself to ICE in Newark, New Jersey, with counsel from my lawyers office.

20. Despite my voluntary appearance, ICE chose to detain me and served me with a Notice to Appear (NTA), charging me as removable for allegedly failing to maintain my nonimmigrant status.

21. Even though my original NTA indicated that my case would be heard in New York, I was immediately flown to Prairieland Detention Center in Los Texas—a remote location 1500 miles from my home in New Jersey where the conditions at the facility are inhumane and severely overcrowded. The terrible conditions at this prison have been amply publicly documented.

22. This transfer of my person has cut me off from my family, I have very limited access to legal counsel, and has severely cut off my ability to even minimally prepare my case with my two attorneys, who do not speak Arabic, and are generously representing me *pro bono*.

23. Even trying to update my meal designation has been nearly impossible from within the facility. I have had to rely on my family and my attorneys to advocate on my behalf from the outside—an effort that has proven extremely difficult and slow.

24. Additionally, due to a lack of available beds, many detainees, about twenty of them, including myself, are forced to sleep on the floor, which has caused me to develop painful skin rashes—to the point of bleeding.

25. While I consider myself somewhat conversant n English, the complexity of my case—combined with the emotional burden of reliving past trauma—makes it extremely difficult to communicate effectively in anything other than my native language Arabic,

12

especially through virtual means.

26. I am unable to afford legal fees in this case. I am unable to pay for my lawyers to travel with me to Texas.

27. I am also unable to afford paying an Arabic interpreter.  I have been unable to obtain local counsel in Texas or to have anyone visit me in jail since I have been here over 2 weeks.

28. I know no one in Texas that can assist me, or that  can visit me or that can help me prepare for my case.

29. If I am free at liberty and I will able to go home and see my family. I can raise funds to be able to pay for my defense.

30. I will be able to locate Arabic interpreters that can help me speak to my lawyers so that I can understand all the complicated terms in the legal terminology of my case.

31. Although I have lived here for several years, the legal system for me here is foreign. I do not know how to defend myself in this legal system.

32. As such, I can only rely on my family and my friends and any good lawyers that can help me, but there's still there is only so very little much any of them can do for me from 1500 miles away.

33. I've been told that my case will require hundreds of hours of in-person preparation with my lawyers at their office.

34. I cannot prepare even minimally from the back of the small room talking to my lawyers via internet video for limited bursts of time only in short, pre-set scheduled appointments.

35. I am deeply sorry for any unintentional violation of the immigration law. I never meant to harm or disrespect the United States, a country that I deeply respect and has given me great opportunities. The US has offered me refuge and a sense of safety from a home I am no longer able to return to.

36. I always strove to follow the immigration laws, even so far as matriculating in school for seven continuous years, under difficult economic circumstances , so as never to fall out of status.

37. Aside from my brief, dismissed accusation for being at a public demonstration in support of human rights on April 30, I have never had any police contact.

13

38. I have always strived to be a positive person in my community and a role model to my younger sister and extended family, who have supported me wholeheartedly over the past nine years.

39. Many of them are willing to submit affidavits of support and serve as sponsors should the Court require it.

40. However, neither they nor I have the financial means to pay for interpreters to visit me in detention and my lawyers do not have the resources to cover the significant costs for travel to this remote facility.

41. I recognize the gravity of this process and respectfully ask for the opportunity to present my case with fairness and dignity.

42. Reuniting me with my loved ones would allow me to work closely with counsel in pursuing the protection I urgently need.

43. I implore you to consider this matter with the sensitivity, compassion and fairness it deserves, and to grant me the freedom to seek safety in a country that made me feel truly secure and at home.

CONCLUSION

For the foregoing reasons, I respectfully request that the Court grant this motion. Date: 03/25/2025

Signature: _____    LEQAA KORDIA

14



Paterson, NJ | Passaic, NJ | Morristown, NJ | New Brunswick, NJ | Perth Amboy, NJ | Red Bank, NJ | Lakewood, | NJ Danbury, CT |
Stamford, CT | Falls Church, VA | Silver Spring, MD | StudyUSA@uceda.edu | www.uceda.edu

March 17, 2025

Re:    Name:        Kordia, Leqaa M A
      SEVIS ID:    N
      DOB:

To whom it may concern:

This letter is to certify that Ms. Kordia was enrolled and attended as a full-time student in the Intensive
English Program at UCEDA International from February 06th, 2017 to March 18th, 2021.

UCEDA International is accredited by the Commission on English Language Program Accreditation
(CEA) and is authorized by the U.S. Student and Exchange Visitor Program (SEVP) to enroll
international students through the F-1 visa program. The student was maintaining an ACTIVE STATUS I
20 Certificate of Eligibility for Nonimmigrant F-1 Student Status attending 18 hours/week.

Ms. Kordia's SEVIS ID was released to Bergen County Career Advancement Training, Inc. on March
18th, 2021.

Should you have any questions, please do not hesitate to contact us.

Sincerely,

Gabriela Tasayco
International Student Services Manager/DSO
UCEDA International

+1 866-823-3299

 **BCCAT / Fort Lee**

**Leqaa Kordia** — Student Report

### Class Enrollments:
These are all of the classes the student has been enrolled in over time.

| Class | Schedule | Teacher | Start | End | Lessons | Absences |
|-------|----------|---------|-------|-----|---------|----------|
| Intermediate (21 Fall) (Group) | daily 20.0 h/wk | Rodolfo Beltran | 09/01/21 | 12/17/21 | 72 | 17 |
| Intermediate (21 Spring) (Group) | daily 20.0 h/wk | Rodolfo Beltran | 03/29/21 | 06/04/21 | 38 | 4 |

### Attendance Summary:
Hours attended versus hours expected based on the class enrollments mentioned above, split by month.
note: lab/self study are counted in the total amount of hours but not in the lesson count

| Month | Lessons attended | Expected hrs | Attended hrs | Attendance Rate |
|-------|------------------|--------------|--------------|-----------------|
| March 2021 | 0 out of 0 | 0h | 0h | N/A |
| April 2021 | 14 out of 15 | 60h | 56h | 93% |
| May 2021 | 16 out of 19 | 76h | 64h | 84% |
| June 2021 | 4 out of 4 | 16h | 16h | 100% |
| September 2021 | 17 out of 21 | 84h | 64h | 76% |
| October 2021 | 17 out of 20 | 80h | 67h | 84% |
| November 2021 | 11 out of 18 | 72h | 44h | 61% |
| December 2021 | 10 out of 13 | 52h | 40h | 77% |
| **Total** | **89 out of 110** | **440h** | **351h** | **80%** |

Attendance rate in the past four weeks: %

**BCAT**

www.bccatschool.com • register@bccatschool.com  t 973 471 4800, 973 471 4802, 877 222 2806 (877 BCCAT 06) • f 973 471 5585 • 60 Saddle River Ave., S. Hackensack, NJ 07606

# OFFICIAL TERMINATION NOTICE

*DATE:*  January - 24 - 2022

*REASON:*  
[   ] Change of Status Approved  
[   ] Financial Reason  
[   ] Lack of Attendance  
[ ✓ ] Other ( Applying for Green Card        )

I, *Legas Kordia*                    understand my F-1 status will
  (STUDENT'S NAME)

be terminated on  January - 24 - 2022
  (DATE)

STUDENT SIGNATURE: _____

OFFICER SIGNATURE: _____

An official website of the U.S. government · Skip Navigation

(b)(6) (b)(7)(C)

Get Plug-Ins

Enter SEVIS ID

SEVIS
Student & Exchange Visitor
Information System

Main   Schools   Students   Employment   Programs   Exchange Visitors   Reports   Message Board   Change Password

Return To Search Results

**View:**
Event History
Form I-17
Request/Authorization Details
Transfer History
Employment Information
Corrections

# Student Information

F-1 STUDENT
**Kordia, Leqaa M A**

Status: **TERMINATED**
Status Change Date: **January 26, 2022**

SEVIS ID: **N**

Bergen County Career Advancement
Training, Inc. - BCCAT
Start Date: **March 29, 2021**   End Date:
**December 31, 2023**

I-901 Fee Paid

I-20 ISSUE REASON: CONTINUED ATTENDANCE
TERMINATION REASON: **CHANGE OF STATUS
APPROVED**

## Personal / Contact

Gender
**FEMALE**
Date of Birth              Age 32

City of Birth

Country of Birth
**WEST BANK**
Country of Citizenship
**WEST BANK**
U.S. Telephone
Foreign Telephone

Email Address

U.S. Address

Address Status
**Valid S - Mailbox at a street address**
Foreign Address
                                    **WEST BANK**

## Overall Remarks

Program

Registration

DEPARTMENT OF HOMELAND SECURITY

**NOTICE TO APPEAR**

Event No: XNK2503000016

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: ███████████

In the Matter of:

FIN ███████████                                    File No ███████████

Respondent: LEQAA KORDIA AKA: Kordia, Leqaa M A

███████████  ██████████████████████                          _____ currently residing at:

(Number, street, city, state and ZIP code)                    (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of STATELESS and a citizen of STATELESS;

3. You were admitted to the United States at Jamaica, New York on or about March 19, 2016, as a B-2 non-immigrant;

4. You were granted a change of status to a F-1 non-immigrant student;

5. You were terminated by Bergen County Career Advancement Training, Inc. - BCCAT on January 26, 2022.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:   ☐ 8CFR 208.30   ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

4250 FEDERAL DR RM F108 BATAVIA NY 14020. EOIR SPC Batavia, NY
_____
(Complete Address of Immigration Court, including Room Number, if any)

on _March 24, 2025_ at _1:00 PM_ to show why you should not be removed from the United States based on the
    (Date)              (Time)

charge(s) set forth above.                    T 6544 COUNTERMINE - Supervisory Special Agent
                                              (Signature and Title of Issuing Officer)

Date: _March 13, 2025_    _____    Newark, NJ
                                                    (City and State)

DHS Form I-862 (6/22)                                                    Page 1 of 3

DEPARTMENT OF HOMELAND SECURITY
## NOTICE TO APPEAR

DOB

Event No: XNK2503000016

---

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID ▮▮▮▮        FINS: ▮▮▮▮        File No: ▮▮▮▮

In the Matter of:

Respondent: **LEQAA KORDIA AKA: KORDIA, Leqaa M A** _____ currently residing at:

_____

(Number, street, city, state and ZIP code)        (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of STATELESS and a citizen of STATELESS;

3. You were admitted to the United States at Jamaica, New York on or about September 18, 2016 as a unknown manner;

4. You were granted a change of status to a F-1 non-immigrant student;

5. You were terminated by Bergen County Career Advancement Training, Inc. - BCCAT on January 26, 2022.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD, LOS FRESNOS, TEXAS 78566. PRAIRIELAND DETENTION CTR
(Complete Address of Immigration Court, including Room Number, if any)

on __May 6, 2025__ at __8:30 am__ to show why you should not be removed from the United States based on the
   (Date)        (Time)

charge(s) set forth above.        E #6885 KLEIN - (a)SDDO
(Signature and Title of Issuing Officer)

Date: __March 15, 2025__        Dallas, Texas
(City and State)

EOIR - 1 of 3

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

DOB:

Event No: XNK2503000016

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: 398195275                        FINS: 1200761066            File No:

In the Matter of:

Respondent: LEQAA KORDIA AKA: KORDIA, Leqaa M A                          currently residing at:

(Number, street, city, state and ZIP code)                    (Area code and phone number)

[ ] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[X] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of STATELESS and a citizen of STATELESS;

3. You were admitted to the United States at Jamaica, New York on or about March 19, 2016, as a B-2 non-immigrant;

4. You were granted a change of status to a F-1 non-immigrant student;

5. You were terminated by Bergen County Career Advancement Training, Inc. - BCCAT on January 26, 2022.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:       [ ] 8CFR 208.30   [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD LOS FRESNOS TX 78566. EOIR SPC Los Fresnos, TX
(Complete Address of Immigration Court, including Room Number, if any)

on April 30, 2025 at 8:30 AM       to show why you should not be removed from the United States based on the
     (Date)          (Time)
charge(s) set forth above.

T 6544 COUNTERMINE - Supervisory Special Agent
(Signature and Title of Issuing Officer)

Date: March 13, 2025                              HSI Newark
                                             (City and State)

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

CERTIFICATE OF DISPOSITION
NUMBER: 63946

**EXHIBIT H**

THE PEOPLE OF THE STATE OF NEW YORK
VS

**NO FEE**

**KORDIA, LEOVAA**

DEFENDANT

██████████

DATE OF BIRTH

██████████

ADDRESS

██████████

CITY          STATE   ZIP

04/30/2024

ISSUE DATE

DOCKET NUMBER: **2024SN010394**

SUMMONS NUMBER: **4444949820**

**PL 240.20 06 0V**

ARRAIGNMENT CHARGES

CASE DISPOSITION INFORMATION:

| DATE | COURT ACTION | JUDGE | PART |
|------|-------------|-------|------|
| 05/20/2024 | DISM-INTEREST JUSTIC CPL170.40 | MCGRATH,K | SAP-D |

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN THIS COURT.

_____          03/17/2025

COURT OFFICIAL SIGNATURE AND SEAL          DATE

All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20, PL 221.35 or PL 221.40 - including any
appearing on this certificate of disposition - are vacated, dismissed, sealed and expunged. It is an unlawful discriminatory
practice for any entity to make any inquiry about such an expunged conviction or to use such an expunged conviction
adversely against an individual in any form of application or otherwise-unless specifically required or permitted to do so by statute

Pursuant to section 70.15 of the Penal Law, any misdemeanor sentence with a jail term of "1 year", "12 months", or "365 days" is,
by operation of law, deemed to be a sentence of 364 days. Any Certificate of Disposition indicating a jail sentence of "1 year",
"12 months", "52 weeks", or "365 days" for a misdmeanor conviction shall be interpreted as a sentence of 364 days.

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE
          COURT SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)

CERTIFICATE OF DISPOSITION
NUMBER: 63947

THE PEOPLE OF THE STATE OF NEW YORK
VS.

**NO FEE**

KORDIA, LEOVAA

DEFENDANT

███████████

DATE OF BIRTH

ADDRESS

███████████████

CITY                STATE   ZIP

04/30/2024

ISSUE DATE

DOCKET NUMBER: 2024SN010396

SUMMONS NUMBER: 4455809932

PL 240.20 05 0V

ARRAIGNMENT CHARGES

CASE DISPOSITION INFORMATION:

| DATE | COURT ACTION | JUDGE | PART |
|------|-------------|-------|------|
| 05/20/2024 | DISM-INTEREST JUSTIC CPL170.40 | MCGRATH,K | SAP-D |

I HEREBY CERTIFY THAT THIS IS A TRUE EXCERPT OF THE RECORD ON FILE IN THIS COURT.

_____         03/17/2025
COURT OFFICIAL SIGNATURE AND SEAL          DATE

All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20, PL 221.35 or PL 221.40 - including any appearing on this certificate of disposition - are vacated, dismissed, sealed and expunged. It is an unlawful discriminatory practice for any entity to make any inquiry about such an expunged conviction or to use such an expunged conviction adversely against an individual in any form of application or otherwise-unless specifically required or permitted to do so by statute.

Pursuant to section 70.15 of the Penal Law, any misdemeanor sentence with a jail term of "1 year", "12 months", or "365 days" is, by operation of law, deemed to be a sentence of 364 days. Any Certificate of Disposition indicating a jail sentence of "1 year", "12 months", "52 weeks", or "365 days" for a misdmeanor conviction shall be interpreted as a sentence of 364 days.

(CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE
COURT SEAL OVER THE SIGNATURE OF THE COURT OFFICIAL.)



(b)(7)(E)

**United States Department of Homeland Security**
Immigration & Customs Enforcement
ENFORCEMENT AND REMOVAL OPERATIONS

**Kordia, Leqaa 235 642 062**

| | |
|---|---|
| Person ID: | Sex: F   DOB       Current Age: 32   COB: STATE   COC: STATE |
| Subject ID : 398199275 | Processing Disposition: Notice to Appear Detained (I-862) |
| Case | Case Category: 2A   Docket: NEW - ELZ-DOCC_XFR to Another AOR |

### Status as of 03/13/2025 1712 : Custody Classification Level Supervisory Approval Complete

Initialized On: 03/13/2025
Last Decision Date: 03/13/2025
Special Vulnerabilities: None

Man Det Stat/Alleg: No
Risk to Public Safety: Low
Risk of Flight: Low

Custody Decision: Detained by the Department c
Custody Classification: Low

#### Recommendations and Decision Results as of 03/13/2025 1712

| Date / Time | Decision | Recommendation(Rec.)/Decision Outcome | Man Det Stat/Alleg | Special Vulner. | Risk to Public Safety | Risk of Flight | Decision By |
|---|---|---|---|---|---|---|---|
| 03/13/2025 1712 | Custody Classification Level Decision | Low | No | None | | | |
| 03/13/2025 1712 | Submitted for Custody Classification Supervisory Approval | Rec: Low | No | None | | | |
| 03/13/2025 1711 | Detain / Release Decision | Detained by the Department of Homeland Security | No | None | | | |
| 03/13/2025 1700 | Submitted for Detain/Release Supervisory Approval | Rec: Supervisor to Determine - Detain or Release on Community Supervision | No | None | | | |
| 03/13/2025 1655 | Risk Classification Assessment Initiated | N/A | N/A | N/A | | | |

#### Special Vulnerabilities as of 03/13/2025 1712

None

| Added On | Added By | Description |
|---|---|---|
| 03/13/2025 1711 | | None |
| Additional information relevant to the users observations and assessment: | | |
| N/A | | |

(b)(6) (b)(7)(C)

*The values above represent all special vulnerabilities that existed on the assessment as of 03/13/2025 1712 .*

#### Mandatory Detention per Statutes and Allegations as of 03/13/2025 1712

| Evaluation Criteria | Outcome |
|---|---|
| Is the alien subject to mandatory detention based on statutes and allegations? | Not subject to mandatory detention per statutes and allegations |
| Is the alien's case in a final order of removal status? | No |
| Is the final order date within 90 days of the current date? | N/A |
| If the final order date is outside 90 days of the current date, is the alien's removal likely in the reasonably foreseeable future? | N/A |
| Is the alien a re-entry after a previous removal order (executed Final Order)? | No |

*The values above represent the results of the mandatory detention per statutes and allegations and all case status checks on the assessment as of 03/13/2025 1712 .*

* The table below lists all INA charges that have been added to the arrest record (encounter associated with the risk classification assessment).

| Charged On | Section | Description |
|---|---|---|
| 03/13/2025 | 237a1Ci | NONIMMIGRANT STUDENT OUT OF STATUS: FAILURE TO ATTEND |

★ indicates an INA charge that will flag the alien as mandatory detention per statutes and allegations.

#### Risk to Public Safety as of 03/13/2025 1712

Risk to Public Safety: Low

| Criminal Record Evaluation Criteria | Outcome |
|---|---|
| Severity of pending charges or convictions associated with the ICE encounter. | No relevant criminal history *(a) |
| Number of special public safety factors (such as DUI) (excluding those used above). | No relevant criminal history *(b) |
| Single most serious conviction remaining in criminal history (excluding those used above). | No relevant criminal history *(c) |
| Number of felony / misdemeanor convictions remaining (excluding those used above). | No relevant criminal history *(d) |
| History/Pattern of Violence (excluding those used above) | No relevant criminal history. Minimum Threshold: 2 *(e) |

The table below lists all criminal charges and convictions used in the criminal record checks described above.

| Date Added | NCIC | Description | Offense Severity | Charge Date | Conviction Date | Disposition | Sentence Length |
|---|---|---|---|---|---|---|---|

*(a) indicates a conviction used to score the severity of crimes associated with the ICE encounter check (if applicable).
*(b) indicates convictions used to score the number of special public safety factors check (if applicable).

(b)(7)(E)

*(c) Indicates the single conviction used to score the     remaining most serious conviction check (if applicable)
(e) indicates charges disciplinary ... check (if applicable)
(e) indicates charges used to score the remaining violent criminal charges check (if applicable).

| Other Public Safety Factors Evaluation Criteria | Outcome |
|---|---|
| Type of open wants / warrants. | None |
| Supervision history (e.g., bond breaches, conditions of supervision violations). | None |
| Security Threat Group (STG) status. | No confirmed or suspected STG/gang affiliation |

| Disciplinary Infraction Information Evaluation Criteria | Outcome |
|---|---|
| Number of additional sustained disciplinary infractions involving violence or behavior representing a threat to the facility (manual entry) | 0 Sustained Infractions |
| Are any of the above disciplinary infractions combative in nature? | N/A |
| Number of historic sustained disciplinary infractions involving violence or behavior representing a threat to the facility (captured in EADM) | 0 Sustained Infractions |
| Known history of combative behavior in historic infractions in a previous facility stay (captured in EADM) | N/A |
| Number of current sustained disciplinary infractions involving violence or behavior representing a threat to the facility (captured in EADM) | 0 Sustained Infractions |
| Combative behavior related to disciplinary infractions in current detention stay (captured in EADM) | N/A |
| History of violent crimes (derived from alien's criminal history and any open wants / warrants) | No known violent history |

*The values above represent the results of the Public Safety Factors evaluation criteria results on the assessment as of 03/13/2025 1712 .*

---

### Risk of Flight as of 03/13/2025 1712

| Immigration / Substance Abuse / Identification Evaluation Criteria | Outcome |
|---|---|
| Immigration violation history. | Lawfully entered country |
| History of absconding. | |
| Substance abuse history. | Not a Current Drug User |
| The individual possesses a valid government issued document from their COC. | No |
| Does the individual possess invalid identification documents (IDs) from any country? | No Number of unique names/aliases: N/A |
| Immigration case status. | No Final Order |

(b)(7)(E)

| Home Stability Evaluation Criteria |
|---|
| The individual has a stable address, but has lived there less than 6 months |

| Ties To Local Community Evaluation Criteria |
|---|
| The individual has family or support in local community. |
| The individual has no established family or community support |

*The values above represent the results of the Flight Risk Factors evaluation criteria results on the assessment as of 03/13/2025 1712 .*

---

The following scoring and list of value (LOV) versions were utilized at the time this decision was completed and data snapshot was stored.
- RCA Scoring Version 6.7
- Special Vulnerabilities Version 1.0
- Subject to Mandatory Detention Version N/A
- Disciplinary Infractions Version N/A

(b)(7)(E)

Dear Honorable Margaret R. MacGregor,

I respectfully submit this letter in full support of my daughter, Leqaa Kordia, and her request for bond. ███████████████, and I am writing as a mother who has spent years longing to be reunited with my child. No words can fully describe the love, pain, and longing that define our relationship. Leqaa is not just my daughter—she is a part of me, my heart, and my greatest blessing.

Leqaa has endured significant hardship throughout her life. As a child, she was taken from me following my divorce and forced to live with her father and his new wife, who cruelly isolated her from me. For years, she suffered in silence, deprived of the love and comfort of a mother. Later, she was pressured into an arranged marriage, but she bravely chose to leave, seeking a life of dignity and self-determination.

When she was finally able to come to the United States on a tourist visa, it felt like I was reclaiming a part of my soul. I immediately petitioned for her legal residency through an I-130 application, believing with all my heart that she had the right to stay in this country, where she belongs. However, due to a misunderstanding about filing an additional visa extension, she now finds herself in detention—a devastating and unjust consequence for someone who has done everything in her power to comply with the legal process.

Leqaa is not a flight risk, nor is she a danger to the community. On the contrary, she has dedicated herself to bettering her life and contributing positively to those around her. ███

███████████████████████████████████████████ before continuing her education at BCCAT in Fort Lee. She has worked tirelessly to build a future, staying on the path toward legal residency with unwavering faith in the system.

Beyond her personal ambitions, Leqaa is the cornerstone of our family. ████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████

If granted bond, Leqaa would live with me at ████████████████████, where I will ensure she complies with all bond conditions. She has nowhere else to go—this is her home. Her deep ties to our family and community reinforce her strong commitment to remaining in full compliance with immigration proceedings.

As a mother, I am begging you—please allow my daughter to return home. She is a responsible, hardworking, and loving individual who deserves the opportunity to continue building her life here.

Thank you for your time and consideration.

**Sincerely,**



March 15, 2025



March 16, 2025

Dear Honorable Margaret R. MacGregor,

My name is ███████████, and I am the sister of Leqaa Kordia. I am writing this letter to express how much she means to me, our family, and our community. Leqaa is not just my sister—she is my best friend, my role model, and the heart of our family. Her detention has devastated me, and I cannot imagine my life without her here.

Leqaa is a woman of incredible strength, kindness, and unwavering moral character. She has always carried herself with dignity and respect, no matter what hardships she has faced. Despite the struggles she endured in her life, she has never allowed them to define her. Instead, she has remained compassionate, hardworking, and deeply committed to those she loves.

One of the qualities I admire most about Leqaa is her selflessness. She is always the first to help others, whether it's taking care of our mother, being a second mother to my younger brother, or volunteering to help family friends whenever they need her. She is the epitome of a villager—giving without expecting anything in return, and her kindness leaves an impact on everyone she meets.

Leqaa has always had an incredible eye for crafts and creativity. She loves making things with her hands, and she once took me to a pottery painting studio where we spent hours decorating mugs together. She was so precise and patient, making sure each brushstroke was perfect, while I was just having fun splashing colors everywhere. In the end, our mugs turned out adorable, and it's a memory I cherish deeply. It's little moments like that—her ability to make simple activities feel special—that make her such a wonderful person to be around.

She is also incredibly generous. Every time we go out, she insists on paying, even when I try to argue with her about it. It's just who she is—she loves taking care of the people she loves, and she always puts others before herself. But more than just material things, she takes care of me in the way a big sister should. She checks up on me, gives me advice, and makes sure I never feel alone.

This means the world to me because growing up, I didn't have a sister. I never knew what it felt like to have that kind of bond until I met Leqaa. She gave me the experience of having an older sister—the kind of unconditional love, protection, and care that I had never known before. Losing her, even temporarily, feels like losing a part of myself.

Leqaa is also incredibly responsible and dedicated. She spent years studying English and working hard to better herself, never once taking shortcuts or trying to bypass the system.

She trusted the process, believing that as long as she followed the rules, she would one day secure her place in this country—the only home she knows now. Her mistake was not one of willful disobedience but a simple misunderstanding based on the guidance she received. She would never purposely do anything to jeopardize her status, and anyone who knows her can attest to that. One of her dreams was to become a business owner and open her own café. I hope she gets to bring that dream into fruition and more.

Beyond her character, Leqaa is deeply rooted in this community. She has family here, including myself and our mother, who need her more than words can express. She is my support system, the person I turn to in difficult times. Knowing she is in detention breaks my heart because I know she doesn't deserve this and can't handle it. She has always followed the rules, respected the law, and worked hard to build a future here. She has high morals, integrity, and a genuine heart. This is someone who wouldn't even take an extra bag out of the vending machine if it accidentally gave her two.

Leqaa has tried hard these last seven years to establish herself in ▮▮▮▮▮▮ She is not a flight risk. She has nowhere else to go—this is her home. She has strong family ties, a support system, and a future here. Nor is she a danger to the community; in fact, she is the opposite. She is a kind, generous, and responsible person who only seeks to live her life in peace with the people she loves.

I ask you with all my heart to please grant her release. She deserves to be with her family, where she is loved, needed, and belongs.

Sincerely,







111 Ellison Street, Paterson, NJ 07505 ○ (866) 823-3299 ○ studyusa@uceda.edu ○ www.uceda.edu

March 17, 2025

U.S. Citizenship and Immigration Services
Attn: Status Verification Unit
970 Broad St. 11th Floor
Newark, NJ 07102

RE:    **Kordia, Leqaa M A** (SEVIS ID: N██████)

To Whom It May Concern:

As a Designated School Official at UCEDA INTERNATIONAL, I am writing to attest to Ms. Leqaa Kordia's academic standing and character during her time as a student at our institution. From **February 6, 2017, to January 31, 2021**, she was an active student in good academic standing, consistently maintaining a full course of study.

Based on conversations with her former instructors and classmates, Ms. Kordia was a dedicated and hardworking student who took her language studies seriously, making significant progress throughout her coursework. She was well-respected by both faculty and peers and contributed positively to our diverse learning environment.

As someone who upholds the values of due process and the principles upon which this nation was built, I trust that her case will be handled in a manner that reflects fairness and respect for individual rights. If any further information is needed, please feel free to contact me at your convenience.

Sincerely,

Richard Rylaner
Vice President/ DSO
UCEDA INTERNATIONAL

March 16, 2025

Honorable Immigration Judge,

My name is ███████████████, and I have had the absolute privilege of knowing Leqaa Kordia for the past seven years. We met when she came to my husband's store to buy Turkish sweets, and from that day forward, our friendship blossomed into something truly special. Leqaa has been a constant source of love, kindness, and support in my life, and I cannot imagine what I would do without her.

From the very beginning, Leqaa felt like family. When my children were small, she was always there to help me take care of them, never expecting anything in return. She is someone I can trust wholeheartedly—someone who has been there for me in my darkest moments. When I lost my brother, his wife, and their baby in the devastating earthquake in Turkey, I was an emotional wreck. I felt like my world had shattered, and I didn't know how I would get through it. But Leqaa was there, standing by my side, helping me grieve, holding me up when I felt like I couldn't keep going. She was my rock during that time, offering comfort and support in ways I can never fully express in words.

Leqaa is not just my best friend—she is family to me. I don't have any relatives in ██████████ and because my husband travels for work frequently, she has been my only real support system. She has been there for me through everything, from the everyday challenges of raising my kids to the most painful experiences of my life. She has babysat for me without hesitation, without ever asking for anything in return, simply because she cares. When I was finishing my clinical psychology master's degree, she stepped in and helped with my children so I could focus on my studies. She always believed in me, constantly encouraging me and reminding me that I could accomplish my dreams. Now, as I work toward completing my MA in Clinical Psychology, I know I couldn't have made it this far without her support.

I am not just losing my best friend and sister—████████████████████████████████ ███████████████████████ Every single day, they ask me when she is coming back, and I have no words to comfort them. They have grown up with her love, care, and presence, and I cannot bear the thought of them losing her. Leqaa has been a maternal figure to them, someone they trust and feel safe with, and her absence has left a painful void in their hearts. She is not just important to me—she is deeply cherished by my children, and they need her just as much as I do.

Leqaa is a person of incredible integrity, patience, and kindness. She is never one to argue or cause problems. In all the years I have known her, we have never once fought—our friendship has always been filled with mutual love and understanding. Whether it was road trips to the beach, spending time together at home, or simply supporting one another through life, every moment with her has been easy and full of warmth. She is one of the cleanest, most polite, and most respectful people I know, making every experience with her a joy.

Beyond just our friendship, Leqaa has been a mentor to others. She has helped many people navigate life in the United States, guiding them toward the right language schools and providing support whenever she could. She is someone who genuinely wants to see others succeed, and she takes the time to help them however she can.

The thought of losing Leqaa from my life is unbearable. She is not a flight risk—she has built a life, a community, and a family here. She is not a danger—she is the exact opposite. She is a person who gives selflessly, who supports others, who uplifts those around her. Her presence in my life, in my children's lives, and in our community is invaluable. I urge you with all my heart to grant her release and allow her to stay where she belongs—with the people who love and need her.

*Sincerely,*



Dear Immigration Judge,

My name is ██████████, and I am currently a ████████████████████████. I grew up in ████████████████, the same neighborhood as Leqaa Kordia. Our families have known each other since I was a child, but I became especially close to Leqaa during my undergraduate years when I began my professional journey in the summer of 2017.

At that time, I worked in the same plaza where she spent countless hours studying. I remember seeing her in the café almost every day, sitting with her textbooks, completely focused, working tirelessly toward her future. During my breaks, I would sit with her, and we would talk—sometimes about our studies, sometimes about life. She always struck me as someone with an incredibly strong moral compass, someone who truly valued hard work and doing things the right way.

One memory that has always stayed with me is when I told her about how ████████ ████████████████████████████████████ Without hesitation, she told me how wrong that was—that learning isn't just about passing a test, but about growing and bettering yourself. She specifically said she would rather fail an exam than cheat just to pass. That one statement speaks volumes about her character. She truly believes that integrity is more important than any grade. She even spent her own time, unpaid, helping classmates who were struggling—simply because she cared. She didn't just want to succeed alone; she wanted those around her to succeed, too.

