# EXHIBIT 20

U.S. Department of Homeland Security
Washington, DC 20528



# Homeland Security

May 17, 2019

| | |
|---|---|
| MEMORANDUM FOR: | All DHS Employees |
| FROM: | Kevin K. McAleenan<br>Acting Secretary |
| SUBJECT: | Information Regarding First Amendment Protected Activities |

I am proud of the work you do every day to protect our Homeland. You serve as America's Frontline and your commitment to the highest ethical and moral principles is a testament to each of you, the founding values of our Department, and our nation. It is in this spirit that I write to you today to emphasize – as you all know – that the privilege of administering and enforcing federal laws carries with it the responsibility for upholding the principles of professionalism, impartiality, courtesy, and respect for civil rights and civil liberties.

DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights.[1] Under the Privacy Act of 1974, all DHS personnel[2] are prohibited from maintaining records that describe how a U.S. citizen (USC) or alien lawfully admitted for permanent residence (LPR)[3] exercises his or her First Amendment rights, "unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."[4]

Information, in any form, regarding how an individual exercises First Amendment rights shall include (among other things):

1. Information about an individual's religious beliefs and practices;
2. Information about an individual's political or personal beliefs or associations, academic or scientific inquiries, or the expressions thereof;

---

[1] The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

[2] For purposes of this memorandum, "DHS personnel" includes all DHS employees, including those who are law enforcement agents and officers and those in the intelligence community, as well as those performing work on behalf of DHS employees, such as contractors.

[3] To the extent that a person's status is unknown or unclear, for the purposes of this policy that person shall be treated as an "individual" covered by the Privacy Act. 5 U.S.C. § 552a(a)(2).

[4] 5 U.S.C. § 552a(e)(7).

Petitioner's Appendix 274
www.dhs.gov

3. Information about an individual's (including journalists, attorneys, academics, representatives of non-governmental organizations, etc.) reporting activities and documentation; or,

4. Information about an individual's associations with others for lawful purposes, including participation in protests or other non-violent demonstrations against government policy or actions.

Individuals' First Amendment rights are protected regardless of the medium of their communications. These principles apply to communications such as oral or written speech (both in paper and electronic form); non-verbal communications such as art works; and, in some instances, to commercial speech and gestures (such as physical rituals associated with prayer).

With those First Amendment rights in mind, I direct that DHS personnel shall not collect, maintain in DHS systems, or use information protected by the First Amendment **unless** (a) an individual has expressly granted their consent for DHS to collect, maintain, and use that information; (b) maintaining the record is expressly authorized by a federal statute; or (c) that information is relevant to a criminal, civil, or administrative activity relating to a law DHS enforces or administers. In addition, DHS personnel should not pursue by questioning, research or other means, information relating to how an individual exercises his or her First Amendment rights unless one or more of the same conditions applies.

**Express Statutory Authorization**

DHS agencies may collect and maintain records regarding First Amendment activity when doing so is *expressly authorized by statute*. As explained in longstanding guidance from the Office of Management and Budget (OMB), a statute need not specifically address the maintenance of records of First Amendment activities if it references activities that are relevant to a determination concerning an individual.[5] Thus, for example, DHS personnel may collect information on First Amendment protected activity when that activity is relevant to the granting or denial of a pending application.

**Consent of the Individual**

Records on First Amendment activity may be maintained if the individual voluntarily provides it, thereby consenting to its use by DHS. For example, "if an individual volunteers information on civic or religious activities in order to enhance his chances of receiving a benefit, such as

---

[5] Privacy Act Implementation, Guidelines and Responsibilities, 40 Fed. Reg. 28,948, 28,965 (July 9, 1975) (hereinafter OMB Guidelines). The Guidelines specifically cite to the Immigration and Nationality Act (INA) as an example: "[S]ince the Immigration and Nationality Act makes the possibility of religious or political persecution relevant to a stay of deportation, the information on these subjects may be admitted in evidence, and therefore would not be prohibited by [subsection (e)(7)." OMB Guidelines, at 28,965. Many other INA provisions potentially involve consideration of First Amendment activity. E.g., 8 U.S.C. 1101(a)(43) (definition of refugee, for purpose of refugee and asylum eligibility determinations, includes persecution based on membership in social group, religion, or political opinion); 8 U.S.C. 1182(a)(3)(B) (inadmissibility of any alien who, inter alia, "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization"); 8 U.S.C. 1182(a)(3)(D) (ground of inadmissibility for membership or affiliation with the Communist or other totalitarian party); 8 U.S.C. 1182(a)(3)(F) (ground of inadmissibility for association with terrorist organizations); 8 U.S.C. 1227(a)(4)(B) (deportability of aliens admitted to the United States if described in terrorism-related grounds of inadmissibility); 8 U.S.C. 1424 (prohibition upon the naturalization of persons opposed to government or law, or who favor totalitarian forms of government).

executive clemency, the agency may consider information thus volunteered."[6] As applied to DHS, individuals may voluntarily provide consent in submitting their associations and beliefs when applying for naturalization pursuant to filing USCIS Form N-400[7] or may proactively provide information in written materials, including correspondence, or during an inspection or encounter.

**Relevant to Law Enforcement Activity**

If the use of information regarding First Amendment protected activities is not otherwise covered by one or both of the exceptions discussed above (explicit statutory authority and consent), DHS personnel may include such information in DHS systems if the information is pertinent to and within the scope of an authorized criminal, civil, or administrative law enforcement activity.[8]

For example, information about First Amendment protected activities is pertinent to and within the scope of DHS's administration or enforcement of a statute, regulation, or executive order when all DHS personnel:

1. Document questions and responses relating to an individual's occupation, purpose for international travel, or any merchandise the individual seeks to bring across the border;
2. Document questions, responses, or other information to validate information supplied by an individual or determine whether potential criminal, civil, or administrative violations exist relating to the laws that DHS enforces or administers;
3. Document journalistic or scientific research, academic inquiry, and/or analysis or questions and responses relating to information regarding an individual indicating a potential violation of a law DHS enforces or administers, or a threat to border security, national security, officer safety, or public safety;
4. Document research and/or analysis relating to activities protected by the First Amendment to the extent that it may facilitate an individual's travel by, for example, verifying information provided by the individual —(e.g., validating a visa based on a religious purpose); or,
5. Take into account information regarding religion in order to identify whether a reasonable accommodation for an individual's religious beliefs would be appropriate. This may include subsequent documentation of relevant information in DHS records regarding the action (for example, noting that a certain action was undertaken as an accommodation or noting that an accommodation was requested or deemed appropriate).

Each of us is called to do an extraordinarily important job for our nation. In executing this mission, it is my job to ensure that you are empowered to do so in accordance with our highest moral, ethical, and legal obligations. To this end, I have tasked the DHS Office for Civil Rights and Civil Liberties and the DHS Privacy Office to review existing guidance and develop new

---

[6] OMB Guidelines, at 28965.

[7] It must be noted that DHS/USCIS may also collect this information pursuant to its statutory authority in determining whether the applicant comes under section 313 of the INA's (8 U.S.C. 1424) prohibition upon the naturalization of persons opposed to government or law, or who favor totalitarian forms of government  Thus, collecting and maintaining this information is lawful both because of express statutory authorization as described above, and because the applicant consented to providing it by signing and filing the application.

[8] DHS may still maintain records consistent with 552a(e)(7) even if there is no ongoing or current law enforcement investigation.

Petitioner's Appendix 276

guidance, where appropriate, to assist the operational components in implementing this memorandum.[9]

As you execute your mission each day, our Privacy and Civil Rights and Civil Liberties colleagues stand by to assist with any further questions or concerns you may have on this topic. Please contact Jonathan R. Cantor, Acting Chief Privacy Officer and Peter Mina, CRCL Deputy Officer for Programs and Compliance, and their staffs with those questions. Please contact your Component Counsel Offices with any legal questions.

---

[9] Nothing in this policy memorandum or tasking otherwise impairs the statutory or delegated authorities and responsibilities of the Privacy Office or the Office for Civil Rights and Civil Liberties, including the authority to "investigate complaints and information indicating possible abuses of civil rights or civil liberties" under 6 U.S.C. § 345 or investigate noncompliance DHS privacy policies under 6 U.S.C. § 142.

# EXHIBIT 21



U.S. Department of Homeland Security
Washington, DC 20528

September 30, 2021

MEMORANDUM TO:      Tae D. Johnson
                    Acting Director
                    U.S. Immigration and Customs Enforcement

CC:                 Troy Miller
                    Acting Commissioner
                    U.S. Customs and Border Protection

                    Ur Jaddou
                    Director
                    U.S. Citizenship and Immigration Services

                    Robert Silvers
                    Under Secretary
                    Office of Strategy, Policy, and Plans

                    Katherine Culliton-González
                    Officer for Civil Rights and Civil Liberties
                    Office for Civil Rights and Civil Liberties

                    Lynn Parker Dupree
                    Chief Privacy Officer
                    Privacy Office

FROM:               Alejandro N. Mayorkas
                    Secretary

SUBJECT:            Guidelines for the Enforcement of Civil Immigration Law

This memorandum provides guidance for the apprehension and removal of noncitizens.

I am grateful to you, the other leaders of U.S. Immigration and Customs Enforcement, and our
frontline personnel for the candor and openness of the engagements we have had to help shape this
guidance. Thank you especially for dedicating yourselves – all your talent and energy – to the
noble law enforcement profession. In executing our solemn responsibility to enforce immigration

1

law with honor and integrity, we can help achieve justice and realize our ideals as a Nation. Our colleagues on the front lines and throughout the organization make this possible at great personal sacrifice.

## I. Foundational Principle: The Exercise of Prosecutorial Discretion

It is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders. The exercise of prosecutorial discretion in the immigration arena is a deep-rooted tradition. The United States Supreme Court stated this clearly in 2012:

> "A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."

In an opinion by Justice Scalia about twelve years earlier, the Supreme Court emphasized that enforcement discretion extends throughout the entire removal process, and at each stage of it the executive has the discretion to not pursue it.

It is estimated that there are more than 11 million undocumented or otherwise removable noncitizens in the United States. We do not have the resources to apprehend and seek the removal of every one of these noncitizens. Therefore, we need to exercise our discretion and determine whom to prioritize for immigration enforcement action.

In exercising our discretion, we are guided by the fact that the majority of undocumented noncitizens who could be subject to removal have been contributing members of our communities for years. They include individuals who work on the frontlines in the battle against COVID, lead our congregations of faith, teach our children, do back-breaking farm work to help deliver food to our table, and contribute in many other meaningful ways. Numerous times over the years, and presently, bipartisan groups of leaders have recognized these noncitizens' contributions to state and local communities and have tried to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens.

The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them. We will use our discretion and focus our enforcement resources in a more targeted way. Justice and our country's well-being require it.

By exercising our discretionary authority in a targeted way, we can focus our efforts on those who pose a threat to national security, public safety, and border security and thus threaten America's well-being. We do not lessen our commitment to enforce immigration law to the best of our ability. This is how we use the resources we have in a way that accomplishes our enforcement mission most effectively and justly.

2

Petitioner's Appendix 280

## II. Civil Immigration Enforcement Priorities

We establish civil immigration enforcement priorities to most effectively achieve our goals with the resources we have.  We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security.

### A.  Threat to National Security

A noncitizen who engaged in or is suspected of terrorism or espionage, or terrorism-related or espionage-related activities, or who otherwise poses a danger to national security, is a priority for apprehension and removal.

### B.  Threat to Public Safety

A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal.

Whether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories.  It instead requires an assessment of the individual and the totality of the facts and circumstances.

There can be aggravating factors that militate in favor of enforcement action.  Such factors can include, for example:

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record.

Conversely, there can be mitigating factors that militate in favor of declining enforcement action.  Such factors can include, for example:

- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;
- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;

3

- time since an offense and evidence of rehabilitation;
- conviction was vacated or expunged.

The above examples of aggravating and mitigating factors are not exhaustive. The circumstances under which an offense was committed could, for example, be an aggravating or mitigating factor depending on the facts. The broader public interest is also material in determining whether to take enforcement action. For example, a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct. The specific facts of a case should be determinative.

Again, our personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly. The overriding question is whether the noncitizen poses a current threat to public safety. Some of the factors relevant to making the determination are identified above.

The decision how to exercise prosecutorial discretion can be complicated and requires investigative work. Our personnel should not rely on the fact of conviction or the result of a database search alone. Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue. The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort.

C. Threat to Border Security

A noncitizen who poses a threat to border security is a priority for apprehension and removal.

A noncitizen is a threat to border security if:

(a) they are apprehended at the border or port of entry while attempting to unlawfully enter the United States; or

(b) they are apprehended in the United States after unlawfully entering after November 1, 2020.

There could be other border security cases that present compelling facts that warrant enforcement action. In each case, there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action. Our personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly.

Petitioner's Appendix 282

### III. Protection of Civil Rights and Civil Liberties

We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it. A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action. A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action. We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

This guidance does not prohibit consideration of one or more of the above-mentioned factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit. For example, religion or political beliefs are often directly relevant in asylum cases and need to be assessed in determining a case's merit.

State and local law enforcement agencies with which we work must respect individuals' civil rights and civil liberties as well.

### IV. Guarding Against the Use of Immigration Enforcement as a Tool of Retaliation for the Assertion of Legal Rights

Our society benefits when individuals – citizens and noncitizens alike – assert their rights by participating in court proceedings or investigations by agencies enforcing our labor, housing, and other laws.

It is an unfortunate reality that unscrupulous employers exploit their employees' immigration status and vulnerability to removal by, for example, suppressing wages, maintaining unsafe working conditions, and quashing workplace rights and activities. Similarly, unscrupulous landlords exploit their tenants' immigration status and vulnerability to removal by, for example, charging inflated rental costs and failing to comply with housing ordinances and other relevant housing standards.

We must ensure our immigration enforcement authority is not used as an instrument of these and other unscrupulous practices. A noncitizen's exercise of workplace or tenant rights, or service as a witness in a labor or housing dispute, should be considered a mitigating factor in the exercise of prosecutorial discretion.

### V. The Quality and Integrity of our Civil Immigration Enforcement Actions

The civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel.

Petitioner's Appendix 283

To ensure the quality and integrity of our civil immigration enforcement actions, and to achieve consistency in the application of our judgments, the following measures are to be taken before the effective date of this guidance:

A.  Training

Extensive training materials and a continuous training program should be put in place to ensure the successful application of this guidance.

B.  Process for Reviewing Effective Implementation

A review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance. The review process should seek to achieve quality and consistency in decision-making across the entire agency and the Department. It should therefore involve the relevant chains of command.

Longer-term review processes should be put in place following the initial 90-day period, drawing on the lessons learned. Assessment of implementation of this guidance should be continuous.

C.  Data Collection

We will need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions we take pursuant to this guidance, both to ensure the quality and integrity of our work and to achieve accountability for it.

Please work with the offices of the Chief Information Officer; Strategy, Policy, and Plans; Science and Technology; Civil Rights and Civil Liberties; and Privacy to determine the data that should be collected, the mechanisms to collect it, and how and to what extent it can be made public.

D.  Case Review Process

We will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken. Discretion to determine the disposition of the case will remain exclusively with the Department.

**VI.  Implementation of the Guidance**

This guidance will become effective in sixty (60) days, on November 29, 2021. Upon the effective date, this guidance will serve to rescind (1) the January 20, *2021 Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* issued by then-Acting Secretary David Pekoske, and (2) the *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* issued by Acting ICE Director Tae D. Johnson.

6

Petitioner's Appendix 284

We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively. Our assessment will be informed by feedback we receive from our law enforcement, community, and other partners.

This guidance is Department-wide. Agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly.

## VII. Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

7

# EXHIBIT 22

Petitioner's Appendix 286

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**

## Policy 11022.1: Detainee Transfers

| | |
|---|---|
| **Issue Date:** | **January 4, 2012** |
| **Effective Date:** | **January 4, 2012** |
| **Superseded:** | All Immigration and Customs Enforcement (ICE) documents that reference or provide guidance related to detainee transfers must be revised in accordance with this Directive. |

**Federal Enterprise Architecture Number:** 306-112-002b

1. **Purpose/Background.** This Directive establishes new prioritized transfer determinations that are meant to minimize, to the extent possible, detainee transfers outside the area of responsibility and to provide cost savings to the agency.

    This Directive consolidates and revises existing policies on how field offices make detainee transfer determinations and conducts transfers out of the Area of Responsibility (AOR). Transfers of detainees within the AOR are not covered by this Directive.

    This Directive establishes responsibilities and procedures for ICE employees who perform detainee transfers and does not govern contract staff. ICE employees are advised that responsibilities and procedures for contract staff can be found in their respective vendor agreements

2. **Policy.** All detainee transfers and transfer determinations will be based on a thorough and systematic review of the most current information available.

3. **Definitions.** The following definitions apply for purposes of this Directive only.

3.1. **Area of Responsibility (AOR).** The geographic area of responsibility under the authority of a Field Office Director (FOD).

3.2. **Detainee transfer.** The transfer of a detainee from one AOR to another. The term does not include intake processing, or the transfer of aliens from facilities that are authorized for less than 72 hours, hold rooms, U.S. Customs and Border Protection Border Patrol stations, or Ports of Entry. The term detainee transfer does not include the transfer of aliens to staging areas or facilities for the purpose of facilitating a scheduled final removal of aliens from the United States, nor does it include the final removal of aliens from the United States.

3.3. **Immediate family.** This may include: mothers, fathers, step-parents, foster parents, brothers, sisters, stepbrothers, stepsisters, biological and adopted children, stepchildren, foster children, and spouses, including common-law marriage or civil unions and

cohabitating domestic partnerships legally recognized by a state or other governmental entity (e.g. District of Columbia, Puerto Rico, Guam).

**3.4.** **Workday(s).** Monday through Friday excluding holidays or other local Enforcement and Removal Operations (ERO)/Executive Office for Immigration Review (EOIR) office closures.

**4.** **Responsibilities.**

**4.1.** **FODs, Supervisory Immigration Officers, Attorneys, Immigration Officers and Medical Staff** are responsible for complying with the policy and procedures set forth in this Directive.

**4.2.** **FODs** are responsible for disseminating and enforcing this Directive and in conjunction with the Office of the Principal Legal Advisor (OPLA), developing protocols with EOIR court administrators within their AOR that ensure a regular exchange of timely and accurate hearing and detainee transfer schedule information.

**5.** **Procedures.**

**5.1.** **Filing of the Notice to Appear (NTA) for Transfers.** Unless impracticable because of logistical or other compelling factors that delay submission on a temporary or ongoing basis, NTAs will be submitted to EOIR within five (5) workdays of the NTA being served on the alien, or upon the alien entering ICE custody, whichever is later. Proper submission of an NTA does not require delivery confirmation, receipt or further action by EOIR. NTAs mailed to EOIR will only require postmark within the five (5) workdays to be considered timely. All NTAs mailed will utilize a service which tracks mailing and receipt dates.

As a general rule, detainees will not be transferred without the A-Files, T-Files, or work folders. If an A-File, T-File, or work folder does not accompany the transferred alien, the five (5) workdays provided for submitting the NTA to EOIR will not begin until the appropriate case officer, agent or other ICE employee who submits NTAs to EOIR receives the A-File, T-File or work folder.

**5.2.** **Transfer Determinations.**

1) Unless a transfer is deemed necessary by a FOD or his or her designee under paragraph (3) of this section, ICE Supervisory Immigration Officer(s) will not transfer a detainee when there is documentation to support the following:

   a) Immediate family within the AOR;

   b) An attorney of record (Form G-28, *Notice of Entry of Appearance as Attorney or Accredited Representative* on file) within the AOR;

Petitioner's Appendix 288

    c) Pending or on-going removal proceedings, where notification of such proceedings has been given, within the AOR; or

    d) Been granted bond or has been scheduled for a bond hearing.

2) The Immigration Officer will conduct a review to determine whether any of these factors exist. Before a transfer is made in a case where one or more of these factors exist, the transfer must be approved at the Assistant Field Office Director level or higher, and the reasons for the transfer must be documented in the detainee's A-File.

3) A transfer may be deemed necessary by a FOD or his or her designee for any of the following reasons:

    a) To provide appropriate medical or mental health care to the detainee.

    b) To fulfill an approved transfer request by the detainee.

    c) For the safety and security of the detainee, other detainees, detention personnel or any ICE employee.

    d) At ICE's discretion, for the convenience of the agency when the venue of EOIR proceedings is different than the venue in which the alien is detained.

    e) To transfer to a more appropriate detention facility based on the detainee's individual circumstances and risk factors.

    f) Termination of facility use due to failure to meet ICE detention standards, lack of sufficient use of the facility by ICE, or emergent situations.

    g) To relieve or prevent facility overcrowding; in such cases, efforts should first be made to identify for transfer those detainees who do not meet any of the criteria listed in section 5.2(1).

4) *Orantes* Class Members.

    a) ICE is prohibited from transferring Salvadoran class members who are not represented by counsel, from the judicial district of their apprehension for at least seven days to afford them the opportunity to secure counsel.

        i) The only exception to this rule applies to class members who are subject to expedited removal final orders. See *Orantes-Hernandez v. Gonzales*, No. 82-01107, Modified Consolidated Injunction, at paragraph 11.b. (C.D. Cal. Nov. 26, 2007*).*

b) Salvadoran class members who *are* represented by counsel or obtain representation within the seven-day period can be transferred to other locations, but venue remains in the judicial district where each member's counsel is located.

c) For any questions regarding the treatment of Salvadoran nationals in ICE custody, pursuant to the requirements of the *Orantes* settlement agreement, please contact the local ICE Office of Chief Counsel.

5) ICE Supervisory Immigration Officers will conduct a thorough review of the most current information available to make all detainee transfer determinations.

### 5.3.   Notifications in the Event of a Detainee Transfer.

1) ICE will ensure that all necessary notifications are made to detainees and their attorneys when detainees are transferred.  ICE is not required to notify family members or other third parties of a transfer.

2) Attorney notification.  If a detainee has an attorney of record (Form G-28 on file), the sending field office will:

a) Notify the attorney that the detainee is being transferred and include the reason for the transfer and the name, location, and telephone number of the new facility as soon as practicable on the day of the transfer, but in no circumstances later than twenty four (24) hours after the transfer occurs.

b) Document the notification in:

i) The Detainee Transfer Check List; and

ii) The appropriate comments screen in ENFORCE.

c) Delay the notification when there are special security concerns, but only for the period of time justified by those concerns.

d) Appropriately document concerns in the detainee's A-File and the appropriate comments screen in ENFORCE.

3) Detainee notification.  Immediately prior to transfer, the sending field office will ensure that the detainee is informed, in a language or manner he/she can understand, that he/she is being transferred to another facility and is not being removed (if applicable).

a) To ensure the safety of ICE personnel, ICE will ensure that specific plans and time schedules are not discussed with detainees and that following notification, the detainee:

---

Detainee Transfers

        i)  Is not permitted to make or receive any telephone calls until the detainee reaches the destination facility;

        ii)  Does not have contact with any detainee in the general population until the detainee reaches the destination facility; and

        iii) Is notified that upon admission into the receiving facility, the detainee may place a domestic phone call, at no expense to the detainee.

  b)  The sending office will ensure that the detainee notification is documented in:

        i)  The Detainee Transfer Notification form; and

        ii)  The appropriate comments screen in ENFORCE.

  c)  At the time of the transfer, ICE will provide the detainee, in writing, the name, address, and telephone number of the facility to which they are being transferred, using the Detainee Transfer Notification form. ICE place a copy of the form in the detainee's A-File.

  d)  ICE will make sure that the detainee acknowledges, in writing, that they have received the transfer destination information and that it is their responsibility to notify family members if so desired, upon admission into the receiving facility.

4) <u>EOIR notification</u>. If a detainee has pending proceedings before EOIR, ICE must submit Form I-830, *Notice to EOIR: Alien Address*. If the alien has an appeal pending with Bureau of Immigration Appeals (BIA), the BIA must be notified. In all cases, a copy of Form I-830 will be placed in the A-file.

## 5.4. Requests for Bed/Designation Transfers from Field Office to Field Office.

1) FODs or their designees are responsible for ensuring that field offices which routinely transfer cases:

  a)  Establish a means of communication so that receiving field offices provide sending field offices daily information regarding available bed space; and

  b)  Provide the names and contact numbers of staff responsible for handling transfers.

2) While field offices are encouraged to communicate directly regarding available bed space, the headquarters Removal Management Division (RMD) is available to assist a field office that has unsuccessfully attempted to locate space.

3) Field offices seeking bed space in other field office jurisdictions should phone the request (or e-mail with a follow-up phone call) with sufficient details of the case to the designated field office contact.

4) Once a field office has preliminarily agreed to accept a detainee from another office, ICE will ensure that:

    a) The Form I-216, *Record of Persons and Property Transfer* is completed;

    b) Complete information detailing the alien's criminal history, medical or mental health concerns, or security risks is provided.

    c) Medical or mental health problems or prescribed medications are documented, either on Form USM-553 (or equivalent), *Medical Summary of Federal Prisoner/Alien in Transit,* or Form I-794, *In-Processing Health Screening*, and the form accompanies Form I-216;

    d) Security concerns are outlined on a separate page and attached to Form I-216; and

    e) A copy of the age verification documentation is attached if it is suspected that the detainee is a juvenile.

5) The FOD(s) or their designee(s) will arrange a method of providing medical histories to Intergovernmental Service Agreement (IGSA) facilities if the IGSA requires that the medical unit review medical histories prior to accepting a transfer.

6) The receiving field office will ensure that Form I-216 is reviewed for consistency with information previously communicated. If there are issues that were not previously relayed to the receiving field office, ICE Supervisory Immigration Officers at the receiving field office will ensure that the sending field office is notified that the transfer request may be declined unless the issues are resolved.

7) Once the receiving field office has agreed to accept the transfer of the detainee on Form I-216, the sending field office will communicate a mutually agreeable estimated time of arrival. The sending field office may not substitute any detainee on Form I-216 without prior approval of the receiving field office.

**5.5.    Detainee Transfer Checklist and Transfer Notification Form.**

1) ICE will ensure that both the Detainee Transfer Checklist and Transfer Notification Form are completed and placed in the detainee's A-File or work folder; and that the A-File or work folder accompanies the detainee to the receiving facility.

2) If the Detainee Transfer Checklist cannot be completed prior to transfer, the detainee may be transferred only if the authorized receiving FOD or his or her designee has expressly waived that procedure. The sending field office will note any such waiver in the A-File.

Petitioner's Appendix 292

5.6.  **A-File.**

1) Prior to transfer, the sending field office will ensure that the A-File is obtained and, in accordance with the appropriate procedures of the ICE Policy Directive titled, "Alien Registration File (A-File) Creation, Maintenance, Organization, and Disclosure of Information":

   a) Forward the A-File to USCIS for consolidation; and

   b) Attach all documents and forms on the proper side of the A-File.

2) The sending field office will ensure that the A-File includes copies of the following properly executed documents, fastened in the file:

   a) I-216 and appropriate copies of Form I-77, Baggage Check (or IGSA equivalent);

   b) Form USM-553 or local Medical Transfer Summary form;

   c) Copy of Form I-213, *Record of Deportable Alien Form*;

   d) Original or photocopy of Form I-203/203A, *Order to Detain/Release Alien*;

   e) Detainee Transfer Checklist;

   f) Age verification documents (if applicable);

   g) A copy or printout of all previous Post Order Custody Reviews (POCRs) and travel document requests in a property envelope fastened to the file;

   h) Classification sheet;

   i) Charging documents/records of proceedings;

   j) Certified copies of convictions;

   k) Fingerprint cards;

   l) Photographs; and,

   m) Printouts from the Central Index System (CIS), ENFORCE and the FBI NCIC database.

3) If the sending field office is unable to obtain the A-File (and does not have a fully documented Temporary File), the detainee may not be transferred unless the receiving

---

Detainee Transfers

field office, before the transfer takes place, accepts a work folder created by the sending field office that includes, at a minimum:

a) Certified copies of convictions or information as addressed in section 5.8;

b) Printouts from the Central Index System (CIS), ENFORCE, and the Federal Bureau of Investigation's (FBI) National Crime Information Center (NCIC) database;

c) Charging documents/copies of the EOIR record of proceedings;

d) Photographs and fingerprints;

e) A Computer Linked Application Information Management System (CLAIMS) printout;

f) A Treasury Enforcement Communications System (TECS) printout; and

g) Any other documents reasonably requested by the receiving field office.

4) The sending field office will ensure that the A-File or work folder accompanies the transfer, except for cases where the receiving field office requests that the A-File or work folder be mailed by overnight express to a particular location. If requested, the sending field office will ensure that it is mailed no later than the following business day.

5) The sending field office shall communicate as soon as possible any anticipated significant delays in the arrival time of the detainees or their files.

**5.7.**       **Charging Documents/Record of Proceeding.**

1) Before the transfer, all charging documents will be issued and signed by the individual with signatory authority for the sending field office.

2) If applicable, prior to transfer, all charging documents will be served on the detainee, including, but not limited to:

a) Form I-862, *Notice to Appear*;

b) Form I-200, *Warrant of Arrest*;

c) Form I-205, *Warrant of Removal*;

d) Form I-286, *Notification of Custody Decision*; and

e) Form I-826, *Notice of Rights*.

3) ICE will ensure that original charging documents or copies, if the originals have been submitted to EOIR (indicating proper service), are included in the A-File. A copy of the charging documents will be provided to the detainee.

**5.8.    Certified Copies of Convictions.** A detainee may not be transferred if the certified copies of conviction relating to the charging document are not included in the A-File or work folder, unless the receiving field office has agreed in writing in advance to accept the case. In such instances, the sending field office will provide the Detainee Transfer Checklist point-of-contact names and phone numbers provided for:

1) The person at the sending field office responsible for obtaining the conviction record; and

2) An individual at the respective court or clerk's office where the record is located.

