UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |
| | § | |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

**PETITIONER'S MOTION FOR TEMPORARY RESTRAINING ORDER ON COUNTS
II & III OF HER AMENDED HABEAS PETITION**

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iii

I. INTRODUCTION ........................................................................................................ 1

II. BACKGROUND .......................................................................................................... 2

      A.      DHS Is Confining Ms. Kordia at the Prairieland Detention Facility. ..................... 2

      B.      The Magistrate Judge Finds the Automatic-stay provision Likely Unconstitutional as Applied to Ms. Kordia, but DHS Tries to Moot the Recommendation. ............. 4

      C.      Respondents Once Again Confine Ms. Kordia Under the Automatic-stay provision, Even Though DHS Conceded Ms. Kordia Met Her Burden of Disproving Supposed Dangerousness. ................................................................. 5

III. NATURE & STAGE OF PROCEEDINGS .............................................................. 8

IV. STANDARD OF REVIEW ....................................................................................... 9

V. ARGUMENT .............................................................................................................. 9

      A.      Ms. Kordia Is Likely to Succeed on the Merits of Her Challenge to the Automatic-stay provision. .................................................................................... 10

      B.      Ms. Kordia Is Likely to Succeed on the Merits of Her Substantive Due Process Claim. ................................................................................................................... 13

      C.      The Remaining Factors Favor Issuing a Temporary Restraining Order. .............. 15

VI. CONCLUSION........................................................................................................ 16

CERTIFICATE OF CONFERENCE............................................................................ 19

CERTIFICATE OF SERVICE ..................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Altagracia Almonte-Vargas v. Elwood*,
No. 02-cv-2666, 2002 WL 1471555 (E.D. Pa. June 28, 2002)................................................. 13

*Arias Gudino v. Lowe*,
No. 1:25-CV-00571, 2025 WL 1162488 (M.D. Pa. Apr. 21, 2025)........................................... 15

*Foucha v. Louisiana*,
504 U.S. 71 (1992)............................................................................................................. 13

*Günaydın v. Trump*,
2025 WL 1459154 (D. Minn. May 21, 2025) ......................................................................... 11, 12

*Hamama v. Adducci*,
Civ. No. 17-11910, 2018 WL 1905074 (E.D. Mich. Apr. 23, 2018)........................................ 12

*Jacinto v. Trump*,
No. 4:25-cv-3161, 2025 WL 2402271 (D. Neb. Aug. 19, 2025)............................................. 11

*Ky. Dep't of Corr. v. Thompson*,
490 U.S. 454 (1989)........................................................................................................... 10

*Leal-Hernandez v. Noem*,
No. 1:25-cv-02428, 2025 WL 2430025 (D. Md. Aug. 24, 2025).................................... 11, 13, 14

*Maldonado v. Olson*,
No. 25-cv-3142, 2025 WL 2374411 (D. Minn. Aug. 15, 2025)............................................. 11

*Mathews v. Eldridge*,
424 U.S. 319 (1976)........................................................................................................... 4, 10

*Matter of Guerra*,
24 I. & N. Dec. 37, 40 (B.I.A. 2006) .................................................................................... 2

*Mohammed H. v. Trump*,
No. 25-cv-1576, 2025 WL 1692739 (D. Minn. June 17, 2025) ............................................. 14

*Nuziard v. Minority Bus. Dev. Agency*,
676 F. Supp. 3d 473 (N.D. Tex. 2023) ................................................................................. 15

*Smith v. Tarrant Cty. Coll. Dist.*,
670 F. Supp. 2d 534 (N.D. Tex. 2009) ................................................................................. 9

*Speaks v. Kruse*,
445 F.3d 396 (5th Cir. 2006) ................................................................................................ 9

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ........................................................................................................... 10

**Rules**

Fed. R. Civ. P. 65 ............................................................................................................. 8, 9

**Regulations**

8 C.F.R. § 1003.19 ......................................................................................................... 3, 4, 9
8 C.F.R. § 1003.6 ............................................................................................................. 3, 4

Petitioner, Leqaa Kordia, respectfully requests this Court issue a temporary restraining order directing Respondents Kristi Noem, Pamela Bondi, Todd Lyons, Josh Johnson, and Thomas Bergami (collectively, "Respondents") to release Ms. Kordia during the pendency of any appeal of the immigration judge's August 28, 2025, order finding Ms. Kordia releasable on a $20,000 bond.

