# Petitioner's TRO Appendix

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |
| | § | |
| KRISTI NOEM, et al., | § | |
| | § | |
| Respondents-Defendants. | § | |

## PETITIONER'S TEMPORARY RESTRAINING ORDER APPENDIX
### TABLE OF CONTENTS

| Exhibit | Description | App. Page No. |
|---|---|---|
| 1 | Declaration of Sarah Sherman-Stokes | 3–5 |
| 1-A | Dep't of Homeland Sec. Notice of Filing, as filed on Apr. 2, 2025 | 6–80 |
| 1-B | Declaration of Hamzah Abushaban | 81–82 |
| 2 | Immigration Judge's August 28, 2025 Bond Order | 82–87 |
| 3 | Department of Homeland Security, Form EOIR-43 (Aug. 28, 2025) | 88–89 |

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | § | |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |
| | § | |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## DECLARATION OF SARAH SHERMAN-STOKES, ESQ.

I, Sarah Sherman-Stokes, hereby declare and state:

1. I represent Ms. Leqaa Kordia in her immigration removal and custody proceedings. I am Clinical Associate Professor of Law and Associate Director of the Immigrants' Rights and Human Trafficking Clinic at the Boston University School of Law. On August 28, 2025, Leqaa Kordia had a second custody hearing before Immigration Judge ("IJ") Tara Naselow-Nahas in the Los Fresnos Immigration Court. I attended the duration of the hearing.

2. Previously, on April 3, 2025, the Los Fresnos Immigration Court found that Ms. Kordia poses no danger to the community and ordered her released from custody upon the payment of a $20,000 bond. On April 16, 2025, the IJ issued a written memorandum in support of this order.

3. Following the Court's order of release on bond, the Department of Homeland Security ("DHS") appealed to the Board of Immigration Appeals ("Board").

4. Subsequently, on August 11, 2025, the Board remanded the case back to the Immigration Judge to make more complete findings of fact regarding Ms. Kordia's putative dangerousness. A second custody hearing was scheduled for August 28, 2025 before IJ Naselow-Nahas.

5. On August 27, 2025, Ms. Kordia, through counsel, submitted briefing and evidence in

support of her release on bond and again demonstrating that she is not a danger. That evidence is attached hereto as Exhibit A.

6. At the custody hearing on August 28, 2025, Ms. Kordia testified under oath. On direct examination, she testified that, if released, she would live her mother, stepfather, and brother in New Jersey. She stated that she came to the United States to be reunited with her mother and that she has a strong interest in living lawfully in the United States. She committed to attending all her immigration hearings and follow all laws. DHS was given a chance to cross examine Ms. Kordia, but it declined. And the immigration judge noted for the record prior evidence that Ms. Kordia's family has the ability to provide her financial support, including by posting bond.

7. Also at the custody hearing on August 28, 2025, DHS was given the chance to argue that Ms. Kordia is a danger, and should be denied release on bond on this basis. DHS offered no evidence on this issue and declined to argue that Ms. Kordia presents any danger, stating that DHS was satisfied that Ms. Kordia had met her burden to demonstrate that she would not pose a danger to the community if released.

8. At the custody hearing on August 28, 2025, the IJ acknowledged on the record that despite her order of release on bond, it is unlikely that DHS will allow Ms. Kordia's release, either by invoking an automatic stay through the Board or by filing an appeal to the Board. The IJ noted that, while she was not discouraging DHS from appealing, it is her view that, even in the case of an appeal, Ms. Kordia is entitled to release while that appeal is pending.

9. The IJ further stated on the record that, under the law, all she can do is issue administrative orders but that whether or not Ms. Kordia is released may require action by the habeas court.

10. When the IJ asked DHS whether it intends to appeal, DHS asked for a brief recess to inquire with superiors. When DHS returned, it stated that it is reserving its right to appeal but that it is undecided for now about whether or not to invoke an automatic stay.

11. The custody proceedings concluded, and then Ms. Kordia's asylum case was continued until October 23, 2025, at 8:30 AM CDT for further proceedings on the merits of her claims for asylum and related forms of humanitarian protection against removal.

12. Upon entry of the immigration judge's bond order, I emailed the bond order to Ms. Kordia's cousin, who immediately took steps to pay the bond. A true and correct copy of his declaration describing those efforts to pay the bond is attached hereto as Exhibit B.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____

Sarah Sherman-Stokes                                August 28, 2025

# EXHIBIT 1-A

Sarah Sherman-Stokes                                                    **DETAINED**
Boston University School of Law
Immigrants' Rights Clinic
197 Friend Street
2nd Floor
Boston, MA 02114


*Pro Bono Attorney for Respondent*

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION**
**REVIEW IMMIGRATION COURT**
**LOS FRESNOS, TX**

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | In Bond Proceedings |
| | ) | |
| KORDIA, LEQAA | ) | A▮▮▮▮▮▮ |
| | ) | |


**Immigration Judge: Hon. Tara Naselow-Nahas**          **Bond Hearing: August 28, 2025**


**RESPONDENT'S BRIEF ON REMAND**
**IN SUPPORT OF HER RELEASE ON BOND**

**ANNOTATED TABLE OF CONTENTS**

**LEQAA KORDIA, A █████████**

| Tab | Description | Page |
|-----|-------------|------|
| | **Declarations corroborating the nature of Ms. Kordia's remittances to family members abroad** | |
| A | Supplemental declaration of Leqaa Kordia<br>• While living in the United States, Ms. Kordia has sent money to struggling family members abroad, using money from her various jobs or money her mother provided her.<br>• Between 2017-2021, Ms. Kordia sent approximately $6,000 to her brother and his wife to help them pay their rent and utilities, get gifts for their daughters, or provide support for daily expenses.<br>• Between 2020-2025, Ms. Kordia helped her mother send approximately $12,000 to her relatives abroad, in Gaza, the United Arab Emirates, and relatives who evacuated from Gaza and now live in Egypt.<br>• Ms. Kordia's mother suffers from significant medical conditions that make it hard for her to move around. Ms. Kordia's mother also needs to stay at home to take care of her son who suffers from ████ and ████████████. For these reasons, Ms. Kordia's mother asks her to send money to their family members on her behalf and Ms. Kordia readily agrees.<br>• On her mother's behalf, Ms. Kordia sent money to ████ ████████ █ ████ ████████, ████████ and ████████ █ Ms. ████████ is Ms. Kordia's aunt, and Ms. Mr. ████████, Mr. ████████ Ms. ████████ are Ms. Kordia's cousins. Ms. Kordia's aunt Ms. ████████ and her two daughters, currently live in Egypt. ████████ lives in the United Arab Emirates and ████████ lives in Gaza.<br>• The money was sent to help ████████ pay for a medical procedure, support Ms. ████ after her home was destroyed and support Ms. Kordia's cousins' daily expenses.<br>• Ms. Kordia does not support terrorism and/or criminal activity and has no reason to think anyone in her family has either. | 1 |
| B | Declaration of ████ ████ with proof of identity and certificate of translation<br>• ████████ is Ms. Kordia's mother.<br>• Ms. ████ has several serious medical conditions, including ████████ and ████████, that make it difficult for her to get around. Ms. ████ also has an autistic son with several | 3 |

|  | conditions that make it difficult to leave him alone for any period of time. Prior to being detained, Ms. Kordia helped her mother look after her brother, clean the house, among other things.<br>• Ms. ███ would occasionally ask Ms. Kordia to help her send money to her family overseas, including family in Palestine, because of Ms. ███ and her son's medical conditions.<br>• Ms. ███ would ask Ms. Kordia to send money the following family members: ███ ███ (Ms. ███ sister), ███ ███ (Ms. ███ niece), ███ (Ms. ███ nephew), ███ ███ (Ms. ███ nephew), ███ (Ms. ███ niece).<br>• Ms. ███ also sent money via MoneyGram to the following relatives: ███ ███ (Ms. ███ brother), ███ nephew), and ███ ███ (Ms. ███ nephew's wife).<br>• Ms. ███ has also asked Ms. Kordia to send money to her son, ███ Kordia, who lives in the West Bank.<br>• Ms. ███ uses her own money or money others have given her to provide humanitarian support to her family abroad. She has no reason to believe that any money went to supporting criminal and/or terrorist activity or that her family is involved in a criminal and/or terrorist organization. |  |
|---|---|---|
| C | Declaration of ███ Kordia, with proof of identity and certificate of translation<br>• ███ ███ is Ms. Kordia's brother.<br>• Since Ms. Kordia arrived in the United States in 2016, Ms. Kordia and ███ would send each other money. Sometimes Ms. Kordia asked his sister for money to pay for specific expenses such as rent, electricity, gas or water.<br>• Sometimes Ms. Kordia sent her brother money to buy gifts for her nieces. Once when ███ daughter was in the hospital, Ms. Kordia sent money for medical expenses. In 2021, Ms. Kordia sent money to her brother to help him set up his store in Ramallah.<br>• Sometimes Ms. Kordia would send money to ███ wife.<br>• ███ has never used the money to support criminal and/or terrorist activity and has never been involved in a terrorist group or activity. | 9 |
| D | Declaration of ███ ███, with proof of identity<br>• ███ ███ is Ms. Kordia's cousin through her mother.<br>• Mr. ███ knew that Ms. Kordia sent money to the following members of their family members abroad on behalf of Ms. Kordia's mother: ███ ███ ███, S███ | 15 |

