# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| | § | |
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |
| | § | |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

## PETITIONER'S REQUEST FOR STATUS CONFERENCE

## APPENDIX

## TABLE OF CONTENTS

| Exhibit | Description | Page |
|---|---|---|
| 1 | Declaration of Hamzah Abushaban | 3-5 |
| 2 | Declaration of Travis Fife | 6-10 |
| 2-A | HIPPA Waiver for Leqaa Kordia | 11-12 |
| 2-B | E-mails sent between Travis Fife and Respondents and LaSalle Corrections Staff (Feb. 6, 2026) | 13-16 |
| 2-C | E-mails sent between Travis Fife and Respondents' Counsel between February 6, 2026 and February 8, 2026 | 17-22 |
| 3 | Declaration of Sadaf Hasan | 23-26 |
| 4 | Declaration of Sarah Sherman-Stokes | 27-31 |
| 4-A | E-mails between Sarah Sherman-Stokes and Stacy Norcross on February 6, 2026 | 32-34 |
| 4-B | E-mails between Sarah Sherman-Stokes and Elisabeth Courson between February 6, 2026 and February 8, 2026 | 35-53 |

| 5 | Declaration of Caitlyn Silhan | 54-56 |
|---|---|---|
| 6 | Dallas Morning News, *Family and lawyers seek answers after ICE detainee Leqaa Kordia is hospitalized* (Feb. 7, 2026), available at https://www.dallasnews.com/news/immigration/2026/02/07/family-and-lawyers-seek-answers-after-ice-detainee-leqaa-kordia-is-hospitalized/ | 57-68 |
| 7 | Letter from Texas State Representative Salman Bohjani (T-92) to Respondent ICE, Feb. 7, 2026 | 69-71 |
| 8 | E-mail from Senator Welch (VT)'s office to ICE, Feb. 7, 2026 | 72-74 |
| 9 | Letter from Bennie Thompson et al. to Secretary Noem, Jan. 22, 2026, https://democrats-homeland.house.gov/imo/media/doc/chs_letter_to_noem_re_ice_and_cbp_condemning_deaths.pdf | 75-79 |
| 10 | Declaration of Leqaa Kordia | 80-85 |
| 11 | Declaration of Dr. Audrey Nath | 86-91 |
| 11-A | Curriculum Vitae of Dr. Audrey Nath | 92-103 |
| 11-B | Complete Hospital Records Reviewed by Dr. Nath | 104-181 |

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LEQAA KORDIA,

     Petitioner-Plaintiff,

v.

KRISTI NOEM et al.,

     Respondents-Defendants.

§
§
§
§
§
§  CIVIL ACTION NO. 3:25-cv-1072-L-BT
§
§
§
§
§
§

**DECLARATION OF HAMZAH ABUSHABAN**

I, Hamzah Abushaban, hereby declare and state:

1. My name is Hamzah Abushaban. I currently reside at  Florida ████ I was born in the United States on ████████ I am Leqaa Kordia's cousin.

2. Since March 14, 2025, my cousin has been confined at the Prairieland Detention Facility ("PDF") in Alvarado, Texas. Since her confinement, I have stayed in constant communication with Leqaa and her legal team.

3. Because Leqaa was taken over 1,500 miles away from her home in New Jersey, her confinement has taken an emotional toll on our family given the distance and our inability to visit her regularly in person at the Prairieland Detention Facility.

4. I speak regularly to Leqaa—on average at least four to five times every week through the Getting Out app. We are extremely close and I have helped her navigate acute periods of stress over the past eleven months. I have grown increasingly concerned about her well-being in recent weeks given what she's reported to me about her health and the overall conditions at the facility. Recently, I've noticed that she has been sick almost every other day when I've spoken to her over the phone.

5. On January 29, 2026, I was finally able to make the journey to Texas from Florida for an approved visit to see her. Leqaa's attorney, Travis Fife, received clearance from the facility weeks prior for us to visit Leqaa with State Representative Salman Bhojani to check on Leqaa's safety, health, and living conditions at the detention facility.

6. On Friday, January 30, 2026, the facility cancelled our visit with Leqaa at the last minute. I did not receive a straight answer for why this visit was cancelled. Leqaa informed me that facility staff told her that there were "200 protestors" outside the facility, which was not true at any point that morning.

7. On Sunday February 1, 2026, I was able to visit her alone without State Representative Bhojani. I was shocked and distressed when I finally saw her in person. She looked like a different human from when I was last able to see her in person. She appeared very fragile and was struggling to hold a phone to her ear to speak with me. She was sick, apparently with flu-like symptoms, and told me: "I'm dying in here."

8. I was extremely upset after seeing Leqaa in person. Over the past eleven months, I and the rest of my family have struggled with feeling hopeless about Leqaa's condition and confinement, worried about her when she gets sick, or when she doesn't get the food she needs. But I left that visit feeling hopeless and even more concerned than before.

9. Less than one week after visiting Leqaa in Texas, I received alarming news about Leqaa's health. On Friday, February 6, 2026, at approximately 9:41am CT I received a text message from a woman previously confined with Leqaa at the facility stating that her f

who is still at the facility informed her that Leqaa became unwell and was taken to the hospital.

Case 3:25-cv-01072-L-BT    Document 93-1    Filed 02/13/26    Page 5 of 181    PageID 2692

10. Immediately upon receiving this message, I contacted the formerly detained individual directly by phone to verify her identity and the credibility of the information. During that call, she explained who she was, confirmed her prior confinement at PDF, and explained how she knew Leqaa and how she received this information from individuals currently inside the facility.

11. After confirming this information, I notified the entire legal team at 9:43am CT. At 9:54am CT I called PDF asking which hospital my cousin was taken to. The staff at PDF informed me it was against the law and facility rules to tell me where Leqaa was taken to even though I explained that I was her family member.

12. Shortly thereafter, I received a phone call at approximately 10:32am CT from an individual inside the facility who was hysterical and crying uncontrollably in recounting what happened to Leqaa, making it very difficult to understand her initially. However, she confirmed that Leqaa was in the hospital.

13. The woman then called again at approximately 10:30am CT and told me Leqaa had fallen, hit her head and had a seizure and was sent to the hospital. During that call, she also expressed deep distress and stated that she begged multiple people inside the facility including officers and staff to at least inform her and others whether Leqaa was simply okay, alive, or where she had been taken. She reported that no clear information was provided to her and other concerned detainees despite repeated inquiries.

14. I asked the woman to send me a text message explaining what had occurred so that I could clearly understand. At approximately 10:57am CT, she sent me a message stating that Leqaa had fainted while she was sitting in the bathroom waiting for the count time to be over. She hit her head by the door and fell down on the floor. She began to have a seizure. Staff then took Leqaa out of the dorm and to a hospital.

15. Since those developments, I have been in close communication with the legal team who have explained the challenges they have faced in getting information about where Leqaa has been hospitalized, the details of what happened surrounding her urgent hospitalization, her current health status, and their efforts to get access to her or learn anything about her condition, to provide the necessary updates to our family.

16. During this time, my mind and heart have been racing on whether she is even alive. Without being able to speak with her, I've been left to imagine the worst-case scenarios with the uncertainty left open of where she is hospitalized and what kind of care she has been provided.

17. Her mother, my aunt, who is not in good health, has been extremely concerned for Leqaa since these developments arose. My aunt was previously hospitalized for pneumonia this winter, and has severe asthma. As far as I know, stress exacerbates her condition.

18. As of the time of this writing, there has been no direct notification provided to anyone in our family regarding Leqaa's medical condition, hospital location, or current status. The only information our family has received is through the legal team confirming she is in a hospital and is supposedly getting testing done. Our family is beyond scared and worried about Leqaa's health and just want to make sure that, at minimum, the legal team is able to speak with her to confirm her location and check on her current health. My cousin has been isolated from even being observed by a single family member or member of her legal team. It's outrageous and extremely alarming.

Hamzah Abushaban

February 9, 2026

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

|  |  |  |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:25-cv-1072-L-BT |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

## DECLARATION OF TRAVIS WALKER FIFE

I, Travis Walker Fife, hereby declare and state:

1. I represent Ms. Leqaa Kordia in the above-captioned case. I am a staff attorney at the Texas Civil Rights Project. I am admitted to practice in the United States District Court for the Northern District of Texas. I am an attorney in good standing with the Texas state bar.

2. Ms. Kordia has been confined at the Prairieland Detention Facility ("PDF") in Alvarado, Texas since March 14, 2025, nearly eleven months. Ms. Kordia has authorized Immigration and Customs Enforcement ("ICE") and PDF to disclose otherwise protected health information to Texas Civil Rights Project to facilitate her legal representation. A true and correct copy of that authorization is attached to this declaration as Exhibit 2-A ("HIPPA Waiver").

3. At approximately 9:43 A.M. CST on Friday, February 6, 2026, I received a message from Ms. Kordia's cousin, Hamzah Abushaban, stating, "Leqaa is in the hospital." Upon further discussion, between approximately 10:00am and 11:00am CT, I understand a woman with whom Ms. Kordia is confined alerted Hamzah that Leqaa lost consciousness while in the bathroom on the morning of the 6th, hit her head on a door, and had a seizure. She was then taken to the hospital.

4. Concerned about my client's health, I, and other members of her legal team, began trying to identify whether Ms. Kordia was hospitalized, where she was hospitalized, and the state of her condition. Counsel also sought to arrange a confidential in-person or virtual meeting with Ms. Kordia.

5. Over the next eleven hours, I inquired with several Immigration and Customs Enforcement officers, private contractor employees of La Salle Corrections, and counsel for Respondents in this case.

6. At no point did any of these individuals provide any of the requested information. Indeed, personnel at La Salle Corrections—the agency responsible for Ms. Kordia's day-to-day safety and care at PDF—stated they either did not know, could not know, or would not disclose whether Ms. Kordia was hospitalized and which hospital she was taken to. Offering to send the signed HIPPA Waiver made no difference in these responses.

7. I made the following attempts to identify Ms. Kordia's whereabouts and health status:

   a. At 10:21 A.M. CST I emailed two staff persons and pdcprograms requesting information on Ms. Kordia's health and location, including whether she was hospitalized. I attached the HIPPA Waiver and a signed G-28 demonstrating my attorney-client relationship to Ms. Kordia. One of those staff persons and pdcprograms arrange attorney visits and, in the past, have promptly responded to emails. The email sign off of the other staff person identifies her as an on-site nurse. Ex. 2-B.

   b. I called the facility's main telephone number at 10:58 A.M., 11:02 A.M., 11:04 A.M., and 11:10 A.M CT. Each time I called, the line would ring for approximately fifteen seconds before automatically disconnecting.

   c. At 11:13 A.M. CST, I sent an additional email to the same two staff persons and pdcprograms stating that I had tried calling the facility four times with no answer. I requested Ms. Kordia's "location and health status ASAP." I also offered for them to call my cell phone. One of the staff persons responded at 2:41 P.M. CST, stating she did "not have the information you are requesting at this time . . . . That is not my department." Ex. 2-B.

   d. At 1:12 P.M. CST, I emailed Brian Stoltz, counsel for Respondents in this case, stating my understanding that Ms. Kordia had a seizure and was taken to the hospital. I requested information regarding the hospital she was taken to, her health status, and whether he could help arrange an attorney visit or phone call. Ex. 2-C.

   e. After not receiving any of the requested information from Respondents' counsel, PDF employees, or any other person, I called PDF's telephone number again.

   f. At 4:17 P.M. CST, I again called the number for PDF, and someone answered it. I identified myself as Ms. Kordia's counsel, explained my prior attempts to identify her location and speak with her, and requested any information he could provide. The individual told me that he just works at the front desk and does not know what happens "in the back," which I understood to mean the secured parts of PDF that house detainees. A representative of PDF's Programs answered. Programs arranges attorney visitation. The Programs representative told me that he "doesn't

know anything that's going on." He further stated he "doesn't even work here" and was "just helping" because programs staff left already.

g.  The Programs representative transferred me to medical around 4:19 P.M. CST. I explained that my client was likely taken to the hospital and requested information about her wellbeing and whereabouts. The medical representative told me she could not give me any information, even with a signed HIPPA waiver, and that I had to hang up, call back, and ask to be transferred to ICE.

h.  At 4:20 P.M. CST, I called PDF's telephone number again. I asked to be transferred to ICE. The line went silent for approximately ten seconds before disconnecting.

i.  I called back three additional times at 4:21 P.M., 4:23 P.M., and 4:25 P.M. CST, and asked to be transferred to ICE each time. Each time the line went silent for about ten seconds before disconnecting.

j.  The last time I called back, the person answering the main telephone said that ICE must be out for the day and there was nothing further he could do.

k.  At 4:53 P.M. CST, I reached Respondents' Counsel via his cellphone. He acknowledged receiving my email, but stated that he was out of office and so had not yet reached out to his contact at ICE. He committed to doing so after our call.

l.  After not receiving any further update, I emailed Respondents' Counsel at 8:27 P.M. CST, reiterating our telephone conversation and stating that if he did not confirm where Ms. Kordia was being held by 1 P.M. CST on the following day (Saturday, February 7, 2026), we would alert the court as soon as possible to access the requested information. Ex. 2-C.

m.  At 8:58 P.M. CST on February 6, 2026, Respondents' Counsel confirmed he had "reached out to ICE." Ex. 2-C.

n.  The next morning, at 9:17 A.M. CST, Respondents' Counsel stated that he had "been in touch with ICE and I've been told they sent information to Sarah." Sarah refers to Sarah Sherman-Stokes, Ms. Kordia's removal defense counsel. Ex. 2-C.

o.  The update ICE provided to Ms. Sherman-Stokes was that Ms. Kordia was still in the hospital and that she was receiving "tests." They stated she would likely be discharged that day (Saturday, February 7, 2026) and returned to PDF. They provided no documentation corroborating these representations. Nor did they provide the location of the hospital treating her

p.  I responded to Respondents' Counsel at 10:35 A.M. CST, stating the information provided is insufficient as it neither confirmed the hospital Ms. Kordia was located at nor provided for a confidential attorney-client call or visit. I also asked Respondents' Counsel to provide updates on whether Ms. Kordia's hospitalization would be extended, when she is discharged, and when she is back at PDF.

    q.  On February 8, 2026, at approximately 10:11 A.M. CST, I sent another follow-up email to ask for an update. Respondents' counsel did not reply to my email of 10:35 A.M. CST on February 7, 2026, nor my morning email of February 8, 2026.

8.  As of this submission, neither Respondents' Counsel, employees, nor contractors have provided: the location of the hospital they took Ms. Kordia to, any opportunity for Ms. Kordia's lawyers to access her in any way, any update to Ms. Kordia's family, nor any other requested information.

9.  The emails attached to this declaration as Exhibits 2-B and 2-C are true and correct copies of the email conversations they purport to represent.

10.  In addition to my own attempts to request information and contact with Ms. Kordia, I also understand that other concerned individuals tried to gather information pertaining to Ms. Kordia's status.

    a.  At approximately 1:22 P.M. CST on February 6, 2026, Dr. Rahim Jamaleddine, an infectious disease doctor who had previously examined Ms. Kordia, told me she called the facility and identified herself as a doctor with a relationship with Ms. Kordia. Dr. Jamaleddine told me that after the facility transferred her to medical, medical informed her that they could not disclose *any* information and that Dr. Jamaleddine had to call ICE.

    b.  State Representative Salman Bhojani, who is an associate of a member of Ms. Kordia's family, sent a letter requesting urgent information regarding Ms. Kordia's whereabouts and health status. He requested that ICE contact Ms. Kordia's family and lawyers as quickly as possible. I was carbon copied on the email thread and received the letter sent to ICE. A true and correct copy of the letter Representative Bhojani sent at 7:58 P.M. CST is attached as Exhibit 7.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Travis Walker Fife*
Travis Walker Fife                                 February 9, 2026

# EXHIBIT 2-A



# AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION

Developed for Texas Health & Safety Code § 181.154(d)
effective June 2013

Please read this entire form before signing and complete all the sections that apply to your decisions relating to the disclosure of protected health information. Covered entities as that term is defined by HIPAA and Texas Health & Safety Code § 181.001 must obtain a signed authorization from the individual or the individual's legally authorized representative to electronically disclose that individual's protected health information. Authorization is not required for disclosures related to treatment, payment, health care operations, performing certain insurance functions, or as may be otherwise authorized by law. Covered entities may use this form or any other form that complies with HIPAA, the Texas Medical Privacy Act, and other applicable laws. Individuals cannot be denied treatment based on a failure to sign this authorization form, and a refusal to sign this form will not affect the payment, enrollment, or eligibility for benefits.