That's who Leqaa is. She is someone who gives selflessly to others, someone whose presence makes the people around her better. She belongs in this community, uplifting those who need it, demonstrating a rare kind of kindness that is hard to come by.

Beyond her generosity, Leqaa is a rule follower in the truest sense. I cannot emphasize this enough. She does everything by the book, not because she has to, but because she genuinely believes in doing what is right. She has never been the type to cut corners or break rules, even in the smallest ways. I remember offering to drive her home countless times because she didn't have a car, and every single time, she would remind me to drive carefully. Once, I crossed a yellow light, and she immediately scolded me, reminding me that pedestrians often start walking when they see the light turn yellow and that I could hurt someone. It wasn't just a casual comment—it was genuine concern. That's the kind of person she is. She isn't reckless. She isn't irresponsible. And she most certainly is not a danger to society.

The fact that she is being detained is not only heartbreaking—it is entirely unjust. She is not a flight risk. This is her home. She has spent years patiently waiting for her legal status to be resolved, always complying with the process, never once straying from the path of compliance. She has deep ties to this community, to the people who love her and need her. Her mother and younger brother rely on her in immeasurable ways, and her absence has left a hole in their lives that no one else can fill.

The idea that someone like Leqaa—someone who has spent her life proving her integrity, selflessness, and dedication to her community—could be considered a risk or a danger is beyond comprehension. I urge you to look at the person she truly is. She has never been anything but a law-abiding, kind-hearted, and responsible individual. If released, I have no doubt that she will comply with all bond conditions, because that is simply who she is.

I ask you, with all sincerity, to grant Leqaa bond and allow her to return home, where she belongs. Our community needs her. Her family needs her. And above all, she deserves the chance to continue the life she has worked so hard to build.

Thank you for your time and consideration.

Sincerely,



March 16, 2025
date

March 16, 2025

Dear Immigration Judge,

My name is ███████████, and I am writing this letter in full support of Leqaa Kordia, my husband's niece. To me, she has been like a daughter. In all the years I have known her, I have never met a more kindhearted, selfless, and compassionate person.

I have had the privilege of knowing Leqaa for over seven years. Every time she visited our home or we visited hers, she brought nothing but warmth, love, and support. I have a child ███████ ████████████████████████████, Leqaa had a remarkable ability to calm and comfort him—a feat that not many can accomplish. She also dedicated her time to sitting with him, helping him with his homework, ensuring he understood his assignments whenever I was busy. Her patience, kindness, and willingness to help without hesitation speak volumes about the kind of person she is.

Leqaa's own life has not been without hardship. As a child, she endured an incredibly painful separation from her mother due to a difficult divorce. At the tender age of five, she was taken from her mother and had no way of contacting her, spending years without the love and guidance of a mother. When she grew older and was finally on her own, she was able to visit her mother and, by the grace of God, reunited with her. I remember wanting to call the news channel to come meet them at the airport because I was so moved by their story. I cannot imagine the pain of losing her mother once again.

Leqaa is not a danger to anyone. On the contrary, she is a source of support, love, and generosity to those around her. She has always put others before herself, offering help in any way she could, whether to family, friends, or even strangers. The fact that she willingly turned herself in only further proves her integrity and willingness to abide by the law.

The issue surrounding her visa status is one big misunderstanding. Her mother, a U.S. citizen, applied for her legal status when she first arrived in the country. Upon completing her education, Leqaa reached out to immigration multiple times, only to be told she needed to wait for the process to be completed. She was also informed that, because her mother had already applied for her, she did not need to file for a visa extension. She has done everything she was told to do and has never attempted to evade the system.

Leqaa is not a flight risk. Her entire family is here—her mother, her loved ones, and her support system. She has nowhere else to go. Her father has passed away, and deporting her would once again rip a family apart, causing irreparable harm.

I plead with you from the depths of my heart to allow Leqaa to stay. She has worked hard to build a future here, and she dreams of becoming a successful, contributing member of this country. She has committed no crime—this is simply an unfortunate misunderstanding regarding her pending status.  Thank you for taking the time to read my letter. I understand that your job carries great responsibility, and I do not make this request lightly. But I beg you, with all the sincerity in my heart, to grant Leqaa the chance to remain with her family and continue the life

she has worked so hard to build.

Sincerely,





To Whom It May Concern:

My name is ████████ and it is my absolute honor to write this character testimonial for my friend Leqaa Kordia.

I live in ████████ was introduced to Leqaa by a mutual friend during a day trip to ████████ in December 2023, where she lives. Leqaa was thrilled to hear that it was my first time in ████ and provided us with numerous recommendations about what restaurants to try and which businesses to patronize. It was clear even then that Leqaa is someone with deep roots in and a profound love for her community i████████ A few months later, I traveled to Washington, DC with the same mutual friend, and Leqaa was there as well. Over the course of the trip there and back, I came to be impressed by Leqaa's generosity, grace, patience, and friendliness while navigating a long and stressful bus journey. When the community group I was a part of organized a food distribution event in the heart ████████ e same generosity impressed itself deeply on me when Leqaa donated food, paying for the food out of her own pocket.

It will be abundantly clear that I have met Leqaa only a handful of times. I am positive that she has many, many family members, friends and loved ones who have known her deeply over many years, and who be able to testify far more strenuously to the depth of Leqaa's character and her deep roots in her community. However, I wanted to write this letter to explain how clear and certain Leqaa's character is to me, as someone who is only a very marginal character in her life, and how deeply her compassion, integrity and generosity was impressed upon me during the sparse handful of times that I had met her.

Leqaa is not an untrustworthy person, nor is she a flight risk. With respect to both conditions, the truth of who Leqaa is and what she means to so many people in her life cannot be understated. I urge you with all my heart to grant Leqaa's release so that she can return to the life and home she has built here in Paterson, New Jersey, amongst the people and community she loves and who love her back unreservedly.

Sincerely,





March 16, 2025

March 16, 2025
Re: Leqaa Kordia

To whom it may concern:

I am writing this correspondence to advocate for the release of Ms. Kordia on bond. I have had interactions with Ms. Kordia at our local mosque i███████████ ██████over several community events. She is always helpful coordinating, organizing and actively seeking to assist in matters that impact our community. I can say with full confidence she does not deserve to be treated like this and hope that you grant her the grace to remain part of this community. Her devotion to improving the conditions for her local community includes work that protect the rights and services of others, she is an asset to all walks of faith and representative of why people seek to study here in the United States. Ms. Kordia is not a flight risk or a danger to anyone in the United States, on the contrary, she is exactly who we need during these turbulent times to shed light on the humanity of the people she represents.

I urge you to consider granting her release and to understand how people like Ms. Kordia are already dehumanized by political bodies seeking to stoke flames of hatred towards marginalized people. She has not committed a crime to my knowledge and her character reflects the goodness of people who want to act with dignity, honor and respect.

Thank you for your consideration in this important matter.

Sincerely ,



March 16, 2025

Re    Leqaa Kordia

To whom it may concern:

I am writing this letter in full support of Leqaa Kordia, respectfully requesting her release on bond. I have known the family of Leqaa (i.e., mother and younger brother) vis a vis attendance at the two major ███████████████████████████████████████████████████████ and ██████████████ I regularly prayed at ██████████████ while I had office in ███████████████ section. Additionally, I lived near the ███████████ for 2 years while repairing my home in █████████ I attended classes at ███ where often I came across her sibling in the for over six years, having met her through other ██████ members who knew the family. She had a good reputation as a good young sister since she was a major factor in the emotional and medical support of her mom.

I can say with absolute confidence that Leqaa is not a danger to society. On the contrary, she is the kind of person who strengthens and uplifts her community. She gives back in every way she can—offering a helping hand, emotional support, and genuine care to those around her. Her presence brings warmth and positivity, and her absence has left a noticeable void in the lives of everyone who knows and loves her. Losing her would not only be a devastating personal loss for her mom and brother but also a significant loss for the community as a whole.

Leqaa is also not a flight risk. She has deep and unshakable ties to this community, including close family members who rely on her and a strong support system that cares for her deeply. She has always been responsible, respectful, and fully compliant with all legal requirements. She is not trying to escape her circumstances, she simply wants the opportunity to remain in the country she calls home and continue being the kind, giving, and law-abiding person she has always been.

I sincerely urge you to consider granting Leqaa bond. She is a valuable member of this community, and those of us who know her can attest to the goodness in her heart and her unwavering commitment to doing what is right. If you require any further information, please do not hesitate to contact me.

Thank you in advance for your time and careful consideration of this request.

Sincerely,





March 17, 2025

To Whom It May Concern,

I am writing in full support of Leqaa Kordia and respectfully request that she be granted release on bond. Although she is my cousin, I have had the privilege of knowing Leqaa for nearly a decade since she first moved to the United States. She is one of the kindest, most selfless, and compassionate individuals I have ever met.

Leqaa has been a pillar of support in my life, always showing up for others in their most difficult moments. She has a heart of gold and consistently prioritizes the well-being of those around her. Whether it's offering emotional support, lending a helping hand, or showing kindness to strangers, she embodies the very best qualities of a caring and responsible member of society.

I can say with absolute confidence that Leqaa is an asset to her community—not a danger. She gives back in every way possible, and her absence has left a noticeable void in the lives of those who love and depend on her. Her loss would not only be deeply felt by her family and friends but also by the broader community that benefits from her presence, generosity, and goodwill.

Furthermore, Leqaa is not a flight risk. She has deep and unshakable ties to this community, including family members who rely on her and a strong support system committed to her well-being. She has always been responsible, respectful, and fully compliant with all legal requirements. She is not seeking to evade accountability —she simply wants the opportunity to remain in the country she calls home and continue living as the kind, giving, and law-abiding person she has always been.

I sincerely urge you to consider granting Leqaa bond. She is a valued and integral part of this community, and those of us who know her can attest to her unwavering integrity and commitment to doing what is right. If you require any further information, please do not hesitate to contact me.

Thank you for your time and consideration.

Sincerely,



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

In the Matter of:    LEQAA KORDIA
A

## <u>ORDER OF THE IMMIGRATION JUDGE</u>

Upon consideration of the **RESPONDENT'S MOTION ON ELIGIBILITY FOR BOND AND CUSTODY REDETERMINATION** , it is HEREBY ORDERED that the Motion be
 **GRANTED    DENIED**  because:

 ☐ DHS does not oppose the motion.

 ☐ The respondent does not oppose the motion.

 ☐ A response to the motion has not been filed with the court.

 ☐ Good cause has been established for the motion.

 ☐ The court agrees with the reasons stated in the opposition to the motion.

 ☐ The motion is untimely per _____.

 ☐ Other: .

 ☐ The date of the rescheduled individual hearing is _____.

Deadlines:

 ☐ The application(s) for relief must be filed by _____.

 ☐ The respondent must comply with DHS biometrics instructions by _____.


Date: _____        _____
                                    Immigration Judge [NAME]

---

**Certificate of Service**

This document was served by:  [  ] Mail    [  ] Personal Service

To:        [  ] Alien      [  ] Alien c/o Custodial Officer      [  ] Alien's Atty/Rep      [  ] DHS


 Date: _____        By: Court Staff_____

**PROOF OF SERVICE**

On March 26, 2025, I, S. Michael Musa Obregon, served a copy of the Respondent's Motion on Eligibility for Bond and Redetermination of Bond and any attached pages to the Department of Homeland Security Counsel, Office of Chief Counsel at the following address:

> U.S. Department of Homeland Security Counsel
> Immigration and Customs Enforcement
> Office of the Chief Counsel
> Port Isabel Detention Center
> 27991 Buena Vista Blvd
> Los Fresnos, TX 78566
> United States

by the following method:

_____ Hand Delivery

_____ U.S. Mail, 1st Class postage pre-paid

_____ Facsimile

_____ Express Mail

__x__ ECAS

03/27/2025

(SIGNATURE)

11

# EXHIBIT 2

Petitioner's Appendix 60

Stacy Norcross                                          **DETAINED**
Assistant Chief Counsel
Office of the Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
Port Isabel Detention Center
27991 Buena Vista Blvd.
Los Fresnos, Texas 78566


## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## PORT ISABEL DETENTION CENTER

_____
                                    )
In the Matter of:                   )
                                    )
Kordia, Leqaa                       )        File No:  A███████
Respondent                          )
                                    )
In Removal Proceedings              )
_____)


Immigration Judge Naselow-Nahas

Next Hearing: April 3, 2025 at 10:30AM


## DEPARTMENT OF HOMELAND SECURITY

## NOTICE OF FILING

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**PORT ISABEL DETENTION CENTER**

_____
                                                    )
In the Matter of:                          )
                                                    )
Kordia, Leqaa                              )          File No:  A█████████
Respondent                                )
                                                    )
In Removal Proceedings                )
_____)


**DEPARTMENT OF HOMELAND SECURITY**

**NOTICE OF FILING**


      Comes now the U.S. Department of Homeland Security, Immigration and
Customs Enforcement, by and through its undersigned counsel, and respectfully submits
the following documents for the Court's consideration in the above-styled case.



Respectfully Submitted,

ANASTASIA S NORCROSS
Digitally signed by
ANASTASIA S NORCROSS
Date: 2025.04.02
17:03:21 -05'00'

_____                    _____
Date                                            Stacy Norcross
                                                    Assistant Chief Counsel
                                                    Office of the Chief Counsel
                                                    U.S. Immigration and Customs Enforcement
                                                    U.S. Department of Homeland Security
                                                    Port Isabel Detention Center
                                                    27991 Buena Vista Blvd.
                                                    Los Fresnos, Texas 78566

## TABLE OF CONTENTS

| Tab | Document | Pages |
|-----|----------|-------|
| A | **Homeland Security Investigations Reports of Investigation** | **1-40** |
| B | **NYPD Report** | **41-45** |

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing which relates to the following case:

Respondent:        Leqaa Kordia
Alien Number:      A███████████

to be served on the respondent's counsel by the following means:

☐         by first-class mail, postage pre-paid, to [address of party served].

☐         by first-class mail, postage pre-paid to [address of party served], by placing into my office's receptacle designated for official "out-going" first class mail.

☐         by personally delivering a true copy thereof to the person set forth above via custodial officer.

☐         by electronic service, with prior consent, at the following e-mail address: [email address of party served].

☐         by eService pursuant to the Terms and Conditions agreed to between the parties.

☒         through the EOIR Courts and Appeals System (ECAS), which will automatically send service notifications to both parties that a new document has been filed.

on this 2nd day of April 2025.

ANASTASIA
S NORCROSS

Digitally signed by
ANASTASIA S NORCROSS
Date: 2025.04.02 17:03:50
-05'00'

DHS/ICE

A

# B



# ENTITY - DETAILED REPORT

# LEQAA KORDIA


New York City Police Department


NO IMAGE AVAILABLE

## PROFILE

| | | | |
|---|---|---|---|
| **Name** | KORDIA, LEQAA | **NYSID** | |
| **Alias** | | **Date of Birth** | 32 yrs) |
| **Sex** | Female | **Race** | Asian / Pac. Isl. |
| **Height** | | **Weight** | |
| **Eye Color** | N/A | **Hair Color** | N/A |
| **FBI Number** | | **Phone Number** | |
| **Tattoo / Marks** | | | |

## OFFICER SAFETY

| | |
|---|---|
| **Gun Charge History** | No |
| **Assault on PO** | No |
| **Escape** | No |
| **Resisting Arrest** | No |
| **EDP / Suicide History** | No |
| **CEW Used** | No |

## QUICK LOOK

| | | | |
|---|---|---|---|
| **Shooting / Hom Hist** | No | | |
| **ECMS Criminal Group** | No | **MTA Ban** | No |
| **Narco History** | No | **Pattern History** | No |
| **SOMU** | No | | |
| **State / City Custody** | | **Local DNA on File** | No |
| **Open Cases** | No | **NY Registered Vehicle** | No |

## STATS

| ARREST | 0 | WARRANT | 0 | I-CARD | 0 | DIR | 0 | COMPLAINT | 0 | PROBATION | NO | PAROLE | NO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Felony | 0 | Arrest | 0 | PC | 0 | Offender | 0 | Perp | 0 | Sentenced | | Released | |
| Misd | 0 | Bench | 0 | Suspect | 0 | Victim | 0 | Victim | 0 | Exp Date | | Exp Date | |
| Viol / Inf | 0 | Summons | 0 | Witness | 0 | N Of Kin | 0 | Witness | 0 | Res. Pct | | Res. Pct | |
| C-Sum | 2 | Other | 0 | Closed | 0 | Arrests | 0 | Reporter | 0 | Crime: | | Crime: | |
| Oath | 0 | Closed | 0 | | | | | | | | | | |

## SHOOTING / HOMICIDE INCIDENTS

NO RECORD FOUND

## I-CARD HISTORY

NO RECORD FOUND

## WARRANT HISTORY

NO RECORD FOUND

## ARRESTS

NO RECORD FOUND

## PATTERNS

NO RECORD FOUND

## RECIDIVIST LISTS

NO RECORD FOUND

**41**



# ENTITY - DETAILED REPORT

# LEQAA KORDIA



**New York City Police Department**

## COMPLAINTS

NO RECORD FOUND

## AIDED CASES

NO RECORD FOUND

## DOMESTIC INCIDENTS

NO RECORD FOUND

## PAROLE HISTORY

NO RECORD FOUND

## PROBATION HISTORY

NO RECORD FOUND

## OCA - OPEN CASES

NO RECORD FOUND

EOIR — 48 of 51

42



# ENTITY - DETAILED REPORT

# LEQAA KORDIA



New York City Police Department

## ADDITIONAL ANALYSIS

### NAMES

| First Name | Last Name | Frequency | | Last Reported Source | Last Reported Date |
|---|---|---|---|---|---|
| LEQAA | KORDIA | 2 | ███ | Summons | 04/30/2024 |

### DATES OF BIRTH

| Date Of Birth | | Frequency | | Last Reported Source | Last Reported Date |
|---|---|---|---|---|---|
| ███ | | 2 | ███ | Summons | 04/30/2024 |

### IDENTIFICATION NUMBERS

NO RECORD FOUND

### ADDRESSES

| Type | Address | Frequency | | Last Reported Source | Last Reported Date |
|---|---|---|---|---|---|
| | W 116 ST &amp; MANHATTAN, NEW YORK 10027 UNITED STATES | 2 | ███ | Summons | 04/30/2024 |

### PHONE NUMBERS

| Type | Phone Number | Frequency | | Last Reported Source | Last Reported Date |
|---|---|---|---|---|---|
| PH | ███ | 2 | ███ | Summons | 04/30/2024 |

### ARREST ASSOCIATES

NO RECORD FOUND

### POSSIBLE ASSOCIATES

| Name | Entity ID | Relationship |
|---|---|---|
| ███ | ███ | Other Number Only |

### EVENT SUMMARY

| Event Type | Count | Last Event Date |
|---|---|---|
| C-Summons | 2 | 04/30/2024 |

### TIMELINE

| Event ID & Date | Event Type | Role | NYSID | Name | DOB | Address |
|---|---|---|---|---|---|---|
| 4444949820 04/30/2024 | C-Summons | Respondent | | LEQAA KORDIA | ███ | ███ |
| 4455809932 04/30/2024 | C-Summons | Respondent | | LEQAA KORDIA | ███ | ███ |

NOTE: This "Entity" report attempts to find and consolidate all of the NYPD's records about a person across many different data sources by using names, dates of birth, addresses, phone numbers, identification numbers (NYSID, SSN), and other data points. This report may fail to incorporate records of the person of interest and/or incorrectly include records relating to a different person. As a result, all data in this report should be independently verified before any police action is taken.



# ENTITY - DETAILED REPORT

# LEQAA KORDIA



Please contact the ITB Help Desk at 646-610-MISD (6473) to report any errors or inconsistencies in this report.

**Click here to generate the NYPD Extended Report for LEQAA KORDIA**

Uploaded on: 04/02/2025 at 05:04:56 PM (Central Daylight Time)  Base City: PEP

## Search Results

Total Records:2

NYPDFINESTIGUACH944617 03/14/2025 15:46:17

**No Image Available**

**Person**  KORDIA, LEQAA
**Event Type**  C-SUMMONS

**Role**  RESPONDENT
**Date**  TUES 04/30/2024 21:10:00

ID: 444949820 - PEOPLE: KORDIA, LEQAA (RESPONDENT); AT TPO I OBSERVED THE DEF. WITH APPROX. 100 STANDING /YELLING, BLOCKING THE GATE @ SAID LOCATION PREVENTINGN ANYONE FROM ENTERING & EXITING @ SAID LOCATION. I OBSERVED NYPD PERSONAL REQUEST DEF. DISPURSE & DEF. FAILED TO COMPLY WITH SAID COMMAND.

**No Image Available**

**Person**  KORDIA, LEQAA
**Event Type**  C-SUMMONS

**Role**  RESPONDENT
**Date**  TUES 04/30/2024 21:10:00

ID: 445809932 - PEOPLE: KORDIA, LEQAA (RESPONDENT); AT TPO I OBSERVED THE DEF. WITH APPROX. 100 STANDING /YELLING, BLOCKING THE GATE@ SAID LOCATION PREVENTINGN ANYONE FROM ENTERING & EXITING @ SAID LOCATION. I OBSERVED NYPD PERSONAL REQUEST DEF. DISPURSE & DEF. FAILED TO COMPLY WITH SAID COMMAND.

45

# EXHIBIT 3

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | IN BOND PROCEEDINGS |
| | ) | |
| **KORDIA, Leqaa** | ) | A █████████ |
| | ) | |
| RESPONDENT | ) | **DETAINED** |

| | |
|---|---|
| **ON BEHALF OF RESPONDENT**: | **ON BEHALF OF THE DEPARTMENT**: |
| Shauky Michael Musa-Obregon, Esq. | Stacy Norcross, Esq. |
| Musa-Obregon Law PC | Assistant Chief Counsel |
| 55-21 69th St., 2nd Fl. | 27991 Buena Vista Blvd. |
| Maspeth, NY 11378 | Los Fresnos, TX 78566 |

**BOND MEMORANDUM**

Respondent is a thirty-two-year-old female, native and citizen of stateless. Exhibit (Exh.) 1-B, Tab G. The Department placed Respondent in custody following an encounter on March 13, 2025, in Newark, New Jersey. Exh. 3-B at 23. On March 27, 2025, Respondent filed a bond redetermination request. Exh. 1-B. At the bond hearing on April 3, 2025, the Court granted Respondent's request for a change in custody status, setting her bond at $20,000. *See* Order of the Immigration Judge (April 3, 2025). This memorandum provides the basis for the Court's grant of bond.

In a custody determination, the Court should first determine whether an alien poses a danger to the community, and, if not, whether she is likely to appear for future proceedings before the Court. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). The Constitution does not guarantee an alien in removal proceedings a right to release on bond. *Carlson v. Landon*, 342 U.S. 524, 534 (1952). An applicant bears the burden to establish she merits release on bond. *Matter of Guerra*, 24 I&N Dec. at 40; *Matter of Adeniji*, 22 I&N Dec. 1102, 1112 (BIA 1999). When an alien is not subject to mandatory detention, the Court has broad discretion in deciding whether she will be released. *Matter of Guerra*, 24 I&N Dec. at 39; *see also Carlson v. Landon*, 342 U.S. at 540. An alien who poses a danger to persons or property shall not be released during pending removal proceedings. *See Matter of Drysdale*, 20 I&N Dec. 815 (BIA 1994). In the absence of a conviction, evidence of serious criminal conduct, including police reports, which is "probative and specific" to the danger a respondent poses to her community may outweigh other factors and provide a reasonable basis for denying bond. *Matter of Guerra*, 24 I&N Dec. at 40; *see also Matter of Siniauskas*, 27 I&N Dec. 207, 208-09 (BIA 2018) (stating immigration judges may consider both arrests and convictions in custody determinations).

Where an immigration judge concludes an applicant is not a danger to the community, the Court must next consider whether the applicant is a flight risk unlikely to appear for future proceedings. *See Matter of Patel*, 15 I&N Dec. 666 (1976) (factors unique to each noncitizen must be evaluated in determining suitability for release from custody). In making this decision, the Court

Petitioner's Appendix 113

can consider many factors including: (1) whether the applicant has a fixed address in the United States; (2) her length of residence in the United States; (3) her family ties in the United States, and whether they may entitle her to reside permanently in the United States in the future; (4) her employment history; (5) her record of appearance in court; (6) her criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) her history of immigration violations; (8) any attempts to flee prosecution or otherwise escape from authorities; and (9) her manner of entry to the United States. *Matter of Guerra*, 24 I&N Dec. at 40. This list of factors is not exhaustive, and any reliable evidence in the record may be considered. 8 C.F.R. § 1003.19(d). An immigration judge may give greater or lesser weight to any given factor or factors, provided the ultimate conclusion is reasonable. *Matter of Guerra*, 24 I&N Dec. at 40. Family and community ties may demonstrate the applicant is not a flight risk but generally do not demonstrate she is not a danger to the community. *Siniauskas*, 27 I&N Dec.at 209-210.

Here, the Court finds that Respondent is not a danger to the community. The Department argues that Respondent is a danger to the community because of her arrest at a protest and because she has sent money to someone in Palestine. Neither of these arguments are persuasive. First, the Department argues that the facts surrounding Respondent's arrest demonstrate that she is a danger. Respondent attended a protest outside of Columbia University on April 30, 2024. Exh. 1-B at 11. She was cited for public disturbance, but the charges were dropped in the interest of justice. Exh. 1-B, Tab H. The police report states that she was with approximately 100 other people and was blocking the gate to keep anyone from entering or exiting. Exh. 3-B at 45. The Department provided no evidence that Respondent specifically threatened the police officers or was involved in any dangerous activity. Standing in a crowd of around 100 people in a protest does not show that she is a danger to the community.

Next, the Department argues that Respondent may have been providing support to terrorist organizations such as Hamas by sending money overseas. To support this claim, the Department submitted a Homeland Security Investigation (HSI) report stating that Respondent and another individual named Abushaban were involved in numerous transactions sending funds to individuals in the Palestinian Authority. Exh. 3-B at 4. The investigation stated that the most recent transaction Respondent initiated through Western Union was on February 25, 2025. *Id.* However, the report gives no details about how much money was sent, why the money was sent, nor the recipient of the funds. The Department also provided a list of MoneyGram transactions from Respondent's mother's address from March 5, 2018, to March 5, 2025. *Id.* at 32. Over these seven years, Respondent's name is listed only once, on March 13, 2022.[1] *Id.* at 35. Respondent claims that she was sending money to her relatives in Palestine. The Department admitted that they do not know any information about the person listed as the recipient of this transaction. There is no evidence in the record that this person supports Hamas or is a member of a terrorist organization. In the absence of evidence of any connection to terrorist organizations, the Court cannot find that Respondent is supporting a terrorist organization by sending money to a family member in Palestine.

---

[1] The Court notes that there are several MoneyGram transactions from ████████████ where Respondent resided with her family. Exh. 3-B, at 35-37. However, Respondent testified that her parents rent the second floor of the house, and the Department submitted no evidence to connect these transactions to Respondent or to a terrorist organization.

Respondent presented evidence of her good character, including letters from her family, friends, and school. *See* Exh. 1-B, Tabs J- M. She has been in the U.S. since 2016, and has not had any encounters with law enforcement other than at the protest in 2024. Thus, Respondent has met her burden to show that she is not a danger to the community, and the Department has not presented evidence to show otherwise. Upon careful consideration of the entire record, the Court concludes that Respondent is not a danger to the community. *See Guerra*, 24 I&N Dec. at 40.

The Court further finds Respondent is not a significant flight risk. Respondent entered the United States in 2016, and has remained in the U.S. since that time. She has lived with her mother in New Jersey since entering and plans to return to her mother's house after being released from detention. Respondent has family ties in the U.S., and specifically in the New York/New Jersey area. She lives with her U.S. citizen mother, stepfather, and brother, and testified that her sister often comes over to visit. Respondent also has a U.S. citizen aunt and uncle and multiple cousins in the U.S. *See* Exh. 1-B. Respondent submitted letters from her friends and family, attesting that she is a valued member of their community and an integral part of her family. Exh. 1-B, Tabs J-M. Respondent did not submit evidence of her family's ability to financially support her, but she testified that she has been employed as a waitress and was trying to start her own business before being detained. Further, her uncle testified that he and Respondent's mother own their own homes and that they will financially support Respondent. Finally, Respondent has multiple avenues for relief which incentivize her appearance at future hearings. Respondent's mother filed an I-130 petition on Respondent's behalf. Exh 1-B, Tab D. The I-130 was approved on May 5, 2021, and Respondent is waiting for her visa to become current. *Id.* Respondent is also *prima facie* eligible for asylum, withholding of removal, and protection under the Convention Against Torture. Exh. 1-B, Tab F. Considering all these factors, the Court concludes Respondent is likely to appear for future proceedings and is not a significant flight risk.

In sum, Respondent met her burden of demonstrating to the Court she is not a danger to the community, and the Department failed to provide evidence that shows otherwise. Further, the Court finds Respondent is not such a flight risk based on her family ties and eligibility for future relief that no bond is appropriate. Accordingly, the Court grants the Respondent's application for custody redetermination and sets her bond amount at $20,000.

Accordingly, the following order shall be entered:

<u>**ORDER**</u>

**IT IS HEREBY ORDERED** Respondent be **RELEASED** from custody of the Department upon the payment of a **$20,000 BOND**.

**Dated:** April 16, 2025

                              _____
                              **Tara Naselow-Nahas**
                              **Assistant Chief Immigration Judge**

Petitioner's Appendix 115

**Order of the Immigration Judge**

Immigration Judge: NASELOW-NAHAS, TARA  04/16/2025

**Certificate of Service**

This document was served:
Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service
To: [ M ] Noncitizen | [  ] Noncitizen c/o custodial officer | [ E ] Noncitizen atty/rep. | [ E ] DHS
Respondent Name : KORDIA, LEQAA | A-Number : ███████████
Riders:

Date:  04/17/2025  By:  French, Annette , Court Staff

# EXHIBIT 4

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB# 1125-0002

**Notice of Appeal from a Decision of an Immigration Judge**

OMB# 1125-0002

---

**1.** | List Name(s) and "A" Number(s) of all Respondent(s)/Applicant(s): | For Official Use Only

Kordia, Leqaa   A██████████

> **⚠ WARNING:** Names and "A" Numbers of **everyone** appealing the Immigration Judge's decision must be written in item #1. The names and "A" numbers listed will be the only ones considered to be the subjects of the appeal.

*(Left margin text: Staple Check or Money Order Here. Include Name(s) and "A" Number(s) on the face of the check or money order.)*

**2.** I am  ☐ the Respondent/Applicant   ☒ DHS-ICE *(Mark only one box.)*

**3.** I am  ☒ DETAINED   ☐ NOT DETAINED *(Mark only one box.)*

**4.** My last hearing was at  Prairieland Detention Center, Alvarado, TX   *(Location, City, State)*

**5.** | **What decision are you appealing?**

*Mark only one box below. If you want to appeal more than one decision, you must use more than one Notice of Appeal (Form EOIR-26).*

☐ I am filing an appeal from the Immigration Judge's decision *in merits proceedings* (example: removal, deportation, exclusion, asylum, etc.) dated_____.

☒ I am filing an appeal from the Immigration Judge's decision *in bond proceedings* dated
April 3, 2025_____. (For DHS use only: Did DHS invoke the automatic stay provision before the Immigration Court?  ☒ Yes.  ☐ No.)

☐ I am filing an appeal from the Immigration Judge's decision *denying a motion to reopen or a motion to reconsider* dated_____.

*(Please attach a copy of the Immigration Judge's decision that you are appealing.)*

*(Left margin: EOIR – 1 of 13)*

Form EOIR-26
Rev. Nov. 2022
Exp. Jan. 2026

**6.** **State in detail the reason(s) for this appeal. Please refer to the General Instructions at item F for further guidance. You are not limited to the space provided below; use more sheets of paper if necessary. Write your name(s) and "A" number(s) on every sheet.**

See attached.