**5.9.    Fingerprint Cards.** The sending field office will send the completed fingerprint cards in the A-File or work folder as noted below:

1) The cards will be signed by the alien and the official taking the fingerprints;

2) The cards will be completely filled out except for the address block requesting a disposition from the FBI;

3) The completed cards will be left in the A-File or work folder for the receiving field office to fill in the response address block and submit to the FBI and DHS Biometrics Support Center (when appropriate), unless the detainee is a Room-and-Board case (short-term staging); and

4) One fingerprint card should remain in the A-File or work folder at all times.

**5.10.    Photographs.** The sending field office will take four (1 sheet of 4) new, standard booking-size photographs on photo quality paper and include any photos not needed for the transfer in the A-File or work folder.

**5.11.    Medical Procedures and Information Required for Transfer.**

1) In advance of the transfer, ICE will ensure that the receiving facility is provided the USM-553 (facsimile or email is acceptable)

2) Transfer of the Detainee's Medical Record.

a) When a detainee is transferred within the ICE Health Service Corps (IHSC) system, IHSC will provide:

i) Form USM-553, or equivalent Medical Transfer Summary, and a copy of the detainee's full medical record; and

ii) The full medical record in a sealed envelope or other container labeled with the detainee's name and A-number and marked "MEDICAL CONFIDENTIAL."

b) When a detainee is transferred to an IGSA detention facility, ICE will ensure that the Transfer Summary will accompany the detainee. Whenever possible, a copy of the full medical record should accompany each detainee during transfer. If the full medical record is not available, it must be sent as soon as possible. FODs will work with IGSAs to make arrangement for the transfer of the full medical record.

3) Medical Transfer Summary.

a) The sending facility's medical staff will prepare a Medical Transfer Summary that must accompany the detainee. Either Form USM-553 or a facility-specific form may be used, provided it shows:

i) Tuberculosis (TB) clearance, including Purified Protein Derivative (PPD) with the test dates, and chest x-ray results if the detainee has received a positive PPD reading;

ii) Current mental and physical health status, including all significant health issues;

iii) Current medications, with specific instructions for medications that must be administered en route; and

iv) The name and contact information of the transferring medical official.

b) The transporting officer may not transport a detainee without the Medical Transfer Summary.

c) The transporting officer will review the information for completeness and make sure that he or she has the in-transit supplies required to provide to the detainee as indicated on the USM-553 or equivalent Medical Transfer Summary.

d) Medical information is available to staff only on a need-to-know basis.

i) Any officer who reviews the Medical Transfer Summary will protect the privacy of the detainee's medical information to the greatest extent possible.

ii) Personnel may not share medical information unless necessary to safely fulfill transportation responsibilities.

Petitioner's Appendix 296

    e) The transporting officer will deliver the Medical Transfer Summary to medical personnel, if practicable, or other staff at the receiving facility and will advise them of any medications provided to the detainee in transit.

4) <u>Medical or Psychiatric Alert</u>.

    a) Appropriate medical staff will notify the facility administrator when they determine that a detainee's physical or mental condition requires:

        i) Clearance by the medical staff prior to transfer; or

        ii) Medical escort and specialized care (e.g. dialysis) during transfer.

5) <u>Medications</u>.

    a) Prior to transfer, medical staff will provide the transporting officers instructions and, if applicable, medication(s) for the detainee's care in transit.

    b) Medical staff will ensure that the detainee is transferred with, at a minimum, seven (7) days worth of prescription medications (for TB medications, up to 15 days' supply) to guarantee the continuity of care throughout the transfer and subsequent intake process.

    c) ICE will ensure that medications:

        i) Are placed in a property envelope labeled with the detainee's name and A-number and appropriate administration instructions;

        ii) Accompany the transfer; and

        iii) If unused, are turned over to the receiving medical personnel.

**5.12. Other Transfer Paperwork.**

1) ICE will ensure that no detainee is transferred without a properly executed Form G-391, I-213, I-216, I-203/I-203A, or equivalent. IGSA facilities may use a local form as long as the form provides the required information.

2) ICE Supervisory Immigration Officers will ensure that records are checked to ascertain if the alien has a criminal history, is dangerous, or has an escape record or medical condition. Any information of an adverse nature must be clearly indicated on the Form G-391, I-216, I-203, or equivalent, and the escorting officers will be notified of the risk and warned to take the necessary precautions.

3) Before beginning the transfer or the detail, the escorting and transportation officers will read their instructions and clearly understand the purpose for which the detainee

Petitioner's Appendix 297

is being removed from the facility. The officers will also discuss emergency contingency plans with a supervisor and/or authorized ICE official before departure.

4) ICE will ensure that Form I-216:

   a) Includes the detainee's name, A-number and detention category;

   b) Indicates if the detainee has a criminal conviction, a history of violence, is an escape risk, or has a medical condition that may require attention during the transfer;

   c) Notes whether the detainee is on prescription medication; and

   d) Indicates the time of arrival estimated by the sending field office.

5) ICE will ensure that Form G-391, I-203/I-203A, or equivalent:

   a) Is properly signed and clearly indicates the name and A-number of the detainee(s);

   b) Indicates the place or places to be escorted; and

   c) Notes the purpose of the trip and other information necessary to efficiently carry out the transfer, or detail.

6) The receiving field office may request that copies of Form I-203/I-203A or I-213 be transmitted directly from the sending field office to the receiving facility.

**5.13.    Property.**

1) Before transfer, the sending facility will ensure that all funds and small valuables are properly documented and closed out on Form G-589/I-77 (or local IGSA property receipt form).

2) If the receiving facility does not accept excess, oversized or bulky belongings (including, but not limited to, suitcases, cartons, televisions, etc.), the sending facility will:

   a) Arrange to store the property elsewhere; or

   b) Process the excess property in accordance with the ICE National Detention Standards (NDS) or Performance Based National Detention Standards (PBNDS) related to the destruction of contraband or abandoned property.

3) If the detainee refuses to provide an appropriate mailing address, or is financially able but unwilling to pay for shipping, ERO may dispose of the property after providing

the detainee written notice in accordance with the ICE National Detention Standards (NDS) or Performance Based National Detention Standards (PBNDS) related to the destruction of contraband or abandoned property.

5.14.  **Movements via ICE-Managed Aircraft.** When detainees are being transported by the ERO Flight Operations Unit, ICE will adhere to protocols established for ICE chartered removals

5.15.  **Post Transfer Activities.**

1) Detainee Phone Calls.

   a) After admission into the receiving facility the FOD will ensure that all detainees are given the opportunity to make a phone call at the government's expense.

2) ENFORCE.

   a) The sending field office will ensure that appropriate screens in ENFORCE are complete, updated, and accurate.

   b) Once the detainee reaches his or her destination, the receiving field office will update the appropriate screens in ENFORCE.

5.16.  **Quality Assurance Review.** Consistent with the terms of this Directive, the FOD shall maintain statistics on transfers and have a quality assurance process in place to monitor all transfer decisions.

6.  **Authorities/References.**

6.1.  Immigration and Nationality Act, Pub. L. No. 82-414, §236(a) (1952) (codified as amended at 8 U.S.C. §§ 1101 et seq).

6.2.  ICE Policy Directive No. 1-32.0, "Alien Registration File (A-File) Creation, Maintenance, Organization, and Disclosure of Information" (Oct. 2, 2009).

7.    **Attachments.**

**7.1.**    Detainee Transfer Notification.

**7.2.**    Detainee Transfer Checklist.

8.    **No Private Right Statement.**    This Directive is an internal policy statement of ICE.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.


**John Morton**
**Director**
**U.S. Immigration and Customs Enforcement**

# EXHIBIT 23

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

Nos. <u>25-2162 & 25-2357</u>

MAHMOUD KHALIL

v.

PRESIDENT UNITED STATES OF AMERICA; DIRECTOR NEW
YORK FIELD OFFICE IMMIGRATION AND CUSTOMS
ENFORCEMENT; WARDEN ELIZABETH CONTRACT DETENTION
FACILITY; DIRECTOR UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT; SECRETARY UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; SECRETARY UNITED
STATES DEPARTMENT OF STATE; and ATTORNEY GENERAL
UNITED STATES OF AMERICA,

Appellants

(D.N.J. No. 2:25-cv-01963)

Present:  HARDIMAN, BIBAS, and FREEMAN, <u>Circuit Judges</u>

1. Appellants' Motion in No. 25-2162 to Stay the District Court's Order Pending
   Appeal [addressing the June 20, 2025, Order that Appellee shall be released from
   immigration custody]

2. Appellee's Response

3. Appellants' Reply

4. Appellants' Motion in Nos. 25-2162 and 25-2357 to Stay the District Court's July
   17, 2025, Order Pending Appeal

5. Appellee's Response

6. Appellee's Motion to Dismiss No. 25-2357 for Lack of Jurisdiction

7. Appellants' Response

Respectfully,
Clerk/tmm

Petitioner's Appendix 302

<u>PER CURIAM ORDER</u>

Appellants' motion to stay pending appeal the District Court's June 20, 2025, Order that Appellee shall be released from immigration custody is DENIED. Appellants have not demonstrated irreparable harm.

Appellee's motion to dismiss Appeal No. 25-2357 for lack of jurisdiction is referred to the merits panel pursuant to 3d Cir. I.O.P. 10.3.5.

Appellants' motion to stay pending appeal the District Court's July 17, 2025, Order is GRANTED IN PART AND DENIED IN PART. The District Court's Order is stayed only insofar as it requires Appellants to cause the Immigration Judge to consider Appellee's request for waiver of removability.

Appeal Nos. 25-2162 and 25-2357 are consolidated for all purposes, including briefing and disposition. The Court issues the following briefing schedule for the consolidated appeals:
- Appellants shall file their Brief and the parties Joint Appendix on or before August 20, 2025.
- Appellee shall file his Brief on or before September 10, 2025.
- Appellants shall file their Reply Brief, if any, on or before September 24, 2025.

The consolidated appeals will be submitted to a merits panel on October 20, 21, or 22, 2025.

The parties are expected to adhere to the briefing schedule. Extensions of time, even if limited in duration, will not be granted absent extraordinary circumstances. The parties are reminded that the deadline for filing a brief is 5:00 pm ET if the brief is submitted on the last day for filing.

Dated: July 30, 2025
TMM/JK/cc: All Counsel of Record

**A True Copy:**

*Patricia S. Dodszuweit*

Patricia S. Dodszuweit, Clerk

# EXHIBIT 24

1

                    **UNITED STATES DISTRICT COURT**
                  **FOR THE DISTRICT OF NEW JERSEY**

2

3   _____

MAHMOUD KHALIL,

4

        Plaintiff,              CIVIL ACTION NUMBER:

5

            vs.                 2:25-cv-1963-MEF

6

Deputy Director William P.      Oral Argument
7   Joyce, in his official
capacity as Acting Field
8   Office Director of New York,
Immigration and Customs
9   Enforcement, et al.,

10

        Defendants.

11   _____

        **Frank R. Lautenberg Post Office and Courthouse**
12      **Two Federal Square**
        **Newark, New Jersey   07102**
13      **June 20, 2025**

14   **B E F O R E:**              **THE HONORABLE MICHAEL E. FARBIARZ,**
                                 **UNITED STATES DISTRICT COURT JUDGE**

15   **A P P E A R A N C E S:**

16

        IMMIGRATION RIGHTS CLINIC, BY:
17      ALINA DAS, ESQ.
        NYU School of Law
18      245 Sullivan Street
        5th Floor
19      New York, New York   10012

20          appeared on behalf of Petitioner;

21          Lisa Larsen, RPR, RMR, CRR, FCRR
                 Official Court Reporter
22          Lisa_Larsen@njd.uscourts.gov
                    (973)776-7741

23

24

        **Proceedings recorded by mechanical stenography.**
25      **Transcript produced by computer-aided transcription.**

Petitioner's Appendix 305

1   **A P P E A R A N C E S**: (Cont'd.)

2       UNITED STATES DEPARTMENT OF JUSTICE, BY:
        BY:  DHRUMAN Y. SAMPAT, SENIOR LITIGATION COUNSEL
3            SARAH S. WILSON, ASST. DIRECTOR
             P.O. Box 878
4            Ben Franklin Station
             Washington, D.C.  20044
5
             appeared on behalf of Respondents; and
6
    **A L S O   P R E S E N T:**
7
        Amy Greer
8       Amy Belsher
        Veronica Salama
9       Robert Hodgson
        Omar Jadwat
10      Esha Bhandari
        Noor Zafar
11      Brian Hauss
        Brett Kaufman
12      Baher Azmy
        Samah Sisay
13      Naz Ahmad
        Ramzi Kassem
14      Mudassar Toppa
        Diala Shamas
15      Marc Van Der Hout
        Johhny Sinodis
16      Oona Cahill
        Jeanne LoCicero
17      Liza Weisberg

18

19

20

21

22

23

24

25

Petitioner's Appendix 306

1    interests.

2         One of the arguments the petitioner has made here is

3    that he is being punished, that there is a disapproval of

4    certain things he has said and done in the past, and that the

5    immigration process is being used not to vindicate the

6    immigration laws but to punish the petitioner for those

7    things.

8         The petition has -- the verified petition has facts

9    along those lines at paragraphs 33 and 73 and 82 and 83 and

10   84.  And when you combine those facts with the current fact,

11   which is that the petitioner -- the respondent, one of them,

12   the Department of Homeland Security Secretary, is detaining

13   and seeking to keep detained the petitioner in the absence --

14   not "in the absence," in the face of thick evidence that has

15   not been controverted as to flight, as to dangerousness, and

16   is keeping and seeking to keep the petitioner detained in

17   light of strong evidence that I have found, that this is

18   overwhelming unlikely to be the ordinary course.

19        All of that, the evidence that strongly suggests that

20   there is no basis for detention here, combined with the

21   paragraphs I've mentioned in the petition at 33 and 73 and 82

22   and 83 and 84, when you put all those together, they suggest

23   that there is at least something to the underlying claim that

24   there is an effort to use the immigration charge here to

25   punish the petitioner, and of course that would be

1    unconstitutional.

2        There is at least enough to that claim that even if

3    *Mapp v. Reno* were to apply here and even if there is some need

4    to show a meaningful move in the direction of meritoriousness

5    in the substantial claim, that part of the *Mapp v. Reno* test

6    would be satisfied.

7        I do not hold that there is a likelihood of success on

8    the merits based on what I have just said.  It's a question

9    that I don't need to reach in light of what I've said about

10   the standard; and it's indeed a question that, as I have made

11   clear in a prior decision, at least in the absence of all the

12   extra things we now have would not have been made out by the

13   petitioner.

14       So my finding is that there are extraordinary

15   circumstances here.  They relate to my findings on risk of

16   flight, my finding on dangerousness to the community, my

17   finding on the overwhelming unlikeliness the detention would

18   be sought in a case of this sort in a context like this one,

19   my finding as to chilling effect, my finding as to the

20   inability of an immigration judge to take on these issues,

21   and, finally, my finding that while it does not rise to the

22   likelihood of success level, the claim that there is a due

23   process violative effort to punish the petitioner is

24   substantial enough that even if *Mapp v. Reno* is in play here,

25   there would be enough as to that claim to justify release.

1          So given all of those factual findings, I'm gonna

2     exercise the discretion that I have to order the release of

3     the petitioner in this case.

4          I don't plan to write an opinion on this.  I will

5     simply issue a very brief release order, and I'll do it

6     shortly, and refer the Court of Appeals, should there be an

7     effort to take an appeal, back to today's transcript.

8          I haven't been reading from an opinion, as I'm sure

9     you've all perceived, so things will be -- I'm sure the

10    transcript will reflect that.  But I'm hopeful that should

11    there be an effort to seek review from the Third Circuit, this

12    will give the Third Circuit a strong sense of my own factual

13    findings and the basis for my exercise of discretion here as

14    well as my decisions as to jurisdiction and exhaustion and the

15    relevant standard.

16         So that's my decision, that the petitioner's motion for

17    release will be granted and that obviates the need for

18    consideration of the petitioner's motion to transfer.

19         Mr. Sampat, let me go to you for half a moment.  Are

20    there any conditions that the respondents would seek be

21    imposed after the entry of the release order?

22         MR. SAMPAT:  Your Honor, I think we would need time to

23    consult with our clients on that to see what conditions would

24    be appropriate, but what we would also ask is, understanding

25    Your Honor's order granting the motion, we would ask that the

1        **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

2

3        I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court

4    Reporter of the United States District Court for the District

5    of New Jersey, do hereby certify that the foregoing

6    proceedings are a true and accurate transcript from the

7    record of proceedings in the above-entitled matter.

8

9

10              */S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

11           Official U.S. District Court Reporter ~

12                  District of New Jersey

13

14              DATED this June 21, 2025

15

16

17                  *    *    *    *    *

18

19

20

21

22

23

24

25

Petitioner's Appendix 310

# EXHIBIT 25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 76


AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
            Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
            Defendants


********


BENCH TRIAL DAY 3


BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE



United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 9, 2025




********



Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

Petitioner's Appendix 312

```
 1   A P P E A R A N C E S

 2   RAMYA KRISHNAN
     XIANGNONG WANG
 3        Knight First Amendment Institute at Columbia
          University
 4        475 Riverside Drive, Suite 302
          New York, NY 10115
 5        (646) 745-8500
          Carrie.decell@knightcolumbia.org
 6   and
     COURTNEY GANS
 7   NOAM BIALE
     ALEXANDRA CONLON
 8        Sher Tremonte LLP
          90 Broad Street, 23rd Floor
 9        New York, NY 10004
          (212) 540-0675
10        Cgans@shertremonte.com
          For Plaintiffs
11

12   ETHAN B. KANTER
     WILLIAM KANELLIS
13   VICTORIA M. SANTORA
     JESSICA A. STROKUS
14        DOJ-Civ
          P.O. 878
15        Ben Franklin Station
          Washington, DC 20044
16        (202) 616-9123
          Ethan.kanter@usdoj.gov
17   and
     SHAWNA YEN
18        United States Attorney's Office
          1 Courthouse Way, Suite 9200
19        Boston, MA 02210
          Shawna.yen@usdoj.gov
20        (617) 748-3100
          For Defendants
21

22

23

24

25
```

1

2                                     <u>INDEX</u>

3

4    <u>WITNESS</u>                                                        <u>PAGE</u>

5    ABU EL-HAJ

6        Direct Examination By Mr. Wang (continued)          5
         Cross-Examination By Mr. Kanellis                   36
7
     PETER HATCH
8
         Direct Examination By Ms. Conlon                    42
9

10
     E X H I B I T S
11

12   <u>Exhibit No</u>.                     Received

13
         228                           16
14
         229                           32
15
         230                           33
16
         231                           34
17

18

19

20

21

22

23

24

25

```
 1    A.    No, it was not on Columbia's campus.  It was -- well, I

 2    don't know if that's Columbia's campus.  It was up at 125th

 3    Street on a plaza in front of, I think it was a Columbia arts

 4    building, but I honestly do not know if that is considered

 5    legally Columbia's campus.

 6    Q.    The press conference was given at the Lenfest Center For

 7    Arts at Columbia University --

 8    A.    But we were not inside, we were not inside the building.

 9    Q.    Ah, I see.  You were outside.  So in that respect you

10    question whether or not it was at Columbia University?

11    A.    Look, I generally just don't know whether legally that

12    public space is owned by Columbia University.  That's all I'm

13    saying.

14    Q.    New York has over eight million residents, doesn't it?

15          MR. WANG:  Objection.

16          THE COURT:  I don't know that she is a demographer.

17          MR. KANELLIS:  She can tell me if she knows.

18          THE COURT:  I'll allow it.

19    A.    That sounds right.

20          THE COURT:  All right.  We'll let that stand.

21    Q.    Okay.  And you knew that by giving this press conference,

22    in making these statements critical of the United States and

23    the policy regarding Palestine and the arrest of Mr. Khalil,

24    that this could be heard by a great number of people; isn't

25    that right?
```

```
 1    A.    Yes.

 2             MR. KANELLIS:  No more questions.

 3    A.    And I repeat, I'm a U.S. citizen.

 4             THE COURT:  Nothing further for this witness,

 5    Mr. Wang?

 6             MR. WANG:  Nothing further from us.

 7             THE COURT:  We thank you, Professor.  All right.  Call

 8    your next witness.

 9             MR. BIALE:  Your Honor, this is Noam Biale for the

10:01 10    plaintiffs.  Plaintiffs call Peter Hatch.

11             THE COURT:  He may be called.

12             PETER HATCH, Sworn

13             COURTROOM CLERK:  Can you please state your full name

14    and spell your last name for the record.

15             THE WITNESS:  Peter John Hatch, H-a-t-c-h.

16             COURTROOM CLERK:  Thank you.  You may be seated.

17    DIRECT EXAMINATION BY MS. CONLON:

18    Q.    Good morning.  Is there a way for me to adjust the volume

19    on this?  Okay.  Good morning, Mr. Hatch.

10:03 20    A.    Good morning.

21    Q.    My name is Alex Conlon.  Thank you for being here.

22             So just to situate us all, Mr. Hatch, you work for the

23    United States Government?

24    A.    Yes, I do.

25    Q.    Okay.  You work in the Department of Homeland Security?
```

  1  A.   Yes, for the component called Immigration and Customs

  2  Enforcement.

  3  Q.   ICE?

  4  A.   Yes.

  5  Q.   And specifically, within ICE, you work for the Office of

  6  Intelligence; is that right?

  7  A.   I work for a subcomponent of ICE called Homeland Security

  8  Investigations, and within Homeland Security Investigations,

  9  I'm the assistant director for the Office of Intelligence.

10:03 10  Q.   Okay.  Now, you and I of course didn't get to prepare

 11  together because you are here with the defendants, so I want to

 12  give you a sense of what we're going to cover today for you and

 13  the court.

 14      In early March you were given the names of student

 15  protesters for the Office of Intelligence to produce

 16  analysis -- reports of analysis on; is that correct?

 17  A.   Yes.

 18          MS. STROKUS:  Objection, Your Honor, leading and

 19  foundation.

10:04 20          MS. CONLON:  Your Honor, this is an adverse witness

 21  and under Rule 611 --

 22          THE COURT:  Please, I'm familiar with the rules of

 23  evidence.  What's your response to that?

 24          MS. STROKUS:  Your Honor, Mr. Hatch is a federal

 25  government employee.

1    THE COURT:  He is.

2    MS. STROKUS:  And he is prepared to testify honestly

3    and truthfully here today.

4    THE COURT:  Well, that's the presumption, and I

5    certainly respect him, as I do all witnesses.  She may lead

6    him.  I'm familiar with leading, and of course it bears on the

7    weight to be given to the answers, but she may proceed in that

8    fashion.

9    MS. CONLON:  Okay.

10:04 10    BY MS. CONLON:

11    Q.  Many of the names of the student protesters provided to

12    you for the Office of Intelligence to produce reports of

13    analysis on came from the website Canary Mission, correct?

14    A.  It's true many of the names, even most of the names came

15    from that website, but we were getting names and leads from

16    many different sources.

17    Q.  The reports of analysis on the student protesters, you had

18    the chance to review, or read, rather, many of them, right?

19    A.  I have read several but not all of the reports of analysis

10:05 20    coming out of that effort.

21    Q.  And the reports of analysis on the student protesters that

22    you've read, you have seen ones that mention Israel, correct?

23    A.  Yes.  They've mentioned several of the nations involved in

24    the Middle East conflict.

25    Q.  You've seen reports of analysis that mention Palestine,

1  correct?

2  A.   Yes.

3  Q.   You've seen reports of analysis that mention

4  pro-Palestinian protests, correct?

5  A.   I've seen reports of analysis that mention Palestine and

6  issues related to Palestine.

7  Q.   You've specifically seen reports of analysis that mention

8  pro-Palestinian protests, correct?

9       THE COURT:  Well, I guess now she's framing it, so I

10:06 10  guess the way I hear her, she wants to have you say, when you

11  read reports, did the phrase "pro-Palestinian" -- what was her

12  third word -- "pro-Palestinian activities" or the like, did you

13  receive reports that had those phrases in it?

14       THE WITNESS:  I don't think the reports of analysis

15  mentioned that phrase as you've described it.  I think the

16  reports of analysis mentioned students involved in protests or

17  personnel involved in protests.  I don't know if a report of

18  analysis specifically said, mentioned pro-Palestine protests,

19  you know, those words.  I just don't remember.

10:07 20       THE COURT:  All right.  How about pro-Hamas?

21       THE WITNESS:  I do remember reports of analysis that

22  mentioned Hamas, but it isn't the analyst's job to make the

23  determination whether something is pro or con.  They would just

24  make the determination that a Hamas leader was, for example,

25  mentioned in the protest or there was some sort of activity or

 1    statement made in support of Hamas or related to Hamas.  But

 2    the analyst would not make the decision of or classify it as

 3    this is pro-Hamas activity, this is pro-Palestine activity.

 4    They just don't make those determinations.

 5    Q.   So I want to make sure we get off on sort of the right

 6    foot here, and if I'm misunderstanding something that you've

 7    said in your deposition, you can tell me.

 8         But we spoke to you in a deposition maybe a week ago; is

 9    that right?

10:08 10   A.   That's correct.

11    Q.   In that deposition -- and for the government's benefit,

12    I'm looking at page 233, lines six to eight.

13         You were asked this question and you gave this answer.

14         Question:  Do you recall seeing any reports of analysis

15    that mention pro-Palestinian protests?

16         Answer:  Yes.

17         MS. STROKUS:  Objection, Your Honor, improper

18    impeachment.  Can she please show the witness the testimony to

19    which she's referring?

10:08 20        THE COURT:  Under Queen Charlotte's case, that's

21    appropriate.

22         MS. CONLON:  I'm happy to show the witness.

23         THE COURT:  Yes, let's do it.

24         MS. CONLON:  We're queueing it up.  While we queue it

25    up --

```
 1              THE COURT:  Government counsel, I just want to call
 2    people by names, and again, your name, I'm sorry?
 3              MS. STROKUS:  Yes, Your Honor.  I'm Jessica Strokus on
 4    behalf of defendants.
 5              THE COURT:  Thank you, Ms. Strokus.
 6    BY MS. CONLON:
 7    Q.    So Mr. Hatch, this deposition took place June 25, right?
 8    A.    Yes.
 9    Q.    And you had government counsel there with you?
10:09 10    A.    Yes.
11    Q.    And of course you were under oath in the deposition?
12    A.    Yes.
13    Q.    And at the outset of that deposition you were instructed
14    that if a question was unclear, you could ask for
15    clarification, right?
16    A.    Yes.
17    Q.    And in fact, many times you did ask for clarification,
18    right?
19    A.    Yes.
10:09 20    Q.    Okay.  So turning your attention now to the section that
21    you see here on the screen, and this again is page 233,
22    starting at line six, you see where it says, Question:  "Do you
23    recall seeing any report of analysis that mentions
24    pro-Palestinian protests?"
25              Answer:  "Yes."
```

          Do you see that there?

1

2   A.   I do, but that's not what it says.

3   Q.   I'm sorry, that's not what it says?

4   A.   I'm looking at line -- the question above that was, "Do

5   you recall seeing any report of analysis that refers to

6   pro-Palestinian protests."

7   Q.   You then asked that the question be rephrased, right?  Do

8   you see that on line four?

9   A.   Yes.

10:10 10   Q.   And then the question was asked -- and I hate to repeat

11   it, but it says, "Do you recall seeing any report of analysis

12   that mentions pro-Palestinian protests?"

13          That is the question that was put to you, and the response

14   you gave was, "Yes."  Isn't that right?

15   A.   "Do you recall seeing any report of" -- yes.

16          MS. CONLON:  Okay.  You can take it down.

17   Q.   Now, the reports of analysis about the student protesters,

18   you said that you only reviewed several of them, correct?

19   A.   That's correct.

10:11 20   Q.   When you say "several," can you give us a sense of how

21   many that means?

22   A.   For this particular effort, I probably reviewed a couple

23   of dozen, maybe a dozen, maybe 20.

24          THE COURT:  When you say "this particular effort," to

25   what do you refer?

1          THE WITNESS:  I review probably almost a thousand,

2     maybe up to a thousand ROAs in total during a year, and we do,

3     the Office of Intelligence does approximately 25,000 to 30,000

4     ROAs a year.

5          THE COURT:  But my question was, you're able to say

6     this particular effort, you reviewed about 20.  What do you

7     mean by "this particular effort"?  What was the mission or the

8     effort that we're talking about?

9          THE WITNESS:  When we were looking at the protests.

10:12  10     So personnel from -- individuals from the lists of people who

11     were involved in protests.

12          THE COURT:  Protests at Columbia or other places as

13     well?

14          THE WITNESS:  Other places as well.

15          THE COURT:  Thank you.  Just so I understand, college

16     protests or --

17          THE WITNESS:  Student, student protests and personnel

18     who was participating in those protests.

19          THE COURT:  Thank you.

10:12  20     BY MS. CONLON:

21     Q.   When you say "personnel participating in the student

22     protests," does that extend to faculty?

23     A.   It extends to everyone other than -- yes, and all others

24     who are involved who may not have been associated with the

25     university at all.

1    Q.   You said a moment ago that the Office of Analysis -- or

2    Intelligence, rather, produces upwards of 25,000 reports of

3    analysis on all kinds of subjects in a given year, right?

4    A.   That's correct.

5    Q.   And you said that you review a small slice of that in a

6    given year, maybe a thousand.  Did I understand you right?

7    A.   That's about right.

8    Q.   And you said that in this line of effort, which was

9    compiling reports of analysis on student protesters, that you

10:13 10    recall reviewing several dozen; is that correct?

11          MS. STROKUS:  Objection, Your Honor.  It misstates his

12    testimony.

13          THE COURT:  That's not exactly what he said.

14          MS. CONLON:  I'm seeking -- I'm sorry.

15          THE COURT:  But I understand, and let me try.

16          MS. CONLON:  Okay.

17          THE COURT:  So with respect to student protests, you

18    recall reviewing about 20?