## I.    INTRODUCTION

Just two months after Magistrate Judge Rebecca Rutherford found an automatic administrative stay of Ms. Kordia's release likely unconstitutional, the Department of Homeland Security ("DHS") doubled down last night by invoking another one to bar her release. Yesterday, August 28, 2025, the immigration judge ordered Ms. Kordia releasable on a $20,000 bond, for the second time since the start of Ms. Kordia's confinement, after holding a custody redetermination hearing. At the hearing, DHS conceded that Ms. Kordia had met her burden to prove her release would not pose a danger to the community, chose not to cross-examine Ms. Kordia, and declined to present any closing argument. Despite its concessions and failure to present evidence, DHS invoked the automatic-stay provision later that night. This second automatic stay could keep Ms. Kordia confined unlawfully for another three months or more.

It is now apparent that Respondents will stop at nothing to keep Ms. Kordia confined as punishment and retaliation for exercising her First Amendment right to express support for the lives and freedom of Palestinians and mourn the nearly 200 members of her own family killed by military violence. An immigration judge has twice granted Ms. Kordia release on bond, and Judge Rutherford recommended her immediate release from custody, yet Respondents continue to maneuver to keep Ms. Kordia unlawfully confined. Without judicial intervention, their punitive and retaliatory procedural gamesmanship will persist.

## II.    BACKGROUND

### A.  DHS Is Confining Ms. Kordia at the Prairieland Detention Facility.

DHS is currently confining Ms. Kordia as part of an unprecedented crackdown on First Amendment rights. *See generally* Am. Pet. for Writ of Habeas Corpus & Compl., Dkt. 69 ("Am. Pet.").[1] Through presidential executive orders, the adoption of new agency operating procedures, public statements, and individual enforcement actions, the executive branch adopted a policy of suppressing advocacy supporting Palestinian rights ("the suppression policy"), by surveilling, arresting, confining, and attempting to deport noncitizens associated with such advocacy, starting with Mahmoud Khalil and Ms. Kordia. *Id.* ¶¶ 40–71, 87–139. Record evidence makes clear that the suppression policy is driving DHS's confinement of Ms. Kordia, including: DHS and other federal officials' description of the suppression policy, Ms. Kordia's vocal support for Palestinian rights, DHS's investigation into every aspect of her life, and the lengths DHS has gone to in order to keep Ms. Kordia confined since March. *Id.* ¶¶ 72–86.

Ms. Kordia has sought her liberty through administrative processes, but DHS has thwarted her at every turn through procedural machinations. Ms. Kordia promptly exercised her right to seek a custody redetermination on March 26, 2025. *Id.* ¶ 167. In order to grant release on bond, an immigration judge must determine that an individual is not a danger to the community and that conditioning release on the payment of a bond would address any risk of flight they may present. *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006).

In support of her request for release on bond, Ms. Kordia submitted numerous letters of support from friends and family members, showing the extensive community she has built in New Jersey. Am. Pet. ¶ 168. This includes multiple United States citizen family members, including her

---

[1] For ease, citations to the Amended Petition expressly incorporate the supporting documents cited therein.

mother and brother, both of whom suffer hardship because of Ms. Kordia's confinement. *Id.*

At the April 3, 2025, custody hearing, DHS argued that Ms. Kordia was both a danger to the community and a flight risk. In claiming that Ms. Kordia was a danger to the community, DHS relied on two premises: (1) Ms. Kordia was briefly arrested by local police in connection with a protest near Columbia University in 2024, and (2) she had sent money to individuals in Palestine. *Id.* ¶ 169. When pressed, DHS could not identify on which dates it believed Ms. Kordia had sent funds, the total amount, or why the identity of any recipient rendered Ms. Kordia a supposed danger, except to insinuate that *any* transfer of funds to persons in Jordan, the West Bank, Gaza, or Turkey was somehow suspect and indicative of support for terrorism. *Id.*

At the conclusion of the custody hearing, the immigration judge issued an oral decision permitting Ms. Kordia's release on bond. *Id.* ¶ 170. Thereafter, on April 16, 2025, the immigration judge issued a written decision memorializing the grant of bond. *Id.*