| | | |
|---|---|---|
| | ████, ████ and ████ ████ <br> • Money was sent to these family members to support their daily expenses. Prior to the war, Mr. ████ 's family struggled and since the war things have become more difficult for them. <br> • None of Mr. ████ s family members that received money from Ms. Kordia have ever used the money to support criminal and/or terrorist activity and has never been involved in a terrorist group or activity. | |
| E | Declaration of ████ ████ with proof of identity and certificate of translation <br> • ████ ████ is Ms. Kordia's aunt through her mother. <br> • Over the past several years, Ms. Kordia occasionally sent money to Ms. ████ on behalf of Ms. Kordia's mother. Ms. ████ spent that money on living expenses and rebuilding her building after it was destroyed in 2022. <br> • When Ms. Kordia's mother couldn't leave the house, it was understood that Ms. Kordia's mother would occasionally have her send money. <br> • Ms. ████ has never used the money to support criminal and/or terrorist activity and has never been involved in a terrorist group or activity. | 17 |
| F | Declaration of ████ ████, with proof of identity <br> • ████ ████ is Ms. Kordia's cousin through her mother. <br> • In February 2025, Ms. Kordia sent money to ████ on behalf of Ms. Kordia's mother. ██ ████ used that money to pay for medical bills and support his family as Mr. Hamida underwent a medical procedure. <br> • ████ has never used the money to support criminal and/or terrorist activity and has never been involved in a terrorist group or activity. | 21 |
| G | Declaration of ████ ████ with proof of identity and certificate of translation <br> • ████ ████ is Ms. Kordia's cousin through her mother. <br> • Over the past several years, Ms. Kordia occasionally sent money to Ms. ████ on behalf of Ms. Kordia's mother. <br> • Ms. ████ used the money for herself, her family's living expenses, or passed the money to her mother. <br> • On occasion, Ms. ████ aunt, ████ ████ would ask Ms. Kordia to send money on her behalf. <br> • Ms. ████ has never used the money to support criminal and/or terrorist activity and has never been involved in a terrorist group or activity. | 23 |

| H | Declaration of ██████████ with proof of identity and certificate of translation<br>• ████████████████ is Ms. Kordia's cousin through her mother.<br>• Over the past several years, Ms. Kordia occasionally sent money to Ms. ████████ on behalf of Ms. Kordia's mother.<br>• Ms. ██████ used that money for living expenses for herself, her family, and her mother. Ms. ████████ has never used the money to support criminal and/or terrorist activity and has never been involved in a terrorist group or activity. | 26 |
|---|---|---|
| I | Declaration of ████ Abu Shaban, with proof of identity and certificate of translation<br>• ██████████ is Ms. Kordia's cousin through her mother.<br>• Over the past several years, Ms. Kordia occasionally sent money to ████████████ on behalf of her mother.<br>• ████████ used this money to help with living expenses for him and his family.<br>• ████████████ has never used the money to support criminal and/or terrorist activity and has never been involved in a terrorist group or activity. | 29 |
| | **Records of money transfers made by Ms. Kordia** | |
| J | Western Union Money Transfer History (August 21, 2025)<br>• Showing money transfers between Ms. Kordia and family members abroad, between 2017 and 2025 | 34 |
| | **Unpublished BIA Decision describing remittances as "positive equity"** | |
| K | In Re: Cupertino Zarate, No. AXXX XX8 165 - CHI, 2016 WL 1722605, (DCBABR Mar. 23, 2016)<br>• IJ considered respondent's desire to remain in the U.S. to work and continue providing remittances to family abroad as a one of several positive equities to balance in establishing adjustment of status as a matter of discretion. | 38 |
| | **Evidence of widespread remittances sent worldwide and to Gaza and the West Bank** | |
| L | World Bank Group, Personal Remittances Received - Worldwide<br>https://data.worldbank.org/indicator/BX.TRF.PWKR.CD.DT<br><br>• Showing that 740.51 billion dollars in remittances were sent in 2024 | 41 |
| M | World Bank Group, Personal Remittances Received - West Bank and | 42 |

| | | |
|---|---|---|
| | Gaza, https://data.worldbank.org/indicator/BX.TRF.PWKR.CD.DT?locations=PS <br><br> • Showing that the money Ms. Kordia's sent to her family members was just a small fraction of the remittances sent to the West Bank and Gaza between 2017-2024 <br> • Showing that 2.38 billion dollars were sent in remittances to the West Bank and Gaza in 2017 <br> • Showing that 2.83 billion dollars were sent in remittances to the West Bank and Gaza in 2018 <br> • Showing that 3.15 billion dollars were sent in remittances to the West Bank and Gaza in 2019 <br> • Showing that 2.56 billion dollars were sent in remittances to the West Bank and Gaza in 2020 <br> • Showing that 3.76 billion dollars were sent in remittances to the West Bank and Gaza in 2021 <br> • Showing that 4.6 billion dollars were sent in remittances to the West Bank and Gaza in 2022 <br> • Showing that 3.24 billion dollars were sent in remittances to the West Bank and Gaza in 2023 <br> • Showing that 735, 607, 752 dollars were sent in remittances to the West Bank and Gaza in 2024 | |
| N | United Nations Department of Economic and Social Affairs, "Much more than a 'lifeline' for millions of households, remittances can spur global growth," https://www.un.org/en/desa/much-more-%E2%80%98lifeline%E2%80%99-millions-households-remittances-can-spur-global-growth-says | 50 |

# Tab A

**Supplemental Declaration of Leqaa Kordia**

I, LEQAA KORDIA, hereby declare and state:

1. My name is Leqaa Kordia. I have been detained by ICE since March 13, 2025, and in ICE custody at the Prairieland Detention Facility since March 14, 2025. Before then, I was living among family, including my U.S. citizen mother, in Paterson, New Jersey.

2. I understand that the government would like additional information about the money I have sent abroad to my family members.

3. While I live in the U.S. now, my family is originally from Gaza, and I used to live in the West Bank with my brother, ███████ ██a. Since 2023, I've lost nearly 175 family members— almost an entire generation— to the ongoing genocide on Gaza. I've luckily had some family members evacuate Gaza and now live in Egypt in safety.

4. While living in the United States, I've sent money to struggling family members abroad, using money I earned through local jobs, like waitressing, or using money my mom provided me.

5. Between 2017-2021, I sent about $6000 dollars to my brother, ███████ Kordia, and my brother's wife, ███ ██████████ ████████████, ████████ is a tailor and ███ stays home with their children. The situation for them in Palestine has always been a struggle; I sent them money to help pay their rent or utility bills, to get gifts for their daughters (my nieces), or just to provide support for daily living expenses.

6. I've always tried to send money to ███████ and ███ whenever I could. Because I miss my brother and live so far from him, it makes me happy to help him in times of financial hardship. For example, I was able to save up enough money in 2020 to help my brother and sister-in-law pay for rent that he was behind on.

7. Some of my other family members abroad, especially those living in Palestine and Gaza, live in difficult situations and struggle financially like my brother. Between 2020-2025, I also assisted my mother to send about $12,000 to our relatives abroad, in Gaza and in the United Arab Emirates, and to relatives who evacuated Gaza and now live in Egypt.

8. My sister, ██████ also used to help our mom in sending money on behalf of family members before she moved to Michigan in 2023. My mother suffers from significant medical conditions, including ███ ████ and ███ This makes it hard for her to move around. She also needs to be at home to care for my brother, ███ who suffers from ████ and ██████ ████████ When she asked me to send money for her, I readily agreed to help her to fulfill my responsibilities as her daughter.

9. On my mother's behalf, I sent money to ████ ███████ ██████ ████ █ ████████ ███████ and ███████ is my aunt, and ████ ████ ███ and ████ are my cousins. My aunt ████ and her two daughters, ███ and ███████ currently live in Egypt. ███ lives in the United Arab Emirates and ████ lives in Gaza.

10. The money I sent came from my mother, or sometimes, she would collect money from our close friends in the neighborhood and pool it together to send to help out our family. As far as I understand, the money we sent to ████ was for a medical procedure, and the money for ████ was to help support her after her home was destroyed. For ████ ████ and ██████ the money we sent was to support their daily living expenses.

11. We sent money to our family abroad in order to support them with living expenses. I have never supported terrorism or criminal activity of any kind; and I have no reason to think anyone in my family has, either. It is both a privilege and a responsibility to live in the U.S. and support struggling family members abroad who rely on our help.

12. Finally, my brother, ███████ also sent money to me in 2021 and 2022. Our father died at the end of 2020 and this was money that he left to us. My brother sent my part to me in the US.

13. I hope to be released from custody so that I can reunite with my family in New Jersey. Against my will, I was separated from my mother for nearly twenty years. Being separated from her again is unbearable.