**NAME OF PATIENT OR INDIVIDUAL**

Kordia, Leqaa

Last _____ First _____ Middle _____

**OTHER NAME(S) USED** _____

**DATE OF BIRTH** Month _▓▓▓▓▓▓▓▓_

**ADDRESS** _Prairieland Detention Center_____

_____

**CITY** Alvarado _____ **STATE** _TX_ **ZIP** _____

**PHONE** (____) _____ **ALT. PHONE** (____) _____

**EMAIL ADDRESS** (Optional): _____

---

## I AUTHORIZE THE FOLLOWING TO DISCLOSE THE INDIVIDUAL'S PROTECTED HEALTH INFORMATION:

Person/Organization Name _Immigration Customs Enforcement, Prairieland Detention Center_
Address 1209 Sunflower Lane_____
City _Alvarado_____ State _TX_ Zip Code _76009_
Phone (_817)_409-3995_____ Fax (____)_____

### WHO CAN RECEIVE AND USE THE HEALTH INFORMATION?

Person/Organization Name _Texas Civil Rights Project, Travis Fife_
Address _1405 Mortopolis Drive_____
City _Austin_▓▓▓▓▓▓_ State _TX_ Zip Code 78741
Phone ▓▓▓▓▓▓

**REASON FOR DISCLOSURE**
(Choose only one option below)

☐ Treatment/Continuing Medical Care
☐ Personal Use
☐ Billing or Claims
☐ Insurance
☐ Legal Purposes
☐ Disability Determination
☐ School
☐ Employment
☐ Other _____

**WHAT INFORMATION CAN BE DISCLOSED?** Complete the following by indicating those items that you want disclosed. The signature of a minor patient is required for the release of some of these items. If all health information is to be released, then check only the first box.

☑ **All health information**
☐ Physician's Orders
☐ Progress Notes
☐ Pathology Reports

☐ History/Physical Exam
☐ Patient Allergies
☐ Discharge Summary
☐ Billing Information

☐ Past/Present Medications
☐ Operation Reports
☐ Diagnostic Test Reports
☐ Radiology Reports & Images

☐ Lab Results
☐ Consultation Reports
☐ EKG/Cardiology Reports
☐ Other_____

**Your initials are required to release the following information:**

_____ Mental Health Records (excluding psychotherapy notes)
_____ Drug, Alcohol, or Substance Abuse Records

_____ Genetic Information (including Genetic Test Results)
_____ HIV/AIDS Test Results/Treatment

**EFFECTIVE TIME PERIOD.** This authorization is valid until the earlier of the occurrence of the death of the individual; the individual reaching the age of majority; or permission is withdrawn; or the following specific date (optional): Month _____ Day _____ Year _____

**RIGHT TO REVOKE:** I understand that I can withdraw my permission at any time by giving written notice stating my intent to revoke this authorization to the person or organization named under "WHO CAN RECEIVE AND USE THE HEALTH INFORMATION." I understand that prior actions taken in reliance on this authorization by entities that had permission to access my health information will not be affected.

**SIGNATURE AUTHORIZATION:** I have read this form and agree to the uses and disclosures of the information as described. I understand that refusing to sign this form does not stop disclosure of health information that has occurred prior to revocation or that is otherwise permitted by law without my specific authorization or permission, including disclosures to covered entities as provided by Texas Health & Safety Code § 181.154(c) and/or 45 C.F.R. § 164.502(a)(1). I understand that information disclosed pursuant to this authorization may be subject to re-disclosure by the recipient and may no longer be protected by federal or state privacy laws.

SIGNATURE X _____
Signature of Individual or Individual's Legally Authorized Representative

DATE 4/29/2025

Printed Name of Legally Authorized Representative (if applicable): _____
If representative, specify relationship to the individual: ☐ Parent of minor　☐ Guardian　☐ Other _____

A minor individual's signature is required for the release of certain types of information, including for example, the release of information related to certain types of reproductive care, sexually transmitted diseases, and drug, alcohol or substance abuse, and mental health treatment (See, e.g., Tex. Fam. Code § 32.003).

SIGNATURE X _____

# EXHIBIT 2-B

This email and any files attached are privileged and confidential and is/are intended only for the individual named. If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

[Quoted text hidden]

📄 **ViewLicense.aspx.pdf**
650K

---

**Kaela Anderson** <​​​@lasallecorrections.com>                    Wed, Jan 21, 2026 at 8:04 AM
To: Travis Fife <travis@texascivilrightsproject.org>
Cc: Rocio Govea <​​​@lasallecorrections.com>, pdcprograms <pdcprograms@lasallecorrections.com>

Received, Thank you

**Kaela Anderson**
**Programs Manager**
**LaSalle Corrections**
**Prairieland Detention Center**
**1209 Sunflower Ln.**
**Alvarado, TX 76009**

**From:** Travis Fife <travis@texascivilrightsproject.org>
**Sent:** Tuesday, January 20, 2026 4:24 PM
[Quoted text hidden]

[Quoted text hidden]

---

**Travis Fife** <travis@texascivilrightsproject.org>                    Fri, Feb 6, 2026 at 10:21 AM
To: Kaela Anderson <​​​@lasallecorrections.com>
Cc: Rocio Govea <​​​a@lasallecorrections.com>, pdcprograms <pdcprograms@lasallecorrections.com>

Ms. Anderson,

I'm reaching out because I received an alarming call that Leqaa Kordia was sent to the hospital this morning. We had a previously scheduled legal call with her at 10am, but she did not attend. Can you confirm whether Leqaa is in the hospital and call me to give me any available information? I'm attaching a signed HIPPA waiver and my g-28.

**Travis Fife**
Pronouns: He/Him/His
*Staff Attorney, Criminal Legal Program*
Texas Civil Rights Project
M:
www.txcivilrights.org
Facebook | Twitter | Instagram
Donate Now!

This email and any files attached are privileged and confidential and is/are intended only for the individual named.  If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

[Quoted text hidden]

**2 attachments**

📄 **Kordia signed HIPAA (1).pdf**
1299K

📄 **Fife G28-Signed (1).pdf**
3756K

---

**Travis Fife** <travis@texascivilrightsproject.org>                              Fri, Feb 6, 2026 at 11:13 AM
To: Kaela Anderson ▮▮▮▮▮▮▮▮▮ @lasallecorrections.com>
Cc: Rocio Govea ▮▮▮▮▮▮▮▮ @lasallecorrections.com>, pdcprograms <pdcprograms@lasallecorrections.com>

Ms. Anderson and Ms. Govea,

I tried calling the facility's main telephone four times. All four calls timed out and automatically disconnected. I also left a voicemail with Ms. Govea. We need to know our client's location and health status ASAP. Please give me a call at the number below.

**Travis Fife**
Pronouns: He/Him/His
*Staff Attorney, Criminal Legal Program*
Texas Civil Rights Project
M: ▮▮▮▮▮▮▮
www.txcivilrights.org
Facebook | Twitter | Instagram
Donate Now!

This email and any files attached are privileged and confidential and is/are intended only for the individual named. If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

[Quoted text hidden]

---

**Kaela Anderson** <▮▮▮▮▮▮▮ @lasallecorrections.com>                              Fri, Feb 6, 2026 at 2:41 PM
To: Travis Fife <travis@texascivilrightsproject.org>

Good afternoon,

I apologize, but I do not have the information you are requesting at this time. I do oversee any Medical information. That is not my department.

Kaela Anderson
**Programs Manager**
**LaSalle Corrections**
**Prairieland Detention Center**
**1209 Sunflower Ln.**
**Alvarado, TX 76009**
▮▮▮▮▮▮▮▮

**From:** Travis Fife <travis@texascivilrightsproject.org>
**Sent:** Friday, February 6, 2026 11:13 AM
[Quoted text hidden]

[Quoted text hidden]

---

**Travis Fife** <travis@texascivilrightsproject.org>                    Mon, Feb 9, 2026 at 8:58 AM
To: Randy Hiroshige <randy@texascivilrightsproject.org>

**Travis Fife**
Pronouns:  He/Him/His
*Staff Attorney, Criminal Legal Program*
Texas Civil Rights Project
M: ███████████
www.txcivilrights.org
Facebook | Twitter | Instagram
Donate Now!

This email and any files attached are privileged and confidential and is/are intended only for the individual named.  If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

[Quoted text hidden]

# EXHIBIT 2-C

**Monday, February 9, 2026 at 11:07:56 Eastern Standard Time**

**Subject:** Re: [EXTERNAL] Re: [Respond by 1pm 2/6] Kordia Hospitalization
**Date:** Sunday, February 8, 2026 at 10:11:57 AM Eastern Standard Time
**From:** Travis Fife
**To:** Stoltz, Brian (USATXN)
**CC:** Haag, Ann (USATXN), Sherman-Stokes- Sarah, Randy Hiroshige, Daniel Hatoum, Caitlyn Silhan, golnaz, Charles Siegel, Naz Ahmad, sadaf, Amal Thabateh, sbeebe@texascivilrightsproject.org

> **\* External Sender - Proceed Cautiously with Links and Attachments. \***

Brian,

Any update on discharge?

**Travis Fife**
Pronouns:  He/Him/His
*Staff Attorney, Criminal Legal Program*
Texas Civil Rights Project
M: ██████████
www.txcivilrights.org
Facebook | Twitter | Instagram
Donate Now!

This email and any files attached are privileged and confidential and is/are intended only for the individual named.  If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

On Sat, Feb 7, 2026 at 10:35AM Travis Fife <travis@texascivilrightsproject.org> wrote:
> Brian,
>
> The information provided is insufficient. We understand from Sarah that Ms. Kordia is in the hospital and receiving tests and may be released soon, but as you know discharge timing can change. We request prompt confirmation as soon as possible

1 of 5

today of: 1) which hospital she is located at, and 2) either an in-person or virtual/telephone (privileged) attorney call to confirm her wellbeing in connection with her pending habeas claims.

Can you also commit to letting us know as soon as possible: 1) whether anything shifts to require her hospitalization offsite beyond today, 2) when she has been discharged, and 3) when she is back at Prairieland? We and her family are understandably distressed by the continued lack of information regarding where Ms. Kordia is hospitalized and the current status of her health.

Please respond with this information ASAP.

**Travis Fife**
Pronouns:  He/Him/His
*Staff Attorney, Criminal Legal Program*
Texas Civil Rights Project
M: ██████████
www.txcivilrights.org
Facebook | Twitter | Instagram
Donate Now!

This email and any files attached are privileged and confidential and is/are intended only for the individual named.  If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

On Sat, Feb 7, 2026 at 9:17AM Stoltz, Brian (USATXN) <Brian.Stoltz@usdoj.gov> wrote:

> I've been in touch with ICE and I've been told they sent information to Sarah.
>
>
> Brian W. Stoltz
>
> Assistant U.S. Attorney
>
> ████████████

**From:** Travis Fife <travis@texascivilrightsproject.org>
**Sent:** Friday, February 6, 2026 8:28 PM
**To:** Stoltz, Brian (USATXN) <Brian.Stoltz@usdoj.gov>; Haag, Ann (USATXN)
<Ann.Haag@usdoj.gov>
**Cc:** Sherman-Stokes- Sarah <sstokes@bu.edu>; Randy Hiroshige
<randy@texascivilrightsproject.org>; Daniel Hatoum <daniel@texascivilrightsproject.org>;
Caitlyn Silhan <csilhan@waterskraus.com>; Golnaz Fakhimi
<golnaz@muslimadvocates.org>; Charles Siegel <siegel@waterskraus.com>; Naz Ahmad
<naz.ahmad@law.cuny.edu>; Sadaf Hasan <sadaf@muslimadvocates.org>; Amal
Thabateh <Amal.Thabateh@law.cuny.edu>; sbeebe@texascivilrightsproject.org
**Subject:** [EXTERNAL] Re: [Respond by 1pm 2/6] Kordia Hospitalization


Brian,


Good talking with you earlier tonight. If you do not confirm where Leqaa is being
held and (hopefully) treated by 1pm tomorrow, we will alert the court as soon as
possible.


I understand you saw my original email. I also appreciate you said you'd try to
contact ICE about whether she's in the hospital and which hospital.  I've called the
facility multiple times. Everyone I've spoken to either says they have no idea if she's
in the hospital or can't disclose any information. Emailing facility personnel my
signed G-28 and the signed HIPAA I have from my client have made no difference.


Please let us know by 1pm tomorrow


Best,

**Travis Fife**

Pronouns:  He/Him/His
*Staff Attorney, Criminal Legal Program*
Texas Civil Rights Project
M: ▮▮▮▮▮▮▮▮
www.txcivilrights.org
Facebook | Twitter | Instagram
Donate Now!

Petitioner's Appendix Page 20

This email and any files attached are privileged and confidential and is/are intended only for the individual named.  If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

On Fri, Feb 6, 2026 at 1:12 PM Travis Fife <travis@texascivilrightsproject.org> wrote:

Brian,

We received word this morning from someone held at Prairieland Detention Facility that Leqaa Kordia (A# 235-642-062) fainted in the shower, hit her head, potentially had a seizure, and was taken to the hospital.

I'm requesting the following information:

- Has Leqaa been hospitalized?

- If so, where?

- Will ICE permit a member of the legal team to visit her?

- If not, can we speak with her on the phone?

- Is there any other information you or the facility can provide?

I have called the facility's main line four times. I also left a voicemail for Rucio Govea, a nurse at PDF. We have also sent emails to separate groups of facility staff. None of these have been responded to.

Please respond as soon as possible.

**Travis Fife**

<u>Pronouns</u>:  He/Him/His
*Staff Attorney, Criminal Legal Program*
Texas Civil Rights Project
M: ███████████
www.txcivilrights.org
Facebook | Twitter | Instagram
Donate Now!

This email and any files attached are privileged and confidential and is/are intended only for the individual named.  If you are not the intended recipient or otherwise have reason to believe that you have received this message in error, please notify the sender by email and delete this message immediately from your computer. Any other use, retention, dissemination, forwarding, printing, or copying of this message and any attachments is strictly prohibited.

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| | § | |
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:25-cv-1072-L-BT |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |
| | § | |

## DECLARATION OF SADAF HASAN

I, Sadaf Hasan, hereby declare and state:

1. I represent Ms. Leqaa Kordia in the above-captioned case. I am a staff attorney at Muslim Advocates. I am admitted to practice *pro hac vice* in this matter. I am an attorney in good standing with the New York State bar.

2. Ms. Kordia has been confined at the Prairieland Detention Facility ("PDF") in Alvarado, Texas since March 14, 2025, for nearly eleven months.

3. Since our representation of Ms. Kordia in this matter began, our legal team regularly meets with Ms. Kordia over scheduled, privileged, video-calls approved by the PDF facility.

4. In our recent legal videoconferences with her ahead of February 6, 2026,, I observed that she appeared weaker physically, with diminished energy over the course of the calls. In one such videoconference she reported that facility staff refused to provide her medication unless she personally walked to the infirmary herself, even though she informed staff she was too physically weak to do so.

5. At approximately 9:43 A.M. CT on Friday, February 6, 2026, our legal team received a message from Ms. Kordia's cousin, Hamzah Abushaban, stating, "Leqaa is in the hospital." Over the next hour or so, we learned through her cousin that a woman with whom Ms. Kordia is confined alerted Mr. Abushaban that Ms. Kordia fainted in the shower that morning, hit her head, and had a seizure that led to her being taken off-site to a hospital.

6.  At 10:00 A.M CT on Friday, February 6, 2026, Muslim Advocates had a pre-scheduled legal zoom arranged with Mr. Kordia. Shortly after receiving this distressing update from Ms. Kordia's cousin, I logged into the video call in case Ms. Kordia might have been produced for the call or if a staff person from the facility might appear and offer information about what had happened. Ms. Kordia was not produced by the facility nor did a PDF representative appear to provide an update on her whereabouts.

7.  After Ms. Kordia did not attend our regular legal call without any prior notice from the facility that the call was cancelled, nor any post-hoc explanation for her absence, it became clear to our legal team that Ms. Kordia was likely hospitalized.