*(Attach additional sheets if necessary)*

**!** **WARNING:** You must clearly explain the specific facts and law on which you base your appeal of the Immigration Judge's decision. The Board may summarily dismiss your appeal if it cannot tell from this Notice of Appeal, or any statements attached to this Notice of Appeal, why you are appealing.

**7.** Do you desire oral argument before the Board of Immigration Appeals? ☐ Yes ☒ No

**8.** Do you intend to file a separate written brief or statement after filing this Notice of Appeal? ☐ Yes ☒ No

**9.** If you are unrepresented, do you give consent to the BIA Pro Bono Project to have your case screened by the Project for potential placement with a free attorney or accredited representative, which may include sharing a summary of your case with potential attorneys and accredited representatives? *(There is no guarantee that your case will be accepted for placement or that an attorney or accredited representative will accept your case for representation)* ☐ Yes ☒ No

**!** **WARNING:** If you mark "Yes" in item #7, you should also include in your statement above why you believe your case warrants review by a three-member panel. The Board ordinarily will not grant a request for oral argument unless you also file a brief.

If you mark "Yes" in item #8, you will be expected to file a written brief or statement after you receive a briefing schedule from the Board. The Board may summarily dismiss your appeal if you do not file a brief or statement within the time set in the briefing schedule.

**10.** | **Print Name:** | Anastasia Norcross |

**11.** | **Sign Here:** ▶ | X ANASTASIA S NORCROSS | Digitally signed by ANASTASIA S NORCROSS Date: 2025.04.15 09:26:01 -05'00' | 4/15/2025 |

Signature of Person Appealing
*(or attorney or representative)*

Date

**12.**

| Mailing Address of Respondent(s)/Applicant(s) | Mailing Address of Attorney or Representative for the Respondent(s)/Applicant(s) |
|---|---|
| Leqaa Kordia | Muhammad Omar Chaudhry |
| (Name) | (Name) |
| 1209 Sunflower Ln. | 55-21 69th St. |
| (Street Address) | (Street Address) |
| | 2nd Floor |
| (Apartment or Room Number) | (Suite or Room Number) |
| Alvarado, TX 76009 | Maspeth, NY 11378 |
| (City, State, Zip Code) | (City, State, Zip Code) |
| | |
| (Telephone Number) | (Telephone Number) |

**NOTE:** You must notify the Board within five (5) working days if you move to a new address or change your telephone number. You must use the Change of Address Form/Board of Immigration Appeals (Form EOIR-33/BIA).

**NOTE:** If an attorney or representative signs this appeal for you, he or she must file *with this appeal*, a Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals (Form EOIR-27).

**13.**

## PROOF OF SERVICE (You Must Complete This)

I Anastasia Norcross _____ mailed or delivered a copy of this Notice of Appeal
(Name)

on _____ to _____
(Date)                    (Opposing Party)

at _____
(Number and Street, City, State, Zip Code)

[X] No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

| SIGN HERE ➡ | X ANASTASIA S NORCROSS | Digitally signed by ANASTASIA S NORCROSS Date: 2025.04.15 09:26:29 -05'00' |
|---|---|---|
| | Signature | |

**NOTE:** If you are the Respondent or Applicant, the "Opposing Party" is the Assistant Chief Counsel of DHS - ICE.

**WARNING:** If you do not complete this section properly, your appeal will be rejected or dismissed.

**WARNING:** If you do not attach the fee payment receipt, fee, or a completed Fee Waiver Request (Form EOIR-26A) to this appeal, your appeal may be rejected or dismissed.

## HAVE YOU?

- [ ] Read all of the General Instructions.
- [ ] Provided all of the requested information.
- [ ] Completed this form in English.
- [ ] Provided a certified English translation for all non-English attachments.
- [ ] Signed the form.

- [ ] Served a copy of this form and all attachments on the opposing party, if applicable.
- [ ] Completed and signed the Proof of Service
- [ ] Attached the required fee payment receipt, fee, or Fee Waiver Request.
- [ ] If represented by attorney or representative, attach a completed and signed EOIR-27 for each respondent or applicant.

EOIR – 3 of 13

**Page 3 of 3**

Page 3 of 3

Petitioner's Appendix 120

Form EOIR-26
Rev. Nov. 2022
Exp. Jan. 2026

## INTRODUCTION

The U.S. Department of Homeland Security (DHS) respectfully submits this Notice of Appeal in lieu of a brief from the immigration judge's April 3, 2025, decision granting the respondent's request for a change in custody status and setting bond in the amount of $20,000 pursuant to Section 236(a) of the Immigration and Nationality Act (INA).[1]  The immigration judge erred in ordering the respondent released on bond and setting bond at $20,000 because the respondent failed to meet her burden of establishing she is not a danger to persons or property and that she is not a danger to the community.  The immigration judge further erred in finding that the respondent does not pose a flight risk.  The DHS respectfully requests that the Board of Immigration Appeals (Board) reverse the immigration judge's order granting the respondent's request for a change in custody status.

DHS further requests that this case be adjudicated by a three-member panel.  The instant appeal meets the criteria for three-member panel review because the facts and circumstances of this case present: (1) the need to review a decision by an Immigration Judge that is not in conformity with the law or with applicable precedents; and (2) the need to reverse a decision of an Immigration Judge, other than a reversal under 8 C.F.R. § 1003.1(e)(5); 8 C.F.R. § 1003.1(e)(6)(iii), (v)–(vi).

## ISSUES PRESENTED

1. Did the immigration judge erroneously order the respondent released on bond in the amount of $20,000, where the respondent failed to meet her burden of establishing that she is not a danger to the community, when the respondent disregarded police orders to disperse from a protest and when she is sending payments to unknown individuals in Palestine?

---

[1] As noted on Form EOIR-26 at question 8, DHS will not be filing a brief in this case.  Thus, this Notice of Appeal includes the entirety of DHS's arguments on appeal.

1

A██████

2. Did the immigration judge erroneously order the respondent released on bond in the amount of $20,000 where the respondent failed to meet her burden of establishing that she does not pose a flight risk despite intentionally evading detection by DHS, failing to provide any financial information, and remaining out of legal status for over 3 years?

## STANDARD OF REVIEW

The Board reviews an immigration judge's findings of fact, which includes predictive findings of what may or may not occur in the future, under a clearly erroneous standard of review. 8 C.F.R. § 1003.1(d)(3)(i); *Matter of Z-Z-O-*, 26 I&N Dec. 586, 587–90 (BIA 2015). Inferences from direct and circumstantial evidence are also reviewed for clear error. The Board reviews all questions of law, discretion, judgment, and all other issues on appeal de novo. 8 C.F.R. § 1003.1(d)(3)(ii)).

The issue of whether the respondent is a danger to the community is a predictive finding of fact that the Board reviews for clear error. *See Jurek v. Texas*, 428 U.S. 262, 275 (1976). While the issue of whether the respondent poses a flight risk is also a predictive finding of fact that the Board reviews for clear error, the factors that the immigration judge considers in setting a bond amount for risk of flight are discretionary and thus reviewed de novo. *See Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (stating that an immigration judge has broad discretion in deciding the factors that he may consider in custody redeterminations); *Matter of R-A-V-P-*, 27 I&N Dec. 803, 805 (BIA 2020) (citing *Guerra*, 24 I&N Dec. at 40)).

## SUMMARY OF THE ARGUMENT

The immigration judge erroneously granted the respondent's request for a change in custody status and set bond in the amount of $20,000 after finding that she met her burden in demonstrating that she is not a danger to the community under INA § 236(a). Specifically, the immigration judge found that the respondent did not pose a danger to the community after being arrested for disorderly conduct at a protest near Columbia University after disregarding the police

2                                           A███████

officers' orders to disperse. Moreover, the immigration judge found that the respondent did not pose a danger to the community despite having sent numerous large payments to individuals in Palestine and Jordan while not having work authorization or any proof of income. Assuming *arguendo* that the respondent demonstrated she was not a danger to the community, the immigration judge erred in finding that the respondent established she is not a flight risk. Here, the immigration judge found that the respondent's family ties to the United States and potential relief outweighed the fact that she initially hid from and evaded detection from Homeland Security Investigations (HSI), and failed to provide any evidence of a financial sponsor or her and her family's financial resources. As such, the Board should reverse the immigration judge's finding that the respondent met her burden establishing she is not a danger to the community and does not pose a risk of flight, and order that the respondent be held without bond.

## STATEMENT OF FACTS

The respondent, a stateless native and citizen, last entered the United States as a B2 nonimmigrant visitor on March 19, 2016. Exh. 1. The respondent adjusted her status to an F-1 nonimmigrant on or about January 23, 2017. *Id.* On or about June 5, 2017, the respondent's United States citizen mother submitted a Form I-130, Petition for Alien Relative, on the respondent's behalf. *Id.* The petition was approved but a visa is not yet available for the respondent to adjust status. *Id.* On or about March 18, 2021, the respondent's F-1 visa was terminated in the Student & Exchange Visitor Information System (SEVIS) for failure to maintain her student status. *Id.* The respondent's F-1 visa was reinstated on or about May 5, 2021; however, it was again terminated in SEVIS on or about January 26, 2022, for failure to maintain her student status. *Id.* The respondent has no lawful status in the United States and has been unlawfully present in the United States since approximately January 26, 2022. *Id.* On or about March 15, 2025, DHS issued the

Petitioner's Appendix 123

respondent a Notice to Appear (NTA) charging her as removable from the United States under INA § 237(a)(1)(C)(i) for failure to maintain her F-1 status. *Id.* On April 3, 2025, the immigration judge granted the respondent's release from custody under a bond of $20,000. The immigration judge did not issue a written decision. The DHS argued that the respondent is a danger to the community given her arrest on April 30, 2024, at a protest that involved "yelling/blocking location and not following orders of police officers." Exh. 3 at 45. The DHS argued that this conduct shows a disregard for law enforcement authority and the laws of this country. The DHS also argued that the evidence shows the respondent is sending large amounts of money to individuals in the Palestinian Authority and Jordan, but she does not have work authorization and provided no evidence of the source of these funds. Moreover, the evidence shows that the respondent's landlord and possible employer is a Hamas sympathizer. The respondent claimed that the money was sent to her family, specifically her aunt, and she was doing her mom a favor by going and sending the money on her behalf.

The immigration judge found that the DHS evidence only shows at most two transactions that the respondent sent over the past few years. The immigration judge found that based on the record, mainly the HSI investigation reports submitted by DHS, she does not believe that there is sufficient evidence to show that the respondent poses a danger to the United States. The immigration judge found that the DHS cannot make connections to show the respondent is giving material support to a terrorist organization without more evidence of who received the money.

With respect to flight risk, the immigration judge found that the respondent has extensive family ties, support in this country, and potential relief in this country if a visa becomes available through her approved Form I-130 Petition. The respondent also filed an I-589, Application for Asylum and for Withholding of Removal. The DHS argued that the respondent did not submit

4    A███████

evidence of an immigration sponsor or any evidence of financial stability from anyone in the respondent's family. Moreover, the respondent has been working unlawfully in the United States and has been unlawfully present in the United States since January 26, 2022. Additionally, the respondent has not tried to gain lawful status since that time, until being detained by DHS. The respondent also refused to voluntarily meet with HSI agents, and it took her approximately one week to surrender herself to authorities. The evidence shows that the respondent was hiding from immigration officials and intentionally evading detection.

The immigration judge found that a bond of $20,000 is an appropriate amount to mitigate the flight risk and ensure that the respondent appears for future hearings, and it would also be a little sacrifice to the family if she does not show up and bond forfeited.

## ARGUMENT

**1. THE IMMIGRATION JUDGE ERRED WHEN SHE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE IS NOT A DANGER TO THE COMMUNITY.**

An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a danger to persons or property. *Matter of Siniauskas*, 27 I&N Dec. 207 (BIA 2018). To evaluate whether an alien has met this burden, the immigration judge must consider whether he or she poses a threat to national security, a danger to the community at large, is likely to abscond, or is otherwise a poor bail risk. *Guerra*, 24 I&N Dec. at 40.

The question of whether an alien is a danger to the community is broader than determining if the record contains evidence of past violence or direct evidence of an inclination toward violence. *Matter of Fatahi*, 26 I&N Dec. 791, 795 (BIA 2016). An immigration judge should consider any evidence in the record that is probative and specific when determining whether an alien is a danger to the community. *Guerra*, 24 I&N Dec. at 41. This includes the "specific

Petitioner's Appendix 125

circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208. The immigration judge should also consider:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal history, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*Guerra*, 24 I&N Dec. at 40.

An immigration judge may not disregard or ignore relevant and material evidence when determining whether an alien is a danger to the community. *See generally* 8 C.F.R. § 1240.1(c) (requiring the immigration judge to receive and consider material and relevant evidence in removal proceedings); *see also Matter of Herrera Del Orden*, 25 I&N Dec. 589, 593–94 (BIA 2011) (instructing that an immigration judge should consider any relevant and probative evidence in a removal proceeding). If an alien cannot demonstrate that he or she is not a danger to the community, no bond should be set. *Fatahi*, 26 I&N Dec. at 793–94; *see also Urena*, 25 I&N Dec. at 141 ("An Immigration Judge should only set a bond if he first determines that the alien does not present a danger to the community.").

Here, the respondent has failed to establish that she is not a danger to the community. Evidence submitted by the DHS shows that between January 2021 to January 2025, the respondent made numerous transactions sending funds to individuals located in the Palestinian Authority and Jordan, some as large as $2,000. Exh. 3 at 4. The source and recipients of the funds remain under investigation by the DHS. The DHS evidence also shows that the respondent's landlord and

6

A█████████

possible employer is a Hamas sympathizer. Exh. 3 at 14, 16. Moreover, there has been no evidence presented in the instant matter, other than a statement from the claimant's attorney claiming that the money was sent to relatives, to negate or diminish any of the information contained in HSI's reports submitted to the court.

Moreover, the DHS evidence further shows that New York Police Department (NYPD) officers apprehended the respondent on April 30, 2024. Exh. 3 at 43–45. The incident record shows she was apprehended because she was "blocking a gate . . . preventing anyone from entering & exiting" and that she "failed to comply" with police commands to disperse. Exh. 3 at 45.

As the respondent has not met her burden in establishing that she is not a danger to the community, the immigration judge erred in ordering the respondent released on bond in the amount of $20,000.

**2. THE IMMIGRATION JUDGE ERRED WHEN SHE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE DOES NOT POSE A FLIGHT RISK.**

Even assuming, *arguendo*, that the respondent met her burden to establish that she is not a danger to the community, the immigration judge nonetheless erred in granting her request for a change in custody status and setting bond in the amount of $20,000 because the respondent failed to show she is not a flight risk.  Only if an alien demonstrates that he or she is not a danger to the community should an immigration judge then determine the extent of flight risk posed by the alien. *Urena*, 25 I&N Dec. at 141 (citing *Matter of Drysdale*, 20 I&N Dec. 815, 817–18 (BIA 1994)). An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a risk of flight and is likely to attend future immigration proceedings.  *R-A-V-P-*, 27 I&N Dec. at 804 (citing *Siniauskas*, 27 I&N Dec. at 207); 8 C.F.R. § 1236.1(c)(8)).   In determining whether an alien is a flight risk, the immigration judge may consider "any 'probative

7

A▮▮▮▮▮▮

and specific' evidence." *Id.* (citing *Guerra*, 24 I&N Dec. at 40-41). Similar to a dangerousness determination, this includes considering the "specific circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208; *see also Guerra*, 24 I&N Dec. at 40. An immigration judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations. *Guerra,* 24 I&N Dec. at 40. An immigration judge may decide to give greater weight to one factor over others, but the decision must be reasonable. *Id.*

Here, the respondent has failed to establish that she does not pose a flight risk because she intentionally evaded detection by DHS. On March 6, 2025, a special agent with HSI contacted the respondent and told her that they needed to speak with her about her immigration status. Exh. 3 at 6. The respondent told the agent that she would meet him in the next 30 minutes, but she did not arrive. Exh. 3 at 6. The respondent's refusal to meet with HSI required an extensive investigation into her whereabouts. Exh. 3 at 6–21. *See Guerra*, 24 I&N Dec. at 40 (holding attempts by the alien to flee prosecution or otherwise escape from authorities is a relevant factor to find a flight risk). On March 13, 2025, the respondent finally self-surrendered to HSI. The DHS evidence indicates that the respondent was intentionally evading HSI agents and actively concealed here whereabouts to avoid detection and apprehension for her immigration violations. Exh. 3 at 6–24.

Moreover, the respondent has failed to provide evidence demonstrating that a financial sponsor in the United States will ensure she appears at all future proceedings. As noted by the immigration judge, there is no information about what the respondent, her mother, or her uncle, who claims to have the money for her bond, do for work and how they support themselves. As such, the immigration judge did not have sufficient information to assess an appropriate bond

amount to ensure that the respondent would show up for future proceedings and that it would be a disincentive to the family if she were to not show up to future proceedings.

Additionally, the respondent has provided no proof of any legal work history in the United States and has repeatedly violated the United States' immigration laws by falling out of her student visa status and continuing to reside in the United States without any legal status for over three years. *Guerra*, 24 I&N Dec. at 40 (holding alien's history of immigration violations and employment history are relevant factors for bond proceedings). As the respondent has not met her burden in establishing that she does not pose a flight risk, the immigration judge erred in ordering the respondent released on bond in the amount of $20,000.

## CONCLUSION

The immigration judge erroneously granted the respondent's request for a change in custody status by setting bond in the amount of $20,000, because the respondent failed to meet her burden of establishing that she is not a danger to the community and does not pose a flight risk. The DHS therefore requests that the Board reverse the immigration judge's order granting the respondent's request for a change in custody status.

Respectfully submitted on April 15, 2025,

**ANASTASIA S NORCROSS**  Digitally signed by ANASTASIA S NORCROSS Date: 2025.04.15 09:23:05 -05'00'

Stacy Norcross
Assistant Chief Counsel
Mary Jane Zamarripa
Deputy Chief Counsel
Jo Ann McLane
Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

9



A

## EOIR-43 Senior Legal Official Certification

I certify that I have approved the filing of the notice of appeal in this case according to review procedures established by U.S. Immigration & Customs Enforcement of the Department of Homeland Security.

I further certify that I am satisfied that the evidentiary record supports the contentions justifying the continued detention of the alien and the legal arguments are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing precedent or the establishment of new precedent. Further, the legal arguments, as specifically warranted above, may be premised on the alien being subject to mandatory detention pursuant to 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c).

April 14, 2025
Date

EMILY B SWANSON
Digitally signed by
EMILY B SWANSON
Date: 2025.04.14
15:38:27 -05'00'

Emily B. Swanson
Acting Chief Counsel, OPLA San Antonio
U.S. Immigration & Customs Enforcement

# EXHIBIT 5

Jo Ann McLane                                                              **DETAINED**
Chief Counsel
Emily Swanson
Deputy Chief Counsel
Carlos A. Rodriguez Jr
Assistant Chief Counsel
U.S. Department of Homeland Security
U.S. Immigration & Customs Enforcement
Office of the Principal Legal Advisor
1015 Jackson-Keller Road, Suite 100
San Antonio, Texas 78213

**UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS**

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| KORDIA, Leqaa | ) |
| | ) |
| In bond proceedings | ) |

File No.: ▉▉▉▉▉▉▉

**DEPARTMENT OF HOMELAND SECURITY
EMERGENCY DISCRETIONARY STAY MOTION IN EOIR-43 CASE**

Petitioner's Appendix 132

## INTRODUCTION

Pursuant to 8 C.F.R. § 1003.19(i)(1), the Department of Homeland Security (DHS) respectfully requests that the Board of Immigration Appeals (Board) issue, on an emergency basis, a discretionary stay of the Immigration Judge's April 3, 2025, order granting the respondent bond in the amount of $20,000. This case involves an EOIR-43 Automatic Stay, which expires on July 2, 2025. *See* 8 CFR 1003.19(i)(2). DHS requests the instant discretionary stay, pursuant to 8 C.F.R. § 1003.6(c)(5).. A Notice of Appeal of the immigration judge's bond decision was previously filed and accepted by the Board on April 15, 2025. A briefing schedule was issued on April 17, 2025, and a decision from the Board remains pending.

The Immigration Judge erred in ordering the respondent released on bond and setting bond at $20,000 because the respondent failed to meet her burden of establishing she is not a danger to persons or property and that she is not a danger to the community. The Immigration Judge further erred in finding that the respondent does not pose a flight risk. The DHS respectfully requests that the Board reverse the Immigration Judge's order granting the respondent's request for a change in custody status.

## STANDARD OF REVIEW

The Board has the authority to stay an Immigration Judge's order redetermining custody when DHS appeals the custody decision or on its own motion. 8 C.F.R. § 1003.19(i)(1). DHS may seek a discretionary stay (whether or not on an emergency basis) from the Board in connection with such an appeal at any time. *Id*. The Board reviews an immigration judge's findings of fact, which includes predictive findings of what may or may not occur in the future, under a clearly erroneous standard of review. 8 C.F.R. § 1003.1(d)(3)(i); *Matter of Z-Z-O-*, 26 I&N Dec. 586, 587–90 (BIA 2015). Inferences from direct and circumstantial evidence are also reviewed for

Petitioner's Appendix 133

clear error. The Board reviews all questions of law, discretion, judgment, and all other issues on appeal de novo. 8 C.F.R. § 1003.1(d)(3)(ii)).

The issue of whether the respondent is a danger to the community is a predictive finding of fact that the Board reviews for clear error. *See Jurek v. Texas*, 428 U.S. 262, 275 (1976). While the issue of whether the respondent poses a flight risk is also a predictive finding of fact that the Board reviews for clear error, the factors that the Immigration Judge considers in setting a bond amount for risk of flight are discretionary and thus reviewed de novo. *See Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (stating that an immigration judge has broad discretion in deciding the factors that he may consider in custody redeterminations); *Matter of R-A-V-P-*, 27 I&N Dec. 803, 805 (BIA 2020) (citing *Guerra*, 24 I&N Dec. at 40)).

## SUMMARY OF THE ARGUMENT

The Immigration Judge erroneously granted the respondent's request for a change in custody status and set bond in the amount of $20,000 after finding that she met her burden in demonstrating that she is not a danger to the community under INA § 236(a). Specifically, the Immigration Judge found that the respondent did not pose a danger to the community after being arrested for disorderly conduct at a protest near Columbia University after disregarding the police officers' orders to disperse. Moreover, the Immigration Judge found that the respondent did not pose a danger to the community despite having sent numerous large payments to individuals in Palestine and Jordan while not having work authorization or any proof of income. Assuming *arguendo* that the respondent demonstrated she was not a danger to the community, the Immigration Judge erred in finding that the respondent established she is not a flight risk. Here, the Immigration Judge found that the respondent's family ties to the United States and potential relief outweighed the fact that she initially hid from and evaded detection from Homeland Security

2

Petitioner's Appendix 134

Investigations (HSI), and failed to provide any evidence of a financial sponsor or her and her family's financial resources. As such, the Board should reverse the Immigration Judge's finding that the respondent met her burden establishing she is not a danger to the community and does not pose a risk of flight, and order that the respondent be held without bond.

## STATEMENT OF FACTS

The respondent, a stateless native and citizen, last entered the United States as a B2 nonimmigrant visitor on March 19, 2016. Exh. 1. The respondent adjusted her status to an F-1 nonimmigrant on or about January 23, 2017. *Id.* On or about June 5, 2017, the respondent's United States citizen mother submitted a Form I-130, Petition for Alien Relative, on the respondent's behalf. *Id.* The petition was approved but a visa is not yet available for the respondent to adjust status. *Id.* On or about March 18, 2021, the respondent's F-1 visa was terminated in the Student & Exchange Visitor Information System (SEVIS) for failure to maintain her student status. *Id.* The respondent's F-1 visa was reinstated on or about May 5, 2021; however, it was again terminated in SEVIS on or about January 26, 2022, for failure to maintain her student status. *Id.* The respondent has no lawful status in the United States and has been unlawfully present in the United States since approximately January 26, 2022. *Id.* On or about March 15, 2025, DHS issued the respondent a Notice to Appear (NTA) charging her as removable from the United States under INA § 237(a)(1)(C)(i) for failure to maintain her F-1 status. *Id.* On April 3, 2025, the immigration judge granted the respondent's release from custody under a bond of $20,000. The immigration judge did not issue a written decision. The DHS argued that the respondent is a danger to the community given her arrest on April 30, 2024, at a protest that involved "yelling/blocking location and not following orders of police officers." Exh. 3 at 45. The DHS argued that this conduct shows a disregard for law enforcement authority and the laws of this country. The DHS also argued that

EOIR – 4 of 35

the evidence shows the respondent is sending large amounts of money to individuals in the Palestinian Authority and Jordan, but she does not have work authorization and provided no evidence of the source of these funds. Moreover, the evidence shows that the respondent's landlord and possible employer is a Hamas sympathizer. The respondent claimed that the money was sent to her family, specifically her aunt, and she was doing her mom a favor by going and sending the money on her behalf.

The immigration judge found that the DHS evidence only shows at most two transactions that the respondent sent over the past few years. The immigration judge found that based on the record, mainly the HSI investigation reports submitted by DHS, she does not believe that there is sufficient evidence to show that the respondent poses a danger to the United States. The immigration judge found that the DHS cannot make connections to show the respondent is giving material support to a terrorist organization without more evidence of who received the money.

With respect to flight risk, the immigration judge found that the respondent has extensive family ties, support in this country, and potential relief in this country if a visa becomes available through her approved Form I-130 Petition. The respondent also filed an I-589, Application for Asylum and for Withholding of Removal. The DHS argued that the respondent did not submit evidence of an immigration sponsor or any evidence of financial stability from anyone in the respondent's family. Moreover, the respondent has been working unlawfully in the United States and has been unlawfully present in the United States since January 26, 2022. Additionally, the respondent has not tried to gain lawful status since that time, until being detained by DHS. The respondent also refused to voluntarily meet with HSI agents, and it took her approximately one week to surrender herself to authorities. The evidence shows that the respondent was hiding from immigration officials and intentionally evading detection.

EOIR – 5 of 35

The immigration judge found that a bond of $20,000 is an appropriate amount to mitigate the flight risk and ensure that the respondent appears for future hearings, and it would also be a little sacrifice to the family if she does not show up and bond forfeited.

**ARGUMENT**

**1.  THE IMMIGRATION JUDGE ERRED WHEN HE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE IS NOT A DANGER TO THE COMMUNITY.**

An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a danger to persons or property. *Matter of Siniauskas*, 27 I&N Dec. 207 (BIA 2018).  To evaluate whether an alien has met this burden, the Immigration Judge must consider whether he or she poses a threat to national security, a danger to the community at large, is likely to abscond, or is otherwise a poor bail risk. *Guerra*, 24 I&N Dec. at 40.

The question of whether an alien is a danger to the community is broader than determining if the record contains evidence of past violence or direct evidence of an inclination toward violence. *Matter of Fatahi*, 26 I&N Dec. 791, 795 (BIA 2016).  An Immigration Judge should consider any evidence in the record that is probative and specific when determining whether an alien is a danger to the community.  *Guerra*, 24 I&N Dec. at 41.  This includes the "specific circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208.  The Immigration Judge should also consider:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal history, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee

5

Petitioner's Appendix 137

prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*Guerra*, 24 I&N Dec. at 40.

An Immigration Judge may not disregard or ignore relevant and material evidence when determining whether an alien is a danger to the community. *See generally* 8 C.F.R. § 1240.1(c) (requiring the Immigration Judge to receive and consider material and relevant evidence in removal proceedings); *see also Matter of Herrera Del Orden*, 25 I&N Dec. 589, 593–94 (BIA 2011) (instructing that an Immigration Judge should consider any relevant and probative evidence in a removal proceeding). If an alien cannot demonstrate that he or she is not a danger to the community, no bond should be set. *Fatahi*, 26 I&N Dec. at 793–94; *see also Urena*, 25 I&N Dec. at 141 ("An Immigration Judge should only set a bond if he first determines that the alien does not present a danger to the community.").

Here, the respondent has failed to establish that she is not a danger to the community. Evidence submitted by the DHS shows that between January 2021 to January 2025, the respondent made numerous transactions sending funds to individuals located in the Palestinian Authority and Jordan, some as large as $2,000. Exh. 3 at 4. The source and recipients of the funds remain under investigation by the DHS. The DHS evidence also shows that the respondent's landlord and possible employer is a Hamas sympathizer. Exh. 3 at 14, 16. Moreover, there has been no evidence presented in the instant matter, other than a statement from the claimant's attorney claiming that the money was sent to relatives, to negate or diminish any of the information contained in HSI's reports submitted to the court.

Moreover, the DHS evidence further shows that New York Police Department (NYPD) officers apprehended the respondent on April 30, 2024. Exh. 3 at 43–45. The incident record shows

Petitioner's Appendix 138

she was apprehended because she was "blocking a gate . . . preventing anyone from entering & exiting" and that she "failed to comply" with police commands to disperse. Exh. 3 at 45.

As the respondent has not met her burden in establishing that she is not a danger to the community, the Immigration Judge erred in ordering the respondent released on bond in the amount of $20,000.

**2. THE IMMIGRATION JUDGE ERRED WHEN HE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE DOES NOT POSE A FLIGHT RISK.**

Even assuming, *arguendo*, that the respondent met her burden to establish that she is not a danger to the community, the Immigration Judge nonetheless erred in granting her request for a change in custody status and setting bond in the amount of $20,000 because the respondent failed to show she is not a flight risk. Only if an alien demonstrates that he or she is not a danger to the community should an immigration judge then determine the extent of flight risk posed by the alien. *Urena*, 25 I&N Dec. at 141 (citing *Matter of Drysdale*, 20 I&N Dec. 815, 817–18 (BIA 1994)). An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a risk of flight and is likely to attend future immigration proceedings. *R-A-V-P-*, 27 I&N Dec. at 804 (citing *Siniauskas*, 27 I&N Dec. at 207); 8 C.F.R. § 1236.1(c)(8)). In determining whether an alien is a flight risk, the Immigration Judge may consider "any 'probative and specific' evidence." *Id.* (citing *Guerra*, 24 I&N Dec. at 40-41). Similar to a dangerousness determination, this includes considering the "specific circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208; *see also Guerra*, 24 I&N Dec. at 40. An Immigration Judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations. *Guerra,*

EOIR – 8 of 35

Petitioner's Appendix 139

24 I&N Dec. at 40.  An Immigration Judge may decide to give greater weight to one factor over others, but the decision must be reasonable.  *Id.*

Here, the respondent has failed to establish that she does not pose a flight risk because she intentionally evaded detection by DHS. On March 6, 2025, a special agent with HSI contacted the respondent and told her that they needed to speak with her about her immigration status. Exh. 3 at 6. The respondent told the agent that she would meet him in the next 30 minutes, but she did not arrive. Exh. 3 at 6. The respondent's refusal to meet with HSI required an extensive investigation into her whereabouts. Exh. 3 at 6–21. *See Guerra*, 24 I&N Dec. at 40 (holding attempts by the alien to flee prosecution or otherwise escape from authorities is a relevant factor to find a flight risk). On March 13, 2025, the respondent finally self-surrendered to HSI. The DHS evidence indicates that the respondent was intentionally evading HSI agents and actively concealed her whereabouts to avoid detection and apprehension for her immigration violations. Exh. 3 at 6–24.

Moreover, the respondent has failed to provide evidence demonstrating that a financial sponsor in the United States will ensure she appears at all future proceedings. As noted by the immigration judge, there is no information about what the respondent, her mother, or her uncle, who claims to have the money for her bond, do for work and how they support themselves. As such, the Immigration Judge did not have sufficient information to assess an appropriate bond amount to ensure that the respondent would show up for future proceedings and that it would be a disincentive to the family if she were to not show up to future proceedings.