19          THE WITNESS:  That's correct.

10:13 20          THE COURT:  All right.  Now go from there.

21          MS. CONLON:  Okay.

22    BY MS. CONLON:

23    Q.   So again, I just want to make sure I'm understanding you

24    and we're on the same page.

25          When you say "dozens," a couple dozen, you mean

```
 1    approximately 100, isn't that right?

 2    A.    No.  We said about -- I've reviewed about 20 of those.

 3    Q.    Okay.

 4    A.    I don't recall the exact number.  Like I said, I review a

 5    lot of ROAs, so I'm estimating here.

 6    Q.    Okay.  I'm going to ask -- I'm going to ask that we put

 7    the transcript back up.  And can we please go first to page 83.

 8    So first -- and we're going to have to do this in a few parts,

 9    but Mr. Hatch, I want to direct your attention to lines 13 to

10:14 10   16 so that you're clear on the context for what I'm going to

11    show you next here.

12        In line 13 you're asked, "Do you recall whether any of

13    these reports of analysis on student protesters mentioned the

14    terms 'Israel' or 'Palestine,'" to which you said yes, which

15    you've also said today.  And now moving ahead to page 84, lines

16    10 to 12, when you were asked about those reports, the question

17    was, "And when you say dozens, what's a ballpark figure?"  And

18    in line 12 the answer you gave was, "Approximately, 100."

19        So you testified that you know that approximately 100 of

10:15 20   the reports of analysis on student protesters mentioned the

21    terms "Israel" or "Palestine," isn't that right?

22            MS. STROKUS:  Objection, Your Honor.  It's unclear

23    from the what's on the screen right now what the original

24    question was.

25            THE COURT:  If it's clear to the witness -- if it's
```

54

that mentioned the terms "Israel" or "Palestine" was a subset
of the total reports of analysis on student protesters
generated in this line of effort, correct?

A.   Yes, I believe it was a subset.

Q.   In other words, there were more than 100 reports of
analysis generated about student protesters, right?

A.   Slightly more, yes.

Q.   How many more?

A.   There were less than 200.

10:19 Q.   More than 100, less than 200?

A.   Yes.

Q.   Okay.  So I want to back up for a moment to -- so at a
high level, so you understand, those are the topics I want to
get into, but I want to get back for a moment to your work.

      So you told us that you work in HSI, which is part of ICE,
and ICE works to, among other things, dismantle transnational
criminal organizations, right?

A.   Yes, HSI's mission is to dismantle transnational criminal
organizations.

10:20 Q.   As in, ICE's mission is broader, but HSI's work is focused
on dismantling transnational criminal organizations; is that
correct?

A.   That is correct.

Q.   HSI, where you work, identifies and investigates people
suspected of breaking criminal laws, right?

1    A.    We don't investigate.  We only analyze.

2    Q.    You analyze, okay.  You research and analyze?

3    A.    Yes.  We're talking about the Office of Intelligence.

4    Q.    Yes.  And let's talk about that.  So you are the assistant

5    director of the Office of Intelligence, right?

6    A.    Yes, I am.

7    Q.    And you have worked in law enforcement overall for more

8    than 35 years, correct?

9    A.    Yes, I have.

10:21 10    Q.    You joined the Department of Homeland Security in 2019?

11    A.    I became an HSI employee in 2019.  Before that I was an

12    officer in the Coast Guard.

13    Q.    And when you joined in 2019, you moved into the senior

14    role that you are in now, right?

15    A.    I did.

16    Q.    It may be obvious to others from your title, but so that

17    I'm clear, you are senior-most office -- official in the Office

18    of Intelligence; is that right?

19    A.    I am.

10:21 20    Q.    And you report directly to senior leadership of the

21    umbrella that is also Homeland Security Investigations?

22    A.    Yes, I report to the deputy.

23    Q.    The deputy is Derek Gordon?

24    A.    That is correct.

25    Q.    You oversee more than a thousand investigative analysts?

1    A.    Approximately a thousand.

2    Q.    Now, the Office of Intelligence focuses on criminal

3    networks, criminal conspiracies, those engaged in criminal

4    conduct, right?

5    A.    That is correct.

6    Q.    Its work is divided into different types of crimes or

7    program areas like child exploitation or human trafficking?

8    A.    Yes.

9    Q.    Okay.  So you said earlier that the Office of Intelligence

10:22 10    doesn't do investigation.  It does research and analysis.

11    A.    Yes.  We are, investigative analysts are not law

12    enforcement officers.  They do not have arrest powers.  They

13    don't have investigative powers.

14    Q.    Okay.  And the Office of Intelligence supports

15    investigations, though it does not do them itself, through

16    factfinding, right?

17    A.    Yes, we -- yes, we do.

18    Q.    And those facts get memorialized in a report called a

19    report of analysis?

10:23 20    A.    Yes, the report of analysis is the way the investigative

21    analyst documents their work.

22    Q.    So I want to talk about what reports of analysis

23    ordinarily contain, and I will be direct with you and tell you

24    I have never seen one.  They have been withheld as privileged

25    in this case.  So if I ask you a question and it doesn't make

 1   sense or it's off-base, please tell me.

 2       A report of analysis can focus on a particular person?

 3   A.   Yes, they can focus on individuals, yes.

 4   Q.   For our purposes, I'll call an individual that's the

 5   subject of a report "the subject," just so I don't have to keep

 6   repeating it.

 7       The report can have a great deal of factual information

 8   about the subject, right?

 9   A.   The report should have a lot of factual information about

10:24 10   the subject and only factual information.

11   Q.   And the factual information they should have are facts

12   that could be relevant to a suspected violation of a criminal

13   law; is that right?

14   A.   Violations of primarily criminal law but violations of

15   law, and for HSI's mission, violations of immigration and

16   customs law, which is our specialty.

17   Q.   And when you say "immigration and customs law," are you

18   referring to the Immigration and Nationality Act?

19   A.   Title 8 for immigration.

10:24 20   Q.   Okay.  The reports of analysis on a subject include, among

21   other things, the person's immigration history?

22   A.   Yes, that would be part of it.

23   Q.   The history of their activity in the United States?

24       MS. STROKUS:  Objection, Your Honor.  This line of

25   questioning is teetering on the law enforcement privilege.

```
 1   What goes into the report of analysis --

 2              THE COURT:  I haven't heard it yet.

 3              MS. STROKUS:  Your Honor, what goes into a report of

 4   analysis has been withheld as privilege.

 5              THE COURT:  It may have, but ultimately that's the

 6   court's decision.  She may have the question.

 7   BY MS. CONLON:

 8   Q.   A report of analysis may contain history of the subject's

 9   activity in the United States, right?

10   A.   It would contain things like their criminal activity,

11   perhaps employment, travel.  But without getting into -- I want

12   to keep it in general terms because people know -- if criminals

13   learn what we write in a report of analysis, then they can make

14   adjustments.

15              THE COURT:  Actually, you've touched on the line I'm

16   trying to draw.  As I view the law enforcement privilege, and

17   you're a person who works in this area, so I want you to tell

18   me if you think a question trenches on it.

19              Nothing here should mess up or impair your office's or

20   any knowledge you have of government operations' ability to

21   enforce the laws and protect the nation generally.

22              Having said that, we're engaged in a search for truth

23   here about certain things that have happened or haven't

24   happened and are in factual dispute.  So it's not wrong for her

25   to start this way because documents have been withheld.  But if
```

1    investigative analysts in the Office of Intelligence, right?

2    A.    Yes, the analysts write the ROAs.  I have not written

3    ROAs.

4    Q.    Not ever probably?

5    A.    Right.

6    Q.    Okay.  Once the ROA is drafted by an investigative -- or

7    by an analyst, the ROA -- and I apologize for the record.

8    That's what I'm abbreviating, report of analysis.

9          THE COURT:  I am following.

10:35 10    Q.    The ROA does not have to go through any formal sign-off

11    procedure within the Office of Intelligence before it can leave

12    the office and be given to whoever requested it, correct?

13    A.    Yes.  They do not go through me, if that's what you're

14    asking.  I do not have approval process where I sign off on

15    every ROA.

16    Q.    Right, because there's like 25,000 of them in a year?

17    A.    Correct.

18    Q.    Okay.  And you have a deputy, correct?

19    A.    I have one deputy.

10:35 20    Q.    Mr. Etter, Bradley Etter?

21    A.    That's correct.

22    Q.    He also doesn't have to sign off on ROAs before they go

23    outside of the Office of Intelligence, right?

24    A.    No.  The relationship is the analyst works with the agent,

25    and that's a partnership that we try to encourage.

1    Q.    In other words, we're talking about direct collaboration

2    between the analyst in the Office of Intelligence and the agent

3    who asked for the office's help?

4    A.    That's correct.

5          THE COURT:  This may all be relevant, but how much

6    more do you think you have for this witness?

7          MS. CONLON:  In general or on this topic?

8          THE COURT:  No, in general.

9          MS. CONLON:  I have a great deal more.

10:36 10          THE COURT:  And you want to get him out of here today?

11          MS. CONLON:  I do.  I understand that he has a lot on

12    his plate.

13          THE COURT:  He may very well.  They may have questions

14    for him.  All right.  You go ahead.  I guess I'm thinking,

15    though he's being perfectly responsive to your questions as far

16    as I can see, it might be helpful to get to this case.

17          MS. CONLON:  I'm almost there, I promise.

18    BY MS. CONLON:

19    Q.    So in the ordinary course, sticking with your regular

10:36 20    process, not the student protester process for a moment, after

21    the Office of Intelligence gives the report of analysis to the

22    party who requested it, that is often the end of the Office of

23    Intelligence's involvement in that case, correct?

24    A.    Yes.  Oftentimes we don't hear back from the agent on any

25    results of the investigation.

1    Q.    Now, you've been in your role for six years,

2    approximately?

3    A.    Since 2019.

4    Q.    For your first five and a half years in your role, you

5    were never involved in the investigation of a foreign student

6    engaged in political protest, correct?

7    A.    I was never asked -- again, I don't do investigations.

8    Q.    Sorry.

9    A.    So I was never -- I don't recall any instance where I was

10:37 10   asked to review protest activity.

11    Q.    Now, prior to 2025, to the best of your knowledge, you

12    also weren't involved in cases involving lawful permanent

13    residence for potential action by the State Department,

14    correct?

15    A.    No.  We -- I don't recall any actions where we provided

16    information to the State Department, but we were -- that is,

17    that referral to the State Department is one of the statutes in

18    Title 8, and we've been investigating or we've been analyzing

19    Title 8 offenses since I've been there.

10:38 20   Q.    So just to bring you back to the question, you had seen

21    reports of analysis on visa holders that went to the State

22    Department prior to 2025 but not reports of analysis on green

23    card holders, lawful permanent residents that went to the State

24    Department before 2025, correct?

25    A.    That I don't recall because I thought your question was

1    related to the protesters.  So if you're asking me, I don't

2    recall any instances of LPRs being referred to the State

3    Department because of protest activity.  I don't know the

4    answer if we referred to any LPRs -- "we" being HSI referred

5    any LPRs for other types of activity, I just don't -- I'm not

6    sure I would remember those.

7    Q.    You don't think you'd recall whether you reviewed reports

8    that went to the State Department about lawful permanent

9    residents before?

10:39 10    A.    Yes.  It's not something I would, as the assistant

11    director, that I would be involved in in the normal course of

12    business.  It wouldn't really rise to my level as an issue.

13    Q.    Do you recall ever seeing see a referral of a student

14    protester for a visa revocation before 2025?

15    A.    I don't recall that.

16    Q.    Now, President Trump was inaugurated in January, right, of

17    this year?

18    A.    Yes.

19    Q.    January 20.  Is that a yes, if you know?

10:40 20    A.    Yes.

21    Q.    And shortly after he took office, he issued several

22    executive orders that relate to the work of the Department of

23    Homeland Security, correct?

24    A.    Yes.

25    Q.    You read, for your work, executive orders that relate to

1   the work of HSI, correct?

2   A.   Yes, the ones that I can find and interpret, yes.

3   Q.   Okay.  And one of the orders that has affected the work of

4   HSI this year is Executive Order 14161, which is titled

5   Protecting the United States From Foreign Terrorists and Other

6   National Security and Public Safety Threats.  Is that right?

7   A.   Yes, but if you're going to ask me questions about it, can

8   I have it, can I read it?

9   Q.   Of course.

10:40  10         MS. CONLON:  Your Honor, you look like you were going

11   to say something.  Should I continue?

12         THE COURT:  No.  I didn't understand your question.

13   But go ahead and ask your question.  He understood it, and I

14   think I do.  He's familiar with that executive order, but if

15   you're going to question him --

16         MS. CONLON:  He wants to see it.

17         THE COURT:  -- we better look at it.

18   Q.   Okay.  So we have put a document that has been marked as

19   Exhibit 70, which is in evidence, in front of you.  Do you see

10:41  20   it on the screen there?

21   A.   Yes, I do.

22   Q.   Do you recognize that as Executive Order 14161?

23   A.   Yes.

24   Q.   And you can see it was issued January 20, 2025?

25   A.   I can see that.

1    A.    I think so.

2    Q.    And Mr. Hammer is the deputy executive associate director

3    of Homeland Security Investigations or rather he was just

4    before Mr. Gordon took over; is that right?

5    A.    He was at the time, yes.

6    Q.    Okay.  I see.  So the meeting occurred when Mr. Hammer was

7    still incumbent in that seat and then Mr. Gordon took over?

8    A.    That's correct.

9    Q.    The meeting also included Roy Stanley, the chief of the

10:46 10    analysis division for the Office of Intelligence; is that

11    right?

12    A.    I believe he was there and he is the unit chief for the

13    analysis division within Office of Intelligence.

14    Q.    Do you recall who else from senior leadership was there,

15    or is that the group?

16    A.    I don't -- I don't remember who else was there.

17    Q.    Okay.  Now, in this meeting, the meeting was convened by

18    HSI's leadership, correct?

19    A.    Yes.

10:47 20    Q.    And the meeting was held as part of HSI's effort to

21    implement Executive Order 14161, correct?

22    A.    I do not characterize it that way because, as I recall

23    from the discussions, I don't think that was the topic of the

24    meeting.  The meeting was to talk about protest activity or

25    student protesters who may be in violation of U.S. law.

```
 1    Q.   So it's your understanding that the meeting was about an

 2    effort to gather information on student protesters, but you

 3    don't understand it to have been --

 4            THE COURT:  Let's not beat around the bush.  I'm

 5    interested in this meeting.  You're the witness.  Not how she

 6    characterizes things.  What were the instructions or the like

 7    from the briefing?

 8            MS. STROKUS:  Objection, Your Honor.

 9            THE COURT:  Overruled.

10:48 10         MS. STROKUS:  Objection, Your Honor, deliberative

11    process privilege.

12            THE COURT:  They weren't deliberating.  They were

13    being briefed.  When you're briefed, you're told what's going

14    to happen.  Were you deliberating?

15            THE WITNESS:  We weren't briefing.  We were

16    discussing.

17            THE COURT:  I stand corrected.  It was referred to as

18    a briefing.

19            So you were discussing and you have characterized the

10:48 20    discussion as student protesters who may have broken the law?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  Okay.  And having been corrected and I

23    appreciate your persistence, I sustain the objection.

24            And now I'll ask this.  So as a result of that

25    meeting, what instructions, if any, were adopted?  And again,
```

```
 1    I'm going to explain the line I'm drawing because I have some

 2    trust that you're following the line.

 3           When you're kicking stuff around, the rest of us

 4    aren't entitled to know that, just as I kick stuff around with

 5    my law clerks.  Once I've decided what we're going to do, well,

 6    then in the judicial end I have to write it all out and that's

 7    all above it.  In your executive end, whatever is decided that

 8    bears on this case and student protesters, we're entitled to

 9    know that, and I need to know it.

10           Do you have that in mind?

11           THE WITNESS:  Yes, Your Honor.

12           THE COURT:  So recognizing that's the line, what came

13    out of it?

14           THE WITNESS:  To look at the protesters, to develop

15    reports of analysis on the protesters, specifically looking for

16    violations of U.S. laws, including and specific to immigration

17    and customs laws.

18           THE COURT:  Can you be any more specific as to the

19    immigrations and customs laws that you were looking for were?

20           THE WITNESS:  Thinking in general terms, it was

21    anything that may relate to national security or public safety

22    issues, things like were any of the protesters violent or

23    inciting violence?  I think that's a clear obvious one.  Were

24    any of them supporting terrorist organizations?  Were any of

25    them involved in obstruction or unlawful activity in the
```

10:49 (line 10)
10:50 (line 20)

1   protest?

2          THE COURT:  What do you mean by "obstruction"?

3          THE WITNESS:  Like blocking normal citizens from going

4   about their business.

5          THE COURT:  Okay.  Thank you.

6          THE WITNESS:  And that we would use the normal report

7   of analysis process and our normal trade craft for this.

8          THE COURT:  Proceed, Ms. Conlon.

9          MS. CONLON:  Okay.  Thanks.

10:51 10   BY MS. CONLON:

11   Q.   So you characterized it as a meeting, not a briefing; is

12   that right?

13   A.   I characterized it as a discussion.

14   Q.   You would call it a discussion?

15   A.   Yes.

16   Q.   The discussion was led by HSI leadership?

17   A.   I think only HSI was in the room.

18   Q.   So by default.

19          THE COURT:  We're going to --

10:51 20          MS. CONLON:  Sorry.

21          THE COURT:  I'm not the only one who needs a break

22   here.  The court reporters need to switch.  So what we're going

23   to do is we're going to take a break until 11:00.  That's the

24   break.  If you want to leave some time to have argument about

25   issues that are to be discussed, fine.  Otherwise you can run

1    until 12:00, and I'm stopping and we will take this matter up

2    tomorrow without any further argument.  And hopefully we can

3    get him on his way.

4        MS. STROKUS:  Your Honor, we were told by plaintiffs

5    that Mr. Hatch would be going first today.  He made his travel

6    arrangements to testify today.  I understand that we are going

7    into tomorrow.  May I request that we do, after the break,

8    arguments on the issues that are percolating so that Mr. Hatch

9    is able to rearrange his travel schedule?

10:52 10        THE COURT:  In other words, you'd like to cause him to

11    rearrange his travel schedule so that we get that taken care

12    of, argument about -- you call it the issues percolating -- the

13    issues about the documents I said could be turned over but I

14    wanted to give you a chance to argue.  That's how you'd like to

15    do it?

16        MS. STROKUS:  Your Honor, just based on the outline

17    that Ms. Conlon started in the beginning, it does not sound

18    like direct will be completed today.

19        THE COURT:  So long as he's going to be here tomorrow,

10:53 20    I'm fine with that.  She's nodding her head.  But for now,

21    five-minute break for all of us.  I will hear you at 11:00, no

22    more than ten minutes of argument.  That's not an invitation to

23    take ten minutes.  And when that's resolved, you may resume the

24    stand, and we'll have the pleasure of your company tomorrow

25    probably.  We'll recess.  (Recess, 10:53 a.m.)

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Professional

4    Reporter, Registered Merit Reporter and Certified Realtime

5    Reporter, in and for the United States District Court for the

6    District of Massachusetts, do hereby certify that the foregoing

7    transcript is a true and correct transcript of the

8    stenographically reported proceedings held in the

9    above-entitled matter to the best of my skill and ability.

10                    Dated this  9th day of July, 2025.

11

12                    /s/ Kelly Mortellite

13                    _____

14                    Kelly Mortellite, RPR, RMR, CRR

15                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 26

Petitioner's Appendix 342

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS (Boston)

 3                        No. 1:25-cv-10685-WGY
                          Volume 2, Page 78 to 121
 4

 5   AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
               Plaintiffs
 6

 7   vs.

 8

 9   MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10               Defendants

11                        * * * * * * * * *

12

13

14                   For Bench Trial Before:
                     Judge William G. Young
15

16

17                   United States District Court
                     District of Massachusetts (Boston.)
18                   One Courthouse Way
                     Boston, Massachusetts 02210
19                   Wednesday, July 9, 2025

20                        * * * * * * * *

21

22        REPORTER: RICHARD H. ROMANOW, RPR
                  Official Court Reporter
23              United States District Court
       One Courthouse Way, Room 5510, Boston, MA 02210
24                  rhr3tubas@aol.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3    RAMYA KRISHNAN, ESQ.
      CAROLINE DeCELL, ESQ.
 4    ALEXANDER ABDO, ESQ.
      SCOTT B. WILKENS, ESQ.
 5    ALEXANDRA CONLON, ESQ.
         Knight First Amendment Institute at Columbia
 6       University
         475 Riverside Drive, Suite 302
 7       New York, NY 10115
         (646) 745-8500
 8       E-mail: Ramya.krishnan@knightcolumbia.org
      and
 9    COURTNEY GANS, ESQ.
      NOAM BIALE, ESQ.
10       Sher Tremonte LLP
         90 Broad Street, 23rd Floor
11       New York, NY 10004
         (212) 540-0675
12       Email: Cgans@shertremonte.com
         For Plaintiffs
13

14    ETHAN B. KANTER, ESQ.
      WILLIAM KANELLIS, ESQ.
15    VICTORIA M. SANTORA, ESQ.
      JESSICA STROKUS, ESQ.
16       DOJ-Civ
         P.O. 878
17       Ben Franklin Station
         Washington, DC 20044
18       (202) 616-9123
         Email: Ethan.kanter@usdoj.gov
19    and
      SHAWNA YEN, ESQ.
20       United States Attorney's Office
         1 Courthouse Way, Suite 9200
21       Boston, MA 02210
         Email: Shawna.yen@usdoj.gov
22       For Defendants

23

24

25
```

```
1                           I N D E X

2

3    WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

4

5    PETER HATCH  (Continued.)

6       By Ms. Conlon          12

7       By Ms. Strokus

8

9

10                       E X H I B I T S

11                        (None marked.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1         I have urged cooperation in significant respects,
 2    though I don't challenge anyone's good faith, there has
 3    not been cooperation.  I need to get through the trial.
 4    The parties are benefitted if I get through the trial.
 5    Now let's get the witness in here.
 6         (Pause.)
 7         THE COURT:  Where'd he go?
 8         MS. SANTORA:  Your Honor, Victoria Santora for the
 9    defendants.  If I may?  We were not able to respond to
10    the motion to compel, but I do just want to note that as
11    plaintiffs --
12         THE COURT:  You just won it?
13         MS. SANTORA:  So I did -- just to the extent that
14    you said that you will consider the witness's conduct in
15    not appearing at trial, I do want to note that it was a
16    logistical issue more on the part of the attorneys than
17    on the witness.
18         THE COURT:  Then it could be worked out rather
19    than having to make motions.  You know we have days.  We
20    have a weekend here.
21         MS. SANTORA:  I agree, your Honor.  And we are
22    willing to cooperate with opposing counsel.
23         THE COURT:  I expect it.  And that's helpful.
24    Thank you, Ms. Santora.
25         What happened to -- usually when we have a jury
```

1    and we have sequestered witnesses and they don't come

2    when you call them, I tell stories about the courtroom

3    to the jury.

4         MS. CONLON:  We'll hear your stories, your Honor.

5         THE COURT:  No, here he is.

6         (Mr. Hatch, the witness, enters courtroom.)

7         THE COURT:  And, Ms. Conlon, you may continue.

8         MS. CONLON:  Thank you, your Honor.

9

10   DIRECT EXAMINATION BY MS. CONLON:  (Continued.)

11   Q.  Okay, Mr. Hatch, before the break you were

12   describing for the Court, um, the instructions that you

13   received at the March meeting with HSA leadership

14   concerning student protestors.  One of the things you

15   said was that you were directed, um, to review and

16   analyze whether any of the student protestors had, for

17   example, supported terrorist organizations.

18        Did anybody specify Hamas in particular in the

19   meeting?

20   A.  I don't --

21        MS. STROKUS:  Objection, your Honor, to the extent

22   it calls for the deliberative process in the discussions

23   in the meeting.

24        THE COURT:  Oh, actually, Ms. Strokus, you're

25   right, you must ask were any of the directions relative

```
 1   to Hamas?
 2         MS. CONLON:  Yes, I will rephrase it.
 3         THE COURT:  (To the witness.)  Do you see the
 4   line?  Not the discussions, but the directions about
 5   what you were going to do.
 6         Did anyone mention that you were, among other
 7   things, going to take a look at Hamas or pro-Hamas
 8   activity?
 9         THE WITNESS:  Um, yes, we -- the -- supporting
10   Hamas would be, um, relative to a violation of law.  So
11   it would be standard practice for an analyst to that
12   anyway.  However, um, my direction to the team, um, was
13   to look for, um -- as an example, to look for Hamas, any
14   statements in support of Hamas, or any activities.
15         THE COURT:  And a question for me.
16         Hamas was a designated terrorist organization well
17   before January 20th of this year, correct?
18         THE WITNESS:  Yes, your Honor, that's correct.
19         THE COURT:  All right.
20         Go ahead, Ms. Conlon.
21         MS. CONLON:  Thank you.
22   Q.  You were just talking about the directions that you
23   gave to others, but I want to bring it back to the
24   directions you received from HSI leadership before we
25   discuss what you may have directed others to do.  So
```

```
 1    sticking with what you were directed to do as a result
 2    of this meeting.
 3            Were you specifically directed to look at whether
 4    student protesters supported Hamas as opposed to just
 5    all foreign terrorist organizations, was there any
 6    specific direction concerning Hamas?
 7    A.  I don't recall receiving any specific direction to
 8    me to look at Hamas.
 9    Q.  You don't recall anything in the meeting about
10    student protestors resulting in a direction to review
11    whether the student protestors expressed support for
12    Hamas?
13            MS. STROKUS:  Objection, your Honor, deliberative
14    process privilege.  He's asking about --
15            THE COURT:  Please.  Please.  I'm not a fan of
16    speaking objections.  It's sufficient, and I think it is
17    your right, to say "Objection, deliberative process
18    privilege."  That calls into mind what we're talking
19    about.  If I need argument, I'll ask for it.
20            This is directions.  It's limited to directions.
21            And do you understand the question?
22            THE WITNESS:  Yes, but I think, um, counsel
23    rephrased the question from one to the other.
24            THE COURT:  Go ahead.
25    A.  So I do not recall receiving any specific direction
```

1    from my supervisors to, um, focus directly and solely on

2    Hamas.

3    Q.  Do you recall receiving any direction to focus on

4    any particular foreign terrorist organization?

5    A.  I recall receiving direction to focus on violations

6    of the U.S. law.  I don't -- I don't recall any

7    instruction to me specifically to Hamas.

8    Q.  Well earlier when you were answering the Court's

9    questions about the instructions you received, you give

10   certain examples of the kind of things that the Office

11   of Intelligence was supposed to be on the lookout for.

12   And your examples, as I recall, included inciting

13   violence, supporting terrorist organizations, etc.

14        But it's true that the direction was actually

15   broader, it was to look for any potential violations of

16   Title VIII, correct?

17   A.  Yes, any violations of U.S. law.

18   Q.  Including Title VIII?

19   A.  Our organization specializes in immigration and

20   customs law.

21   Q.  And the examples you were giving were examples that

22   might be particularly relevant to the review of a

23   student protester's conduct, is that correct?

24   A.  Yes.  You're asking me to speculate and those are

25   the ones that would be -- those are the ones that I can

 1   think of that would be relevant right now.

 2   Q.  Well you are an authority here, so I'm happy to have

 3   your understanding of it.

 4        Now when you say "supporting terrorist

 5   organizations," in this context, were you given any

 6   direction about what "supporting" means here for the

 7   work of the Office of Intelligence?

 8   A.  I was not.

 9        THE COURT:  From something you said earlier, I got

10   the sense, but let's see if I heard it right.  And

11   thereafter you carried out that mission, but you carried

12   it out in your usual way?

13        THE WITNESS:  Yes, sir.

14   Q.  What kind of evidence does the Office of

15   Intelligence look for as indicative potentially that a

16   noncitizen supports a foreign terrorist organization?

17   Can you -- I'm trying to understand what you mean when

18   you say "supporting a terrorist organization"?

19        MS. STROKUS:  Objection, your Honor.

20        THE COURT:  Yeah, sustained.

21   Q.  What does "supporting a terrorist organization" mean

22   when you say it?

23   A.  (Pause.)  Again the analyst looks for indicators,

24   does not make the judgment on whether the activity

25   actually supports or doesn't support terrorism.  So we

```
 1    look for activities, um, such as, um, support for a
 2    terrorist -- statements in support of a terrorist
 3    leader, um, everything from that to material support,
 4    which would be providing money to a terrorist
 5    organization or making, um, donations to an organization
 6    that's affiliated with a terrorist organization.  But I
 7    really don't want to say any more detail than that.
 8         THE COURT:  And that's perfectly acceptable to the
 9    Court.  Let me give you this example.
10         If you find out that a person was saying, um,
11    statements like this, "Hamas is right, what Hamas is
12    doing is right for the situation, or for the Middle
13    East, or just right."  And I'll stop there.
14         How does that fit or doesn't it?
15         THE WITNESS:  Yes.  In that example, the analyst
16    would be, um, within policy to include that statement,
17    because again the analyst is just collecting the facts.
18         THE COURT:  Right.
19         THE WITNESS:  If the person actually didn't say
20    that or someone alleged they say that and the analyst
21    found out that they didn't say that, then they would
22    write the facts and not the allegations.  So it's just
23    factfinding.
24         If they, um, made a statement in support of the
25    Yankees, the analyst wouldn't put it in there because
```

```
 1    it's not related to a national security or public safety

 2    issue.  Although in the case of the Yankees, it might

 3    be.

 4    Q.  Are you a Nationals' fan?

 5    A.  I'm a Red Sox fan.

 6    Q.  Oh, then you're in the right place.

 7         So the Court gave you an example of a statement

 8    that say, for example, "Hamas is right," that could be

 9    relevant to, um, an analyst's compiling of a report of

10    analysis about a student protester.