Instead of resulting in Ms. Kordia's release, the immigration judge's decision prompted months of procedural machinations from DHS to keep Ms. Kordia confined for no lawful purpose. By regulation, DHS may unilaterally prevent an immigration judge's custody redetermination from going into effect whenever DHS believes a noncitizen "should not be released." 8 C.F.R. § 1003.19(i)(2). This means the person will necessarily remain in custody until either the Board of Immigration Appeals ("BIA") decides the custody redetermination appeal or ninety days pass. *Id.* § 1003.6(c)(4). Since DHS has ten days to file the notice of appeal before the ninety-day clock begins, the automatic-stay provision creates a 100-day due-process-free zone where there is no ability to be heard at a meaningful time, nor present evidence and argument to a neutral arbiter. *Id.* And at the end of the automatic stay period, the immigration judge's order to release a noncitizen on bond remains stayed for up to thirty days while the BIA considers any request for a discretionary

stay. *Id.* § 1003.6(c)(5). Thus, the regulations permit a 130-day period of confinement without *any administrative procedures* to contest or challenge that confinement.

Incredibly, and in a departure from prior agency practice, DHS exercised its automatic stay power in Ms. Kordia's case, despite her lack of criminal history and the agency's own rating of her as low risk. Am. Pet. ¶ 173. In effectuating the automatic stay, DHS did not have to make any showing, and Ms. Kordia did not have any chance to respond. *Id.* DHS merely had to file a piece of paper to keep Ms. Kordia confined. *Id.*

**B. The Magistrate Judge Finds the Automatic-Stay Provision Likely Unconstitutional as Applied to Ms. Kordia, but DHS Tries to Moot the Recommendation.**

In a thorough and well-reasoned decision, Judge Rutherford recommended this Court grant Ms. Kordia's Motion for a Preliminary Injunction Ordering Release Pending Final Judgment. In issuing her recommendation, Judge Rutherford found Ms. Kordia likely to succeed on her procedural due process claim, because the automatic stay procedures outlined in 8 C.F.R. §§ 1003.19(i)(2) and 1003.6(c) lack constitutionally required procedural protections for Ms. Kordia's significant liberty interest. Findings, Conclusions, and Recommendation, Dkt. 53 at 14–19 ("FCR"). Specifically, she applied the balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which considers: "(1) 'the private interest that will be affected by the official action,' (2) 'the risk of an erroneous deprivation of such interest through [available] procedures,' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Id.* at 15–16 (quoting *Mathews*, 424 U.S. at 334–35).

Applying these factors, Judge Rutherford found the automatic-stay provision restricts Ms. Kordia's "significant liberty interest in being free from detention," FCR at 16, and "creates a serious risk of erroneous deprivation" because it takes effect "without requiring DHS to meet—or

even consider—any threshold standard," *id.* Nor can Ms. Kordia challenge the "the imposition of the stay." *Id.* As to the government's interest in the procedures, Judge Rutherford found "nothing in the record to suggest that imposing additional procedural requirements . . . would impose any fiscal or administrative burden." *Id.* at 18.

Judge Rutherford also found a preliminary injunction is necessary to prevent "a substantial threat of irreparable harm" and to be "in the public interest." *Id.* at 19–21. Accordingly, Judge Rutherford recommended that this Court enter a preliminary injunction "ordering [Ms. Kordia's] immediate release from immigration detention pending a final judgment on her underlying habeas claim." *Id.* at 22. Judge Rutherford specifically found that Ms. Kordia had "already been detained for more than two months since the [immigration judge] determined she should be released," *id.* at 17, on a likely unconstitutional basis, *id.* at 18–19.

DHS, though, almost immediately tried to thwart the FCR by seeking a discretionary stay from the BIA on July 2, 2025. Am. Pet. ¶ 175. Even though the mere filing of a motion for a discretionary stay keeps the automatic stay in effect for thirty days while the BIA decides whether to issue a discretionary stay, the BIA granted the discretionary stay the next day, in an unreasoned decision, and without affording Ms. Kordia an opportunity to respond. *Id.*

Given this last-minute gamesmanship, District Judge Sam. A. Lindsay recommitted the Motion for Preliminary Injunction back to Judge Rutherford in light of the new facts. Dkt. 65.

**C. Respondents Once Again Confine Ms. Kordia Under the Automatic-stay provision, Even Though DHS Conceded Ms. Kordia Met Her Burden of Disproving Supposed Dangerousness.**

Today, even after the FCR finding the automatic-stay provision likely unconstitutional, DHS is once again confining Ms. Kordia pursuant to the automatic-stay provision. On August 11, 2025, the BIA remanded the immigration judge's April 3, 2025, bond decision back to the immigration judge for the issuance of a new decision after further fact-finding. Am. Pet. ¶ 176.