The contents of this statement were read to me in English, a language I am fluent in and understand, and I certify that it is true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____                                    _____

Leqaa Kordia                                                                August 26, 2025

Tab B

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE OF IMMIGRATION REVIEW
PORT ISABEL IMMIGRATION COURT
LOS FRESNOS, TX

In the Matter of: )
                              ) **IN BOND PROCEEDINGS**
**KORDIA, Leqaa** )
                              ) **File No.: A# ████████**
                              )
                              )
In custody proceedings )
                              )

DECLARATION OF ████████

I, ████████ hereby declare and state:

1. My name is ████████ I am a naturalized U.S. citizen. I was born on ████████ in Gaza.
I currently live in Paterson, New Jersey.

2. Leqaa Kordia is my daughter.

3. I was married to Leqaa's father, my ex-husband, from the late 1980s to 1995. We married in
Gaza. We had two children, ████████ and Leqaa .

4. My family is originally from Gaza. My family in Gaza goes back to before 1948, when other
Palestinians fled to Gaza during the war.

5. My ex-husband's family fled to Gaza from Jaffa in 1948.

6. Prior to our divorce, my ex-husband had received authorization to live and work in the West
Bank, which is why ████████ and Leqaa grew up in the West Bank.

7. I came to the United States in the late 1990s after my divorce. I lost custody of Leqaa and
████████ in the divorce, and so I was separated from them for quite some time.

8. I reconnected with Leqaa and ████████ over the phone around 2015. Leqaa decided to visit me
in the United States.

9.    After she came to the United States in 2016, Leqaa lived with and near me in Paterson, NJ before she was arrested by ICE in March 2025 when she went to their office.

10.   Leqaa helped me a lot before she was detained. She would help me in taking care of my son, ▮▮▮▮ her brother. Omar has several conditions, including ▮▮▮▮▮▮▮▮▮. It is difficult to leave him alone for any period of time, and it is difficult to go outside with him for errands. Leqaa would help me with ▮▮▮ either by sitting with him if I needed to go outside for an appointment, or running errands, or making him food. Leqaa was able to help him calm down if he got upset.

11.   I have several conditions as well, including ▮▮▮▮▮ and ▮▮▮▮▮ making it somewhat difficult for me to get around. For example, because of my ▮▮▮▮▮ it is very difficult for me to clean because of the fumes from cleaning products. Before I received some assistance from the state, Leqaa helped me a lot with the cleaning.

12.   My other daughter, ▮▮▮▮ would also help me with these tasks before she moved to Michigan in 2023.

13.   Because my family and Leqaa's father's family lived in Gaza, Leqaa and I have lost many family members to the ongoing genocide on Gaza. Between our two families, Leqaa has lost nearly 175 family members to the genocide on Gaza.

14.   I am aware that in Leqaa's bond hearing, the government raised issues around Leqaa sending money overseas, specifically to Palestine.

15.   I attended Leqaa's first bond hearing online in April 2025. It was quite upsetting to hear the government claim that any transfer of money to Palestine and/or Palestinians was inherently suspicious, especially when I heard my sister's name brought up.

16.   I understand now that Leqaa has been asked to provide more information about any transfer of money overseas.

17.   I would occasionally ask Leqaa and ▮▮▮▮ for assistance in sending money to my family overseas, including in Palestine. I have eleven siblings and many nieces and nephews.

18. Before ▮▮▮ moved to Michigan, I would usually first ask ▮▮▮ for assistance, and if she was not available, then I would ask Leqaa.

19. I would usually ask for their assistance because it was easier for them to leave the house than it was for me due to my health issues and to stay with my son ▮▮▮ given his medical condition.

20. I cannot recall every single time I asked for Leqaa's help, but I do know that I asked her to help me send money to family members usually due to their financial situations- especially for those living in Palestine and Gaza where the living conditions are tough - including the following people:

    a.    ▮▮▮ [also transliterated as ▮▮▮, who is my sister.

    b.    ▮▮▮, who is ▮▮ daughter.

    c.    ▮▮▮, who is my brother's son.

    d.    ▮▮▮, who is my sister's son.

    e.    ▮▮▮, who is my sister ▮▮'s daughter.

21. I have also reviewed the records from MoneyGram that the government previously submitted. The following individuals are also my relatives:

    a.    ▮▮▮ is my brother

    b.    ▮▮▮ is my niece (daughter of my sister ▮▮

    c.    ▮▮▮ is my nephew, ▮▮ son

    d.    ▮▮▮ is ▮▮▮ wife

22. ▮▮▮, and ▮▮ are all in Egypt now, having been able to evacuate Gaza since the genocide began.

23. ▮▮▮ is still living in Gaza.

24. ▮▮▮ is living in the United Arab Emirates.

25. Although I do not remember specifically, I may have also asked Leqaa once or twice to send money to her brother, ▮▮▮ ▮▮▮ lives in the West Bank with his wife, ▮▮ and their children.

26. Over the years, I have sent money to my family overseas, in Gaza and elsewhere, like many other immigrants do, to help them with various expenses, including food, shelter, medical expenses.

27. Specifically, as to my sister ▇▇▇ I recall that a few years ago, during one of the aggressions on Gaza, my sister ▇▇▇ building in which she lived and operated a salon, was destroyed. My sister was in great need after that incident, so I asked Leqaa for her assistance in sending money to ▇▇ and her family.

28. I used my own money, or money that my neighbors or friends had given to me, to send to Gaza given the need to provide essential life-saving humanitarian support. My neighbors and friends knew we had family in Gaza and that they might be in need, so sometimes they would offer financial support for them, to help with living or medical expenses.

29. I only ever intended to help my family with their expenses when I would send money myself or ask Leqaa or my other daughter to send for me. I have no reason to believe that any of this money ended up supporting criminal and/or terrorist activity. I have no reason to believe that anyone in my family is involved in criminal or terrorist activity or a terrorist organization.

30. The contents of this statement were read to me in Arabic, a language I am fluent in and understand, and I certify that it is true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.



8/26/2025



Certification of Translation

My name is ███████████ I am fluent in Arabic and English. I certify that I read the enclosed declaration to ██████ in Arabic and confirmed the accuracy of the statement with her in Arabic.



08/26/2025

8

Tab C

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE OF IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**
**LOS FRESNOS, TX**

|  |  |
|---|---|
| In the Matter of: | ) **IN BOND PROCEEDINGS** |
| **KORDIA, Leqaa** | ) **File No.: A# ███████** |
| In custody proceedings | ) |

**DECLARATION OF ███████ ███████**

I, ███████ ███████a, hereby declare and state:

1. My name is ███████ Kordia. My date of birth is ███████ I am a resident of Al-███████ near Ramallah, West Bank.

2. Leqaa Kordia is my sister. Leqaa and I grew up mostly in the West Bank with our father and step-mother.

3. ███████ ███████ is my wife. We have two daughters.

4. After Leqaa went to the United States in 2016, we both sent each other money.

5. After our father died, I sent her money as a portion of the inheritance.

6. Leqaa has also sent me money over the years.

7. Sometimes I have asked her for money, if I needed to cover a specific expense, such as rent, electricity, gas, water, etc. Sometimes she would send us money without us asking.

8. I remember specifically several years ago, in early 2020, I was about four months behind on the rent. She sent money to ███████ my wife, for the rent.

9

9. Sometimes she would send money to ▮▮▮▮ nstead of me, if I was unable to make it to the money transfer business. Since ▮▮▮ does not work outside the home, it was often easier for her to pick up the money.

10. Sometimes Leqaa would send us money when she wanted to buy a gift for our children, she would tell us to pick something out for them after she sent the money.

11. Another time, I remember, my daughter was in the hospital, and the money Leqaa sent us was for her medical bills.

12. In 2021, I opened a store in Ramallah. I am a tailor. I sell curtains and other such items. After that, Leqaa sent me some money to help me with setting up the store.

13. I only used the money Leqaa sent ▮▮▮▮ and me for our family: rent, electricity, water, gas, medical expenses, or gifts for our daughters, or for my store.

14. I am aware that the government has made an issue out of Leqaa sending money to people in Palestine.

15. I have never been involved with criminal or terrorist activity, nor a terrorist organization. I never used the money she sent me for criminal or terrorist activity, or to support such activity.