8.  Given the fact that last year was the deadliest year in more than two decades for individuals in ICE custody, our legal team became increasingly concerned about Ms. Kordia's health and the lack of information provided by the facility.[1] Other people in ICE custody who have suffered seizures have died while in ICE custody.

9.  Since the morning of February 6, 2026, our legal team has exhaustively attempted to ascertain the details of Ms. Kordia's hospitalization and current health conditions—including reaching out multiple times to Immigration and Customs Enforcement (ICE) officers, private contractor employees of La Salle Corrections, and counsel for Respondents in this case.

10. I and other members of the legal team collectively contacted twenty hospitals located near PDF but were unable to receive any confirmation from any hospital staff that Ms. Kordia was receiving care on-site.

11. Several elected officials have also urgently requested the Department of Homeland Security (DHS), including its contractors, to provide a timely update  to Ms. Kordia's legal team with information about where she is hospitalized, her current health conditions, and ensuring access to legal counsel whether by phone or an in-person visit. As of the time of filing, I am unaware of any direct response received to those inquiries.

12. As of this submission, neither Respondents' Counsel, their employees, nor their contractors have confirmed Ms. Kordia's location, provided the information requested to Ms. Kordia's legal team and her family about her current health status,  nor arranged for any access to Ms. Kordia despite repeated requests. The dearth of information or any access to our client is extremely alarming and material to the pending claims in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

---

[1] Maanvi Singh, Coral Murphy and Charlotte Simmonds, *2025 was ICE's deadliest year in two decades. Here are the 32 people who died in custody*, The Guardian, Jan. 4, 2026, https://www.theguardian.com/us-news/ng-interactive/2026/jan/04/ice-2025-deaths-timeline

*/s/ Sadaf Hasan*

Sadaf Hasan                                              February 9, 2026

# EXHIBIT 4



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

§
LEQAA KORDIA,                                  §
                                               §
                    Petitioner-Plaintiff,      §
                                               §
v.                                             §      CIVIL    ACTION    NO.
                                               §      3:25-cv-1072-L-BT
KRISTI NOEM et al.,                            §
                                               §
                    Respondents-Defendants.    §
                                               §
                                               §

## DECLARATION OF SARAH SHERMAN-STOKES

I, Sarah Sherman-Stokes, hereby declare and state:

1.  I represent Ms. Leqaa Kordia in her immigration removal case. I am the Associate
    Director and Supervising Attorney with the Boston University School of Law
    Immigrants' Rights and Human Trafficking Program.  I am an attorney in good standing
    with the Massachusetts state bar.

2.  Ms. Kordia has been confined at the Prairieland Detention Facility ("PDF") in Alvarado,
    Texas since March 14, 2025, nearly eleven months.

3.  At approximately 9:43am CT on Friday, February 6, 2026, I received a message from Ms.
    Kordia's cousin, Hamzah Abushaban, stating, "Leqaa is in the hospital." Over the next
    hour or so, I understand a woman with whom Ms. Kordia is confined alerted Hamzah that
    Leqaa lost consciousness while in the shower on the morning of February 6th, hit her
    head and had a seizure. She was then taken to an undisclosed hospital.

4.  Concerned about my client's health, I, and other members of her legal team, began trying
    to identify whether Ms. Kordia was hospitalized, where she was hospitalized, and her
    condition, wellbeing and prognosis. Counsel also sought to arrange a confidential
    in-person or virtual meeting with Ms. Kordia.

5.  Over the next eleven hours, I reached out to several Immigration and Customs
    Enforcement offices, the Assistant Chief Counsel ("ACC") from the U.S. Department of
    Homeland Security ("DHS") in Ms. Kordia's immigration court proceedings, and
    Prairieland Detention Facility.

6.  I made the following attempts to identify Ms. Kordia's whereabouts and health status:

    a.  On February 6, 2026, between 4:20pm and 9:02pm CT, I personally contacted eleven different hospitals in/around Dallas/Fort Worth trying to identify where Ms. Kordia was being hospitalized, and her condition. Together with my co-counsel, we contacted twenty different hospitals in the area in total. All stated that Ms. Kordia was not being hospitalized there.

    b.  At 4:43pm CT on February 6, 2026, I emailed the DHS ACC, attaching my G-28 Notice of Appearance, asking where Ms. Kordia is hospitalized and how to reach her. I received no response. I also called the DHS ACC and left a voicemail. I did not hear back.

    c.  At 9:08pm CT on February 6, 2026, I emailed two more senior DHS Attorneys and attached my G-28. I inquired as to Ms. Kordia's location and wellbeing.

    d.  At 8:45am CT on February 7, 2026, I received an email response from one of the more senior DHS Attorneys, suggesting I reach out to Acting Deputy Principal Legal Advisor Nelson Perez or the FLO Special Counsel. I reached out to both email addresses and received an out of office message from Attorney Perez.

    e.  At 8:48am CT on February 7, 2026, one of the senior DHS attorneys emailed me, stating, "I just received an update from the detention facility that Ms. Korda is still at the hospital with tests being run, but they anticipate she will be discharged today." I responded at 8:54 am CT to ask where Ms. Kordia was hospitalized and to again request a call or zoom with legal counsel. The DHS attorney responded at 9:45 am CT stating, "It sounds like she's going to be discharged very soon and will be back at Prairieland. She'll be able to have a private attorney call there." Again, at 10:31 am CT, I responded that we need to know where she is hospitalized, what her current condition is, and when/whether she is being released or transferred. I also reiterated my request for a legal call. I provided my cell phone number. At 11:09 am CT, the DHS attorney responded, "We will provide updates as soon as we are able as well as connect you for a phone call with Ms. Kordia." I responded at 12:21 pm CT that I needed to speak with Ms. Kordia by 4pm CST today, February 7, 2026.

    f.  Also on February 7, 2026, I contacted daldetaineddocketunit@ice.dhs.gov by email, attaching my G-28 and requesting Ms. Kordia's location and condition. I received no response.

7.  On February 8, 2026, I again contacted the same DHS attorney to ask for an update about when I could speak with Ms. Kordia. The same DHS attorney advised that Ms. Kordia had earlier been cleared for discharge, but that another doctor wanted to keep her for observation, and was non-committal as to whether I would be able to speak with her at 4:00pm.

    a.  I asked for more information. I also made clear my understanding of the sensitivity about public disclosure of my client's location and assured DHS that I

and the other attorneys representing Ms. Kordia have no interest in undertaking such a disclosure.

    b.  Later, the DHS attorney confirmed that Ms. Kordia would remain in the hospital for observation, but refused to provide her location, stating: "For the safety and security of all parties, hospital information is not disclosed, but she is still within the NDTX."

8.  Around 2:00pm CT on February 8, 2026, a journalist with the Dallas Morning News contacted me about Ms. Kordia. This journalist had written an article that was published on February 7, 2026 concerning Ms. Kordia, our lack of access to her and lack of information about her well-being.

    a.  This journalist asked me if I had received a response from DHS containing Ms. Kordia's whereabouts, as she had received one after her piece went to print the previous day. I said I had not, and asked her to share the response.

    b.  Contained within the response was this language: "On Feb. 6, 2026, at approximately 8:45 p.m., medical staff at the Prairieland Detention Center in Alvarado, Texas, notified ICE that detainee Leqaa Kordia was admitted to ███ ████████████████ in ██████, Texas, for further evaluation following a seizure. Her admission to the hospital was made out of an abundance of caution to ensure her health and safety. The hospital is monitoring her condition and ICE will continue to ensure she receives proper medical care."

    c.  I urged the journalist not to publicly release the name of the hospital to the public.

9.  Counsel for Ms. Kordia in her habeas petition, Ms. Caitlyn Silhan went to the ███ ██████████████████ ("the Hospital") and communicated to me that she arrived around 4:00pm CT.

    a.  I informed the same DHS attorney that I had been in contact with through the weekend that Ms. Silhan was on site and wanted to speak with Ms. Kordia, and reiterated a request for a call with Ms. Kordia.

    b.  Around 4:48pm CT, that DHS attorney responded: "Those on site cannot accommodate a visit nor is the facility equipped for this. As I mentioned earlier, a phone call can also not be accommodated. However, Ms. Kordia will be able to contact you as soon as she returns to PDC."

10.  Ms. Kordia has a deadline at the Board of Immigration Appeals on February 11, 2026. It is imperative that I accessMs. Kordia in advance of this deadline, in order to adequately represent her and prepare her appeal. If Ms. Kordia is in a position where she is medically unable to communicate with me, my representation of her will still benefit from accessing her, if only to observe her condition and assess its implications for the imminent deadline in her removal proceedings, and it is otherwise important that any incapacity to communicate she is experiencing, along with her condition and prognosis, is communicated to me as soon as possible, and certainly in advance of February 11, 2026.

If she is medically able to communicate with me, I need to speak with her today: immediately.

11. As of 12:30 P.M. CT today, I have received no further correspondence from the DHS attorney regarding setting up a phone/video call with Ms. Kordia nor any information as to Ms. Kordia's location or condition.

12. As of this submission, neither Respondents' Counsel nor PDF employees nor Respondents' employees have shared with counsel whether Ms. Kordia has been discharged, nor an opportunity for Ms. Kordia to speak with her lawyers, an update to Ms. Kordia's family, or any other requested information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


*/s/ Sarah Sherman-Stokes*
Sarah Sherman-Stokes                                                February 9, 2026

# EXHIBIT 4-A

 **Outlook**

---

**RE: URGENT: Leqaa Kordia hospitalized following seizure (A ████████ )**

---

**From** Norcross, Anastasia S < ████████████████ >

**Date** Mon 2026-02-09 9:13 AM

**To**    Sherman-Stokes, Sarah <sstokes@bu.edu>

Good morning,

Sorry for the late response—just seeing this. I've reached out to management that covers Prairieland to see if they know anything. Hopefully, you all have already gotten the information you need. I'll let you know if I hear anything else.

Thanks,

**Stacy Norcross**
Assistant Chief Counsel, San Antonio
Department of Homeland Security
U.S Immigration and Customs Enforcement
Office of Principal Legal Advisor (Port Isabel)
████████████████

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***

This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Friday, February 6, 2026 4:43 PM
**To:** Norcross, Anastasia S ██████████████████ >
**Subject:** URGENT: Leqaa Kordia hospitalized following seizure (A ████████ )

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Stacy,
I'm sorry to bother you on a Friday afternoon, but my client, Leqaa Kordia (A ████████ ), was hospitalized today apparently following a fall and a seizure. Her health has been worsening significantly over the last few months.

We have reached out to Prairieland and ICE multiple times today and cannot reach anyone. Is there any way you can find out where she is hospitalized or how to reach her? We would be incredibly grateful as we, and her family, are extremely worried.

Thank you. My cell is ███████

Sincerely,
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
████████
Boston, MA 02215
██████████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

# EXHIBIT 4-B

Case 3:25-cv-01072-L-BT    Document 93-1    Filed 02/13/26    Page 36 of 181    PageID 2723

 Outlook

---

## Re: URGENT - Leqaa Kordia (A ███████ Hospitalization

**From** Courson, Elisabeth < ████████████████ >

**Date** Sun 2026-02-08 6:43 PM

**To**    Sherman-Stokes, Sarah <sstokes@bu.edu>

Good afternoon, Sarah.

Those on site cannot accommodate a visit nor is the facility equipped for this. As I mentioned earlier, a phone call can also not be accommodated. However, Ms. Kordia will be able to contact you as soon as she returns to PDC. This can be coordinated with the staff at PDC.

Elisabeth Courson
Chief Counsel
Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement
████████████

*** ATTORNEY/CLIENT PRIVILEGE *** ATTORNEY WORK PRODUCT ***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Sunday, February 8, 2026 5:18:23 PM
**To:** Courson, Elisabeth < ███████████████ > Caitlyn Silhan <csilhan@waterskraus.com>
**Cc:** Brian.Stoltz@usdoj.gov <Brian.Stoltz@usdoj.gov>; Travis Fife <travis@texascivilrightsproject.org>
**Subject:** Re: URGENT - Leqaa Kordia (A ███████ ) Hospitalization

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Elisabeth,
Attorney Caitlyn Silhan is on site at ███████ and has been refused access to Ms. Kordia. Can you please facilitate her access to Ms. Kordia? She is currently in the lobby and can remain until 6pm.

Alternately, I want to renew my request for a phone call with Ms. Kordia today.

Thank you for your prompt attention to this.

Sincerely,
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
██████████
Boston, MA 02215
██████████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's
campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community
leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in
acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place
within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the
land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag
and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the
attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity
named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are
not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have
received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

---

**From:** Courson, Elisabeth <██████████████████████>
**Sent:** Sunday, February 8, 2026 5:59 PM
**To:** Sherman-Stokes, Sarah <sstokes@bu.edu>; Caitlyn Silhan <csilhan@waterskraus.com>
**Cc:** Brian.Stoltz@usdoj.gov <Brian.Stoltz@usdoj.gov>
**Subject:** Re: URGENT - Leqaa Kordia (A ██████████) Hospitalization

Thank you for this additional information, Sarah.

Elisabeth Courson
Chief Counsel
Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement
██████████

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client
privileged information or attorney work product and/or law enforcement sensitive information. It is not
for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.
Please notify the sender if this message has been misdirected and immediately destroy all originals and
copies. Any disclosure of this document or information contained therein must be approved by the Office
of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for
INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Sunday, February 8, 2026 4:16 PM
**To:** Courson, Elisabeth <███████████████████████> Caitlyn Silhan
<csilhan@waterskraus.com>
**Cc:** Brian.Stoltz@usdoj.gov <Brian.Stoltz@usdoj.gov>
**Subject:** Re: URGENT - Leqaa Kordia (A █████████) Hospitalization

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize
> and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and
> follow instructions.

Elisabeth,
Replying all and CC'ing AUSA Brian Stoltz as Ms. Silhan is a member of Ms. Kordia's habeas team.

We look forward to hearing from you on arranging an attorney-client visit or call today.

Sincerely,
Sarah


Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
████████████
Boston, MA 02215
T. ████████████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's
campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community
leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in
acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place
within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the
land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag
and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the
attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity
named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are
not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have
received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Sunday, February 8, 2026 5:07 PM
**To:** Courson, Elisabeth <███████████████████ Caitlyn Silhan <csilhan@waterskraus.com>
**Subject:** Re: URGENT - Leqaa Kordia (A █████████ Hospitalization

Elisabeth,
Since my last email, it's come to our attention that DHS has disclosed to Dallas Morning News that Ms. Kordia is █
██████████ A member of our legal team, Caitlyn Silhan, is now on site at ████████ with an

Case 3:25-cv-01073-L-BT    Document 93-1    Filed 02/13/26    Page 39 of 181    PageID 2726

executed G-28. She is hoping to visit Ms. Kordia today and we hope that you will facilitate this lawyer-client meeting.

As you can imagine, we are extremely concerned about Ms. Kordia's health and wellbeing. And in order to effectively represent her, we need access to our client.

Ms. Silhan is CC'ed here and can be reached on her cell at ███████. If for some reason you're unable to accommodate Ms. Silhan's in person visit today, I need to have a phone call with Ms. Kordia today. I look forward to hearing from you.

Sincerely,
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
███████
Boston, MA 02215
███████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

---

**From:** Courson, Elisabeth <███████
**Sent:** Sunday, February 8, 2026 4:52 PM
**To:** Sherman-Stokes, Sarah <sstokes@bu.edu>███████
**Subject:** Re: URGENT - Leqaa Kordia (A███████) Hospitalization

Good afternoon, Sarah.

While Ms. Kordia remains at the hospital, there is  not the capacity to facilitate a private attorney call. However, she will have the opportunity to speak to you as soon as she arrives back at PDC. This should be well in advance of the Wednesday brief deadline. For the safety and security of all parties, hospital information is not disclosed, but she is still within the NDTX.

Full staff should be back at PDC tomorrow as well to obtain additional updates directly from the facility and officers.

Elisabeth Courson

**Chief Counsel**
Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement
▮▮▮▮▮▮

<span style="color:red">**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***</span>
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Sunday, February 8, 2026 2:00:43 PM
**To:** Courson, Elisabeth <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Subject:** Re: URGENT - Leqaa Kordia (A▮▮▮▮▮▮▮▮▮) Hospitalization

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Elisabeth,
Thank you for your update. I still need to speak with her today. We have a briefing deadline and as her lawyer, I need to speak with her in order to adequately represent her in her case. Can we speak at 4pm today as previously agreed to?