Additionally, the respondent has provided no proof of any legal work history in the United States and has repeatedly violated the United States' immigration laws by falling out of her student visa status and continuing to reside in the United States without any legal status for over three

EOIR – 9 of 35

Petitioner's Appendix 140

years. *Guerra*, 24 I&N Dec. at 40 (holding alien's history of immigration violations and employment history are relevant factors for bond proceedings). As the respondent has not met her burden in establishing that she does not pose a flight risk, the Immigration Judge erred in ordering the respondent released on bond in the amount of $20,000.

The Department of Homeland Security ("DHS"), by and through its Assistant Chief Counsel, attaches the following documents in support of the present Discretionary Stay Motion in EOIR-43 Case.

## TABLE OF CONTENTS

| TAB | Document |
|-----|----------|
| A | Form EOIR-26, Notice of Appeal |
| C | Immigration Judge Decision June 28, 2025 |
| D | Form I-862, Notice to Appear |

## CONCLUSION

The Immigration Judge erroneously granted the respondent's request for a change in custody status by setting bond in the amount of $20,000, because the respondent failed to meet her burden of establishing that she is not a danger to the community and does not pose a flight risk. Based on the foregoing facts, DHS respectfully requests that the Board, on an emergency basis, issue a discretionary stay of the Immigration Judge's April 3, 2025, order granting the respondent bond.

Respectfully submitted on the 2nd day of July, 2025.

CARLOS A
RODRIGUEZ JR

Digitally signed by CARLOS A
RODRIGUEZ JR
Date: 2025.07.02 16:14:11
-05'00'

Carlos A Rodriguez Jr
Assistant Chief Counsel

9

EOIR – 10 of 35

David Wallen
Deputy Chief Counsel
Jo Ann McLane
Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Petitioner's Appendix 142

# TAB A

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB# 1125-0002

**Notice of Appeal from a Decision of an
Immigration Judge**

---

<table>
<tr>
<td>1.</td>
<td>List Name(s) and "A" Number(s) of all Respondent(s)/Applicant(s):<br><br>Kordia, Leqaa ███████</td>
<td>For Official Use Only</td>
</tr>
</table>

*(left margin, rotated)* Staple Check or Money Order Here. Include Name(s) and "A" Number(s) on the face of the check or money order.

**!  WARNING:** Names and "A" Numbers of **everyone** appealing the Immigration Judge's decision must be written in item #1. The names and "A" numbers listed will be the only ones considered to be the subjects of the appeal.

2. I am ☐ the Respondent/Applicant    ☒ DHS-ICE *(Mark only one box.)*

3. I am ☒ DETAINED    ☐ NOT DETAINED *(Mark only one box.)*

4. My last hearing was at  Prairieland Detention Center, Alvarado, TX _____ *(Location, City, State)*

---

5. **What decision are you appealing?**

<u>Mark only one box below.</u> *If you want to appeal more than one decision, you must use more than one Notice of Appeal (Form EOIR-26).*

☐ I am filing an appeal from the Immigration Judge's decision *in **merits** proceedings* (example: removal, deportation, exclusion, asylum, etc.) dated_____.

☒ I am filing an appeal from the Immigration Judge's decision *in **bond** proceedings* dated
 April 3, 2025 _____ . (For DHS use only: Did DHS invoke the automatic stay provision before the Immigration Court? ☒ Yes. ☐ No.)

☐ I am filing an appeal from the Immigration Judge's decision ***denying a motion to reopen or a motion to reconsider*** dated_____.

*(Please attach a copy of the Immigration Judge's decision that you are appealing.)*

---

*(left margin)* EOIR – 13o6f135

Form EOIR-26
Rev. Nov. 2022
Exp. Jan. 2026

**6.** **State in detail the reason(s) for this appeal. Please refer to the General Instructions at item F for further guidance. You are not limited to the space provided below; use more sheets of paper if necessary. Write your name(s) and "A" number(s) on every sheet.**

See attached.

*(Attach additional sheets if necessary)*

> **!** **WARNING:** You must clearly explain the specific facts and law on which you base your appeal of the Immigration Judge's decision. The Board may summarily dismiss your appeal if it cannot tell from this Notice of Appeal, or any statements attached to this Notice of Appeal, why you are appealing.

**7.** Do you desire oral argument before the Board of Immigration Appeals?  ☐ Yes  ☒ No

**8.** Do you intend to file a separate written brief or statement after filing this Notice of Appeal?  ☐ Yes  ☒ No

**9.** If you are unrepresented, do you give consent to the BIA Pro Bono Project to have your case screened by the Project for potential placement with a free attorney or accredited representative, which may include sharing a summary of your case with potential attorneys and accredited representatives? *(There is no guarantee that your case will be accepted for placement or that an attorney or accredited representative will accept your case for representation)*  ☐ Yes  ☒ No

> **!** **WARNING:** If you mark "Yes" in item #7, you should also include in your statement above why you believe your case warrants review by a three-member panel. The Board ordinarily will not grant a request for oral argument unless you also file a brief.
>
> If you mark "Yes" in item #8, you will be expected to file a written brief or statement after you receive a briefing schedule from the Board. The Board may summarily dismiss your appeal if you do not file a brief or statement within the time set in the briefing schedule.

**10.** **Print Name:**    Anastasia Norcross

**11.** **Sign Here:** ▶    X  ANASTASIA S NORCROSS    Digitally signed by ANASTASIA S NORCROSS
Date: 2025.04.15 09:26:01 -05'00'    **4/15/2025**

Signature of Person Appealing    Date
*(or attorney or representative)*

EOIR – 24o6f135

**12.**

| Mailing Address of Respondent(s)/Applicant(s) | Mailing Address of Attorney or Representative for the Respondent(s)/Applicant(s) |
|---|---|
| Leqaa Kordia | Muhammad Omar Chaudhry |
| (Name) | (Name) |
| ▇▇▇▇▇▇▇▇▇. | 55-21 69th St. |
| (Street Address) | (Street Address) |
| | 2nd Floor |
| (Apartment or Room Number) | (Suite or Room Number) |
| ▇▇▇▇▇▇▇ | Maspeth, NY 11378 |
| (City, State, Zip Code) | (City, State, Zip Code) |
| | |
| (Telephone Number) | (Telephone Number) |

**NOTE:** You must notify the Board within five (5) working days if you move to a new address or change your telephone number. You must use the Change of Address Form/Board of Immigration Appeals (Form EOIR-33/BIA).

**NOTE:** If an attorney or representative signs this appeal for you, he or she must file *with this appeal*, a Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals (Form EOIR-27).

**13.**

### PROOF OF SERVICE (You Must Complete This)

I Anastasia Norcross _____ mailed or delivered a copy of this Notice of Appeal
_____(Name)_____

on _____ to _____
_____(Date)_____         _____(Opposing Party)_____

at _____
_____(Number and Street, City, State, Zip Code)_____

[X] No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

| SIGN HERE ➤ | X ANASTASIA S NORCROSS | Digitally signed by ANASTASIA S NORCROSS. Date: 2025.04.15 09:26:29 -05'00' |
|---|---|---|
| | Signature | |

**NOTE:** If you are the Respondent or Applicant, the "Opposing Party" is the Assistant Chief Counsel of DHS - ICE.

**WARNING:** If you do not complete this section properly, your appeal will be rejected or dismissed.

**WARNING:** If you do not attach the fee payment receipt, fee, or a completed Fee Waiver Request (Form EOIR-26A) to this appeal, your appeal may be rejected or dismissed.

### HAVE YOU?

☐ Read all of the General Instructions.
☐ Provided all of the requested information.
☐ Completed this form in English.
☐ Provided a certified English translation for all non-English attachments.
☐ Signed the form.

☐ Served a copy of this form and all attachments on the opposing party, if applicable.
☐ Completed and signed the Proof of Service
☐ Attached the required fee payment receipt, fee, or Fee Waiver Request.
☐ If represented by attorney or representative, attach a completed and signed EOIR-27 for each respondent or applicant.

Petitioner's Appendix 146    Form EOIR-26
Rev. Nov. 2022
Exp. Jan. 2026

EOIR – 15o6f135

## INTRODUCTION

The U.S. Department of Homeland Security (DHS) respectfully submits this Notice of Appeal in lieu of a brief from the immigration judge's April 3, 2025, decision granting the respondent's request for a change in custody status and setting bond in the amount of $20,000 pursuant to Section 236(a) of the Immigration and Nationality Act (INA)..[1] The immigration judge erred in ordering the respondent released on bond and setting bond at $20,000 because the respondent failed to meet her burden of establishing she is not a danger to persons or property and that she is not a danger to the community. The immigration judge further erred in finding that the respondent does not pose a flight risk. The DHS respectfully requests that the Board of Immigration Appeals (Board) reverse the immigration judge's order granting the respondent's request for a change in custody status.

DHS further requests that this case be adjudicated by a three-member panel. The instant appeal meets the criteria for three-member panel review because the facts and circumstances of this case present: (1) the need to review a decision by an Immigration Judge that is not in conformity with the law or with applicable precedents; and (2) the need to reverse a decision of an Immigration Judge, other than a reversal under 8 C.F.R. § 1003.1(e)(5); 8 C.F.R. § 1003.1(e)(6)(iii), (v)–(vi).

### ISSUES PRESENTED

1. Did the immigration judge erroneously order the respondent released on bond in the amount of $20,000, where the respondent failed to meet her burden of establishing that she is not a danger to the community, when the respondent disregarded police orders to disperse from a protest and when she is sending payments to unknown individuals in Palestine?

---

[1] As noted on Form EOIR-26 at question 8, DHS will not be filing a brief in this case. Thus, this Notice of Appeal includes the entirety of DHS's arguments on appeal.

1

2. Did the immigration judge erroneously order the respondent released on bond in the amount of $20,000 where the respondent failed to meet her burden of establishing that she does not pose a flight risk despite intentionally evading detection by DHS, failing to provide any financial information, and remaining out of legal status for over 3 years?

## STANDARD OF REVIEW

The Board reviews an immigration judge's findings of fact, which includes predictive findings of what may or may not occur in the future, under a clearly erroneous standard of review. 8 C.F.R. § 1003.1(d)(3)(i); *Matter of Z-Z-O-*, 26 I&N Dec. 586, 587–90 (BIA 2015). Inferences from direct and circumstantial evidence are also reviewed for clear error. The Board reviews all questions of law, discretion, judgment, and all other issues on appeal de novo. 8 C.F.R. § 1003.1(d)(3)(ii)).

The issue of whether the respondent is a danger to the community is a predictive finding of fact that the Board reviews for clear error. *See Jurek v. Texas*, 428 U.S. 262, 275 (1976). While the issue of whether the respondent poses a flight risk is also a predictive finding of fact that the Board reviews for clear error, the factors that the immigration judge considers in setting a bond amount for risk of flight are discretionary and thus reviewed de novo. *See Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) (stating that an immigration judge has broad discretion in deciding the factors that he may consider in custody redeterminations); *Matter of R-A-V-P-*, 27 I&N Dec. 803, 805 (BIA 2020) (citing *Guerra*, 24 I&N Dec. at 40)).

## SUMMARY OF THE ARGUMENT

The immigration judge erroneously granted the respondent's request for a change in custody status and set bond in the amount of $20,000 after finding that she met her burden in demonstrating that she is not a danger to the community under INA § 236(a). Specifically, the immigration judge found that the respondent did not pose a danger to the community after being arrested for disorderly conduct at a protest near Columbia University after disregarding the police

EOIR — 57o6f135

officers' orders to disperse. Moreover, the immigration judge found that the respondent did not

pose a danger to the community despite having sent numerous large payments to individuals in

Palestine and Jordan while not having work authorization or any proof of income. Assuming

*arguendo* that the respondent demonstrated she was not a danger to the community, the

immigration judge erred in finding that the respondent established she is not a flight risk. Here,

the immigration judge found that the respondent's family ties to the United States and potential

relief outweighed the fact that she initially hid from and evaded detection from Homeland Security

Investigations (HSI), and failed to provide any evidence of a financial sponsor or her and her

family's financial resources. As such, the Board should reverse the immigration judge's finding

that the respondent met her burden establishing she is not a danger to the community and does not

pose a risk of flight, and order that the respondent be held without bond.

## STATEMENT OF FACTS

The respondent, a stateless native and citizen, last entered the United States as a B2

nonimmigrant visitor on March 19, 2016. Exh. 1. The respondent adjusted her status to an F-1

nonimmigrant on or about January 23, 2017. *Id.* On or about June 5, 2017, the respondent's United

States citizen mother submitted a Form I-130, Petition for Alien Relative, on the respondent's

behalf. *Id.* The petition was approved but a visa is not yet available for the respondent to adjust

status. *Id.* On or about March 18, 2021, the respondent's F-1 visa was terminated in the Student &

Exchange Visitor Information System (SEVIS) for failure to maintain her student status. *Id.* The

respondent's F-1 visa was reinstated on or about May 5, 2021; however, it was again terminated

in SEVIS on or about January 26, 2022, for failure to maintain her student status. *Id.* The

respondent has no lawful status in the United States and has been unlawfully present in the United

States since approximately January 26, 2022. *Id.* On or about March 15, 2025, DHS issued the

3

respondent a Notice to Appear (NTA) charging her as removable from the United States under INA § 237(a)(1)(C)(i) for failure to maintain her F-1 status. *Id.* On April 3, 2025, the immigration judge granted the respondent's release from custody under a bond of $20,000. The immigration judge did not issue a written decision. The DHS argued that the respondent is a danger to the community given her arrest on April 30, 2024, at a protest that involved "yelling/blocking location and not following orders of police officers." Exh. 3 at 45. The DHS argued that this conduct shows a disregard for law enforcement authority and the laws of this country. The DHS also argued that the evidence shows the respondent is sending large amounts of money to individuals in the Palestinian Authority and Jordan, but she does not have work authorization and provided no evidence of the source of these funds. Moreover, the evidence shows that the respondent's landlord and possible employer is a Hamas sympathizer. The respondent claimed that the money was sent to her family, specifically her aunt, and she was doing her mom a favor by going and sending the money on her behalf.

The immigration judge found that the DHS evidence only shows at most two transactions that the respondent sent over the past few years. The immigration judge found that based on the record, mainly the HSI investigation reports submitted by DHS, she does not believe that there is sufficient evidence to show that the respondent poses a danger to the United States. The immigration judge found that the DHS cannot make connections to show the respondent is giving material support to a terrorist organization without more evidence of who received the money.

With respect to flight risk, the immigration judge found that the respondent has extensive family ties, support in this country, and potential relief in this country if a visa becomes available through her approved Form I-130 Petition. The respondent also filed an I-589, Application for Asylum and for Withholding of Removal. The DHS argued that the respondent did not submit

4



EOIR — 19c6f135

evidence of an immigration sponsor or any evidence of financial stability from anyone in the respondent's family. Moreover, the respondent has been working unlawfully in the United States and has been unlawfully present in the United States since January 26, 2022. Additionally, the respondent has not tried to gain lawful status since that time, until being detained by DHS. The respondent also refused to voluntarily meet with HSI agents, and it took her approximately one week to surrender herself to authorities. The evidence shows that the respondent was hiding from immigration officials and intentionally evading detection.

The immigration judge found that a bond of $20,000 is an appropriate amount to mitigate the flight risk and ensure that the respondent appears for future hearings, and it would also be a little sacrifice to the family if she does not show up and bond forfeited.

**ARGUMENT**

1. **THE IMMIGRATION JUDGE ERRED WHEN SHE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE IS NOT A DANGER TO THE COMMUNITY.**

An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a danger to persons or property. *Matter of Siniauskas*, 27 I&N Dec. 207 (BIA 2018). To evaluate whether an alien has met this burden, the immigration judge must consider whether he or she poses a threat to national security, a danger to the community at large, is likely to abscond, or is otherwise a poor bail risk. *Guerra*, 24 I&N Dec. at 40.

The question of whether an alien is a danger to the community is broader than determining if the record contains evidence of past violence or direct evidence of an inclination toward violence. *Matter of Fatahi*, 26 I&N Dec. 791, 795 (BIA 2016). An immigration judge should consider any evidence in the record that is probative and specific when determining whether an alien is a danger to the community. *Guerra*, 24 I&N Dec. at 41. This includes the "specific

5

circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208. The immigration judge should also consider:

> (1) whether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal history, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*Guerra*, 24 I&N Dec. at 40.

An immigration judge may not disregard or ignore relevant and material evidence when determining whether an alien is a danger to the community. *See generally* 8 C.F.R. § 1240.1(c) (requiring the immigration judge to receive and consider material and relevant evidence in removal proceedings); *see also Matter of Herrera Del Orden*, 25 I&N Dec. 589, 593–94 (BIA 2011) (instructing that an immigration judge should consider any relevant and probative evidence in a removal proceeding). If an alien cannot demonstrate that he or she is not a danger to the community, no bond should be set. *Fatahi*, 26 I&N Dec. at 793–94; *see also Urena*, 25 I&N Dec. at 141 ("An Immigration Judge should only set a bond if he first determines that the alien does not present a danger to the community.").

Here, the respondent has failed to establish that she is not a danger to the community. Evidence submitted by the DHS shows that between January 2021 to January 2025, the respondent made numerous transactions sending funds to individuals located in the Palestinian Authority and Jordan, some as large as $2,000. Exh. 3 at 4. The source and recipients of the funds remain under investigation by the DHS. The DHS evidence also shows that the respondent's landlord and

possible employer is a Hamas sympathizer. Exh. 3 at 14, 16. Moreover, there has been no evidence presented in the instant matter, other than a statement from the claimant's attorney claiming that the money was sent to relatives, to negate or diminish any of the information contained in HSI's reports submitted to the court.

Moreover, the DHS evidence further shows that New York Police Department (NYPD) officers apprehended the respondent on April 30, 2024. Exh. 3 at 43–45. The incident record shows she was apprehended because she was "blocking a gate . . . preventing anyone from entering & exiting" and that she "failed to comply" with police commands to disperse. Exh. 3 at 45.

As the respondent has not met her burden in establishing that she is not a danger to the community, the immigration judge erred in ordering the respondent released on bond in the amount of $20,000.

**2. THE IMMIGRATION JUDGE ERRED WHEN SHE ORDERED THE RESPONDENT RELEASED ON BOND IN THE AMOUNT OF $20,000, WHERE THE RESPONDENT FAILED TO ESTABLISH THAT SHE DOES NOT POSE A FLIGHT RISK.**

Even assuming, *arguendo*, that the respondent met her burden to establish that she is not a danger to the community, the immigration judge nonetheless erred in granting her request for a change in custody status and setting bond in the amount of $20,000 because the respondent failed to show she is not a flight risk. Only if an alien demonstrates that he or she is not a danger to the community should an immigration judge then determine the extent of flight risk posed by the alien. *Urena*, 25 I&N Dec. at 141 (citing *Matter of Drysdale*, 20 I&N Dec. 815, 817–18 (BIA 1994)). An alien in a custody determination hearing pursuant to INA § 236(a) must establish that he or she does not present a risk of flight and is likely to attend future immigration proceedings. *R-A-V-P-*, 27 I&N Dec. at 804 (citing *Siniauskas*, 27 I&N Dec. at 207); 8 C.F.R. § 1236.1(c)(8)). In determining whether an alien is a flight risk, the immigration judge may consider "any 'probative

and specific' evidence." *Id.* (citing *Guerra*, 24 I&N Dec. at 40-41). Similar to a dangerousness determination, this includes considering the "specific circumstances surrounding the alien's conduct" to determine whether bond is warranted, and if so, the appropriate amount. *Siniauskas*, 27 I&N Dec. at 208; *see also Guerra*, 24 I&N Dec. at 40. An immigration judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations. *Guerra*, 24 I&N Dec. at 40. An immigration judge may decide to give greater weight to one factor over others, but the decision must be reasonable. *Id.*

Here, the respondent has failed to establish that she does not pose a flight risk because she intentionally evaded detection by DHS. On March 6, 2025, a special agent with HSI contacted the respondent and told her that they needed to speak with her about her immigration status. Exh. 3 at 6. The respondent told the agent that she would meet him in the next 30 minutes, but she did not arrive. Exh. 3 at 6. The respondent's refusal to meet with HSI required an extensive investigation into her whereabouts. Exh. 3 at 6–21. *See Guerra*, 24 I&N Dec. at 40 (holding attempts by the alien to flee prosecution or otherwise escape from authorities is a relevant factor to find a flight risk). On March 13, 2025, the respondent finally self-surrendered to HSI. The DHS evidence indicates that the respondent was intentionally evading HSI agents and actively concealed here whereabouts to avoid detection and apprehension for her immigration violations. Exh. 3 at 6–24.

Moreover, the respondent has failed to provide evidence demonstrating that a financial sponsor in the United States will ensure she appears at all future proceedings. As noted by the immigration judge, there is no information about what the respondent, her mother, or her uncle, who claims to have the money for her bond, do for work and how they support themselves. As such, the immigration judge did not have sufficient information to assess an appropriate bond

amount to ensure that the respondent would show up for future proceedings and that it would be a disincentive to the family if she were to not show up to future proceedings.

Additionally, the respondent has provided no proof of any legal work history in the United States and has repeatedly violated the United States' immigration laws by falling out of her student visa status and continuing to reside in the United States without any legal status for over three years. *Guerra*, 24 I&N Dec. at 40 (holding alien's history of immigration violations and employment history are relevant factors for bond proceedings). As the respondent has not met her burden in establishing that she does not pose a flight risk, the immigration judge erred in ordering the respondent released on bond in the amount of $20,000.

**CONCLUSION**

The immigration judge erroneously granted the respondent's request for a change in custody status by setting bond in the amount of $20,000, because the respondent failed to meet her burden of establishing that she is not a danger to the community and does not pose a flight risk. The DHS therefore requests that the Board reverse the immigration judge's order granting the respondent's request for a change in custody status.

Respectfully submitted on April 15, 2025,

ANASTASIA S NORCROSS    Digitally signed by ANASTASIA S NORCROSS
Date: 2025.04.15 09:23:05 -05'00'

Stacy Norcross
Assistant Chief Counsel
Mary Jane Zamarripa
Deputy Chief Counsel
Jo Ann McLane
Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security



EOIR – 21 of 15

## EOIR-43 Senior Legal Official Certification

I certify that I have approved the filing of the notice of appeal in this case according to review procedures established by U.S. Immigration & Customs Enforcement of the Department of Homeland Security.

I further certify that I am satisfied that the evidentiary record supports the contentions justifying the continued detention of the alien and the legal arguments are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing precedent or the establishment of new precedent. Further, the legal arguments, as specifically warranted above, may be premised on the alien being subject to mandatory detention pursuant to 236(c) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c).

April 14, 2025
Date

EMILY B SWANSON

Digitally signed by
EMILY B SWANSON
Date: 2025.04.14
15:38:27 -05'00'

*Emily B. Swanson*
Acting Chief Counsel, OPLA San Antonio
U.S. Immigration & Customs Enforcement

# TAB B

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | IN BOND PROCEEDINGS |
| | ) | |
| **KORDIA, Leqaa** | ) | A ▉▉▉▉▉▉ |
| | ) | |
| RESPONDENT | ) | **DETAINED** |

**ON BEHALF OF RESPONDENT**:
Shauky Michael Musa-Obregon, Esq.
Musa-Obregon Law PC
55-21 69th St., 2nd Fl.
Maspeth, NY 11378

**ON BEHALF OF THE DEPARTMENT**:
Stacy Norcross, Esq.
Assistant Chief Counsel
27991 Buena Vista Blvd.
Los Fresnos, TX 78566

**BOND MEMORANDUM**

Respondent is a thirty-two-year-old female, native and citizen of stateless. Exhibit (Exh.) 1-B, Tab G. The Department placed Respondent in custody following an encounter on March 13, 2025, in Newark, New Jersey. Exh. 3-B at 23. On March 27, 2025, Respondent filed a bond redetermination request. Exh. 1-B. At the bond hearing on April 3, 2025, the Court granted Respondent's request for a change in custody status, setting her bond at $20,000. *See* Order of the Immigration Judge (April 3, 2025). This memorandum provides the basis for the Court's grant of bond.

In a custody determination, the Court should first determine whether an alien poses a danger to the community, and, if not, whether she is likely to appear for future proceedings before the Court. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). The Constitution does not guarantee an alien in removal proceedings a right to release on bond. *Carlson v. Landon*, 342 U.S. 524, 534 (1952). An applicant bears the burden to establish she merits release on bond. *Matter of Guerra*, 24 I&N Dec. at 40; *Matter of Adeniji*, 22 I&N Dec. 1102, 1112 (BIA 1999). When an alien is not subject to mandatory detention, the Court has broad discretion in deciding whether she will be released. *Matter of Guerra*, 24 I&N Dec. at 39; *see also Carlson v. Landon*, 342 U.S. at 540. An alien who poses a danger to persons or property shall not be released during pending removal proceedings. *See Matter of Drysdale*, 20 I&N Dec. 815 (BIA 1994). In the absence of a conviction, evidence of serious criminal conduct, including police reports, which is "probative and specific" to the danger a respondent poses to her community may outweigh other factors and provide a reasonable basis for denying bond. *Matter of Guerra*, 24 I&N Dec. at 40; *see also Matter of Siniauskas*, 27 I&N Dec. 207, 208-09 (BIA 2018) (stating immigration judges may consider both arrests and convictions in custody determinations).

Where an immigration judge concludes an applicant is not a danger to the community, the Court must next consider whether the applicant is a flight risk unlikely to appear for future proceedings. *See Matter of Patel*, 15 I&N Dec. 666 (1976) (factors unique to each noncitizen must be evaluated in determining suitability for release from custody). In making this decision, the Court

EOIR — 27 of 35

Petitioner's Appendix 158

can consider many factors including: (1) whether the applicant has a fixed address in the United States; (2) her length of residence in the United States; (3) her family ties in the United States, and whether they may entitle her to reside permanently in the United States in the future; (4) her employment history; (5) her record of appearance in court; (6) her criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) her history of immigration violations; (8) any attempts to flee prosecution or otherwise escape from authorities; and (9) her manner of entry to the United States. *Matter of Guerra*, 24 I&N Dec. at 40. This list of factors is not exhaustive, and any reliable evidence in the record may be considered. 8 C.F.R. § 1003.19(d). An immigration judge may give greater or lesser weight to any given factor or factors, provided the ultimate conclusion is reasonable. *Matter of Guerra*, 24 I&N Dec. at 40. Family and community ties may demonstrate the applicant is not a flight risk but generally do not demonstrate she is not a danger to the community. *Siniauskas*, 27 I&N Dec.at 209-210.

Here, the Court finds that Respondent is not a danger to the community. The Department argues that Respondent is a danger to the community because of her arrest at a protest and because she has sent money to someone in Palestine. Neither of these arguments are persuasive. First, the Department argues that the facts surrounding Respondent's arrest demonstrate that she is a danger. Respondent attended a protest outside of Columbia University on April 30, 2024. Exh. 1-B at 11. She was cited for public disturbance, but the charges were dropped in the interest of justice. Exh. 1-B, Tab H. The police report states that she was with approximately 100 other people and was blocking the gate to keep anyone from entering or exiting. Exh. 3-B at 45. The Department provided no evidence that Respondent specifically threatened the police officers or was involved in any dangerous activity. Standing in a crowd of around 100 people in a protest does not show that she is a danger to the community.

Next, the Department argues that Respondent may have been providing support to terrorist organizations such as Hamas by sending money overseas. To support this claim, the Department submitted a Homeland Security Investigation (HSI) report stating that Respondent and another individual named ███████ were involved in numerous transactions sending funds to individuals in the Palestinian Authority. Exh. 3-B at 4. The investigation stated that the most recent transaction Respondent initiated through Western Union was on February 25, 2025. *Id.* However, the report gives no details about how much money was sent, why the money was sent, nor the recipient of the funds. The Department also provided a list of MoneyGram transactions from Respondent's mother's address from March 5, 2018, to March 5, 2025. *Id.* at 32. Over these seven years, Respondent's name is listed once, on March 13, 2022.[1] *Id.* at 35. Respondent claims that she was sending money to her relatives in Palestine. The Department admitted that they do not know any information about the person listed as the recipient of this transaction. There is no evidence in the record that this person supports Hamas or is a member of a terrorist organization. In the absence of evidence of any connection to terrorist organizations, the Court cannot find that Respondent is supporting a terrorist organization by sending money to a family member in Palestine.

---

[1] The Court notes that there are several MoneyGram transactions from ███████ where Respondent resided with her family. Exh. 3-B, at 35-37. However, Respondent testified that her parents rent the second floor of the house, and the Department submitted no evidence to connect these transactions to Respondent or to a terrorist organization.

Respondent presented evidence of her good character, including letters from her family, friends, and school. *See* Exh. 1-B, Tabs J- M. She has been in the U.S. since 2016, and has not had any encounters with law enforcement other than at the protest in 2024. Thus, Respondent has met her burden to show that she is not a danger to the community, and the Department has not presented evidence to show otherwise. Upon careful consideration of the entire record, the Court concludes that Respondent is not a danger to the community. *See Guerra*, 24 I&N Dec. at 40.

The Court further finds Respondent is not a significant flight risk. Respondent entered the United States in 2016, and has remained in the U.S. since that time. She has lived with her mother in New Jersey since entering and plans to return to her mother's house after being released from detention. Respondent has family ties in the U.S., and specifically in the New York/New Jersey area. She lives with her U.S. citizen mother, stepfather, and brother, and testified that her sister often comes over to visit. Respondent also has a U.S. citizen aunt and uncle and multiple cousins in the U.S. *See* Exh. 1-B. Respondent submitted letters from her friends and family, attesting that she is a valued member of their community and an integral part of her family. Exh. 1-B, Tabs J-M. Respondent did not submit evidence of her family's ability to financially support her, but she testified that she has been employed as a waitress and was trying to start her own business before being detained. Further, her uncle testified that he and Respondent's mother own their own homes and that they will financially support Respondent. Finally, Respondent has multiple avenues for relief which incentivize her appearance at future hearings. Respondent's mother filed an I-130 petition on Respondent's behalf. Exh 1-B, Tab D. The I-130 was approved on May 5, 2021, and Respondent is waiting for her visa to become current. *Id.* Respondent is also *prima facie* eligible for asylum, withholding of removal, and protection under the Convention Against Torture. Exh. 1-B, Tab F. Considering all these factors, the Court concludes Respondent is likely to appear for future proceedings and is not a significant flight risk.

In sum, Respondent met her burden of demonstrating to the Court she is not a danger to the community, and the Department failed to provide evidence that shows otherwise. Further, the Court finds Respondent is not such a flight risk based on her family ties and eligibility for future relief that no bond is appropriate. Accordingly, the Court grants the Respondent's application for custody redetermination and sets her bond amount at $20,000.

Accordingly, the following order shall be entered:

## ORDER

**IT IS HEREBY ORDERED** Respondent be **RELEASED** from custody of the Department upon the payment of a **$20,000 BOND**.

**Dated:** April 16, 2025

_____
**Tara Naselow-Nahas**
**Assistant Chief Immigration Judge**

Petitioner's Appendix 160

## Order of the Immigration Judge

Immigration Judge: NASELOW-NAHAS, TARA  04/16/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service

To: [ M ] Noncitizen | [  ] Noncitizen c/o custodial officer | [  E  ] Noncitizen atty/rep. | [ E ] DHS

Respondent Name : KORDIA, LEQAA | A-Number : █████████

Riders:

Date: 04/17/2025 By: French, Annette , Court Staff

EOIR – 30 of 35

# TAB C

Designated Country: ISRAEL |

**DEPARTMENT OF HOMELAND SECURITY**

**NOTICE TO APPEAR**

DOB:

Event No: XNK2503000016

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: _____    FINS: _____    File No: _____

In the Matter of:

Respondent: **LEQAA KORDIA AKA: KORDIA, Leqaa M A** _____ currently residing at:

_____

(Number, street, city, state and ZIP code)    (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of STATELESS and a citizen of STATELESS;

3. You were admitted to the United States at Jamaica, New York on or about September 18, 2016 as a unknown manner;

4. You were granted a change of status to a F-1 non-immigrant student;

5. You were terminated by Bergen County Career Advancement Training, Inc. - BCCAT on January 26, 2022.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

27991 BUENA VISTA BLVD,    LOS FRESNOS, TEXAS 78566. PRAIRIELAND DETENTION CTR

(Complete Address of Immigration Court, including Room Number, if any)

on __M a y 6, 2025__ at __8:30 am__ to show why you should not be removed from the United States based on the
   (Date)          (Time)

charge(s) set forth above.    E #6885 KLEIN - (a)SDDO

(Signature and Title of Issuing Officer)

Date: __March 15, 2025__    Dallas, Texas

(City and State)

EOIR - 12 of 335

DHS Form I-862 (6/22)

Filed at BIA on 07/02/2025 at 05:18:02 PM (Eastern Daylight Time) Base City: PEP

Case 3:25-cv-01072-L-BT   Document 70   Filed 08/18/25   Page 164 of 272   PageID 1438

Warning: Any statement you make may be used against you in removal proceedings.