11         Could a statement like "Free Palestinian" be

12    similarly relevant?

13    A.  Again all of these are on a case-by-case basis.  But

14    it could be, depending on the circumstances of that

15    individual.  But as long as that statement was factual

16    and we could corroborate that it was made by the

17    individual under the circumstances described.

18    Q.  And just to understand the flip side of it.  Could a

19    statement condemning the actions or the existence of

20    Israel still be relevant to a report of an analyst in

21    the same way?

22    A.  Again, it depends on the circumstances of the

23    individual.  It depends on the individual circumstances.

24    But the analyst would -- as long as that statement is

25    factual, the analyst would not be against policy in
```

Petitioner's Appendix 353

1    including that in the Report Of Analysis.  And it isn't

2    the, um, the presence or existence of a Report of

3    Analysis does not presume guilt or innocence, it's just

4    factfinding.

5    Q.  Okay.  So it's fair to say the analyst's job is to

6    include whatever facts could be relevant to a

7    determination that a person, um, act contrary to U.S.

8    law and that could include the person's speech, correct?

9    A.  That's correct.  It includes all kinds of

10   activities.

11   Q.  Now, um, this -- back to the March meeting -- we'll

12   move on from it momentarily, but back to this March

13   meeting where you received this guidance to produce

14   these reports.

15       A team was formed to carry out that line of

16   effort, correct?

17   A.  I don't believe the team was formed during that

18   meeting, I think the team was formed after that meeting,

19   maybe a week after, several days after.  I don't know

20   the exact timeframe.

21   Q.  And for our ease of reference here, that team's

22   nickname was the Tiger Team?

23   A.  It was called the "Tiger Team," yes.

24   Q.  And the Tiger Team included senior officials

25   carrying out this line of effort?

1    A.  The Tiger Team consisted of not senior officials, it

2    consisted of analysts, an agent, um, and led by the unit

3    chief you mentioned earlier, Roy Stanley.  He was not

4    the unit chief at the time -- he was not the division

5    chief at the time, he was the unit chief.

6    Q.  Were you part of the Tiger Team?

7    A.  No, I was not part of the Tiger Team.

8    Q.  Who, um, briefed you on the progress of the Tiger

9    Team?

10   A.  Um, the unit chief, often through my deputy Brad

11   Edder, was the one briefing me on the activities, or the

12   progress of the Tiger Team.

13   Q.  Now the Tiger Team, which was formed shortly after

14   this March, um, meeting had rolling discussions over the

15   following days about its work, right?

16   A.  I believe they had daily discussions.

17   Q.  "Daily," you said?

18   A.  Within the team, you're asking me about discussions

19   within the team?

20   Q.  Actually, um, now understanding you're not a part of

21   the team, I'm interested in your contact with the team.

22        So how often did you speak with the team?

23   A.  I did not speak with the team as a group, I spoke

24   with the team leader maybe once a day on all issues, not

25   just, um, the team's issues, and specifically with the

1    team, um, I mean over the last -- over -- maybe

2    initially once a day.  But after weeks, when the team

3    was home, maybe every other day, um, three times a week

4    maybe.

5    Q.  And the team itself, so far as you knew, did its

6    work on a daily basis, right?

7    A.  Yes.

8    Q.  When you had discussions with senior leadership

9    about the work of the Tiger Team, those discussions

10   included the people you mentioned earlier, Derrick

11   Gordon, Robert Handler, William Walker, Roy Stanley, is

12   that right?

13   A.  Yes.

14   Q.  Okay.  So I want to talk about the Tiger Team's

15   process for this line of effort.

16        The Tiger Team was -- well, withdrawn.

17        At the March meeting, I understand that a

18   procedure to expedite this work was set up, and I'm

19   thinking of what you said in your deposition, in

20   particular that the Office of Intelligence would do the

21   factfinding, the National Security Division of Homeland

22   Security Investigations would compile the information in

23   a letter to the State Department, and the State

24   Department would make the decision on what action to

25   take.

1    went and looked at it once and saw whatever he saw.  And

2    he's careful to point out, "They're not us."  His

3    looking at it told him that they make accusations.  And

4    I will tell you, it's significant to me that he said,

5    "We approached it with an independent view," not simply

6    accepting accusations that they got.  Now it's not a

7    discovery deposition.  I think we've gotten his

8    knowledge.  But I'll ask this question.

9        Have I accurately characterized your testimony?

10   Because I didn't use your words exactly and I was just

11   saying this is what I'm hearing.

12       Have I accurately characterized it?

13       THE WITNESS:  Yes, your Honor.

14       THE COURT:  All right.  I think that's what he

15   knows.

16       MS. CONLON:  And, your Honor, if that's all he

17   knows, that's all he knows.  But we heard about a list

18   of 5,000 people on the website.  And I appreciate this

19   isn't discovery, but it's news to us that that is how it

20   worked.

21       THE COURT:  Well it's news to me, and I find it

22   very interesting.  But I'm telling you what I got from

23   it.  And now we've gotten it, so let's move on.

24   Q.  So, Mr. Hatch, um, understanding that you have not

25   spent time looking at the website, have you seen Reports

```
 1    of Analysis that were generated in response to the
 2    directive to look at the Canary Mission website?
 3    A.  We, um -- the analysts wrote ROAs on personnel or
 4    individuals who are named in the website.
 5    Q.  To your knowledge, did the analysts include, in
 6    their ROAs, the allegations from the Canary Mission
 7    website as relevant -- as information that could be
 8    relevant to a potential violation of Title VIII?
 9         MS. STROKUS:  Objection, your Honor.
10         THE COURT:  Sustained.  The best evidence are the
11    ROAs.
12         MS. CONLON:  And, your Honor, it's ironic because
13    I don't have them and I wish I did.
14         THE COURT:  I understand.
15         MS. CONLON:  But I can't offer them to you.
16         THE COURT:  And we will see about that.  Because
17    they would seem, at least with respect to the target
18    individuals, to be relevant.  Perhaps they should have
19    been prepared.  I've made a ruling now with respect to a
20    subset of documents.  It's clarified that I don't have
21    them.  I'm wondering about that.
22         Go ahead.
23         MS. CONLON:  Okay.  I'm sorry, I'm getting a
24    correction from somebody.  (Talks to co-counsel.)  Yes.
25    Okay.
```

```
 1        It is our understanding that the Court did receive
 2   all 5 of the Reports of Analysis on the targeted
 3   individuals in a production -- a document production to
 4   the Court on June 11th, that is, um --
 5        (To co-counsel.)  I think that's correct?
 6        THE COURT:  Well I'll look at what I have,
 7   physically.
 8        MS. CONLON:  Okay.  And for the Court's ease of
 9   reference, we understand that to be Docket 131, that
10   docket entry.
11        THE COURT:  Thank you.
12        MS. CONLON:  Okay.
13   Q.  Now, um, you said that the project was to look at
14   this list from Canary Mission.  Did the list of student
15   protesters -- it included information of student
16   protesters identified through other means apart from
17   simply Canary Mission?
18        MS. STROKUS:  Objection, your Honor, a
19   mischaracterization of testimony.
20        THE COURT:  Well let me ask this question.
21        She started out saying how much -- how many ROAs
22   did you look at, and you used the word the "student
23   protester effort," and as you started, I didn't know
24   what you were talking about.
25        Do we now understand that's the Tiger Team's work
```

```
 1    after you got this list?  Well I shouldn't even say "got
 2    this list," after the list was provided on the website?
 3          THE WITNESS:  Yes, your Honor.  But the Canary
 4    Mission wasn't the only, um, group of students.  It was
 5    most of it.
 6          THE COURT:  Yes.
 7          THE WITNESS:  But it wasn't the only way that we
 8    received, um, information on protesters.  And also there
 9    were duplicates, we received information about the same
10    protester from multiple sources.  But Canary Mission was
11    the most inclusive of that.
12          THE COURT:  Do you recall other sources?  Without
13    revealing investigatory matters.
14          THE WITNESS:  There was another website that does
15    the same thing.  I don't remember the name of it.  Um,
16    and --
17          THE COURT:  If I suggested "Betar"?
18          THE WITNESS:  That sounds right, sir.
19          THE COURT:  Okay.  Go ahead.
20          THE WITNESS:  And then we would get individual
21    names or we could even get a list from a police
22    department if any protesters were arrested.  We could
23    get that.
24          So the list, um, came in from all different
25    directions.  The team -- the source of the information
```

1    was not necessarily relevant to the analyst, because the

2    analysts were doing factfinding, and the analysts were

3    not reporting, um, that, um -- where the name came from,

4    because They're independent from that.  Nor would

5    they -- it's not our standard practice, it's not within

6    policy for us to report other people's uncorroborated

7    allegations or assertions.  Everything, like I said

8    before, needs to be collaborated.

9         THE COURT:  So these sources though that you've

10   now identified, as far as my notes, they came down from

11   Mr. Jordan, is that right?

12        THE WITNESS:  Mr. Gordon.

13        THE COURT:  Mr. Gordon.  They all come down from

14   him.  But of course you're looking at them.  And you can

15   see if a police department -- for instance, if it

16   arrested someone at a protest, whether it fit within the

17   scope of what the Tiger Team was doing?

18        THE WITNESS:  Yes, sir.

19        THE COURT:  All right.  I think that it's noon.  I

20   am -- and I apologize for this, the time is not counted

21   against you, but we'll start promptly at 9:00 a.m.

22   tomorrow morning.

23        The total elapsed time for the plaintiffs is 2

24   days, 15 minutes.  For the defense, 2 hours, 30 minutes.

25        We'll recess till 9:00 a.m. tomorrow morning.

1    We'll recess.

2            THE CLERK:  All rise.

3            (Adjourned, 12:00 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5    hereby certify that the forgoing transcript of the

6    record is a true and accurate transcription of my

7    stenographic notes, before Judge William G. Young, on

8    Wednesday, July 9, 2025, to the best of my skill and

9    ability.

10

11

12

13
     /s/ Richard H. Romanow 07-9-25
14   _____
     RICHARD H. ROMANOW  Date
15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 27

Petitioner's Appendix 364

```
 1                 UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Boston)

 3                            No. 1:25-cv-10685-WGY
                              Volume 1, Page 1 to 71
 4

 5   AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
                Plaintiffs
 6

 7   vs.

 8

 9   MARCO RUBIO, in his official capacity as
     Secretary of State, et al,
10                Defendants

11
                          * * * * * * * * *
12

13
                       For Bench Trial Before:
14                     Judge William G. Young

15

16
                       United States District Court
17                     District of Massachusetts (Boston.)
                       One Courthouse Way
18                     Boston, Massachusetts 02210
                       Thursday, July 10, 2025
19

20                        * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23               United States District Court
           One Courthouse Way, Room 5510, Boston, MA 02210
24                     rhr3tubas@aol.com

25
```

```
 1                  A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     CAROLINE DeCELL, ESQ.
 4   ALEXANDER ABDO, ESQ.
     SCOTT B. WILKENS, ESQ.
 5   ALEXANDRA CONLON, ESQ.
         Knight First Amendment Institute at Columbia
 6       University
         475 Riverside Drive, Suite 302
 7       New York, NY 10115
         (646) 745-8500
 8       E-mail: Ramya.krishnan@knightcolumbia.org
     and
 9   COURTNEY GANS, ESQ.
     NOAM BIALE, ESQ.
10       Sher Tremonte LLP
         90 Broad Street, 23rd Floor
11       New York, NY 10004
         (212) 540-0675
12       Email: Cgans@shertremonte.com
         For Plaintiffs
13

14   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
15   VICTORIA M. SANTORA, ESQ.
     JESSICA STROKUS, ESQ.
16       DOJ-Civ
         P.O.  878
17       Ben Franklin Station
         Washington, DC 20044
18       (202) 616-9123
         Email: Ethan.kanter@usdoj.gov
19   and
     SHAWNA YEN, ESQ.
20       United States Attorney's Office
         1 Courthouse Way, Suite 9200
21       Boston, MA 02210
         Email: Shawna.yen@usdoj.gov
22       For Defendants

23

24

25
```

3

```
 1                    I N D E X

 2

 3   WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   PETER HATCH  (Continued.)

 6     By Ms. Conlon          10

 7     By Ms. Santora

 8

 9

10

11                    E X H I B I T S

12        EXHIBIT 232................................ 29

13        EXHIBIT 233................................ 47

14        EXHIBIT 234................................ 53

15        EXHIBIT 235................................ 60

16        EXHIBIT 236................................ 66

17

18

19

20

21

22

23

24

25
```

Petitioner's Appendix 367

 1        MS. CONLON:  I am offering what was EK for

 2   evidence as Exhibit 232.

 3        THE COURT:  And I just want to be clear, the

 4   documents you looked at -- we've both been looking at

 5   together, down to Exhibit I, the page that says "Exhibit

 6   I," are those pages, is that how they appeared in the,

 7   um, report?  Does the question make sense?  Is that --

 8   there's attachments, for instance.  And were those

 9   attachments part of that report?

10        THE WITNESS:  I don't -- I don't remember, um,

11   this report specifically, but it would be within policy

12   to include these other attachments.

13        THE COURT:  And, um, as you look at the document,

14   that's the type of material that would, in the ordinary

15   course, be attached to such a report?

16        THE WITNESS:  Yes, that's correct, sir.

17        THE COURT:  All right.

18        EK is -- with the pages he's identified, may be

19   admitted as Exhibit 232.  The defendants' rights are

20   saved.

21        (Exhibit 232, marked.)

22        MS. CONLON:  And if the Court would permit me to

23   publish it, while we speak about it, so the government

24   and everybody has it.  As well as I'm covering, to be

25   clear, personal identifying information that is on it in

1    terms of Social Security number or anything else.

2        MS. SANTORA:  Your Honor, we object to the showing

3    of the document publicly.

4        THE COURT:  Overruled.  It's a public trial.  I've

5    admitted it in evidence.

6        MS. SANTORA:  This document, I believe, is

7    confidential pursuant to the terms of the protective

8    order and --

9        THE COURT:  Well, but the protective order is

10   between you and them.  I preside.  Now they may use it

11   as evidence.  The public is entitled to know what I'm

12   going to base my findings on.  And it may be used.  And

13   if I were to base them on anything else, um -- let me

14   give you an example here, because this troubles me.

15       I agreed with Mr. Kanter that I may have spoken

16   too quickly in overruling a Presidential privilege.  But

17   if that's so, why was the document given to me, the

18   judge who must make the findings of fact?  One can only

19   infer from the submission of the document to me that it,

20   one, was relevant, two, it was authentic, and three,

21   somehow it was intended to persuade me of something.

22       Now if the privilege is upheld as to that

23   document, then I'll be clear as to what I'm going to do,

24   I'm going to set it aside, it won't have any bearing on

25   this case at all.

1          Now you say that's so here.  I disagree.  I've
2    made my rulings.  I express no opinion on any of this,
3    but I'm going to look at it.  As other documents as to
4    which I have overruled the privilege.
5          MS. SANTORA:  Your Honor, if I may?  We did submit
6    this document, um, in-camera at your invitation to us to
7    submit it.
8          THE COURT:  Yes, and I've ruled for the
9    law-enforcement privilege, which you have significantly
10   interpreted overbroadly, and I have rejected that.
11         MS. SANTORA:  I just want to reiterate what
12   Mr. Kanter said, that it is our position that this
13   document is law-enforcement privileged and we do intend
14   to submit a privilege log for it on Monday.
15         THE COURT:  I understand that.  I understand that
16   and we're going forward.  I've said your rights are
17   saved.
18         Go ahead.
19   Q.  Now, Mr. Hatch, this is Exhibit 232 on the screen.
20   I have put Post Its over things like Social Security
21   numbers that I'm not planning to ask you about.  I'd
22   like to turn your attention to the top left corner where
23   it says "Analysis Findings."
24         Here the first sentence indicates that Ms. Ozturk,
25   who is a Visa holder, is, quote, "A co-author of an

```
 1    Op-Ed calling for divestment from Israel and associates
 2    with Tufts Students for Justice in Palestinian, which
 3    was suspended for cause for student intifada," end
 4    quote.
 5          What is the reason that her Op-Ed, which calls for
 6    divestment from Israel, is mentioned in the analysis
 7    findings?
 8    A.  Again it's a fact that she wrote the Op-Ed, and the
 9    lead was for Ms. Ozturk, so the analyst, um, was
10    presenting information on her.  Again I did not write
11    this ROA.  I only read it one time.  So I didn't -- I
12    did not approve -- I'm not an approver of ROAs.  So, um,
13    all I can comment on is policies and procedures --
14    Q.  Are you --
15    A.  -- in general terms.
16    Q.  I'm sorry, I didn't mean to interrupt you.  Are you
17    finished?
18    A.  I finished.
19    Q.  You say you're not an approver for ROAs, but you did
20    read this one.  And is it true that this one, as part of
21    a sort of development of the three-step process we
22    discussed yesterday, wherein certain ROAs were reviewed
23    by senior HSI leadership before they were actually
24    referred to the State Department for action, isn't that
25    right?
```

```
1    A.   That process, as I described it yesterday, was

2    already in place, and we read the ROAs -- the review is

3    a connotation that, um, that -- it connotates to me an

4    approval.

5             THE COURT:  Um, I just need to follow up here.

6             Do you recall that in the -- in the ordinary

7    course of doing your business, this particular ROA,

8    you've read that, before we gathered in the midst of

9    this lawsuit, is that true?

10            THE WITNESS:  I have read this.

11            THE COURT:  You read it back in the ordinary

12   course?

13            THE WITNESS:  Yes.

14            THE COURT:  So why did this one come to your

15   attention?

16            THE WITNESS:  Because of this process, um, I would

17   see the ROAs in the, um -- within the process at times.

18   I didn't see all of them.  What I saw was a few of them,

19   um, especially at first.  And, um, and it looks like

20   this one was written in March.

21            So, um, at that time I wanted to -- I actually

22   wanted to make sure that the process was working, that

23   the analysts were providing information, and that the

24   analysts were doing what was, um -- what we wanted them

25   to do.
```

1   And I asked him a question about what pages went along

2   with the facing page, and he said that it appears that

3   the other pages go along with that facing page.

4        What are we adding?

5        MS. CONLON:  Well, your Honor, in candor the

6   government wouldn't even stipulate that Ms. Ozturk wrote

7   this Op-Ed, so I just want the record to be clear.

8        THE COURT:  The case is being tried to me.

9        MS. CONLON:  Okay.  If the Court accepts that,

10  then we can move on.

11       THE COURT:  No one accepts it, I accept that it

12  exists, and that this appears to be the authentic and

13  complete -- I -- the complete ROA.

14       So far as you know, it's the complete ROA, is that

15  right?

16       THE WITNESS:  That's right.

17       MS. CONLON:  Thank you.

18       THE COURT:  It's always a question whether as

19  factfinder I believe him, and I'm not permitted to say

20  yet.  We'll see the whole sweep of the exhibits.  But I

21  understand the testimony.

22       MS. CONLON:  Okay.

23  Q.  So it's fair to say that this ROA on Ms. Ozturk

24  includes no allegations about her protest activity apart

25  from what's on the face of it, in other words you're not

1   aware of anything missing, any other basis for the HSI

2   to think that she had additional involvement, is that

3   correct?

4   A.  I believe this is what the analyst could find

5   related to Ms. Ozturk.

6   Q.  Okay.  All right.

7        MS. CONLON:  Thanks.  And you can take that down.

8        (Pause.)

9        THE COURT:  Are we done with the questions as to

10  Ms. Ozturk?

11       MS. CONLON:  As to Ms. Ozturk, yes.

12       THE COURT:  Then maybe he can give me back those

13  pages.

14       MS. CONLON:  Yes.  Sorry.

15  Q.  Now I'd like to turn your attention to another

16  document, and the Court, I believe, has a copy.  And I'm

17  sorry to deprive the Court of what may be its only copy,

18  but I would ask that the witness be given the pages

19  concerning Mahmoud Khalil.

20       THE COURT:  Let me do that.

21       (Pause.)

22       MS. SANTORA:  Your Honor, for the record we would

23  like to preserve our objection with respect to the --

24       THE COURT:  Oh, I think that's fair, you have a

25  continuing objection as to each of the documents I have

```
1    provided this morning, on all the grounds you've

2    articulated both in writing and, um, orally, not only

3    today, but in the course of this proceeding.

4         MS. SANTORA:  Thank you, your Honor.

5    Q.  Have you had a chance to skim the document that is

6    -- oh, he doesn't have it yet.  Sorry.

7         (Judge gives documents to witness.)

8         THE COURT:  Now that's the government's, um, not

9    you, but start on the next page.  No, no, keep going.

10        May I have the page before that?

11        (Hands to judge.)

12        THE COURT:  Okay.  For ease of the government

13   following, I'm giving him the pages that were

14   denominated of what was submitted as Exhibit E.  They

15   were proceeded by Exhibit D, which appears to be the

16   Andre Watson letter.

17        Go ahead.

18        MS. CONLON:  Thank you, your Honor.

19   Q.  Okay.  Mr. Hatch, do you recognize what I'm going

20   to, for the record, premark as EO, the document in front

21   of you?

22   A.  It is the subject profile from Mr. Khalil.

23   Q.  Does it appear to you to be a true and accurate copy

24   of the subject profile that the Office of Intelligence

25   prepared on Mr. Khalil?
```

1    A.   It appears to be.

2    Q.   Does it appear to you to be a complete profile of

3    Mr. Khalil?

4    A.   Again I only in read this one once.  It appears to

5    be, but I'm not -- I'd have to see our document.

6         MS. CONLON:  At this time I would ask to move into

7    evidence what's been premarked as EO, as Exhibit 233.

8         THE COURT:  I understand the government to object.

9    I think the foundation is sufficient.  Overruled.  It's

10   Exhibit 233 in evidence.

11        (Exhibit 233, marked.)

12   Q.   Now I'm going to show you the first page, and again

13   here I've put Post Its over the personal identifying

14   information that I don't intend to ask you about.  The

15   top of the report says "Analysis Findings."

16        Is that meant to capture everything that follows

17   or does that refer only to the two bullets that appears

18   right underneath the header?

19   A.   The two bullets underneath the header.

20   Q.   Okay so the findings for Mr. Khalil relay that he

21   became a lawful permanent resident, correct?

22   A.   Can you -- can you ask your -- the previous question

23   again?

24   Q.   The findings for Mr. Khalil indicate that he is a

25   lawful permanent resident, correct?

1    A.    No, I'm --

2        THE WITNESS:  Sorry, your Honor, I'm confused.

3    Can you start over?  Please ask the question one more

4    time, I wasn't -- you didn't have my full attention.  I

5    was looking at the document.

6        THE COURT:  Her more general question was, the

7    portion above the picture is the total findings of the

8    examiner including in the report as to Mr. Khalil, the

9    factual findings as to Mr. Khalil, that's how I took her

10   question, is that right?

11       THE WITNESS:  Not exactly.  That paragraph, the

12   analysis findings paragraph, is kind of what, um, those

13   two bullets are, um, kind of a way for a person to read

14   and get key details quickly.  The entire document is the

15   research and analysis, the totality of the research and

16   analysis.  It provides a partial summary so that the

17   reader can get an understanding very quickly of what

18   we're talking about and what the situation is.

19   Q.  It's like the "headlines" basically?

20   A.  Basically, yes.

21   Q.  Okay.  Now the categories that are covered are under

22   the headline of "Biographical Information" and other

23   such categories.  I want to move to what is the third

24   page of Exhibit 233, the category here is "News

25   Articles."  Now you don't have the benefit of having the

```
 1    actual articles in front of you, and neither do I, so
 2    I'm not going to ask you what they say.  However you are
 3    an expert in the Report of Analysis process.
 4        Can you explain why these articles would be
 5    relevant to a Report of Analysis about Mr. Khalil?
 6    A.  Again, providing context for the -- for the
 7    individual who was in the lead -- who was the subject of
 8    the lead, um, it appears the analyst was, um, trying to
 9    get an understanding of his activities.
10    Q.  Now you said it helps to provide context.  The third
11    bullet here actually is Mr. Khalil's Canary Mission
12    profile, is that right?  Do you see where it says
13    "canarymission.org/individual/mamoud_khalil"?
14    A.  It does appear that that's from Canary Mission, a
15    source of Canary Mission, or --
16    Q.  The italicized language that appears in this page,
17    these are excerpts from articles that the analyst has
18    highlighted as particularly relevant, is that correct?
19    A.  It appears to be that the analyst highlighted where
20    "Khalil" was mentioned.
21    Q.  In other words, your understanding about -- at least
22    how it ordinarily works, is that an analyst pulls out
23    the relevant portions of sources that it is including as
24    those sources relate to the person that the report is
25    about?
```

1    A.   Yes.

2    Q.   I'm going to turn to -- and just so we're clear on

3    this, the sources here, so we have an article from the

4    "Wall Street Journal," the "Guardian," Canary Mission,

5    and at the bottom we see "The New York Post"?

6    A.   I see "The New York Post."

7    Q.   Okay.  And I'm going to put the next page in front

8    of you and give you a second to -- oh, you have it in

9    front of you already, to just take a look.  This last

10   bullet at the top of the next page I think is a

11   continuation -- but tell me if I'm looking at it

12   incorrectly, of what was from "The New York Post"

13   article.  Is that a fair understanding of it?

14   A.   It appears to be.  (On screen.)

15   Q.   And here you see where it says that Mr. Khalil told

16   the "Columbia Daily Spectrum," reading from the top,

17   that he didn't participate in protests because he was

18   worried about losing his Student Visa status that lets

19   him be in the U.S.

20        What is the relevance of that to the context here?

21   A.   Again, it's just a news article on him.

22   Q.   You agree that the only articles we're seeing about

23   Ms. Ozturk or Mr. Khalil are ones that relate to

24   protests of Israel and Palestine and not any other

25   topic, right?

1    A.   That's correct.

2    Q.   Um, okay.  Just a moment.  (Pause.)  Okay.  I'm

3    going to -- and I guess lastly, you can see here the

4    last category appears to be social media.  There is an

5    Instagram posting of a news clip -- that is an ordinary

6    thing, I take it, to include in a Report of Analysis, an

7    Instagram post, for example?

8    A.   It could be.

9    Q.   It could be.  Okay.  I'm going to move to another

10   profile because I think the profile --

11        THE COURT:  Well since we're working off paper

12   copies, if he could give me that back.  (Hands to

13   judge.)

14        And the next one is who?

15        (Pause.)

16   Q.   Okay.

17        MS. CONLON:  If the Court could please give -- and

18   thank you for your help, Mr. Hatch the document -- the

19   pages concerning Badar Khan Suri.

20        THE COURT:  All right.

21        (Hands to witness.)

22        (Pause.)

23   Q.   And when you've had a chance to -- oh, you don't

24   have it yet.  Sorry.

25        (Pause.)