5

Specifically, as to Ms. Kordia's involvement in the April 2024 protest, the BIA found "no clear error" in the immigration judge's finding that Ms. Kordia's arrest at a protest provided no basis for continued confinement. *Id.* As to the money transfers, though, the BIA remanded "to make more complete findings of fact . . . regarding the extent of the money transfers from [Ms. Kordia] to persons in the Palestinian Authority." *Id.*

On August 28, 2025, the immigration judge held a second custody redetermination hearing. TRO App. at 4 (PX 1, Decl. of Sarah Sherman-Stokes ¶ 1) ("Sherman-Stokes Decl."). Prior to the hearing, Ms. Kordia submitted supplemental evidence responsive the BIA's decision, including detailed declarations from Ms. Kordia and members of her family describing the dire situation for their family members abroad and the humanitarian purpose of the money transfers. *Id.* at 7–80 (PX 1-A, Sherman-Stokes Decl. Ex. A). The declarations from family members abroad who have received financial assistance from Ms. Kordia attest that they have never been involved in criminal or terrorist activity and they used the money for necessities. *Id.* at 34–50. Ms. Kordia additionally submitted evidence that her support of her family members abroad is part of a commonplace and widespread practice among migrants, globally, who routinely provide aid to their loved ones abroad. *Id*. at 65–79. Ms. Kordia also testified that, upon release, she could live with her mother, step-father, and brother in New Jersey. *Id.* at 5 (PX 1, Sherman-Stokes Decl. ¶ 6).

At the custody hearing, immigration counsel for Ms. Kordia asked DHS whether it had any evidence to offer relevant to the BIA's remand instruction or any argument that Ms. Kordia's evidence was insufficient. *Id.* ¶ 7. DHS had no evidence to offer and explicitly declined to argue that Ms. Kordia's release would pose a danger to the community. *Id.* DHS thus conceded that Ms. Kordia had met her burden to prove that she would not pose a danger to the community if released. *Id.* DHS also expressly declined to cross-examine Ms. Kordia, who testified on direct examination

to her family ties in New Jersey and her commitment to abide by all laws and show up to court. *Id*. ¶ 6. The immigration judge also acknowledged previously submitted evidence that Ms. Kordia's family has the ability to provide her financial support, including through the posting of bond. *Id*.

Based on the record, the immigration judge ordered Ms. Kordia releasable on a $20,000 bond, finding that she met her burden to establish that she would be neither a flight risk nor a danger to the community if released on a $20,000 bond. *Id.* at 86–87 (PX 2, Aug. 28, 2025 Bond Order).

Once again, though, DHS reserved an appeal to consider invocation of the automatic stay. *Id.* at 5 (PX 1, Sherman-Stokes Decl. ¶ 10). When pressed by the immigration judge further on that question, DHS's attorney asked for a recess to speak with her superiors. *Id.* After that recess, DHS confirmed it was reserving appeal, but it had not decided whether to invoke the automatic stay. *Id.*

The immigration judge noted that it was unlikely DHS would release Ms. Kordia, given DHS's responses to her prior bond order up to that point. *Id.* ¶ 8. The immigration judge recognized that while DHS has the right to appeal, she believes Ms. Kordia to be entitled to release pending any appeal of her decision finding Ms. Koria releasable. *Id.* The immigration judge further remarked that all she can do is issue administrative orders, but that ultimately only the habeas court may be able to effectuate Ms. Kordia's release from custody. *Id.* ¶ 9.

Within hours of the immigration judge's issuance of the order yesterday finding Ms. Kordia releasable on bond, Ms. Kordia's cousin sought to post the bond at a local DHS office, where DHS officers refused to take his payment. *Id.* at 82 (PX 1-B, Sherman-Stokes Decl. Ex. B ¶¶ 7–10). He then received a call from a DHS officer, alerting him that DHS is appealing the bond order and to

wait ten days before attempting to post the bond. *Id*. ¶ 11. DHS invoked the automatic-stay provision later that night. *Id.* at 89 (PX 3, Department of Homeland Security, Form EOIR-43, Aug. 28, 2025).

## III.    NATURE & STAGE OF PROCEEDINGS

Ms. Kordia filed this consolidated habeas petition and civil complaint on April 30, 2025.[2] Shortly thereafter, Ms. Kordia filed a Motion for Preliminary Injunction, Dkt. 13, which resulted in expedited briefing, Dkts. 28, 40, and a hearing before Judge Rutherford, Dkt. 32. After oral argument, Judge Rutherford issued her FCR, recommending the Court grant Ms. Kordia's Motion for Preliminary Injunction, order her immediate release, and find the automatic-stay provision likely unconstitutional.