16. I strongly urge that my sister be released from detention, I am so worried about her.

17. The contents of this statement were read to me in Arabic, a language I am fluent in and understand, and I certify that it is true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

27/8/2025

Date



**Palestinian Authority**                    **IDENTITY CARD**

IDENTITY NO.                    ███████        [Photo]
FIRST NAME                      ████
FATHER'S NAME                   ██
GRANDFATHER'S NAME           A █
LAST NAME                       ███
MOTHER'S NAME                   ███
DATE OF BIRTH                   ██████

PLACE OF BIRTH        Gaza
SEX            Male            RELIGION            Moslem

REGISTERED IN    Ram'allah        Date: Dec 29, 2013

**IDENTITY CARD ATTACHMENT**                PALESTINIAN AUTHORITY
ID No. 8 0146786 1
LAST NAME            ████
FIRST NAME          █████
ADDRESS            0        0
TOWN              Ram'allah
PERSONAL STATUS      Married        SPOUSE'S I.D. NUMBER ██████
██████  ████        ████
SPOUSE'S ID NUMBER
SPOUSE'S NAME
PREVIOUS LAST NAME
PREVIOUS FIRST NAME

12



**LM Language Services Inc.**
**103 Carnegie Center, Suite # 300 Princeton, NJ 08540**
**Phone: 917-319-9932   Fax: 212-428-6724**
**E-mail: projects@lmlanguageservices.net**


AFFIDAVIT FROM MOUSTAFA ABOUELKHEIR

STATE OF NEW JERSEY
[COUNTY OF MERCER] ss:


I, <u>Moustafa Abouelkheir</u>, being duly sworn, under penalty of perjury and say:

1. I, <u>Moustafa Abouelkheir,</u> hereby certify that I am fluent in Arabic and Hebrew and English and I am competent to translate from Arabic and Hebrew to English. I am bilingual and have translated legal documents into both languages.
2. I have translated the document: "ID-███████ ███████ from Arabic and Hebrew into English, and the translation is true and accurate to the best of my abilities.


_____
Signature of translator: Moustafa Abouelkheir


Subscribed and sworn before me on this
___27__ day of _____August___ 2025



13

Certification of Translation

My name is ███████████████ I am fluent in Arabic and English. I certify that I translated the enclosed declaration of ██████████ from English to Arabic and confirmed the accuracy of the statement with him in Arabic.

███████████████

08/26/2025

Tab D

**Declaration of** ██████ █████

I, ██████ █████ hereby declare and state:

1. My name is ██████ █████ an and I am Leqaa's cousin on her mother's side. Leqaa's mother is my father's sister.

2. I currently reside at ████████████████████████. I am a US Citizen; I was born in the United States on ██████████. I currently work in pharmaceutical sales.

3. I first met Leqaa when she was about 3 years old. But we didn't see each other as children because she was separated from her mother's family for many years. We met again in 2016 when she came to the United States. Before I moved to Florida, I saw her often in New Jersey. After I moved, she would often come to my family's house in Coral Springs, Florida.

4. I understand that Leqaa has been asked to provide additional information about her money transfers to our family members abroad.

5. I can confirm that ██████ ████ ████ ████████, ████ ████ ████ ████ and ████ ████████ are all family members on my father's side (Leqaa's mother's side). ████ is our aunt, and ████ ████ ████ and ████ are our cousins.

6. I can also confirm that money was sent to them to support their expenses of daily living. Even before the war, it was a struggle there. As family members, we have a moral obligation to support them. Since the war, things have only become more difficult.

7. Leqaa is a really hard worker; she works two or three jobs at a time. She didn't always have a lot of money to send, but she sent whatever she could.

8. I also know that she would often send money on her mother's behalf. Leqaa's mother has medical conditions and a special needs son she is trying to care for. She needed Leqaa's help to send this money.

9. No one in our family has engaged in terrorism or terrorist activity; none of these family members were using this money to support criminal or terrorist activity.

10. I have also never been involved in a terrorist organization or terrorist activity.

The contents of this statement were read to me in English, a language I am fluent in and understand, and I certify that it is true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

██████████████

████ █████                                          August 26, 2025

15



Tab E

DECLARATION OF ███████████

I, ████████████ hereby declare and state:

1. My name is ██████████ My name is also transliterated from Arabic as ████ ████████
   I was born on ██████████████ n Gaza, Palestine.

2. I currently live in Cairo, Egypt with my husband. My daughters ████ and ████ also
   live in Cairo.

3. My family and I were able to leave Gaza after the genocide began.

4. I run a small hair styling business, mostly out of my home.

5. Leqaa Kordia is my niece, the daughter of my sister ████ ████

6. I am aware that in Leqaa's bond hearing, the government raised issues around Leqaa
   sending money overseas, specifically to Palestine.

7. I was also told by one of my relatives that my name was raised in the first bond hearing,
   as though it was somehow bad for Leqaa to have sent me money. It is quite upsetting to
   hear that the government thinks that sending money to anyone in Palestine or to
   Palestinians is suspicious.

8. I understand now that Leqaa has been asked to provide more information about any
   transfer of money overseas.

9. Over the past several years, Leqaa has occasionally sent me money on behalf of her
   mother.

10. I have used the money she sent me for living expenses. I have also used this money to
    help rebuild. In 2022, during one of the aggressions on Gaza, my building was destroyed
    and we needed money to rebuild.

17

11. I know that occasionally, my sister ███ would have her daughters send money, if she couldn't leave the house.

12. I have only ever used the money that Leqaa has sent me for living expenses, for me and my family. I have never used the money to support criminal and/or terrorist activity.

13. I have never been involved in a terrorist organization or terrorist activity.

14. The contents of this statement were read to me in Arabic, a language I am fluent in and understand, and I certify that it is true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.



8/26/2025

18

Certification of Translation

My name is ██████████ I am fluent in Arabic and English. I certify that I translated the enclosed declaration of ███████ from English to Arabic and confirmed the accuracy of the statement with her in Arabic.

08/26/2025

Tab F

DECLARATION OF █████████

I, ████████████ hereby declare and state:

1. My name is ███████████ I was born on ████████████ in Gaza, Palestine.

2. I currently live in Dubai, United Arab Emirates with my wife and children.

3. I work at ██████████ in their media department.

4. Leqaa Kordia is my cousin, the daughter of my aunt, ████ ████.

5. I have been told by family members that Leqaa has been asked to provide more information about any transfer of money overseas.

6. In February 2025, Leqaa sent me some money on behalf of her mother, my aunt.

7. I used this money to cover some medical bills, and generally to support my family as I had to undergo a medical procedure.

8. I did not use this money for criminal or terrorist activity.

9. I have never been involved in a terrorist organization or terrorist activity.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.



8/26/2025

السلطة الفلسطينية
## THE PALESTINIAN AUTHORITY



THIS PASSPORT/TRAVEL DOCUMENT IS ISSUED PERSUANT TO
THE PALESTINIAN SELF GOVERNMENT AGREEMENT ACCORD-
ING TO OSLO AGREEMENT SIGNED IN WASHINGTON ON
13/9/1993

IT IS REQUIRED FROM ALL THOSE WHOM IT MIGHT CONCERN
TO ALLOW THE BEARER OF THIS PASSPORT/TRAVEL DOCUMENT
TO PASS FREELY WITHOUT LET OR HINDRANCE AND TO AFFORD
HIM (HER) SUCH ASSISTANCE AND PROTECTION AS MAY BE
NECESSARY.

MINISTER OF THE INTERIOR

OR

DIRECTOR GENERAL OF
CIVIL REGISTRATION AND
PASSPORT DEPARTMENT

Tab G

DECLARATION OF ███████████

I, ███████████, hereby declare and state:

1. My name is ███████████ I was born on ███████████ in Gaza, Palestine.
2. I currently live in Cairo, Egypt with my husband and two children.
3. My family and I were able to leave Gaza after the genocide began.
4. I work as a secretary at ███████████.
5. Leqaa Kordia is my cousin, the daughter of my aunt, ███ ███.
6. I understand that Leqaa has been asked to provide more information about any transfer of money overseas.
7. Over the past several years, Leqaa has occasionally sent me money on behalf of her mother.
8. I have either used the money for myself, for my family's living expenses, or I passed this money along to my mother, ███ ███.
9. I recall from speaking with my mother that my aunt, ███ would sometimes ask her daughters, ███ or Leqaa, to send the money on her behalf.
10. I have only ever used the money that Leqaa has sent me for living expenses, for me and my family. I have never used the money to support criminal and/or terrorist activity.
11. I have never been involved in a terrorist organization or terrorist activity.
12. The contents of this statement were read to me in Arabic, a language I am fluent in and understand, and I certify that it is true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.



8/26/2025



السلطة الفلسطينية
THE PALESTINIAN AUTHORITY

THIS PASSPORT/TRAVEL DOCUMENT IS ISSUED PURSUANT TO
THE PALESTINIAN SELF GOVERNMENT AGREEMENT ACCORD-
ING TO OSLO AGREEMENT SIGNED IN WASHINGTON ON
1993/XII.

IT IS REQUIRED FROM ALL THOSE WHOM IT MIGHT CONCERN
TO ALLOW THE BEARER OF THIS PASSPORT/ TRAVEL DOCUMENT
TO PASS FREELY WITHOUT LET, HINDERANCE, AND TO AFFORD
HIM/HER SUCH ASSISTANCE AND PROTECTION AS MAY BE
REQUIRED.

OF

DIRECTOR-GENERAL OF
CIVIL AFFAIRS, BORDERS AND
PASSPORT DEPARTMENT

Certification of Translation

My name is ███████████████ I am fluent in Arabic and English. I certify that I translated the enclosed declaration ██████ a ██████ from English to Arabic and confirmed the accuracy of the statement with her in Arabic.