I also would appreciate knowing her location. I'm not sure why that can't be shared? We are not trying to create trouble and will not share with press, etc.

Thank you.

Sincerely,
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
▮▮▮▮▮▮
Boston, MA 02215
▮▮▮▮▮▮

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place

Case 3:25-cv-01072-L-BT   Document 93-1   Filed 02/13/26   Page 41 of 181   PageID 2728

within that history. Ownership of land is itself a colonial concept, many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

**From:** Courson, Elisabeth <█████████████████████>
**Sent:** Sunday, February 8, 2026 2:51 PM
**To:** Sherman-Stokes, Sarah <sstokes@bu
**Subject:** RE: URGENT - Leqaa Kordia (A███████████) Hospitalization

Good afternoon, Sarah.

Unfortunately, there's been another delay. While Ms. Kordia was cleared for discharge this morning, another doctor would like to continue observing her. For now, it's unclear if she'll still be discharged today.

Sincerely,
Elisabeth Courson
Chief Counsel
Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement
█████████████

*** ATTORNEY/CLIENT PRIVILEGE *** ATTORNEY WORK PRODUCT ***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

**From:** Courson, Elisabeth <█████████████████████>
**Sent:** Sunday, February 8, 2026 12:27 PM
**To:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Subject:** Re: URGENT - Leqaa Kordia (A███████████) Hospitalization

Good afternoon, Sarah.

I haven't received any updates yet on Ms. Kordia's status or discharge time. However, the team confirmed a 4pm call should still not be a problem. I haven't received confirmation on the type of call yet.

As I receive updates, I'll let you know.

Elisabeth Courson
Chief Counsel

Petitioner's Appendix Page 41

Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement

███████████

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Sunday, February 8. 2026 10:16 AM
**T    Courson. Elisabeth <**████████████████████**>; Pincheck, Catherine
<**████████████**>, Detention.LegalAccess
<**detention.legalaccess@ice.dhs.gov**>
**Subject:** Re: URGENT - Leqaa Kordia (A 235-642-062) Hospitalization

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Good morning, Elizabeth,
I'm writing to follow up on my email from last night. Is there any update on Ms. Kordia's condition and/or when she will be discharged?

Can you also clarify whether today's call is a legal zoom VTC or a phone call or something else? Also, confirming it will be at 4pm CST?

Can you please also convey best wishes from the legal team. We are extremely worried for her.

Thank you,
Sarah
Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
███████████

Boston, MA 02215
███████████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the

Case 3:25-cv-01072-L-BT    Document 93-1    Filed 02/13/26    Page 43 of 181    PageID 2730

land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Saturday, February 7, 2026 8:06 PM
**To:** Courson, Elisabeth <                                        Pincheck, Catherine
<                                        >; Detention.LegalAccess <Detention.LegalAccess@ice.dhs.gov>
**Subject:** Re: URGENT - Leqaa Kordia (A                    Hospitalization

Thank you, Elisabeth. Can you confirm where she is being held?

Can you also confirm whether tomorrow is a legal VTC over zoom (as we have traditionally done with Ms. Kordia) or something else?

Thank you for clarifying.

Sincerely,
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue

Boston, MA 02215

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

**From:** Courson, Elisabeth <​ ████████████████ >
**Sent:** Saturday, February 7, 2026 6:15 PM
**To:** Sherman-Stokes, Sarah <sstokes@bu.edu>; Pincheck, Catherine
████████████████████████████ >; Detention.LegalAccess <detention.legalaccess@ice.dhs.gov>
**Subject:** Re: URGENT - Leqaa Kordia ████████ ) Hospitalization

Hey, Sarah.

The medical team just updated ERO at 4:40 that, unfortunately, Ms. Kordia is going to be kept
overnight and released in the morning, hence the delay in her return to PDC. She is stable, but
they would like to observe her overnight.

I have confirmed a 4pm call for you tomorrow though. Absent any changes to her condition, she
should be discharged and back at PDC by then.

Again, apologies for the delays with the evolving situation.

Elisabeth Courson
Chief Counsel
Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement
████████████

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client
privileged information or attorney work product and/or law enforcement sensitive information. It is not
for release, review, retransmission, dissemination, or use by anyone other than the intended recipient.
Please notify the sender if this message has been misdirected and immediately destroy all originals and
copies. Any disclosure of this document or information contained therein must be approved by the Office
of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for
INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Saturday, February 7, 2026 4:46:57 PM
**To:** Courson, Elisabeth <​ ████████████████ >; Pincheck, Catherine
<​ ████████████████████ >; Detention.LegalAccess <detention.legalaccess@ice.dhs.gov>
**Subject:** Re: URGENT - Leqaa Kordia (A ████████ ) Hospitalization

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you
recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not
present, click here and follow instructions.

Thank you for this update. Can you let me know what the current expected time of discharge is and/or time of
return to PDC? Alternately, if there are still tests pending, can you let me know when results are expected on those?

Finally, can you assist in arranging a secure legal call for tomorrow? We don't want to interfere with anyone else's
legal call, but I need the opportunity to speak with Ms. Kordia.

Thank you.
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor

Immigrants Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue

Boston, MA 02215

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

---

**From:** Courson, Elisabeth <███████████████████>
**Sent:** Saturday, February 7, 2026 5:14 PM
**To:** Sherman-Stokes, Sarah <sstokes@bu.edu>; Pincheck, Catherine
<████████████████████>; Detention.LegalAccess <Detention.LegalAccess@ice.dhs.gov>
**Subject:** RE: URGENT - Leqaa Kordia (███████████) Hospitalization

Good afternoon, Sarah.

I apologize for the delay. I have reached out to ERO for an update to Ms. Kordia's ETA at Prairieland. The facility has been instructed to have Ms. Kordia call you as soon as she arrives back at the facility. I understand your urgency in wishing to speak with her, and that will be accommodated. All indications from medical staff were that Ms. Kordia was cleared to be discharged, but they were awaiting final test results. Unfortunately, it seems that may have caused the delay in discharge. As soon as I know more, I'll reach out.

Sincerely,
Elisabeth Courson
Chief Counsel
Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office

Case 3:25-cv-01072-L-BT    Document 93-1    Filed 02/13/26    Page 46 of 181    PageID 2733
of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for
INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Saturday, February 7, 2026 4:06 PM
**To:** Courson, Elisabeth <█████████████████████████>; Pincheck, Catherine
<█████████████████████>; Detention.LegalAccess <detention.legalaccess@ice.dhs.gov>
**Subject:** Re: URGENT - Leqaa Kordia (A █████████ Hospitalization

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you
> recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not
> present, click here and follow instructions.

Elisabeth,
It's past 4pm CST and I have not heard from you, or from my client. Can you please confirm where she is currently
hospitalized (or if she has been moved back to Prairieland or elsewhere) and what her current condition is?

As I stated earlier, I need to speak with her today. I can be reached on my cell phone at ████████████.

Thank you.
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
█████████
Boston, MA 02215
█████████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's
campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community
leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in
acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place
within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the
land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag
and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the
attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity
named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are
not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have
received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Saturday, February 7, 2026 1:21 PM
**To:** Courson, Elisabeth <█████████████████████████>; Pincheck, Catherine

Petitioner's Appendix Page 46

Case 3:25-cv-01072-L-BT    Document 83-1    Filed 02/13/26    Page 47 of 181    PageID 2734

Detention.LegalAccess <detention.legalaccess@ice.dhs.gov>

**Subject:** Re: URGENT - Leqaa Kordia (A ████████ Hospitalization

Thank you, Elisabeth.

I need to speak to Ms. Kordia by 4pm CST today. Our privileged/legal VTC was cancelled with her on Friday, and we won't be able to have another one until Monday (as you may know, there are no privileged legal calls on the weekend at Prairieland). We have a filing deadline this week at the BIA so communicating with her in a privileged legal call today is imperative.

We also still do not know where she is. Can you confirm where she is hospitalized?

Thank you.
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue

████████

Boston, MA 02215

████████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

---

**From:** Courson, Elisabeth <████████████>
**Sent:** Saturday, February 7, 2026 12:09 PM
**To:** Sherman-Stokes, Sarah <sstokes@bu.edu>; Pincheck, Catherine <████████████v>; Detention.LegalAccess <████████████>
**Subject:** Re: URGENT - Leqaa Kordia (A ████████) Hospitalization

Good morning, Sarah.

We will provide updates as soon as we are able as well as connect you for a phone call with Ms. Kordia.

Petitioner's Appendix Page 47

Elisabeth Courson
Chief Counsel
Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement
████████

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***

This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Saturday, February 7, 2026 10:31 AM
**T    Courson, Elisabeth <        ████████        >; Pincheck, Catherine
<        ████████        >; Detention.LegalAccess
<Detention.LegalAccess@ice.dhs.gov>
**Subject:** Re: URGENT - Leqaa Kordia (A ████████ ) Hospitalization

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Elisabeth,

Thank you for your email. I'd still appreciate the opportunity to have a privileged conversation with my client, Ms. Kordia, before she is discharged. Given an upcoming briefing deadline with the Board of Immigration Appeals, it is imperative that I speak with her as soon as possible.

Where is she currently hospitalized? Can you please let me know how I can speak with her by phone/video call? I can be available any time today and I can be reached on my cell phone, ████████ .

As well, because time of discharge can be dynamic, can you please keep me updated as to:

      (1) her condition and wellbeing;
      (2) whether anything shifts to require her hospitalization offsite beyond today;
      (3) when she is released; and
      (4) when she is back at Prairieland?

I look forward to hearing from you as soon as possible.

Sincerely,
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
████████

Boston, MA 02215

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

---

**From:** Courson, Elisabeth <███████████████████████>
**Sent:** Saturday, February 7, 2026 10:45 AM
**To:** Sherman-Stokes, Sarah <sstokes@bu.edu>; Pincheck, Catherine <███████████████████>; Detention.LegalAccess <Detention.LegalAccess@ice.dhs.gov>
**Subject:** Re: URGENT - Leqaa Kordia (A █████████ Hospitalization

Good morning, Sarah.

It sounds like she's going to be discharged very soon and will be back at Prairieland. She'll be able to have a private attorney call there.

Elisabeth Courson
Chief Counsel
Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement
███████████

**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***
This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Saturday, February 7, 2026 8:54:20 AM
**To:** Courson, Elisabeth <███████████████████>; Pincheck, Catherine <Catherine.Pincheck@ice.dhs.gov>; Detention.LegalAccess <Detention.LegalAccess@ice.dhs.gov>
**Subject:** Re: URGENT - Leqaa Kordia (A █████████) Hospitalization

You don't often get email from sstokes@bu.edu. Learn why this is important

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Thank you, Elisabeth.

Where is she hospitalized and can we arrange, this morning, a call or zoom with legal counsel?

Thank you.

Sincerely,
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
█████████
Boston, MA 02215
█████████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

**From:** Courson, Elisabeth <████████████████████████>
**Sent:** Saturday, February 7, 2026 9:48 AM
**To:** Sherman-Stokes, Sarah <sstokes@bu.edu>; Pincheck, Catherine
<████████████████████>; Detention.LegalAccess <Detention.LegalAccess@ice.dhs.gov>
**Subject:** Re: URGENT - Leqaa Kordia (A █████████ Hospitalization

Good morning, Sarah.

I apologize for the delay. I just received an update from the detention facility that Ms. Korda is still at the hospital with tests being run, but they anticipate she will be discharged today.

If you have any other questions, please don't hesitate to reach out.

Sincerely,
Elisabeth Courson
Chief Counsel
Office of the Principal Legal Advisor, Dallas
U.S. Immigration and Customs Enforcement

<span style="color:red">**\*\*\* ATTORNEY/CLIENT PRIVILEGE \*\*\* ATTORNEY WORK PRODUCT \*\*\***</span>

This communication and any attachments may contain confidential and/or sensitive attorney/client privileged information or attorney work product and/or law enforcement sensitive information. It is not for release, review, retransmission, dissemination, or use by anyone other than the intended recipient. Please notify the sender if this message has been misdirected and immediately destroy all originals and copies. Any disclosure of this document or information contained therein must be approved by the Office of the Principal Legal Advisor, U.S. Immigration and Customs Enforcement. This document is for INTERNAL GOVERNMENT USE ONLY and is FOIA exempt under 5 U.S.C. § 552(b)(5), (b)(7).

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Sent:** Saturday, February 7, 2026 8:45:07 AM
**To:** Pincheck, Catherine <█████████████████>; Detention.LegalAccess <Detention.LegalAccess@ice.dhs.gov>
**Cc:** Courson, Elisabeth <██████████████████>
**Subject:** Re: URGENT - Leqaa Kordia (A███████████) Hospitalization

You don't often get email from sstokes@bu.edu. Learn why this is important

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Hi Catherine,

Thank you for your email. It's now been nearly 24 hours since I learned of Ms. Kordia's hospitalization and we still have no idea where she is, or what her condition is. I also just wanted to confirm that if we do not have answers to those questions by 1pm CST, habeas counsel will be alerting the court.

Sincerely,
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
██████████
Boston, MA 02215
██████████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

Case 3:25-cv-01072-L-BT Document 93-1 Filed 02/13/26 Page 52 of 181 PageID 2739

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

---

**From:** Pincheck, Catherine <███████████████████>
**Sent:** Saturday, February 7, 2026 9:33 AM
**To:** Sherman-Stokes, Sarah <sstokes@bu.edu>; Detention.LegalAccess <Detention.LegalAccess@ice.dhs.gov>
**Cc:** Courson, Elisabeth <███████████████████>
**Subject:** RE: URGENT - Leqaa Kordia (A█████████ Hospitalization

Good morning, Sarah.

Unfortunately, I just boarded a flight and do not have access to look into this matter; however, wanted to confirm receipt and to let you know we will look into.

Thank you,

Catherine

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** Sherman-Stokes, Sarah <sstokes@bu.edu>
**Date:** Saturday, Feb 07, 2026 at 9:02 AM
**To:** Detention.LegalAccess <detention.legalaccess@ice.dhs.gov>
**Cc:** Courson, Elisabeth <███████████████████>, Pincheck, Catherine <███████████████████>
**Subject:** URGENT - Leqaa Kordia (A█████████) Hospitalization

You don't often get email from sstokes@bu.edu. Learn why this is important

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

To whom it may concern:

I'm reaching out regarding my client, **Leqaa Kordia** (███████████. I received word that Ms. Kordia was hospitalized yesterday, apparently following a fall and a seizure at Prairieland Detention Center.

Petitioner's Appendix Page 52

I have reached out to Prairieland, ICE, and ACC Stacy Norcross multiple times yesterday and cannot reach anyone who can provide information as to her location or condition. I'm reaching out now because her family and I are extremely worried for her wellbeing.

My G-28 is attached and I look forward to hearing from you as soon as possible. Habeas counsel for Ms. Kordia has already conveyed to AUSA Brian Stoltz that if he does not confirm her location and condition by 1pm CST today, they will be alerting the district court.

Sincerely,
Sarah

Sarah Sherman-Stokes (she/her)
Associate Director & Clinical Associate Professor
Immigrants' Rights and Human Trafficking Program
Boston University School of Law
765 Commonwealth Avenue
██████████████
Boston, MA 02215
██████████████

You can access my papers on SSRN here.
Click here to support our work by giving to the program.

The territory on which Boston University stands is that of The Wampanoag and The Massachusett People. BU's campus is a place to honor and respect the history and continued efforts of the Native and Indigenous community leaders which make up Eastern Massachusetts and the surrounding region. This statement is one small step in acknowledging the history that brought us to reside on the land, and to help us seek understanding of our place within that history. Ownership of land is itself a colonial concept; many tribes had seasonal relationships with the land we currently inhabit. Today, Boston is still home to indigenous peoples, including the Mashpee Wampanoag and Wampanoag Tribe of Gay Head (Aquinnah).

CONFIDENTIALITY NOTICE: The information contained in this e-mail transmittal may be protected by the attorney-client and/or attorney-work product privileges. It is intended only for the use of the individual or entity named above and the privileges are not waived by virtue of the document(s) having been sent by e-mail. If you are not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error, please immediately notify us by return e-mail at sstokes@bu.edu. Thank you.