Allegation Designated Country: ISRAEL

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____     _____
                                        *(Signature of Respondent)*

_____     Date: _____
*(Signature and Title of Immigration Officer)*

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on __March 15, 2025__, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person   ☐ by certified mail, returned receipt # _____ requested   ☐ by regular mail
☐ Attached is a credible fear worksheet.
☒ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the __English__ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____     K8224 GATES-JONES  Deportation
*(Signature of Respondent if Personally Served)*        Officer
                                        *(Signature and Title of officer)*

---

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justica.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

Leqaa Kordia



## PROOF OF SERVICE

On July 2, 2025, I caused a copy of this Emergency Discretionary Stay Motion in EOIR-43 Case and any attached pages to Sabrine Mohamad at the following address: PO Box 57089, New Orleans, LA 70157 by first-class mail.

_____
Carlos A. Rodriguez Jr.
Assistant Chief Counsel

Petitioner's Appendix 166

# EXHIBIT 6



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

_____

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**Mohamad, Sabrine**
**Southern Poverty Law Center**
**Po Box 57089**
**New Orleans  LA  70157**

**DHS/ICE OFFICE OF CHIEF COUNSEL - PEP**
**27991 BUENA VISTA BLVD**
**LOS FRESNOS TX 78566**

**Name: KORDIA, LEQAA**

**A** █████████

**Date of this Notice:**    **7/3/2025**

Enclosed is a copy of the Board's stay decision.

Sincerely,

John Seiler

John Seiler
Acting Chief Clerk

Enclosure

Userteam:  Paralegal

NOT FOR PUBLICATION

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

MATTER OF:

Leqaa KORDIA, A███████████

Respondent

FILED

Jul 03, 2025

ON BEHALF OF RESPONDENT: Sabrine Mohamad, Esquire

ON BEHALF OF DHS: Anastasia S. Norcross, Assistant Chief Counsel

IN BOND PROCEEDINGS
On Motion for Stay of Removal before the Board of Immigration Appeals

Before: Mullane, Appellate Immigration Judge

Opinion by Appellate Immigration Judge Mullane

MULLANE, Appellate Immigration Judge

STAY ORDER

The Department of Homeland Security has filed a motion for an emergency stay of the Immigration Judge's bond order, issued on April 3, 2025, ordering the respondent released from custody upon posting a bond of $20,000. After consideration of all information, the Board has concluded that the motion for emergency stay of the bond order will be granted.

ORDER: The motion for stay of execution of the bond order is granted.

# EXHIBIT 7



U.S. Department of Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*



**DHS/ICE OFFICE OF CHIEF COUNSEL - PEP**
**27991 BUENA VISTA BLVD**
**LOS FRESNOS TX 78566**

Name: **KORDIA, LEQAA**                 A █████████

Date of this Notice:    8/11/2025

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

John Seiler
Acting Chief Clerk

Enclosure

Userteam:  <u>Docket</u>



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

_____

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**KORDIA, LEQAA**
**A** ▬▬▬▬▬
**Prairieland Detention Center**
**1209 Sunflower Lane**
**Alvarado TX 76009**

**DHS/ICE OFFICE OF CHIEF COUNSEL - PEP**
**27991 BUENA VISTA BLVD**
**LOS FRESNOS TX 78566**

**Name: KORDIA, LEQAA**              A▬▬▬▬▬

**Date of this Notice:   8/11/2025**

Enclosed is a copy of the Board's decision in the above-referenced case. This copy is being provided to you as a courtesy. Your attorney or representative has been served with this decision pursuant to 8 C.F.R. § 1292.5(a). If the attached decision orders that you be removed from the United States or affirms an Immigration Judge's decision ordering that you be removed, any petition for review of the attached decision must be filed with and received by the appropriate court of appeals within 30 days of the date of the decision.

Sincerely,

John Seiler
Acting Chief Clerk

Enclosure

Userteam:  <u>Docket</u>

NOT FOR PUBLICATION

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

MATTER OF:

Leqaa KORDIA, A███████

Respondent

FILED
Aug 11, 2025

ON BEHALF OF RESPONDENT: ████████████

ON BEHALF OF DHS: Anastasia S. Norcross, Assistant Chief Counsel

IN BOND PROCEEDINGS
On Appeal from a Decision of the Immigration Court, Los Fresnos, TX

Before: Goodwin, Appellate Immigration Judge; Hunsucker, Appellate Immigration Judge;
Mullane, Appellate Immigration Judge

Opinion by Appellate Immigration Judge Hunsucker
Appellate Immigration Judge Mullane, dissents without opinion

HUNSUCKER, Appellate Immigration Judge

The Department of Homeland Security ("DHS") appeals from the Immigration Judge's April 3, 2025, order[1] granting the respondent's release on payment of a $20,000 bond. Section 236(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(a); 8 C.F.R. § 1236.1(d). The respondent has filed a brief on appeal. We will remand the record for further proceedings, and issuance of a new decision.[2] [3]

We review findings of fact determined by an Immigration Judge, including credibility findings, under a "clearly erroneous" standard. 8 C.F.R. § 1003.1(d)(3)(i) (2020). We review questions of law, discretion, and judgment, and all other issues in appeals from decisions of Immigration Judges de novo. 8 C.F.R. § 1003.1(d)(3)(ii).

---

[1] On April 16, 2025, the Immigration Judge issued a written memorandum in support of the bond order.

[2] The respondent remained in DHS' detention pursuant to DHS' invocation of the autostay regulation at 8 C.F.R. § 1003.19(i)(2), and the filing of a "Form EOIR-43." The autostay expired on July 2, 2025. That same day, DHS moved for an emergency stay of the Immigration Judge's bond order, and on July 3, 2025, the Board granted DHS' motion. The respondent therefore remains detained in DHS' custody.

[3] The bond appeal also contains a July 2, 2025, motion to withdraw filed by two of the respondent's attorneys. We will grant the attorneys' motion to withdraw.

We will remand the record for the Immigration Judge to make more complete findings of fact to allow the Board to meaningfully review the parties' appellate arguments regarding whether the respondent met her burden of proving that she is not a danger. *See Matter of M-M-A-*, 28 I&N Dec. 494, 497 (BIA 2022) ("Immigration Judges must make sufficient findings of fact and conclusions of law on issues raised before them to ensure the Board can conduct effective appellate review."); *see also Matter of A-P-*, 22 I&N Dec. 468, 477 (BIA 1999) (holding that the record should include a complete decision that accurately summarizes relevant facts, reflects the Immigration Judge's analysis of applicable legal precedents, and clearly sets forth the Immigration Judge's legal conclusions); *see also Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) ("The burden is on the alien to show to the satisfaction of the Immigration Judge that he or she merits release on bond.").

The Immigration Judge determined that the respondent met her burden of proving that her release would not present a danger to the community, and that her degree of flight risk is low enough that a bond of $20,000 will ensure her presence at future immigration hearings (IJ at 2-3). DHS contends that the respondent did not meet her burden of proving that she is not a danger because she participated in an April 30, 2024, protest at Colombia University, and engaged in behavior that included "blocking a gate ... preventing anyone from entering and exiting," and that she "failed to comply" with police commands to disperse (DHS' Appellate Statement at 7; Exh. 3-B at 30). We discern no clear error in the Immigration Judge's findings that the respondent's conduct during the April 30, 2024, protest was not dangerous, she did not threaten police officers, and that the charges filed against her were dropped in the interest of justice (IJ at 2; Exh. 1-B; Tab H at 36; Exh. 3-B at 30).

DHS also argues that the respondent did not meet her burden of proving that she is not a danger because a Homeland Security Investigation ("HSI") report submitted by DHS states that in the 4-year period between January of 2021 and January of 2025, the respondent made numerous transactions sending funds to individuals located in the Palestinian Authority and Jordan, with some transfers as large as $2,000 (Statement attached to DHS' Notice of Appeal at 6 (hereinafter, "DHS' Appellate Statement"); Exh. 3-B at 4). The Immigration Judge found that the HSI report stated that the respondent and another individual were involved in "numerous transactions" sending funds to individuals in the Palestinian Authority, and that the most recent transaction that the respondent initiated through Western Union was on February 25, 2025 (IJ at 2; Exh. 3-B at 4). The Immigration Judge also found that evidence submitted by DHS regarding money transfers sent through MoneyGram from the address of the respondent's mother reflects that for the 7-year period from March 5, 2018, to March 5, 2025, one transaction, a March 13, 2022, transfer, was specifically identified as from the respondent (IJ at 2; Exh. 3-B at 35-37). The Immigration Judge also found that the HSI report and the MoneyGram logs did not identify the recipients of the money transfers from the respondent, and that the respondent claimed that she was sending money to family members in the Palestinian Authority (IJ at 2; Exh. 3-B at 4, 35-37).

We will remand the record for the Immigration Judge to make more complete findings of fact, based on an updated record, regarding the extent of the money transfers from the respondent to persons in the Palestinian Authority and Jordan, including the specific identity of the recipients of the money transfers. The Immigration Judge's April 16, 2025, decision does not make any findings

of fact regarding how much money the respondent transferred, how often she made money transfers, or the identity and geographic location of the recipients of her money transfers. While the Immigration Judge is correct that the HSI report and the MoneyGram logs filed by DHS do not identify the recipients of the money transfers from the respondent, the burden is on the respondent to prove that her release would not pose a danger to the community, and is not on DHS to prove that the respondent is a danger (IJ at 2; Exh. 3B at 4, 35-37). *See Matter of Guerra*, 24 I&N Dec. at 40. Further, as the money transfers were sent from the United States, the respondent should have been able to provide more corroboration of her claims after DHS submitted evidence of the money transfers, including corroborating that the money she transferred was sent to her family members.

Thus, we will remand the record for the Immigration Judge to issue a new decision that makes more complete findings of fact regarding the extent of the respondent's money transfers, including how many transfers she made, how often, the amount of money transferred in each transaction, and the identity and geographic location of the recipients of each money transfer from the respondent. The new decision should also reach a new legal conclusion, based on the more complete findings of fact regarding the money transfers, as to whether the respondent has met her burden of proving that she is not a danger. *See Matter of Guerra*, 24 I&N Dec. at 40. The parties should be provided an opportunity to supplement the record on remand, including any evidence from the respondent identifying the number of money transfers she made, their frequency, the amount of money transferred in each transaction, and the identity and geographic location of the recipients of her money transfers.

Accordingly, the following order will be issued.

ORDER: The record is remanded for further proceedings in accordance with the foregoing opinion, and issuance of a new decision.

Appellate Immigration Judge Hugh Mullane dissents without opinion.

# EXHIBIT 8



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

Respondent Name:

KORDIA, LEQAA

To:



A-Number:

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
06/27/2025

☐ Unable to forward - no address provided.

☑ Attached is a copy of the **decision of the Immigration Judge.** This decision is final unless an appeal is filed with the Board of Immigration Appeals within 30 calendar days of the date of the mailing of this written decision. See the enclosed forms and instructions for properly preparing your appeal. Your notice of appeal, attached documents, and fee or fee waiver request must be mailed to:

> Board of Immigration Appeals
> Office of the Clerk
> P.O. Box 8530
> Falls Church, VA 22041

☐ Attached is a copy of the decision of the immigration judge as the result of your Failure to Appear at your scheduled deportation or removal hearing. This decision is final unless a Motion to Reopen is filed in accordance with Section 242B(c)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1252B(c)(3) in deportation proceedings or section 240(b)(5)(c), 8 U.S.C. § 1229a(b)(5)(c) in removal proceedings. If you file a motion to reopen, your motion must be filed with this court:

> Immigration Court

☐ Attached is a copy of the decision of the immigration judge relating to a Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. § 1208.31(g)(1), no administrative appeal is available. However, you may file a petition for review within 30 days with the appropriate Circuit Court of Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA § 242.

☐  Attached is a copy of the decision of the immigration judge relating to a **Credible Fear Review.** This is a final order. No appeal is available.

☐  Other:

Date:

Immigration Judge: NASELOW-NAHAS, TARA 06/27/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ P ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : KORDIA, LEQAA | A-Number : ▮▮▮▮▮▮▮

Riders:

Date: 06/28/2025 By: ARROYO CRUZ, CHELSEA, Court Staff



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

Respondent Name:

    KORDIA, LEQAA

To:



A-Number:

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
06/27/2025

## ORDER OF THE IMMIGRATION JUDGE

Upon consideration of Respondent's Motion to File Oversize Brief, it is HEREBY ORDERED that the motion be DENIED.

Moreover, during the master calendar hearing held on March 27, 2025, Respondent, through counsel, conceded proper service of the NTA, admitted the factual allegations contained therein, and conceded removability. Based on the admissions and concessions of record, the Court found the removability of Respondent established. The Court directed Israel as the country of removal should such become necessary. The Court then scheduled the case for a hearing on the merits of any pending applications to July 24, 2025.
The Court further ordered Respondents to file all relief applications no later May 16, 2025. No application had been received. On June 10, 2025, a motion to substitute was filed by new counsel. The motion was granted by order dated June 10, 2025. In the order the Court specifically notified new counsel that no I-589 application had been received by the Court and that the deadline had long passed. Nevertheless, given the change in counsel, the Court extended the filing deadline for receipt of the I-589 application to June 20, 2025. The parties were further notified that the Court would deem relief applications abandoned and denied if not timely filed. 8 C.F.R. § 1003.31(c); Matter of R-C-R-, 28 I&N Dec. 74, 78, 83 (BIA 2020); Matter of Interiano Rosa, 25 I&N Dec. 264, 265 (BIA 2010). Additionally, the Court notified the parties it would order the removal of Respondent if the applications were not timely filed. Matter of R-C-R-, 28 I&N Dec. at 83.

To date, the Court has not received any application for relief or protection from Respondent. Nor has Respondent provided any explanation for the failure to file the applications as ordered by the Court. Accordingly, the Court finds that Respondent has waived the opportunity to file relief applications. See 8 C.F.R. § 1003.31(c) ("If an application or document is not filed within the time set by the Immigration Judge, the opportunity to file that application or document shall be deemed waived"); Matter of R-C-R-, 28 I&N Dec. at 77-8 (BIA 2020) (Once an Immigration

Judge has set a firm deadline for filing an application for relief, the opportunity to file the application may be deemed waived, if the deadline passes without submission of the application and no good cause for noncompliance has been shown).

As no applications have been filed, the Court will enter an order of removal against Respondent. See Matter of R-R-, 20 I&N Dec. 547, 549 (BIA 1992) ("The Board has long held that applications for benefits under the Act are properly denied as abandoned when the [noncitizen] fails to timely file them").

Based on the foregoing, the Court will enter the following Order:

**Order:**

IT IS HEREBY ORDERED that Respondent be REMOVED from the United States to ISREAL on the charge contained in the Notice to Appear.

Immigration Judge: NASELOW-NAHAS, TARA 06/27/2025

Appeal:    Department of Homeland Security: ☐ waived    ☐ reserved
           Respondent:                     ☐ waived    ☐ reserved
Appeal Due:

## Certificate of Service

This document was served:
Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable
To: [ ] Noncitizen | [ P ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS
Respondent Name : KORDIA, LEQAA | A-Number : █████████
Riders:
Date: 06/28/2025 By: ARROYO CRUZ, CHELSEA, Court Staff

# EXHIBIT 9



# UNITED STATES DEPARTMENT OF JUSTICE
# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
# PORT ISABEL IMMIGRATION COURT

Respondent Name:

KORDIA, LEQAA

To:



A-Number:

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
07/10/2025

☐ Unable to forward - no address provided.

☐ Attached is a copy of the **decision of the Immigration Judge.** This decision is final unless an appeal is filed with the Board of Immigration Appeals within 30 calendar days of the date of the mailing of this written decision. See the enclosed forms and instructions for properly preparing your appeal. Your notice of appeal, attached documents, and fee or fee waiver request must be mailed to:

> Board of Immigration Appeals
> Office of the Clerk
> P.O. Box 8530
> Falls Church, VA 22041

☐ Attached is a copy of the decision of the immigration judge as the result of your Failure to Appear at your scheduled deportation or removal hearing. This decision is final unless a Motion to Reopen is filed in accordance with Section 242B(c)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1252B(c)(3) in deportation proceedings or section 240(b)(5)(c), 8 U.S.C. § 1229a(b)(5)(c) in removal proceedings. If you file a motion to reopen, your motion must be filed with this court:

> Immigration Court

☐ Attached is a copy of the decision of the immigration judge relating to a Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. § 1208.31(g)(1), no administrative appeal is available. However, you may file a petition for review within 30 days with the appropriate Circuit Court of Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA § 242.

☐ Attached is a copy of the decision of the immigration judge relating to a **Credible Fear Review.** This is a final order. No appeal is available.

☑ Other:

      Order on motion to reconsider

Date:

Immigration Judge: NASELOW-NAHAS, TARA 07/10/2025

### Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : KORDIA, LEQAA | A-Number :

Riders:

Date: 07/11/2025 By: Alcaine, Salvador, Court Staff



## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## PORT ISABEL IMMIGRATION COURT

Respondent Name:

    KORDIA, LEQAA

To:



A-Number:

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
07/10/2025

## ORDER OF THE IMMIGRATION JUDGE

☑ Respondent ☐ the Department of Homeland Security has filed a motion to reconsider.

Upon consideration of the motion, and any opposition from the non-moving party, the motion is ☐ granted ☑ denied for the following reason(s):

☐ The motion is numerically barred. *See* INA § 240(c)(6)(A); 8 C.F.R. § 1003.23(b)(1).

☐ The motion is untimely. *See* INA § 240(c)(6)(B); 8 C.F.R. § 1003.23(b)(1).

☑ The motion does not specify errors of law or fact in the previous order or is not supported by pertinent authority. *See* INA § 240(c)(6)(C); 8 C.F.R. § 1003.23(b)(2).

☑ Other:

By order dated June 29, 2025, the Court found that Respondent had failed to file her I-589 or any other applications by the date set by the Court and thus she waived any opportunity to so. The Court further found that since no applications had been timely filed, Respondent was subject to removal. An order of Removal was entered to Isreal.

A timely motion to reconsider was filed by Respondent on June 29, 2025, and a DHS opposition was subsequently received. Respondent further filed a reply to the DHS opposition. After a review of the complete record, the motion and all reply briefs, the Court finds that Respondent has not established a basis for the Court to reopen proceedings and to allow her to move forward on an I-589 application.

Contrary to Respondent's belief that an I-589 was referred to the Court by USCIS, no application was ever forwarded. The Court made this clear at the initial master calendar hearing on March 27, 2025. While there was a discussion regarding the I-589 application that Respondent had filed with USCIS and attached as an exhibit to her bond motion, the Court advised counsel that it did not have one and that he would either need to file the electronic copy submitted to USCIS with an amended application, or file a new application with the Court no later than May 16, 2025. Thus this claim has no merit.

Further Respondent's claim that counsel was not aware of the new deadline set by the Court in the June 10, 2025, order because only the primary attorney was notified by email of the order is also without merit. The Court properly uploaded the order to the EROP and proper notification went to the primary attorney of record as required. Thus, non-primary attorney's lack of knowledge is not a basis for the failure to comply with the Court Order.

As such the Court declines to reopen proceedings to allow Respondent to file an I-589 application and proceed with her request for withholding under the INA and relief under the Convention Against Torture.

The Court will however consider reopening proceedings for the limited purpose of allowing Respondent an opportunity to seek voluntary departure. However, Respondent is only eligible for pre-hearing voluntary departure. In order to qualify for pre-hearing voluntary departure, among other requirements, Respondent must agree to waive appeal and accept the Court's decision as final. Respondent must also agree that any voluntary departure would be under DHS safeguards.

As such, Respondent has until July 25, 2025, to notify the Court in writing if she wishes to seek pre-hearing voluntary departure under DHS safeguards in lieu of removal and understands and agrees that she gives up any right to appeal the decision of the Court. If Respondent choices this path, her attorney should endeavor to meet and confer with DHS counsel regarding their position on a grant of voluntary departure with the conditions mentioned above.

If no advisal is received from Respondent by July 25, 2025, the Case will be considered concluded.



Immigration Judge: NASELOW-NAHAS, TARA 07/10/2025

Appeal:     Department of Homeland Security:   ☐  waived     ☐  reserved
            Respondent:                        ☐  waived     ☐  reserved

Appeal Due:

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : KORDIA, LEQAA | A-Number : ███████

Riders:

Date: 07/11/2025 By: Alcaine, Salvador, Court Staff

# EXHIBIT 10



# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### PORT ISABEL IMMIGRATION COURT

Respondent Name:

   KORDIA, LEQAA

To:



A-Number:

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
07/28/2025

☐ Unable to forward - no address provided.

☑ Attached is a copy of the **decision of the Immigration Judge.** This decision is final unless an appeal is filed with the Board of Immigration Appeals within 30 calendar days of the date of the mailing of this written decision. See the enclosed forms and instructions for properly preparing your appeal. Your notice of appeal, attached documents, and fee or fee waiver request must be mailed to:

        Board of Immigration Appeals
        Office of the Clerk
        P.O. Box 8530
        Falls Church, VA 22041

☐ Attached is a copy of the decision of the immigration judge as the result of your Failure to Appear at your scheduled deportation or removal hearing. This decision is final unless a Motion to Reopen is filed in accordance with Section 242B(c)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1252B(c)(3) in deportation proceedings or section 240(b)(5)(c), 8 U.S.C. § 1229a(b)(5)(c) in removal proceedings. If you file a motion to reopen, your motion must be filed with this court:

        Immigration Court

☐ Attached is a copy of the decision of the immigration judge relating to a Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. § 1208.31(g)(1), no administrative appeal is available. However, you may file a petition for review within 30 days with the appropriate Circuit Court of Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA § 242.

☐ Attached is a copy of the decision of the immigration judge relating to a **Credible Fear Review.** This is a final order. No appeal is available.

☐ Other:

Date:

Immigration Judge: NASELOW-NAHAS, TARA 07/28/2025

### Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable
To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS
Respondent Name : KORDIA, LEQAA | A-Number : ███████
Riders:
Date: 07/28/2025 By: Pardo-Mares, Santa, Court Staff



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

Respondent Name:

KORDIA, LEQAA

To:

A-Number:

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
07/28/2025

## ORDER OF THE IMMIGRATION JUDGE

☑ Respondent ☐ the Department of Homeland Security has filed a motion to reopen these proceedings. Upon reading and considering the motion, and any opposition from the non-moving party, the motion is ☑ granted ☐ denied for the following reason(s):

☐ The motion is untimely and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).
☐ The motion is numerically barred and fails to meet any exceptions. *See* 8 C.F.R. § 1003.23(b)(1),(4).
☐ The moving party failed to provide evidence demonstrating changed circumstances that is material and that was unavailable or could not have been discovered or presented at the previous proceedings. *See* 8 C.F.R. § 1003.23(b)(4)(i).
☐ The moving party failed to submit the appropriate application for relief and any accompanying documents. *See* 8 C.F.R. § 1003.23(b)(3).
☐ The Respondent has been removed or otherwise departed from the United States. *See* 8 C.F.R. § 1003.23(b)(1).
☑ Other:

This matter is before the Court pursuant to Respondent's motion to reopen filed on July 15, 2025. See Motion to Reopen (MTR). Respondent was placed into removal proceedings through personal service of a Notice to Appear on March 15, 2025. Exhibit 1. Respondent appeared for a master calendar hearing on March 27, 2025 with counsel. At this hearing, the Court ordered Respondent to submit her I-589 application by May 16, 2025 and all other supporting documents by June 27, 2025. On June 10, 2025, Respondent filed a motion to substitute counsel, asking to replace ▮▮▮▮▮ and his firm with attorneys ▮▮▮▮▮ as primary attorney of record and ▮▮▮▮▮ as non-primary. The Court granted the motion on the same day, and in the order notified Respondent and her counsels that the I-589 had not been filed by the May 16, 2025 deadline. The Court continued the deadline to June 20, 2025 as a curtesy to the new attorneys on the case. However, the Court clearly stated that if a completed I-589 was not filed by June 20, 2025, then the Court would find such relief abandoned. Respondent failed to file an application by June 20, 2025, and accordingly, on June 28, 2025, the Court found such relief abandoned and ordered Respondent removed. Respondent now moves to reopen proceedings due to ineffective assistance of counsel or in the alternative sua sponte. The Department opposes the motion.

Generally, a motion to reopen must be filed within 90 days of the date of a final order of removal. INA § 240(c)(7)(C). Here, Respondent was ordered removed on June 28, 2025, and

filed the motion to reopen on July 15, 2025. Accordingly, the motion is timely. Respondent requests that the Court reopen proceedings due to the ineffective assistance of Respondent's prior counsels. A claim of ineffective assistance of counsel, if properly established, may constitute proper grounds for reopening removal proceedings. See Matter of H-Y-Z-, 28 I&N Dec. 156, 159 (BIA 2020). In such cases, compliance with Matter of Lozada, 19 I&N Dec. 637 (BIA 1988), is required. See Lara v. Trominski, 216 F.3d 487, 496-98 (5th Cir. 2000); see also Hernandez-Ortez v. Holder, 741 F.3d 644, 648 (5th Cir. 2014). According to Matter of Lozada, a claim of ineffective assistance of counsel requires:

(1) an affidavit by the alien setting forth the relevant facts, including the agreement with counsel regarding the alien's representation;
(2) evidence that counsel was informed of the allegations and allowed to respond, including any response; and
(3) an indication that . . . a complaint has been lodged with the relevant disciplinary authorities, or an adequate explanation for the failure to file such a complaint.

Hernandez-Ortez, 741 F.3d at 647-48 (citing Matter of Lozada, 19 I&N Dec. at 639). After such procedural requirements are met, the respondent must show that he was substantially prejudiced by the ineffective assistance of counsel. See Hernandez-Ortez, 741 F.3d at 647-48 (citing Matter of Lozada, 19 I&N Dec. at 639); De Zavalos v. Ashcroft, 385 F.3d 879, 883 (5th Cir. 2004).

Here, the Court finds that Respondent has taken all procedurally necessary steps under Lozada. Respondent provided a written declaration setting forth the relevant facts. MTR, Tab A. She attests that she believed her asylum application was already pending with the Court and that her former attorneys, ███████████████, did not see the Court's order with the updated filing deadlines and thus missed the deadline. Id. The Department argues that Respondent's statement did not go into sufficient detail about the scope of her representation. However, the Court finds that Respondent included the relevant facts surrounding the missed deadline which is the basis of her ineffective assistance claim. Respondent also provided evidence of her emails to former attorneys ███████████████ informing them of the allegations of misconduct. Id. at Tabs E; G. She also submitted their replies to the allegations. Id. at Tabs F; H. Finally, Respondent submitted copies of the complaints filed against her former counsels to the ████████ and ████████ State Bars. Id. at Tabs I-J. Thus, Respondent submitted the proper evidence to meet the procedural requirements under Lozada.

Further, Respondent was substantially prejudiced by the ineffective assistance of her counsel. She relied upon her attorneys to file an application for asylum on her behalf, and their failure to comply with the deadlines given by this Court resulted in an order of removal. Respondent has provided evidence that she would be prima facie eligible for the non-discretionary forms of relief of withholding of removal and withholding under the CAT. MTR, Tabs B-D. As such, the Court finds that Respondent was substantially prejudiced by her counsels' ineffective assistance and grants Respondent's request to reopen proceedings.

While significant evidence has been filed by Respondent, and there is no need to resubmit these documents, there is no clear indication that the I-589 has been received by the Court. Thus, no later than August 5, 2025, Respondent shall upload to the EROP the I-589 she intends to have the Court consider. This filing should just include the I-589, any declaration by Respondent in support thereof, and the receipt notice from USCIS showing that they received an affirmative I-589 filing on March 12, 2025, so that no initial filing fee is required.

Lastly, the case is being set for a hearing on the merits of all applications for relief that

Respondent is eligible for on August 28, 2025, at 8:30 am.  The case will proceed until 4:30 pm if necessary so the parties should be available the entire day. The hearing will be held via Webex.  Any and all supplemental documents including briefs on eligibility are due from both sides no later than August 22, 2025.

Immigration Judge: NASELOW-NAHAS, TARA 07/28/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Respondent Name : KORDIA, LEQAA | A-Number : ▇▇▇▇▇▇▇

Riders:

Date: 07/28/2025 By: Pardo-Mares, Santa, Court Staff

# EXHIBIT 11

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Mahmoud KHALIL,

       *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P.
JOYCE, in his official capacity as Acting
Field Office Director of New York,
Immigration and Customs Enforcement;
Yolanda PITTMAN, in her official capacity as
Warden of Elizabeth Contract Detention
Facility; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement;
Kristi NOEM, in her official capacity as
Secretary of the United States Department of
Homeland Security; Marco RUBIO, in his
official capacity as Secretary of State; and Pamela
BONDI, in her official capacity as Attorney
General, U.S. Department of Justice,

       *Respondents*.

Case No. 25-cv-01963
(MEF-MAH)

**DECLARATION OF
VICTORIA PORELL**

     I, Victoria Porell, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.  I submit this declaration in support of Petitioner Mahmoud's Khalil motion for a preliminary injunction in his above-captioned habeas corpus petition and in particular to address the ways in which the United States government's targeting of Mr. Khalil for his Palestinian rights advocacy is causing him irreparable harm and is contrary to the public interest.

2.  Specifically, I write to explain the ways in which, even in the context of a long term campaign to target and silence students advocating for Palestinian human rights, Palestine Legal has observed and documented a substantial increase in concerns expressed by students – and corollary chill to their activism – in direct reaction to the arrest and detention of Mahmoud Khalil on March 8, 2025. I

conclude that the arrest, detention and attempted removal of Mr. Khalil for what the federal government has explicitly attributed to his campus activism on behalf of Palestine has had a considerable chilling effect on activism and particularly student campus activism.

## Background on Palestine Legal

3. Palestine Legal (a project of Tides Center) is a non-profit legal and advocacy organization specifically dedicated to protecting the civil and constitutional rights of people in the U.S. who speak out for Palestinian freedom. Palestine Legal tracks and responds to efforts to suppress expression supporting Palestinian rights, particularly those aiming to chill, or wholly eliminate, campus-based organizing. Palestine Legal has advised thousands of students, campus groups, and other advocates whose rights have been violated for expressive conduct supporting Palestinian rights and faced false accusations of support for terrorism, doxing, and other repressive efforts.

4. We have successfully defended the civil and constitutional rights of students advocating for Palestinian human rights through strategic litigation, amicus curiae filings, complaints alleging violations of Title VI of the Civil Rights Act of 1964 based on Palestinian national origin and related associational discrimination, along with other legal advocacy. See., e.g., *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 U.S. Dist LEXIS 178359 (D. Md. Oct. 1, 2024).

## Qualifications

5. I am a Senior Staff Attorney at Palestine Legal and have worked at the organization since January 2024, primarily representing students and faculty members facing retaliation for their speech in support of Palestine. Prior to my employment at Palestine Legal, from 2018-2023, I was a member of Palestine Legal's attorney network and volunteered on cases referred to me. I also worked as a Legal Intern for Palestine Legal in 2016-2017.

6. At Palestine Legal, I have been serving at the head of our Intake Committee, overseeing all incoming requests for legal support, monitoring trends in requests for support, and ensuring requests are addressed either by a Palestine Legal attorney or a referral from our attorney network.