```
 1          THE COURT:  These are the documents, um, tabbed
 2    Exhibit K in the government's submission to the Court,
 3    so we're clear.  The first page is not the file itself.
 4    Q.  I'm just going to give you a moment to look at that.
 5    A.  (Reads.)
 6    Q.  So you're reviewing right now what I'd like to have
 7    marked as -- EN for identification.
 8          THE COURT:  It may be so marked.
 9    Q.  Do you recognize this document?
10    A.  It appears to be the ROA for Mr. Suri.
11    Q.  Does this appear to be a true and accurate copy of
12    the ROA for Mr. Suri, so far as you can tell?
13    A.  It appears to be, so far as I can tell, not being
14    familiar with this ROA, only having read it once.
15    Q.  But you recall reading it, um, at some point before
16    today, correct?
17    A.  Yes.
18    Q.  And you read it in the same context in which you
19    read Ms. Ozturk's and Mr. Khalil's, which is to say in a
20    meeting with senior HSI leadership, correct?
21    A.  I do not recall where I read this one.
22    Q.  Okay.  And it appears to you, as you page through,
23    to be the complete Report of Analysis from Mr. Suri, is
24    that correct?
25    A.  It looks like it.
```

1      MS. CONLON:  We offer what has been premarked as

2  Exhibit EN for identification as Exhibit 234 into

3  evidence.

4      THE COURT:  The government objects and its rights

5  are saved, but the objection is overruled.  It may be

6  admitted, EN is admitted, Exhibit 234 in this

7  proceeding.

8      (Exhibit 234, marked.)

9      MS. CONLON:  Now I'm going to put this up in a

10  second, I'm just covering any biographical, sensitive

11  information, so I apologize.  Just a moment.

12      (Pause.)

13  Q.  Okay.  So this page here, Page 1, for Mr. Suri --

14      MS. SANTORA:  Your Honor, I'm so sorry to

15  interrupt, but I don't think the government has that

16  document, um, in the packet that was handed to us.  He

17  said it was Exhibit K, our packet stops at Exhibit I.

18      THE COURT:  The law clerks may -- confer with her,

19  um, with Ms. Conlon.

20      (Pause.)

21      THE COURT:  Ms. Santora, also confer with

22  Ms. Belmont, the Clerk, because you should have

23  everything that she has, in the exactly the same form.

24      (Confers.)

25  Q.  So just to confirm for the record, the government

1    does have it?

2         THE COURT:  Well now they do.

3         MS. CONLON:  Thank you.

4    Q.  So this ROA for Mr. Suri has more information in the

5    analysis binder than the others we've looked at, right?

6    A.  It does.

7    Q.  It cites here that Mr. Suri is married to a person

8    who is the daughter of a person who is or was a senior

9    Hamas figure in Gaza, is that right?

10   A.  It appears to say that.

11   Q.  And it says that Mr. Suri, according to open source

12   reporting, spreads Hamas propaganda and promotes

13   antisemitism on social media, right?

14        THE COURT:  Well it's in evidence now, it speaks

15   for itself.  I can speak and read.

16        MS. CONLON:  I want to ask him about that.

17        THE COURT:  Then why don't you ask him about that.

18   Q.  Where it says "open source reporting," that means

19   there has been reporting in sources online that the

20   government identified?

21   A.  Yes, that's usually what "open source" means.

22   Q.  I'm wondering if it's a term of art or if I'm

23   misunderstanding something.  So just to confirm, "open

24   source reporting" means sources online have reported

25   these claims about Mr. Suri, correct?

1    A.   "Open source" usually means press reporting.

2    Q.   Press reporting.   Okay.

3         So turning to the press reporting here, which I

4    think starts on Page 4.

5    A.   (Looks.)

6    Q.   There is -- just making sure you can see it.   Okay.

7         Page 4, there's a Twitter posting included here,

8    by someone else, not Mr. Suri, another person, Anna

9    Stanley, with claims about Mr. Suri.   Is that an example

10   of "open source reporting"?

11   A.   (Looks.)   It could be.

12   Q.   In other words, social media, in Reports of

13   Analysis, doesn't have to be limited to the subject's

14   social media, it can include things about the subject on

15   social media, correct?

16   A.   It can, yes.

17   Q.   And in this instance the open source reporting about

18   Mr. Suri from social media includes something by someone

19   who isn't him, correct?

20   A.   That's correct.

21   Q.   Now -- just a moment.

22   A.   One correction.   One addition to that.

23   Q.   Yes.

24   A.   I'll note that the analyst properly included where

25   the post came from, who posted it, um, and it looks like

1    it factually represented what was posted and the
2    details.
3    Q.  Yes.  In other words, the analyst didn't suggest
4    this is what the analyst thinks, the analyst made clear
5    this is what somebody else has said?
6    A.  That's correct.  And the analyst did not say that
7    that's what the government thinks or did not recommend
8    anything from that, just put the fact that there was an
9    article or a post and this is what it said and this is
10    who it is said by.
11    Q.  Yes, and that is the only sort of job as the ROA,
12    that is what it's supposed to do?
13    A.  That's correct.
14    Q.  Now in the next page of this, at the top, um, here,
15    it says "Khan Suri appears to post pro-Palestinian
16    content."  That is not an excerpt from social media,
17    that is a characterization by the analyst about the
18    nature of Mr. Suri's online postings, correct?
19    A.  Again, you'd have to ask the analyst.  I don't
20    know -- again it says "It appears to post
21    pro-Palestinian content."  So, yes -- and it looks to be
22    that that was written by the analyst, from the context
23    of this report.
24    Q.  That's all I wanted to confirm.  I appreciate that
25    you don't know what the content is.  But just to be

1   clear, like if it were an excerpt, it would be in

2   italics with a quotation mark.  This text here, below

3   the Instagram link, is actually something written coming

4   from the analyst, not an excerpt or quotation from

5   someone else?

6   A.  It looks like it.

7   Q.  And the -- what's listed as social media includes

8   things other than, um -- you know includes things other

9   than posts on like social media websites.  So it

10  includes things here, for example, about his work

11  profile in the Georgetown website.

12      Is that, in the ordinary course, something that

13  gets included?

14  A.  Yes.  We're collecting information about -- or

15  reporting information about the individual, to

16  understand the, um -- the, um, details about the

17  individual.

18  Q.  And on the next page, in addition to exploring --

19  the page before, that we just looked at, had

20  descriptions about his research, and here on the next

21  page there's a description of the course he's teaching

22  from some website "Corsical."

23      So in a Report of Analysis, it's relevant, on a

24  faculty member, what course they teach?

25  A.  Again, we also put what car he drives or where he

 1   lives.  It provides information to understand the
 2   individual and what that individual does.
 3   Q.  Well just a moment, and I don't want to quivel, but
 4   there's nothing in here about, for example, what car he
 5   drives, right?  I mean you don't know, from looking at
 6   this, if this man has a driver's license or drives a
 7   car, right?
 8   A.  As an example, I put car information and residence
 9   and other types of information in the ROA.
10   Q.  But there's nothing in here about his hobbies,
11   right?
12   A.  I don't see anything like that.
13   Q.  There's nothing in here about how he spends his time
14   on the weekends, right?
15   A.  There doesn't appear to be.
16   Q.  Because this is only collect information pertinent
17   potentially to a violation of law, right?
18   A.  That's correct.
19   Q.  And in this instance, for a professor, what was
20   potentially pertinent were articles about his
21   scholarship, his course posting at his university, and
22   things that other people wrote about him on the
23   internet, right?
24   A.  This is what the analyst could find.
25   Q.  And this is all they could find?

Petitioner's Appendix 387

1   A.  I would assume so.

2   Q.  Okay.

3        MS. CONLON:  I would ask that the Court please

4   provide Mr. Hatch with the pages concerning Mohsen Kadar

5   Mahdawi, and we're done speaking about Mr. Suri.

6        THE COURT:  And then what?

7        MS. CONLON:  I'm done with Mr. Suri's pages, so I

8   was suggesting maybe they be returned to the Court.

9        THE COURT:  Yes, and Mr. Hatch will do that while

10  I'm finding Mr. Mahdawi.

11       MS. CONLON:  Yes, Mr. Mahdawi.

12       (Pause.)

13       THE COURT:  And so we're clear, I'm giving the

14  witness the pages that the government has denominated

15  Exhibit G in the submission to the Court.

16       And if you'll return what you've got.  Yes, thank

17  you.  (Witness returns pages.)

18  Q.  Okay.  When you've had a moment to take a look, just

19  let me know.

20  A.  (Looks.)  Okay.

21  Q.  Now I'm showing you what I'd like premarked as EN

22  for the record.

23       Do you recognize this document?

24  A.  It appears to be the Report of Analysis on

25  Mr. Mahdawi.

1  Q.  Does it appear to be a true, accurate, and complete

2  copy of that document as far as you can tell?

3  A.  As far as I can tell, it appears to be.

4  Q.  Okay.

5       MS. CONLON:  I would like to offer this into

6  evidence as Exhibit 235.

7       THE COURT:  The government objects.  It's rights

8  are saved.  The objection is overruled.  The document

9  may be admitted, Exhibit 235 in evidence.

10      (Exhibit 235, marked.)

11  Q.  Okay.  I'm showing you this first page.  Here,

12  again, we have the highlights and the analysis findings,

13  which in this instance seem only biographical.

14      And a question for you.  Is that typically the

15  case?

16  A.  That the analysis findings only include biographical

17  information?

18  Q.  We've seen kind of a mix as we look through these,

19  and in some instances there's some indication of why the

20  person is being examined and in some it's just here's

21  when they came, here's their status, and I'm wondering

22  if there's any sort of rhyme or reason into what goes

23  into that section of the report?

24  A.  It's just a summarization of the information they

25  found.  I don't know the answer to that.

1    Q.   Okay.  Fair enough.

2         Turning to -- and, Mr. Mahdawi, sorry, before we

3    go on, he's a lawful permanent resident, as you see at

4    the top.

5         I take it there's no difference in the type of

6    Report of Analysis prepared whether the person is a Visa

7    holder or a lawful permanent resident, is that correct?

8    A.   We don't have Reports of Analysis categories based

9    on those types of considerations.

10   Q.   Okay.  The process is the same?

11   A.   Yes.

12   Q.   Okay.  Now I'm going to direct your attention to the

13   third page, and I'm going to skip Page 2, which has lots

14   of identifying information, but the third page does not,

15   it has -- this is the section on social and open

16   sources.

17        And my first question is this.  Drawing your

18   attention to the bullet on the left where it says, "has

19   the Twitter X post."  It includes the post claiming that

20   Mr. Mahdawi is pro-Hamas based on an appearance he had

21   on "60 Minutes."

22        You'd agree with me that there's nothing in the

23   report indicating the analyst reviewed his appearance on

24   "60 Minutes" to determine whether the Twitter post

25   characterized his appearance accurately, right?

```
1   A.  I --
2        THE COURT:  I didn't understand the question.
3        MS. CONLON:  Sorry, I'm going to break it into
4   multiple parts just so we can all be on the same page.
5   Q.  So first what we have here on the left is a Twitter
6   post by someone else accusing Mr. Mahdawi of being
7   pro-Hamas based on remarks he's alleged to have made on
8   "60 Minutes," correct?
9   A.  Yes, it appears to be.
10  Q.  There is nothing in the Report of Analysis
11  indicating that the analyst reviewed his appearance on
12  "60 minutes" to determine whether what this person on
13  Twitter said about him was correct, do you agree with
14  that?
15  A.  I don't see anything about the -- I don't know if
16  the analyst reviewed "60 Minutes" or not.
17  Q.  And is it, in the ordinary course, is that -- I'm
18  trying to understand sort of the extent or the depth of
19  the look that's given by the analyst.
20       Is it enough for the report if the analyst just
21  indicates "Here is what someone else has accused this
22  person of?"  Is that --
23       THE COURT:  Enough for what?
24       MS. CONLON:  For the purpose of following the
25  policies and guidance about making an ROA.  Like is that
```

1   all that's expected?

2   A.   Just on the circumstances you've given me, and in

3   that scenario, I would have expected the analyst to have

4   reviewed the "60 Minutes" report.  However, as long as

5   the analyst properly cites this was what it was, it was

6   a statement made by a person about a video they had seen

7   related to the individual, it's not a judgment call from

8   the analyst, it's what they found.

9   Q.   I understand that, that the analyst is not

10  superimposing their characterization of it, they're just

11  reporting what someone else says.  But I'm concerned

12  that the only information that's used later by

13  decision-makers is what's in the Report of Analysis --

14       THE COURT:  With all respect, Ms. Conlon, your

15  concerns are not dispositive.

16       MS. CONLON:  Sure.  I'm sorry.  I'm just trying to

17  explain my question.  But I can just be more direct.

18  Q.   At least in this instance for Mr. Mahdawi, there's

19  no indication on the face of this report that anybody

20  reviewed any of the underlying materials that are being

21  characterized by other people on social media, isn't

22  that correct?

23  A.   I don't know if you can make that characterization.

24  I can't look at this and say the analyst -- that they

25  may have looked at the "60 Minutes" report and, um,

1    found something or found nothing.  They -- I can't make
2    the judgment that you assert.
3    Q.  If a person had looked, an analyst had looked at the
4    "60 Minutes" report, wouldn't you expect them to
5    include, in the report, whether or not that is what
6    happened, whether or not the allegation was true?
7    A.  I would have expected that.  But again, if I'm
8    looking at this, um, the ROA, and like you said
9    assessing the -- whether or not the analyst followed
10   policy, I see here that the analyst properly, um, wrote
11   "sourced the material," and showed whoever reads it that
12   this is just a claim somebody made about reading the
13   report.  So you could take this report and say, "Okay,
14   the next step is to read the -- to actually look at the
15   '60 Minutes' report," or again that's the other side of
16   this on how the ROA is used.  I'm assessing the ROA as
17   to whether or not it's within policy, did the analyst do
18   their job.
19   Q.  So from your perspective -- or withdrawn.
20        It's not the Office of Intelligence's
21   responsibility to take what you have identified as a
22   potential useful next step, that's not the Office of
23   Intelligence's responsibility, is that correct?
24   A.  In a scenario like this, I or one of the supervisors
25   could have asked the analyst, "Did you look at the '60

```
 1    Minutes' report?"  And I don't know if that happened.  I
 2    don't recall if that happened.  But that's the -- yeah.
 3    Q.  You don't recall -- you did review this one, but
 4    just to be clear, you don't recall whether you received
 5    any information not contained within this report about
 6    Mr. Mahdawi, correct?
 7    A.  I don't remember -- I don't -- I know that I read
 8    the report.  I don't recall any actions taken from this
 9    report.
10    Q.  Okay.
11         MS. CONLON:  One second.
12         (Pause.)
13         MS. CONLON:  Okay.  And I think we can hand back
14    to the Court the paperwork on Mr. Mahdawi, and I have
15    one more Report of Analysis that I'd like to show you.
16    If the Court would please provide Mr. Hatch with the
17    Report of Analysis on Yunseo Chung.
18         (Pause.)
19         THE COURT:  And I've given Mr. Hatch the documents
20    that appear, and the government's designation, when
21    submitted to the Court, as Exhibit C.
22         MS. CONLON:  And I'm going to ask that the
23    document be premarked as Exhibit EO for identification.
24         THE COURT:  It may be so marked.
25         (Pause.)
```

1    Q.   Do you recognize this document?

2    A.   It appears to be the Report of Analysis for

3    Ms. Chung.

4    Q.   And does it appear to you to be a true, accurate,

5    and complete copy of the Report of Analysis on

6    Ms. Chung?

7    A.   It appears to be.  Again, the same comments as

8    before.  I think I read this one once.

9         MS. CONLON:  Your Honor, I'd like to offer what

10   was premarked as Exhibit EN -- EO rather, into evidence

11   as Exhibit 237.

12        THE COURT:  The government objects under its

13   continuing objection to these, and its rights are saved,

14   but overruled.  The document may be admitted and marked

15   Exhibit 236 in evidence.

16        (Exhibit 236, marked.)

17   Q.   Now I'm going to show that you this exhibit, so you

18   know what we're looking at.

19   A.   (Looks.)

20   Q.   This is a Report of Analysis on Ms. Chung, who is a

21   legal permanent resident, and that is all that's in the

22   headline of her report, right?

23   A.   The report says she's a legal permanent resident.

24   Q.   Okay.  Now I want to turn to the substance of it in

25   terms of the information about her activity.  (On

1    screen.)

2         Here there are two news articles on this page and

3    there are some notes from the analyst about the news

4    articles above the excerpts about the article -- from

5    the article.  So turning your attention to the first one

6    from the New York post.

7         Am I correct that the text that appears below the

8    link where it says -- it describes her as being part of

9    the protest, that is text that was put there by the

10   analyst, and what appears below it is a quote from the

11   article, is that right?

12   A.  That's what it appears to be.

13   Q.  And then again, on the next bullet, the same thing,

14   right?  This text here, the nonitalicized text under the

15   link, that's the analyst's input, correct?

16   A.  It appears to be from the analyst.

17   Q.  Okay.  And I don't want to put the first page -- I

18   don't want to take the Post Its off this first page, so

19   I'm just -- but I do need to look at it, so I need to

20   direct your attention back to the first page.

21        There's a section on the first page that says

22   "Criminal History," right?

23   A.  Yes.

24   Q.  And it lists three charges that were apparently

25   related, it would seem, to the protest, is that correct?

1    A.  I don't -- I don't know if I can make that judgment.

2    I see the charges.

3    Q.  The charges have the date -- there's a parenthetical

4    after them that says "March 2025," that would be

5    something that the analyst inputted, is that right?

6    A.  Yes, that would be.

7    Q.  And there's a description of the charges, but no

8    indication of their status, is that correct?

9    A.  That's correct.

10   Q.  In other words, we can tell from this report that

11   she was accused of disorderly conduct, trespass, and

12   obstructing governmental administration, in the second

13   degree, and that those charges were made in the New York

14   County Criminal Court, is that correct?

15   A.  That's what it says.

16   Q.  But you couldn't discern, from looking at this,

17   whether those charges were dismissed, is that right?

18   A.  I cannot.

19   Q.  If the charges had been dismissed or were later

20   dismissed, does the ROA get updated to reflect that or

21   once the ROA's made and goes out the door, that's the

22   end of it?

23   A.  It is our policy for ROAs to be updated.

24   Q.  Okay.  And this ROA, the published date at the

25   bottom, that is the date that it was created, March 6th.

1    If it had been updated, would there be a second date on

2    it?

3    A.  There usually would be.

4    Q.  It would appear -- would you see only one date, the

5    most recent, or do you see ordinarily the original

6    publication date and then a date of the revision or

7    amendment?

8    A.  It could be both.

9    Q.  Okay.

10        MS. CONLON:  One second.

11        (Pause.)

12   Q.  Now, um, the five -- and you can put that aside, I

13   don't expect to ask you more that requires you to look

14   at the documents.  I hope not to.

15        The five reports -- oh, sorry, your Honor, I think

16   he's --

17        THE COURT:  Yes.  I'm sorry.

18   Q.  The five reports that we've looked at, um, they

19   are -- are they representative of the reports that you

20   saw produced by the Tiger Team on the protestors as part

21   of this effort that began in March?

22   A.  Representative in what way?

23   Q.  Um, is there anything special about --

24        THE COURT:  I understand that question, and it

25   occurred to me.

```
 1          Are these typical reports?
 2          THE WITNESS:  They're typical subject profiles.
 3          THE COURT:  Okay.
 4   Q.  And is there anything different about these five
 5   subject profiles that you recall from the other subject
 6   profiles that you saw produced by the Tiger Team?
 7   A.  No, not substantially.
 8          THE COURT:  Much more for this witness,
 9   Ms. Conlon?
10          MS. CONLON:  A bit more, your Honor, but not much.
11   But more than 5 minutes.
12          THE COURT:  Would you like to take the recess?
13          MS. CONLON:  Yes, if your Honor wouldn't mind.
14   Yes, please.
15          THE COURT:  We'll take the recess for one half
16   hour until 11:15.
17          We'll stand in recess.
18          THE CLERK:  All rise.
19          (Recess, 10:45 a.m.)
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3

4           I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5      hereby certify that the forgoing transcript of the

6      record is a true and accurate transcription of my

7      stenographic notes, before Judge William G. Young, on

8      Thursday, July 10, 2025, to the best of my skill and

9      ability.

10

11

12

13

     /s/ Richard H. Romanow 07-10-25
14   _____
     RICHARD H. ROMANOW  Date
15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 28

Petitioner's Appendix 401

```
                    UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS

                                No. 1:25-cv-10685-WGY
                                Volume 2, Pages 72 - 132

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants


                        ********


                    BENCH TRIAL DAY 4



              BEFORE THE HONORABLE WILLIAM G. YOUNG
                 UNITED STATES DISTRICT JUDGE



                    United States District Court
                    District of Massachusetts (Boston.)
                    One Courthouse Way
                    Boston, Massachusetts 02210
                    July 10, 2025



                        ********



        Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                         Official Court Reporter
                         United States District Court
                         One Courthouse Way
                         Boston, Massachusetts  02210
                         mortellite@gmail.com
```

```
 1   A P P E A R A N C E S

 2   RAMYA KRISHNAN
     XIANGNONG WANG
 3         Knight First Amendment Institute at Columbia
           University
 4         475 Riverside Drive, Suite 302
           New York, NY 10115
 5         (646) 745-8500
           Carrie.decell@knightcolumbia.org
 6   and
     COURTNEY GANS
 7   NOAM BIALE
     ALEXANDRA CONLON
 8         Sher Tremonte LLP
           90 Broad Street, 23rd Floor
 9         New York, NY 10004
           (212) 540-0675
10         Cgans@shertremonte.com
           For Plaintiffs
11

12   ETHAN B. KANTER
     WILLIAM KANELLIS
13   VICTORIA M. SANTORA
     JESSICA A. STROKUS
14         DOJ-Civ
           P.O. 878
15         Ben Franklin Station
           Washington, DC 20044
16         (202) 616-9123
           Ethan.kanter@usdoj.gov
17   and
     SHAWNA YEN
18         United States Attorney's Office
           1 Courthouse Way, Suite 9200
19         Boston, MA 02210
           Shawna.yen@usdoj.gov
20         (617) 748-3100
           For Defendants
21

22

23

24

25
```

Petitioner's Appendix 403

1

2                                  INDEX

3

     WITNESS                                                    PAGE

4

5    PETER HATCH

6         Direct Examination By Ms. Conlon (continued)          75
          Cross-Examination By Ms. Santora                      90
7         Redirect Examination By Ms. Conlon                   107

8    AMY GREER

9         Direct Examination By Mr. Biale                      113
          Cross-Examination By Mr. Kanellis                    125
10

11

      E X H I B I T S

12

13   Exhibit No.                Received

14

       237                          124
15

16

17

18

19

20

21

22

23

24

25

**Petitioner's Appendix 404**

1    go through the front office, so the leadership of HSI, but they

2    come from Office of Border Czar, Office of the Secretary."

3    A.    The leads go through -- in this case, the leads went

4    through the front office and could have come from those

5    locations.

6         As I said before, for example, with the Canary Mission

7    list, I don't know how that was presented to us.  I don't know

8    who sent that, notified us of the website.  I don't know of any

9    leads, any particular leads coming from any place outside of

11:28 10   HSI.  I can't tell you where each lead came from.

11   Q.    So I am clear here, when you made a reference in your

12   deposition in response to a question about the leads to the

13   Office of the Border Czar, you were referring to the Border

14   Czar who is appointed by the President outside of the

15   Department of Homeland Security; is that correct?

16   A.    When I said "Border Czar," I was referring to the Border

17   Czar.

18   Q.    The Border Czar being Tom Homan.  We can talk about him by

19   name, right?

11:28 20   A.    That's correct.

21   Q.    Tom Homan was -- withdrawn.  Tom Homan does not work for

22   DHS, right?

23   A.    I think -- I don't know who the Border Czar works for, if

24   he works for DHS --

25   Q.    He's not part of HSI's leadership; is that fair to say?

1    A.    He's not part of HSI leadership.

2    Q.    When you said that ordinarily -- or I'm not sure what

3    you're saying about it now, but when you said in your

4    deposition that, "Lists go through the front office but come

5    from the Office of Border Czar or Office of the Secretary,"

6    "Office of the Secretary" was a reference to the Secretary of

7    Homeland Security, correct?

8    A.    Yes.  And what I meant was their offices.  So obviously

9    the Secretary of Homeland Security is not sending us leads

11:29 10    personally.

11    Q.    The executive office?

12    A.    Yes, her office, her staff, as well as Border Czar.  And

13    for clarification, as I said before in the deposition and now,

14    I don't know where each particular lead came from.  I don't

15    know where each particular list came from.  So I can't say for

16    certain, but I was giving you general where they may have come

17    from.  I could not cite, for example, a specific lead that came

18    from any particular source if you were to ask me.

19    Q.    Yeah, I understand that you don't know the specific origin

11:30 20    of these leads.  I'm asking you how it normally works since you

21    don't know the specifics of this source of leads.  So that's

22    what I wanted to clarify.

23    A.    To answer your question on how it normally works is I get

24    the lead from the chain of command.  That's the normal process.

25    How the chain of command gets it is something beyond my

         1   visibility.

         2   Q.   Okay.  Well, just to be very clear, the question you were

         3   asked was about how leadership gets it, and the answer you gave

         4   was that the lists go through the front office.  Was that

         5   untrue?  Is that incorrect?

         6   A.   The list goes through the front office -- in this case,

         7   the lists and leads were coming from the front office, the HSI

         8   front office.

         9   Q.   And literally in your deposition you said, quote, "But

11:31   10   they come from Office of Border Czar, Office of the Secretary."

        11   Was that incorrect?

        12   A.   They could come from --

        13   Q.   That isn't what you said.  Do you want to see it?

        14          MS. SANTORA:  Objection.

        15          THE COURT:  The objection is sustained.  I've looked

        16   at the deposition.  He said what he said.  You've read it.

        17   It's part of the record.  He's given his testimony here today.

        18   Let's move on.

        19   Q.   Okay.  We can move on to -- I only have a few questions

11:31   20   remaining.

        21       So we spoke about the ROAs for five particular people, and

        22   you looked at them with me.  You've mentioned that there were

        23   approximately 200, as best you know, ROAs generated by the

        24   tiger team, right?

        25   A.   Approximately, yes.  I don't recall the numbers.  I was

1    not keeping stats of what I read.

2    Q.    I understand.  Now, most of the ROAs, so far as you know,

3    mentioned Israel or Palestine, correct?

4    A.    Yes, as you saw the way they were mentioned in the five we

5    reviewed earlier.

6    Q.    In other words, whether a person -- references to what the

7    person had said concerning Israel or Palestine?

8    A.    Could be.

9    Q.    Many of them mentioned specifically the war in Gaza,

11:32 10    right?

11    A.    I don't know.

12    Q.    Do you recall seeing any that mentioned the war in Gaza?

13    A.    I recall, yes.

14    Q.    Is that a yes?

15    A.    Yes.  Some mentioned Gaza, I believe.

16    Q.    Some mentioned pro-Palestinian protests, right?

17    A.    I think so.

18    Q.    More than just the one we saw today, correct?

19    A.    Yes, I think so.

11:32 20    Q.    Some used the term "pro-Hamas," correct?

21    A.    I believe so.

22    Q.    Some, like the ones we saw today, mentioned a student

23    protester's public writing, correct?

24    A.    If you mean a post as public writing, then yes.

25    Q.    I don't only mean a post.  Articles in newspapers, for

1   example?

2   A.   That's possible as well.

3   Q.   To be clear, I'm not asking you to just summarize what you

4   and I looked at in those five, but I'm asking the broader body

5   of ones --

6   A.   I understand.

7   Q.   Okay.  Some mentioned a student protester's social media,

8   right?

9   A.   That's correct.

11:33 10   Q.   Some of the ROAs mentioned public statements by

11   protesters, not from social media, not from, say, an article,

12   right?

13   A.   Yes, some mentioned public statements.

14   Q.   Some mentioned a student protester's chants at a student

15   protest, right?

16   A.   I believe some did.

17        THE COURT:  Some of them mentioned criminal activity.

18        THE WITNESS:  Yes, sir.

19   Q.   Well, the question is about the ones we haven't seen, so I

11:33 20   guess the question for you, to build on what Your Honor has

21   asked, Mr. Hatch, approximately how many of them mentioned

22   criminal activity?

23   A.   I don't recall those numbers.

24   Q.   Today we looked at five, only one of which made a

25   reference to a person having been arrested.  Is that a

1  representative sample?

2  A.   I think there were two with.

3  Q.   I'm sorry?

4  A.   I think that I read two today -- two of those five had

5  criminal activity.  One had the ones you mentioned about the

6  New York cases, but another had an LSD possession charge.

7  Q.   I am talking about recent criminal activity at a protest.

8  You're talking about something else.  I understand the

9  distinction, so let me be clear.

11:34  10       Of the population of reports of analysis that you

11  reviewed, approximately how many included allegations of recent

12  criminal conduct in connection with a protest?

13  A.   I don't know.

14  Q.   Did any of the reports of analysis you reviewed mention

15  that a person had been convicted of a crime?

16  A.   I don't remember.

17  Q.   Hmm.  Some of the ROAs that you reviewed, not just the

18  ones in this courtroom, specifically mentioned a protester's

19  membership in a student group, right?

11:35  20  A.   That's possible.

21  Q.   That's possible or that is what you recall?

22  A.   I believe there were some.

23  Q.   Some specifically mentioned a student's membership in the

24  group Students For Justice in Palestine, right?

25  A.   I think that was one.

```
 1   Q.   Some specifically mentioned a student protester's

 2   statements or views on Israel, correct?

 3   A.   I believe so.

 4   Q.   Fair to say that the vast majority of the ROAs you

 5   reviewed said nothing about criminal activity whatsoever?

 6   A.   I don't know.

 7   Q.   You don't know whether the vast majority --

 8   A.   I don't recall the details of those ROAs.

 9   Q.   Now, this whole effort, tiger team effort, began sometime

11:36 10   in March, right?

11   A.   I believe so, yes.

12   Q.   And it was responsive to two executive orders issued by

13   the President, one of which we've spent some time discussing,

14   and those would be Executive Order 14161 and 14188, correct?

15   A.   As I said before, the tiger team was formed because of the

16   large number of individuals in the lists.  The tiger team was

17   formed to look at protesters.

18   Q.   Okay.  And the reason that you were looking at protesters

19   was because of the executive orders, correct?

11:37 20   A.   The reason I was looking at protesters is because I was

21   directed to from HSI leadership.  Whether or not they did it in

22   response to the executive orders was not something I was privy

23   to.

24        Do the protesters' activities relate to an executive

25   order?  Possibly.  I guess it could be characterized that way.
```

1    But you're asking me if I characterized it that way, and I did

2    not.

3    Q.   Well, Mr. Hatch, I really don't want to have to go back to

4    your deposition transcript, but I will if you don't recall

5    saying this.

6         You've previously testified that Mr. Gordon gave you

7    guidance or instructions about the executive orders to produce

8    reports of analysis on student protesters.  You linked those

9    things, isn't that correct?

11:37 10   A.   I think it's fair to say that yes, but that's not my -- I

11   did link those things, but my direction to the team was not

12   execute the executive order.  My direction to the team was look

13   at protesters.

14   Q.   I don't want to argue with you.  I'm not asking about your

15   direction to your team.  I'm asking about what you received,

16   the directions you got.  And the directions you got were to

17   create these reports of analysis on student protesters as part

18   of HSI's response to Executive Orders 14161 and 14188, isn't

19   that right?

11:38 20   A.   I don't know if -- I'm just trying to answer the question

21   as best I can, Your Honor.  I don't characterize it that way.

22   I know that the executive orders, I know one of those executive

23   orders existed.  As I said in my deposition, that was the first

24   time I had read one of them.  So the context of everything we

25   were doing is obviously from the executive orders, but in this

1    particular effort, my direction to the team and as I received

2    it, my characterization of it is we were looking at protesters.

3    Q.   Can we please put page 149 of the deposition transcript on

4    the screen.  Please take a look.

5         Line 11, Question:  "Well, you -- you agreed -- you

6    answered in the affirmative to whether you have received

7    guidance or instructions about the executive orders and you

8    named as one person who has provided that guidance, Mr. Gordon.

9    My question is what was that guidance?"

11:39 10        Ms. Safavi objects.  You answered, "Produce reports of

11   analysis on individuals involved in protests as it relates to

12   Title 8."

13        That's what you said, right?

14   A.   Yes, I think that's what I just said a minute ago.  The

15   job was to produce reports of analysis on individuals involved

16   in protests as it relates to Title 8 and violations of law.

17   Q.   I'm not sure why you're so resistant to answer this here.

18        THE COURT:  Don't characterize the witness's answers.

19   I'm listening.

11:40 20        MS. CONLON:  Okay.  We can take down the transcript.