In light of intervening developments after the FCR, the Court recommitted the Motion for Preliminary Injunction. Dkt. 65. To facilitate an expeditious resolution of this case, and avoid duplicative briefing, the Parties jointly moved to consolidate the Motion for Preliminary Injunction with the merits of the habeas claims and for entry of an agreed-upon briefing schedule. Dkt. 67. Pursuant to that briefing schedule, Ms. Kordia filed an Amended Petition on August 18, 2025. Dkt. 69. Respondents' responsive pleading on the merits of the habeas claims is currently due September 2, 2025.

Prior to filing this Motion, and nine hours before DHS's invocation of the second automatic stay, habeas counsel for Ms. Kordia conferred via email with counsel for Respondents about whether DHS would invoke the automatic-stay provision, despite Judge Rutherford's FCR finding its application to Ms. Kordia likely unconstitutional. After learning of its invocation, habeas counsel confirmed with Respondents' counsel that Respondents oppose the instant motion.

---

[2] Ms. Kordia's civil rights claim under the Religious Freedom Restoration Act ("RFRA") is currently stayed pending resolution of the habeas claims. Dkt. 68, and are not issue in this Motion.

Respondents will receive notice of any Temporary Restraining Order, or related hearing, via the Case Management / Electronic Case Files system. *See* Fed. R. Civ. P. 65.

## IV.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 65, to enter a temporary restraining order, the Court must find four factors, on balance, weigh in Plaintiffs' favor:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006) (quotations omitted); *see also Smith v. Tarrant Cty. Coll. Dist.*, 670 F. Supp. 2d 534, 537 (N.D. Tex. 2009).

## V.    ARGUMENT

The Court should grant Petitioner's Motion and issue a temporary restraining order, directing Respondents to release Ms. Kordia in accordance with the immigration judge's August 28, 2025, order and during the pendency of any related administrative appeal. **First,** as Judge Rutherford has already found, Ms. Kordia is likely to succeed on the merits of her procedural due process challenge to the automatic-stay provision, codified at 8 C.F.R. § 1003.19(i)(2), because it keeps her physically confined for months without any opportunity to be heard and without DHS's having to make any showing. **Second,** Ms. Kordia is likely to succeed on her substantive due process claim because, as the August 28, 2025, custody hearing makes clear, she is likely to show her civil confinement serves no lawful purpose. **Third,** irreparable harm and the equities favor Ms. Kordia. Her continued physical confinement unquestionably inflicts irreparable harm. And vindicating constitutional rights always serves the public interest. By contrast, Respondents would face no harm from Ms. Kordia's release because they have conceded she presents no danger to the community and because she otherwise presents no risk of flight after posting the bond set by the

9

immigration judge.

A temporary restraining order is especially necessary now. Ordering Ms. Kordia's release pursuant to the immigration judge's August 28, 2025, order would avoid *any further* procedural machinations from Respondents. For example, it would prevent Respondent Bondi's BIA from rubberstamping *another* discretionary stay of the immigration judge's release order on an administrative record reflecting: (1) that DHS no longer disputes that Ms. Kordia would not pose a danger to the community if released, (2) Ms. Kordia's substantial community ties and incentives to appear in immigration court, and (3) no rebuttal evidence or argument from DHS substantiating why she presents flight risk unaddressable through the posting of the $20,000 bond that the immigration judge set and that Ms. Kordia's family can post.

**A. Ms. Kordia Is Likely to Succeed on the Merits of Her Challenge to the Automatic-stay provision.**

Respondents' continued confinement of Ms. Kordia by executing yet another an automatic stay of her release violates her right to procedural due process. When the Government deprives someone of a liberty interest, "the procedures attendant upon that deprivation [must be] constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citation omitted). The constitutional sufficiency of procedures is determined by weighing three factors: (i) the private interest that will be affected by the official action, (ii) the risk of erroneous deprivation of that interest through the available procedures, and (iii) the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). As Judge Rutherford previously found, the *Mathews* factors all favor Ms. Kordia. FCR at 14–19; *see ,e.g.*, Dkt. 13 at 35–39; Dkt. 40 at 18–21; Dkt. 60 at 11.

**First,** Ms. Kordia is likely to show she has a strong liberty interest in her release pending

10

appeal. "Petitioner has a significant liberty interest in being free from detention—particularly because an IJ determined, after an evidentiary hearing, that she is entitled to release on bond." FCR at 16. That is because "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)).