███████████████████████

08/26/2025

Tab H

DECLARATION OF ▆▆▆▆▆▆▆

I, ▆▆▆▆▆▆▆, hereby declare and state:

1. My name is ▆▆▆ ▆▆▆. I was born on ▆▆▆▆▆▆ in Gaza, Palestine.

2. I currently live in Cairo, Egypt with my husband and my children. My husband is an Egyptian citizen.

3. I work as a secretary in Cairo for an Egyptian construction company.

4. I was living in Gaza when the war began. My family and I were able to escape to Egypt.

5. Leqaa Kordia is my cousin, the daughter of my aunt ▆▆▆ ▆▆▆

6. My family has informed me that Leqaa has been asked to provide more information about any transfer of money overseas.

7. Over the past several years, Leqaa has occasionally sent me money on behalf of her mother.

8. I have used the money she sent me for living expenses for me and my family, and for my mother.

9. I have never used the money to support criminal and/or terrorist activity.

10. I have never been involved in a terrorist organization or terrorist activity.

11. The contents of this statement were read to me in Arabic, a language I am fluent in and understand, and I certify that it is true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.



8/26/2025

26



السلطة الفلسطينية
THE PALESTINIAN AUTHORITY

السلطة الفلسطينية

THIS PASSPORT/TRAVEL DOCUMENT IS ISSUED PERSUANT TO
THE PALESTINIAN SELF GOVERNMENT AGREEMENT ACCORD-
ING TO THE OSLO AGREEMENT SIGNED IN WASHINGTON ON
13/9/1993

IT IS REQUESTED FROM ALL THOSE WHOM IT MIGHT CONCERN
TO ALLOW THE HOLDER OF THIS PASSPORT/ TRAVEL DOCUMENT
TO PASS FREELY WITHOUT ANY HINDRANCE AND TO AFFORD
HIM/HER ALL POSSIBLE HELP AND PROTECTION AS MAY BE
NECESSARY.

MINISTRY:

OR:

DIRECTOR GENERAL:

CIVIL REGISTRATION AND
PASSPORT DEPARTMENT:

Certification of Translation

My name is ▮▮▮▮▮▮▮▮▮ I am fluent in Arabic and English. I certify that I translated the enclosed declaration of ▮▮▮ ▮▮▮▮ from English to Arabic and confirmed the accuracy of the statement with her in Arabic.

▮▮▮▮▮▮▮▮▮▮▮

08/26/2025

Tab I

DECLARATION OF ███████/ ███████

I, ████ ██████ hereby declare and state:

1. My name is ██████████. I was born on ██████████ in Gaza, Palestine.

2. I currently live in Gaza, Palestine with my wife and two children.

3. I work at a local supermarket.

4. Leqaa Kordia is my cousin, the daughter of my aunt, ██████ ██████

5. I have been told by family members that Leqaa has been asked to provide more information about any transfer of money overseas.

6. Over the past several years, Leqaa has sent me money on behalf of her mother.

7. I have used this money to help with my living expenses for me and my family.

8. I did not use this money for criminal or terrorist activity.

9. I have never been involved in a terrorist organization or terrorist activity.

10. The contents of this statement were read to me in Arabic, a language I am fluent in and understand, and I certify that it is true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.



8/26/2025



30

**Palestinian Authority**                                      **IDENTITY CARD**

IDENTITY NO.                        ███████████         [Photo]
FIRST NAME                          ████
FATHER'S NAME                       ██████
GRANDFATHER'S NAME                  █████
████  ██████                        ████████
MOTHER'S NAME                       █████
████  ███████                       ███████████

PLACE OF BIRTH            Gaza
SEX            Male       RELIGION            Moslem

REGISTERED IN    Gaza          Date: Oct 20, 2016

31



**LM Language Services Inc.**
**103 Carnegie Center, Suite # 300 Princeton, NJ 08540**
**Phone: 917-319-9932   Fax: 212-428-6724**
**E-mail: projects@lmlanguageservices.net**

AFFIDAVIT FROM MOUSTAFA ABOUELKHEIR

STATE OF NEW JERSEY
[COUNTY OF MERCER] ss:

I, <u>Moustafa Abouelkheir</u>, being duly sworn, under penalty of perjury and say:

1. I, <u>Moustafa Abouelkheir,</u> hereby certify that I am fluent in Arabic, Hebrew and English and I am competent to translate from Arabic and Hebrew to English. I am bilingual and have translated legal documents into both languages.
2. I have translated the document: "ID-█████ ████████ from Arabic and Hebrew into English, and the translation is true and accurate to the best of my abilities.

_____
Signature of translator: Moustafa Abouelkheir

Subscribed and sworn before me on this
___27__ day of _____August___ 2025



32

Certification of Translation

My name is ███████████ I am fluent in Arabic and English. I certify that I translated the enclosed declaration of ██ ████████ from English to Arabic and confirmed the accuracy of the statement with him in Arabic.

████████████████████

08/26/2025

Tab J



Western Union
Privacy Office
7001 E Belleview Ave
Denver, CO 80237

█████████

Leqaa M A Kordia

████████████

███████████████

Re: Your money transfer history request

August 21, 2025

Hi Leqaa,

All set – we've completed your money transfer history request on 08/20/2025 and attached a copy of your history from 01/01/2017 to 08/19/2025 for your review.

Just a heads up, transfer history records don't reflect money transfers from within the last 48 hours. If you need a report that includes these transfers (as indicated on your money transfer history request form), please let us know and we'll get back to you with a complete report within 48 hours.

If you need a more extensive transfer history, please submit a request at https://www.westernunion.com/global/en/carf-form.html.

Thanks for choosing Western Union.

Devendu D





**TRANSFER HISTORY REPORT for Sent Money Transfers***

| MTCN | SENDER'S NAME | SEND DATE | SEND AMOUNT AND CURRENCY | FEES | RECEIVER'S NAME | PAID DATE | PAID AMOUNT AND CURRENCY | DESTINATION |
|---|---|---|---|---|---|---|---|---|
| | LEQAA KORDIA | 2/24/2025 | USD 1,000.00 | USD 16.00 | | 2/26/2025 | AED 3,422.60 | UNITED ARAB EMIRATES |
| | LEQAA KORDIA | 4/22/2024 | USD 1,000.00 | USD 16.00 | | 4/24/2024 | USD 1,000.00 | EGYPT |
| | LEQAA KORDIA | 2/14/2024 | USD 2,000.00 | USD 31.00 | | 2/16/2024 | USD 2,000.00 | EGYPT |
| | LEQAA KORDIA | 4/29/2022 | USD 1,100.00 | USD 17.50 | | 4/30/2022 | USD 1,100.00 | PALESTINE |
| | LEQAA KORDIA | 12/29/2021 | USD 100.00 | USD 8.00 | | 12/30/2021 | USD 100.00 | PALESTINE |
| | LEQAA KORDIA | 12/1/2021 | USD 600.00 | USD 16.00 | | 12/2/2021 | USD 600.00 | PALESTINE |
| | LEQAA KORDIA | 11/15/2021 | USD 1,000.00 | USD 16.00 | | 11/16/2021 | USD 1,000.00 | PALESTINE |
| | LEQAA KORDIA | 10/15/2021 | USD 100.00 | USD 8.00 | | 10/16/2021 | USD 100.00 | PALESTINE |
| | LEQAA KORDIA | 8/8/2021 | USD 500.00 | USD 11.00 | | 8/10/2021 | USD 500.00 | PALESTINE |
| | LEQAA KORDIA | 6/7/2021 | USD 900.00 | USD 16.00 | | 6/12/2021 | USD 900.00 | PALESTINE |
| | LEQAA KORDIA | 6/3/2021 | USD 900.00 | USD 16.00 | | 6/5/2021 | USD 900.00 | PALESTINE |
| | LEQAA KORDIA | 4/28/2021 | USD 200.00 | USD 9.00 | | 4/29/2021 | USD 200.00 | PALESTINE |
| | LEQAA KORDIA | 4/13/2021 | USD 1,000.00 | USD 16.00 | | 4/14/2021 | USD 1,000.00 | PALESTINE |
| | LEQAA KORDIA | 2/12/2021 | USD 100.00 | USD 11.99 | | 2/15/2021 | USD 100.00 | PALESTINE |
| | LEQAA KORDIA | 1/13/2021 | USD 1,000.00 | USD 11.99 | | 1/14/2021 | USD 1,000.00 | PALESTINE |
| | LEQAA KORDIA | 11/16/2020 | USD 150.00 | USD 11.99 | | 11/17/2020 | USD 150.00 | PALESTINE |
| | LEQAA KORDIA | 10/17/2020 | USD 150.00 | USD 11.99 | | 10/17/2020 | USD 150.00 | PALESTINE |
| | LEQAA KORDIA | 10/5/2020 | USD 2,000.00 | USD 40.99 | | 10/6/2020 | USD 2,000.00 | PALESTINE |
| | LEQAA KORDIA | 6/18/2020 | USD 300.00 | USD 11.99 | | 6/20/2020 | USD 300.00 | PALESTINE |
| | LEQAA KORDIA | 3/19/2020 | USD 300.00 | USD 11.99 | | 3/25/2020 | USD 300.00 | PALESTINE |
| | LEQAA KORDIA | 2/16/2020 | USD 600.00 | USD 16.99 | | 2/17/2020 | USD 600.00 | PALESTINE |
| | LEQAA KORDIA | 2/15/2020 | USD 1,000.00 | USD 19.99 | | 2/16/2020 | USD 1,000.00 | PALESTINE |
| | LEQAA KORDIA | 2/13/2020 | USD 100.00 | USD 11.99 | | 2/15/2020 | USD 100.00 | PALESTINE |
| | LEQAA KORDIA | 1/10/2020 | USD 300.00 | USD 11.99 | | 1/11/2020 | USD 300.00 | PALESTINE |
| | LEQAA KORDIA | 8/16/2019 | USD 400.00 | USD 11.99 | | 8/17/2019 | USD 400.00 | PALESTINE |