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| LEQAA KORDIA, | § § § | |
| Petitioner-Plaintiff, | § § | |
| v. | § § § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |
| KRISTI NOEM et al., | § § | |
| Respondents-Defendants. | § § § | |

**<u>DECLARATION OF CAITLYN E. SILHAN</u>**

I, Caitlyn E. Silhan, hereby declare and state:

1. I represent Ms. Leqaa Kordia in the above-captioned case. I am a partner at Waters Kraus Paul & Siegel. I am admitted to practice in the United States District Court for the Northern District of Texas. I am an attorney in good standing with the Texas state bar.

2. At approximately 2:15 P.M. CST on Sunday, February 8, 2026, I learned that Ms. Kordia has been hospitalized at ████████████ (hereinafter "Hospital") in ██████, Texas. I left my home shortly thereafter and arrived at the Hospital at approximately 4 P.M. CST.

3. At 4:08 P.M. CST, Ms. Kordia's removal defense attorney, Sarah Sherman-Stokes, notified counsel for ICE that I was present at the Hospital and seeking to visit Ms. Kordia, and provided ICE with my contact information.

4. I waited in the lobby to hear from ICE or Hospital personnel until approximately 4:45 P.M. CST, when I approached Hospital staff directly to identify myself and inquire about access to Ms. Kordia or, failing that, to speak with ICE personnel on site.

5. Hospital staff advised me that if ICE would grant permission for me to access my client, the Hospital would allow it. They made multiple inquiries on my behalf to ICE personnel, and subsequently advised me that ICE would not permit me to access Ms. Kordia in person or by phone.

6. Ms. Kordia's health status is material to her claim of ongoing and irreparable harm in the habeas proceedings before the Court.

7.  I was not permitted to access Ms. Kordia or to speak to anyone about her condition. I left the Hospital at 6:30 P.M. CST.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 9, 2026                                      */s/ Caitlyn E. Silhan*
                                                            Caitlyn E. Silhan

# EXHIBIT 6

Petitioner's Appendix Page 57

**MORE FROM HOMEPAGE**

A challenge but 'worth it': Texas schools push to certify teachers even with extension

Five things the Dallas Cowboys must do to become Super Bowl contenders

DART this we

ADVERTISEMENT

**NEWS** | **IMMIGRATION**

# Family and lawyers seek answers after ICE detainee Leqaa Kordia is hospitalized

Two Texas lawmakers are raising alarm about the health of the 33-year-old Palestinian woman held at Prairieland Detention Center in Alvarado



By **Lilly Kersh**
Staff Writer

Feb. 7, 2026 | Updated Feb. 8, 2026 at 4:30 p.m. CST | ⏱ 6 min. read



Hamzah Abushaban (left), cousin of Leqaa Kordia, speaks as State Rep. Salman Bhojani, D-Euless, listens during a press conference after they were denied meeting with Leqaa Kordia, arrested by the Trump administration last year, on Friday, Jan. 30, 2026, outside of Prairieland Detention Center in Alvarado

SHAFKAT ANOWAR/ STAFF PHOTOGRAPHER



> **Update:**
>
> Sunday Feb. 8, 4:30 p.m.: This story has been updated with comment from the Department of Homeland Security

Family and lawyers are seeking answers after learning Leqaa Kordia, a 33-year-old Palestinian woman detained in North Texas by Immigration and Customs Enforcement, was hospitalized after a reported seizure.

Two Texas lawmakers are raising alarms about what they've learned about Kordia, who has been held for nearly a year at Prairieland Detention Center in Alvarado.

State Rep. Salman Bhojani, D-Euless, who has urged the Department of Homeland Security to release Kordia, was scheduled to meet with her in late January in detention. But federal immigration officials canceled the visit. He called the facility "a black box" and was alarmed it took nearly 24 hours for Kordia's legal team to confirm she was in the hospital.

"She's not been getting proper nutrition, it seems, and not getting proper sleep," Bhojani said. "As a democracy, we should be holding our government to the transparency standards. ... The violation of one person's right is a violation of everyone's right that's inside the prison."

### Breaking News

Get the latest breaking news from North Texas and beyond

| Email Address | SIGN UP |
|---|---|

Or with:  **G GOOGLE**

By signing up, you agree to our Terms of Service and Privacy Policy

**Related**



**'A betrayal': Community rallies around husband of McKinney school teacher detained by ICE**

On Friday around 8:45 p.m., medical staff at the Prairieland Detention Center notified ICE that Kordia was admitted to a hospital for further evaluation following a seizure, according to the DHS.

ADVERTISEMENT

"Her admission to the hospital was made out of an abundance of caution to ensure her health and safety," the department said in a statement. "The hospital is monitoring her condition and ICE will continue to ensure she receives proper medical care."

Kordia's family and attorneys have received limited information from officials on her condition and were not in contact with her Sunday afternoon despite requests for calls.

Kordia's legal team has pushed for her release from detention, arguing in a federal lawsuit she was targeted by federal officials for her participation in a pro-Palestinian protest near Columbia University in 2024.

In a statement, the DHS said Kordia was arrested in 2025 for overstaying an expired student visa. In addition to her arrest in 2024 for her involvement in protests at Columbia University, she was also found to be providing financial support to individuals in nations hostile to the U.S., the department said in a statement Sunday.

ADVERTISEMENT

"Her arrest had nothing to do with her radical activities," the DHS said in April. "Kordia was arrested for immigration violations due to having overstayed her F-1 student visa, which had been terminated on January 26, 2022 for lack of attendance."

**Related**



**Palestinian woman's attorney argues for her release from North Texas immigration detention**

State Rep. Gene Wu, D-Houston, said the government is "intentionally being cruel" in immigration cases like Kordia's.

"All she did was speak up for Palestine," Wu said. "Her treatment in custody did not have to happen that way. ... I hope that this rings the alarm bells as much as the killing of [Renée] Nicole Good and Alex Pretti," who were killed by federal agents during protests in Minneapolis.

Hamzah Abushaban, Kordia's cousin, said he first heard Friday morning from a person formerly detained with Kordia that she had fallen, hit her head and suffered a seizure in a bathroom at the Prairieland Detention Center, about 35 miles southwest of downtown Dallas.

Family and attorneys were not able to get information on Kordia's health condition until Saturday morning.

Sarah Sherman-Stokes, attorney with the Boston University School of Law Immigrants Rights Clinic who represents Kordia in her immigration removal proceedings, said attorneys called 16 hospitals in the Dallas-Fort Worth area trying to locate Kordia. "Every single hospital we called said she was not there," Sherman-Stokes said Saturday. "We're pretty despairing."

ADVERTISEMENT

**Related**



**Palestinian woman arrested by Newark ICE agents held in North Texas**

Abushaban said Kordia's health has declined while at the facility, where he said conditions are poor. The detention center is crowded, food is not nutritious, beds are uncomfortable and there

are limited accommodations for prayer and halal food for his cousin, who is Muslim, he said.

A 2025 U.S. Senate investigation uncovered dozens of credible reports of medical neglect and poor conditions in immigration detention centers nationwide, building on a series of inquiries into alleged human rights abuses in the detention system, according to the Associated Press.

According to the DHS, ICE detainees receive medical, dental and mental health intake screening within 12 hours of arriving at each detention facility, a full health assessment within two weeks of entering ICE custody or arrival at a facility and access to medical appointments and 24-hour emergency care.

ADVERTISEMENT

When Abushaban visited Kordia in detention last week, Kordia said she felt dizzy and too weak to even hold the phone that detainees use to speak with visitors at the center. "She was lifeless," he said. "That was the most alarming part… She told me that she literally feels like she's slowly dying. And then … four or five days later, this happens."

Abushaban said Kordia is not known to faint or experience seizures. She's the kind of person who puts up an energetic front even if just to protect someone else's feelings, he said. But in detention, she has looked pale and weak, he said. He said detainees are cold, and Kordia is not guaranteed halal food and often eats packaged foods.

**Related**

 **ICE denies North Texas Democratic lawmaker a visit with detained Palestinian woman**

"It's because of the ongoing … malnutrition, lack of sleep, lack of proper hygiene, waking up at the crack of dawn every day," he said. "It's the lack of normal, basic human rights that led to what happened yesterday."

ADVERTISEMENT

Kordia legally entered the U.S. in 2016 from the West Bank and lived with her family in New Jersey on a tourist visa before transitioning to a student visa, according to her habeas corpus petition.

In 2021, her green card application was approved. While waiting for a lawful permanent resident visa to become available, she received erroneous advice that led to her student visa ending in 2022, according to her lawyers. In April 2024, she was arrested with others during a demonstration near Columbia, but the case was quickly dropped.

Her detention in March 2025 came days after the arrest of Mahmoud Khalil, a Columbia student who helped lead pro-Palestinian protests on the campus.

**Related**

 **Dallas museum brings Palestinian diaspora together to archive history, preserve past**

ADVERTISEMENT

In June, a federal magistrate judge recommended Kordia's release while her case challenging detention proceeds, but a federal district judge ordered additional fact-finding. A federal

immigration judge has twice approved her release on bond. The government has appealed the ruling, keeping her in custody.

Protesters have advocated for her release, with signs reading "Bring Leqaa Home!" displayed outside her court proceedings.

"She should never have been detained, but today, almost one year following her detention, she absolutely should be free, because now her health is at significant risk," Sherman-Stokes said.

Naz Ahmad is the co-director of a clinic at the City University of New York School of Law that aims to meet unmet legal needs for Muslim and other communities. The project is helping represent Kordia in her federal lawsuit.

ADVERTISEMENT

**Related**



**Hundreds of protesters in Plano condemn recent ICE shootings, amid unrest in Minneapolis**

"It should not take 12+ hours and multiple, concerted efforts to simply receive news about whether a loved one or a client in ICE detention is receiving urgent medical attention and why," Ahmad wrote in a statement. "Family members and counsel deserve more. If ICE hadn't gone to every length to prevent Ms. Kordia's release, we would not be in this situation of wondering what is happening with our client."

Kordia has no family in Texas. Abushaban lives in Florida and much of Kordia's family is in New Jersey and in Gaza, where conflict has taken the lives of many of her relatives, according to the Texas Civil Rights Project, a nonprofit social justice organization.

"Our client's experience in the past 24 hours reflects one facet of cruelty of an immigration detention system defined by cruelty," according to Golnaz Fakhimi, legal director of Muslim Advocates, a group representing Kordia in her federal lawsuit. "If it sends you to the hospital, best

of luck to your family and lawyers when it comes to whether, how, and when they learn anything about where you are or how you're doing."

ADVERTISEMENT

Abushaban said it's been a rollercoaster ride of emotions and "surreal" to see his cousin's declining health.

"Her body finally giving up on her at the hands of our government is the most bizarre thing to think about," Abushaban said. "Especially for someone that purposely came to this country seeking freedom."

**Correction:** 8:38 p.m. Feb. 7, 2026: *A previous caption in a photo erroneously said Leqaa Kordia was a graduate student at Columbia.*

**MORE ABOUT:**   U.S. News   Israel-Palestine Conflict   Social Justice   Texas

## Read Next

←  →



**Letters to the Editor - Homelessness, ICE center, McCaa, hard work, Belichick**



**Trump administration is delivering water to Americans in need**



**Austin girl's body never recovered after Texas floods. Her parents are suing Camp Mystic**





**A challenge but 'worth it': Texas schools push to certify teachers even with extension**

**Letter — Reli refere readi seatin**

By **Lilly Kersh**

Lilly Kersh is a local government accountability reporter at The Dallas Morning News covering Collin County with a focus on McKinney and Plano. She graduated in 2024 from the University of Georgia with a degree in journalism and was born and raised in Atlanta, Georgia.

---

**TOP PICKS**



### High School Sports

See live scores, schedules and stats for high school football.



### Future of North Texas

We're covering the impact of North Texas; surging population on our quality of life – our workforce, our schools, our roads, our health care and our energy.

## Commenting Experience Feedback

Encounter an issue with commenting? Take 2 minutes to **provide feedback** to help us improve your experience.

---

## Join the conversation

Thank you for reading. We welcome your thoughts on this topic. Comments are moderated for adherence to our Community Guidelines. Please read the guidelines before participating.

# EXHIBIT 7

**Monday, February 9, 2026 at 11:03:13 Eastern Standard Time**

| | |
|---|---|
| **Subject:** | URGENT — ACTION REQUIRED IMMEDIATELY: A# ███████ – Medical Emergency of Leqaa Kordia |
| **Date:** | Friday, February 6, 2026 at 9:04:49 PM Eastern Standard Time |
| **From:** | Salman Bhojani |
| **To:** | ███████ @ice.dhs.gov |
| **CC:** | ███████ @lasallecorrections.com, ███████ @lasallecorrections.com, ███████ @ice.dhs.gov, ███████ @lasallecorrections.com, travis@texascivilrightsproject.org, Naz Ahmad, sstokes@bu.edu, golnaz, Amal Thabateh, csilhan@waterskraus.com |
| **Attachments:** | Rep. Bhojani Letter for Outreach to Prairieland.pdf |

> **\* External Sender - Proceed Cautiously with Links and Attachments. \***

Mr. Bartlett

I am attaching a formal letter regarding the urgent medical status of Leqaa Kordia that requires your immediate review.

This matter is time-sensitive and carries a deadline of 12:00 PM CT on February 7, 2026.

I have flagged this as a high priority. Please confirm receipt of this email and the attached letter. I am available by phone at (███████ should you have any questions.

Respectfully,

**Salman Bhojani**
Texas State Representative
House District 92

1 of 1



# SALMAN BHOJANI
## Texas State Representative

February 6, 2026

John Bartlett
Assistant Chief Counsel
ERO Embed Attorney (Prairieland Detention Center)
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor, Dallas

*Sent via email to:* ██████████@ice.dhs.gov;
*Carbon copy:* ██████████@lasallecorrections.com; ██████████@lasallecorrections.com;
██████████@ice.dhs.gov; ██████████@lasallecorrections.com
██████████@lasallecorrections.com; travis@texascivilrightsproject.org; naz.ahmad@law.cuny.edu;
sstokes@bu.edu; golnaz@muslimadvocates.org; Amal.Thabateh@law.cuny.edu; csilhan@waterskraus.com;

Dear Mr. Bartlett,

We received word this morning from someone held at Prairieland Detention Facility that Leqaa Kordia (A# ███████, DOB ██████) fainted in the shower, hit her head, potentially had a seizure, and was taken to the hospital. Her legal team has called Prairieland four times and sent emails to multiple groups of facility staff, including nursing staff. Neither her family nor the legal team has received a reply or any information about her condition. I became concerned when my scheduled visit with Leqaa was unexpectedly cancelled this morning.

I'm reaching out now to request that DHS (including its contractors) communicate with Leqaa's legal team (cc'd above) and with her designated emergency contact(s) to confirm the following:

      1. Has Leqaa been hospitalized?
      2. If so, where?
      3. Does Leqaa's condition enable her to communicate and to receive a visit from her family and/or a member of her legal team?
      4. Can ICE arrange for the legal team to speak with Leqaa on the phone?
      5. Will ICE permit a member of the legal team to visit her?
      6. What is Leqaa's current medical condition, including diagnoses?
      7. How long is she expected to remain hospitalized?
      8. Is there any additional information that ICE can provide?

Please respond to these inquiries by 12:00 pm CT 2/7/2026. Thank you for your prompt attention to this urgent matter. If you have any questions or need additional clarification, you may contact me directly at (███████████

*Salman*

**Salman Bhojani**
Texas State Representative
House District 92

# EXHIBIT 8

**Monday, February 9, 2026 at 12:43:50 Eastern Standard Time**

**Subject:** FW: detainee medical situation / TODAY
**Date:** Friday, February 6, 2026 at 4:13:19 PM Eastern Standard Time
**From:** ▇▇▇▇▇▇ (Welch)
**To:** Naz Ahmad
**CC:** ▇▇▇▇▇▇▇▇▇▇▇▇
**Attachments:** image001.png

> **\* External Sender - Proceed Cautiously with Links and Attachments. \***

Just FYI. Sent this to Bartlett and the Dallas ICE inbox.