2

**Requests for Legal Support Following Mr. Khalil's Arrest—By the Numbers**

7. The movement for Palestinian rights and freedom has long been hotly contested in the United States. On college campuses, where there is a concentration of advocacy for Palestinian rights, student advocates have consistently faced pervasive threats to their political expression and associational rights via doxing by anti-Palestinian groups, differential treatment and disciplinary processes.

8. Since the onset of Israel's latest military offensive against Palestinians in the Gaza Strip, more and more students have used common protest tactics to express their dissent against the United States' and their own institutions' support for Israel's prolonged military offensive that has killed over 54,000 Palestinians, including over 16,000 children. (*See*, Jay Ulfelder, *Crowd Counting Consortium: An Empirical Interview of Pro-Palestine Protests at U.S. Schools*, Harvard Kennedy School, Ash Center for Democratic Governance and Innovation, (May 30, 2024), https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools/.) With students' protests against the onslaught on Gaza has come unprecedented retaliation: in the 17 months since October 2023, Palestine Legal has received over 3,500 requests for legal support, the majority related to campus-based suppression.

9. Since the onset of the Trump administration in late January 2025, student organizers face a new, dire threat to their political expression: the leveraging of the federal government's vast immigration powers to punish and thereby deter constitutionally protected advocacy for Palestinian rights. These efforts at state-directed political suppression have been deemed "the greatest threat to free speech since the Red Scare." (*See*, Michelle Goldberg, *This Is the Greatest Threat to Free Speech Since the Red Scare*, THE NEW YORK TIMES (Mar. 10, 2025), https://www.nytimes.com/2025/03/10/opinion/mahmoud-khalil-free-speech.html.)

10. Since March 8, 2025[1], the date of Mr. Khalil's arrest and detention by ICE, Palestine Legal has received 409 requests for legal support. In the same amount of time (82 days) immediately preceding March 8, 2025, we received 322 requests for legal support. This amounts to a nearly 30% increase, at a time (since October 2023) when we have been receiving an already heightened volume of requests. As a point of comparison, in all of 2022, we received 290 requests for legal support.

11. I personally responded to 39 of the 409 requests for legal support that we received.

---

[1] As of May 29, 2025, 9:08pm PST.

Petitioner's Appendix 196

12. Of the 409 requests that Palestine Legal received since March 8, 2025, 167 requests were related to educational institutions, the majority coming from students or faculty members from colleges and universities.

13. Many non-citizen students and faculty reaching out for legal support have been targeted and doxed by the same or similar pro-Israel organizations that targeted Mr. Khalil prior to his detention, including Betar, Canary Mission, and Documenting Jew Hatred on Campus. (*See,* Tsehai Alfred, *Mahmoud Khalil, SIPA '24, asked Columbia for protection a day before detainment, lawyers confirm,* COLUMBIA SPECTATOR (Mar. 12, 2025), [https://www.columbiaspectator.com/news/2025/03/12/mahmoud-khalil-sipa-24-asked-columbia-for-protection-a-day-before-detainment-lawyers-confirm/](https://www.columbiaspectator.com/news/2025/03/12/mahmoud-khalil-sipa-24-asked-columbia-for-protection-a-day-before-detainment-lawyers-confirm/).)

14. Palestine Legal does not inquire about the citizenship status of those seeking legal support, so precise numbers are not available, but anecdotally, requests for immigration consultation and representation from students and faculty increased dramatically after March 8, 2025, with many individuals directly referencing the high-profile detention of non-citizen students such as Mahmoud Khalil.

15. After March 8, 2025, Palestine Legal also received a significant increase in the number of requests for "Know Your Rights" presentations and materials, particularly for non-citizens resulting from escalating fear from pro-Palestinian activists about possible retribution by ICE and/or universities.

16. Since March 8, 2025, Palestine Legal staff have participated in at least 13 "Know Your Rights" trainings or other public presentations that reached an estimated audience of over 2,700 people.

### Increasing Requests for Legal Support—Individual Examples

17. In the days and weeks following Mr. Khalil's arrest, as we saw an increase in the numbers of requests for legal support, I also saw an intensification of the emotional state of those reaching out for support. Students I spoke to expressed anxiety, panic, and terror at the possibility that they may be disappeared off the street and detained without warning. Multiple student clients, and even one member of Palestine Legal's attorney network, broke down in tears while we were on the phone.

18. A law student organization asked me if they shouldn't have meetings anymore so as to protect their members, especially non-citizens on campus.

4

19. Multiple graduate students and faculty members (citizens and non-citizens) asked if it was safe to travel abroad or if they should reschedule international conferences and field work. An international graduate student from a US university who was abroad conducting research reached out because he was concerned about his ability to re-enter the US because his name appeared in a news article about a Palestinian rights demonstration.

20. Multiple non-citizen students who were in leadership positions of student organizations or officers in student government asked if they could or should request that their institutions remove their names from internal and external websites. One chapter of Students for Justice in Palestine (SJP) contacted Palestine Legal after their university refused to make private a spreadsheet listing the leadership of student clubs. They expressed that they were especially worried one of their board members, a non-citizen, would be retaliated against by the federal government if this information remained public.

21. Student journalists, from at least two universities, asked if they should remove by-lines from articles having anything to do with the Middle East or campus protests. These questions followed reporting that professors, including Dean of the Columbia Journalism School Jelani Cobb, had publicly told students who were not U.S. citizens to avoid publishing work on Gaza, Ukraine and their former classmate's arrest, and that "nobody can protect you. These are dangerous times." (*See*, Liam Stack and Katherine Rosman, *At Columbia, Tension Over Gaza Protests Hits Breaking Point Under Trump*, THE NEW YORK TIMES (Mar. 12, 2025), https://www.nytimes.com/2025/03/12/nyregion/columbia-university-trump-protests.html.)

22. A non-citizen student expressed that they had not left their apartments out of fear that they would be arrested by ICE.

23. A student who was President of SJP at her University and a United States citizen asked if her non-citizen roommates were at risk because of her position of leadership.

24. A faculty member reported to Palestine Legal that they were supposed to give a lecture in March. However, the event was cancelled at the last minute and the reason provided to the faculty member was that the organizers had concerns about retaliation against non-citizen academics.

25. A member of a graduate student government reached out because they had

5

Petitioner's Appendix 198

received a number of questions from doctoral students about whether they would
be able to remain enrolled and/or finish their degrees from oversees if they are
deported for their Palestine organizing or have their F-1 student visas cancelled.

26. At least three non-citizen students who had written op-eds about campus protests
reached out seeking legal representation because they believed that they may be
targeted as a result.

27. Multiple students who had been interviewed or photographed for campus
newspaper articles concerning demonstrations asked if they could or should
request their names or pictures be removed from previously published articles.

28. Many students asked if it was safe for them to be members of student
organizations or attend campus events having to do with Palestine. A first-year
doctoral student and legal permanent resident asked whether he was at risk of
having his green card revoked for having been a member of SJP and whether he
should stop associating with the group.

29. A non-citizen Palestine Legal client who was a lawful permanent resident
expressed intense fear of retaliation for being involved in campus activities
concerning Palestine and decided to put her application for citizenship on hold.

30. I am attaching as **Exhibit A** an article that Palestine Legal attorneys and clients
were consulted on that includes some additional examples that illustrate the
climate of fear that has set in on campuses, particularly amongst non-citizen
students and scholars.

31. Attached hereto, at the exhibits listed below, are true and correct copies of the
following materials:

   A. Attached as **Exhibit A**: Sanya Mansoor, *Will ICE Come to My Dorm Today?
   International students who protested Israel's war in Gaza grapple with Trump's
   crackdown.*, THE CUT (Mar. 26, 2025), https://www.thecut.com/article/pro-
   palestine-student-protesters-worry-will-ice-come-for-me.html.

Dated: June 3, 2025                         Signed:
Oakland, CA

                                            */s/* Victoria Porell

6

# F-1
# Exhibit A

# Will ICE Come to My Dorm Today? International students who protested Israel's war in Gaza grapple with Trump's crackdown.

By Sanya Mansoor, a freelance reporter who covers immigration and Gaza

MAR. 26, 2025                                              🔖 SAVE    | 💬 22

Photo-Illustration: by The Cut; Photo: Michael Nigro/Sipa USA via AP

Since ICE agents arrested Columbia graduate Mahmoud Khalil in early March, Maryam, a student at Cornell University, doesn't leave the house unless they need to. They started getting groceries delivered and rarely go out to the shops. While they still help support and organize local demonstrations against Israel's war in Gaza, they no longer attend in person. When they do go out to class or to work, they write an employment lawyer's phone number on their body and carry all their documentation. As a person of Arab descent who is in the U.S. on a student visa, Maryam worries that they could be swept up in the Trump administration's crackdown on pro-Palestine activists. Recently, they installed security cameras outside their off-campus apartment. "It felt like a way I could protect myself," they say, if immigration agents were to show up at the door.

On top of all this, Maryam's sister is pregnant and they are now unsure of when they will be able to visit family. If they leave the country, they fear they won't be allowed to return. They try their best to calm down their parents, who are scared of ICE detaining their child. Maryam's mother texts that she loves them more frequently, while their father, who normally talks a lot, now trails off and becomes quiet on the phone. "He understands that it is not in me to be bullied or cowed," they say.

International students across the country like Maryam are spooked by the arrests of Khalil, a U.S. permanent resident, and Georgetown University researcher Badar Khan Suri, an Indian national. (Maryam's name and that of other students in this story have been changed, as they fear the federal government may target them for deportation.) Trump's campaign-trail rhetoric about throwing student protesters out of the country has since become a real threat. The administration rescinded a longstanding policy that protected universities and other vulnerable locations from immigration enforcement; the State Department is launching an AI-driven program to help deport foreign nationals perceived as supporting Hamas; sweeping executive orders threaten deportation or criminal prosecution over actions the administration

views as <u>antisemitic</u> or expressing a "hostile attitude" toward the U.S.; and <u>Trump is</u>
<u>pressuring</u> universities to impose stricter protest rules or else lose their federal funding.

This all leaves international students wrestling with how to criticize the U.S.'s continued
military support of Israel without jeopardizing their visa status. Several students I spoke with
worried that identifying their country of origin or which university they attend, let alone
talking about their protest activity, would put a target on their backs. Some are doubling down
by engaging more publicly, including by protesting without a mask, while others are paring
back their social-media activity and taking more precautions at protests. James, who attends
New York University on a student visa, has continued to go to demonstrations and wears a
shiesty to obscure his face and cover his eyebrows — "all this stuff we know can stop facial
recognition," he explains. Stopping his activism was not an option. "I don't see myself
disengaging completely," he says. "It's just a matter of picking different ways of engagement
and supporting people who can be more visible." Still, he's nervous that authorities seem to be
casting a wide net in their pursuit of pro-Palestine activists. "It's not just lead organizers, it's
people who were at protests or signed letters," he says. "That makes me afraid, because how
much more can they expand it? How much leeway do they have that I don't know about?
Where do I fall?"

Salman, an Arab graduate student at NYU, had briefly met Khalil at a friend's birthday party
last year. They didn't speak much, but the interaction was enough to make the news of the
Columbia graduate's detention feel less abstract. *If they're deporting someone with a green
card, then what protection does my F-1 student visa offer me?* Salman thought. He also saw
parallels between his situation and the argument the Trump administration made for
detaining Khalil: While he is not an organizer, Salman has frequently posted on social media
about protests and policy demands, like calling for a cease-fire and arms embargo. "I don't
think I post more or less than your average pro-Palestinian advocate," he says, but he fears that
"people can read into what you post in whatever way." He's started to pull back from sharing
his personal political opinions on social media. He did go to a protest earlier this month to
demand Khalil's release, however, and then to another demonstration to protest Israeli
airstrikes on Gaza. He wore a mask after friends and family urged him to take steps to conceal
his identity. "I'm not taking a step back on this," he says.

Salman says his parents want him to be safe and finish his degree. "They also understand that
I'm at a point in my life right now where even if they were to tell me 'Don't do this' or 'Don't do
that,' they know me too well to think that I'm going to become silent all of a sudden out of
fear," he says. Salman currently plans to fly to attend his sibling's engagement outside of the

Petitioner's Appendix 202

U.S., which he knows involves risk, but he plans to have a lawyer or emergency contact on standby in case he runs into issues reentering the United States.

NYU is one of several universities, including Brown and UC Berkeley, that are urging international students to reconsider traveling out of the country. (Cornell had advised international students to return to campus before Trump took office in anticipation of changing immigration policies.) The U.S. government wields more power and discretion at the border than it does within its borders, and "severe consequences can emerge very quickly," says Golnaz Fakhimi, legal director of the civil-rights organization Muslim Advocates. In the span of a few hours, one interaction with a border agent could lead to a person's removal from the country and a ban on seeking reentry for years. Muslim Advocates is helping students prepare for all scenarios, including ICE detention; that means figuring out a care plan for any dependents and putting a process in place to notify emergency contacts.

Both Muslim Advocates and the advocacy group Palestine Legal tell me they've received an uptick in inquiries recently from non-citizen students who are trying to gauge the risks involved in traveling, living in on-campus housing, protesting, and posting pro-Palestine content on social media. Some students who've reached out to them have a more public profile, but many of them don't and are still worried they may be on the government's radar. Palestine Legal senior staff attorney Radhika Sainath says there has been a subtle shift in the group's approach to providing Know Your Rights training for students, given that "we have an administration in place that does not respect the law." "There's more of a focus on different scenarios and what people might expect given what they said, or who they are, and their citizenship status," she said. Still, she stresses, everybody in the U.S. — regardless of their immigration status — has a right to freedom of speech and expression, which includes criticizing the American and foreign governments.

At Columbia, which has become Trump's biggest campus target, the international student community is rallying together after ICE detained Khalil and attempted to arrest Fulbright student Ranjani Srinivasan, who subsequently left for Canada. Grant Miner, the president of Columbia's student workers union, said that typically about five people come to its international student working group meetings. Following Khalil's arrest, 80 showed up. "People I've never seen before are coming to union meetings," Miner says, "and that's not because we did a good job organizing them, it's because they feel angry." Ph.D. student Allie Wong has been referring these students to mutual-aid funds and friendly lawyers, helping provide walking escorts for those who feel unsafe, and connecting them to healing circles. She's also heard from international students who are considering moving off-campus or want a

Petitioner's Appendix 203

secondary place to stay should ICE agents show up at their residence. Some of her peers have expressed interest in helping out, but the Justice Department recently directed federal prosecutors to investigate local compliance with Trump's immigration crackdown. That can include cases where the government believes U.S. citizens are harboring people who are in the country illegally. "This is paralyzing people who do have good intentions, and who want to help their friends, who are not promoting terrorism; they're just trying to get a good education," Wong says.

Some international students are confronting the Trump administration head-on. At Cornell, Momodou Taal, a British Gambian Ph.D. student, filed a lawsuit this month alongside two U.S. citizens that alleged the executive orders Trump is using to crack down on pro-Palestine activists amount to an unconstitutional silencing of their political views. "It got to a point where international students are becoming sitting ducks," Taal says. "We shouldn't be penalized and punished with the threat of deportation because of expressing our views." Residents of Taal's building tipped him off last week that unidentified law-enforcement officers had arrived at his Ithaca home, and in a statement on X he wrote, "Trump is attempting to detain me to prevent me from having my day in court." On Friday, the Justice Department asked Taal to surrender to ICE; his legal team filed an emergency petition seeking to prevent the government from detaining him before a Tuesday hearing on the merits of his case.

Columbia student Yunseo Chung also filed a lawsuit Monday after immigration officials unsuccessfully tried to deport her. Chung is a lawful permanent resident like Khalil, and the government is relying on the same obscure immigration law to argue that her conduct — she was arrested after a campus sit-in — negatively affects America's foreign policy. Chung, who does not appear to have a leadership role in the student protest movement, and her legal team filed a petition that would block her detention while her lawsuit is ongoing, which a judge granted Tuesday.

The crackdown has led several of the students I spoke with, including those from countries that routinely stifle free speech, to question their long-term plans. Even if they want to stay in America because of their strong community ties and a desire to fight for the cause they believe is right, they're grappling with whether it's worth living in a country that won't allow them to freely express their political beliefs. James says he planned to stay in New York after his program ends, "not for nationalistic reasons" but because of the city and the friendships he's built there. But now, he's not sure it'll be possible. "It's not a question of wanting" to remain in

Petitioner's Appendix 204

the States, he says. "How long will it be until they find something to use as a reason to not let me in?"

Maryam came to the U.S. to work with particular scholars at Cornell and had no plans to stay in the country longer. Then they got into a relationship with an American citizen. "I started to think, *Maybe I could settle down here. Maybe this is a place where we could have a family and be happy*," they say. But in the wake of Khalil's arrest, the couple is talking about living "anywhere that is not here." The future they envisioned together no longer feels realistic when "international students are being hunted by the federal government," Maryam says. They're not surprised that Trump is making good on his campaign promise, but they are increasingly worried that the American public won't push back enough on the administration's crackdown. "That scares me more than anything else," they say. "That the entire world is finding a way to make this a personal failing rather than a structural issue of targeting students who engage in constitutionally protected speech."

TAGS:  POLITICS  POWER  TRUMP 2.0  THE CLASH ON CAMPUS  MORE

◼ **SHOW 22 COMMENTS**

# EXHIBIT 12

Petitioner's Appendix 206

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER, <br><br> AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AT NEW YORK UNIVERSITY, <br><br> RUTGERS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS, and <br><br> MIDDLE EAST STUDIES ASSOCIATION, <br><br>        Plaintiffs, <br><br>     v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, and the DEPARTMENT OF STATE, <br><br> KRISTI NOEM, in her official capacity as Secretary of Homeland Security, and the DEPARTMENT OF HOMELAND SECURITY, <br><br> TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, and <br><br> UNITED STATES OF AMERICA, <br><br>        Defendants. | Civil Action No. 1:25-cv-10685 (WGY) |

## DECLARATION OF VEENA DUBAL

I, Veena Dubal, declare and state as follows:

1.      I am a professor of law at the University of California, Irvine School of Law and the general counsel of the American Association of University Professors ("AAUP"). I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently do so under oath.

## Background

2.      The AAUP is a nonprofit membership association and labor union of faculty, graduate students, and other academic professionals. Founded in 1915, the AAUP seeks to promote academic freedom and shared governance at the nation's colleges and universities.

3.      The AAUP has campus chapters at colleges and universities around the country. Among those chapters are the AAUP-Harvard Faculty Chapter ("Harvard-AAUP"), AAUP at New York University ("NYU-AAUP"), and Rutgers AAUP-American Federation of Teachers ("Rutgers AAUP-AFT").

4.      I have served as the AAUP's general counsel since October 2024. In that role, I provide legal advice to the organization and monitor legal developments that are relevant to the AAUP and its members. I am also a member of the AAUP.

5.      In the past few weeks, I have closely followed the Trump administration's policy of arresting, detaining, and deporting students for their pro-Palestinian expression and association (the "ideological-deportation policy"). Because of the policy's effects on the AAUP and its members—described in more detail below—I regularly discuss it with my colleagues in the AAUP's national leadership, leaders of AAUP campus chapters, and AAUP members around the country.

Petitioner's Appendix 208

**Harm to the AAUP**

6.    In my role as the general counsel of the AAUP, I have observed firsthand two principal ways in which the ideological-deportation policy has impeded and continues to impede the AAUP from carrying out its mission.

7.    *Reducing participation in AAUP events*. The ideological-deportation policy has deterred noncitizen members from participating in AAUP events. Many noncitizen members have stayed away from AAUP gatherings over the last few weeks, particularly those that touch upon the Trump administration's efforts to deport pro-Palestinian students and faculty or to investigate universities for their handling of campus protests relating to Israel and Palestine. I have heard directly from noncitizen members, who explained that they were interested in attending AAUP events addressing these topics but decided not to for fear of being associated with advocacy related to the topics and targeted for deportation on that basis. Noncitizen members who have nonetheless attended recent AAUP events on these topics have generally refrained from speaking.

8.    For example, the AAUP recently hosted the first of a series of member gatherings to discuss the destruction of schools in Gaza. The purpose of the series was to inform the AAUP's position on and advocacy relating to the allegation that Israel has engaged in "scholasticide." Crucial to that purpose was hearing from a diverse range of the AAUP's membership, but some noncitizen members did not attend out of fear that the government might target them for their association with the event, and most of the noncitizen members who did appear kept their voices muted. Similarly, the AAUP attempted to organize a virtual event about the threats its noncitizen members face of being targeted under the ideological-deportation policy. But I heard directly from multiple noncitizen members that they would not attend unless the virtual meeting software could anonymize their identities. Because anonymity directly undermined the purpose of the event—

3

which was to hear the experiences of noncitizen members—the AAUP dropped the idea of member participation and conversation in this event.

9.     My colleagues in the AAUP's national leadership and I have had similar experiences with a range of other events, including member discussions about academic freedom and Palestine and a recent event at Columbia University focused on the Trump administration's attacks on the university and how the AAUP should respond. For example, I had hoped to have an open conversation with the membership about the repression of pro-Palestinian speech on campuses, but I heard from many chapter leaders that too many of their citizen and noncitizen chapter members would be afraid to attend, leading to a one-sided conversation.

10.     Reduced participation in AAUP events directly frustrates the AAUP's mission. The AAUP's over 44,000 members are the lifeblood of the organization. AAUP leadership engages with members through a democratic process to develop its positions and priorities and carry out its initiatives. Throughout the year, the AAUP hosts in-person and virtual gatherings to discuss academic freedom and other pressing topics in higher education. The gatherings often draw hundreds of members. My colleagues in the AAUP's national leadership and I rely on these conversations to make virtually every decision of substance about the organization's work. When members are afraid to participate in AAUP events, it prevents us from representing their interests in the organization's policymaking, report writing, and public advocacy.

11.     *Diverting resources*. The ideological-deportation policy has also forced the AAUP to divert resources that it would otherwise devote to its core mission. AAUP leadership has spent a significant percentage of its time counseling noncitizen members on the risks of deportation for participating in pro-Palestinian protests and connecting noncitizen members with immigration attorneys. I, for example, now devote at least 50 percent of the time that I allot to my AAUP

leadership position to these activities, regularly fielding calls and emails from AAUP members and chapters related to the policy. These activities are not ones that the AAUP or its leadership typically engage in, and they leave me and my colleagues in the AAUP's national leadership with less time to focus on the organization's core mission. For example, I have almost no time to discuss or advise on broader issues of shared governance at the university level or on state legislative attacks on tenure. Many of our members have lost their federal grant funding, and my attention to this critical problem and its implications for academic freedom has been limited.

**Harm to AAUP Campus Chapters**

12.     As the AAUP's general counsel, I routinely speak with leaders of AAUP campus chapters, including leaders of Harvard-AAUP, NYU-AAUP, and Rutgers AAUP-AFT. In these conversations, chapter leaders have relayed three principal ways in which the ideological-deportation policy has impeded and continues to impede their chapters from carrying out the AAUP's mission.

13.     *Diverting resources.* Much like the AAUP's national organization, all three of the above-mentioned chapters have diverted resources away from their core missions and towards advising noncitizens who fear that they will be punished under the ideological-deportation policy. For example, Harvard-AAUP has redirected resources from its work promoting shared governance and economic justice to respond to the ideological-deportation policy. Because noncitizen members expressed concern that they could be flagged for deportation based on their social media activity or other online communications, the chapter expended significant effort organizing trainings for faculty seeking to avoid government surveillance of their expressive activities online. NYU-AAUP and Rutgers AAUP-AFT have similarly diverted chapter resources to organize trainings or prepare training materials related to the ideological-deportation policy. NYU-AAUP, for instance, is preparing "know your rights" materials related to immigration enforcement on

5

NYU's campus. NYU-AAUP and Rutgers AAUP-AFT are also spending time guiding noncitizen members through university immigration resources and connecting them with individual legal support.

14.    *Suppressing membership and participation*. The ideological-deportation policy has also chilled noncitizens from joining and participating fully in all three of the above-mentioned chapters, preventing these chapters from advocating for the interests of their full constituencies. This harm is particularly acute for Harvard-AAUP, a relatively new chapter that is attempting to recruit members and build its presence on campus. Its leaders recently learned that some noncitizens who would have been eligible to become members have declined to join the organization out of fear that their membership could put them at risk of deportation. Many Harvard faculty, staff, and graduate students are noncitizens, so losing their participation deprives Harvard-AAUP of opportunities to hear from and associate with an important segment of the community it serves.

15.    In a similar vein, I have learned that the ideological-deportation policy has caused noncitizen leaders at AAUP chapters around the country to step back from leadership positions and public appearances out of fear that they will be falsely labeled as "pro-Hamas" and targeted for deportation on that basis. As an organization, the AAUP has been heavily involved in advocacy relating to academic freedom, the suppression of student and faculty discussion of Israel and Palestine on campus, the Trump administration's efforts to punish universities for not suppressing these discussions even more aggressively than they have, and the Trump administration's recent efforts to arrest, detain, and deport noncitizen students and faculty who have participated in pro-Palestinian protests. The leaders at our many chapters around the country participate in this advocacy, but noncitizen leaders are now terrified of being publicly associated with it because of

6

the risk that the Trump administration will identify them and target them for deportation. I have heard directly from one noncitizen member who has withdrawn from a chapter leadership position, and several additional members who have refrained from making public statements on behalf of their chapter. Chapter leaders have also told me that noncitizen members have declined to attend in-person meetings and events. This has deprived AAUP chapters of experienced leaders and prevented them from engaging in effective advocacy on their campuses.

16.    *Impeding campus advocacy*. The ideological-deportation policy has likewise prevented some of the above-mentioned chapters from advocating for their interests on campus in concert with noncitizen faculty and students. For example, members of NYU-AAUP recently delivered a petition to the NYU administration urging the university to drop disciplinary charges against students who had engaged in pro-Palestinian activism. NYU-AAUP members felt compelled to remove the names of all the signatories from the petition due to concerns that noncitizen signatories, including both faculty and students, could be targeted for deportation based on their decision to participate. The NYU administration discounted the petition in part because it lacked the names of the signatories. This undermined NYU-AAUP's ability to effectively advocate before the NYU administration, one of the organization's primary missions.

## Harm to the AAUP's Members

17.    As AAUP's general counsel, I also routinely speak with individual members of AAUP chapters around the country, including members of Harvard-AAUP, NYU-AAUP, and Rutgers AAUP-AFT. In these conversations, members have explained how the ideological-deportation policy has harmed and continues to harm them. I have also received reports of additional AAUP members who have been and continue to be harmed by the ideological-deportation policy.

7

### *U.S. Citizen Members*

18.    I have heard from U.S. citizen members that the ideological-deportation policy prevents them from hearing their noncitizen students' and colleagues' perspectives. Members have told me about noncitizen colleagues and students who have ceased speaking or writing publicly about Palestine, withdrawn from academic events, or altered their research or teaching plans out of fear that their expression will lead to deportation.

19.    In our conversations, U.S. citizen members have underscored how valuable to their scholarship, teaching, and public engagement they find the speech that the ideological-deportation policy suppresses. Some AAUP members I have spoken with study the world outside the United States and rely on noncitizens' perspectives to add texture to their academic work. Others collaborate closely with noncitizen colleagues and students in their teaching or research. U.S. citizen members have had to cancel events—including talks and conferences—and postpone or stop their plans to write grants, conduct research, and produce scholarship with noncitizen members who fear immigration consequences because of the ideological-deportation policy.

20.    I have also heard from U.S. citizen members that the ideological-deportation policy prevents them from associating with noncitizen members. U.S. citizen members have conveyed that their noncitizen colleagues and students have stopped attending protests and other public gatherings related in any way to Israel and Palestine, including AAUP events, because they fear that attending these gatherings could mark them for deportation.

21.    By way of example, I have spoken directly with some of the U.S. citizen members named in the complaint who have been injured by the ideological-deportation policy. I describe their circumstances below.

22.    *Joseph Howley.* Joseph Howley is an associate professor of Classics and the Paul Brooke Program Chair for Literature Humanities at Columbia. Howley's current scholarship and

8

teaching focus on the history of the book and Greek and Latin literature, among other topics. He is a U.S. citizen and a member of the AAUP.

23.     The ideological-deportation policy has limited Howley's ability to hear from and engage with his noncitizen colleagues and students, and it has undermined his teaching. As program chair of the year-long Literature Humanities course in Columbia's Core Curriculum, Howley supervises graduate students who instruct weekly seminars with undergraduate students to discuss significant literary works from a range of perspectives across time and cultures. In his regular teaching sessions with instructors, he has observed that many noncitizen instructors have stopped attending in recent weeks, and that those who do attend are preoccupied with fears of deportation and unable to focus on the course material. One noncitizen instructor told Howley they feared deportation based on their attendance merely as a bystander at a protest last year related to Israel and Palestine. Howley has also heard from noncitizen colleagues that are considering not teaching topics related to Israel and Palestine or political activism that they might otherwise have taught.

24.     The policy has also harmed Howley's right to assemble with his noncitizen colleagues and students to engage in public advocacy. Howley joined other faculty and staff members in de-escalation efforts outside the Columbia solidarity encampment in April 2024. Following the police sweep of the encampment on April 18, he appeared alongside Mahmoud Khalil and other speakers at an emergency press conference, to criticize the school president's decision to have police arrest students at the encampment. On April 22, Howley joined hundreds of citizen and noncitizen faculty at Columbia in a walkout protesting that same decision. But when he spoke at a press conference convened by the AAUP following Khalil's arrest this month, he was joined only by citizen members. He understood that noncitizen members who previously

9

would have joined him were too afraid to do so now, given the threat of deportation under the policy. It is now much more difficult for Howley to coordinate de-escalation efforts with noncitizen colleagues, including one who is now afraid to move freely around the Columbia campus and surrounding neighborhood.

26. *Chenjerai Kumanyika.* Chenjerai Kumanyika is an assistant professor at NYU's Arthur L. Carter Journalism Institute. He specializes in using audio journalism to critically investigate the way Americans understand issues such as race, the Civil War, and policing. He is also the Peabody Award–winning host of the *Empire City* podcast, which focuses on the history of the New York Police Department. Kumanyika is a U.S. citizen, a member of the AAUP and NYU-AAUP, and an elected at-large council member of the AAUP.

26. The ideological-deportation policy has limited Kumanyika's ability to hear and engage with perspectives and scholarship critical to his work. Kumanyika has collaborated in his research and scholarship with scholars across the university working on interdisciplinary initiatives that address issues of inequality and justice in the U.S. and transnationally. These scholars include noncitizens who have concerns about the public visibility of their research and scholarship because of the ideological-deportation policy. Some of these scholars have removed research and scholarship from the internet because they fear this research and scholarship could expose them to deportation.

27. *Vasuki Nesiah.* Vasuki Nesiah is a professor of practice at NYU's Gallatin School of Individualized Study, and faculty director of the Gallatin Global Fellowship in Human Rights. Nesiah's scholarship and teaching focus on human rights and international law. She is a U.S. citizen and a member of the AAUP and NYU-AAUP.

10

28.     The ideological-deportation policy has limited Nesiah's ability to hear from and engage with her noncitizen colleagues and students, and it has undermined her teaching. Prior to the policy's adoption, Nesiah frequently talked with noncitizen colleagues about Israel and Palestine and academic freedom to discuss these and other sensitive issues. Since the policy's implementation, Nesiah's noncitizen colleagues have become increasingly unwilling to discuss these topics in public or private. In a recent academic panel that Nesiah participated in, for example, the panel was simply advertised as a conversation without the names of the panelists or their institutional affiliations because another panelist feared retaliation under the policy. These measures reduced attendance and hindered the dialogue and sharing of research that is critical to Nesiah's academic work. Similarly, many of her noncitizen colleagues who live outside of the United States are now unwilling to attend academic events inside the country for fear that they will be detained and deported. For instance, several colleagues who typically attend the Law and Society Association Annual Meeting (to be held in Chicago in May 2025) have informed her that they will not attend for this reason. Because her field of international law is particularly engaged with the work of scholars who live abroad, these withdrawals hamper Nesiah's research. The policy has also chilled student discussion on campus, with many noncitizen students now avoiding the topic of Israel and Palestine out of fear that they will be targeted for deportation if they discuss it. Some noncitizen students have also expressed concern about even showing up to class, and there have been conversations among her colleagues about conducting classes over Zoom, which Nesiah considers to be a poor substitute for in-person teaching.