21   Q.   Now, these protests that we're talking about, the student

22   protests, they began in October of 2023, right?

23   A.   Yes, I believe so.

24   Q.   Okay.  This urgent effort by HSI to identify these student

25   protesters didn't start in 2023 when the protests began.  It

1          Now, there are various protective orders into which

2     the attorneys have voluntarily entered, and those continue, and

3     you are all subject to those.

4          MR. BIALE:  Thank you for that helpful clarification,

5     Your Honor.

6          THE COURT:  Total elapsed time for the plaintiffs is

7     two days, two hours, 45 minutes.  Defense, three hours, 15

8     minutes.  We'll resume tomorrow promptly at 9:00 a.m.  Thank

9     you.

10          (Recess, 12:47 p.m.)

11                         * * * * *

12               CERTIFICATE OF OFFICIAL REPORTER

13          I, Kelly Mortellite, Registered Professional

14     Reporter, Registered Merit Reporter and Certified Realtime

15     Reporter, in and for the United States District Court for the

16     District of Massachusetts, do hereby certify that the foregoing

17     transcript is a true and correct transcript of the

18     stenographically reported proceedings held in the

19     above-entitled matter to the best of my skill and ability.

20               Dated this 10th day of July, 2025.

21

22               /s/ Kelly Mortellite

23               _____

24               Kelly Mortellite, RPR, RMR, CRR

25               Official Court Reporter

# EXHIBIT 29

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 1, Pages 1 - 65

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
        Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
        Defendants

*  *  *  *  *  *  *  *

BENCH TRIAL DAY 5

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 11, 2025

*  *  *  *  *  *  *  *

Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
                 Official Court Reporter
                 United States District Court
                 One Courthouse Way
                 Boston, Massachusetts  02210
                 mortellite@gmail.com

```
 1   A P P E A R A N C E S

 2   RAMYA KRISHNAN
     SCOTT WILKENS
 3        Knight First Amendment Institute at Columbia
          University
 4        475 Riverside Drive, Suite 302
          New York, NY 10115
 5        (646) 745-8500
          Carrie.decell@knightcolumbia.org
 6   and
     COURTNEY GANS
 7   NOAM BIALE
     ALEXANDRA CONLON
 8        Sher Tremonte LLP
          90 Broad Street, 23rd Floor
 9        New York, NY 10004
          (212) 540-0675
10        Cgans@shertremonte.com
          For Plaintiffs
11

12   ETHAN B. KANTER
     WILLIAM KANELLIS
13   VICTORIA M. SANTORA
     JESSICA A. STROKUS
14        DOJ-Civ
          P.O. 878
15        Ben Franklin Station
          Washington, DC 20044
16        (202) 616-9123
          Ethan.kanter@usdoj.gov
17   and
     SHAWNA YEN
18        United States Attorney's Office
          1 Courthouse Way, Suite 9200
19        Boston, MA 02210
          Shawna.yen@usdoj.gov
20        (617) 748-3100
          For Defendants
21

22

23

24

25
```

Petitioner's Appendix 417



1

2                                    INDEX

3

   WITNESS                                                    PAGE

4

5    MAUREEN SMITH

6       Direct Examination By Ms. Strokus                       8
         Cross-Examination By Mr. Wilkens                      20

7

8

   E X H I B I T S

9

10   None

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Petitioner's Appendix 418

1          Did you say the other name was Chung?

2   Q.   Yes.

3   A.   I do not recognize that name.  And can you repeat the name

4   of the other applicant, please?

5   Q.   Mohsen Mahdawi.  Sorry, go ahead.

6   A.   Sorry.  I do recognize the name Mahdawi, but I thought --

7   I think it's a he --

8   Q.   Yes.

9   A.   I thought he was from a different country.  And when I saw

10  it during the deposition, it was a different country than I had

11  remembered.  The name does sound familiar.  But again, my role

12  would have been limited to checking if the person was a valid

13  visa holder or a legal permanent resident, visa status.

14  Q.   Thanks.  I'll ask about one more name, Rumeysa Ozturk.

15  Were you involved in her case in any way?

16  A.   I do not remember working on her case, no.

17          MR. WILKENS:  Okay.  Thank you.  And Your Honor, I

18  just wanted to raise one thing.  It looked to me like

19  Ms. Strokus maybe had been speaking with someone else in the

20  room.  And if there's someone else in the room, I'd like them

21  to be identified.

22          MS. STROKUS:  That's fine, Your Honor.  We have agency

23  counsel here.  We just have a limited screen.

24          THE COURT:  I appreciate that.

25          MR. ANDERSON:  Carl Anderson, with the State

```
 1   Department.
 2           THE COURT:  And Mr. Anderson, thank you for
 3   identifying yourself.
 4           Is that it for this witness?
 5           MR. ANDERSON:  Thank you, Your Honor.
 6           MR. WILKENS:  Not it for my questions, Your Honor, but
 7   yes, thank you for clarifying that.
 8           THE COURT:  And Mr. Anderson, you are certainly
 9   welcome.
10   BY MR. WILKENS:
11   Q.  I want to -- so you've just spoken about one way in which
12   the Bureau of Consular Affairs has worked with the Department
13   of Homeland Security on revoking the visas of student
14   protesters, and I want to -- I just want to talk about one
15   other way, as I understand it, that the two agencies have
16   addressed or discussed the issue of visa revocations for
17   student protesters.
18        And you were part of a student working group with DHS in
19   which the issue of the revocation of student visas for students
20   who are engaged in protests was discussed, correct?
21           MS. STROKUS:  Objection.
22           THE COURT:  Well, I think that may run afoul of the
23   deliberative privilege.  Sustained.
24           I'll ask the question.  As part of your job, ma'am, at
25   some time in the period we're talking about, you were part of a
```

1    working group within DHS, the Department of Homeland Security,

2    that concerned itself with student protesters.  Is that true?

3            THE WITNESS:  Your Honor, in my role as senior adviser

4    in Consular Affairs, I did participate in a group with the

5    Department of Homeland Security about student visa protesters

6    and other matters, yes.

7            THE COURT:  Thank you.

8    BY MR. WILKENS:

9    Q.   And I want to ask about what you referred to in your

10   deposition as the Homeland Security Council.  Do you remember

11   talking about that?

12           MS. STROKUS:  Objection.

13           THE COURT:  Well, since I don't know -- I don't have

14   the deposition before me, I'll allow her to answer yes or no.

15           Do you remember mentioning that individual or office

16   in your deposition, ma'am?

17           THE WITNESS:  Yes, Your Honor, I did mention in my

18   deposition that the Homeland Security Council calls meetings,

19   and I have attended several of those meetings.

20   BY MR. WILKENS:

21   Q.   And in those meetings, the attendees, the meetings that

22   you attended, the issue of student protesters and the

23   revocation of their visas came up, didn't it?

24           MS. STROKUS:  Objection, Your Honor.  Presidential

25   communications privilege.

```
 1              THE COURT:  What?  Presidential?  Is that --
 2              MS. STROKUS:  Yes, Your Honor.
 3              THE COURT:  -- the privilege you're asserting?
 4              MS. STROKUS:  Homeland Security Council is a direct
 5    advisory to the President, Your Honor.
 6              THE COURT:  So let me be very clear now.  You're
 7    asserting the executive privilege of the President of the
 8    United States with respect to these meetings?
 9              MS. STROKUS:  Yes, Your Honor, the Homeland Security
10    Council is part of the executive, it is part of the White
11    House.
12              THE COURT:  You're all part of the executive, aren't
13    you?  You're part the executive.
14              MS. STROKUS:  I am, Your Honor.  I mean specifically
15    that this council advises directly to the President.  It is
16    part of the Executive Office of the President.
17              THE COURT:  This council we're talking about is part
18    of the Executive Office of the President.  What's his or her
19    name?
20              MS. STROKUS:  Yes.  Your Honor, it is a council of
21    people who have been collected to advise on Homeland Security.
22    It is termed the Homeland Security Council, and it is part of
23    the Executive Office of the President.
24              THE COURT:  Okay.  I appreciate your help.  So there's
25    an informal council on Homeland Security.
```

```
 1                MS. STROKUS:  No, Your Honor.  It is a formal council.
 2      It is a formal council that is part of the Executive Office of
 3      the President.
 4                THE COURT:  And its name is --
 5                MS. STROKUS:  The Homeland Security Council.
 6                THE COURT:  Thank you.  And it's comprised of whom?
 7                MS. STROKUS:  Your Honor, that is part of the
 8      Presidential communications privilege.
 9                THE COURT:  So it's a secret council?
10                MS. STROKUS:  The existence of the council is not a
11      secret, Your Honor.
12                THE COURT:  But its membership is secret?
13                MS. STROKUS:  They are staff members of the Executive
14      Office of the President, Your Honor.
15                THE COURT:  And its membership is secret?
16                MS. STROKUS:  I would not say that it is secret, Your
17      Honor.  I would say that it is privileged.
18                THE COURT:  And it's privileged from this court?  I
19      may not know who these people are?  I mean, you tell me that.
20      Is that what you're saying?
21                MS. STROKUS:  Given the ongoing issues with privilege
22      in this court, Your Honor, I will maintain that this is the
23      Presidential communications privilege and the identities of the
24      individuals on the Homeland Security Council are privileged.
25      The discussions that are had within the Homeland Security
```

1    Q.   And under the two executive orders we've been talking

2    about and the policy guidance with regard to how they should be

3    implemented, the facts, the totality of the circumstances

4    include a student engaging in a student protest, correct?

5         MS. STROKUS:  Objection.

6         THE COURT:  If I understand, your question is a

7    hypothetical.  Ask it again.

8         MR. WILKENS:  Sorry, Your Honor.

9    BY MR. WILKENS:

10   Q.   Since -- when you are considering the totality of

11   circumstances, is engaging in a campus protest inconsistent

12   with a student's visa status?

13        MS. STROKUS:  Objection.

14        THE COURT:  Overruled.  She may give us her opinion.

15   A.   Well, I think it's a bit of a hypothetical question, but

16   we would need to look at all of the facts of the case.  I mean,

17   I don't want to veer off into, you know, if this, then that.

18   But, you know, if it were someone, a visa holder who engages in

19   violent activity, whether it's during a protest or not, if they

20   were arrested for that violent activity, then that is something

21   that we would consider for possible visa revocation.

22   Q.   So I'm not -- so putting aside student visa holders who

23   engage in some kind of violence or have been arrested, putting

24   that to one side, isn't it accurate to say that engaging in a

25   campus protest -- sorry.  Isn't it accurate to say that when

Petitioner's Appendix 424

1    you are looking at the totality of the circumstances, engaging

2    in a campus protest is inconsistent with a student's visa

3    status?

4         MS. STROKUS:  Objection, asked and answered.

5         THE COURT:  Well, she hasn't answered it, but he

6    stated it the other way.  He's asking --

7         THE WITNESS:  Can you repeat the question, please,

8    counsel.

9         THE COURT:  Well, the information ultimately is coming

10   to me, and I guess what he's trying to get at is, do you think

11   that engaging in a student protest, nonviolent and standing

12   alone, is inconsistent with a student's visa status -- I'll

13   state it differently -- is grounds for revoking his visa

14   status?  Do you think that?

15        THE WITNESS:  I think it's a difficult question to

16   answer.  If it's a nonviolent protest and it's not a protest

17   that is supporting terrorism, then I'm not sure that that would

18   be a problem.  I think that we would probably see it in a

19   negative light if the person were protesting in a way that

20   supports terrorism, even if it's a nonviolent protest.

21        THE COURT:  Thank you.

22        THE WITNESS:  Again, I think we'd have to look at the

23   totality of the circumstances for the individual applicants.

24        MR. WILKENS:  Just one moment, Your Honor.

25        THE COURT:  Of course.

1          While we're waiting, I've waffled on the document, HM

2     for identification, which was proffered by the defendants as

3     admissible evidence under 611.  Reviewing it and on reflection,

4     it's not.  It doesn't meet the criteria of 611, but the court

5     receives it as a chalk or demonstrative aid, illustrative of

6     the witness's testimony.

7          MS. STROKUS:  Your Honor, just to clarify, it was also

8     offered under 107(a).

9          THE COURT:  And I am excluding it.  Thank you for your

10    precision.  Your rights are saved.

11         Is that it for this witness?

12         MS. CONLON:  No.

13         MR. WILKENS:  Your Honor, we're trying to pull up a

14    document.  We're going to return for a moment, but it will be

15    brief, to the Homeland Security Council and a current White

16    House document that describes, it's a Presidential memorandum

17    from President Trump issued since he entered office that

18    describes the National Security Council and also describes when

19    that becomes the Homeland Security Council through the change

20    of agency heads who are part of the Homeland Security Council

21    but not the National Security Council.

22         THE COURT:  Well, you know, where does it come from?

23         MR. WILKENS:  The Whitehouse.gov.  It's an

24    executive -- it's in the same part of the Whitehouse.gov

25    website that has the executive orders that we've been talking

1   about.

2          THE COURT:  If it does, I mean, I suppose it's

3   something of which I could take judicial notice.  I mean, you

4   proffered something that was not current, so the objection was

5   very well taken.  But if you have something current, I don't

6   know what this witness can add to it because, at least for

7   presiding here in the midst of trial, I'm not going to take it

8   upon myself to overrule the objection that's been stated as to

9   Presidential communications.  I am going to reflect on it.

10         MR. WILKENS:  Yes, Your Honor.  We would like to just

11  offer it.  It's EQ for identification.

12         THE COURT:  Where is it physically?

13         MR. WILKENS:  It's coming up.

14         MS. STROKUS:  Your Honor, I object.

15         MR. WILKENS:  It will come up on screen.

16         MS. STROKUS:  Objection.

17         THE COURT:  Yes.  And your objection is sustained

18  because that's too evanescent for this old guy, a ruling not

19  found in the Federal Rules of Evidence.

20         Look, when you get me a paper copy, life goes on, then

21  I'll take a look at it.

22         MR. WILKENS:  Yes, Your Honor.  We'll do that over the

23  break.

24         THE COURT:  And it seems to me that it's a type of

25  thing as to which I can take judicial notice.  It doesn't have

Petitioner's Appendix 427

1    to be marked as an exhibit, unless of course there's some

2    dispute that that is in fact what the White House website

3    itself is putting out.

4    BY MR. WILKENS:

5    Q.    So Ms. Smith, just returning to the issue of student -- a

6    student protest and a student visa holder who is present at a

7    student protest, when that is inconsistent with the student

8    visa status, which we spoke about a couple of minutes ago, I

9    want to ask you, so a nonviolent protest but a protest that can

10   be considered pro-Hamas, that is consistent with a student's

11   visa status, correct?

12         MS. STROKUS:  Objection.

13         THE COURT:  Sustained.  These questions are

14   argumentative.  The language is what it is.  She's an employee

15   of the agency, and therefore you may argue that's a statement

16   of the agency, but these matters are all subject to argument

17   here.

18         No.  Sustained.  And I've allowed her to give her

19   answer, not on your specific question, but as to how she would

20   go about it.

21         MR. WILKENS:  Thank you, Your Honor.  Let me just

22   quickly go --

23         THE COURT:  How much more have you for her?

24         MR. WILKENS:  Just, I think, Your Honor, we're going

25   to break soon.  I think I just need ten, ten more minutes.

1    take it, and you will represent to the court, will not exceed

2    five minutes, right, not exceed five minutes?

3              MR. WILKENS:  I'll do my best, Your Honor -- yes.

4              THE COURT:  I hear the answer yes.  We'll recess until

5    25 minutes after 11:00.  We'll recess.

6              (Recess, 10:56 a.m.)

7                            * * * * *

8              CERTIFICATE OF OFFICIAL REPORTER

9

10             I, Kelly Mortellite, Registered Professional

11   Reporter, Registered Merit Reporter and Certified Realtime

12   Reporter, in and for the United States District Court for the

13   District of Massachusetts, do hereby certify that the foregoing

14   transcript is a true and correct transcript of the

15   stenographically reported proceedings held in the

16   above-entitled matter to the best of my skill and ability.

17             Dated this  11th day of July, 2025.

18

19             /s/ Kelly Mortellite

20             _____

21             Kelly Mortellite, RPR, RMR, CRR

22             Official Court Reporter

23

24

25

# EXHIBIT 30

Petitioner's Appendix 430

```
 1                  UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Boston)

 3                          No. 1:25-cv-10685-WGY
                            Volume 1, Page 1 to 82
 4

 5     AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
                  Plaintiffs
 6

 7     vs.

 8

 9     MARCO RUBIO, in his official capacity as
       Secretary of State, et al,
10                  Defendants

11
                            * * * * * * * * *
12

13
                          For Bench Trial Before:
14                        Judge William G. Young

15

16
                       United States District Court
17                     District of Massachusetts (Boston.)
                       One Courthouse Way
18                     Boston, Massachusetts 02210
                       Tuesday, July 15, 2025
19

20                          * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
23                  United States District Court
             One Courthouse Way, Room 5510, Boston, MA 02210
24                        rhr3tubas@aol.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     CAROLINE DeCELL, ESQ.
 4   ALEXANDER ABDO, ESQ.
     SCOTT B. WILKENS, ESQ.
 5   ALEXANDRA CONLON, ESQ.
        Knight First Amendment Institute at Columbia
 6      University
        475 Riverside Drive, Suite 302
 7      New York, NY 10115
        (646) 745-8500
 8      E-mail: Ramya.krishnan@knightcolumbia.org
     and
 9   COURTNEY GANS, ESQ.
     NOAM BIALE, ESQ.
10      Sher Tremonte LLP
        90 Broad Street, 23rd Floor
11      New York, NY 10004
        (212) 540-0675
12      Email: Cgans@shertremonte.com
        For Plaintiffs
13

14   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
15   VICTORIA M. SANTORA, ESQ.
     JESSICA STROKUS, ESQ.
16      DOJ-Civ
        P.O. 878
17      Ben Franklin Station
        Washington, DC 20044
18      (202) 616-9123
        Email: Ethan.kanter@usdoj.gov
19   and
     SHAWNA YEN, ESQ.
20      United States Attorney's Office
        1 Courthouse Way, Suite 9200
21      Boston, MA 02210
        Email: Shawna.yen@usdoj.gov
22      For Defendants

23

24

25
```

Petitioner's Appendix 432

```
 1                    I N D E X

 2

 3   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   WILLIAM CROGAN  (By Zoom)

 6      By Ms. Safavi (By Zoom)5

 7      By Ms. Conlon             33

 8

 9   PATRICK CUNNINGHAM

10      By Ms. Santora      39

11      By Mr. Tremonte            63

12

13                    E X H I B I T S

14

15                 (None marked.)

16

17

18

19

20

21

22

23

24

25
```

Petitioner's Appendix 433

1          MS. SAFAVI:  Thank you, your Honor.

2    Q.    Mr. Crogan, um, was there -- I'm sorry, Agent

3    Crogan, were there any, um, other things, um, that you,

4    um, participated in in terms of Mr. Mahdawi's arrest?

5          THE COURT:  I don't understand the question?  Well

6    evidently he does.

7          (Laughter.)

8          THE COURT:  Well if you understand it, sir, go

9    ahead and answer.

10          THE WITNESS:  Yes, your Honor.

11    A.    I understand it to be as my involvement was part

12    of the planning and the supervision of the planning for

13    Mr. Mahdawi's investigation, which came first, um, and

14    eventually the arrest, when that was authorized.

15    Q.    And when did you first learn of Mr. Mahdawi, when

16    did he first come to your attention?

17    A.    Um, approximately mid March of 2025.

18    Q.    And, um, did you receive a communication informing

19    you about this subject?

20    A.    Yes, I did.  My supervisor communicated to me that

21    the State Department may be providing a finding against

22    Mr. Mahdawi, and then eventually a finding was

23    transmitted to me via e-mail, where I recall there was

24    an attached document, um, produced by the U.S.

25    Department of State, referencing Mr. Mahdawi.

1    Q.    Was there any other communication involving

2    Mr. Mahdawi that you received?

3    A.    Yes, I also, um, engaged with the HSI New York

4    office, um, on Mr. Mahdawi, and the HSI New York office

5    provided information about Mr. Mahdawi's, um, alleged

6    activities and engagement with, um, police and law

7    enforcement in the past.  And, um, yeah, I believe

8    that's, you know, most of what I recall.

9    Q.    And after receiving --

10    THE COURT:  Wait a minute.

11    And how did the New York office communicate this

12    data to you, sir?

13    THE WITNESS:  The New York office provided

14    information, your Honor, regarding, um, Mr. Mahdawi's

15    interactions with the FBI of being --

16    THE COURT:  My question was not for you to

17    characterize it, but how did you get it?  E-mail?  Snail

18    mail?  Telephone call?  That type of thing.

19    THE WITNESS:  Yes, your Honor.  I received it

20    principally by e-mail and also phone calls.

21    THE COURT:  Thank you.

22    Q.    And after receiving the communications, what did

23    you do next?

24    A.    I ensured that agents at the HSI Vermont office

25    were proceeding with their investigation and following

1    up with the information that came from New York.

2    Q.    Was Mr. Mahdawi, um -- was there surveillance

3    operations?

4    A.    There were -- inside of that information package,

5    if you will, there were addresses for Mr. Mahdawi in

6    Vermont.  I believe that's why we were contacted,

7    because the government records had addressed this for

8    Mr. Mahdawi in New York and in Vermont.  And as a matter

9    of routine investigative procedure, agents checked the

10   addresses in Vermont, um, trying to determine if

11   Mr. Mahdawi was present in the district.

12   Q.    And, um, when did you -- what date did you make

13   the arrest?

14   A.    The arrest of Mr. Mahdawi occurred in mid April of

15   2025, I believe April 14th.

16   Q.    And where did it occur?

17   A.    It occurred at the CIS office in Colchester,

18   Vermont.

19   Q.    Okay.  And, um, in terms of Mr. Mahdawi's arrest,

20   um, as the supervisor, was the arrest consistent with

21   HSI's procedures and policies?

22   A.    Yes, it was.

23         THE COURT:  Did I hear an objection?  No.  Very

24   well.

25         Proceed.

```
 1          MS. SAFAVI:  Thank you, your Honor.
 2          THE COURT:  Go ahead, Ms. Safavi.
 3          MS. SAFAVI:  Thank you, your Honor.
 4   Q.    And, um, in your oversight of the arrest, um, was
 5   there anything inconsistent, um, that the agents did in
 6   terms of arresting Mr. Mahdawi?
 7   A.    Um, no, not that I recall.
 8   Q.    And, um, were you -- did anyone ever communicate
 9   to you or ever suggest that Mr. Mahdawi's arrest was
10   because of his pro-Palestinian views?
11          MS. CONLON:  Objection.
12          THE COURT:  No, overruled.
13   A.    No, I don't recall that either.  No.
14   Q.    Did anyone ever tell you or suggest that
15   Mr. Mahdawi's arrest was, um, based on his criticisms of
16   Israel?
17   A.    No.
18   Q.    Did anyone ever communicate to you or suggest that
19   Mr. Mahdawi's arrest is based on his political views?
20   A.    No.
21          MS. CONLON:  Objection, asked and answered.
22          THE COURT:  Overruled, and his answer, "No," may
23   stand.
24   Q.    And, um, in terms of, um, after the -- Mr. Mahdawi
25   was arrested, in your role as, um, ASAC, are you
```

1    involved with any of the decisions regarding the

2    detention of Mr. Mahdawi?

3    A.    No, HSI relies on other elements of ICE and

4    Homeland Security to maintain custody or detention of

5    someone who's arrested for a civil immigration

6    violation.

7         THE COURT:  Well let me just follow that up

8    because I'm not clear what you know.

9         So you make the arrest in the little CIS office

10   there in Colchester, Vermont.  You, um -- he's

11   handcuffed.  You take him out to a -- to an HSI vehicle.

12   A couple agents put masks on because you go into the

13   public area.  And then what happens to your --

14        THE WITNESS:  Yes, your Honor.

15        THE COURT:  Wait a minute.

16        THE WITNESS:  Yes, your Honor.

17        After Mr. Mahdawi is placed, escorted to a

18   vehicle, the vehicle drives to the HSI office and --

19        THE COURT:  Which is where?

20        THE WITNESS:  Which is in South Burlington,

21   Vermont.

22        THE COURT:  Okay.  All right.

23        THE WITNESS:  I --

24        THE COURT:  Do you -- all right, keep going.

25        THE WITNESS:  Yes, your Honor.

1    e-mail from Ms. Garolini, just referring back to that.

2        Some of the communications you received at that

3    time about Ms. Ozturk were e-mail-forwards, correct?

4    A.    I believe so.

5    Q.    Okay.  All right.  And, um, after you received

6    this, um, set of instructions and these materials, um, a

7    decision was made to effectuate an arrest of Ms. Ozturk,

8    is that right?

9    A.    A decision was made to try and locate her, and,

10    you know, we were then, um --

11    Q.    Whose decision was that?

12    A.    So as I mentioned that surge operation, we were --

13    it was a pure coincidence that Ms. Ozturk's information

14    came in at that same time we were doing that.  I was in

15    a room with my Special Agent in Charge and other senior

16    officials from other agencies.  So we were all talking.

17    And it was like, "Okay, go" --

18    Q.    So you just happened to be with all these other

19    officials at the time when the direction from

20    headquarters came in?

21    A.    That's correct.

22    Q.    Okay.  And was it a group decision to effectuate

23    the arrest?

24    A.    I mean the decision ultimately lies with the

25    Special Agent in Charge to impress upon us to go out and

```
 1   effectuate the arrest.
 2   Q.    So we have clarity, was it the Special Agent in
 3   Charge who directed you to arrange for the surveillance
 4   and arrest of Ms. Ozturk?
 5   A.    It was his direction to prioritize it and, yes,
 6   to, you know, put resources towards Ms. Ozturk.
 7   Q.    Okay.  And at some point after that instruction
 8   was given to you, you separately consulted with one of
 9   HSI's lawyers in your office, didn't you?
10   A.    I did.
11   Q.    And you did that to make sure that the arrests
12   that you have been instructed to make was legally
13   appropriate, correct?
14   A.    As I mentioned last week --
15         MS. SANTORA:  Objection, this is attorney-client
16   privileged, your Honor.
17         THE COURT:  It is.  I sustain it.
18         MR. TREMONTE:  I'm not asking for the contents of
19   the communication, your Honor.
20         THE COURT:  Well, you're asking as to why.
21         MR. TREMONTE:  Yes.
22         THE COURT:  Of course.  So the privilege covers
23   both the request for legal advice and the legal advice
24   that is, um, given.  And it's -- I sustain the
25   privilege.
```

1          Of course there may be a cost for that, but that

2    can be briefed, in the sense of an adverse inference.  I

3    don't say I'm drawing one, and that's only the

4    Commonwealth of Massachusetts, but I do mention it.

5          Go ahead.

6    Q.    Mr. Cunningham, at your deposition you testified

7    that the reason why you consulted with a lawyer was to

8    ensure that the arrest that you'd been instructed to

9    make was legal and appropriate, didn't you?

10   A.    I testified to that.  I did also testify to the

11   fact that, you know, when you receive information from

12   headquarters, at this level, top down, um, it -- you

13   make the assumption that it's legally sufficient.  But I

14   did contact our legal counsel to ensure that we were on

15   solid legal ground.

16   Q.    Right, because for whatever reason, under these

17   unique circumstances with which you had no prior

18   experience, you thought it was important --

19          MS. SANTORA:  Objection.

20   Q.    -- to have a lawyer weigh in, even though you'd

21   been given a direct demand by your headquarters?

22          MS. SANTORA:  Objection, mischaracterizes --

23          THE COURT:  Sustained, but not on that ground.

24   Sustained, because it goes beyond what he testified as

25   to the reasons for consulting the lawyer.

1          Who's the lawyer here?

2          THE WITNESS:  It was a lawyer from the Office of

3    the Principal Legal Advisor.

4          THE COURT:  And what's his or her name?

5          THE WITNESS:  His name is Lincoln Jalalian.

6          THE COURT:  Thank you.

7    Q.    And absent consulting with a lawyer, you were not

8    in a position to make an independent judgment about the

9    lawfulness of the arrest, correct?

10   A.    No, with my basis of knowledge in, you know,

11   immigration law, I would defer to legal counsel before

12   taking any action.  And the same thing with criminal

13   law.

14   Q.    And again, an administrative civil arrest based on

15   a Visa revocation was not within the heartland of your

16   experience as an agent, correct?

17   A.    It was not something that I had, um, much

18   experience with, no, if any.

19   Q.    Right.  And all you knew was that Ms. Ozturk's

20   Visa had been revoked, correct?

21   A.    I knew that her Visa had been revoked, um, and

22   also the contents of the e-mail, the additional

23   information.  But the most important portion of it was

24   that her Visa was revoked and that was the grounds for,

25   you know, the apprehension.

1                    C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5    hereby certify that the forgoing transcript of the

6    record is a true and accurate transcription of my

7    stenographic notes, before Judge William G. Young, on

8    Tuesday, July 15, 2025, to the best of my skill and

9    ability.

10

11

12

13

    /s/ Richard H. Romanow 07-15-25
14    _____
    RICHARD H. ROMANOW  Date
15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 31

Petitioner's Appendix 444

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

No. 1:25-cv-10685-WGY
Volume 2, Pages 83 - 127

AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
          Plaintiffs

vs.