Ms. Kordia's interest is even greater now than when Judge Rutherford first considered her Motion for Preliminary Injunction because DHS has already kept her confined for over five months. And DHS's re-invocation of an automatic stay of her release means that Ms. Kordia could face another three months or more of unlawful confinement without any process whatsoever.

**Second,** the automatic-stay provision creates a serious risk of erroneous deprivation. "Because the stay takes effect without requiring DHS to meet—or even consider—any threshold standard and Petitioner has no opportunity to challenge the imposition of the stay, there are no procedural safeguards to prevent prolonged, unwarranted detention pending DHS's appeal." FCR at 16 (citing *Günaydın v. Trump*, 2025 WL 1459154, at *8–9 (D. Minn. May 21, 2025)). "The automatic stay is a violent distortion of proper, legitimate process whereby the Government, as though by talisman, renders itself at once prosecutor and adjudicator." *Leal-Hernandez v. Noem*, No. 1:25-cv-02428, 2025 WL 2430025, at *14 (D. Md. Aug. 24, 2025).

Since the FCR on June 27, 2025, several other district courts have joined Judge Rutherford in finding that the automatic stay's procedure-less deprivation of liberty creates an unconstitutional risk of erroneous deprivation. *See, e.g.*, *Leal-Hernandez*, 2025 WL 2430025, at *14 ("The automatic stay declares: "Heads, I win. Tails, you lose."); *Maldonado v. Olson*, No. 25-cv-3142, 2025 WL 2374411, at *13 (D. Minn. Aug. 15, 2025) ("[T]he automatic stay provision, 8 C.F.R. § 1003.19(i)(2), creates a substantial risk of erroneous deprivation of Petitioner's interest in being

free from arbitrary confinement."); *Jacinto v. Trump*, No. 4:25-cv-3161, 2025 WL 2402271, at *3 (D. Neb. Aug. 19, 2025) ("[T]here is a large risk of erroneous deprivation of Petitioner's liberty interest through the procedures used in this case, and there are available alternative procedures which would ameliorate those risks.").

The risk of erroneous deprivation is even greater than it was in June, as DHS has now conceded, on the record before the immigration judge, that Ms. Kordia had met her burden to show she would not pose a danger if released. TRO App. at 5 (PX 1, Sherman-Stokes Decl. ¶ 7). In no other context could a government lawyer concede, on the record, that Ms. Kordia had met her burden as to dangerousness and decline the opportunity to cross-examine Ms. Kordia, only to turn around and file a slip of paper that keeps her confined for another three months or more with no administrative recourse to challenge the confinement. *See Günaydın*, 2025 WL 1459154, at *10 ("[T]he automatic stay regulation is . . . a rare and somewhat exceptional action in the first place." (citing implementing regulations)). That extraordinary power, as applied to Ms. Kordia, creates an exceptionally high risk of erroneous deprivation.

Worse, without immediate intervention, Respondents' procedural machinations will prevent Ms. Kordia from having any recourse. For example, after Judge Rutherford issued an FCR finding the application of the automatic administrative stay of Ms. Kordia's release likely unconstitutional, FCR at 21–22, Respondents answered with more gamesmanship to moot the FCR: the DHS Respondents immediately moved for a discretionary administrative stay of Ms. Kordia's release. Am. Pet. ¶ 175. And the BIA—under Respondent Bondi's control—granted that request in less than a day through an unreasoned order without Ms. Kordia's having an opportunity to respond. *Id.*; *see Hamama v. Adducci*, Civ. No. 17-11910, 2018 WL 1905074, at *2–3 (E.D. Mich. Apr. 23, 2018) (assessing interplay between automatic and discretionary administrative

stays of releases and ordering procedures to address procedural deficiencies of each).