**Western Union**

| | | | | | | |
|---|---|---|---|---|---|---|
| LEQAA KORDIA | 5/23/2019 | USD 350.00 | USD 11.99 | | 5/25/2019 | USD 350.00 | PALESTINE |
| LEQAA KORDIA | 8/17/2018 | USD 100.00 | USD 11.99 | | 8/19/2018 | USD 100.00 | PALESTINE |
| LEQAA KORDIA | 6/28/2018 | USD 50.00 | USD 11.99 | | 6/30/2018 | USD 50.00 | PALESTINE |
| LEQAA KORDIA | 6/13/2018 | USD 100.00 | USD 11.99 | | 6/13/2018 | USD 100.00 | PALESTINE |
| LEQAA KORDIA | 5/16/2018 | USD 300.00 | USD 11.99 | | 5/17/2018 | USD 300.00 | PALESTINE |
| LEQAA KORDIA | 12/26/2017 | USD 200.00 | USD 11.99 | | 12/27/2017 | USD 200.00 | PALESTINE |
| LEQAA KORDIA | 10/27/2017 | USD 300.00 | USD 11.99 | | 10/28/2017 | USD 300.00 | PALESTINE |
| LEQAA KORDIA | 10/20/2017 | USD 300.00 | USD 11.99 | | 10/21/2017 | USD 300.00 | PALESTINE |

\* If you requested information regarding money transfers sent over 5 years ago, this list may not be complete due to system limitations.

If you find errors, send us an email at customeraccess.request@westernunion.com so we can correct incomplete or inaccurate information.

36

**Western Union**

## TRANSFER HISTORY REPORT for Received Money Transfers*

| MTCN | RECEIVER'S NAME | SEND DATE | SENDER'S NAME | PAID DATE | PAID AMOUNT AND CURRENCY | ORIGINATING COUNTRY | DESTINATION |
|------|-----------------|-----------|---------------|-----------|--------------------------|---------------------|-------------|
| | LEQAA M A KORDIA | 8/10/2022 | | 8/12/2022 | USD 300.00 | PALESTINE | UNITED STATES |
| | LEQAA M A KORDIA | 7/14/2022 | | 7/14/2022 | USD 200.00 | PALESTINE | UNITED STATES |
| | LEQAA M A KORDIA | 6/28/2022 | | 6/28/2022 | USD 1,000.00 | PALESTINE | UNITED STATES |
| | LEQAA M A KORDIA | 5/9/2022 | | 5/9/2022 | USD 2,000.00 | PALESTINE | UNITED STATES |
| | LEQAA KORDIA | 9/28/2021 | | 9/29/2021 | USD 300.00 | PALESTINE | UNITED STATES |

* If you requested information regarding money transfers sent over 5 years ago, this list may not be complete due to system limitations.

If you find errors, send us an email at customeraccess.request@westernunion.com so we can correct incomplete or inaccurate information.

37

Tab K

Pacheco, Evelyn 8/27/2025
For Educational Use Only

IN RE: CUPERTINO ZARATE, 2016 WL 1722605 (2016)

---

**2016 WL 1722605 (BIA)**


**\*\* THIS IS AN UNPUBLISHED DECISION - NOT INTENDED FOR CITATION AS PRECEDENT \*\***


U.S. Department of Justice

Executive Office for Immigration Review

Board of Immigration Appeals

IN RE: CUPERTINO ZARATE

File: AXXX XX8 165 - Chicago, IL
March 23, 2016


**IN REMOVAL PROCEEDINGS**


**APPEAL**


ON BEHALF OF RESPONDENT:

Matthew P. Dillinger, Esquire


ON BEHALF OF DHS:

Colleen Peppard
Assistant Chief Counsel


CHARGE:


**\*1** Notice: Sec. 212(a)(6)(A)(i), I&N Act [8 U.S.C. § 1182(a)(6)(A)(i)] - Present without being admitted or paroled (conceded)


**APPLICATION: Adjustment of status; voluntary departure**


The respondent, a native and citizen of Mexico, has appealed from the Immigration Judge's March 17, 2014, decision denying his application for adjustment of status under section 245(i) of the Immigration and Nationality Act, 8 U.S.C. § 1255(i), as the widow of a United States citizen and his request for post-conclusion voluntary departure under section 240B(b) of the Act, 8 U.S.C. § 1229c(b), in the exercise of discretion. [1] The Department of Homeland Security ("DHS") opposes the appeal. [2] The appeal will be dismissed.

IN RE: CUPERTINO ZARATE, 2016 WL 1722605 (2016)

We review findings of fact, including credibility findings, for clear error. 8 C.F.R. § 1003.1(d)(3)(i). We review de novo all other issues, including issues of law, judgment, and discretion. 8 C.F.R. § 1003.1(d)(3)(ii). Because the respondent filed his application after May 11, 2005, it is subject to the provisions of the REAL ID Act of 2005. *See Matter of M-L-M-A-*, 26 I&N Dec. 360, 362 n.2 (BIA 2014).

It is undisputed that the respondent is statutorily eligible for adjustment of status under section 245(i) of the Act (I.J. at 3). However, the Immigration Judge determined that the respondent did not establish that adjustment was warranted as a matter of discretion (I.J. at 5-8). *See Matter of Estrada*, 26 I&N Dec. 180, 183 (BIA 2013). Where, as here, an applicant for adjustment of status under section 245 of the Act presents adverse discretionary factors, it is necessary for him to offset these negative factors with countervailing positive equities, including evidence of family ties in the United States, hardship if the application is not granted, and the length of the applicant's residence in the United States, among other things. *See Matter of Arai*, 13 I&N Dec. 494, 496 (BIA 1970).

In terms of positive equities, the Immigration Judge found that: the respondent has lived in the United States for more than 15 years; the respondent had a good relationship with his United States citizen spouse before she died and continues to have a good relationship with his in-laws; and the respondent cared and provided for his spouse, as his wife was disabled and did not work during their marriage from 2001 until her death in 2011 (IJ. at 3-6; Exh. 2 at Tabs Z, EE-GG; Tr. at 25-30, 60-62, 71-72, 82-86, 92-94). [3] Although most of the respondent's immediate family lives in Mexico, two of his siblings live in the United States but reside apart from the respondent in separate states (I.J. at 4, 6-7; Tr. at 38, 51-52). The respondent has been employed as an automobile mechanic during most of his time in the United States, and his employer considers him to be a valuable worker (I.J. at 4, 6; Exh. 3 at Tab BB; Tr. at 28, 46-48). The respondent did not work while incarcerated but was rehired following his release from prison in 2013, until he was laid off before his final hearing (I.J. at 6; Tr. at 46-49). While employed, the respondent sent remittances to his family in Mexico, although he is uncertain of how much or how often he sent money (I.J. at 4, 6; Tr. at 38-39, 64-65). The respondent testified that the denial of his application for adjustment of status would cause him hardship because he would no longer be able to work in the United States and send remittances to his family in Mexico to assist them with building a home in that country (I.J. at 4, 7-8; Tr. at 65-69). However, the Immigration Judge concluded that the equitable significance of the respondent's financial contributions is undercut by the fact that the record does not contain persuasive evidence that the respondent could not find gainful employment to assist his family in Mexico (I.J. at 6-8; Tr. at 67-68).

**\*2**  In terms of negative factors, the Immigration Judge found that the respondent has an extensive criminal history in the United States, consisting of numerous arrests and convictions, many of which stem from his ▮▮ of alcohol (I.J. at 6; Exh. 2 at Tabs Q-Y; Tr. at 40-46). Specifically, the respondent was: convicted of driving under the influence ("DUI") in 2004 and arrested and convicted of driving without a license the same year; he was convicted of DUI a second time in 2005; he was convicted of aggravated DUI in 2006; and he was convicted of aggravated DUI a second time in 2012 (I.J. at 6-7; Tr. at 40-46; Exh. 2 at Tabs Q-Y). The respondent acknowledges his alcoholism and expresses regret for his crimes (I.J. at 6-7; Exh. 2 at Tab Z).