Held off on sharing with other offices. Feel free so share this sent email directly with Kim, Booker, Durbin immigration counsels if you all decide to expand the outreach—and they need to know what we sent.



---

**From:** ▇▇▇▇▇▇ (Welch)
**Sent:** Friday, February 6, 2026 4:11 PM
**To:** ▇▇▇▇▇▇@ice.dhs.gov' ▇▇▇▇▇▇@ice.dhs.gov>
**Cc:** ▇▇▇▇▇▇ (Judiciary-Dem) ▇▇▇▇▇▇▇▇▇▇▇▇>
**Subject:** detainee medical situation / TODAY

Hi Mr. Bartlett,

I am reaching out with an urgent request for assistance on a medical situation. We were hoping that ICE or the relevant authorities could simply reach out to the family or attorneys of Leqaa Kordia to let them know of her medical status.

The Senator's office learned that this morning, February 6, Leqaa Kordia (A number ending ▇▇▇▇) experienced a medical episode and was likely taken for medical care outside of the Prairieland Detention Facility. Her family is very concerned and no one in her family has received an update—and to the best of our knowledge, no one at ICE has responded to requests from her legal counsel.

Would you be willing to ask if the relevant team could reach out as soon as possible to her family (cousin, Hamzah Abushaban) and any member of her legal team (Sarah Sherman Stokes, Travis Fife, Golnaz Fakhimi, or Naz Ahmad)?

Thanks so much for the help!

Office of Senator Peter Welch (VT)
Washington, D.C.
@welch.senate.gov



# EXHIBIT 9



**One Hundred Nineteenth Congress**
**Committee on Homeland Security**
**U.S. House of Representatives**
**Washington, DC 20515**

January 22, 2026

The Honorable Kristi Noem
Secretary
U.S. Department of Homeland Security
Washington, D.C. 20528

Dear Secretary Noem:

We are outraged that 53 people have died in the custody of Immigration and Customs Enforcement (ICE) or Customs and Border Protection (CBP) on your watch. Every death is a tragedy. We write to demand that you ensure ICE and CBP avoid preventable deaths of people in their custody.

The Department of Homeland Security's (DHS) callous disregard for human life was made apparent by the heinous killing of Renee Good in Minneapolis by an ICE officer. Two days after Ms. Good's death, ICE notified Congress that Geraldo Lunas Campos, an ICE detainee at a makeshift detention camp in Texas had died in custody after "staff observed him in distress and contacted on-site medical personnel for assistance [who] responded, initiated lifesaving measures, and requested emergency medical services." That statement to Congress turned out to be a lie. According to reports, Mr. Campos likely died from being choked to death at the hands of detention staff—a homicide.[1] To cover up ICE's lie, DHS this weekend attempted to deport two detainees who witnessed the death of Mr. Campos, even though Mr. Campos's death "is still an active investigation," according to DHS.[2]

It is obvious yet tragic that ICE is unwilling or unable to provide basic care for detainees. ICE stopped paying its third-party medical providers for detainee care in October of last year.[3] At the same time, DHS has not demonstrated that its attempts to hire more medical personnel to fill critical shortages have been fruitful. Despite the fact that a lack of medical personnel at detention facilities "may increase the risk of inadequate medical care"[4] and evidence that low medical

---

[1] Douglas MacMillan, *Medical Examiner Likely to Classify Death of ICE Detainee as Homicide, Recorded Call Says*, WASH. POST (Jan. 15, 2026), https://www.washingtonpost.com/immigration/2026/01/15/ice-detention-death-homicide/.
[2] Douglas MacMillan, *DHS Seeking to Deport Two Men Who Said Fellow ICE Detainee Was Killed*, WASH. POST (Jan. 17, 2026), https://www.washingtonpost.com/immigration/2026/01/17/detainee-death-witnesses-deported-dhsa/.
[3] Judd Legum, *ICE Has Stopped Paying for Detainee Medical Treatment*, POPULAR INFO. (Jan. 20, 2026), https://popular.info/p/ice-has-stopped-paying-for-detainee.
[4] U.S. DEP'T OF HOMELAND SEC. OFF. OF THE INSPECTOR GEN., OIG-22-03, MANY FACTORS HINDER ICE'S ABILITY TO MAINTAIN ADEQUATE MEDICAL STAFFING AT DETENTION FACILITIES 16 (2021).

staffing levels lead to preventable deaths,[5] the Trump administration has spent the year terrorizing American communities by conducting indiscriminate roundups of immigrants who will be sent to facilities that are incapable of providing proper medical care. DHS also has gutted its internal detention oversight offices,[6] and ICE is evading congressional oversight by barring Members of Congress from conducting unannounced inspections of detention facilities.[7]

Sadly and predictably, more people died in ICE custody last year than in any of the past twenty years,[8] including a 75-year-old Cuban parolee who had been in the United States since 1966 and a 34-year-old man who died from an apparent suicide only one day after being detained. In just the past week, two men died from suicide in ICE detention facilities.[9]

In addition to the 36 deaths in ICE custody reported since President Trump took office for his second term, CBP has reported to Congress 17 deaths in custody. In March of 2025, for example, a woman who had multiple medical issues committed suicide in her CBP cell despite contact with contract medical personnel only hours before her death. CBP then discovered its personnel had falsified her welfare check records. This is unacceptable.

The Trump administration's deployment of out-of-control ICE and CBP personnel to round up immigrants in American communities has proven to be dangerous and even deadly. Given that the Trump administration plans to further increase immigrant detention while still being unable to hire sufficient personnel to ensure the health and safety of those in its custody, please provide or respond to the following requests no later than February 5, 2026:

1. The number of people held at each ICE and CBP facility, including Field Offices, as of the date of this letter.
2. For each ICE and CBP facility in which people are detained, the average length of detention and longest detention as of the date of this letter.
3. Updates on the circumstances and causes of death, including a copy of autopsy and Office of Professional Responsibility reports, for each death in ICE and CBP custody from January 20, 2025, to the present.
4. The number of medical professionals currently employed or contracted at each ICE and CBP facility, broken out by profession, licensure, and facility location.
5. The staffing requirements for medical professionals at each ICE and CBP facility.

---

[5] EUNICE HYUNHYE, ET AL., DEADLY FAILURES: PREVENTABLE DEATHS IN U.S. IMMIGRATION DETENTION 7, 49-50.
[6] Sean Michael Newhouse, *DHS Says It Won't Eliminate Oversight Offices But Is Still Pursuing Layoffs*, GOV. EXEC. (May 27, 2025), https://www.govexec.com/workforce/2025/05/dhs-says-it-wont-eliminate-oversight-offices-still-pursuing-layoffs/405612/.
[7] Camilo Montoya-Galvez, *Trump Administration Again Restricts When Members of Congress Can Inspect ICE Facilities*, CBS NEWS (Jan. 11, 2026), https://www.cbsnews.com/news/ice-facilities-homeland-security-lawmakers-visit-inspections/; David Janovsky, *ICE Barring Congress From Detention Facilities Is Illegal*, PROJECT ON GOV'T OVERSIGHT (Aug. 11, 2025), https://www.pogo.org/analysis/ice-barring-congress-from-detention-facilities-is-illegal.
[8] Ximena Bustillo & Rahul Mukerjee, *It's the Deadliest Year for People in ICE Custody in Decades; Next Year Could Be Worse*, NPR (Oct. 23, 2025), https://www.npr.org/2025/10/23/nx-s1-5538090/ice-detention-custody-immigration-arrest-enforcement-dhs-trump.
[9] Jozsef Papp, *Mexican National Dies While in ICE Custody in Clayton County*, ATLANTA J.-CONST. (Jan. 17, 2026), https://www.ajc.com/news/2026/01/mexican-national-dies-while-in-ice-custody-in-clayton-county/; Meredith Deliso, *ICE Detainee Dies of 'Presumed Suicide' at Texas Detention Facility, Agency Says*, ABC NEWS (Jan. 20, 2026), https://abcnews.go.com/US/ice-detainee-dies-presumed-suicide-texas-detention-facility/story?id=129364093.

6. Have ICE and CBP increased medical personnel at detention facilities and other locations where ICE and CBP are detaining people, and are such increases, if they have occurred, proportional to the increase in detainee numbers this year?

7. Any planning documents related to hiring or contracting of medical personnel in 2025 and 2026.

8. How do ICE and CBP monitor detainee health during transport?

9. How do ICE and CBP conduct mental health screenings during intake, and how often does ICE conduct such screenings during detention? Are such screening conducted by a medical professional with a recognized mental health specialization?

10. What steps are ICE and CBP taking to prevent further deaths by suicide in custody?

11. What disciplinary steps has CBP taken against the personnel who falsified welfare check logs related to the death by suicide on March 29, 2025, at Yuma Station?

12. Which entities are investigating the death in custody of Geraldo Lunas Campos?

13. All records relating to any investigations into the death of Geraldo Lunas Campos, including records of any use of force investigation.

14. Copy of any video footage or images showing Geraldo Lunas Campos during the time period beginning one hour from the time of his death and ending one hour after the time of his death.

15. All records relating to the creation and distribution of an email sent to Congress from CongresstoICE@ice.dhs.gov on January 9, 2026, titled "Congressional Notification: ICE reports aggravated felon and convicted child sex offender's death at Camp East Montana in Texas," including any records discussing the contents of such notification and death of Geraldo Lunas Campos.

We look forward to your timely response.

Sincerely,

Bennie G. Thompson
Ranking Member

Eric Swalwell
Member of Congress

J. Luis Correa
Member of Congress

Shri Thanedar
Member of Congress

Dan Goldman
Member of Congress

Delia C. Ramirez
Member of Congress

Timothy M. Kennedy
Member of Congress

LaMonica McIver
Member of Congress

Julie Johnson
Member of Congress

Nellie Pou
Member of Congress

Troy A. Carter, Sr.
Member of Congress

Al Green
Member of Congress

James R. Walkinshaw
Member of Congress

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**



|  |  |  |
|---|---|---|
| | § | |
| LEQAA KORDIA, | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |
| v. | § | |
| | § | |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |

## DECLARATION OF LEQAA KORDIA

I, LEQAA KORDIA, hereby declare and state:

1. My name is Leqaa Kordia. I am a 33-year-old Palestinian woman and an observant Muslim. The facts I'm stating in this declaration stated herein are based on my personal knowledge unless I've specified otherwise.

2. I have been confined by ICE for nearly a year, since March 13, 2025.

3. I am currently in ICE custody at the Prairieland Detention Facility in Alvarado, Texas ("Prairieland"). Before then, I was living among family, including my U.S. citizen mother, in Paterson, New Jersey.

4. The weekend of January 28-February 1, 2026, I was very sick. I felt like I had a very high fever and I could just barely move. I asked the facility staff for medication, like Tylenol, to help with the fever.

5. At Prairieland, in order to get food or medication, I have to leave the dorm and go to another building and wait in line for medication. While I was sick with fever, I could not get myself up to go to stand in line for medication because I felt so physically weak. I tried to explain this to the facility staff, but they insisted I would need to leave the dorm to get medication.

6. My cousin, Hamzah Abushaban, visited me on Sunday, February 1, 2026. I wanted to see him, but I was also still feeling very weak from being sick. For a family visit, I am separated from my cousin by thick glass. We must speak through the phone to hear each other.

7. During the visit, I could barely hold my head up to stay on the phone.

1

8. I felt so much despair about my condition and future in the facility, given how sick I was feeling. It was very difficult to recuperate because it is difficult to sleep and I can't access nutritious food that's halaal.

9. I told my cousin, "I feel like I'm dying in here."

10. Throughout the next week, I continued to suffer from the lack of sleep and access to nutritious halaal food during the time I was sick. While I was sick, I did not consistently leave the dorm to get food because of how weak I felt.

11. It is very difficult to get any good sleep or rest in the facility. The lights are not turned off in the dorm until around 10:30pm or later. The guards come in throughout the night and early in the morning, banging the door, with their key chains making a lot of noise. They often deport and transfer people in the middle of the night, which also is very noisy and makes it difficult to sleep.

12. Given the sheer number of women in the dorm, there is always loud conversation, making it hard to sleep even when the lights are turned off.

13. I no longer have to sleep on the floor, but the mattress I sleep on is very thin.

14. Any rest or sleep I am able to get is not the equivalent of being able to sleep in a quiet, darkened room by myself, as I would have been able to do if I were at home.

15. On the evening of February 5, 2026, I noticed that I was twitching throughout the evening. It was throughout my body; I couldn't even hold up the book I was reading because of it. I wasn't sure what to make of it. I thought it was from stress and consistent lack of sleep. I later learned from a doctor that this is a sign that I might experience a seizure, but I did not know this at the time.

16. On February 6, 2026, I was hospitalized. I do not remember all the details of how it happened, but I have been told by other women in the dorm, based on eyewitnesses accounts of what happened, that I was in the bathroom, hit my head, fell to the ground, and had a seizure. I don't know when the seizure started: before I hit my head or after.

17. What I can remember is waking up in a room in the medical unit of Prairieland, with a nurse telling me that I had had a seizure. I was terrified to wake up there without any memory of what had happened to me. I felt very dizzy and nauseous, and I remember throwing up in the medical unit.

18. Following my fall and seizure, the facility transferred me to Texas Health Huguley Hospital's emergency room on February 6, 2026. I was nauseous and dizzy on the way to the hospital and also had a severe headache. I remember throwing up on the way to the hospital.

2

19. I spent most of the day on Friday, February 6, 2026, in the hospital's emergency room. While I was in the emergency room, I was put on an IV. Late in the evening that day, I was moved to a private room.

20. I saw multiple doctors while I was there. On Saturday and Sunday, I still felt quite dizzy. and I had a headache.

21. The whole time I was in the hospital, I was guarded by two guards, who I believe were worked for LaSalle, the company that operates Prairieland for Immigration and Customs Enforcement ("ICE"). These guards kept me chained to the bed at my wrists and ankles. I asked multiple times to have the chains removed, but the guards refused.

22. The guards required me to remain chained when I needed to use the bathroom or take a shower.

23. The chains were heavy, uncomfortable, and humiliating: they made me feel like an animal.

24. At some point, the pain from being chained was so great, that I asked to be sent back to Prairieland, despite the doctors' wanting to keep me monitored. I didn't want to return to Prairieland, but I couldn't bear remaining chained up any longer.

25. I had an MRI and other tests on February 6, 2026. It was still difficult for me to understand exactly what was happening because of how badly I felt.

26. During my stay in the hospital, one of the doctors tried to explain the results of the MRI to me; what I understood from the explanation is that now that I've suffered one seizure, I'm more likely to suffer further seizures.

27. The hospital staff drew my blood at least twice a day while I was in the hospital. That was particularly draining for me because of how weak I felt.

28. After I had been tested and monitored, I spoke with hospital staff, including the doctors who examined me.

29. After speaking with them, I was left with the impression that poor nutrition, sleep, and stress likely contributed to why I had a seizure.

30. I have never had a seizure before. The doctors prescribed anti-seizure medication, which I am supposed to take for the next two to three years. The seizure medication is known to cause nausea, so I was also prescribed anti-nausea medication.

31. During my hospitalization, I requested the guards who were with me to speak with my family and legal counsel so I could update them on my medical emergency and hospitalization, but I was denied any communication. I asked if they could even just inform my attorneys that I am okay, and that request was also denied.

3

32. At one point during my hospitalization, I believe on Sunday, February 8, 2026, I overheard hospital security staff discussing with the guards that an attorney was at the hospital, trying to see me. No one asked me if I wanted to see my attorney.

33. If I had been given the option by hospital security staff, the guards from LaSalle, or other representatives of ICE, I would have spoken with my attorney.

34. I felt so dehumanized by this treatment. It scared me that my family and legal team could be kept in the dark about my location and condition.

35. I was hospitalized for over 72 hours. I was discharged on February 9, 2026, at approximately 1pm or 2pm. Guards returned me to Prairieland, where I remain confined.

36. Before I was discharged, the hospital told me that I would need to come back for a follow up appointment in a month or so.

37. Additionally, the hospital staff advised that I should try to avoid stress and get proper rest and nutrition. The hospital staff left me with the impression that I would have more seizures if I could not reduce stress and ensure proper rest and nutrition.

38. Since being discharged, I have continued to experience some dizziness and nausea.

39. After I was discharged, the facility staff at Prairieland told me that I would only be able to go to the follow up appointment at the off-site hospital if ICE approves the request. At least to my knowledge, there is no guarantee that ICE will approve the request.