29.     The policy has also limited Nesiah's ability to associate with noncitizen colleagues. For example, a noncitizen colleague who had signed an open letter related to academic freedom that Nesiah and her colleagues had recently organized asked that their name be removed from the

Petitioner's Appendix 217

letter, because they feared that signing the letter would make them a target for deportation under the policy.

30.     *Sonya Posmentier.* Sonya Posmentier is an associate professor of English at NYU and the director of graduate studies in the NYU English department. Her research and teaching interests include African American and Black Diasporic literature and culture, poetry and poetics, and abolition. She is a U.S. citizen, a member of the AAUP and NYU-AAUP, and a member of NYU-AAUP's executive committee.

31.     The ideological-deportation policy has limited Posmentier's ability to hear and engage with perspectives and scholarship critical to her work. For example, Posmentier had planned to attend a conference concerning Israel and Palestine to hear a noncitizen scholar deliver a talk in their area of expertise, but that individual was forced to pull out of the conference due to a fear of deportation under the policy. As a result, Posmentier missed an opportunity to engage with and learn from that scholar, distorting Posmentier's academic community, which depends on the exchange of ideas and information between scholars. In addition, the NYU chapter of a pro-Palestinian faculty group recently removed all videos of teach-ins and public-facing events since October 2023 out of a fear that leaving the videos up would expose noncitizen colleagues featured in the videos to deportation. These videos focus on a range of topics, including definitions of antisemitism, the global university, and scholasticide. The removal of these videos prevents Posmentier and many others from listening to and learning from those conversations, as well as using them as a resource in research and teaching.

32.     The policy has limited Posmentier's ability to associate with her noncitizen colleagues and students. Posmentier has been working with her students on a collaborative publication about abolition movements that addresses, among other topics, the criminalization of

Petitioner's Appendix 218

pro-Palestinian protest on university campuses. The group had planned to publish and distribute the publication and hold a launch event including readings and performance. In consultation with her students, however, Posmentier has decided not to move forward with this plan because of student fears that it could lead to noncitizen contributors to being targeted for deportation. This deprives the entire department of the contributors' many valuable insights.

33.    In addition to the U.S. citizen members I've spoken with directly, I have received reports about several other U.S. citizen AAUP members who have been injured by the ideological-deportation policy. I describe their circumstances below.

34.    *Patricia Dailey.* Patricia Dailey is an associate professor of English and Comparative Literature at Columbia University. She specializes in medieval literature and critical theory. Dailey is a U.S. citizen and a member of the AAUP.

35.    The ideological-deportation policy has harmed Dailey's ability to hear perspectives she values as a member of her university community, and to associate with other members of the AAUP. Dailey was a member of an independent and long-running online community made up of Columbia faculty and staff, including other AAUP members. Dailey relied on the community to engage with other members of the Columbia community, including AAUP members, and to stay informed about university-related topics as well as political issues, including issues related to Israel and Palestine. Fearing that the community's content about Israel and Palestine would jeopardize the immigration status of its noncitizen members, however, the organizer of the online community, who is a noncitizen, recently decided to delete it. As a result, Dailey has lost access to views and information she found valuable, and she is no longer able to engage with other AAUP members as she once did.

13

36.     *Maya Jasanoff.* Maya Jasanoff is a professor of History at Harvard. Jasanoff's scholarship and teaching focus on the history of the British empire. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

37.     The ideological-deportation policy has harmed Jasanoff's ability to hear from her noncitizen colleagues and students. She has recently observed that noncitizen colleagues and students are reluctant to speak publicly about politics and world affairs out of concern that they will be targeted for ideological deportation. The silencing of noncitizen colleagues and students directly impacts Jasanoff's work. Because she studies the British empire, which covered nearly a quarter of the globe at its peak, she relies on the perspectives of students and colleagues from around the world to inform her scholarship and teaching.

38.     *Lauren Kaminsky.* Lauren Kaminsky is an associate senior lecturer and the director of studies for the Committee on Degrees in History and Literature at Harvard. Kaminsky's scholarship and teaching focus on European history. She is a U.S. citizen and a member of Harvard-AAUP and the AAUP.

39.     The ideological-deportation policy has harmed Kaminsky's ability to hear from, as well as associate and assemble with, her noncitizen colleagues and students. She has observed that noncitizen colleagues—even those who previously felt secure in their immigration status—have recently refrained from teaching classes or speaking publicly on increasingly politicized topics, including Palestine, and noncitizen colleagues and students have recently refrained from writing on these topics. Kaminsky is also aware of several noncitizens who have declined to join Harvard-AAUP in recent weeks out of fear that their membership could put them at risk. She has observed that noncitizen colleagues have been less willing to attend political gatherings in recent weeks.

Petitioner's Appendix 220

40.    *Rebecca Karl.* Rebecca Karl is a professor of History at NYU. Karl's research and

teaching focus on modern Chinese history, as well as the history of social theory, feminism, Mao

Zedong Thought and Marxism, and global revolution. Karl is a U.S. citizen, a member of the

AAUP, and a former president and now member-at-large of NYU-AAUP.

41.    The ideological-deportation policy has limited Karl's ability to hear and engage

with perspectives and scholarship she values. As a student of and researcher on histories of

repressive regimes, Karl is interested in the multiple ways in which marginalized people

understand their lives and worlds. As a Jewish person, she is particularly interested in the history

of antisemitism and Zionism and has helped organize educational events at NYU on those topics.

In doing so, she has sought out and engaged with the views of citizen and noncitizen colleagues.

Following the adoption of the policy, however, some noncitizen colleagues have felt compelled to

take down research and scholarly work that was previously available online, and have ceased

speaking publicly about issues related to Israel and Palestine; others have declined public speaking

opportunities.

42.    The policy has undermined Karl's ability to assemble with noncitizen faculty and

students to engage in public advocacy. Over the last year and a half, Karl has regularly engaged in

pro-Palestinian protests and public advocacy at NYU. Since the implementation of the policy,

however, Karl has noticed a significant decrease in the participation of noncitizen faculty and

students in pro-Palestinian expression, including petition-signing and public letter signing.

43.    *David Kurnick.* David Kurnick is a professor of English at Rutgers University. His

research and teaching interests include the history and theory of the novel, narrative theory, and

sexuality and gender, with an emphasis on the nineteenth century. He is a U.S. citizen and a

member of the AAUP and Rutgers AAUP-AFT.

15

44.     The ideological-deportation policy has limited Kurnick's ability to associate with his noncitizen colleagues and students. Several graduate and undergraduate students that Kurnick associates with have informed him that they have decided to refrain from signing anything related to Israel and Palestine, and to refrain from participating in any pro-Palestinian marches or demonstrations, out of fear of being targeted for deportation. Kurnick has also abstained from any public discussion of matters relating to Israel and Palestine with his noncitizen students. Instead, he has limited his communications with noncitizen students to in-person conversations. Kurnick is also responsible for the English Department's graduate admissions process this year, and some admitted students outside the U.S. have expressed hesitation about coming to study inside the United States because of concerns that the ideological-deportation policy would force them to self-censor.

45.     *Judith Surkis.* Judith Surkis is a professor of History at Rutgers University and Director of Graduate Studies in the History Department. She specializes in Modern European History, with an emphasis on France and the French Empire, gender and sexuality, and intellectual, cultural, and legal history. She is a U.S. citizen and a member of the AAUP and Rutgers AAUP-AFT.

46.     The ideological-deportation policy has limited Surkis's ability to associate with her noncitizen colleagues and students. As a member of Rutgers Faculty for Justice in Palestine, she has witnessed a radical decline in public engagement by noncitizen students and faculty on the question of Palestine since the announcement of the ideological-deportation policy. She has also noticed that noncitizen faculty are more hesitant to speak about or even attend events that address Palestine. The inability of noncitizen students and faculty to freely participate in these events deprives Surkis of their experiences and insights.

Petitioner's Appendix 222

47.     The policy has also forced Surkis to modify how she advises noncitizen graduate students in her department. Surkis previously encouraged students to travel abroad to conduct the necessary field research to write their seminar papers, devise their dissertation topics, and ultimately write their dissertations. Now, she is reluctant to recommend that they travel for their studies, because she fears some of these students may be denied re-entry, detained, and even stripped of their visas on return.

48.     *Kirsten Weld.* Kirsten Weld is a professor of History at Harvard. Weld's research focuses on modern Latin America and explores struggles over inequality, justice, historical memory, and social inclusion. She is a U.S. citizen and a member of the AAUP and Harvard-AAUP. She also serves as Harvard-AAUP's president.

49.     Weld has observed that following the administration's adoption of the ideological-deportation policy, many noncitizen students, staff, and faculty colleagues, particularly those who had been involved in pro-Palestinian organizing, have retreated from ordinary university life. Rather than engaging with the university community and participating in educational and developmental activities, noncitizen students, staff, and faculty have devoted significant attention and resources to preparing for potential immigration consequences that may result from their past expressive activities. Additionally, some noncitizen students who had previously spoken or written publicly about Israel and Palestine have now ceased participating publicly on those issues out of fear that doing so will lead to deportation. Weld valued hearing from noncitizen students on these topics, and is now deprived of receiving the speech of those who have been chilled by the policy.

### *Noncitizen Members*

50.     These accounts conform with those I have heard directly from the AAUP's noncitizen members. Many noncitizen members I have spoken to are deeply fearful that they will be targeted for arrest, detention, and deportation based on their expression and association relating

17

to Israel and Palestine. I have heard directly from noncitizen members who have withdrawn from academic conferences and pulled scholarly articles relating to Israel and Palestine because of these fears. I have also heard from one noncitizen member who has left the United States and plans to fulfill their academic responsibilities remotely for the rest of the semester. Some noncitizen members expressed concern to me that being named or even described in this lawsuit could put them at risk of retaliation under the policy.

51.    By way of example, I have spoken directly with noncitizen members—referred to in the complaint as AAUP Member C and D—who have been injured by the ideological-deportation policy. I describe their circumstances below.

52.    *AAUP Member C.* AAUP Member C is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

53.    Before the administration adopted the ideological-deportation policy, AAUP Member C regularly published their writing and participated in public advocacy on issues related to academic freedom. Now, due to fears that they will be targeted for deportation based on that writing and advocacy, AAUP Member C has felt compelled to remove previously published writing and scholarship from the internet, and to turn down opportunities to speak at academic talks and other public-facing events that they would otherwise have accepted.

54.    The individual has also been chilled from associating with colleagues at their local AAUP chapter. AAUP Member C values the ability to engage in collective action with other chapter members, but because they fear that public association with the chapter could expose them to deportation, they have forgone leadership opportunities within the chapter, reduced their participation in the chapter's public-facing work, and declined to participate in political organizing with the chapter.

55.     AAUP Member C has also been chilled from engaging in peaceful political protest and assembly. Although they would like to gather with others to engage in pro-Palestinian advocacy, they no longer do so out of fear of arrest and deportation for lawful political speech.

56.     *AAUP Member D.* AAUP Member D is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

57.     AAUP Member D recently withdrew from presenting on a topic related to Israel and Palestine at an academic conference out of concern that this could expose them to deportation under the policy. Also due to the concern about the policy, they have stopped traveling abroad for academic conferences.

58.     The individual has also been chilled from associating with colleagues at their local AAUP chapter and colleagues nationally. AAUP Member D no longer signs their name to open letters that their colleagues circulate—including open letters related to Israel and Palestine—for fear of being targeted for deportation. For the same reason, they have also ruled out pursuing a leadership position at their local AAUP chapter.

59.     The individual has also been chilled from engaging in peaceful political protest and assembly. AAUP Member D wishes to gather with others to engage in pro-Palestinian speech and advocacy, but now fears that they will be deported for doing so. They do not plan to attend future protests, but, if they do attend, they intend to wear a mask and other clothing to obscure their identity.

60.     In addition to the noncitizen members I've spoken with directly, I have received reports about several other noncitizen AAUP members—referred to in the complaint as AAUP Member A, B, and E—who have been injured by the ideological-deportation policy. I describe their circumstances below.

Petitioner's Appendix 225

61.    *AAUP Member A.* AAUP Member A is a legal permanent resident, a member of the AAUP, and a lecturer at a university in the Northeast whose research interests include race and migration.

62.    Before the administration adopted the ideological-deportation policy, AAUP Member A regularly posted on social media and engaged in other public advocacy on issues related to Israel and Palestine. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, AAUP Member A has taken down previously published social media posts about Israel and Palestine and stopped assigning materials about Palestine in the courses they teach.

63.    They have also been chilled from engaging in peaceful political protest and assembly. AAUP Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of the fear that they will be arrested and deported for doing so.

64.    *AAUP Member B.* AAUP Member B is a legal permanent resident, a member of the AAUP, and a professor at a university in the Northeast.

65.    Although AAUP Member B's academic work has obvious relevance to issues relating to Israel and Palestine, they have decided to forgo opportunities to write about these issues due to concerns that they may face immigration consequences stemming from the policy. They also decided against teaching a class they have offered in the past because the class syllabus would necessarily have included materials related to Palestine. AAUP Member B made this decision out of concern that including that material would put them at risk of deportation under the policy.

66.    AAUP Member B has also been chilled from associating with AAUP colleagues. AAUP Member B has worked for over a year with university faculty across the United States, including other AAUP members, on a national organization addressing the concerns of Jewish faculty, including on issues related to Israel and Palestine. Due to the ideological-deportation policy, AAUP Member B no longer feels comfortable having their name associated with the prospective organization or doing any public-facing work for the prospective organization.

67.    AAUP Member B has also been chilled from engaging in peaceful political protest and assembly. They previously participated in pro-ceasefire protests and other public demonstrations but no longer do so because of the fear that their lawful advocacy will lead to arrest and deportation.

68.    *AAUP member E.* AAUP Member E is a legal permanent resident, a member of the AAUP, and a professor in at a university in the Northeast. As a noncitizen, AAUP Member E was already hesitant to speak about political issues on social media. The ideological-deportation policy has made them reluctant to participate in protests and to engage in expressive or associational activities that require them to disclose their name. As a result of the policy, AAUP Member E no longer feels that they can safely exercise their free speech rights in the United States and will be spending most of the Spring semester outside of the country. Although they are able to conduct research abroad, an extended stay would substantially disrupt their professional activities and daily life.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: April 1, 2025    _____
    Veena Dubal

Petitioner's Appendix 227

# EXHIBIT 13

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS,

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS-HARVARD
FACULTY CHAPTER,

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS AT NEW
YORK UNIVERSITY,

RUTGERS AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS-AMERICAN
FEDERATION OF TEACHERS, and

MIDDLE EAST STUDIES ASSOCIATION,

          Plaintiffs,

     v.

MARCO RUBIO, in his official capacity as
Secretary of State, and the DEPARTMENT
OF STATE,

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, and the
DEPARTMENT OF HOMELAND
SECURITY,

TODD LYONS, in his official capacity as
Acting Director of U.S. Immigration and
Customs Enforcement,

DONALD J. TRUMP, in his official capacity
as President of the United States, and

UNITED STATES OF AMERICA,

          Defendants.

Civil Action No. 1:25-cv-10685

1

## DECLARATION OF ASLI Ü. BÂLİ

I, Aslı Ü Bâli, declare:

1.      I am the current President of the Middle East Studies Association of North America ("MESA"), a plaintiff in the above-captioned case. I have held that position since November 6, 2023. In my capacity as President, I regularly communicate with and respond to the interests and concerns of MESA members. I have spoken to and heard reports from many MESA members who have been directly and seriously harmed by the Trump administration's policy of targeting noncitizen faculty and students for arrest, detention, and deportation on the basis of their participation in pro-Palestinian protests and related expression and association (the "ideological-deportation policy").

2.      I am a U.S. citizen, and am myself a member of MESA. I am also a member of the American Association of University Professors, another plaintiff in this case.

3.      In addition to my role within MESA, I am the Howard M. Holtzmann Professor of Law at Yale Law School. My research and teaching interests include public international law, particularly human rights law and the law of the international security order, and comparative constitutional law, with a focus on the Middle East. As a scholar, I have written on the nuclear non-proliferation regime, humanitarian intervention, the roles of race and empire in the interpretation and enforcement of international law, the role of judicial independence in constitutional transitions, federalism and decentralization in the Middle East, and constitutional design in religiously divided societies.

4.      My declaration is based on my experience leading MESA, one of the premier academic and advocacy-oriented organizations that focuses on the study of the Middle East; my conversations with and reports I have received about members of MESA; and my own experience as a scholar who engages in research and teaching about the Middle East. I have personal

Petitioner's Appendix 230

knowledge of the facts stated in this declaration, and, if called to testify, I could competently do so under oath.

## MESA

5.      MESA is a 501(c)(3) nonprofit membership association of faculty, students, and researchers interested in the study of the Middle East (including Southwest Asia, the Arab world, and North Africa). Founded in 1966, MESA's mission is to foster the study of the Middle East, promote high standards of scholarship and teaching, and encourage public understanding of the region and its peoples.

6.      MESA accomplishes these goals by organizing programs, publications, and services that enhance education, further intellectual exchange, recognize professional distinction, and defend academic freedom. For instance, MESA hosts for its members an annual meeting, which is the premiere conference for scholars who research the Middle East. MESA also publishes the *International Journal of Middle East Studies*, the leading peer-reviewed scholarly journal on the region, and the *MESA Review of Middle East Studies*. In addition to its academic programming, MESA advocates on behalf of its members through its Committee on Academic Freedom and its Task Force on Civil and Human Rights, which work on issues that are central to MESA's mission of promoting high standards of scholarship and teaching, defending academic freedom, and supporting civil and human rights.

7.      MESA has over 2,000 individual members, including faculty and students at universities across the country who work in the field of Middle East studies, as well as more than 50 institutional members and 36 affiliated institutions. MESA's membership is made up of U.S. citizens as well as many noncitizens, and includes members who live outside of the U.S. or who

Petitioner's Appendix 231

frequently travel abroad as part of their academic work—all of whom contribute invaluably to the scholarly community MESA seeks to foster.

**The Effect of the Ideological-Deportation Policy on MESA's Members**

8.      I and other members of MESA have been directly and seriously harmed by the Trump administration's ideological-deportation policy. The policy, along with the Trump administration's attendant threats, has created a climate of fear and repression that has caused significant and lasting damage to the community of scholars—both U.S. citizens and noncitizens alike—that MESA represents.

9.      Since the ideological-deportation policy began, I have heard from many MESA members who feel the need to self-censor out of fear that their speech and expression could put them at risk of arrest, detention, or deportation. For instance, I know that some noncitizen MESA members have deleted their social media profiles or decided to take down posts that could be interpreted as advocating for pro-Palestinian positions. Some have removed public indicia of their involvement with pro-Palestinian groups on campus. Noncitizen MESA members have told me that they are afraid to organize even ordinary academic programming and events that touch on the issue of Palestine. Similarly, I have spoken to noncitizen members who are concerned that simply teaching about Israel and Palestine in class might put them at risk for arrest, detention, or deportation. As a result of the policy, many noncitizen members of MESA are now terrified of engaging in critical aspects of their research, teaching, and public advocacy, especially when those activities touch on Israel or Palestine.

10.      For example, I have spoken with two noncitizen MESA members—whom the complaint refers to as MESA Member A and MESA Member B—who have drastically limited

4

their scholarly and public engagement because of the ideological-deportation policy. I describe their circumstances below.

11. **MESA Member A.** MESA Member A is a legal permanent resident, a member of MESA, and a professor at a university in the southern United States whose research interests include topics related to Israel and Palestine.

12. Before the administration adopted the ideological-deportation policy, MESA Member A regularly posted on social media about Israel and Palestine, including on topics related to their area of academic expertise, and engaged in other public advocacy on issues related to Israel and Palestine. Other MESA members followed MESA Member A on social media and frequently engaged with their posts. Because of the policy, however, and the fear that they will be targeted for deportation based on their writing and advocacy, MESA Member A has significantly reduced their engagement on social media, and feels compelled to self-censor when posting about Israel and Palestine.

13. The policy has also interfered with MESA Member A's academic research and writing. Out of concern that their current immigration status could be revoked at any moment based on their past expressive activity, MESA Member A now refrains from traveling internationally. This has prevented them from engaging in key aspects of their research, including conducting interviews with people abroad and accessing research materials that are available only abroad. It has disrupted MESA Member A's ability to conduct research for a new book project that relies on those methods. MESA Member A also had to cancel plans to travel to academic conferences in Europe that they otherwise would have attended, preventing them from associating with their colleagues, including other MESA members.

Petitioner's Appendix 233

14.    They have also been chilled from engaging in peaceful political protest and assembly. MESA Member A previously participated in pro-Palestinian protests and public demonstrations regularly and still wishes to gather with others to engage in pro-Palestinian speech and advocacy. They no longer participate in these activities because of fear that they will be arrested and deported for doing so.

15.    **MESA Member B.** MESA Member B is a legal permanent resident, a member of MESA and the AAUP, and a professor at a university in the Northeast whose research interests include gender studies and Middle East studies.

16.    Before the administration adopted the ideological-deportation policy, MESA Member B regularly organized workshops, teach-ins, and meetings related to Palestine and shared information about Palestine-related events on social media. Now, due to fears that these activities could lead to deportation, they have declined opportunities to chair academic committees, refrained from publishing work related to Palestine, stopped going to protests or demonstrations, and taken down all their social media posts about events related to Palestine.

17.    MESA Member B has also forgone research grants and opportunities that would have required them to travel to the Middle East, due to the risk of being denied reentry based on their pro-Palestinian expression and association. This has harmed their ability to pursue their scholarship, which requires traveling abroad to interview people and attend cultural events that are the subject of their research.

18.    The experiences of MESA Member A and B are just two examples. I have heard from and know of many more noncitizen MESA members who have sharply limited their speech and expression on issues relating to Israel and Palestine, out of fear that they may be targeted for arrest, detention, or deportation based on those activities. Indeed, some noncitizen members

Petitioner's Appendix 234

expressed concern that even being named or described in connection with this lawsuit could put them at risk under the ideological-deportation policy. Others informed me that they were deeply concerned about having their specific experiences described at all in the lawsuit, even anonymously.

19.    The climate of fear and repression created by the ideological-deportation policy has not only harmed noncitizen MESA members, it has also had a direct and significant impact on MESA members who are U.S. citizens by preventing them from engaging with and hearing from their noncitizen colleagues and students.

20.    I rely greatly on the insights of my noncitizen colleagues in MESA. As President of MESA, it is important for me to understand the breadth of interests represented in the organization to ensure that I am able to address the most pressing priorities for MESA's membership. Being able to freely communicate with noncitizen members of MESA about their views and opinions is vital to achieving that goal. Because of the ideological-deportation policy, however, many noncitizen members of MESA are concerned about communicating with me about topics relating to Israel and Palestine, especially in writing or over email, even though those topics are salient to their scholarship or to MESA's work defending the academic freedom of its members. Many noncitizen members have also retreated from public engagement on issues relating to Israel and Palestine, which is a crucial area of Middle East study, making it harder for me to stay on top of scholarly and other developments in the field that are important to my role as President of MESA.

21.    The policy has also seriously undermined my academic work. I am a legal scholar whose research and teaching focuses on the Middle East. My work has often placed special attention on Palestine. For instance, I have written about and discussed publicly the United

7

Nations' unique role in the Israeli-Palestinian conflict and the application of international law to Israel and Palestine. I have organized conferences and events on human rights in Israel and Palestine and engaged with colleagues and students about their views on the topic. Because many noncitizen MESA members have restricted their expressive and academic activities out of fear that they may be targeted for arrest, detention, or deportation, I have lost the benefit of many of my colleagues' research and expert views on the issues I am interested in studying, particularly where they relate to Israel and Palestine. Because I understand that my noncitizen colleagues now fear deportation based on their scholarly work, I hesitate to approach them to collaborate on public projects that might put them at risk. For instance, I am reluctant to coauthor blog posts, essays, or articles with noncitizen graduate students or untenured colleagues that touch on issues related to Israel and Palestine for fear of putting these potential coauthors at risk of ideological deportation. These are partnerships I would have enthusiastically pursued prior to the ideological-deportation policy.

22.    Additionally, I have become increasingly concerned about the participation of some of my noncitizen colleagues in a conference scheduled to take place in April at Yale Law School. Although I and others have spent over a year organizing this conference and expected the event to take place in-person, I recently proposed moving the conference entirely or partially online due to concerns that noncitizens would not participate in light of the ideological-deportation policy. Some participants have decided to limit their participation by joining virtually rather than risk potential deportation if they traveled to attend in person. This change has already diminished the value I and the other organizers hoped to gain from the conference. Should more participants decide to join exclusively online it would be devastating to the conference, which was intended to bring the participants together in the same space to network and exchange ideas in-person.

Petitioner's Appendix 236

23.    I also know of, or have heard from colleagues about, noncitizen students who have been significantly harmed by the ideological-deportation policy. Noncitizen students have removed posts from their social media, taken down previously published writing, and removed references to published writing from their own profiles, particularly if the content of the posts or writings touch on Palestine. This is especially damaging for any students who wish to become academics, as it prevents them from developing a public profile of scholarly work in the field. Noncitizen students have also withdrawn from student organizations on campus in order to distance themselves from events relating to Israel and Palestine, because of the fear that being associated with the events could have consequences for their immigration status. The chill that the ideological-deportation policy has produced on student speech directly and adversely affects my own work because my research agenda is ordinarily informed and enriched by ideas and novel issue areas that I develop or learn about in conversation with my students.

24.    My experiences are not unique. I have spoken with at least four of my MESA colleagues, whom I describe in more detail below. These members, and many more, have been seriously harmed by the ideological-deportation policy and the broad chilling effect it has had on the expressive and associational activities of noncitizen faculty and students who do work or advocacy related to the Middle East.

25.    **Beth Baron.** Beth Baron is a distinguished professor of History at the City University of New York. Baron's scholarship focuses on the history of medicine in Egypt. She is a U.S. citizen and a member of MESA.

26.    The ideological-deportation policy has harmed Baron's ability to receive information from her noncitizen students. Several of Baron's noncitizen students, some of whom are members of MESA, are now afraid to travel abroad to visit archives and libraries that have

historical sources critical to their research because they fear they will not be allowed back into the country. This fear of travel due to the policy significantly limits the set of topics Baron's students can research or write about, which diminishes her own, and her department's, ability to benefit from these students' work. Baron has also heard from noncitizen students who have removed content from their social media accounts, taken down images and content from websites, and who are self-censoring in their teaching, especially on topics related to Israel and Palestine and U.S. foreign policy. These students have taken these actions out of a fear that their speech could lead to them being targeted for deportation. Baron has been deprived of these students' insights and experiences, which she otherwise would have valued engaging with.

27.    The policy has also limited Baron's ability to associate and assemble with noncitizen colleagues and students. Baron recently attended an academic event related to Palestine that was accessible only in-person because the organizers decided not to allow people to access the event remotely, out of fear that doing so would expose noncitizen participants to deportation. Prior to the policy, Baron attended anti-war demonstrations with noncitizen students and colleagues. Now, many of those individuals have stopped attending protests because they are afraid of being deported.

28.    **Nadia Abu El-Haj.** Nadia Abu El-Haj is a professor of anthropology at Barnard College, Columbia University and the Co-Director of the Center for Palestine Studies ("CPS") at Columbia University. Abu El-Haj's scholarship focuses on Zionism, Israel, and Palestine. She is a U.S. citizen and a member of MESA and the AAUP.

29.    The ideological-deportation policy has harmed Abu El-Haj's ability to hear from and associate with her noncitizen colleagues and students. One of her noncitizen students, who previously contributed to many events on campus and posted useful updates from Arabic language

10

news reports on social media, has now ceased participating in events and deleted their social media accounts for fear of losing their student visa. Another noncitizen student, who was once a leading pro-Palestinian voice on campus, has stopped speaking publicly and has gone into hiding since Khalil's arrest, out of fear that ICE might arrest or detain them. In response to her noncitizen students' and colleagues' concerns about ICE raids at campus events, Abu El-Haj cancelled a CPS event that was scheduled to take place in February. She has since felt compelled to cancel two more upcoming CPS events in April for the same reason. The policy has thus impaired Abu El-Haj's ability to learn from and meet with these students and to host CPS events.

30.    **Noura Erakat.** Noura Erakat is a professor of Africana studies and Criminal Justice at Rutgers University. Her research and teaching focus on international law, including human rights law. She is a U.S. citizen and a member of MESA.

31.    The ideological-deportation policy has harmed Erakat's ability to hear from her noncitizen colleagues and students. Noncitizen colleagues with whom Erakat collaborates closely have paused work on ongoing projects related to Palestine out of concern that they will be targeted for ideological deportation. One colleague, for example, paused their contributions to a legal research project that they are drafting in collaboration with Erakat after learning of Khalil's arrest. Erakat has also observed that noncitizens students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their personal experiences. Because her scholarship relies on narratives from conflict zones, her work suffers when noncitizens are chilled from sharing their experiences.

32.    **Zachary Lockman.** Zachary Lockman is a professor of Middle Eastern and Islamic Studies and of History at NYU. His research and teaching focus on the modern history of the Middle East. He is a U.S. citizen and a member of the AAUP, NYU-AAUP, and MESA. He chairs

Petitioner's Appendix 239

the subcommittee of MESA's Committee on Academic Freedom that seeks to address threats to academic freedom in the United States and Canada.

33.     The ideological-deportation policy has harmed Lockman's ability to hear from and engage with his noncitizen colleagues and students. Lockman relies on the perspectives of noncitizen colleagues and students to enrich his work in Middle East studies. Some of his noncitizen colleagues in MESA have recently declined invitations to speak at academic events, however, due to concern that increased visibility could lead to their deportation. Others have censored their syllabi for the same reason. Lockman has also observed that noncitizen students are less willing to speak in class and in public about Palestine or related issues, even if those issues relate to their countries of origin. And he is aware of noncitizen graduate students who have altered their research plans to avoid international travel because they fear having their visas or green cards revoked based on their pro-Palestinian expression or association. As a result, Lockman and his colleagues are deprived of the results of this research.

34.     In addition to these four MESA members, I have heard from many more U.S. citizen members of MESA who have lost the benefit of hearing from and engaging with their noncitizen colleagues and students due to the ideological-deportation policy. Some members have reported that they are now required to take on more public-facing work in their departments or other groups due to their noncitizen colleagues' decisions to step back from this work out of fear that they may be targeted under the policy. Some have expressed increasing concern about approaching noncitizen colleagues to collaborate on or co-author any kind of public writing. Others have described canceling or altering planned events out of fear that they might place noncitizen colleagues or students at risk. The result of the ideological-deportation policy has been

Petitioner's Appendix 240

to significantly limit the ability of citizen members of MESA to work with and learn from their noncitizen colleagues and students.

## The Effect of the Ideological-Deportation Policy on MESA

35.    The Trump administration's ideological-deportation policy has also seriously harmed MESA itself.

36.    In line with the experiences described above, many noncitizen members of MESA have scaled back their participation in MESA's events and projects due to their fears of being targeted for arrest, detention, or deportation based on their political and scholarly engagement related to Israel and Palestine.

37.    Noncitizen members play an especially critical role in the academic community MESA seeks to foster. They often possess unique insights, personal connections, and skills— including heritage language skills—that allow them to become among the most effective ethnographers and researchers working in the discipline. This also gives many noncitizen members special insight into how an academic and advocacy organization like MESA can best serve its community of scholars. Noncitizen members of MESA make invaluable contributions to the organization. That the ideological-deportation policy has compelled many noncitizen members of MESA to step back their engagement with MESA undermines MESA's goal of facilitating the exchange of pedagogical insights, academic expertise, and novel research among its members.

38.    The policy has also had a significant negative impact on participation in MESA's annual meeting. As part of its mission to grow and support the academic community that studies the Middle East, MESA hosts an annual meeting, which is the premier academic conference for those who study the Middle East. The meeting consists of four days of academic programming, professional development, networking, and special events. Participants in the annual meeting

13

attend research workshops, participate in joint projects that help advance the study of the Middle East, form research collaborations, and discuss the issues most pertinent to their work. The meeting is a critical forum for scholarship, intellectual exchange, and pedagogical innovation, and for many MESA members, the annual meeting is the highlight event of the year.