MARCO RUBIO, in his official capacity as
Secretary of State, et al,
          Defendants

********

BENCH TRIAL DAY 7

BEFORE THE HONORABLE WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
July 15, 2025

********

Court Reporter:  Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1  A P P E A R A N C E S

 2  RAMYA KRISHNAN
    ALEXANDER ABDO
 3  SCOTT B. WILKENS
    XIANGNONG WANG
 4      Knight First Amendment Institute at Columbia
        University
 5      475 Riverside Drive, Suite 302
        New York, NY 10115
 6      (646) 745-8500
        Carrie.decell@knightcolumbia.org
 7  and
    COURTNEY GANS
 8  NOAM BIALE
    ALEXANDRA CONLON
 9      Sher Tremonte LLP
        90 Broad Street, 23rd Floor
10      New York, NY 10004
        (212) 540-0675
11      Cgans@shertremonte.com
        For Plaintiffs
12

13  ETHAN B. KANTER
    WILLIAM KANELLIS
14  VICTORIA M. SANTORA
    JESSICA A. STROKUS
15      DOJ-Civ
        P.O. 878
16      Ben Franklin Station
        Washington, DC 20044
17      (202) 616-9123
        Ethan.kanter@usdoj.gov
18  and
    SHAWNA YEN
19      United States Attorney's Office
        1 Courthouse Way, Suite 9200
20      Boston, MA 02210
        Shawna.yen@usdoj.gov
21      (617) 748-3100
        For Defendants
22

23

24

25
```

Petitioner's Appendix 446



1

2                              INDEX

3

   WITNESS                                                PAGE

4

5

   DARREN MCCORMACK

6
       Direct Examination By Ms. Santora                   86
7      Cross-Examination By Ms. Conlon                     101

8

   CHRISTOPHER HECK

9
       Direct Examination By Ms. Strokus                  110
10

11

   E X H I B I T S

12

   None
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Resumed, 11:18 a.m.)
 2          THE COURT:  Call your next witness.
 3          MS. SANTORA:  Your Honor, defendants call Special
 4   Agent Darren McCormack.
 5          THE COURT:  He may be called.
 6          DARREN MCCORMACK, Sworn
 7          COURTROOM CLERK:  Can you please state your full name
 8   and spell your last name for the record.
 9          THE WITNESS:  Darren McCormack, M-c-C-o-r-m-a-c-k.
10          THE COURT:  Ms. Santora, you may proceed.
11   DIRECT EXAMINATION BY MS. SANTORA:
12   Q.   Good morning, Detective McCormack.  Thank you for being
13   here today.  Where do you currently work?
14   A.   HSI New York.
15   Q.   What is your job title?
16   A.   Deputy special agent in charge.
17   Q.   How long have you held that role?
18   A.   Approximately three years.
19   Q.   What are your responsibilities in that role?
20   A.   Operational and administrative oversight of Division 1,
21   which was comprised of criminal investigators, special agents,
22   administrative staff and intel.
23   Q.   When did you begin working for United States Government?
24   A.   2005.
25   Q.   In what capacity?
```

1    A.    As a special agent with HSI.

2    Q.    Where were you located?

3    A.    My first duty assignment was Newark, New Jersey.

4    Q.    Did you receive training before you started that duty

5    assignment?

6    A.    I did.

7    Q.    Where did you receive training?

8    A.    The Federal Law Enforcement Training Center in Glynco,

9    Georgia.

10   Q.    Can we refer to that as FLETC?

11   A.    Yes.

12   Q.    What training did you he receive at FLETC?

13   A.    I received three months of criminal investigative training

14   and three months of ICE-specific special agent training.

15   Q.    And you said that following that you worked as a special

16   agent in Newark, New Jersey?

17   A.    Yes.

18   Q.    How long were you there?

19   A.    Approximately seven years.

20   Q.    And what was your job after that?

21   A.    From there I went to HSI headquarters in Washington, D.C.

22   and worked on a technical development project as a special

23   agent.

24   Q.    How long were you there?

25   A.    Approximately three years.

1   Q.   And what was your job after that?

2   A.   Following that I was the assistant attache in the U.S.

3   embassy in Vienna, Austria.

4   Q.   How long were you in Vienna?

5   A.   Four years.

6   Q.   And after Vienna?

7   A.   After Vienna, back to Newark, New Jersey, as a supervisory

8   special agent for approximately a year and a half to two years.

9   Q.   And following that?

10  A.   Following that to New York, HSI New York as an assistant

11  special agent in charge for approximately two years.

12  Q.   And following that?

13  A.   My current role.

14  Q.   Your current role.  Does your office's work involve

15  enforcing criminal laws?

16  A.   Yes.

17       THE COURT:  Let me interrupt.  I'm one question behind

18  here.  So you were assistant to special agent in charge, and

19  now you're an assistant special agent in charge, but they're

20  different.  Can you explain that to me.

21       THE WITNESS:  I was an assistant special agent in

22  charge, and now I'm a deputy special agent in charge.

23       THE COURT:  Which is higher.

24       THE WITNESS:  One rank higher.  And then one above

25  that is the special agent in charge, which is essentially the

1   reveal anything that is uncommon.  I don't mean it critically,

2   but this is what law enforcement officers do.

3        MS. SANTORA:  To the extent it reveals their methods

4   and techniques leading up to the arrest.

5        THE COURT:  But that's true.  If the privilege were

6   that broad, no police report could ever be produced if the

7   government decided not to produce it.  That's not the law

8   enforcement privilege.  You give me some case that sweeps that

9   broadly.

10        That's what has baffled me from the outset here.  This

11   has no forward-looking aspect.  It has no revelation as to

12   planned law enforcement operations, and at least in my limited

13   experience this all looks like just sound police work carrying

14   out their directions.

15        MS. SANTORA:  Your Honor, to the extent that it

16   reveals the methods that the officers used in surveilling an

17   individual, that could be extrapolated to other cases and allow

18   other individuals to potentially --

19        THE COURT:  Let me see.  Since you don't seem to be

20   able to put your finger on it and we have to work from the --

21   now, this you say can be extrapolated from -- actually, we have

22   another copy.  But so if you need one, Mr. Hohler will give you

23   one.

24        You did surveillance and had his picture.  I don't see

25   anything -- and I mean no disrespect -- anything specifically

1  secret about going about criminal investigations that way.  No.

2  It's overruled.

3        And I really scrupulously want to honor the stay of

4  the Court of Appeals, but this does not seem to fall within

5  that order, and it may be given to the plaintiffs, and

6  Mr. Hohler will give a copy to the plaintiffs, pages 23, 24 and

7  25 of 337.

8        MS. SANTORA:  Your Honor, unfortunately, we only have

9  a copy that is double-sided, which will reveal an additional

10  page.

11        THE COURT:  We'll give you our copy.  It happens I

12  have two copies, and I have a wonderful law clerk who can find

13  it.  You may have it.

14        MS. CONLON:  May I receive a copy?

15        THE COURT:  Oh, yes.  I said we have all these copies.

16  Now I'll give you the one that I have.

17        MS. CONLON:  Thank you.

18        THE COURT:  There's two sets.  And what we'll do is

19  we'll let her cross-examine.  We'll xerox the copy, or when

20  she's done her cross-examination, she can give you the copy

21  she's been operating from and you can use it for redirect if

22  you wish.  Go ahead, Ms. Conlon.

23        MS. CONLON:  Yes, Your Honor.

24        THE COURT:  Once again, after all this work, it's

25  hardly a smoking gun.

1          MS. CONLON:  I take the court's word for it, and one

2     of my colleagues will surely let me know.

3          THE COURT:  We lawyers have to act like lawyers.

4          THE WITNESS:  I understand.  You're doing a good job,

5     Judge.

6          MS. CONLON:  For better or worse.

7          THE COURT:  Go ahead.

8     CROSS-EXAMINATION BY MS. CONLON:

9     Q.    Okay.  Agent McCormack, is that -- what's the right title

10    to use?

11    A.    That's fine.

12    Q.    On March 6, thereabouts, you received initial instructions

13    concerning Mahmoud Khalil, right?

14    A.    No.

15    Q.    Okay.  On what date?

16    A.    I became with aware of Mr. Khalil on or around the 7th,

17    March 7th.

18    Q.    And on the date that you became aware of him you received

19    some initial instructions about him, right?

20    A.    Yes.

21    Q.    Those instructions included conducting pattern of life

22    surveillance; is that right?

23    A.    The instructions were to locate him and, yes, establish a

24    pattern of life with surveillance.

25    Q.    And those instructions came from HSI senior leadership,

1    right?

2    A.    Through other channels, but yes, ultimately through HSI

3    leadership at headquarters.

4    Q.    And through other channels, meaning it filtered to you

5    through the special agent in charge?

6    A.    Correct.

7    Q.    Now, at that time when you first were made aware of

8    Mr. Khalil, you did not understand him to be the subject of a

9    criminal or civil enforcement action; is that correct?

10   A.    Can you repeat the question?

11        THE COURT:  When you first heard of him, you didn't

12   understand that he was the subject of a criminal or civil

13   investigation, when first you heard of him?

14        THE WITNESS:  No, I did not understand him to be

15   either.

16   BY MS. CONLON:

17   Q.    You understood at that time that somebody at a higher

18   level than you had some interest in him; is that right?

19   A.    I was informed that somebody at a higher level than the

20   people I was speaking to had an interest in him for whatever

21   reason.

22   Q.    Someone at a higher level even than the special agent in

23   charge, in other words?

24   A.    Correct, but this conversation was not with the special

25   agent in charge.

1  Q.   Who was this one with?

2  A.   The acting assistant director.

3  Q.   The acting assistant director --

4  A.   For domestic operations, for HSI's domestic operations.

5  Q.   William Walker?

6  A.   Yes.

7  Q.   And William Walker conveyed to you that the State

8  Department had an interest in him, right?

9  A.   I believe at some point the State Department's interest

10  came up in conversation, yes.

11  Q.   Just a moment.

12      He conveyed to you, specifically, that Secretary Rubio was

13  interested in Mr. Khalil, correct?

14  A.   At some point I was made aware that the Secretary of State

15  and/or the White House had an interest in Mr. Khalil.

16  Q.   And you were made aware of that through Mr. William

17  Walker?

18  A.   Correct.

19  Q.   Now, approximately the day after you began or HSI began

20  surveilling Mr. Khalil, you received a memo from the State

21  Department about him, right?

22  A.   Can you repeat the first part of the question, for the

23  timing.

24  Q.   Sure.  The day after you became aware of Mr. Khalil and

25  were surveilling him, you then received a memo about him from

1  the State Department, right?

2  A.   Correct.

3  Q.   The memo indicated that the State Department had

4  determined that he was removable, correct?

5  A.   The memo indicated that his status, his immigration status

6  in the United States had changed.  It did not say anything

7  about -- if we're talking about the same document --

8  Q.   I'm not sure if we are.

9  A.   I don't recall it saying anything about his removability.

10 Q.   That his status had changed in a manner that made him no

11 longer a lawful permanent resident or something to that effect?

12 A.   Something to that effect.

13 Q.   Now, you had never seen a memo like this?

14 A.   When you say "like this" --

15 Q.   A memo from the State Department in this manner.

16      MS. SANTORA:  Objection.  If we're discussing a

17 document, can we show the witness?

18      MS. CONLON:  My time is short and I think we all know

19 the document I'm talking about so I'd prefer not to.

20      THE COURT:  I'm not sure that he knows it.  They talk

21 about these A4(c) memos.  Is that what you --

22      THE WITNESS:  I'm understanding the memo written by

23 Secretary of State signed at the top.

24      THE COURT:  Right.

25      THE WITNESS:  Yes, yes, if that's what we're referring

1    to.

2              THE COURT:  She may question.

3              MS. SANTORA:  Your Honor, we would ask that to the

4    extent they continue to question on the document the witness be

5    shown the document.

6              THE COURT:  Show him the document.  She may continue.

7    Q.    In your current position, you had never seen a memo like

8    this before signed by the Secretary, correct?

9    A.    When you say "like this," can you be more specific?

10   Q.    A memo from the Secretary indicating that a person's

11   status had changed, correct?

12   A.    I've seen memos from the Secretary of State before when I

13   worked overseas.

14   Q.    I'll ask you again.  In your current position you had

15   never seen a memo from the Secretary of State indicating that a

16   person's status had changed, correct?

17   A.    I have not, correct.

18   Q.    Now, you got this memo, and after you received it, you

19   checked in with somebody named William Joyce who works in ERO,

20   right?

21   A.    Yes.

22   Q.    And you did that because civil Title 8 enforcement is

23   usually in the purview of ERO, correct?

24   A.    I did that because while Title 8 or any sort of civil,

25   criminal or administrative enforcement is in the statutory

1    authority of HSI agents, we historically, in the recent time,

2    had not enforced those laws.  So in an effort to comply with

3    what my headquarters was asking, I wanted to confirm there was

4    a legal basis for arrest with Mr. Joyce.

5    Q.    Right.  So headquarters HSI told you to make the arrest,

6    but you checked in about it with William Joyce at ERO, correct?

7    A.    HSI headquarters said, "Do your best to find him.  If you

8    find him, arrest him."

9    Q.    And then you checked in about it with ERO, right?

10   A.    Correct.

11   Q.    And you checked in with ERO because they're the steward,

12   historically at least, of all things immigration that are civil

13   in Title 8, right?

14   A.    It's more of their priority mission set, yes.

15   Q.    And after checking in with ERO, that was when you

16   determined that Mr. Khalil could be arrested; is that right?

17   A.    I had confirmation from ERO that he was arrestable, given

18   the change in status referenced in the Secretary of State's

19   memo, at which point I informed -- I delegated the same

20   instructions of locate and arrest to people in my chain of

21   command.

22   Q.    You weren't there for the arrest, correct?

23   A.    I was not there for the arrest.

24   Q.    What you know about it is what the people who effected it

25   told you and whatever you saw in videos; is that right?

1    A.    And what I read in multiple records reports.

2    Q.    There were multiple reports about his arrest?

3    A.    There was a synopsis that was provided to me that night.

4    There was a synopsis emailed to me.  There was a traditional

5    report of investigation.  There was what I believe the judge

6    was just looking at, the report, I think it's an I-213.  I

7    think that's it.

8            MS. CONLON:  Okay.  I'm going to make the court aware

9    that that, to us, sounds like there are several more documents

10   relating to this arrest that we have not received, and I'll

11   just turn to finish this examination.

12   Q.    You don't know why HSI had to do this civil arrest of

13   Mr. Khalil rather than ERO, do you?

14   A.    Repeat the question.

15   Q.    You're not sure why it was that this got assigned to HSI

16   when it was a civil enforcement action as opposed to ERO,

17   correct?

18   A.    No, I'm not sure why.

19   Q.    You wondered about it at the time, and you still don't

20   know, correct?

21           MS. SANTORA:  Objection.

22           THE COURT:  Well, it's compound, so I'll sustain it.

23   Q.    You wondered at the time why it was coming to you,

24   correct?

25           MS. SANTORA:  Objection.

```
 1            THE COURT:  Overruled.

 2            THE WITNESS:  Am I answering that?

 3            THE COURT:  Yeah, you answer.

 4  A.   I wondered why HSI was effectuating this arrest, not ERO,

 5  yes.

 6  Q.   And you still don't know?

 7  A.   I don't know.

 8            MS. CONLON:  Nothing further.

 9            THE COURT:  Nothing further, Ms. Santora?

10            MS. SANTORA:  Nothing further.

11            THE COURT:  You may step down.  And may I have the

12  document back?  Simply because -- what we'll do is, the record

13  is clear I showed it to you.  Today we'll cause copies to be

14  made both to the government and for plaintiffs so you know

15  exactly what it is that I asked --

16            MS. CONLON:  Your Honor, with respect to those

17  additional documents, does the court know whether the court is

18  in receipt of these additional reports that the witness

19  mentioned?

20            THE COURT:  No.  I'm not going to be put in a position

21  of culling through everything.  I'm doing the best I can.

22  You're going to give me a list, and in addition to the list I

23  suppose you're going to give me a request, and I will take my

24  time promptly and address it.

25            MS. CONLON:  With respect to the next witness --
```

1    program, criminal investigator training where we receive

2    customs law, a little bit of immigration law as well as other

3    activities.

4    Q.    And after that training was complete, did you receive any

5    other training?

6    A.    Sure.  Throughout the course of my career and every

7    special agent's career, we get annual training, legal training,

8    firearms training, defensive tactics training.  Depending on

9    what type of investigative discipline you're assigned, whether

10   it is criminal investigations or Title 8 work, you receive

11   on-the-job training and sometimes advanced training as well.

12   Q.    So would it be fair to say that you've received continuous

13   training on law enforcement techniques?

14   A.    Yes, ma'am.

15   Q.    As the acting special agent in charge for the Washington,

16   D.C. area, how many people do you supervise?

17   A.    Between administrative and government law enforcement

18   officers as well as state and local task force officers, it's

19   roughly 400.

20   Q.    And of the agents that you supervise, do they also receive

21   the same training that you receive?

22   A.    The special agents do, yes.

23   Q.    And that includes continuous training on law enforcement

24   techniques as well?

25   A.    Yes, quarterly defensive tactics training as well as

1    firearms training.

2    Q.   What type of work do the agents that you supervise

3    perform?

4    A.   Agents under my purview, with any HSI special agent, we

5    conduct criminal investigations pursuant to Title 18 of the

6    U.S. Code, Title 19 of the U.S. Code, as well as Title 8

7    enforcement operations.

8    Q.   In your rather long career at HSI, have you personally

9    performed arrests?

10   A.   I have.

11   Q.   And are you familiar with the protocol surrounding arrest

12   operations?

13   A.   I am.

14   Q.   Are your agents that you currently supervise similarly

15   familiar with arrest protocols and practices?

16   A.   Yes, they are.

17   Q.   I would like to ask you a few questions about the arrest

18   of Mr. Badar Khan Suri.  Were you involved in that arrest in

19   any capacity?

20   A.   In charge of the field office, I oversaw the arrest, but I

21   was not physically present at the time of arrest.

22   Q.   So what was your role in the arrest?

23   A.   To oversee the administrative arrest of Badar Khan Suri.

24   Q.   Were normal HSI procedures followed with respect to

25   Mr. Suri's arrest?

1    A.   Again, I was not out there present on the street with the

2    arrest.  However, there would be no -- yes, the proper

3    protocols would have been followed if I would have been --

4         MS. CONLON:  Objection, Your Honor.  I'm moving to

5    strike this as speculative based on his response.

6         THE COURT:  Well, I'll let what he responded to stand

7    and I'll stop him at that point.  He doesn't know of any

8    deviation from procedure is what I get from him.

9    Q.   Would you have been informed if there were any deviations

10   from regular HSI procedures that occurred at Mr. Suri's arrest?

11        MS. CONLON:  Objection.  Calls for speculation.

12        THE COURT:  Sustained.  It does.

13   Q.   With respect to Mr. Suri, when did you first become aware

14   of Mr. Suri?

15   A.   Sometime in mid March.  I don't recall the specific date.

16   Q.   And how did you become aware of Mr. Suri?

17   A.   I received a phone call from our headquarters stating that

18   the Department of State may deem Mr. Suri removable and that he

19   may be amenable to administrative arrest at some point should

20   that removability happen.

21   Q.   And did you receive any instructions from headquarters on

22   what to do with respect to Mr. Suri at that time?

23   A.   Yes, sure.  Headquarters just stated to get out and start

24   beginning surveillance to try and locate Mr. Suri in the event

25   that the State Department deemed him removable.

1   Q.   Did HSI engage in this surveillance of Mr. Suri?

2   A.   We did, yes.

3   Q.   And at what point did HSI arrest Mr. Suri?

4   A.   A few days later.  Again, I don't remember the specific

5   dates.  I want to say I was notified on the weekend, and I

6   believe he was arrested on a Monday night, from my

7   recollection.

8   Q.   Are you familiar with how Mr. Suri was arrested?

9   A.   I'm aware that he was arrested in the Rosslyn, Virginia

10  area and taken into custody there administratively, yes.

11  Q.   Are you aware of any specifics with respect to Mr. Suri's

12  arrest?

13  A.   The specific arrest, he was apprehended in Rosslyn and

14  taken into custody as normal protocol policies would dictate.

15          MS. CONLON:  Objection, Your Honor.  Moving to strike

16  that last portion as speculative.

17          THE COURT:  He doesn't know any evidence that they

18  were not.  I'll let it stand for that.  Go ahead.

19  Q.   At any point were you told or was it ever suggested to you

20  that Mr. Suri was going to be arrested because of his support

21  for Palestine?

22          MS. CONLON:  Objection, form.

23          THE COURT:  Overruled.  I've allowed questions in this

24  form.  It goes to the heart of the case.  They may get his

25  answers.

1    A.   Can you repeat the question, please?

2    Q.   Sure.

3         THE COURT:  Were you ever told or was it suggested to

4    you that the reason for his arrest was his support for

5    Palestine?

6    A.   No.

7    Q.   Were you ever told or was it ever suggested to you that

8    Mr. Suri would be arrested because of his criticism of Israel?

9    A.   No, never told that.

10   Q.   Did you ever receive any communication of any kind at any

11   time indicating that Mr. Suri was being arrested because of his

12   political views?

13   A.   No.

14        MS. STROKUS:  I tender the witness, Your Honor.

15        THE COURT:  Thank you.

16        Any questions for this witness?

17        MS. CONLON:  No, I don't think we do.

18        THE COURT:  You may step down.  Thank you.

19        All right.  That concludes the testimony for today.

20   I'm not charging this last hour to anyone because witnesses

21   that are available and could be called clearly fall within the

22   stay of the Court of Appeals, and to honor that stay, it would

23   be unfair to charge the time.  Let me tote up the time that we

24   have used and we'll recess.

25        Total elapsed time, plaintiff three days, one hour, 35

1    minutes.  Defense, one day, three hours, five minutes.

2         One thing, anticipating that we may get Mr. Armstrong

3    back and I think we've discussed it sufficiently that I'm able

4    to rule.  I do rule that the assertion of the deliberative

5    privilege applies to those statements apparently of

6    Mr. Armstrong on the discussion letters, so I'm not going to

7    consider those statements.  However, given Mr. Armstrong's

8    central role here, he may be examined as to his views about the

9    matters where he has written something on those statements.

10        Should he not remember, the discussion letters may be

11   used to refresh his memory without them being in evidence, and

12   I think that's sufficient under the circumstances.

13        MS. CONLON:  Your Honor, may I -- sorry.

14        THE COURT:  Actually, I saw Ms. Santora first.  We'll

15   go with their side first, but I could use the recess.

16        Ms. Santora, anything before we recess?

17        MS. SANTORA:  Yes, Your Honor.  We do have documents

18   that the plaintiffs requested earlier today.

19        THE COURT:  Then they may of course be disclosed.

20        Mr. Kanellis.

21        MR. KANELLIS:  Your Honor, yesterday we raised the

22   question of the timing of the posttrial --

23        THE COURT:  You did and I didn't answer it.  I don't

24   know that I can answer it, but I'm thinking about it.

25        Here is what I'm thinking.  Suppose my hopes are

1   witnesses not covered by the First Circuit's order, and I would

2   like to hear those witnesses.  Thank you.  We'll recess.

3           (Adjourned, 12:17 p.m.)

4

5                           * * * * *

6               CERTIFICATE OF OFFICIAL REPORTER

7               I, Kelly Mortellite, Registered Professional

8   Reporter, Registered Merit Reporter and Certified Realtime

9   Reporter, in and for the United States District Court for the

10  District of Massachusetts, do hereby certify that the foregoing

11  transcript is a true and correct transcript of the

12  stenographically reported proceedings held in the

13  above-entitled matter to the best of my skill and ability.

14              Dated this  15th day of July, 2025.

15

16              /s/ Kelly Mortellite

17              _____

18              Kelly Mortellite, RPR, RMR, CRR

19              Official Court Reporter

20

21

22

23

24

25

# EXHIBIT 32

Petitioner's Appendix 468

```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MASSACHUSETTS (Boston)

 3                              No. 1:25-cv-10685-WGY

 4

 5     AMERICAN ASSOCIATION of UNIVERSITY PROFESSORS, et al,
                 Plaintiffs
 6

 7     vs.

 8

 9     MARCO RUBIO, in his official capacity as
       Secretary of State, et al,
10                 Defendants

11                          * * * * * * * * *

12

13
                          For Bench Trial Before:
14                        Judge William G. Young

15

16
                     United States District Court
17                   District of Massachusetts (Boston.)
                     One Courthouse Way
18                   Boston, Massachusetts 02210
                     Thursday, July 17, 2025
19

20                          * * * * * * * *

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                 United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                     rhr3tubas@aol.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3   RAMYA KRISHNAN, ESQ.
     CAROLINE DeCELL, ESQ.
 4   ALEXANDER ABDO, ESQ.
     SCOTT B. WILKENS, ESQ.
 5   ALEXANDRA CONLON, ESQ.
        Knight First Amendment Institute at Columbia
 6      University
        475 Riverside Drive, Suite 302
 7      New York, NY 10115
        (646) 745-8500
 8      E-mail: Ramya.krishnan@knightcolumbia.org
     and
 9   COURTNEY GANS, ESQ.
     NOAM BIALE, ESQ.
10      Sher Tremonte LLP
        90 Broad Street, 23rd Floor
11      New York, NY 10004
        (212) 540-0675
12      Email: Cgans@shertremonte.com
        For Plaintiffs
13

14   ETHAN B. KANTER, ESQ.
     WILLIAM KANELLIS, ESQ.
15   VICTORIA M. SANTORA, ESQ.
     JESSICA STROKUS, ESQ.
16      DOJ-Civ
        P.O. 878
17      Ben Franklin Station
        Washington, DC 20044
18      (202) 616-9123
        Email: Ethan.kanter@usdoj.gov
19   and
     SHAWNA YEN, ESQ.
20      United States Attorney's Office
        1 Courthouse Way, Suite 9200
21      Boston, MA 02210
        Email: Shawna.yen@usdoj.gov
22      For Defendants

23

24

25
```

Petitioner's Appendix 470

1                          I N D E X

2

3    WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

4

5    MOHAMED MAKLAD

6       By Mr. Kanellis          5

7       By Mr. Biale                      18

8

9    ANDRE WATSON

10      By Mr. Kanellis          26

11      By Ms. Krishnan                   60

12

13                        E X H I B I T S

14

15         EXHIBIT 240.............................. 22

16         EXHIBIT 241.............................. 22

17         EXHIBIT 242.............................. 80

18         EXHIBIT 243.............................. 97

19         EXHIBIT 244.............................. 98

20         EXHIBIT 245.............................. 99

21         EXHIBIT 246.............................. 99

22

23

24

25

1    at once.

2         So --

3         MS. KRISHNAN:  Your Honor, may I be heard on the

4    issue of documents?

5         THE COURT:  Yes.  Why don't you, once again,

6    introduce yourself.

7         MS. KRISHNAN:  Yes.  Good morning, your Honor, my

8    name is Ms. Krishnan.

9         THE COURT:  Yes.

10        MS. KRISHNAN:  So I'll start by saying that the

11   only documents that are part of the core documents that

12   we plan to cross-examination Mr. Watson on are the

13   letters that he authored that went to the State

14   Department, and our understanding is that the First

15   Circuit stay doesn't reach those documents because those

16   documents are ones over which the government only claims

17   the law enforcement privilege, and we had understood

18   your Honor to have overruled the assertion of that

19   privilege.

20        THE COURT:  And your understanding is correct.

21   Your understanding of what I've done is correct.  But I

22   read the order of the Court of Appeals -- and I'm not at

23   all clear that their understanding is the same as mine.

24        So unless the government agrees with you and has

25   no problem with -- I certainly accept your

```
 1    representation that there's no problem allowing cross-
 2    examination as to those transmittal letters, then I'd be
 3    fine.
 4          But Mr. Kanellis?
 5          MR. KANELLIS:  That's fine with us, your Honor.
 6          THE COURT:  Oh, it is?
 7          MR. KANELLIS:  Yes.
 8          THE COURT:  All right.
 9          MR. KANELLIS:  That is the --
10          THE COURT:  No, no, I'll hold her to it.  I mean
11    she's an officer of the court.
12          He made be called.
13          (Pause.)
14          THE COURT:  And while he's coming, are we clear
15    then that the only thing that remains for the
16    evidentiary presentation is the cross-examination of
17    Mr. Armstrong, if you press to have Armstrong as a
18    witness, is that right?
19          MS. KRISHNAN:  Yes, in addition to, um, one of
20    plaintiffs' witnesses, Professor Veena Dubal, who is the
21    General Counsel of AAUP.
22          THE COURT:  Yeah, when are we going to hear her?
23          MS. KRISHNAN:  Friday.
24          THE COURT:  Okay, thank you.
25          (ANDRE WATSON, sworn.)
```

```
1        THE CLERK:  And please state your full name and
2   spell your last name for the record.
3        THE WITNESS:  Yes, ma'am.  Andre Watson.  My last
4   name is spelled W-A-T-S-O-N.
5        THE CLERK:  Thank you.
6
7   * * * * * * * * * * * *
8   ANDRE WATSON
9   * * * * * * * * * * * *
10
11  DIRECT EXAMINATION BY MR. KANELLIS:
12  Q.   Good morning, Mr. Watson.  I'm going to call you
13  "AD Watson," because your title is "Assistant Director."
14  Is that all right with you?
15  A.   Yes, sir.
16  Q.   AD Watson, who do you work for?
17  A.   U.S. Immigrations and Customs Enforcement.
18  Q.   And what is your current position?
19  A.   The Assistant Director of the National Security
20  Division.
21  Q.   And for how long have you held the position of the
22  Assistant Director for the National Security Division?
23  A.   Since July of 2020.
24  Q.   Let's talk briefly about your background.  Where
25  did you grow up?
```

Petitioner's Appendix 474

```
 1   A.    I grew up in the Tidewater Region of Virginia,
 2   sir.
 3   Q.    And did you go to college?
 4   A.    Yes, sir.
 5   Q.    Where did you go to college?
 6   A.    Ultimately the Old Dominion University in Norfolk
 7   Virginia.
 8   Q.    After you graduated from college, um, what year
 9   was that actually?
10   A.    In 1993, sir.
11   Q.    And what did you do after you graduated from Old
12   Dominion University in 1993?
13   A.    I accepted an appointment to the position of
14   Special Agent with the United States Customs Service.
15   Q.    Briefly describe for the Court your
16   responsibilities as a Special Agent for the Customs
17   Service?
18   A.    Conducting criminal investigations as to
19   violations of customs and federal law, in addition to
20   revenue collection investigations in furtherance of
21   customs duties.
22   Q.    Was that your first employment with the federal
23   government?
24   A.    Yes, sir, it was.
25   Q.    May I ask you why did you want to work for the
```

1    federal government?