**Third,** Respondents' legally cognizable interests in civil immigration confinement—preventing danger to the community or flight from immigration enforcement—do not require Ms. Kordia's confinement. Indeed, DHS *no longer disputes* lack of dangerousness and otherwise received a full opportunity during yesterday's administrative custody hearing to contest and rebut the record evidence from Ms. Kordia that substantiates her community ties, family support, and incentives to appear in immigration court. Their failure to do so a second time obviates any flight risk unaddressable through the posting of the bond set by the immigration judge. As the immigration judge herself recognized yesterday, Ms. Kordia has amply substantiated why she can and should be at liberty during appeal. TRO App. at 5 (PX 1, Sherman-Stokes Decl. ¶ 8); *see also Leal-Hernandez*, 2025 WL 2430025 at *14–15 ("[T]he court finds it inappropriate to stay its order so that the Government may seek a discretionary stay through the BIA."); *Altagracia Almonte-Vargas v. Elwood*, No. 02-cv-2666, 2002 WL 1471555, at *5 (E.D. Pa. June 28, 2002) ("We decline the Government's alternative request that we refer this matter to the INS District Director for an individualized custody determination."). Ms. Kordia consequently urges this Court to give effect to the terms of yesterdays' order from the immigration judge finding Ms. Kordia releasable on bond, because Respondents have no constitutional interest in her continued confinement.

## B. Ms. Kordia Is Likely to Succeed on the Merits of Her Substantive Due Process Claim.

The record of the custody hearing before the immigration judge yesterday makes abundantly clear that DHS has no lawful purpose to justify Ms. Kordia's ongoing confinement. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action," and it is unquestionably a fundamental right. *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). The Supreme Court has recognized two justifications

13

for civil immigration confinement: preventing danger to the community and flight from immigration enforcement. *Zadvydas*, 533 U.S. at 690. At best, Ms. Kordia's confinement serves neither purpose, and, at worst, it constitutes unlawful punishment. Either way, Respondents confinement violates her substantive due process rights.

To date, Ms. Kordia has submitted reams of evidence demonstrating that her continued confinement is not necessary to serve any legally permissible purpose, including declarations from family members, Ms. Kordia's testimony, DHS's own Risk Classification Assessment rating to be her low risk across all relevant factors, her lack of criminal record, and mountains of rebuttal evidence disproving DHS's speculations around dangerousness and flight risk. *See generally*, TRO App. at 7–80 (PX 1-A, Sherman-Stokes Decl. Ex. A); Am. Pet. App., Dkt. 71-1 at 15–59 (PX 1, Motion for Bond and Custody Redetermination). In response, DHS offered next to nothing. Its representative conceded that Ms. Kordia met her burden on dangerousness. TRO App. at 5 (PX 1, Sherman-Stokes Decl. ¶ 7). And while Ms. Kordia testified that she would attend all court proceedings and live with her family if released, DHS's attorney declined to cross-examine her, all the while arguing that Ms. Kordia poses a flight risk if released. *Id.* ¶ 6. The record to date, including and especially at yesterday's custody hearing, makes abundantly clear that Respondents have no cognizable interest that justifies Ms. Kordia's ongoing confinement and that release on bond or other reasonable conditions could not otherwise address.

Likewise, DHS's reinvocation of the automatic stay of Ms. Kordia's release is totally unmoored from any lawful purpose. At this point, the "[t]he Government has made no effort to explain what 'special justification' exists to deny [Ms. Kordia] the liberty the IJ ordered subject to bond." *Leal-Hernandez*, 2025 WL 2430025, at *13. Because the automatic-stay provision operates "[s]imply by fiat—without introducing any proof," *Mohammed H. v. Trump*, No. 25-cv-1576,

2025 WL 1692739, at *5 (D. Minn. June 17, 2025), the automatic stay has enabled the government to prolong Ms. Kordia's confinement without a lawful basis. "As such, the automatic stay results in Petitioner's arbitrary detention violative of [Ms. Kordia's] substantive due process rights guaranteed by the Fifth Amendment." *Leal-Hernandez*, 2025 WL 2430025, at *13 (collecting cases).

### C. The Remaining Factors Favor Issuing a Temporary Restraining Order.

The remaining factors—irreparable harm and the public interest—favor an order for Ms. Kordia's immediate release. As Judge Rutherford previously concluded, such an order is necessary to prevent ongoing irreparable harm to Ms. Kordia and protect the public interest and would not impair the government's cognizable interests in immigration enforcement.

First, irreparable harm. When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing . . . is necessary" to establish irreparable harm. FCR at 19 (quotation omitted). Further, "In the immigration context, unlawful detention is a sufficient irreparable injury." *Arias Gudino v. Lowe,* No. 1:25-CV-00571, 2025 WL 1162488, at *13 (M.D. Pa. Apr. 21, 2025). This is because of the "evidence of subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017).

This Court's intervention is all the more important because Respondents have been confining Ms. Kordia for nearly five months since the immigration judge first determined she is releasable and again subjecting her to the prospect of another three months or longer of continued unlawful confinement with no recourse to any further administrative review. While the Court cannot remedy her past unconstitutional confinement through the instant proceedings, the Court can prevent it, going forward, along with the daily infliction of irreparable harm it has caused and

will otherwise continue to cause.