The Immigration Judge additionally found that while the respondent maintained his sobriety following his 2006 conviction for DUI, he ultimately relapsed after his wife's death, and this relapse resulted in his 2012 conviction (I.J. at 6-7; Exh. 2 at Tab Z; Tr. at 60, 62-63, 99-100). For the latter offense, the respondent was sentenced to 2 years of incarceration (I.J. at 7; Exh. 2 at Tab X; Tr. at 58). The Immigration Judge acknowledged that the respondent has recently reenrolled in Alcoholics Anonymous but also noted he had participated in such classes following his other convictions but continued to reoffend (I.J. at 7; *see* Exh. 2 at Tab AA; Tr. at 54-60, 78-80). The Immigration Judge's findings in this regard are not clearly erroneous (I.J. at 4, 6-7; Exh. 2; Tr. at 25-30, 38-39, 40-49, 51-69, 71-72, 78-86, 92-100).

Upon de novo review, we agree with the Immigration Judge that the respondent's positive equities do not outweigh the respondent's history of alcohol ▮▮ driving under the influence, and recidivism (I.J. at 6-8). Driving under the influence is a

Pacheco, Evelyn 8/27/2025
For Educational Use Only

IN RE: CUPERTINO ZARATE, 2016 WL 1722605 (2016)

serious crime, which risks causing severe injury or death to others, and displays a complete disregard for the law or the safety and wellbeing of others. *See Begay v. United States*, 553 U.S. 137, 156-57 (2008) (Scalia, J., dissenting) (outlining statistics showing that "'"driving under the influence of alcohol is very dangerous'"); *Matter of Ramos*, 23 I&N Dec. 336, 340 (BIA 2002). The respondent's four DUI convictions spanning more than a decade weigh heavily in our analysis (I.J. at 6-7; Tr. at 40-46; Exh. 2 at Tabs Q-Y). While we recognize that the respondent relapsed following the death of his wife in 2011, that does not change the dangerous nature of his misconduct in 2012, which involved driving under the influence of alcohol and endangering the health and safety of others for the fourth time. Notwithstanding the respondent's attempts at rehabilitation, we, like the Immigration Judge, lack confidence that the respondent will not continue to endanger the community by drinking and driving based on his history of recidivism and alcohol abuse (I.J. at 7).

**\*3** In balancing the foregoing positive equities and negative factors, we ultimately agree with the immigration Judge that the negative considerations presented outweigh the respondent's lengthy presence in the United States, his history of employment in this country, his good relationship with his in-laws, his brief period of sobriety, and his desire to remain in the United States so that he can work and continue to send remittances to his family Mexico (I.J. at 6-8). As a consequence, the respondent does not merit adjustment of status in the exercise of discretion. Based on the foregoing, we additionally agree with the Immigration Judge's decision to deny the respondent's request for voluntary departure under section 240B(b) of the Act in the exercise of discretion (I.J. at 8; Respondent's Brief at 8). Accordingly, the following order will be entered.

ORDER: The respondent's appeal is dismissed.

Roger Pauley
FOR THE BOARD

---

### Footnotes

1    The Immigration Judge alternatively denied the respondent's request for voluntary departure based on statutory ineligibility due to the respondent's lack of good moral character (I.J. at 8). *See* section 240B(b)(1)(B) of the Act.

2    Because the respondent has filed no opposition to the DHS's October 2014 motion to accept its late-filed brief, the motion is granted.

3    Contrary to the respondent's assertions on appeal (Respondent's Brief at 6-8), the Immigration Judge did consider the effect the death of the respondent's wife had on him (I.J. at 3; Exh. 2 at Tab Z; Tr. at 59-60, 99-100).

**2016 WL 1722605 (BIA)**

End of Document                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Tab L



Personal remittances, received (current US$)

IMF balance of payments data, International Monetary Fund (IMF); Staff estimates, World Bank (WB)

License : CC BY-4.0

World (2024) **740.51 Billion**

Tab M











# Personal remittances, received (current US$) - West Bank and Gaza

IMF balance of payments data, International Monetary Fund ( IMF ); Staff estimates, World Bank ( WB )

**License** : CC BY-4.0 ⓘ

Line    Bar    Map

⋮ Also Show    ✦ Share    ⊕ Details    🔽 LABEL

West Bank and Gaza (2021) **3.76 Billion**

WEST BANK AND GAZA

1995    2000    2005    2010    2015    2020

1995 - 2024

Personal remittances, paid (current US$)

Personal transfers, receipts (BoP, current US$)

Personal remittances, received (% of GDP)

Secondary income receipts (BoP, current US$)

Net secondary income (BoP, current US$)

Net capital account (BoP, current US$)

Secondary income, other sectors, payments (BoP, current US$)

Exports of goods and services (BoP, current US$)

**Download**
CSV    XML    EXCEL

**DataBank**
Explore Our DataBank

WDI Tables

46



Personal remittances, received (current US$) - West Bank and Gaza

IMF balance of payments data, International Monetary Fund (IMF); Staff estimates, World Bank (WB)

License : CC BY-4.0

West Bank and Gaza (2022) **4.6 Billion**

WEST BANK AND GAZA

1995 - 2024

47





Tab N

Case 3:25-cv-01072-L-BT     Document 73-1     Filed 08/29/25     Page 76 of 89     PageID 2386

# Department of Economic and Social Affairs(/en/desa)



# Much more than a 'lifeline' for millions of households, remittances can spur global growth, says UN agency

Not only are remittances a "critical lifeline" for millions globally, the direct benefits of money sent home by migrant workers touch the lives of one in every seven persons on the planet – over one billion people, the United Nations rural development agency has said.

Remittances are vital(https://www.ifad.org/en/web/latest/news-detail/asset/40323937) for millions of families, helping them to address their own development goals, but we can help them do more and build their longer-term

50

Case 3:25-cv-01072-L-PT   Document 73-1   Filed 08/29/25   Page 77 of 89   PageID 2387

future," said Gilbert Houngbo, the President of the International Fund for Agricultural Development (IFAD (https://www.ifad.org/)).

Last year, 200 million migrants sent $481 billion to remittances-reliant countries. Of this amount, $466 billion went to developing countries and there are estimates that between 2015 and 2030, remittances sent to developing countries could cross $6.5 trillion.

According to IFAD, after spending remittances on basic needs such as food, housing, education and health, a sizable amount – over $100 billion, still remains – presenting a large pool of resources, which can then be invested in financial and tangible assets such as savings or small business development that help families build their future.

These productive activities can also create jobs and transform economies, in particular in rural areas, added IFAD.

"Given appropriate investment options, customized to their circumstances and goals, remittance families will invest more and become agents of change in their communities," urged Mr. Houngbo.

The IFAD President's call comes against the backdrop of the recent designation, by the UN General Assembly, of 16 June as the International Day of Family Remittances (http://www.un.org/en/events/family-remittances-day/), originally created by the IFAD Governing Council.

Proclaiming the International Day, the General Assembly also recognized (http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/72/281) the "transformative impact" of remittances, including those from migrants, for the implementation of the Sustainable Development Goals and in supporting long term development strategies.

[embed]https://www.youtube.com/watch?v=KVxCvwtiP2c[/embed]

Source: UN News Centre

## Related information

International Day of Family Remittances(http://www.un.org/en/events/family-remittances-day/)
Global Compact for Safe, Orderly and Regular Migration (https://refugeesmigrants.un.org/migration-compact)
UN DESA's Population Division – International migration (http://www.un.org/en/development/desa/population/migration/index.shtml)

## ABOUT UN DESA

- What We Do (/en/desa/what-we-do)

51

- Leadership (/en/desa/about-us/leadership)

- Advisory Board (/en/desa/about-us/advisory-board)

- Policy Dialogues (/en/desa/policy-dialogue)

- ECESA (https://www.un.org/development/desa/ecesa/)

- Organigramme (/en/desa/about-us/organigramme)

## KEY TOPICS

- Climate Action (/en/desa/key-topics/climate-action)

- Data (/en/desa/key-topics/data-sdgs)

- Financing (/en/desa/key-topics/financing-sustainable-development)

- Global Partnerships (/en/desa/key-topics/enhancing-global-partnerships)

- HLPF (/en/desa/key-topics/hlpf)

- Leaving No One Behind (/en/desa/key-topics/leaving-no-one-behind)

- Science, Technology and Innovation (/en/desa/key-topics/science-technology-and-innovation)

- Strengthening Institutions (/en/desa/key-topics/strengthening-institutions)

- Thought Leadership (/en/desa/key-topics/thought-leadership)

## UN DESA PRODUCTS

- Publications (https://desapublications.un.org)

- Databases (/en/desa/products/un-desa-databases)

- Policy Briefs (https://desapublications.un.org/policy-briefs)

- Working Papers (https://desapublications.un.org/working-papers)

- Webinars (/en/desa/products/webinars)

- Statements (https://www.un.org/en/desa/products/statements)

- UN DESA Voice (https://desapublications.un.org/un-desa-voice)

- Videos (https://www.youtube.com/user/UnitedNationsDESA)