40. Prior to my confinement, I never experienced a seizure.

41. On February 12, 2026, I asked for my medical records from the facility. The facility staff said they had received the records from the hospital, but that they would have to wait for ICE's approval before releasing my own medical records to me.

42. On February 12, 2026, I learned from my attorneys, who had received my medical records from the hospital, that the records showed a likely diagnosis of epilepsy.

43. Next week, Ramadan will start. This will be my second Ramadan in ICE custody, I will likely be unable to fast because of my condition. Certainly, if I do fast, it would likely make me feel weaker. I understand from doctors at the hospital that this could trigger another seizure. I feel so disheartened at the prospect that I will again be unable to fast.

44. Fasting is supposed to bring me closer to God, and this place is robbing me of that opportunity.

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


*/s/ Leqaa Kordia (signed by permission)*
Leqaa Kordia                                              February 13, 2026


Despite reasonable diligence, I, Sadaf Hasan, was unable to conduct an in-person meeting with Ms. Leqaa Kordia prior to filing. However, on February 13, 2026, I had a video conference with Ms. Leqaa Kordia in which I read the above declaration to Ms. Kordia Ms. Kordia confirmed the accuracy and truthfulness of the factual allegations contained therein and authorized me to electronically affix her signature to the document.

*/s/ Sadaf Hasan*
Sadaf Hasan

5

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| LEQAA KORDIA, | § | |
| | § | |
| | § | |
| Petitioner-Plaintiff, | § | |
| | § | CIVIL ACTION NO. 3:25-cv-1072-L-BT |
| v. | § | |
| | § | |
| KRISTI NOEM et al., | § | |
| | § | |
| Respondents-Defendants. | § | |
| | § | |

**<u>DECLARATION OF DR. AUDREY NATH, M.D., P.hD</u>**

1. My name is Audrey Nath. I am an American physician licensed to practice in the State of Texas, practicing at Neuromonitoring Associates, and previously as faculty at the Baylor College of Medicine.

2. I am a neurologist, board certified by the American Board of Psychiatry and Neurology (ABPN) in neurology with a special qualification in child neurology, with additional subspecialty board certifications in clinical neurophysiology and epilepsy.

3. I am a graduate of the McGovern Medical School in Houston, Texas. I completed a residency in neurology at the Boston Children's Hospital/Beth Israel Deaconess Medical Center/Harvard Medical School program in Boston, Massachusetts. This residency provided extensive experience in history taking, physical examination, and medical management of adults and children with neurological diseases. I have evaluated and treated many different types of seizures in both the outpatient and inpatient setting. My research background is extensive, including a PhD in Neuroscience, with expertise in functional neuroimaging. My Curriculum Vitae is attached as Exhibit A to this declaration.

4. I have practiced neurology for seven years, during which time I have published numerous peer-reviewed articles in neurology. Within my role, I provide neurological evaluations of my patients on a regular basis. I consider a full medical, surgical, social, and psychiatric history and a physical exam to be a part of a routine, comprehensive examination. I care for a wide variety of patients, many with medically-refractory epilepsy who require long-term management with multiple seizure medications.

5. After my residency training as a neurologist, I pursued fellowships in both clinical neurophysiology and epilepsy at Baylor College of Medicine in Houston, with

exposure to both adult, pediatric and neonatal studies. These two years of clinical neurophysiology and epilepsy fellowship were devoted to the interpretation of scalp and invasive electroencephalograms (EEGs), as well as the medical and surgical management of patients with medically-refractory epilepsy.

6.  Afterwards, as an assistant professor at the Baylor College of Medicine, I was the supervising attending in caring for many patients with difficult-to-treat epilepsies, as well as patients with ongoing seizure activity within the intensive care unit.

7.  I have reviewed the hospital medical records provided to me by lawyers for the Petitioner in the above-captioned case. I have reviewed Ms. Leqaa Kordia's neurological care provided in ███████████████████ ("Hospital") from February 6, 2026 to February 9, 2026. I understand that Ms. Kordia's attorneys received these records directly from the Hospital. A true and correct copy of the records I reviewed are attached as Exhibit B to this declaration.

8.  The client is not my patient and I have not had the opportunity to speak with her directly or conduct a physical exam. I do not have authority over the client's direct medical treatment or diagnosis.

9.  I have received no remuneration for my time reviewing this case. No compensation is contingent on me reaching a particular conclusion or opinion.

**A. Ms. Kordia had a seizure on February 6, 2026 and is sent to the hospital.**

10.  Ms. Kordia is a 33-year-old woman with chronic dizziness (on meclizine) who was brought in by an ambulance to the emergency department on 2/6/26. Per records from ████████████████████l, "She was brought to the emergency room with seizure-like activity noted on surveillance cameras." More specifically, "...patient was in the bathroom at detention center fell backwards hit her head with loss of consciousness unknown amount of time."

11.  Given the report of a head strike, brain imaging with both a CT scan and MRI of the brain were performed, both without evidence of an intracranial hemorrhage.███████ ████████████████

12.  An EEG was performed on February 6, 2026, █████████████████████ ████████████

13.  Ms. Kordia was evaluated by a neurologist, and █████████████████ ████████

**B.** ██████████████████████.

14.  ████████████████████████████████ ████████████████████████████████

2



15. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**C.** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ **on chronic dizziness and seizures.**

16. Of note, Ms. Kordia has a history of chronic dizziness, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

17. Any brain mass causing clinical symptoms should be evaluated by a neurosurgeon, to evaluate if the mass is stable over time, or is at risk to cause further compression, which could be lethal.

## D. Exacerbating factors for epileptic seizures while in a detention facility

18. I have reviewed Ms. Kordia's Amended Petition for Writ of Habeas Corpus (Dkt. 69). Based on paragraphs 151–161, I understand that the stress, lack of privacy, loud noises, and uncomfortable sleeping conditions have made it very difficult for her to sleep.

19. Sleep deprivation is a well-known trigger ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ It is also well-established that people who are incarcerated very frequently experience sleep deprivation, due in part to noise, excessive lighting, and uncomfortable or lack of bedding (Ireland & Culpin, 2006).

20. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

21. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. We do not know how long the initial seizure lasted, and it is possible that it was a prolonged seizure lasting more than 5 minutes, defined as status epilepticus, which has a mortality rate up to 39%.

3

Docusign Envelope ID: CEA4142A-465F-4D3E-B557-F39DA17EBE4E

22. ██████████████████████████████████████████

These are findings from my review of around 77 pages of medical records and the habeas petition pertaining to the case of Ms. Leqaa Kordia.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DocuSigned by:

*[signature]*

Audrey Nath, MD, PhD
February 13th, 2026

4

## References



5

# EXHIBIT 11-A

# AUDREY NATH, M.D., Ph.D.



## SUMMARY

Harvard-trained triple-board certified MD/PhD epileptologist. 20 years of translational research experience in both academia and biotech, including funded grants and over 20 peer-reviewed publications. Leads a collaborative team of epileptologists, neurosurgeons, radiologists and psychologists to create surgical plans for epilepsy patients (UTMB). Passion for communication of health topics to the public and advocacy for marginalized populations.

## WORK EXPERIENCE

Praxis Precision Medicines                                                   7/2024-present
    Clinical trial neurologist sub-investigator

Ceribell                                                                               6/2023-present
    Expert epileptologist collaborating with research scientists in developing AI
    algorithms for the detection of seizures in pediatric patients

University of Texas Medical Branch                                      9/2021-present
    Clinical Assistant Professor, Department of Neurosurgery

Neuromonitoring Associates
    Clinical Neurophysiologist/Oversight Neurologist          1/2021-5/2024

Baylor College of Medicine/Texas Children's Hospital
    Assistant Professor, Department of Pediatric Neurology and          7/2019-1/2021
    Developmental Neuroscience, Division of Epilepsy

## PROFESSIONAL TRAINING

Baylor College of Medicine, Houston, TX
    Clinical neurophysiology/epilepsy fellow                       7/2017-6/2019

Children's Hospital/Harvard Medical School, Boston, MA
    Child neurology resident                                             7/2014-2017

University of Texas Health Science Center at San Antonio, San Antonio, TX
    Pediatrics resident                                                  7/2012-6/2014

## EDUCATION

UT-Houston MSTP Program, Houston, TX

|  |  |
|---|---|
| M.D., Ph.D., Program in Neuroscience | 8/2005-5/2012 |

Rice University, Houston, TX

|  |  |
|---|---|
| B.S. Bioengineering, B.A. Cognitive Sciences with honors | 8/2001-5/2005 BOARD CERTIFICATION |
| ABPN epilepsy | 10/2020 |
| ABPN clinical neurophysiology | 10/2019 |
| ABPN neurology with special qualifications in child neurology | 9/2017 |

**CLINICAL TRIALS**

| Novartis phase I/II clinical trial (NCT00411619) | 7/2018-6/2019 |
|---|---|

Neuroimaging research analyzing DTI data to determine longitudinal effects of everolimus on white matter in children with tuberous sclerosis

| Clinical trial for the Sleep Activity Monitor (SAMi) device | 4/2024-present |
|---|---|

Currently designing a clinical trial with UTMB and HiPass Design LLC to determine the efficacy of the SAMi device in detecting seizures, compared with gold-standard EEG

**GRANTS**

| Thrasher Research Fund Early Career Award Program Grant | 2019-2021 |
|---|---|

"Language localization in pediatric epilepsy patients using novel, task-free neuroimaging techniques."
Principle Investigator

| Office of Graduate Medical Education (GME) and the Program for | 2015-2016 |
|---|---|

Patient Safety and Quality (PPSQ) Quality Improvement Grant, "Reducing Sedation Needs for Children Undergoing Neurological Diagnostic Work Up"
Principle Investigator

**CURRENT RESEARCH PROJECTS**

| Investigation of chronic health outcomes in patients experiencing | 04/2024-present |
|---|---|

episodic homelessness UTMB IRB #24-0053

| Examination of epilepsy care among the patients within the Texas | 01/2024-present |
|---|---|

Department of Criminal Justice (TDJC)
UTMB IRB # 23-0248

| Evaluation of seizure detection with a non-wearable device | 12/2023-present |
|---|---|

UTMB IRB approval pending

**SCIENTIFIC PUBLICATIONS**

1. Clements ME, Briscoe C, Curcio AM, Douglass LM, Kassiri J, Liu LC, Mathias SV, Moore-Hill D, Nalluri D, **Nath A**, Romeu AM, Syed TS, Vinarsky V, Wiener S, JoJo Yang Q, Betstadt SJ, Harrison EI, Kulkarni N, Puntambekar P, Samanta D, Singla L, Voinescu PE & Kirkpatrick L. Counseling Reproductive-Age Youth with Epilepsy: Literature Review and Expert Opinion from the Epilepsy in the Child-Bearing Ages through Menopause Consortium (ECAM). Pediatric Neurology. 2025.

2. Gunnell S, **Nath A**, Karas P, Masel T. Lateralization discordance between stereo EEG and scalp EEG in temporal epilepsy: A case report. Epilepsy Behav Rep. 2025 Jul 5;31:100803.

3. Voinescu PE, Seliger J, Gerard EE, Birnbaum AK, Johnson EL, Pennell PB, Tsai JJ, **Nath A**, Jacobs CS, Decker BM, Mihaylova TG, Singla L, Munger Clary HM, Cavitt J, Gedzelman E, Sazgar M, Krishnaiengar S, Zarroli K, Smith F, Serafini A, Hanna J, Velez-Ruiz N, Moore-Hill D, Meador KJ. Prescribing Practices of Antiseizure Medications at US Academic Medical Centers for Pregnant People With and Without Epilepsy. Neurology. 2025 Oct 21;105(8):e214219.

4. Chawla R, **Nath A**. Anti-immigrant sentiment and the crisis of caregiver separatation. Int J Neuropsy Beh Sci. 2024; 5(3):1-3.

5. Magnotti JM, Lado A, Zhang Y, Maasø A, **Nath A**, Beauchamp MS. Repeatedly experiencing the McGurk effect induces long-lasting changes in auditory speech perception. Commun Psychol 2024, 2(25).

6. Ali A, **Nath A**. Racial differences in removal rates of children by the Texas Department of Family and Protective Services: A study of 2013-2021 data. J Comm Med and Pub Health Rep 2024;5(03).

7. Kumar P, **Nath A**. Negative effects of the Dobbs decision on intellectually disabled adolescents, a vulnerable population: mini review. SOJ Neuro Neurosci. 2024;4(1):1–3.

8. Kaur P, **Nath A**. Cultural and Ethnic Factors in Mental Health Care Disparities amongst Asian Americans. Inf J Neuropsy Beh Sci. 2023;4(2):1-2.

9. Ravindra VM, Ruggieri L, Gadgil N, Addison AP, Patino I, Gonda DD, Chu J, Whitehead L, Anderson A, Diaz-Medina G, Houck K, Katyayan A, Masters L, **Nath A**, Quach M, Riviello JJ, Seto E, Sully KE, Agurs L, Sen S, Handoko M, Coorg R, Ali I, Ikeda D, Weiner H, Curry DJ. An Initial Experience of Completion Hemispherotomy via Magnetic Resonance-Guided Laser Interstitial Therapy. Stereotact Funct Neurosurg. 2023;101(3):179-187.

10. Prueksapraopong C, Zhou A, Yu B, Ip C, **Nath A**. Teaching NeuroImages: Gerstmann Syndrome in a Pediatric Patient with a Dominant Parietal Pleomorphic Xanthroastrocytoma. Archives of Clinical and Medical Case Reports. 2023, 7:269-270.

11. Han S, **Nath A**. Neurological Conditions Among the Incarcerated: A Medically Underserved Population. J Neuro Neurophysiol. 2022, 13(12), 001-005.

12. **Nath A**, Whitworth E, Bretz D, Davila-Williams D, McIntosh L.

Electrical Status Epilepticus in Sleep (ESES) in an Elderly Adult: A Case Report. Cureus. 2022 Jun 27;14(6):e26372.

13. Nascimento FA, **Nath AR**. Teaching NeuroImages: Epileptiform K-complexes in genetic generalized epilepsy: Common but underappreciated. Neurology. 2020 May 12;94(19):e2072-e2073.

14. **Nath A**, Robinson M, Magnotti J, Karas P, Curry D, Paldino M. Determination of Differences in Seed-Based Resting State Functional Magnetic Resonance Imaging Language Networks in Pediatric Patients with Left- and Right-Lateralized Language: A Pilot Study. J Epilepsy Res. 2019 Dec 31;9(2):93-102.

15. Peters JM, Prohl A, Kapur K, **Nath A**, Scherrer B, Clancy S, Prabhu SP, Sahin M, Franz DN, Warfield SK, Krueger DA. Longitudinal Effects of Everolimus on White Matter Diffusion in Tuberous Sclerosis Complex. Pediatr Neurol. 2019 Jan;90:24-30.

16. Sims E, **Nath A**, Sugalski A. Successful Treatment of Osteosarcoma Without Methotrexate in a 13-Year-Old Boy With Down Syndrome. J Pediatr Hematol Oncol. 2019 Jan;41(1):71-73.

17. Aravamuthan BR, **Nath AR**, Ghosh PS. Teaching NeuroImages: Medullary lesions causing dysphagia in Leigh/MELAS overlap syndrome.  Neurology. 2016 Jul 12;87(2):e18-9.

18. Chen G, Saad ZS, **Nath AR**, Beauchamp MS, Cox RW. fMRI group analysis combining effect estimates and their variances. Neuroimage. 2012 Mar;60(1):74765.

19. **Nath AR**, Beauchamp MS. A neural basis for interindividual differences in the McGurk effect, a multisensory speech illusion. NeuroImage 2012, 59(1):781-7.

20. **Nath AR**, Fava EE, Beauchamp MS. Neural correlates of interindividual differences in children's audiovisual speech perception. Journal of Neuroscience 2011, 31(39):13963–13971.

21. **Nath AR**, Beauchamp MS. Dynamic changes in superior temporal sulcus connectivity during perception of noisy audiovisual speech. Journal of Neuroscience 2011, 31(5), 1704-1714.