39.    Unfortunately, there will be a decline in participation this year as a result of the policy. I have heard from noncitizen members of MESA who are concerned about attending MESA's annual meeting, which is scheduled to take place in November 2025 in Washington, DC. Members have told me that they fear that their attendance at the conference could put them at risk for arrest, detention, deportation, or other immigration consequences. Each year, in preparation for the annual meeting, MESA solicits paper proposals for the conference in mid-February. After the administration's adoption of the ideological-deportation policy, I have noticed a meaningful decline in submissions. This year, the initial deadline for submitting paper proposals was on February 13, 2025. However, a number of scholars who ordinarily submit paper proposals informed me that they were unable to meet the deadline for submissions. Some expressed concerns about attending the meeting, due to its location. In particular, members outside of the U.S. expressed fears that they would be denied entry or harassed because of the administration's ideological-deportation policy. Noncitizen members also reported feeling overwhelmed and unable to focus on making plans for the annual meeting because of their fear that scholarship and speech about the Middle East, the entire focus of their academic careers, might become the basis for being targeted by the government.

40.    Submissions at the initial deadline this year were almost 40 percent below where they should have been, based on my estimates from past MESA annual meetings in Washington, DC. Given that sharp decline in submissions by that deadline, MESA's leadership decided to grant

Petitioner's Appendix 242

an across-the-board extension to February 20, 2025, something that the organization has rarely done in its history. After we extended the deadline for submissions, there was still a marked decrease in the total number of submissions compared to prior years. Based on the number of submissions, participation in the 2025 annual meeting is projected to fall 10 percent below the level we expected.

41.    Due to our members' fears of ideological deportation, MESA's annual meeting will have lower attendance, garner fewer contributions to the scholarly field, and provide a less effective opportunity for intellectual exchange. Additionally, noncitizen members' reports of self-censorship in their research, scholarship, and advocacy based on their fear of being targeted by the government is expected to reduce overall engagement in the annual meeting and reduce submissions to MESA's scholarly publications, particularly on issues concerning Israel and Palestine.

42.    The absence of these noncitizen members' voices will have a substantial impact on the annual meeting, depriving MESA and its other members of the important insights, information, and views these scholars would have contributed. Academic conferences, especially ones like MESA's annual meeting, are most effective when a wide-range of backgrounds and viewpoints are represented. Reduced attendance or engagement at the annual meeting will limit the information and ideas shared at the meeting and the opportunities for networking and intellectual exchange that would otherwise be available in the absence of the policy. It will take away from the vibrancy of the conversation and community MESA seeks to foster at its annual meeting, and it will greatly impair MESA's ability to pursue its mission of fostering the study and public understanding of the Middle East.

Petitioner's Appendix 243

43.     Reduced attendance at the annual meeting will also impose serious financial burdens on MESA. A significant portion of MESA's budget is funded through the registration fees connected to attendance at the annual meeting. Based on the sizable reduction in the number of academic papers submitted for the meeting, which has previously been a reliable predictor of attendance, I anticipate that registrations for the next annual meeting will be seriously reduced, meaning MESA will collect substantially fewer registration fees. Additionally, because the annual meeting is the premier event of the year for MESA members, I anticipate that some individuals who cannot or will not attend the meeting due to concerns relating to the ideological-deportation policy will allow their memberships to lapse, and others who might have joined MESA to attend the annual meeting will not do so due to fears of the potential immigration consequences stemming from the ideological-deportation policy. This would impose an even greater financial cost on MESA given its reliance on dues-paying members for its annual operation budget.

44.     The ideological-deportation policy has also required MESA to divert resources to managing and addressing the consequences of the policy for its members, that it would otherwise devote to its core mission. I and other members of MESA's leadership, staff, and volunteer faculty are now required to spend substantial time and attention responding to crises stemming from the ideological-deportation policy, which takes away from MESA's ability to develop and foster scholarship.

45.     For instance, MESA's Committee on Academic Freedom and MESA's Task Force on Civil and Human Rights have recently been inundated with requests for assistance from noncitizen MESA members who fear arrest, detention, and deportation under the policy. Before the policy, these advocacy committees addressed each member's request for assistance individually. Now, they spend time developing triage criteria for prioritizing certain requests. The

16

committees have also needed to shift their focus from addressing threats to MESA's members from foreign governments to addressing threats stemming from the U.S. government's ideological-deportation policy. For example, in past years, a significant portion of the Committee on Academic Freedom's work involved advocacy outside the United States. Now, the committee is forced to devote most of its attention to addressing the concerns of noncitizen MESA members who fear potential immigration consequences stemming from the ideological-deportation policy. Between November 2018 and November 2024, the committee produced 211 letters, of which 85 (or 40 percent) concerned North America. In the first few months of 2025, 80 percent of the letters produced by the committee have concerned North America.

46.    MESA leadership has also been required to develop new and different programming aimed at addressing members' concerns related to the ideological-deportation policy. For example, MESA developed and held a know your rights workshop on March 27, which addressed details about the legal options available to noncitizen students and colleagues should they be affected by the ideological-deportation policy, as well as best practices to address risks to our members during travel. MESA has another similar workshop planned for April 1. These are events that MESA leadership believed were necessary to help protect its members from the ideological-deportation policy. MESA leadership is also facilitating meetings between its members and legal services groups on April 9 to respond to member concerns relating to travel and digital security. This is programming that MESA would not typically arrange for its members, and is not the kind of service that a scholarly association regularly provides for its members.

47.    Additionally, because so many MESA members are fearful of the immigration consequences stemming from the ideological-deportation policy, MESA has begun to distribute a new monthly message to members to provide them with resources and information about MESA's

Petitioner's Appendix 245

response to the ideological-deportation policy. For instance, on February 10 and March 21, MESA's leadership sent members information about threats to academic freedom and MESA's mission arising from the ideological-deportation policy. As a result of this significant shift in focus and attention, MESA has had fewer resources to dedicate to its regular academic programming. This includes supporting the program committee's work in selecting proposals to include in our annual meeting in November 2025, with our usual timeline having had to be pushed back to accommodate new demands on our resources. In addition, more staff time is now dedicated to messaging and communications around the threats to academic freedom and freedom of association in the U.S. due to the ideological-deportation policy.

48.    I declare under penalty of perjury that the forgoing is true and correct.

Respectfully submitted,

_____
Aslı Ü Bâli

April 1, 2025

Petitioner's Appendix 246

# EXHIBIT 14

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

### DECLARATION OF CORI HASH

I, Cori Hash, here by declare and state:

1.     I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

2.     I am a resident of Austin, Texas. I am an attorney licensed by the State of Texas. I am also licensed in Kentucky and Virginia, though I currently have inactive status in both states. I have been practicing immigration law for the past twenty years. I practiced immigration law in Kentucky from 2004 until 2014. In 2014, I relocated to the Washington, DC area where I worked for a non-profit organization representing asylum seekers and mentoring pro bono attorneys handling asylum cases. During the time I worked in Kentucky and Washington, DC, I occasionally represented individuals detained in Texas. In 2018, I moved to Austin, Texas where I practiced immigration law, including representing numerous individuals in removal proceedings, until 2024.

3.     I am currently a Senior Staff Attorney at Immigrant Legal Resource Center ("ILRC"). In my current role, I provide technical assistance and training to attorneys and

accredited representatives around the country working on immigration cases. This includes drafting guidance on immigration practice. Further, as part of this practice, I participate in the "attorney of the day program," which is where ILRC attorneys consult with immigration attorneys and accredited representatives who want technical assistance on a particular case. I usually participate in this program about three times a month, but it can be more. On any one day where I work on that program, I get anywhere from two to twenty cases to review. Also, as part of my role, I monitor listservs where immigration attorneys reach out for additional assistance and review the various facts of many cases from around the country.

4.    In my practice as an immigration attorney, I have worked with many clients who have held non-immigrant visas. I have worked specifically with students dealing with immigration issues related to student and other temporary visas, including students utilizing the F-1 program. I have represented dozens of students with F-1 visas seeking other immigration status, including those applying for Lawful Permanent Resident Status, and those who overstay their visa or face other complications maintaining lawful status. I have worked with students who have fallen out of status and were later placed in removal proceedings, with some of those following an ICE encounter. Leqqa Kordia's case is out of the ordinary based on my experience.

5.    In my experience, most students who are a "visa overstay," are issued a Notice to Appear in immigration court, and are rarely detained unless they have a criminal conviction. I can only recall one student visa holder who was detained by ICE without a criminal conviction, and that individual was arrested in a county that turns people over to ICE before an initial hearing in criminal state court. Further, in that instance's immigration case, an Immigration Judge granted a bond, and ICE did not appeal, nor did ICE use their automatic stay powers to prolong the detainee's detention. This case is memorable to me because it was so out of the ordinary.

6.      Absent the above exception, in my 20 years of practice, I have not seen a case where DHS has detained an individual student visa holder, absent that exception.

7.      Further, based on my experience, it is extraordinary that DHS would target for investigation and prioritize someone who was a prior F-1 visa holder and whose status had lapsed, with the exception of individuals who were being held in jail pursuant to state criminal arrests.

8.      I have never had DHS make a press release for one of my clients. I have seen DHS release press releases for the arrest of immigrants in the past, but almost all of those arrests pertained to serious criminals who appeared to be part of a broader strategic arrest plan.

9.      Across hundreds of cases I have been a part of, I have rarely encountered a student visa holder with no criminal history being detained for overstaying his or her student visa for more than a few days, and certainly not where that student has credible defenses to removal. As an immigration law practitioner, the Petitioner's continued detention, which, as I understand, has now lasted over a month, represents a stark departure from standard practice over my 20 years of experience.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 21st day of April 2025 in Austin, Texas.

Cori Hash
Senior Staff Attorney, Immigrant Legal Resource Center

# EXHIBIT 15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

**<u>DECLARATION OF ANNE CHANDLER</u>**

I, ANNE CHANDLER, here by declare and state:

1.        I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

2.        I am a resident of Austin, Texas. I have been a licensed attorney in Texas since 1998. Over the past 25 years, I have focused my career on helping immigrants navigate the complexities of the immigration system, including obtaining or maintaining legal status. My legal specialty is immigration law. I am currently the Founding Executive Director of the Texas Immigration Law Council ("TxILC"), a nonpartisan, statewide immigrant legal resource and advocacy organization.

3.        Prior to founding TxILC, I served as the Director of the Immigration Legal Services of the YMCA International Services of Greater Houston where I was the sole attorney, overseeing a department of seven individuals that provided free or low cost representation to over 550 immigrant clients, most of whom were seeking to adjust their status to become legal permanent

residents based on an approved family petition or because they were statutorily eligible to do so due to their status as refugees or asylees.

4.　　　After practicing immigration law at the YMCA International Services, I became an Associate Clinical Professor of the University of Houston Law Center (2002-2009) where I taught immigration law and supervised law students enrolled in the Law Center's Immigration Clinic. Over my seven years at the Immigration Clinic of the Law Center, I represented or supervised the representation of over 380 immigrant clients and provided legal information or assisted pro se services to over 2,000 individuals who were detained by the Immigration Customs Enforcement ("ICE").

5.　　　In 2009, I became the Founding Executive Director of the Houston Office of the Tahirih Justice Center, an immigration legal services organization that partners with pro bono attorneys to deliver free immigration legal services. Over the ten years when I was at the Tahirih Justice Center, we represented over 900 immigrant clients in a broad range of immigration matters.

6.　　　Since I became an attorney in 1998, I have been involved in representing thousands of immigrants who had cases before the DOJ Executive Office of Immigration Review and in affirmative cases before USCIS. In cases involving detained clients in civil detention centers across Texas, I, or pro bono attorneys and law students under my supervision, frequently served as legal counsel before ICE to secure our clients release from civil detention.

7.　　　My work has focused on delivering immigration legal services to immigrants who were seeking to obtain legal status or adjust their status to become a legal permanent resident. I have represented, supervised, or assisted in the legal representation of hundreds of immigrants who were originally admitted to the United States on F-1 student visas, B-2 tourist visas, or K-1 fiancé visas. I have also represented, supervised, or assisted in the legal representation of hundreds of

adults who were detained for various reasons, such as failure to be properly inspected and admitted into the United States or because they engaged, or were believed to have engaged, in criminal conduct. With one exception, I have never had a client—who was of sound mind, properly admitted on a visa, and with no criminal history—be detained for any extended period.

8.    When employed full-time by the University of Houston Law Center, our Immigration Clinic received DOJ grant funding to provide Know Your Rights presentations and pro se legal help to adult immigrants detained in the Houston area. Through this program, my students and I had access to immigration records and charging documents of over 2,000 detained adults. The majority had not been properly admitted into the United States on visas or as legal permanent residents. Those who had been admitted often had significant criminal histories that subjected them to mandatory detention or removal. When we identified cases where we believed the law was not being accurately applied, our Clinic frequently represented individuals in bond or merits hearings before immigration judges. Across hundreds of cases, I never had a client— lawfully admitted with no criminal history and with credible evidence—detained for more than a few days. I also never had a client in that category, with an approved I-130 petition, detained within a few days.

9.    I am familiar with the facts of Ms. Leqaa Kordia's case. I understand that she has an approved I-130 that forms the bases of her ability to adjust status to lawful permanent residency, but that she allegedly overstayed her student visa. I understand that she has been detained since March 13, 2025, after voluntarily presenting herself to authorities. I also understand that Ms. Kordia has never been convicted of a crime.

10.    I have never had DHS or any other federal agency issue a press release about one of my detained clients, which I understand happened to Ms. Kordia.

11.     In my 25+ years of experience, Ms. Kordia's prolonged detention is unprecedented. I have never had a client who was lawfully admitted into the United States with no allegation of fraud, without any criminal history, and with an approved I-130, be detained for any meaningful length of time, let alone for over a month.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 19, 2025, in Austin, Texas.

_____

Name: Anne Chandler
Title:   Executive Director, TxILC

# EXHIBIT 16

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

**DECLARATION OF JODI GOODWIN**

I, JODI GOODWIN, hereby declare and state:

1.      I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

2.      I am a resident of Harlingen, Texas. I am an attorney licensed by the State of Texas. I am Board Certified in Immigration and Nationality Law through the Texas Board of Legal Specialization. I obtained my Juris Doctor degree from St. Mary's University School of Law in 1995. Following my graduation, I was a Judicial Law Clerk with the U.S. Department of Justice Executive Office for Immigration Review, providing legal research and writing support for Immigration Judges at the Harlingen, Texas and Port Isabel Service Processing Center Immigration Courts.  After leaving this position, I established my own firm, the Law Office of Jodi Goodwin, based in the Rio Grande Valley. Through this practice, I serve clients worldwide.

3.      I have practiced immigration law exclusively for nearly 29 years. Through my law practice, I have assisted clients at virtually every step of the immigration process. It is my estimate

that I have worked with approximately 5,000 clients over the course of my practice. This includes cases involving complex removal defense, applications for humanitarian protection, applications for waivers of inadmissibility, naturalization, family-based petitions, business immigration visas, consular processing, and varied requests for non-immigrant status. I have represented these clients at nearly every level of the court system, resulting in numerous published decisions issued by the Board of Immigration Appeals and Federal Courts of Appeals.

4.      Throughout my career, I have been an active member of the immigration bar. I have mentored dozens of immigration practitioners informally, and through formal mentorship programs. I am a past Chair of the Texas, Oklahoma, and New Mexico Chapter of the American Immigration Lawyers Association, and past Director of the Cameron County Bar Association. I have also served on national and local liaison committees with Customs and Border Protection and Immigration and Customs Enforcement. For my decades of work in immigration law, I have received the Arthur C. Helton Award for Advancement of Human Rights, and the Michael Maggio Memorial Pro Bono Award from the American Immigration Lawyers Association.

5.      A significant portion of my practice involves complex removal defense of individuals who are detained by Immigration and Customs Enforcement (ICE). This practice frequently involves requests for custody redeterminations in the form of bond proceedings. Since establishing my practice, I estimate that I have participated in, as lead counsel or as a mentor, in 700-800 bond proceedings over the course of my career. Many of these bond proceedings have been conducted by Immigration Judges sitting at the Port Isabel Detention Center.

6.      In my nearly thirty years of experience in immigration law, the use of the automatic stay provision housed in 8 C.F.R. 1003.19(i)(2) is exceedingly rare. I have been successful in obtaining release on bond for hundreds of clients over the course of my career. In each of these

occasions, ICE has had the option to seek the automatic stay. Despite this, I have memory of only two cases in which the government has invoked this stay. These cases involved individuals with extensive or extreme criminal history. I have never been involved in a case where the government invoked the automatic stay against an individual with no criminal history.

7.      Furthermore, in my experience, it is highly unusual for the government to detain an individual in Ms. Kordia's position all together. I have represented hundreds of individuals seeking to obtain and/or maintain lawful status who have been issued a Notice to Appear in immigration court following an encounter with immigration officials. This includes individuals who, like Ms. Kordia, have fallen out of F-1 student visa status. Because of the particular geographical area in which I practice, I most often come into contact with individuals with lapsed F-1 status who were attempting to cross a Customs and Border Protection checkpoint after having vacationed south of the checkpoint. In each of these cases, although my clients were detained by ICE, I have been able to have them released on their own recognizance or on a minimum $1,500 bond. I have never had ICE invoke the automatic stay in any of these cases.

8.      In my experience, it is out of the ordinary for ICE to detain anyone whose lawful immigration status has lapsed absent some other factor, such as criminal history.

9.      It is also highly unusual for an individual with Ms. Kordia's history to be named in a Department of Homeland Security press release. ICE press releases have been reserved for the clients I have represented whose immigration cases touched on matters of grave consequence, such as government informants, individuals designated under the Foreign Narcotics Kingpin Designation Act, and those accused of extensive ties to drug- and human- smuggling operations.

10.     The government's choice to detain Ms. Kordia, an individual with a lapsed immigration status and several avenues for relief in front of the immigration court, half way across

the country from her family, is extraordinarily out of the typical course of conduct that I have observed in my decades of practice of immigration law in a detained and non-detained setting.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _April 29, 2025_____ in Harlingen, TX.

_____

Jodi Goodwin
Law Office of Jodi Goodwin

# EXHIBIT 17

## DECLARATION OF KERRY DOYLE

I, Kerry Doyle, certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1.  My name is Kerry Doyle.  I am currently Of Counsel with Green and Spiegel, LLC, which is an immigration firm based in Philadelphia, Pennsylvania. I graduated cum laude from American University, Washington College of Law with a J.D. and The George Washington University with a B.A. in Political Science.  I am a member of the Commonwealth of Massachusetts Bar, the Supreme Court Bar and the bars of Several Federal Courts of Appeals and U.S. District Courts.

2.  I have practiced immigration, asylum and refugee law since 1993. I have served in the government and worked in both the non-profit and private sector. I served as Principal Legal Advisor (PLA), for Immigration Customs Enforcement (ICE) from September 2021 through September 2024. During that time, I served on detail as Acting Deputy General Counsel, Office of General Counsel (OGC), Department of Homeland Security (DHS) from February 2024 through May 2024 and as Deputy General Counsel from October 2024 through December 2024. I was appointed as an Immigration Judge and served in that position from December 2024 through mid-February 2025. I managed Graves and Doyle, a private immigration firm, in Boston, MA for twenty years after working in the non-profit sector for almost ten years. I have taught immigration, asylum and refugee law as an adjunct professor at both University of Miami School of Law and Suffolk University School of Law. I previously served as Chair of the New England Chapter of the American Immigration Lawyers Association (AILA).

3.  I am a recognized expert in complex immigration issues, including immigration court removal proceedings. I have been a frequent speaker at immigration conferences and national lawyer trainings, including recurring trainings co-hosted by the Boston Immigration Court (part of the Executive Office for Immigration Review (EOIR)) and the New England chapter of AILA, with a specific focus on training pro-bono attorneys volunteering to represent noncitizens in immigration bond hearings. I have been recognized as an expert witness on immigration law topics before both state and federal courts. In light of my expertise, while in private practice, I was selected by the Immigration Court to represent detained individuals who have been deemed incompetent through the National Qualified Representative Program. In the past, I worked closely with the Massachusetts Immigrant and Refugee Advocacy Coalition and the Massachusetts Law Reform Institute providing technical assistance and public testimony on various immigration-related policy issues before the state legislature and the Boston City Council. More recently, I have testified before the Federal Law Enforcement subcommittee of the Government Oversight Committee in the U.S. House of Representatives.

4.  As the PLA, I served as general counsel for ICE supporting the Acting Director of ICE and other leaders in ICE and the Department of Homeland Security, providing legal advice on a wide variety issues, including immigration litigation and prosecutorial strategy and policy. I oversaw the 1,500 attorneys and staff who work for the Office of the Principal Legal Advisor (OPLA) across the country. As PLA, I was responsible for establishing the direction and priorities of our office in alignment with OGC, ICE and

DHS leadership.

5.  I am providing this declaration in my personal capacity. The opinions here should not be construed to represent the position of the Department of Homeland Security or any components therein, the Department of Justice or Green and Spiegel, LLC.

6.  I am familiar with the regulation at 8 C.F.R. § 1003.19(i)(2) that permits a United States government immigration prosecutor from one of OPLA's Offices of the Chief Counsel (OCC), the ability to file a unilateral "automatic stay" to override an Immigration Judge's order granting bond to a noncitizen while an appeal to the Board of Immigration Appeals (BIA) is pending.

7.  In the twenty plus years I practiced immigration law prior to my government service, I have represented many hundreds of noncitizens in removal proceedings. During the same period, I also observed and consulted with countless professional colleagues on their own immigration removal cases across the country. I have never seen an OPLA prosecutor file an automatic stay in any of my own client's cases, nor am I personally aware of any automatic stays having been filed in any other cases. Overall, I am generally aware, from my years of private law practice, that OPLA's use of the automatic stay regulation to unilaterally prevent an Immigration Judge's bond order from taking effect has been extraordinarily rare.

8.  I am also aware that in the past two months, DHS has terminated thousands of international student records in the Student and Exchange Visitor Information Systems (SEVIS) system. I base this statement upon my personal knowledge of DHS's actions as a result of the international students I have spoken to, the information my colleagues have gathered from international students, and based upon reports from immigration colleagues and organizations working with students and educational institutions across the country. Many of the students who have had their SEVIS records terminated appear to have been targeted based upon extremely minor interactions with the criminal justice system. Impacted international students include some previously arrested, but never charged with any crime, some victims of domestic violence, individuals with minor misdemeanors, and also some international students with no discernible history of contact with the criminal justice system or police. None of the cases that I am personally aware of have any incidents that would form a legal basis for SEVIS termination.

9.  While thousands of international students have had their SEVIS records terminated by DHS in the past two months, I am aware of only a small number of international students and teachers who DHS has also arrested and detained during this period. I am aware that in the past month, DHS has detained four international students in Minnesota, while also terminating their F-1 records in the SEVIS system, and each had misdemeanor convictions in the past. It is my understanding and belief that immigration judges in Minnesota have issued orders granting bonds to each of these four students, after which DHS reserved appeal of the bond orders and then invoked the automatic stay regulation 8 C.F.R. § 1003.19(i)(2) to unilaterally prevent any release of the students from ICE custody while DHS appealed that decision to the BIA, a process that often lasts a period of months, even when expedited.

10. While I do not represent ███████████ and I have no first-hand knowledge of the

facts of his case, I do understand from his counsel that Mr. ███ is one of the four international students who DHS arrested and detained in Minnesota in the past month, while also terminating their SEVIS student visa records. It is my understanding that Mr. ███ only criminal history was a speeding ticket and a single misdemeanor charge for simple assault in 2023, which was dismissed, at which point he pleaded guilty to a separate misdemeanor disorderly conduct charge under Minnesota Statute 609.72.1(3), paid a small fine, received a 90-day stayed sentence, and completed one year of unsupervised probation. It is my understanding and belief that Mr. ███ was never arrested in connection with this incident and was never jailed. It is also my understanding, as noted above, that in the past two weeks Mr. ███ received a bond hearing before an Immigration Judge in Minnesota, who granted him a bond, at which point OPLA's Office of Chief Counsel invoked the automatic stay regulation 8 C.F.R. § 1003.19(i)(2).

11. Based upon the information that has been provided to me, it is my professional opinion that the minor misdemeanor conviction Mr. ███ received does not impose immigration consequences in terms of triggering inadmissibility to or deportability from the United States. In my professional experience based upon the more than twenty years of private practice as an immigration attorney, it is highly unusual for the government to invoke an automatic stay to prevent an individual like Mr. ███ from posting a bond and being released pursuant to an Immigration Judge's favorable bond order.

12. I have had clients in my private practice who had much more serious criminal convictions than Mr. ███, who receive bond without the invocation of 8 C.F.R. § 1003.19(i)(2) by the government. In those cases, if the government had ongoing concerns over serious and significant public safety or flight risks, they have instead filed an emergency appeal of the Immigration Judge bond order to the BIA, and simultaneously sought a discretionary stay from the BIA of that bond order, pursuant to the separate regulatory provision 8 C.F.R. § 1003.19(i). Unlike an automatic stay unilaterally imposed by DHS pursuant to 8 C.F.R. § 1003.19(i)(2), when DHS files an emergency motion for a discretionary stay of an Immigration Judge's bond order pursuant to 8 C.F.R. § 1003.19(i), the detained noncitizen has the opportunity to reply in opposition to DHS's emergency motion before the BIA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: April 21, 2025                                    _____*/s/ Kerry E. Doyle*_____
                                                         Kerry Doyle

# EXHIBIT 18

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

**<u>SUPPLEMENTAL DECLARATION OF KERRY DOYLE</u>**

I, KERRY DOYLE, here by declare and state:

1.      The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

2.      I am currently Of Counsel with Green and Spiegel, LLC, which is an immigration firm based in Philadelphia, Pennsylvania. I graduated *cum laude* from American University, Washington College of Law with a J.D. and The George Washington University with a B.A. in Political Science. I am a member of the Commonwealth of Massachusetts Bar, the Supreme Court Bar and the bars of Several Federal Courts of Appeals and U.S. District Courts.

3.      I served as Principal Legal Advisor (PLA), for Immigration Customs Enforcement (ICE) from September 2021 through September 2024. During that time, I served on detail as Acting Deputy General Counsel, Office of General Counsel (OGC), Department of Homeland Security (DHS) from February 2024 through May 2024 and as Deputy General Counsel from October 2024 through December 2024. I was appointed as an Immigration Judge and served in that position from December 2024 through mid-February 2025.

4.      In private practice, I have represented many hundreds of noncitizens in removal proceedings. My further background as an expert in complex immigration, asylum, and refugee law is set forth in my Original Declaration, which I understand was filed as part of Ms. Leqaa Kordia's Motion for Preliminary Injunction Ordering Release Pending Final Judgment, Dkt. 13-2 at 210–12 (PX 10, Decl. of Kerry Doyle).

5.      I am providing this supplemental declaration in my personal capacity. The opinions here should not be construed to represent the position of DHS or any components therein, the Department of Justice, or Green and Spiegel, LLC.

6.      I have reviewed Ms. Kordia's Verified Original Petition for Writ of Habeas Corpus, Application for Order to Show Cause, and Complaint, Dkt. 1 ("Verified Petition"). While I do not represent Ms. Kordia and I have no first-hand knowledge of the facts from this case, I understand Ms. Kordia is confined at the Prairieland Detention Facility in Alvarado, Texas. I understand from the Verified Petition that Ms. Kordia has never been convicted of a crime and only arrested once, in connection with a protest in support of Palestinian rights she attended in April 2024. From the Verified Petition, I understand Ms. Kordia had attended other similar peaceful protests. I also understand that Ms. Kordia has been confined at Prairieland since March 14, 2025. According to her Verified Petition, an immigration judge found her releasable on a $20,000 bond, but the Office of the Principal Legal Advisor ("OPLA") attorney representing the Department of Homeland Security ("DHS") in Ms. Kordia's case invoked the automatic stay provision of 8 C.F.R. § 1003.19(i)(2).

7.      The automatic stay provision enables DHS to obtain a unilateral "automatic stay" to override an Immigration Judge's order granting bond to a noncitizen while an appeal to the Board of Immigration Appeals (BIA) is pending.

8.    Based on my over twenty-five  years of immigration law practice, Ms. Kordia's overnight transfer to Texas and the invocation of the automatic stay provision are highly usual for the government to engage in.

9.    **First,** based on my experience in private practice, it is unusual for DHS to transfer someone, overnight, from New Jersey to Texas, particularly where the transferee facility did not have a bed for Ms. Kordia to sleep on and her family and then-attorney of record were in the New Jersey area. I cannot recall a situation in which something similar happened to one of my clients in private practice.

10.    **Second**, as explained in my original declaration, I have never seen DHS seek an automatic stay in any of my own client's cases, nor am I personally aware of any automatic stays having been filed in any other cases. Overall, I am generally aware, from my years of private law practice, that DHS's use of the automatic stay regulation to unilaterally prevent an Immigration Judge's bond order from taking effect has been extraordinarily rare. I have had clients in my private practice who have had serious criminal convictions or untested allegations of criminal conduct, who receive bond without the invocation of 8 C.F.R. § 1003.19(i)(2) by the government. In my private practice, I have never had DHS use my client's attendance at a protest as evidence of dangerousness, which I understand DHS did in Ms. Kordia's case, both at the bond hearing and when invoking the automatic stay before the BIA.

11.    As explained in my original declaration, DHS has other avenues at its disposal if it had concerns about Ms. Kordia's dangerousness or flight risk. DHS could have filed an emergency appeal of the Immigration Judge bond order to the BIA, and simultaneously sought a discretionary stay from the BIA of that bond order, pursuant to the separate regulatory provision 8 C.F.R. § 1003.19(i). Unlike an automatic stay unilaterally imposed by DHS pursuant to 8 C.F.R. §

1003.19(i)(2), when DHS files an emergency motion for a discretionary stay of an Immigration Judge's bond order pursuant to 8 C.F.R. § 1003.19(i), the detained noncitizen has the opportunity to reply in opposition to DHS's emergency motion before the BIA. On the contrary and as discussed above, the automatic stay permits the OPLA prosecutor to override the Immigration Judge's decision unilaterally.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Kerry Doyle

4

# EXHIBIT 19

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LEQAA KORDIA,                              §
                                          §
                        Petitioner,       §
                                          §
v.                                        §
                                          §    CIVIL ACTION NO. _____
KRISTI NOEM et al.,                       §
                                          §
                Respondents-Defendants.   §
                                          §
                                          §

## DECLARATION OF CHARLES GILLMAN

I, Charles Gillman, here by declare and state:

      1.      I am submitting this declaration on behalf of Petitioner, Leqaa Kordia. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I am over eighteen years of age and of sound mind to declare to the facts stated herein.

      2.      I am a resident of Houston, Texas. I am an attorney licensed by New York State since June 1994 and am admitted to practice in the United States District Court for the Southern District of New York. I have practiced immigration law for thirty (30) years. I am currently a Partner at Gonzalez Olivieri LLC in Houston, Texas.

      3.      My practice focuses exclusively on U.S. immigration law and compliance.

      4.      I have also worked with students dealing with immigration issues related to student visas and other temporary visas, specifically including students utilizing the F-1 student visa program. I have represented international students regarding their F-1 student visas, including filing for adjustment of status, obtaining lawful permanent residence, and those that overstay their visa or face other complications maintaining lawful status.

**Petitioner's Appendix 271**

5.      Across dozens of clients that I have represented, I have never encountered a student with no criminal history being detained for overstaying his or her student visa and certainly not where that student has credible defenses to removal. As an immigration law practitioner, the Petitioner's continued detention, which as I understand has now lasted over a month, represents a stark departure from standard practice over my thirty years of experience.

6.      Similarly, I have never had the Secretary of the Department of Homeland Security provide a press release about one of my clients, which I understand Secretary Kristi Noem made about Ms. Kordia.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 22nd of April 2025 in Houston, Texas.


Charles Gillman
Partner