2    A.    I grew up in a house that had military backgrounds

3    with my father and I always saw a career either in the

4    military or in law enforcement.

5    Q.    How long did you remain as a Special Agent for the

6    U.S. Customs Service?

7    A.    Until the creation of the Department of Homeland

8    Security.

9    Q.    And when was that?

10    A.    March of 2003, sir.

11    Q.    Do you have an understanding, based upon your

12    experience, of why the Department of Homeland Security

13    was formed in 2003?

14    A.    Yes, sir, I do.

15         MS. KRISHNAN:  Objection.

16    Q.    What is your understanding?

17    A.    It was created in response to the terrorist

18    attacks that occurred on 9/11.

19    Q.    And what -- can you describe generally the changes

20    that occurred with respect to the U.S. Customs Service

21    in 2003?

22         MS. KRISHNAN:  Objection, relevance.

23         THE COURT:  No, no, he may do it.  Generally.

24         How did things change?

25    A.    For Special Agents assigned to the U.S. Customs

1   Service, we were merged with Special Agents from the

2   Immigration and Naturalization Service, and for

3   uniformed personnel with U.S. Customs Service, they were

4   merged with uniformed personnel from the Immigration and

5   Naturalization Service, and two agencies were created

6   therein, being one, um, Immigration and Customs

7   Enforcement, and the other being U.S. Customs and Border

8   Protection.

9           THE COURT:  Just so I'm clear, prior to this

10  merger, the first agency was in what Cabinet Secretary?

11          THE WITNESS:  For U.S. Customs Service, that was

12  within the Department of Treasury, your Honor.

13          THE COURT:  And --

14          THE WITNESS:  And the Immigration and

15  Naturalization Service was within the Department of

16  Justice.

17          THE COURT:  Understood.  Thank you.

18          THE WITNESS:  Yes, sir.

19  Q.    So since 2003, you said the Department of Homeland

20  Security was created.  Was the Department of Homeland

21  Security Investigations also created at that time?

22  A.    Um, ICE was.

23  Q.    Uh-huh.  And what about -- can you explain to the

24  Court the difference between ICE and HSI, if there is

25  one?

1   A.    Yes, sir.  Homeland Security Investigations is a

2   program office within U.S. Immigrations and Customs

3   Enforcement.

4   Q.    Okay.  Now since 2003, you've worked for HSI,

5   correct?

6   A.    Yes, sir.

7   Q.    And has HSI's mission changed or stayed the same

8   since 2003?

9   A.    It has stayed the same.

10  Q.    Have priorities changed with different

11  administrations since your -- since its inauguration in

12  2003?

13  A.    Yes, sir.

14  Q.    Can you give some examples of priorities changing

15  with different Presidential administrations?

16  A.    Yes, sir.  I can begin with during the Obama

17  administration that our priorities realigned to

18  organized crime and firearms trafficking, to include

19  firearms smuggling from the United States into the

20  Republic of Mexico.

21  Q.    Okay.  And were there any other changes after the

22  Obama administration left office?

23  A.    Yes, sir, with the first Trump administration.

24  Q.    Okay.  Now you're aware that this case centers

25  around HSI's enforcement of its Title VIII mission,

1    right?

2    A.    Yes, sir.

3    Q.    Can you explain to the Court briefly what your

4    understanding of the Title VIII mission is?

5    A.    The Title VIII mission for HSI focuses on

6    opportunities to conduct criminal investigations as it

7    relates to violations of United States Code.  That

8    sometimes goes into the space of Title VIII in areas

9    such as Alien smuggling and so forth.

10   Q.    Does Title VIII also include civil law violations?

11   A.    It can.

12   Q.    And in 2003, was HSI's mission, did it include the

13   ability to enforce civil immigration laws?

14   A.    Yes, sir.

15   Q.    And just to be clear, were HSI's authorities, in

16   2003, different than they are now?

17   A.    No, sir.

18   Q.    You've talked about, um -- strike that.

19        Has the emphasis on Title VIII enforcement changed

20   over time?

21   A.    Yes, sir, it has.

22   Q.    Well can you describe how it's changed?

23   A.    It has changed in areas like investigations --

24   criminal investigations, in furtherance of worksite

25   enforcement, labor trafficking.  So there have been

1    times where HSI Special Agents have leveraged

2    opportunities to conduct criminal investigations into

3    those activities and allegations.

4    Q.    And has the emphasis on Title VIII enforcement

5    changed with different administrations?

6    A.    Yes, sir.

7    Q.    Does the -- do these changes impact the way HSI

8    does business, in your experience?

9    A.    No, sir.

10   Q.    Can you explain to the Court why, if the

11   priorities regarding Title VIII are different, your

12   responsibilities remain the same?

13   A.    Pursuant to our statutory authority, by way of the

14   Homeland Security Act of 2003, as well as DHS delegation

15   Order 7030.2, we've always had that authority to conduct

16   criminal investigations to include enforcement of the

17   Immigration and Nationality Act.  So if we encounter a

18   scenario where we're conducting a criminal investigation

19   and we in turn identify an undocumented alien or a

20   foreign student that is present without inspection or

21   out of status or here otherwise contrary to law, we can,

22   in coordination with the principal legal advisor and/or

23   Enforcement and Removal Operations, take action.

24   Q.    Let's take a step back to your background for a

25   moment after you began working at HSI in 2003.

Petitioner's Appendix 480

1        Can you briefly describe for the Court your
2    professional background and promotions?
3    A.    Um, yes.  So again, beginning with my employment
4    as a Special Agent with the U.S. Customs Service, I
5    began in Atlanta, Georgia and served there for just
6    under 8 years.  And prior to that I took a reassignment
7    to the U.S. Customs Service post in Vancouver or British
8    Columbia as a Customs representative.  And from that
9    location I promoted out and became a Supervisory Special
10   Agent in the Wayne Washington field office.  At the time
11   we merged and became DHS and then ICE.  And then I took
12   reassignment to ICE headquarters serving as a Section
13   Chief and Unit Chief within the National Security
14   Division.
15       And then on to an Assistant Special Agent in
16   Charge in our Houston, Texas field office.  Then back to
17   headquarters to serve at the Department of Justice
18   International Organized Crime Intelligence Operations
19   Center.  And then a reassignment to the Office of the
20   Director to serve as the Chief of Staff to the Deputy
21   Director.  And then as a Deputy Special Agent In Charge
22   in the Washington, D.C. field office.  Then Special
23   Agent in Charge in the Baltimore, Maryland field office.
24   Before a detail assignment to DHS headquarters to serve
25   as the Principal Deputy Assistant Secretary for the

1    Countering of Weapons of Mass Destruction field office.

2    Q.    And what do you do now, again?

3    A.    The Assistant Director for the National Security

4    Division.

5    Q.    How many people work for the National Security

6    Division approximately?

7    A.    Up to 400 employees, sir.

8    Q.    What is the mission of the National Security

9    Division?

10   A.    Our mission is to leverage Customs and Immigration

11   Authorities through programmatic support for HSI Special

12   Agents that are assigned to the FBI's Joint Terrorism

13   Task Force, as well as the Counterintelligence Task

14   Force, to HSI Special Agents that are assigned to our

15   Human Rights Violators and War Crimes Center -- as well

16   as Unit, and also to our Special Agents that are working

17   in the Counterintelligence Development Unit.  And

18   finally, with regards to the Student and Exchange

19   Visitor Program compliance and oversight functions for

20   just over 7,000 certified schools and universities in a

21   student population of just under 1.3 million.

22   Q.    The Student and Exchange Visitors Program, I think

23   I mixed up that.  Can you describe that a little bit?

24   A.    Yes, sir.  So that has primacy for oversight and

25   compliance functions as it relates to colleges and

1    universities that are SEVP certified.  So you're looking

2    at a population of just under 7,000 schools.  But you

3    also have designated school officials, just under

4    40,000, that are certified by SEVP, to coordinate the

5    functions of schools and universities in compliance with

6    the code of federal regulations.  And again, the student

7    population is just under 1.3 million currently in the

8    United States.

9    Q.    How does the enforcement of immigration laws under

10   Title VIII touch on issues of national security?

11   A.    With regards to Title VIII, um, we are talking

12   about non-immigration Visa holders and overstays, alien

13   overstays, but also foreign students that are studying

14   in the United States.  So by way of the movement of

15   people comes the opportunity for the United States

16   government to screen and vet those persons that are

17   coming into the United States.

18        So through our lines of effort and through

19   partnerships across the agencies, we work hand and glove

20   with the Department of Justice and the Department of

21   State to identify risk and innate vulnerabilities as it

22   relates to individuals that are presenting themselves

23   for inspection or entry into the United States.  But

24   also while they're here in the United States, to ensure

25   that they are in compliance with the laws thereto.  If

1    there are threats or concerns that are raised, we
2    coordinate with the inner agency to take action as
3    appropriate.
4    Q.    Why do these threats or concerns cause -- or how
5    does that cause you, in the NSD, to take action?
6    A.    With threats and concerns, we look to activities,
7    associations, and/or conduct, and if there is linkage to
8    foreign terrorist organizations or there are other
9    national security or public safety concerns, those are
10   indicators of opportunities whereby further analysis and
11   review is required to determine if that person's
12   presence is contrary to law.
13   Q.    Since your work in 2003 with HSI, are you aware of
14   historical events where immigration concerns have
15   overlapped with the National Security Division's
16   mandate?
17   A.    Yes, sir.
18   Q.    And can you provide examples of those?
19   A.    Most recently, um, we've had instances of foreign
20   students that have made threats at colleges and
21   universities, and based on reports that came to the
22   attention of law enforcement either by way of local
23   law-enforcement representatives assigned to the Joint
24   Terrorism Task Forces or to the school officials.  HSI
25   was brought in to conduct criminal investigations in

1    coordination with the JTTF in the case of one school,

2    and in the case of another, after the fact, successfully

3    taking action by one, issuing NTAs, in the case of one

4    school, for individuals that were arrested on state

5    charges, and in the instance of the other, issuing an

6    NTA pursuant to a threat made by a student against a

7    university Professor.

8        THE COURT:  What's an "NTA"?

9        THE WITNESS:  A "Notice to Appear," your Honor.

10       THE COURT:  Thank you.

11   Q.    And are there other historical events where the

12   National Security Division has investigated matters

13   relating to immigration?

14   A.    Yes, sir, there is a continuous requirement in

15   that space where the National Security Division has

16   supported our Special Agents that are assigned to the

17   Joint Terrorism Task Forces, and I have the privilege of

18   seeing that information by way of reporting from my

19   personnel at FBI headquarters, sir.

20   Q.    Okay.  Was the Boston Marathon Bombing, was that

21   an example of such an immigration-related national

22   security concern?

23   A.    Yes, sir.

24   Q.    And how about the San Bernadino attack?

25   A.    Yes, sir.

1  Q.    Okay, let's be clear about something.  Does HSI

2  make evaluations about whether someone may or may not

3  receive a Visa?

4  A.    Yes, sir.

5  Q.    You make the evaluations or -- or how do you make

6  those evaluations?

7  A.    We contribute to that process.

8  Q.    I see.  And has that always been the case since

9  HSI was formed in 2003?

10  A.    To the best of my knowledge.

11  Q.    Does HSI make decisions to revoke a visitor's

12  Visa?

13  A.    No, sir.

14  Q.    What agency do you understand makes that decision?

15  A.    The Department of State, sir.

16  Q.    You were aware of the charges in the complaint,

17  um, filed by the American Association of University

18  Professors and other organizations, right?

19  A.    Yes, sir.

20  Q.    I'm going to refer to that organization as AAUP.

21        Are you familiar with the allegations that the

22  government is targeting certain foreign Visa and green

23  card holders for protesting?

24  A.    Yes, sir.

25  Q.    So that we can address them, describe your

1    A.    Yes, sir.

2    Q.    Are you familiar with this document?

3    A.    Yes, sir.

4    Q.    Briefly describe for the Court what is this

5    document?

6    A.    "Protecting the United States Against Foreign

7    Terrorists and other National Security and Public Safety

8    Threats."

9    Q.    And when did you, um, see this document for the

10   first time?

11   A.    The latter part of January 2025, sir.

12   Q.    And this came from President Trump's office,

13   correct?

14   A.    Yes, sir.

15   Q.    And what was your understanding of what this order

16   related to?

17   A.    Screening and vetting of, um, foreign nationals

18   and aliens.

19   Q.    When you received this Executive Order, did HSI

20   already conduct screening and vetting of foreign aliens?

21   A.    Yes, sir.

22   Q.    What did you do with respect to your

23   responsibilities in your office in response to this, um,

24   upon receipt of this Executive Order?

25   A.    Ensured that my subordinate staff, one, was aware,

1    and to executing operations accordingly.

2    Q.    What do you mean by "executing operations

3    accordingly"?

4    A.    Existing screening and vetting operations, sir.

5    Q.    And can you elaborate a little bit about what that

6    means in terms of what the National Security Division

7    actually did?

8    A.    Yes, sir.  So through process on an annual basis,

9    the National Security Division receives just under 1.3

10    million records from the U.S. Customs and Border

11    Protection arrival and departure information system.  In

12    addition to that, we also receive records from the

13    Student Exchange Visitor Information System, and we also

14    receive records from the Department of State Bureau of

15    Consular Affairs as it relates to potential overstays

16    that are believed to be within the Continental United

17    States.

18    Q.    Did you understand this Executive Order, when you

19    reviewed it and received it, to change HSI's authorities

20    in any way?

21    A.    No, sir.

22    Q.    Did you understand this Executive Order to change

23    HSI's protocols for arrest or investigation?

24    A.    No, sir.

25    Q.    Did it change or alter the tools HSI already had

1    available with respect to conducting investigations?

2    A.    No, sir.

3    Q.    Did you -- did HSI, in response to this Executive

4    Order, and your office in particular, develop a plan of

5    action to implement the objectives of this Executive

6    Order?

7    A.    Yes.

8    Q.    And can you describe, um, generally to the Court

9    what did that plan entail?

10   A.    That plan entailed a unit within the Office of

11   Intelligence to process referrals, um, from a variety of

12   sources, um, to complement the Executive Order and our

13   existing lines of effort.

14   Q.    Did that, um, initiative that you've just

15   described involve coordination with the Department of

16   State?

17   A.    Yes, sir.

18   Q.    And can you describe for the Court, um -- well,

19   strike that.

20        Had -- prior to this Executive Order, had HSI in

21   the past coordinated with the Department of State to

22   implement national security interests?

23   A.    Yes, sir.

24   Q.    And describe how you've done so, you, HSI and NSD,

25   have done so in the past?

1  A.    So in the past, with regards to coordination from

2  the Department of State, we've had that through our

3  Human Rights Violators and War Crimes Center, we've had

4  the pleasure of a virtual and/or part-time

5  representative from the Department of State supporting

6  that initiative in the space of human rights violators

7  and war criminals.

8        Conversely, we've also leveraged that Department

9  of State asset through our Counterthreat Lead

10 Development Unit, as it relates to international

11 military students that are in the United States, that

12 sometimes go absent without leave.  And upon receiving

13 notifications from the Department of Defense of that

14 declaration, we then in turn coordinate with the

15 Department of State to make sure that they are aware of

16 that status issue, and then take appropriate action as

17 deemed necessary.

18 Q.    With respect to the Executive Order that is

19 contained in Exhibit 7, you indicated you coordinated

20 with State.  Well how did you -- what steps did you take

21 to coordinate with State?

22       THE COURT:  Actually I'm going to interrupt.

23       Your testimony is that following the Executive

24 Order, you developed a plan of action concerning these

25 matters.

1          Is that written down anywhere?

2          THE WITNESS:  Not to my knowledge, sir.

3          THE COURT:  All right.  Describe it, as best you

4    can, what's the plan now?

5          THE WITNESS:  The plan was -- a team, based within

6    the Office of Intelligence, that would conduct analysis

7    on referrals from a variety of sources and prepare

8    Reports Of Analysis for review and consideration and

9    potential referral to the Department of State.

10         THE COURT:  And these Reports of Analysis, I've

11   heard them referred to as "ROAs," is that correct?

12         THE WITNESS:  Yes, your Honor.

13         THE COURT:  And that's -- in essence, that's the

14   plan?

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  Go ahead, Mr. Kanellis.

17         MR. KANELLIS:  Your Honor, you anticipated my next

18   line of questions.

19         THE COURT:  Well go ahead.

20   Q.    Which is, um, AD Watson, for purposes of this

21   trial, have you reviewed a visual depiction of the

22   collaborative process between DHS and State?

23   A.    Yes, sir.

24   Q.    And would this chart help you to explain to the

25   Court in understanding how that process worked?

```
 1   A.     Yes, sir.
 2          (Interruption.)
 3          THE COURT:  He hasn't shown it to you yet.  You're
 4   assuming it will help you.  I assume he's going to show
 5   you what we have marked as HN.
 6          Is that right?
 7          MR. KANELLIS:  HO?
 8          THE COURT:  Well maybe this is something else.
 9   All right.
10          MR. KANELLIS:  I'm not sure about HO.  I have the
11   exhibit here, your Honor, and we will --
12          (On screen.)
13          MR. KANELLIS:  Your Honor, may I approach?
14          THE COURT:  You may.
15          (Hands to witness and judge.)
16   Q.     AD Watson, we have on the screen here a visual
17   PowerPoint presentation to assist in your testimony to
18   the Court.
19          Can you describe to the Court, in a little more
20   detail, how this initiative between State and DHS works
21   with respect to DHS's response to the Executive Order?
22   A.     Yeah.  So as I understand it, the HSI Office of
23   Intelligence was the "process owner," if you will, by
24   way of their employees being criminal analysts to
25   conduct analyses of referrals of information from a
```

1    variety of sources.  Those analysts in turn, um, upon

2    receipt of those referrals, would conduct open-source

3    analysis and various checks to, one, validate the

4    availability of information and/or the referral, and

5    they would put together what's called a Report of

6    Analysis.  That Report of Analysis was prepared and

7    reviewed and ultimately submitted for approval within

8    the Office of Intelligence leadership framework, and

9    then from there, um, with a letterhead memorandum

10    prepared, in coordination with the Office of the

11    Principal Legal Advisor as well as HSI's Special Agents

12    assigned to the Office of Intelligence on detail, a

13    package for referral to me as the Assistant Director.

14    Q.    Okay.  And so here we have, on the screen,

15    depicting the HSI Director for National Security -- the

16    Assistant Director for National Security Division, and

17    that's you?

18    A.    Yes, sir.

19    Q.    Now what did you do when you received this packet?

20    A.    Upon receipt of the approved packet, um, I then

21    reviewed the letterhead, um, memorandum -- the

22    letterhead memorandum letter, as well as the ROA, and

23    with approval signed it, meaning I'm approving the

24    submission package together, and providing a digital

25    signature, and then referred it to the Department of

1    A.    Yes, ma'am.  I don't have it in front of me.

2    Q.    It's being pulled up on the screen.

3    A.    Okay.  (Looks.)

4    Q.    All right.  I'm going to ask you again.

5          Is ICE enforcing the Executive Order 14188?

6    A.    So, Counselor, I only see Page 1 in front of me,

7    and this Executive Order speaks to specific lines of

8    effort and gives primacy to various departments.  So

9    I'll reference in Section 3, um, Section C, that the

10   attorney in general is encouraged to employ appropriate

11   civil rights enforcement authorities.  ICE is a

12   component within the Department of Homeland Security and

13   not within that framework.  So since I can only see the

14   first page, I don't think it's wise to speak beyond that

15   under oath.

16   Q.    And, Mr. Watson, you were deposed in this case,

17   correct?

18   A.    Yes.

19   Q.    You were deposed just over a month ago on June

20   11th?

21   A.    The month of June, yes.  The date I don't

22   remember.

23   Q.    And you understood that you were then under oath?

24   A.    Yes.

25   Q.    And you had an attorney present with you at that

1  deposition?

2  A.    Yes.

3  Q.    You were asked this question and gave this answer

4  at that deposition.

5      Question:  "So as you indicated in your

6  declaration, ICE enforces the Executive Order 14188,

7  correct?"  And your answer was "Yes, ma'am"?

8      MR. KANELLIS:  Objection, your Honor.  Can the

9  witness and can I see the transcript so we can --

10      THE COURT:  Well she's read it, and in these

11  circumstances, she's entitled to read it.  If she wants

12  to question him, then she should show it to him.  But

13  that's what he said on his deposition and I'm allowed to

14  pair it with his testimony at trial, and I do.

15      Go ahead.  Go ahead, Ms. Krishnan.

16      MS. KRISHNAN:  Thank you.

17  Q.    HSI is implementing the two Executive Orders we've

18  discussed?

19      MR. KANELLIS:  I'm going to object again, your

20  Honor, what she said mischaracterizes --

21      THE COURT:  Wait a minute.  When I need your

22  argument, I'll ask for it.  The objection is sustained.

23      See he hasn't said it.

24      MS. KRISHNAN:  I was reading from the data, but I

25  believe we've now got the deposition transcript up on

1    the screen.  And this starts at the bottom of Page 11,

2    um, 111, my apologies, and it runs on to the top of 112.

3         (On screen.)

4    Q.    So it says:  "So as you indicated in your

5    declaration, ICE enforces this Executive Order 14188,

6    correct?"  And the answer states, "Yes, ma'am."

7         You said that, right?

8    A.    It's captured in the transcript, Counselor.

9    Q.    Okay, thank you.

10        And HSI is implementing --

11   A.    I'm sorry, the screen just went dark.  I

12   apologize.  I can't see it anymore.

13   Q.    Understood.  I'm not asking -- this question isn't

14   about your deposition transcript.

15        HSI is implementing EO 14161 and EO 14188, is that

16   right?

17   A.    (Looks.)  HSI has participated in support of

18   Enforcement and Removal Operations as it relates to

19   Title VIII initiatives.  So by virtue of that support

20   that HSI, as a program office, has provided to ERO, that

21   that can apply on a large macro scale.  But I can't

22   speak to individual instances as I do not have oversight

23   of every operation or investigation that is being

24   conducted in the United States.

25   Q.    HSI has implemented the Executive Orders we've

1    discussed by initiating a new program, right?

2    A.    That's fair.

3    Q.    Uh-huh.  And you learned of this program through

4    an executive briefing in March?

5    A.    That's correct.

6    Q.    Attended by senior HSI leaders?

7    A.    That's correct.

8    Q.    Including Acting Deputy Executive Associate

9    Director Derrick Gordon?

10    A.    Gordon, yes.

11    Q.    And then Acting Executive Associate Director

12    Robert Hammer?

13    A.    That's correct.

14    Q.    Assistant Director of the Office of Intelligence

15    Peter Hatch was also present?

16    A.    That's correct.

17    Q.    As was your deputy, Bradley Etter?

18    A.    That's correct.  Well not my deputy, Mr. Etter is

19    the deputy of Assistant Director Peter Hatch.  Mr. Etter

20    works within the Office of Intelligence.  He's not my

21    deputy.

22    Q.    Understood.  And the purpose of this program, what

23    you called the Plan of Action letter, it was to identify

24    protesters whose actions violated the Executive Orders?

25    A.    (Pause.)  The plan of action was to address the

1           MS. KRISHNAN:  That's correct.

2           THE COURT:  All right.  I follow that.

3           Is that what you were told?  Is that what you were

4    expected to emphasize or focus on, Reports of Analysis

5    of conduct that, among other things, ran contrary to the

6    President's Executive Orders?

7           THE WITNESS:  That was a deliverable that would be

8    produced upon completion of analysis.  So it's an

9    output, your Honor, that could result from their efforts

10   to review information received from various sources.

11          THE COURT:  Right, I follow that.  So let me put

12   it to you another way.

13          One of the things you were directed to do was look

14   at your leads and see if, having done your professional

15   work, there's conduct contrary to the Executive Orders?

16          THE WITNESS:  Yes, sir, your Honor.

17          THE COURT:  All right.

18          Go ahead, Ms. Krishnan.

19          MS. KRISHNAN:  Thank you.

20   Q.    And these reports were then sent to the National

21   Security Division?

22   A.    If they were approved.

23   Q.    Approved by the Office of Intelligence?

24   A.    That's correct.

25   Q.    Uh-huh.  And upon receipt of these reports, the

1    National Security Division reviews them?

2    A.    That's correct.

3    Q.    And if the National Security Division determines

4    that an ROA should be referred to the State Department

5    for potential action, it refers that Report of Analysis

6    to the State Department?

7    A.    In coordination with the Office of the Principal

8    Legal Advisor.

9    Q.    Senior leaders at HSI have been continually

10   updated about the new program, correct?

11   A.    I don't understand the question in terms of

12   "continually updated"?

13   Q.    Well have senior leaders received updates about

14   the new program?

15   A.    They have received briefings and updates on the

16   work and progress thereto.

17   Q.    This program has been discussed in numerous

18   meetings since the executive briefing, right?

19   A.    (Pause.)  It has come up on several occasions from

20   its inception, but I can't say when those briefings

21   ceased.

22   Q.    Well it has been discussed on at least a weekly

23   basis, right?

24   A.    At its inception, yes.

25   Q.    And in these meetings, senior HSI leaders were

1    present?

2    A.    Yes.

3    Q.    I want to talk more about your role in the process

4    we've been discussing.

5          You received instructions in connection with the

6    process, right?

7    A.    Yes.

8    Q.    From senior HSI leaders?

9    A.    Yes.

10   Q.    Including Derrick Gordon?

11   A.    Yes.

12   Q.    And Robert Hammer?

13   A.    Yes.

14   Q.    You were instructed to make referrals to the State

15   Department?

16   A.    Yes, when deemed appropriate.

17   Q.    Uh-huh.  These referrals included the Report of

18   Analysis?

19   A.    Yes.

20   Q.    And an accompanying letter?

21   A.    Yes.

22   Q.    That was signed by you?

23   A.    Yes.

24         THE COURT:  I just want to get the names right.

25   From Derrick Gordon and Robert --

1          THE WITNESS:  Hammer.

2          THE COURT:  Hammer.  Yes.  Thank you.

3    Q.    And when deemed appropriate, you sent these

4    referrals directly to John Armstrong?

5    A.    He was one recipient, yes.

6    Q.    He's the head of the State Department's Bureau of

7    Consular Affairs?

8    A.    That is my last understanding.

9    Q.    HSI couldn't act on these referrals alone?

10   A.    Correct.

11   Q.    HSI needed Secretary of State Marco Rubio or

12   Senior Bureau Official John Armstrong to decide whether

13   it was appropriate for HSI to act or not?

14   A.    (Pause.)  Their decision is pursuant to their

15   authorities, not ours.

16         THE COURT:  Well I think what she's asking is you

17   understood that, um, when she says you "needed them"

18   under the law to take it any further, it was a decision

19   that resided by law in the Secretary of State or in some

20   instances Mr. Armstrong, is that what you thought?

21         THE WITNESS:  Yes, your Honor.

22         THE COURT:  All right.

23   Q.    And some of these referrals sought the Secretary

24   of State's assessment whether a noncitizen's activities

25   in the U.S. would compromise a compelling U.S. foreign

```
 1   policy interest, right?
 2   A.    Correct.
 3   Q.    In some of these referrals, it was the State
 4   Department's assessment whether to revoke a Visa,
 5   correct?
 6   A.    Correct.
 7   Q.    You had conversations with the State Department
 8   about these referrals?
 9   A.    Only to inform that they are coming.
10   Q.    Okay.  The first time you had one of these
11   conversations was in March?
12   A.    That seems accurate.
13   Q.    You made the referral in Mahmoud Khalil's case?
14   A.    I signed the letter, yes.
15   Q.    And in Yunseo Chung's case?
16   A.    I signed that letter too.
17   Q.    In Rumeysa Ozturk's case?
18   A.    I signed that letter.
19   Q.    In Mohsen Mahdawi's case?
20   A.    I signed that letter.
21   Q.    In Badar Khan Suri's case?
22   A.    I signed that letter.
23   Q.    And these referrals I just mentioned, they were
24   part of any process we've been discussing?
25   A.    Yes.
```

1    referrals of information, um, as it relates to it.  So I

2    can't say, as you stated, that is the plan of action,

3    that's not what I recall specifically.

4    Q.    But you became aware of activities at student

5    protests from the Reports of Analysis, that was your

6    testimony?

7    A.    Me personally, yes.

8    Q.    Okay.  And the program we'd been discussing, it

9    led to a new process, right?

10   A.    I don't know that it's a new process, because I

11   can't speak to the lines of effort that the Office of

12   Intelligence already has in place.

13   Q.    Well I'm going to return to the deposition

14   transcript.  (Pause.)  All right, well before I get to

15   the transcript.

16         This process was new in your time at HSI, is that

17   right?

18   A.    It's new in my role as the Assistant Director

19   where we, by way of the National Security Division, are

20   providing a resource in support thereof.

21   Q.    Were you aware of this process before you assumed

22   your current role as Assistant Director in the National

23   Security Division?

24   A.    Not to my knowledge, no.

25   Q.    Okay.  And the process we're discussing, that

Petitioner's Appendix 503

1                    C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5     hereby certify that the forgoing transcript of the

6     record is a true and accurate transcription of my

7     stenographic notes, before Judge William G. Young, on

8     Thursday, July 17, 2025, to the best of my skill and

9     ability.

10

11

12

13
     /s/ Richard H. Romanow 07-17-25
14   _____
     RICHARD H. ROMANOW  Date
15

16

17

18

19

20

21

22

23

24

25

Petitioner's Appendix 504