The third and fourth temporary restraining order factors also favor Ms. Kordia's immediate release. "[A]n injunction protecting Petitioner's interest in being free from unconstitutional detention is in the public interest." FCR at 21 & n.84 (quoting *Nuziard v. Minority Bus. Dev. Agency*, 676 F. Supp. 3d 473, 485 (N.D. Tex. 2023)). In the face of Ms. Kordia's "compelling interest in release from detention that likely violates" the constitution, FCR at 20, Respondents have presented only an abstract interest in "the enforcement of the immigration laws and the removal of [noncitizens]." FCR at 20 (quoting Dkt. 28, Resp'ts' Resp. at 16). But as Judge Rutherford found, because Ms. Kordia "does not challenge the validity of the removal proceedings themselves" in the habeas proceedings, *id.*, nothing about this case or release from custody as remedy will affect Respondents' ability to enforce immigration laws against Ms. Kordia or anyone else.[3] Through her habeas petition, Ms. Kordia challenges only the lawfulness of her confinement during the pendency of removal proceedings, not the removal proceedings themselves. *Id.* at 21. And as the immigration judge found, and Ms. Kordia testified to, Ms. Kordia will live with her family and be able to abide by all bond requirements, including attending court. TRO App. at 5 (PX 1, Sherman-Stokes Decl. ¶ 6); *id.* at 86 (PX 2, Aug. 28, 2025 Bond Order).

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant Petitioner's Motion and issue a temporary restraining order, directing Respondents to release Ms. Kordia during the pendency of any appeal of the immigration judge's August 28, 2025, order finding Ms. Kordia releasable on a $20,000 bond.

---

[3] Ms. Kordia's next immigration court hearing is set for October 23, 2025. TRO App. at 5 (PX 1, Sherman-Stokes Decl. ¶ 11).

Dated: August 29, 2025

Respectfully submitted,

*/s/ Travis Walker Fife*
Travis Walker Fife
Texas State Bar No. 24126956
Randall Hiroshige
Texas State Bar No. 24124299
Texas Civil Rights Project
P.O. Box 1108
Houston, Texas 77251-1108
travis@texascivilrightsproject.org
randy@texascivilrightsproject.org

Charles S. Siegel
Texas State Bar No. 18341875
Caitlyn Silhan
Texas State Bar No. 24072879
Waters Kraus Paul & Siegel
3141 Hood Street, Suite 200
Dallas, Texas 75219
Telephone: 214-357-6244
Facsimile: 214-357-7252
siegel@waterskraus.com
csilhan@waterskraus.com

Molly Petchenik
Texas State Bar No. 24134321
Texas Civil Rights Project
P.O. Box 17757
Austin, Texas 78760
Telephone: 512-474-5073
Facsimile: 512-474-0726
molly@texascivilrightsproject.org

Daniel Hatoum
Texas State Bar No. 24099136
Erin D. Thorn*
Texas State Bar No. 24093261
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
Telephone: 512-474-5073
daniel@texascivilrightsproject.org
erin@texascivilrightsproject.org

Naz Ahmad*
New York State Bar No. 5327424
Amal Thabateh*
New York State Bar No. 5923826
CUNY School of Law
2 Court Square West, 5th Floor
Long Island City, NY 11101
(718) 340-4630
naz.ahmad@law.cuny.edu
amal.thabateh@law.cuny.edu

Golnaz Fakhimi*
New York State Bar No. 5063003
Sadaf Hasan*
New York State Bar No. 6046023
Muslim Advocates
1032 15th Street Northwest, Unit 362
Washington, D.C. 20005
(202) 655-2969
golnaz@muslimadvocates.org
sadaf@muslimadvocates.org

* *Admitted to practice PHV*

**ATTORNEYS FOR PETITIONER-PLAINTIFF**

**<u>CERTIFICATE OF CONFERENCE</u>**

I certify that on August 28 and 29, 2025, Travis Fife for Petitioner-Plaintiff and Brian

Stoltz for Respondents conferred via email and telephone. Respondents are opposed.

*/s/ Travis Walker Fife*
Travis Walker Fife

**CERTIFICATE OF SERVICE**

I certify that on August 29, 2025, a true and correct copy of this document was properly

served on all counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Travis Walker Fife*
Travis Walker Fife