## UN DESA DIVISIONS

- Office of Intergovernmental Support and Coordination for Sustainable Development (https://ecosoc.un.org)

- Division for Sustainable Development Goals(https://sdgs.un.org)

- Population Division(https://www.un.org/development/desa/pd/)

- Division for Public Institutions and Digital Government(https://publicadministration.desa.un.org/)

- Financing for Sustainable Development Office(https://financing.desa.un.org/)

- Division for Inclusive Social Development(https://social.desa.un.org/)

- Statistics Division(http://unstats.un.org/unsd/default.htm)

- Economic Analysis and Policy Division(https://policy.desa.un.org)

- United Nations Forum on Forests(http://www.un.org/esa/forests/)

- Capacity Development Programme Management Office(https://capacity.desa.un.org/)

---

(https://www.un.org/en/)

**DONATE (/EN/ABOUT-US/HOW-TO-DONATE-TO-THE-UN-SYSTEM)**

 (https://www.facebook.com/joinundesa)     (https://twitter.com/undesa)

 (https://www.youtube.com/user/UnitedNationsDESA)

 (https://www.linkedin.com/company/united-nations-department-of-economic-and-social-affairs/)

---

**A-Z SITE INDEX (HTTPS://WWW.UN.ORG/EN/SITE-INDEX)** ▮
**CONTACT (HTTPS://WWW.UN.ORG/EN/CONTACT-US-0)** ▮
**COPYRIGHT (HTTPS://WWW.UN.ORG/EN/ABOUT-US/COPYRIGHT)** ▮
**FAQ (HTTPS://WWW.UN.ORG/EN/ABOUT-US/FREQUENTLY-ASKED-QUESTIONS)** ▮
**FRAUD ALERT (HTTPS://WWW.UN.ORG/EN/ABOUT-US/FRAUD-ALERT)** ▮
**PRIVACY NOTICE (HTTPS://WWW.UN.ORG/EN/ABOUT-US/PRIVACY-NOTICE)** ▮
**TERMS OF USE (HTTPS://WWW.UN.ORG/EN/ABOUT-US/TERMS-OF-USE)**

**PROOF OF SERVICE**

On August 27, 2025, I, Sarah Sherman-Stokes, served a copy of **RESPONDENT'S BRIEF ON REMAND IN SUPPORT OF RESPONDENT'S RELEASE ON BOND AND SUPPORTING EVIDENCE TABS A-N** on the Department of Homeland Security, Immigration and Customs Enforcement, Office of the Principal Legal Advisor, via filing with the ECAS system.

_____
Sarah Sherman-Stokes


_8/27/2025_____
Date

# EXHIBIT 1-B

**Declaration of Hamzah Abushaban**

1. My name is Hamzah Abushaban and I am Leqaa's cousin.
2. I currently reside in Coral Springs, Florida. I am a US Citizen; I was born in the United States. I currently work in pharmaceutical sales.
3. On April 4, 2025, I paid the original $20,000 bond ordered by the immigration judge.
4. ICE accepted my payment, but informed me that Leqaa would not be released because DHS was appealing.
5. I later received the $20,000 refunded to me in July 2025, because of the appeal of the bond order.
6. On August 28, 2025, I received a copy of the immigration judge's bond order around 12:20pm.
7. By no later than 2:00pm on August 28, 2025, I went to the ICE Field Office at 2805 SW 145th Avenue Miramar, FL 33027, with a cashier's check for $20,000 and a copy of the bond order.
8. I spent more than 30 minutes talking to different ICE officers, trying to lodge payment of the bond.
9. These officers refused to accept payment of the bond. Eventually, around 2:40pm, one of them told me that their office was closing for the day at 3:00pm and that no one would be around to assist me.
10. I left the office.
11. Around 5:50pm, I received a call from someone at ICE, informing me that DHS was filing an appeal of the bond order and that I should wait 10 days before paying the bond.
12. I remain ready to pay the $20,000 bond to secure my cousin's release, as I previously did nearly four months ago.
13. Everyone in my family wants Leqaa home in Paterson, NJ where she belongs. I am incredibly frustrated that despite doing everything in her power to secure release, and despite the fact that an immigration judge has twice said she can be released, the government has found ways to prevent that from happening.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____                          _____

Hamzah Abushaban                                 August 29, 2025

# EXHIBIT 2



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

Respondent Name:

    KORDIA, LEQAA

To:

    Sherman-Stokes, Sarah R

A-Number:

    █████████

Riders:

In Custody Redetermination Proceedings

Date:
08/28/2025

☐ Unable to forward - no address provided.

☑ Attached is a copy of the **decision of the Immigration Judge.** This decision is final unless an appeal is filed with the Board of Immigration Appeals within 30 calendar days of the date of the mailing of this written decision. See the enclosed forms and instructions for properly preparing your appeal. Your notice of appeal, attached documents, and fee or fee waiver request must be mailed to:

    Board of Immigration Appeals
    Office of the Clerk
    P.O. Box 8530
    Falls Church, VA 22041

☐ Attached is a copy of the decision of the immigration judge as the result of your Failure to Appear at your scheduled deportation or removal hearing. This decision is final unless a Motion to Reopen is filed in accordance with Section 242B(c)(3) of the Immigration and Nationality Act, 8 U.S.C. § 1252B(c)(3) in deportation proceedings or section 240(b)(5)(c), 8 U.S.C. § 1229a(b)(5)(c) in removal proceedings. If you file a motion to reopen, your motion must be filed with this court:

    Immigration Court

☐ Attached is a copy of the decision of the immigration judge relating to a Reasonable Fear Review. Pursuant to 8 C.F.R. § 1208.31(g)(1), no administrative appeal is available.

☐ Attached is a copy of the decision of the immigration judge relating to a **Credible Fear Review.** This is a final order. No appeal is available.

☐ Other:

Date:

Immigration Judge: NASELOW-NAHAS, TARA 08/28/2025

## Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Alien | [ ] Alien c/o custodial officer | [ E ] Alien atty/rep. | [ E ] DHS

Respondent Name : KORDIA, LEQAA | A-Number : ███████████

Riders:

Date: 08/28/2025 By: Pardo-Mares, Santa, Court Staff



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**PORT ISABEL IMMIGRATION COURT**

Respondent Name:

KORDIA, LEQAA

To:

Sherman-Stokes, Sarah R

A-Number:

Riders:
In Custody Redetermination Proceedings

Date:
08/28/2025

## ORDER OF THE IMMIGRATION JUDGE

The respondent requested a custody redetermination pursuant to 8 C.F.R. § 1236. After full consideration of the evidence presented, the respondent's request for a change in custody status is hereby ordered:

☐ Denied, because

☑ Granted. It is ordered that Respondent be:
    ☐ released from custody on his own recognizance.
    ☑ released from custody under bond of $ 20,000.00
    ☐ other:

☑ Other:
    Following BIA remand bond in the amount of $20,000.00 is reinstated.



Immigration Judge: NASELOW-NAHAS, TARA 08/28/2025

Appeal:    Department of Homeland Security:  ☐ waived  ☐ reserved

                Respondent:  ☐ waived  ☐ reserved

Appeal Due:

### Certificate of Service

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable

To: [ ] Alien | [ ] Alien c/o custodial officer | [ E ] Alien atty/rep. | [ E ] DHS

Respondent Name : KORDIA, LEQAA | A-Number : █████████

Riders:

Date: 08/28/2025 By: Pardo-Mares, Santa, Court Staff

# EXHIBIT 3

U.S. Department of Justice
Executive Office for Immigration Review

**Notice of ICE Intent to Appeal Custody Redetermination**

Date: 08/28/2025

Alien Number: ████████

Alien Name: Leqaa KORDIA

1.    Immigration and Customs Enforcement (ICE) has:

☒    a.    Held the respondent without bond.

❑    b.    Set the respondent's bond at $ _____ .

2.    The Immigration Judge on ____08/28/2025____
                                  (Date)

❑    a.    Authorized the respondent's release.

☒    b.    Redetermined the ICE bond to $ ___$20,000___ .

3.    Filing this form on ____08/28/2025_____ automatically stays the
                             (Date)

Immigration Judge's custody redetermination decision. See 8 C.F.R. §1003.19(i)(2).

4.    The stay shall lapse if ICE does not file a notice of appeal along with appropriate certification within ten business days of the issuance of the order of the Immigration Judge, or upon ICE's withdrawal of this notice, or as set forth in 8 C.F.R. §1003.6(c)(4) and (5).
      See 8 C.F.R. §1003.6(c)(1).

*Emily B. Swanson*
_____
ICE Counsel

I, ___Emily B. Swanson___ , served the Notice of ICE Intent to Appeal Custody Redetermination on
            (Name)

___Sarah Sherman-Stokes, Respondent's Representative___ , on ___08/28/2025___ .
      (Respondent or Respondent's Representative)                    (Date)

*Emily B. Swanson*   DCC OPLA San Antonio
_____
Signature

EOIR – 1 of 1

Form EOIR-43
Rev. Oct. 2006