22. Beauchamp MS, **Nath AR**, Pasalar S. fMRI-guided transcranial magnetic stimulation reveals that the superior temporal sulcus is a cortical locus of the McGurk effect. Journal of Neuroscience 2010, 30(7), 2414-2417.

23. Colorado RA, **Nath AR**. Research overdue on subterfuge versus forced treatment in psychiatric emergencies. Ann Emerg Med 2006, 48, 479.

24. **Nath A**, Rivoire K, Chang S, West L, Cantor SB, Basen-Engquist K, AdlerStorthz K, Cox DD, Atkinson EN, Staerkel G, MacAulay C, Richards-Kortum R, Follen M. A pilot study for a screening trial of cervical fluorescence spectroscopy. Int J Gynecol Cancer. 2004 Nov-Dec;14(6):1097-107.

25. Rivoire K, **Nath A**, Cox D, Atkinson EN, Richards-Kortum R, Follen M. The effects of repeated spectroscopic pressure measurements on fluorescence intensity in the cervix. Am J Obstet Gynecol. 2004 Nov;191(5):1606-17.

26. **Nath A**, Rivoire K, Chang S, Cox D, Atkinson EN, Follen M, Richards-Kortum R. Effect of probe pressure on cervical fluorescence spectroscopy measurements. J Biomed Opt. 2004 May-Jun;9(3):523-33.
27. Gill E, Malpica A, Alford R, **Nath A**, Follen M, Richards-Kortum R, Ramanujam N. Relationship between collagen autofluorescence of the human cervix and menopausal status. Photochem Photobiol. 2003 Jun;77(6):653-8.

## INVITED PRESENTATIONS

"Medicolegal advocacy for marginalized populations."                    06/13/2024
    Healthcare for All Texas. Houston, TX

"Alternative Career Paths in Neurology Panel Discussion."              11/12/2023
    3rd Annual Women in Neurologist Conference. Bonita Springs, FL.

"Medicolegal advocacy for neurological care for detainees and           03/02/2022
    incarcerated people." DEI/Advocacy lecture series of Neurology  Grand Rounds, Texas Children's Hospital, Houston, TX.

## ADVOCACY/VOLUNTEERING

The Village Connect, advisory board member and director of research     8/2023-present
    Leading peer-reviewed research into healthcare outcomes for episodically homeless people

TeleEEG                                                                  7/2023-present
    Providing remote EEG interpretation to the developing world

Momentum Education, mentor and advisory board member                    7/2023-present
    Mentoring first-generation, low-income students who are interested in medicine

Texas Department of State Health Services, Medical Advisory Board        6/2023-present
    Providing recommendations regarding motor vehicle safely and proper use and storage of handguns to the Department of Public Safety (DPS) of the State of Texas

ECAM (Epilepsy in the Childbearing Ages through Menopause)               3/2023-present
    Consortium, neurologist member
    Performing research regarding antiseizure medication (ASM) use in pregnant patients. Developing expert-opinion consensus statement on standards for counseling adolescents and young adults with epilepsy about reproductive health.

Public education regarding the effect of the Dobbs decision on          8/2022
    intellectually-impaired adolescents
    Publications including Neurology Advisor, Neurology Today

Chasing Medicine, National Grants and Charitable Giving Director     9/2022-present
    Mentoring underrepresented minorities in medical school admissions. Overseeing
    financial donations and investments.

Nath A & Murphey D. "Commentary: Biases unjustly put Lucio on death row."     4/2022
    San Antonio Express News, 4/15/22

Healthcare for Action PAC national board member     11/2021-present

COVID advocacy, speaking out against vaccine mandate bans     10/2021
    Publications including Newsweek, KHOU

Medical Justice Alliance, RAICES, Harris County Public Defenders Office
    Medicolegal advocate for incarcerated and detained people     1/2021-present

**NARRATIVE WRITING**

Nath A. "Learning to Listen." What We Bring to the Practice of Medicine: Perspectives from Women Physicians, edited by K. Greene-Liebowitz & D. Corriel, Kent State Press, April 4, 2023, pg. 37-39.

Nath A. "The mirage of meaning: My journey through perfection and beyond." The Perfect Doctor, edited by S. Yakhkind, Pager Publications, in press.

**COMMUNITY AND PUBLIC HEALTH EDUCATIONAL CONTENT**

American Academy of Neurology, Brain and Life Podcast. The Brain & Life® Podcast from the American Academy of Neurology (AAN) explores the intersection of brain health and neurologic disease. Weekly episodes highlight neurology/neuroscience experts, celebrity advocates, and people whose lives are affected by brain conditions to educate and inspire health awareness.

   1.   Correa, DJ; Nath, AR. (Hosts and editors) Introducing Brain & Life. [Audio podcast episode]. Episode 1. In Brain & Life. AAN. AAN. 3/3/2022

   2.   Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Bove, R. (Expert guest). Courtney Platt Dances Through Life with Multiple Sclerosis. [Audio podcast episode]. Episode 2. In Brain & Life. AAN. 3/31/2022

   3.   Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Oaklander, AL. (Expert guest). Part One: George Lopez on Finding Laughter Despite Neuropathy. [Audio podcast episode]. Episode 3. In Brain & Life. AAN. 4/7/2022

   4.   Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor) ; Oaklander, AL. (Expert guest). Part Two: George Lopez on Finding Laughter and

Prioritizing His Health. [Audio podcast episode]. Episode 4. In Brain & Life. AAN. 4/13/2022

5.    Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Aravamuthan, B. (Expert guest). Josh Blue Uses Humor to Ease the Stigma Around Cerebral Palsy. [Audio podcast episode]. Episode 5. In Brain & Life. AAN. 4/20/2022

6.    Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Dalmau, J. (Expert guest). Susannah Cahalan on Anti-NMDA Encephalitis and Her Journey to Diagnosis. [Audio podcast episode]. Episode 6. In Brain & Life. AAN. 4/27/2022

7.    Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor). Voices from the Multiple Sclerosis Community. [Audio podcast episode]. Episode 7. In Brain & Life. AAN. 5/4/2022

8.    Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Raffalli, P.; Barkoudah, E. (Expert guests). RJ Mitte on Living Confidently with Cerebral Palsy. [Audio podcast episode]. Episode 8. In Brain & Life. AAN. 5/11/2022

9.    Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Riviello, J. (Expert guest). Beth Usher on Life with Half a Brain. [Audio podcast episode]. Episode 9. In Brain & Life. AAN. 5/18/2022

10.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Williams, O. (Expert guest). Matt and Kanlaya Cauli on Rebuilding Life After Stroke. [Audio podcast episode]. Episode 10. In Brain & Life. AAN. 5/25/2022

11.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Seyedsadjadi, R. (Expert guest). Paralympian Jamal Hill on Winning Bronze with Charcot-Marie-Tooth. [Audio podcast episode]. Episode 11. In Brain & Life. AAN. 6/1/2022

12.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Greenberg, S. (Expert guest). Peter Frampton on Rockin' for Research to Cure Inclusion Body Myositis. [Audio podcast episode]. Episode 12. In Brain & Life. AAN. 6/8/2022

13.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Sirven, J. (Expert guest). Greg Grunberg on Raising Epilepsy Awareness. [Audio podcast episode]. Episode 13. In Brain & Life. AAN. 6/15/2022

14.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Parashos, S. (Expert guest). NBA Star Brian Grant Living On Time with Parkinson's. [Audio podcast episode]. Episode 14. In Brain & Life. AAN. 6/22/2022

15.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Digre, K (Expert guest). Outdoors Woman Crystal Gail Welcome on Nature and Chronic Pain. [Audio podcast episode]. Episode 15. In Brain & Life. AAN. 6/28/2022

16.  Correa, DJ. (Host and editor); Nath, AR. (co-host); Song S. (Expert guest). Timothy Omundson on Stroke Recovery and His Return to Television. [Audio podcast episode]. Episode 16. In Brain & Life. AAN. 7/6/2022

17.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Tempini, MG. (Expert guest). Barbara Corcoran on Becoming a Business Tycoon with Dyslexia. [Audio podcast episode]. Episode 17. In Brain & Life. AAN. 7/13/2022

18.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Harris, S. (Expert guest). Colors of Multiple Sclerosis with Artist Lindsey Holcomb. [Audio podcast episode]. Episode 18. In Brain & Life. AAN. 7/20/2022

19.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Gelfand, J (Expert guest). Karen Duffy on Making Peace with Neurosarcoidosis. [Audio podcast episode]. Episode 19. In Brain & Life. AAN. 7/27/2022

20.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Noble, J. (Expert guest). Journalist Greg O'Brien on Chronicling His Life with Alzheimer's. [Audio podcast episode]. Episode 20. In Brain & Life. AAN. 8/4/2022

21.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Halfer, D. (Expert guest). Nancy Davis' Race to Erase Multiple Sclerosis. [Audio podcast episode]. Episode 21. In Brain & Life. AAN. 8/10/2022

22.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Skylar-Scott, I. (Expert guest). Lauren Miller Rogen on Facing a Parent's Early-Onset Alzheimer's Diagnosis. [Audio podcast episode]. Episode 22. In Brain & Life. AAN. 8/17/2022

23.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor). Why Sleep Is Important for Brain Health. [Audio podcast episode]. Episode 23. In Brain & Life. AAN. 8/25/2022

24.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Stark, C. (Expert guest). Marilu Henner and the Mysteries of Memory. [Audio podcast episode]. Episode 24. In Brain & Life. AAN. 8/31/2022

25.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Levin, A. (Expert guest). Soledad O'Brien on Raising a Child with Hearing Loss. [Audio podcast episode]. Episode 25. In Brain & Life. AAN. 9/7/2022

26.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Amezcua, L. (Expert guest). Chef Mariana Orozco on Multiple Sclerosis and the Healing

Power of Food. [Audio podcast episode]. Episode 27. In Brain & Life.
AAN. 9/14/2022

27. Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Pantelyat,
A. (Expert guest). Billy McLaughlin on Life as a Musician with Focal
Dystonia. [Audio podcast episode]. Episode 28. In Brain & Life. AAN. 9/21/2022

28. Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor) ; Silvestri,
N. (Expert guest). Soap Opera Star Suzanne Rogers Brings Awareness to
Myasthenia Gravis. [Audio podcast episode]. Episode 29. In Brain & Life.
AAN. 9/29/2022

29. Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Ciede, M.
(Expert guest). Christina Zorich on the Joys and Struggles of Caregiving. [Audio
podcast episode]. Episode 30. In Brain & Life. AAN. 10/6/2022

30. Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Patel, C.
(Expert guest). Figure Skating Legend, Scott Hamilton on Finding Inspiration in
Hardship. [Audio podcast episode]. Episode 31. In Brain & Life. AAN. 10/13/2022

31. Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor);
Robinson, M. (Expert guest). Nora McInerny on Moving Forward with
Grief. [Audio podcast episode]. Episode 32. In Brain & Life. AAN. 10/20/2022

32. Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Kutcher,
J. (Expert guest) Professional Dancers on Connecting the Mind and Body for
Optimal Performance. [Audio podcast episode]. Episode 33. In Brain & Life.
AAN. 10/27/2022

33. Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Hessler,
A. (Expert guest). Brain Health for Women, Part One. [Audio podcast episode].
Episode 34. In Brain & Life. AAN. 11/3/2022

34. Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Wu, A.
(Expert guest). How American Ninja Warrior Jimmy Choi Rose Above
Parkinson's. [Audio podcast episode]. Episode 35. In Brain & Life.
AAN. 11/10/2022

35. Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Hessler,
A. (Expert guest). Brain Health for Women, Part Two. [Audio podcast episode].
Episode 36. In Brain & Life. AAN. 11/18/2022

36. Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Skylar-
Scott, I. (Expert guest). Listener Favorite: Lauren Miller Rogen on Facing a Parent's
Early-Onset Alzheimer's Diagnosis. [Audio podcast episode]. Episode 37.
In Brain & Life. AAN. Re-release 11/24/2022

37.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); San Luciano, M. (Expert guest). Rogers Hartmann on Beating Dystonia. [Audio podcast episode]. Episode 38. In Brain & Life. AAN. 12/1/2022

38.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Armand, C (Expert guest). Julia Easterlin on Being a Performer with Migraine. [Audio podcast episode]. Episode 39. In Brain & Life. AAN. 12/8/2022

39.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Goutman, S (Expert guest). Hop on a Cure for ALS with John Driskell Hopkins. [Audio podcast episode]. Episode 40. In Brain & Life. AAN. 12/15/2022

40.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Costello, F. (Expert guest). MasterChef Christine Ha on Adapting to Life with NMO. [Audio podcast episode]. Episode 41. In Brain & Life. AAN. 12/22/2022

41.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor). Best of 2022: This Year's Impactful Voices. [Audio podcast episode]. Episode 42. In Brain & Life. AAN. 12/29/2022

42.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Ramachandran, V.S.; Miller, BJ (Expert guests). BJ Miller on Guiding Chris Hemsworth Through a New Outlook on Life. [Audio podcast episode]. Episode 43. In Brain & Life. AAN. 1/5/2023

43.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor). Listener Questions: Restless Legs Syndrome, TBI, and Brain Surgery. [Audio podcast episode]. Episode 44. In Brain & Life. AAN. 1/12/2023

44.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Noch, E. (Guest and Expert). Switching Roles: A Neuro-oncologist Reflects on his Own Experience with a Brain Tumor. [Audio podcast episode]. Episode 45. In Brain & Life. AAN. 1/19/2023

45.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Urion, D (Expert guest). Bake Off Star Lizzie Acker on Showstopping Cakes through Neurodivergent Eyes. [Audio podcast episode]. Episode 46. In Brain & Life. AAN. 1/26/2023

46.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor). Exploring the Evolving Brain with Neuroscientist Joseph Jebelli. [Audio podcast episode]. Episode 47. In Brain & Life. AAN. 2/2/2023

47.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Goldman, A. (Expert guest). Actor Cameron Boyce's Legacy and Raising Awareness About SUDEP.    [Audio podcast episode]. Episode 48. In Brain & Life. AAN. 2/9/2023

48.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Kallmyer, B (Expert guest). The 'Humor and Heartache' of Caregiving with Filmmaker Michelle Boyaner. [Audio podcast episode]. Episode 49. In Brain & Life. AAN. 2/16/2023

49.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host). Food and Your Brain: What You Need to Know to Keep Your Brain Healthy. [Audio podcast episode]. Episode 50. In Brain & Life. AAN. 2/23/2023

50.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Jordan, J (Expert guest). Lawyer, Model Victoria Vesce Uses Her Platform for Brain Tumor Advocacy. [Audio podcast episode]. Episode 51. In Brain & Life. AAN. 3/2/2023

51.  Correa, DJ. (Host and editor); Nath, AR. (Co-host and Assoc. editor); Jaffee, M. (Expert guest). U.S. Soccer Legend Briana Scurry on Concussion and Mental Health. [Audio podcast episode]. Episode 52. In Brain & Life. AAN. 3/9/2023

52.  Correa, DJ. (Host and editor); Stark, C. (Expert guest). Memory and Your Brain, Explained. [Audio podcast episode]. Episode 53. In Brain & Life. AAN. 3/16/2023

53.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Schlaug, G. (Expert guest). Personal Trainer Javeno McLean on Helping Clients Find Physical and Emotional Strength. [Audio podcast episode]. Episode 54. In Brain & Life. AAN. 3/23/2023

54.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Zoghbi, H. (Expert guest). Journalist Richard Engel on Parenting a Child with Rett Syndrome. [Audio podcast episode]. Episode 55. In Brain & Life. AAN. 3/30/2023

55.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Okun, M. (Expert guest). From Obstacle to Opportunity: David Begnaud on Living with Tourette Syndrome. [Audio podcast episode]. Episode 56. In Brain & Life. AAN. 4/6/2023

56.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Day, G. (Expert guest). Author, Speaker Jackie Stebbins on Rebuilding Her Life After Autoimmune Encephalitis. [Audio podcast episode]. Episode 57. In Brain & Life. AAN. 4/13/2023

57.  Nath, AR (Host and Assoc. editor); Correa, DJ. (Editor and co-host); Ramachandran, V.S.; Miller, BJ (Expert guests). Special Bonus and Release: Physician BJ Miller's Recovery from Phantom Limb Pain. [Audio podcast episode]. Episode 58. In Brain & Life. AAN. 4/20/2023

# EXHIBIT 11-B

Petitioner's Appendix Page 104